# EXHIBIT A-2

وفي الاعتراض الخامس على تقرير الخبرة ذهب دفاع المحتكم ضدهما إلى أن التقرير في صفحته رقم 31 نص على أن الشركة المحتكمة لم تتخلف عن تنفيذ التزاماتها التعاقدية التي يتوقف تنفيذها على قيام المحتكم ضدها بتنفيذ التزاماتها بتشغيل خطوط الطيران أما باقي الالتزامات التي لم يرتبط تنفيذها بتشغيل خطوط الطيران فقد قامت المحتكمة بتنفيذها. وأورى دفاع المحتكم ضدهما تعليقا على ما أورده الخبير أنه لم يتناول دفاعهما بالمذكرة المقدمة أمام الخبير ذاته بتاريخ 2023/4/30 وذلك فيما يخص الكفالة البنكية التي كان يتعين على المحتكمة سدادها بتاريخ 2001/3/15 إنفاذا لملحق عقد الوكالة في البند 24 والذي جاء بفقرتها الأول النص على التزام الوكيل بتقديم خطاب ضمان قيمته مائة ألف دولار أمريكي. وهو ما لم تقم المحتكمة به حتى إلغاء الوكالة في 2005/11/17, إلا أن الخبير التفت عن هذا الدفاع.

وفي الاعتراض السادس أورد المحتكم ضدهما أن الخبير أيضا لم يتناول دفاع المحتكم ضدهما المتعلق بتاريخ إنهاء عقد الوكالة في2005/11/17 حيث كان يتعين على الخبرة أن تبحث المستندات المقدمة من المحتكمة ـإن صحت الصور الضوئيةـ حتى تاريخ إنهاء الوكالة وليس حتى العام 2013.

وفي الاعتراض السابع بعنوان"الشركة الشقيقة" قال دفاع المحتكم ضدهما أن تقرير الخبرة استعرض وفحص مستندات الشركة المحتكمة فقط وتوصيفها وإبرازها وكأنها أصول وليست صور ضوئية وقام بتكرار عبارة الشركات الشقيقة لعدد 64 مرة وهي عبارة من عندياته عندما وجد الخبير أن المحتكم ضدها تتمسك بدفاعها بأن الصور الضوئية لا تخصها ولكن تخص شركات أخرى لا علاقة لها بموضوع عقد الوكالة الملغي, وأورد دفاع المحتكم ضدهما أنه قدم عدد ثلاثة عشر حافظة أمام الخبرة منها أصل السجل التجاري لشركة الحصان والذي خلا من وجوـأي شركات شقيقة أو أم إلا أن الخبير التفت عن هذا الدفاع وتلك المستندات.

وفي الاعتراض الثامن بعنوان العلاقة بين الطرفين قال دفاع المحتكم ضدهما أنه ردا على ما أسماه الخبير العلاقة بين الطرفين ص 4 من التقرير فقد أثبت نقطة هامة بخصوص ما أسماه وثائق والخاصة بالمستندات التي تحكم العلاقة بين الطرفين وأثبت حرصه على بيان أنه لم يتم جحدها من أطراف الدعوى بالرغم من أنها صور ضوئية وكأنه سيطرحها جانبا إذا ما تم جحدها من أي من الطرفين كما قام بالتعامل مع مستندات المحتكم ضدها وهو ما يدل على تناقض قناعة الخبير في الدعوى. كذلك قال دفاع المحتكم ضدهما أن الخبير تجاهل دفاعهما بإنعدام وبطلان الوثائق الثلاثة المحددة للعلاقة بين الطرفين وهو الدفاع الذي سبق التمسك به في المذكرات السابقة, وأن هذا الدفاع وإن كان في ظاهره دفاع قانوني إلا أنه يدخل في اختصاص الخبير لأنه يدخل ضمن قانون الشركات وتأسيسها واكتسابه الشخصية الاعتبارية.

وتحت الاعتراض التاسع قال دفاع المحتكم ضدهما أنه ردا على ما جاء بتقرير الخبرة ص 5 تحت بند الالتزامات المحددة بعقد الوكالة المتفق عليه في 2001/1/30 عرض الخبير للإلتزامات التي تقع على المحتكمة وجاء بعبارة قد أقر بهذه الالتزامات المحتكم ضدهما في المذكرة المقدمة للرد على بيان الدعوى التحكيمية دون التعرض لما قام المحتكم ضدهما بالتعليق عليه في مذكرة 2023/4/30 والتي جاء بها ذات الالتزامات الواردة في عقد الوكالة الملغي وأن الخبرة تتجاهل أو لا تعترف بأي

**151**

مستند مقدم من المحتكم ضدهما يفيد إخلال المحتكمة بالتزاماتها بما يؤكد الموقف غير الحيادي للخبرة والانحياز للشركة المحتكمة.

وتحت عنوان الاعتراض العاشر ذهب دفاع المحتكم ضدهما إلى أن الخبير المنتدب استخدم أيضا ذات العبارات الاستفزازية على غير الحقيقة بالصفحة رقم 8 من التقرير تحت عنوان التزامات الشركة المحتكمة وفقا لما ورد بملحق العقد المؤرخ 2001/3/15 في شأن ما نسبه إلى المحتكم ضدهما من إقرارات متجاهلا ما ورد بدفاع المحتكم ضدهما المقدم بمذكرة دفاعهما المقدمة أمام الخبيرة بتاريخ 2023/4/30.

وذهب المحتكم ضدهما في الاعتراض الحادي عشر على تقرير الخبرة, إلى أن التقرير جاء به في ص 13 من خلال الإنذارات التي قدمتها الشركة المحتكم ضدها أن الشركة المحتكمة أكدت فيها تنفيذ كافة التزاماتها في عقد الوكالة وأن بينها قيام المحتكمة تأسيس شركة للنقل والسياحة باسم هورس للسياحة والسفر لتنفيذ الوكالة و إعادة بناء وتأسيس المقر الخاص بالخطوط الجوية العراقية سدادها كافة المستحقات التي كانت على الخطوط الجوية العراقية واستخراج التراخيص اللازمة للتشغيل وسداد أجور العاملين بكل هذه المكاتب للخطوط الجوية العراقية, وأورى دفاع المحتكم ضدهما أنه باستعراض كل هذه البنود يتبين أن خبير الدعوى جاء باستنتاجات من عندياته مخالفة لما هو ثابت بمذكرة دفاع المحتكم ضدهما ومستنداتهما, وذلك على التفصيل الذي أورده المحتكم ضدهما بالمذكرة والذي اطلعت عليه هيئة التحكيم وألمت به.

وفي الاعتراض الثاني عشر أورد دفاع المحتكم ضدهما أن الخبير عند استعراض وفحص صور المستندات المقدمة من المحتكمة وخاصة عقود الإيجار قام باستخدام عبارة المستخدمة أو المستأجرة لنشاط الوكالة العامة وكررها عدة مرات في حين أن صور عقود الإيجار المقدمة من المحتكمة لم يثبت فيها هذه العبارة ويكون الخبير قد جاء بها من عندياته, بما لا يصلح التقرير دليلا يمكن الأخذ به.

وفي الاعتراض الثالث عشر قال دفاع المحتكم ضدهما أن الخبير بصفحة 30 من تقريره أورد أنه اطلع على وفحص المستندات وانتهى إلى أن المحتكم ضدها  خالفت التزاماتها التعاقدية لأنها أصدرت بتاريخ 2004/12/2 قرارا بإنهاء الوكالة ولم تنسب فيه إلى المحتكمة أية مخالفات تعاقدية ثم عدلت عن الإنهاء وإعادة تفعيل الوكالة بتاريخ 2005/8/29 ثم عادت إلى إصدار قرار بإلغاء الوكالة ثم عدلت عن قرار الإنهاء وأصدرت قرار بإيقافها. وأورى دفاع المحتكم ضدهما أن هذا مردود عليه بأن الخبير لم يطلع على ما جاء بدفاع المحتكم ضدهما بالمذكرات المقدمة في 1/27/ 2014 أو في 2014/6/10 حيث سبق الرد فيها تفصيلا على ما انتهى إليه الخبير في هذا الشأن, ثم أورى دفاع المحتكم ضدهما في إعادة ما سبق وأن أورده في مذكراته السابقة على ما أورده الخبير في هذا الشأن, وهو ما اطلعت عليه هيئة التحكيم والمت به.

وفي الاعتراض الرابع عشر قال دفاع المحتكم ضدهما أن الخبير انتهى في نتيجته النهائية إلى ترك الأمر في الفصل في الدفوع القانونية المبداه من المحتكم ضدهما, في حين أنه لم يترك أملا الدفوع

القانونية أو جحد الصور الضوئية إلى هيئة التحكيم بل فصل فيها وتعرض لها وفي المقابل التفت عن دفاع المحتكم ضدهما الذي لم يتعرض له من قريب أو بعيد, بما يكون معه التقرير مجحفا بحقوق المحتكم ضدهما.

وفي الاعتراض الخامس عشر ذكر دفاع المحتكم ضدهما أن التقرير أورد في النتيجة النهائية ما نصه" وفي ضوء فحص ودراسة دلالة المذكرات وصور المستندات المقدمة من الطرفين أمام هيئة التحكيم والمرفقة بخطاب التكليف بالخبرة والمذكرات وصور المستندات تبين لنا التالي: أن سبب قرار إنهاء الوكالة ثم قرار إيقاف الوكالة من جانب الشركة المحتكم ضدها الأولى لا يرجع إلى أي خطأ منسوب إلى المحتكمة ولكن يرجع إلى ما أبدته الشركة المحتكم ضدها من رغبتها في إنهاء العقد بناء على توجهات الدولة العراقية الجديدة ..إلى أخر ما جاء بتقرير الخبرة. وقال دفاع المحتكم ضدهما أن هذا مردود عليه بما سبق إيضاحه في المذكرة المقدمة بتاريخ 2014/1/27 أمام هيئة التحكيم, وأعاد دفاع المحتكم ضدهما ما سبق من دفاع بتلك المذكرة التي سبق وأن اطلعت عليها هيئة التحكيم أيضا.

وفي الاعتراض السادس عشر والمعنون ما فات من كسب أورد دفاع المحتكم ضدهما أن الخبيرة عن استعراضها لبند ما فات المحتكم من كسب بالاعتماد الكامل على التقرير المحاسبي المقدم من مراقب الحسابات للشركة المحتكمة وأيد كل ما ورد به ملتفتا على التقرير المحاسبي المقدم من المحتكم ضدها من مكتب الأستاذ/ مجدي حشيش والذي لم يشر إليه من قريب أو بعيد في حين أن هذا التقرير المحاسبي الأخير سبق إفراغه في مذكرات دفاع المحتكم ضدهما المقدمة بتاريخ 2014/6/10, 2023/4/30. ثم أعاد دفاع المحتكم ضدهما ما ورد من دفاع في هذا الشأن بالمذكرات السالف الإشارة إليها والتي اطلعت عليها هيئة التحكيم, منتهيا إلى بطلان تقرير الخبرة وطلب الالتفات وعدم الأخذ به واستبعاده نهائيا.

وتحت عنوان ما لحق من كسب ورد الاعتراض السابع عشر للمحتكم ضدهما على تقرير الخبرة حيث قال الدفاع أن التقرير في هذا الشأن جاء معتمدا كليا على ما قدمته المحتكمة من صور ضوئية لمستندات لا تخص المحتكمة وإنما تخص شركات أخرى ليس لها علاقة بعقد الوكالة موضوع الدعوى التحكيمية وقام بإعادة تفريغ ما جاءت به المحتكمة من بيان لصور المستندات المقدمة منها وقام بتأييدها دون نقاش أو تبرير حسابي صحيح ودون أن يتعرض للتقرير المقدم من المحتكم ضدهما الصادرعن مكتب الأستاذ/ مجدي حشيش بما يكون معه ما انتهى إليه الخبير في تقريره جديرا بالالتفات عنه لكون النتيجة التي توصل إليها الخبير واردة على غير أساس علمي ومخالفة للقواعد المحاسبية والقانونية.

هذا وقد اختتم المحتكم ضدهما دفاعهما في هذه المذكرة الثانية بالطلبات السالف بيانها.

كذلك فقد طالعت هيئة التحكيم المذكرة الثالثة المقدمة من الوكيل القانوني للمحتكم ضدهما الأستاذ/ أحمد الدريني المعنونة "الدفاع الموضوعي" والتي وقعت في عدد 28 ورقة اختتمها بالطلبات الأتية: أولا:-عدم قبول التحكيم شكلا وبطلان إجراءاته لمخالفة تشكيل هيئة التحكيم لشرط التحكيم وللقوانين والأعراف الدولية.

153

ثانيا:-سقوط حق الشركة المحتكمة في اللجوء للتحكيم نفاذا لعقد الوكالة محل النزاع .

ثالثا:-سقوط حق الشركة المحتكمة في إقامة الدعوى لمرور أكثر من سنتين على انتهاء العلاقة التعاقدية.

رابعا:-بطلان عقد الوكالة الملغي لقيامه على إرادة معيبة .

خامسا:-عدم أحقية الشركة المحتكمة في طلباتها التي تدعيها لعدم اتفاقها مع القانون والواقع.

سادسا:-رفض كافة طلبات التعويض المطالب بها من الشركة المحتكمة .

سابعا:-عدم قبول الدعوى لعدم تقديم أصول المستندات .

ثامنا:-رفض الدعوى لخلوها من مستندات تؤيد إدعاء الشركة المحتكمة .

تاسعا:-عدم قبول الدعوى بالنسبة للمحتكم ضده الثاني لتمتعه بالحصانة الدبلوماسية نفاذا لاتفاقية فيينا للعلاقات الدبلوماسية.

عاشرا:-عدم إلزام المحتكم ضدهما بمقابل العمولة التي تدعيها الشركة المحتكمة لعدم استحقاقها.

حادي عشر:-عدم إلزام المحتكم ضدهما برد أي مبالغ يدعي المحتكم بأنها قيمة نفقات فعلية.

ثاني عشر:-عدم إلزام المحتكم ضدهما بأي فوائد بنكية.

ثالث عشر:-إلزام الشركة المحتكمة بسداد كل تكاليف التحكيم وأمانة ومصروفات التحكيم وأتعاب المحكمين وأتعاب محامين المحتكم ضدهما.

هذا وقد أحال دفاع المحتكم ضدهما إلى دفاعهما السابق المقدم بمذكرات دفاعهما السابقة أمام هيئة التحكيم وأمام الخبرة بتواريخ 2014/1/27 و 2014/6/10 و 2023/4/30 وتمسك بالدفوع التالية:

1ـ بطلان إجراءات التحكيم لمخالفة تشكيل هيئة التحكيم لشرط التحكيم وللقوانين والأعراف الدولية.

2ـ جحد كافة الصور الضوئية المقدمة من الشركة المحتكمة.

3ـ رفض الدعوى لعدم تقديم المحتكمة أصول المستندات وتقديم مستندات باللغة الأجنبية الغير مترجمة ترجمة معتمدة إلى اللغة العربية.

4ـ سقوط حق الشركة المحتكمة في اللجوء للتحكيم نفاذا لعقد الوكالة الملغي.

5ـ بطلان عقد الوكالة الملغي لقيامه على إرادة معيبة.

6ـ أن محضر اجتماع 2005/8/29 ليس عقدا.

7ـ عدم سريان عقد الوكالة المنعدم حتى تاريخ الإلغاء.

8ـ عدم استحقاق الشركة المحتكمة لأي عمولة.

وذلك استنادا إلى ذات الأساس الذي سبق وأن أورده المحتكم ضدهما في مذكراتهم السابقة والتي اطلعت عليها هيئة التحكيم.

ـ هذا وقدم المحتكم ضدهما رفق مذكرات الدفاع الثلاثة سالفة البيان حافظة مستندات طالعتها هيئة التحكيم والمت بما ورد بها, وقد اشتملت على المستندات التالية:

المستند الأول: صورة طبق الأصل من محضر الاجتماع المؤرخ في 2005/9/27 بين سلطات الطيران المدني المصري والطيران المدني العراقي لبدء تشغيل الخطوط الجوية العراقية وممارسة نشاطها .

**154**

المستند الثاني: صور طبق الأصل من كتاب صادر من سفارة جمهورية العراق بالقاهرة إلى وزارة النقل العراقية تشير فيه إلى اتصالها مع سلطات الطيران المدني المصري وعدم ممانعته في تشغيل خط جوي مباشر بين بغداد والقاهرة.

المستند الثالث: صور طبق الأصل من كتاب صادر من وزارة الخارجية العراقية إلى وزارة النقل العراقية يشير إلى الكتاب السابق لتزويدهم بالمستندات المطلوبة لبدء تشغيل رحلات الخطوط الجوية العراقية بين القاهرة وبغداد.

هذا وقد استدل المحتكم ضدهما من خلال تلك المستندات على عدم قيام المحتكمة بأي إجراءات لاستخراج تراخيص الطائرات لبدء التشغيل بما يثبت عدم ادعاءها أنها هي التي قامت باستخراج التراخيص.

ـ وبتاريخ 2023/6/20 أيضا أودع مكتب الدكتور/ محمد مصطفى حمودة المحامي والوكيل القانوني أيضا للمحتكم ضدهما مذكرة بدفاعهما وعدد سبع حوافظ مستندات طالعتهم الهيئة, وتبين من مطالعة المذكرة أنها مكونة من 103 صفحة بدأت بعنوان الوقائع التي أحال فيها دفاع المحتكم ضدهما إلى سائر أوراق الدعوى التحكيمية ومذكرات الدفاع السابق تقديمها من المحتكم ضدهما منعا للتكرار. وتحت عنوان الدفاع دفع المحتكم ضدهما بالدفوع التالية:

ـ تحت عنوان أولا دفع المحتكم ضدهما بسقوط اتفاق التحكيم الوارد بالبند السادس عشر من الوريقة المزعوم أنها اتفاقية وكالة عامة مؤرخة 2001/1/30 وذلك لانتهاء مدة التحكيم الأصلية والإضافية المتفق عليها بين طرفي التحكيم بمحضر الجلسة الإجرائية الأولى المؤرخ 2013/11/28 دون صدور الحكم المنهي للخصومة. وقد أورد دفاع المحتكم ضدهما شرحا لهذا الدفع نصوص المواد 8 و22 و 45 من قانون التحكيم المصري 27 لسنة 1994 بشأن التحكيم في المواد المدنية والتجارية ألحق بها بعض أحكام قال أنها صادرة عن محكمة النقض المصري ومحكمة استئناف القاهرة, ثم أورى دفاع المحتكم ضدهما بعدها أنه لما كان الثابت من الأوراق أن طرفي التحكيم اتفقا بمحضر الجلسة الإجرائية الأولى المنعقدة بتاريخ 2013/11/28 على أن قانون التحكيم المصري هو الواجب التطبيق على إجراءات التحكيم, كما اتفقا على أن مدة التحكيم 12 شهرا تبدأ من تاريخ تلك الجلسة مع عدم الإخلال بحق هيئة التحكيم في مد المدة لستة أشهر أخرى بما يعني أن مدة التحكيم 18 شهرا تبدأ من تاريخ جلسة 2013/11/28, وأنه بحساب مدة التحكيم فإنه يتضح أنه قد تجاوزت المدة المتفق عليها دون صدور الحكم المنهي للخصومة مع الأخذ في الاعتبار استقطاع مدد الوقف التي اعترت الخصومة, فضلا عن أن الأطراف لم يتفقا على مد التحكيم لا صراحة ولا ضمنا بعد انتهاء المدة الإضافية الصادر بها قرار هيئة التحكيم في 2015/1/15 بمد مدة التحكيمي ستة أشهر أخرى, وهو ما تمسكت به المحتكم ضدها بجلسة 2023/3/19 أمام الخبرة, وقدمت بشأنه مذكرة بدفاعها أثبتت فيه هذا الدفع, فضلا أيضا عن أن هيئة التحكيم متنحية عن المهمة التحكيمية منذ عام 2017 بكامل تشكيلها.

ـ وتحت عنوان ثانيا دفع المحتكم ضدهما ببطلان تشكيل هيئة التحكيم الحر في الدعوى التحكيمية المقامة من الشركة المحتكمة لسبق تنحي رئيس هيئة التحكيم وكذلك تنحي المحكم المسمى عن

155

الشركة المحتكم ضدها وعدم تسميتها محكم جديد عنها يختار بالتشاور مع المحكم المسمى عن الشركة المحتكمة رئيسا لهيئة التحكيم وعدم صلاحية أعضاء هيئة التحكيم لنظر الدعوى التحكيمية لافتقادهم مبدأي الحيدة والاستقلال اللازمين لمباشرة مهمتهم التحكيمية. وشرحا للدفع أورد دفاع المحتكم ضدهما نصوص المواد 16و17و21 من قانون التحكيم المصري أعقبه بعض أحكام قال أنها لمحكمة النقض المصرية ثم أورى من خلال ذلك أنه لما كان الثابت من الأوراق تنحي كل من المحكم المسمى عن الشركة المحتكم ضدها وكذلك رئيس هيئة التحكيم عن مهمتهما التحكيمية ومن ثم فإنه لا يجوز للمحكم المسمى عن الشركة المحتكم ضدها المتنحي الدكتور/ عبد الحميد الأحدب أن يشارك في اختيار رئيس هيئة التحكيم وهو ما تمسكت به المحتكم ضدها في جلسة 2023/2/16, وأنه لايقدح في ذلك ما أورده رئيس هيئة التحكيم في العديد من المخاطبات والمراسلات أن الشركة المحتكم ضدها أعادت اختياره بتوجيهها إنذارا قضائيا له بتاريخ 2022/4/18 يستفاد منه رضائها باختياره رئيسا لهيئة التحكيم بعد تنحيه لأن هذا الإنذار لم يتضمن صراحة أو ضمنه ذلك, وكان موجها لغرض محدد هو أن الشركة المحتكم ضدها قامت بتغيير موطنها القانوني لضمان العلم بوصول أية إعلانات قضائية إليها. كما أن المحتكم ضدها لم تقم بتسمية محكم عنها بعد تنحي محكمها الدكتور/ عبد الحميد الأحدب وأن اختيار المحكم المرجح لا يكون إلا بتسمية من محكمي الطرفين. وأضاف المحتكم ضدهما أن الثابت من الأوراق والمذكرات المقدمة من أعضاء هيئة التحكيم في الدعاوى القضائية التي دارت في فلك الدعوى التحكيمية المعروضة أن أعضاء هيئة التحكيم صاروا خصوما في تلك الدعاوى القضائية وقدمت منهم عشرات المذكرات أبدوا فيها آراء في النزاع التحكيمي كما تناولوا الاتهامات التي وجهت إليهم من جانب المحتكمة واحتفظوا بحقهم المادي والأدبي في الرجوع عليها بعد تنحيهم نهائيا. ثم استعرض دفاع المحتكم ضدهما بعض المواقف التي قال أنها حدثت أثناء الدعاوى القضائية التي أقامتها الشركة المحتكمة ضد رئيس وأعضاء هيئة التحكيم -طالعتها الهيئة وألمت بها-,منتهيا إلى التمسك بالدفع ببطلان إعادة تشكيل الهيئة وعدم صلاحية أعضائها لنظر الدعوى التحكيمية وافتقادهم الحيدة والاستقلال.

ـ وتحت عنوان ثالثا, فقد دفع المحتكم ضدهما ببطلان كافة إجراءات استئناف سير الدعوى التحكيمية والإجراءات السابقة على جلسة 2023/2/16 والإجراءات التي تمت بتلك الجلسة بما في ذلك القرار الصادر بندب خبير في الدعوى التحكيمية وذلك لثبوت تنحي هيئة التحكيم بكامل تشكيلها وعدم جدوى استمرار الدعوى التحكيمية بتنحيهم ووجوب اتخاذ إجراءات جديدة من قبل طرفي التحكيم بتسمية محكم جديد عن كل طرف منهما وقيام المحكمين المسميين عنهما باختيار رئيس هيئة التحكيم ومباشرة التحكيم بإجراءات يتفق عليها طرفي التحكيم. وبمطالعة هيئة التحكيم لما أورده المحتكم ضدهما من شرح لهذا الدفع استبان لها أنه لم يخرج عن سياق ما استند إليه المحتكم ضدهما في بيان وشرح الدفع السابق الذي اطلعت عليه الهيئة وألمت به.

ـ كما دفع المحتكم ضدهما أيضا وتحت البند رابعا, بعدم قبول الدعوى التحكيمية لرفعها على غير ذي صفة بالنسبة للسيد/ وزير النقل العراقي بصفته لعدم امتداد اتفاق التحكيم إليه. وهو الدفع الذي سبق وأن أبداه دفاع المحتكم ضده الثاني في المذكرات السابقة والذي أورده الدفاع أيضا بالمذكرة

156

الماثلة استنادا إلى ذات السياق الذي أبدي فيه الدفع في المذكرات السابقة التي سبق وأن طالعتها هيئة التحكيم وألمت بها.

ـ كذلك تمسك المحتكم ضدهما تحت البند خامسا بالطعن بالتزوير على الصور الضوئية للمستندات التي حوتها الخمسة كراتين المقدمة من الشركة المحتكمة بملف الدعوى التحكيمية وأبديا أنهما يعتصمان بطلب وقف الدعوى التحكيمية لاتخاذ إجراءات الطعن بالتزوير عليها لحين الفصل فيه مستندين في هذا الطلب إلى نصوص المواد 12و15و29 من قانون المرافعات والمادة 46 من قانون التحكيم المصري وأورى دفاع المحتكم ضدهما أن المحتكم قدمت عدد خمس كراتين لصور ضوئية من مستندات تم جحدها من المحتكم ضدهما ولم تقدم المحتكمة أصلها رغم مطالبة المحتكم ضدهما لها بذلك, ولازالت تصر على تقديم الأصول لا سيما وأن تقرير الخبرة المودع في الدعوى قد اعتمد في نتيجته على هذه المستندات المجحودة والغير مقدم أصلها بما يعد نكول المحتكمة عن تقديم أصول المستندات شاهدا من شواهد تزويرها لأنها إن لم تكن مزورة بطريق الإصطناع لبادرت المحتكمة بتقديمها فضلا عن أن هيئة التحكيم هي من أقرت بارتكاب الشركة المحتكمة لجرائم التزوير في المستندات وسرد المحتكم ضدهما بعض الوقائع قالا أنها حدثت في أثناء دعوى العزل رقم 3 لسنة 132 ق استئناف القاهرة. وأورى دفاع المحتكم ضدهما ما أفادا بأنه شواهد التزوير:

1ـ فقال المحتكم ضدهما بأن المحتكمة وجهت إنذارا بتاريخ 2006/3/18 إلى المحتكم ضدها تطالبها بسداد مبلغ 15 مليون جنيه مصري قيمة المصروفات التي تكبدتها بالإضافة إلى مبلغ 10 مليون مصري كتعويض عن الأضرار الأدبية والمادية التي لحقت بها من جراء إنهاء الوكالة دون إرفاق أية مستندات تؤيد صرف هذه المبالغ أو الأقل منها جزءا. 2ـ كما قالا بأنه بتاريخ 2006/4/19 تم عقد اجتماع بين بعض مسئولي الشركتين وورد به أنه"قرر الطرفان الاجتماع يوم الأربعاء 2006/4/19 لمناقشة أوجه الخلاف التي ظهرت فيما يتعلق بإنهاء الوكالة ... وتم الاتفاق على ما يلي: ـ قيام شركة هورس بإعداد تفصيلات المبالغ المطالب بها وما يؤيدها من مستندات وذلك خلال عشرة أيام , ـ سوف تقدم الخطوط الجوية العراقية في الاجتماع وجهة نظرها في المبالغ الواردة بالتفصيلات لتحديد مقدار المطالبة وعرضت شركة هورس للسياحة مناقشة الحلول الوسط المتاحة لاستمرار العلاقة من عدمه. ـ ستقوم شركة الخطوط الجوية العراقية بإرسال المخالفات المدعاة إلى شركة هورس للسياحة ..". ولم تقم الشركة المحتكمة بإرسال المستندات الخاصة بتفصيلات المبالغ التي تطالب بها إلى الشركة المحتكم ضدها سواء خلال المدة سالفة الذكر أو بعدها. 3ـ بتاريخ 2006/5/13 وجهت المحتكمة إنذارا إلى المحتكم ضدها أشارت فيه إلى أنها بذلك جهودا للحصول على تراخيص إعادة التشغيل وقد أنفقت في سبيل تجهيز مكتب الشركة ما يتجاوز15 مليون دولار وأوردت نصا في حالة تعسف المنذر إليه في إنهاء الوكالة يتعين على المنذر إليه سرعة سداد 15 مليون دولار أمريكي قيمة المصروفات التي قام المنذر بتكبدها وكذلك مبلغ 10 مليون دولار كتعويض عن الأضرار المادية والمعنوية التي أصابت المنذر وهو ما يبين منه أن المحتكمة تحول مطالباتها من الجنية إلى الدولار بالإضافة إلى أن بنود أخرى أضافتها في الإنذار الثاني في أقل من شهرين فضلا عن أن الإنذارين لم يتضمنا أية مستندات تفيد الصرف.4ـبتاريخ 2008/9/7 وبعد أكثر من عامين على الإنذار الأول وجهت المحتكمة إنذارا آخر تمهد فيه إلى رفع سقف مطالباتها بشكل غير مباشر بادعائها بنود صرف أخرى لم يرد بشأنها أية

157

إشارة في الإنذار الأول.5ـأن المحتكمة وجهت إنذارا بتاريخ 2008/11/15 تضمن رفع سقف مطالباتها المالية إلى 28 مليون دولار أمريكي ورفعت التعويض إلى 70 مليون دولار أمريكي عن الأضرار الأدبية ليصل مجموع ما تطالب به إلى 98 مليون دولار أمريكي.6ـقررت المحتكمة بعد أكثر من ست سنوات على إنهاء العقد رفع دعواها التحكيمية لتقوم بإيداع بيان الدعوى التحكيمية طالبة في ختامه مبلغ 103666858 دولار أمريكي بالإضافة إلى مبلغ 100000000 دولار تعويض عن النهاء التعسفي ومبلغ 497096579 دولار قيمة عمولات, ومبلغ 500000000 دولار أمريكي تعويض عن الأضرار الأدبية, بالإضافة إلى إلزامها بالفوائد 11% ومصروفات التحكيم.7ـيتضح مما سبق التباعد غير المعقول بين المبالغ التي طالبت بها الشركة المحتكم ضدها بموجب الإنذارات وبين الواردة ببيان الدعوى التحكيمية. إذ لا تناسب بينهما مطلقا بما يجزم بقيام المحتكمة باصطناع المستندات على خلاف الحقيقة لتخدم بها مطالبها غير المشروعة.8ـقررت المحتكمة زيادة مطالباتها المالية إلى خمسة أضعاف ليصل ما تطالب به إلى 5 مليار دولار أمريكي على النحو الوارد بمذكرة تعديل الطلبات.9ـأن ما يؤكد اصطناع المستندات أنها غير ثابتة بوجه رسمي وأحالت دفاع المحتكم ضدهما إلى تقرير الخبير الحسابي المقدم منهاما وهو تقرير الأستاذ/ مجدي حشيش الذي انتهى إلى عدم صحة الأغلبية العظمي من المستندات المقدمة من الشركة المحتكمة. 10ـ تعمد الخبير الحسابي تجاهل التقرير الحسابي المقدم من المحتكم ضدها وكأنه غير مقدم في الدعوى رغم جوهريته وما به من رأي بشأن اصطناع المحتكمة للمستندات.

وتمسك المحتكم ضدهما بالطعن بالتزوير على المستندات ووقف الدعوى التحكيمية لحين الفصل في إدعاء التزوير باعتبارها مسألة أولية للفصل في موضوع النزاع.

ـ وتحت عنون سادسا دفع المحتكم ضدهما ببطلان التقرير المقدم من الخبير للأوجه الأتية: الوجه الأول أن التقرير عول في نتيجته على مستندات عبارة عن صور ضوئية لا أصل لها وغير موجود. الوجه الثاني أن تقرير الخبير عول في نتيجته النهائية على مستندات مقدمة من المحتكمة محررة بلغة أجنبية غير مترجمة ترجمة معتمدة باللغة العربية. الوجه الثالث,أنه عول في نتيجته النهائية على مستندات مقدمة من المحتكمة غير صحيحة. الوجه الرابع هو خلو التقرير نهائيا من أي بحث فني أو محاسبي بل أنصب على نقل وفحص لصور المستندات من التقريرين الصادرين بناء على طلب الشركة المحتكمة المقدمين بأوراق الدعوى التحكيمية, وهو ما يخرج الخبرة عن نطاقها الفني ويبطل التقرير للفساد في الاستدلال. الوجه الخامس وهوالاستخلاص الخاطئ فيما انتهى إليه الخبير من أن إنهاء الوكالة ثم إيقافها لا يرجع إلى خطأ منسوب إلى المحتكمة ولكن يرجع إلى الشركة المحتكم ضدها من رغبتها في إنهاء العقد بناء على توجهات الدولة العراقية الجديدة. الوجه السادس وهو تجاوز الخبير المنتدب حدود المأمورية وتعرض بالفصل في مسألة قانونية يمتنع عليه كفني التعرض لها وإبداء رأيه فيها كونها من اختصاص هيئة التحكيم وهي مسألة سبب إنهاء العقد وأن الشركة المحتكمة قامت بتنفيذ التزاماتها التعاقدية. الوجه السابع وهو تجاوز الخبير المنتدب حدود المأمورية المكلف بها وقام بتحويل المبالغ التي انتهى إليها في تقريره إلى تقويمها بالدولار دون طلب منه الهيئة. الوجه الثامن تناقض وتضارب تقرير الخبرة فيما انتهى إليه من نتائج.

وانتهى دفاع المحتكم ضدهما استنادا إلى ما سبق من أوجه اعتراضات على تقرير الخبرة إلى طلب بطلان التقرير .

وتحت البند سابعا والثامن دفع المحتكم ضدهما ببطلان الاتفاقات التي تستند إليها المحتكمة بطلانا مطلقا , وبسقوط الدعوى بالتقادم, وبمطالعة الهيئة لهذين الدفعين تبين أنهما يقوما على ذات الأساس القانوني لذات الدفعين والسابق إيراده بمذكرات المحتكم ضدهما السابقة.

وتحت عنوان تاسعا الرد على مزاعم المحتكمة الواردة في دعواها التحكيمية أحال دفاع المحتكم ضدهما الوارد في هذه المذكرة إلى ما تضمنته مذكرة الدكتور/ فتحي والي المودعة بملف الدعوى ثم اتبع دفاع المحتكم ضدهما هذه الإحالة بالرد على ما قالته المحتكمة في شأن انتفاء الخطأ في جانبها وكذا ما قالته بشأن توافر الخطأ المفترض في جانب المحتكم ضدهما وعلى ما قالته بشأن الخطأ الجسيم في إنهاء العقد ثم إيقافه بالإرادة المنفردة وكذا الرد على ما قالته المحتكمة بشأن خطأ المحتكم ضدها الأولى في الالتزام بإعطاء المعلومات والأدوات اللازمة لأداء الوكيل لعمله, وكذلك الرد على ما قالته المحتكمة بشأن الاعتداء على نطاق الوكالة وبعدم صرف مستحقاتها وإطالة أمد التقاضي في التسوية الودية والتعرض لسمعتها والرد أيضا على ما قالته المحتكمة في شأن الأخطاء التي ارتكبت في المدة المتفق عليها لتنفيذ العقد .

ـ البند العاشر من المذكرة وتحت عنوان عدم قيام المسئولية العقدية في جانب المحتكم ضدها الأولى أحال دفاع المحتكم ضدهما إلى مذكرة الدكتور/ فتحي والي في هذا الشأن ثم تناول الدفاع بعض النقاط الأخرى التي لا تخرج عن دفاع المحتكم ضدهما السابق في هذا الشأن .

هذا وقد اختتم المحتكم ضدهما دفاعهما في المذكرة بالطلبات الأتية:

أولا: سقوط اتفاق التحكيم وذلك لانتهاء مدة التحكيم الأصلية والإضافية المتفق عليها بين طرفي التحكيم دون صدور الحكم المنهي للخصومة.

ثانيا: بطلان تشكيل ببطلان تشكيل هيئة التحكيم الحر في الدعوى التحكيمية المقامة من الشركة المحتكمة لسبق تنحي رئيس هيئة التحكيم وكذلك تنحي المحكم المسمى عن الشركة المحتكم ضدها وعدم تسميتها محكم جديد عنها يختار بالتشاور مع المحكم المسمى عن الشركة المحتكمة رئيسا لهيئة التحكيم وعدم صلاحية أعضاء هيئة التحكيم لنظر الدعوى التحكيمية لافتقادهم مبدأي الحيدة والاستقلال اللازمين لمباشرة مهمتهم التحكيمية وبطلان كافة إجراءات استئناف سير الدعوى التحكيمية وكافة الإجراءات والقرارات الصادرة عن الهيئة.

ثالثا: وقف الدعوى التحكيمية تعليقيا لحين الفصل في موضوع الطعن بالنقض رقم 11263 لسنة 92 ق تجاري بحكم بات والمحدد لنظره جلسة 2023/6/22 وذلك لتعلقه بالفصل في تشكيل هيئة التحكيم المعروض أمام الدعوى التحكيمية.

رابعا: وقبل الفصل في موضوع الدعوى التحكيمية:

1 ـ تحديد جلسة لإبداء المرافعة الشفوية عن المحتكم ضدهما وإخطارنا بها فور تحديدها.

2 ـ إلزام الشركة المحتكمة بتقديم كافة أصول المستندات المجحودة صورها الضوئية المقدمة بالكراتين الخمسة منها بالدعوى التحكيمية, وفي حالة عدم تقديمها بصدر الحكم باعتبار هذه الصور الضوئية للمستندات غير موجودة وفقا لحكم المادة 51 من قانون الإثبات.

159

3ـ وقف الدعوى تعليقيا لاتخاذ إجراءات الطعن بالتزوير على الصور الضوئية للمستندات المقدمة بالكرتين الخمسة من الشركة المحتكمة بالدعوى التحكيمية ولحين الفصل في الادعاء بالتزوير .

4ـ الحكم برد وبطلان كافة الصور الضوئية للمستندات المقدمة بالكرتين الخمسة من الشركة المحتكمة بالدعوى التحكيمية لاصطناعها وتزويرها.

خامسا: وفي موضوع الدعوى التحكيمية الحكم

1ـ بعدم قبول الدعوى التحكيمية لرفعها على غير ذي صفة بالنسبة للسيد/ وزير النقل العراقي بصفته.

2ـ بسقوط الدعوى التحكيمية بالتقادم إعمالا لنص المادة 190 من قانون التجارة المصري.

3ـ برفضها موضوعا.

ومن باب الاحتياط: إحالة أوراق التحكيمية إلى لجنة خبراء ثلاثية لفحص عناصرها وصولا لوجه الحق في الدعوى التحكيمية المعروضة.

وفي جميع الأحوال إلزام الشركة المحتكمة بأن ترد للشركة المحتكم ضدها ما سددته من أتعاب لهيئة التحكيم ومصروفات التحكيم مع احتفاظ الشركة المحتكم ضدها بحقوقها الأخرى.

ـ هذا وقد قدم دفاع المحتكم ضدهما رفق المذكرة عدد سبع حوافظ مستندات أطلعت عليها الهيئة وألمت بها, وبيانها كالتالي:

الحافظة الأولى: مستند واحد أثبت المحتكم ضدهما على غلاف الحافظة أنه عبارة عن صورة ضوئية من صحيفة دعوي عزل محكمين مقامة من الشركة المحتكمة ضد أعضاء هيئة التحكيم بطلب عزلهم وإلزامهم برد أتعاب التحكيم والتعويض ضمن عدة طلبات أخري تضمنتها صحيفة الدعوي وقد أحاطت الهيئة بمضمون التعليق الوارد على غلاف الحافظة.

الحافظة الثانية: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من مذكرة تكميلية إضافية مقدمة من الدكتور/ حسن عبد الباسط جميعي في دعوي عزل المحكمين رقم 3 لسنة 132ق استئناف القاهرة المقامة من الشركة المحتكمة ضده وآخرين بطلب عزله وإلزامه برد الأتعاب والتعويض وقد قدمها إبان فترة حجز الدعوي للحكم لجلسة 2018/6/27 وقد أحاطت الهيئة بمضمون التعليق الوارد على غلاف الحافظة.

الحافظة الثالثة: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من مذكرة بدفاع ودفوع الدكتور/ عبد الحميد الأحدب المقدمة منه في دعوي عزل المحكمين رقم 3 لسنة 132 ق استئناف القاهرة المقامة من الشركة المحتكمة ضده وأخرين وقد قدم هذه المذكرة بجلسة 2016/8/28 وقد أحاطت الهيئة بمضمون التعليق الوارد على غلاف الحافظة.

الحافظة الرابعة: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من الرسالة الإلكترونية الموجه من الدكتور/ حسن عبدالباسط جميعي إلى طرفي التحكيم تفيد قيامه بعقد اجتماع منفرد مع رئيس لجنة التحفظ القائمة علي إدارة الشركة المحتكمة, وذلك للسماح له بتمكينه من التنحي عن المهمة التحكيمية في الصيغة والضوابط التي تقرها اللجنة وقيامه بإخطار الشركة المحتكم ضدها في اليوم التالي للاجتماع وقد أحاطت الهيئة بمضمون التعليق الوارد على غلاف الحافظة.

الحافظة الخامسة: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من رد أمين سر الدعوي التحكيمية علي وكيل الشركة المحتكم ضدها والخصم المدخل الأستاذ الدكتور/ محمد حمودة إبان تعيينه

160

وكيلا عنهما يفيد الرد علي طلبه بالحصول علي نسخة كاملة من كافة أوراق ومستندات أوراق الدعوي التحكيمية المعروضة وقد أحاطت الهيئة بمضمون التعليق والدلالة الوارد على غلاف الحافظة.

الحافظة السادسة: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من مذكرة برأي نيابة النقض مقدمة في الطعن رقم 11263 لسنة 92ق المرفوع من الشركة المحتكم ضدها ضد أعضاء هيئة التحكيم والشركة المحتكمة تفيد انتهاء رأي النيابة إلي قبول الطعن شكلا ونقضه موضوعا وقد أحاطت الهيئة بمضمون التعليق والدلالة الوارد على غلاف الحافظة.

الحافظة السابعة: مستند واحد أثبت على غلافها أنه عبارة عن صورة ضوئية من شهادة صادرة من محكمة النقض (مقدم الأصل أمام هيئة التحكيم) تفيد أنه قد تحدد جلسة 2023/6/22 أمام دائرة الخميس تجاري منعقدة في غرفة المشورة لنظر موضوع الطعن رقم 11263 لسنة 92 ق تجاري المرفوع من الشركة المحتكم ضدها ضد أعضاء هيئة التحكيم ولنظر باقي الطعون الأخرى المقامة طعنا علي الحكم الصادر برفض دعوي عزل المحكمين (أعضاء هيئة التحكيم الحاليين) الرقيمة 3 لسنة 132 ق استئناف القاهرة وقد أحاطت الهيئة بمضمون التعليق والدلالة الوارد على غلاف الحافظة.

ــ بتاريخ 2023/6/22 أرسل الوكيل القانوني للشركة المحتكمة مكاتبة بعنوان "إستدراك" إلى رئيس وأعضاء هيئة التحكيم أشار فيها إلى المذكرة التي قدمها بتاريخ 2023/6/20 تعقيبا على التقرير الخبرة ودفاع المحتكم ضدهما وأنه قد ورد بها خطأ مادي في صياغة الطلب (د) بالصفحة رقم 52 من المذكرة حيث ورد على سبيل الخطأ المادي عبارة (خمسمائة دولار أمريكي) قيمة التعويض عن الأضرار التي أصابتها من جراء فقدها سوق التعامل في مجالات السفر والسياحة والطيران وما أرتبط بهم من مجالات أخرى وما ترتب عليه من أضرار مادية والتي لحقت بالشركة, وأن صحتها وفقا للطلبات السابقة وما جاء بعرض الطلبات بالمذكرة المقدمة بالصفحات أرقام 45 و46 و48على النحو الذي تتكامل به الطلبات الختامية الوردة بصلب المذكرة مع العبارة الواردة بالفقرة (د) السابق الإشارة إليها والسابق التمسك بها على مدار التحكيم هي مبلغ (خمسمائة مليون دولار أمريكي) ويعتبر ذلك تصحيح للخطأ المادي الوارد بالمذكرة المقدمة بتاريخ 2023/6/20.

ــ وقد قام رئيس هيئة التحكيم بمخاطبة أعضاء هيئة التحكيم والمحتكم ضدهما بهذه المخاطبة.

ــ بتاريخ 2023/6/24 ورد لرئيس هيئة التحكيم من وكيل المحتكم ضدها الأولى الأستاذ/ أحمد الديريني مخاطبة عبر البريد الإلكتروني أشار فيها إلى طلب الشركة المحتكمة تحت عنوان استدراك والتي تصحح بموجبها الخطأ المادي لعبارة (خمسمائة دولار أمريكي) الواردة في صياغة الطلب (د) بالصفحة رقم 52 من المذكرة المقدمة منها بتاريخ 2023/6/20 أورد فيها رفض المحتكم ضدها الأولى التام لهذا الطلب لأنه يعتبر منح لمدة إضافية سيما وأن المحتكمة سبق وأن رفضت طلب المحتكم ضدها الأولى منحها مهلة إضافية لإيداع المذكرات التي كان محدد لها 2023/6/20 وأكدت الشركة المحتكم ضدها ممثلة في وكيلها القانوني ثقتها العالية جدا بأن هيئة التحكيم لا تتبع سياسة الكيل بمكيلين وأنها حريصة كل الحرص على تطبيق أسس العدالة والإنصاف بالدعوى كما أكد على علم المحتكم ضدها التام أن هيئة التحكيم تتعامل مع الطرفين بما يتصف بالحيادية التامة. هذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم والمحتكمة بهذه المخاطبة.

161

ـ وبذات التاريخ أيضا وردت لرئيس هيئة التحكيم مخاطبة عبر البريد الإلكتروني من الدكتور/ محمد مصطفى حمودة الوكيل القانوني أيضأ للمحتكم ضدهما طلب فيها رفض طلب الشركة المحتكمة المعنون استدراك لتصحيح الخطأ المادي لمخالفته القانون المصري وقرار هيئة التحكيم لأن آخر يوم لتقديم المذكرات والمستندات هو 2023/6/20 وأضاف في مخاطبته أن الطعون بالنقض المقامة طعنا على الحكم الصادر في دعوى عزل المحكمين الرقيمة 3 لسنة 132 ق استئناف القاهرة رأت محكمة النقض أنها جديرة بالنظر وحددت جلسة مرافعة لنظر الطعون يوم الخميس الموافق 2023/10/12, ولذلك فإنه يصمم على طلب وقف الدعوى التحكيمية تعليقيا لحين الفصل في هذه الطعون.

ـهذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم و المحتكمة بهذه المخاطبة .

ـ بتاريخ 2023/6/25 قام وكيل المحتكم ضدهما الدكتور/ محمد حمودة بإرسال بريدا إلكترونيا إلى رئيس هيئة التحكيم أشار فيه إلى الرسالة السابقة مرفقا بالرسالة صورة شهادة صادرة من محكمة النقض تفيد بأنه تحدد لنظر الطعون بالنقض جلسة مرافعة يوم الخميس الموافق 2023/10/12ن وصمم على طلب وقف الدعوى التحكيمية تعليقيا لحين الفصل في الطعون.

ـهذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم و المحتكمة بهذه المخاطبة .

ـ بتاريخ 2023/7/4 ورد لرئيس هيئة التحكيم من وكيل المحتكم ضدهما الأستاذ/ أحمد الديريني مخاطبة عبر البريد الإلكتروني أورد فيها أنها بانتظار قرار هيئة التحكيم فيما يخص الطلب الذي تقدمت به الشركة المحتكمة لاستدراك طلباتها الختامية, كما يلتمس في المخاطبة أيضا إعلامه بالإجراء الي سيتم اتخاذه من هيئة التحكيم في القضية التحكيمية في طلبات الشركة المحتكم ضدها.

هذا وقد قام رئيس التحكيم بإخطار المحتكمة بهذه المخاطبة .

هذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم و المحتكمة بهذه المخاطبة .

ـ بتاريخ 2023/7/5 ورد لرئيس هيئة التحكيم من وكيل المحتكم ضدهما الدكتور/ محمد حمودة مخاطبة عبر البريد الإلكتروني أشار فيها إلى القضية التحكيمية وإلحاقا إلى طلباتهما الختامية بالمذكرة المقدمة بتاريخ 2023/6/20 وفيما يتعلق بالطلب المبدى من المحتكم ضدهما بشأن إحالة الدعوى التحكيمية إلى لجنة خبراء لفحص عناصرها فإن الشركة المحتكم ضدها تقترح انتداب مكتب أرنست أند يونج للمحاسبة والمراجعة المالية لكونه مكتب محاسبة ذو سمعة دولية ويتمتع بالحيادية والمهنية لإعداد تقرير محاسبي في الدعوى التحكيمية وأن الشركة لا تمانع في أن تتحمل كافة النفقات والمصروفات الخاصة بانتداب المكتب المذكور.

هذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم و المحتكمة بهذه المخاطبة .

ـ بتاريخ 2023/7/10 ورد إلى رئيس هيئة التحكيم مخاطبة بالبريد الإلكتروني من الوكيل القانوني للشركة المحتكمة تضمنت رد المحتكمة على مخاطبة المحتكم ضدهما إلى رئيس هيئة التحكيم بشأن رفضهما لما ورد بطلب استدراك الخطأ المادي الوارد في الطلبات الختامية بمذكرة المحتكمة المودعة بتاريخ 2023/6/20 بأن المحتكمة تتمسك بأن هذا ليس طلبا جديدا وإنما تصحيح للخطأ المادي على نحو ما أوضحته المحتكمة .

كما تضمنت المخاطبة أيضا ردا على ما تضمنته مخاطبة المحتكم ضدهما بشأن ثقتها في هيئة التحكيم وفي القضاء على أسس العدالة والإنصاف فإن المحتكمة هي أيضا تؤكد على ثقتها في هيئة التحكيم وفي حيادها التام وتقبل هي أيضا تفويض هيئة التحكيم في القضاء بناء على أسس العدالة والإنصاف وأن هذا تفويض لهيئة التحكيم منها في القضاء بالعدل والإنصاف وبهذا القبول يكون قد تم الاتفاق برضاء أطراف التحكيم.

كما تضمنت المخاطبة أيضا الرد على مخاطبتي المحتكم ضدهما الواردتين رئيس هيئة التحكيم بتاريخي 4 و 2023/7/5 وأوردت أنها تتمسك بحجز الدعوى للحكم وترفض طلب المحتكم ضدهما بندب لجنة خبرة ثلاثية أو خبير جديد والانفراد بتحديده.

-هذا وقد قام رئيس التحكيم بإخطار أعضاء هيئة التحكيم والمحتكم ضدهما بهذه المخاطبة .

– بتاريخ 2023/7/11 قررت هيئة التحكيم بإجماع الأراء غلق باب المرافعة وحجز الدعوى التحكيمية للحكم على أن يصدر الحكم بالإيداع بمقر التحكيم في موعد يخطر به الأطراف, وقد قام رئيس هيئة التحكيم بمخاطبة الأطراف بهذا القرار.

-بتاريخ 2023/7/12, وهو تاريخ لاحق على قرار هيئة التحكيم بإغلاق باب المرافعة و حجز الدعوى للحكم بالإيداع بمقر التحكيم في تاريخ يخطر به الأطراف,كما سلف بيانه, ورد بريد الكتروني من الأستاذ الدكتور محمد حمودة الوكيل القانوني للمحتكم ضدهما يتضمن ترديدا لما سبق و أرسله سيادته بتاريخ 25 و 26 فبراير 2023 بموجب إنذار قضائي ثم رسالة بالبريد السريع الخاص (سبق إخطار أعضاء هيئة التحكيم و المحتكمة بهم), تتضمن أنه الوكيل القانوني للمحتكم ضدهما وأنه نما إلى علمه انتواء هيئة التحكيم استئناف نظر الدعوى التحكيمية, و بهذه المراسلة تكرار لطلبه السابق بأن يكون طرفا في الإخطارات والمراسلات تخص الشركة في النزاع التحكيمي وأنه يحتفظ بحقه في إبداء كافة الدفوع الشكلية والإجرائية والموضوعية و لطلبه بإخطاره بتوقيت وميعاد انعقاد جلسة التحكيم حال تحديد جلسة, ولما سبق أن راسلنا به أيضا من أنه في غضون عام 2017 سبق إخطارنا بأنه الوكيل للشركة العامة للخطوط الجوية العراقية بطلب قدمه لأمين السر بشأن طلب تصوير والإطلاع على كافة مفردات الدعوى التحكيمية, وأرفق مرة أخرى صورة الوكالة عن المحتكم ضدهما. وقد قررت هيئة التحكيم إرفاق هذه المخاطبة بملف الدعوى التحكيمية.

– وبتاريخ 2023/7/18, وهو تاريخ لاحق على قرار هيئة التحكيم بإغلاق باب المرافعة و حجز الدعوى للحكم بالإيداع بمقر التحكيم في تاريخ يخطر به الأطراف, وردت رسالة بالبريد المسجل من الأستاذ الدكتور /محمد حمودة الوكيل القانوني للمحتكم ضدهما, مرددة لما سبق لسيادته إرساله و التمسك به من قبل ولذات الأسباب, وذلك برفض طلب الشركة المحتكمة بالاستدراك بتصحيح الخطأ المادي في البند (د) من طلباتها الختامية لوروده بعد الميعاد المحدد لإيداع المذكرات الختامية, والتمسك بطلب إيقاف الدعوى التحكيمية لحين الفصل بحكم بات في الطعون بالنقض على الحكم الصادر برفض إنهاء مهمة كل من رئيس التحكيم و المحكم المسمى من المحتكم ضدهما لكونها مسألة جوهرية تتعلق ببطلان تشكيل هيئة التحكيم و عدم صلاحيتها للفصل في الدعوى التحكيمية, وعلى النحو الوارد بهذه الرسالة و المذكرات المشار إليها فيها. وقد قررت هيئة التحكيم إرفاق هذه المخاطبة بملف الدعوى التحكيمية.

163

هيئة التحكيم

بعد الإطلاع على الأوراق وسماع الإيضاحات والمرافعة وبعد المداولة قانونا بين أعضاء هيئة التحكيم.

ومن حيث أن الدعوى التحكيمية قد استوفت أوضاعها الإجرائية والموضوعية وأبدى كل طرف ما طاب له من دفاع ودفوع وطلبات وتقديم المذكرات والمستندات إلى أن حجزت الدعوى للحكم, ومن ثم فقد أضحت الدعوى مهيأة وصالحة للحكم فيها وفقا لما يلي:

<u>القسم الأول:</u> اتفاق التحكيم ومشارطته,ومخاطبات الأطراف بشأن الثقة فى أن هيئة التحكيم تطبق أسس العدالة والإنصاف وتفويضها فى ذلك.

أولا: اتفاق التحكيم: <u>ورد اتفاق التحكيم في البند 16 من الاتفاقية المعنونة "اتفاقية وكالة عامة" المبرمة بتاريخ 2001/1/30, الذي يكون هو ونص البند 16 من ملحق عقد الوكالة الأساسي المبرم بتاريخ 2001/3/15 شرط واتفاق التحكيم:</u>

<u>وقد ورد نص البند 16 من اتفاقية الوكالة العامة الموقعة بين الشركة العامة للخطوط الجوية العراقية وشركة هورس للسياحة والسفر بتاريخ 2001/1/30 كالأتي:-</u>

"1ـ في حالة حدوث أي نزاع يتعلق بتفسير أو تطبيق هذه الاتفاقية, فعلى كلا الطرفين أن يبذلا الجهود القصوى لحل هذا النزاع فيما بينهم بالطرق المناسبة خلال 3 أيام فقط وإن لم يتم التوصل لإيجاد حل يجب عليهم أن يختاروا لجنة التحكيم بالطرق الآتية:

1- يقوم الطرف الأول بتعيين محكم.

2- يقوم الوكيل العام بتعيين محكم.

3- يقوم محكمين كلا الطرفين بالتشاور فيما بينهم بتعيين رئيس للجنة وإذا فشلا في ذلك يقوم مدير منظمة الأياتا بتعيين رئيس لجنة التحكيم .

2ـ تقوم لجنة التحكيم بتحديد إجراءاتها والقانون الحاكم.

3ـ الطرف الخاسر سوف يتحمل كل التكلفة والنفقات الناجمة عن إجراء التحكيم ."

<u>كما ورد نص البند 16 من الوثيقة المعنونة "ملحق عقد الوكالة العامة" الموقع بين الشركة العامة للخطوط الجوية العراقية وشركة هورس للسياحة والسفر بتاريخ 2002/3/15 بأنه:-</u>" يتولى الطرفان المتعاقدان حسم كافة المستجدات والخلافات التي تظهر بينهما بالطرق الودية وفي حالة عدم التوصل إلى حسم ما يستجد من أمور أو خدمات بين الطرفين يحل عن طريق لجنة التحكيم يتفق عليها الطرفين المتعاقدين.



164

ثانيا مشارطة التحكيم وإجراءات التحكيم الواجبه : اتفق أطراف التحكيم على مشارطة التحكيم والتي ورد

بها تحديد اجراءات التحكيم, في الجلسة الأولى الإجرائية من جلسات التحكيم والتي عقدت بتاريخ

2013/11/28 والتالي نصها نقلا من واقع محضر الجلسة سالفة البيان:

"أعلن الطرفان عن قبولهما لجميع أعضاء هيئة التحكيم, وقد اتفق الطرفان على استكمال اتفاق التحكيم

وإجراءاته على النحو التالي والذي أقرته هيئة التحكيم:

1ـ لغة التحكيم هي اللغة العربية.

2ـ موضوع النزاع كما أوضح أطراف الخصومة على النحو التالي :

1/2: أوضح الحاضر عن الشركة المحتكمة (هورس للسياحة والسفر) أن موضوع النزاع وطلباته

تنحصر في أن الشركة المحتكمة تحصلت على وكالة عامة وحصرية بجمهورية مصر العربية عام

2001 وقامت بتنفيذ كافة التزاماتها بالعقد وأنه وقت الوكالة كان هناك حظراً جويا على دولة العراق

ولم يكن هناك تسيير لحركة الطائرات ولم يكن معلوما متى سيزول الحظر, وعلى الرغم من طول مدة

الحظر, إلا أن الشركة المحتكمة استمرت في تنفيذ الالتزامات المنوطة بها وأنه عندما استشعرت

الشركة المحتكم ضدها أن الحظر الجوي سيتم رفعه بادرت بوقف الوكالة الأمر الذي استدعى بعض

المفاوضات لإعادة تفعيل الوكالة حيث كان الحظر قد زال في هذا التوقيت, إلا أنه ولأسباب سياسية

تتعلق بالعراق ولم يمر على إعادة تفعيل الوكالة سوى ثلاثة أشهر أو أقل, قامت المحتكم ضدها بإنهاء

الوكالة بالإرادة المنفردة للمرة الثانية ودون الرجوع إلى ما ورد بالقانون أو العقد.

وأضاف الحاضر عن المحتكمة أنه ومنذ هذا التاريخ استمرت المفاوضات بين الجانبين من خلال

مجموعة من المفوضين العراقيين ومن الشركة المحتكمة وكلها انتهت إلى الإخفاق في الحل بين

الجانبين ورغم ذلك استمرت الشركة المحتكمة في تنفيذ التزاماتها التعاقدية بالنظر إلى أنها مازالت

تعتبر عقد الوكالة الذي بيدها ساريا حتى تاريخه وهو ما انتهى إلى الوصول إلى تنفيذ البند 16 من عقد

الوكالة بطلب تشكيل هيئة التحكيم وهو الأمر الذي استغرق وقتا طويلا حتى تم تعيين المحكم الثاني

لمدة تقرب من العامين, ثم لم يحدث توافق على اختيار المحكم الثالث مما اضطرها إلى التوجه مرة

أخرى إلى المحاكم وسط كثير من التأجيل من الطرف العراقي ولمدة تزيد عن العام مما أدى إلى

الإضرار الجسيم بالشركة المحتكمة وأفاد الحاضر عن الشركة المحتكمة بأن طلباته سيوضحها تفصيلا

أثناء سير الخصومة التحكيمية.

2/2: وقد أوضح الحاضر عن الشركة المحتكم ضدها (الشركة العامة الخطوط الجوية العراقية) أن

المنازعة موضوع التحكيم هو أنه من بداية تحرير التعاقد في 2001/1/30 لم تقم الشركة المحتكمة

بتنفيذ أي من بنود عقد الوكالة أو ملحق العقد في 2003/3/15 ونظرا لعدم تنفيذ الشركة المحتكمة لأي

بنود العقد قامت الشركة المحتكم ضدها بإلغاء العقد وفقا للقانون والبنود المقررة بالعقد وأثناء هذه الفترة

تضررت المحتكم ضدها من عدم تنفيذ عقد الوكالة لعدم تنفيذ الالتزامات وأن التأجيلات التي قامت بها

أثناء تحديد المحكم ورئيس هيئة التحكيم أمام المحكمة كان استعمالا لحقها في التقاضي وكان نظرا

165

لاستحصال الموافقات الأصولية من الجهات المعنية العراقية وأن الجانب العراقي قام بالإصرار مرات عديدة منذ عام 2006 حتى تاريخه بعرض كافة الطرق الودية لحل النزاع المزعوم مع الشركة المحتكمة وتحتفظ المحتكم ضدها بحقها في تفصيل بيان ردها ودعواها المقابلة بعد الرجوع لجهات الاختصاص وتقديم ذلك أثناء سير الدعوى التحكيمية.

3ـ القانون الواجب التطبيق: تطبيق قانون التحكيم المصري رقم 27 لسنة 1994 على إجراءات التحكيم وتطبيق  كافة القوانين المصرية في شأن الفصل في موضوع النزاع والإثبات وكل ما تعلق بهذا التحكيم.

4ـ مقر التحكيم: مكتب أ. د/ حسن عبد الباسط جميعي الكائن بالشقة رقم 15 بالدور الرابع بالعقار 7 شارع الفضل ـطلعت حربـقسم عابدينـالقاهرة, ولهيئة التحكيم نقل المقر أو عقد الجلسات في أي مكان آخر ترى عقد جلساتها فيه داخل جمهورية مصر العربية أو خارجها. وفي حالة طلب أي من الطرفين عقد جلسة أو جلسات في مكان آخر فإن لهيئة التحكيم أن تقبل ذلك وتصدر به قرارا يتضمن تحمل مقدم الطلب كافة النفقات المترتبة على طلبه مشروطا بسداد المصروفات والنفقات التي تحددها الهيئة في الموعد الذي تحدده لذلك.

5ـ عناوين المخاطبات و طريقة المراسلة و الإخطارات:

اتفق الطرفان علي أن أي مخاطبات أو إنذارات أو إخطارات من أو إلي هيئة التحكيم من أي من الطرفين أو إلى أي منهم, أو من أو إلى أحد الطرفين فيما بينهم في خصوص هذه الدعوى التحكيمية تكون عن طريق البريد السريع الحكومي أو الخاص مع ملاحظة إمكان تعزيز المخاطبات البريدية سالفة البيان بالبريد الإلكتروني علي العناوين التالية

ـ عنوان الشركة المحتكمة ( شركة هورس للسياحة والسفر)

9 شارع الشهيد محمد جمال برعيـأرض الجولفـ القاهرة.

فاكس رقم: 0201001880055-020222602400/0224149170

هاتف أرضي: 0224142178 محمول: 01223686945

البريد الإلكتروني: salaheldin.aladalacenter@gmail.com

عنوان الشركة المحتكم ضدها الشركة العامة الخطوط الجوية العراقية

المقر الرئيسي الذي كان وقت التعاقد هو مطار صدام الرئيسيـبغدادـالعراقـ, وأصبح مطار بغداد الدوليـبغدادـالعراق, مع تمسك الشركة بأن تكون مخاطبتها على مقرها الرئيسي بالقاهرة وهو 22 شارع قصر النيلـقسم عابدينـالقاهرة, لضمان سرعة وصول المخاطبات مع اعتبار تلك المراسلات مسلمة للشركة المحتكم ضدها بالعراق ويعتد بها قانونا في مواجهتها.

فاكس رقم: 0020223934200 هاتف أرضي:0202 23934149  محمول: 01114335800

البريد الإلكتروني:iraqiairways.cairo@hotmail.com& Ahmed_derani@yahoo.com

**166**

عنوان هيئة التحكيم: مكتب رئيس هيئة التحكيم الكائن 7 شارع الفضل المتفرع من طلعت حرب / شقة 15 الدور الرابع-عابدين-القاهرة-مصر. البريد الإلكتروني:hgemei@hotmail.com

هاتف أرضي: 0020223951777 محمول: 00201001649560

6- مدة التحكيم: اتفق الطرفان علي أن مدة التحكيم اثنى عشر شهرا وفقا للقانون تبدأ من تاريخ الجلسة الماثلة 2013/11/28 وذلك مع عدم الإخلال بحق هيئة التحكيم في مد مدة التحكيم وفقا للقانون .

7- أمانة ومصروفات التحكيم: قررت هيئة التحكيم بصفة مبدئية تحديد مصروفات التحكيم بمبلغ خمسون ألف دولار أمريكي علي أن يتم سداد هذه القيمة مناصفة بين الطرفين وذلك في موعد أقصاه سبعة أيام من تاريخ هذه الجلسة.

ويتم السداد في حساب رئيس هيئة التحكيم أ.د/ حسن عبد الباسط محمد,

وفي حالة عدم قيام أي من الطرفين بسداد حصته من هذه المصروفات والأتعاب يمنح الطرف الأخر سبعة أيام إضافية  للسداد نيابة عنه إذا رغب في ذلك, وفي حالة عدم سداد هذه القيمة في المواعيد المحددة يكون للهيئة اتخاذ القرار الذي تراه مناسبا, ومن ذلك إيقاف إجراءات التحكيم لحين السداد, وقد قررت الهيئة إرجاء القرار بتحديد الأتعاب إلى جلسة تالية ليصدر القرار في ضوء الطلبات التي يتم تقديمها في موضوع التحكيم.

8- أقر الأطراف قيام الأستاذ /فتحي محمد عبد المالك بأمانة سر جلسات التحكيم, وللهيئة تعيين من تراه لأمانة السر وتحديد مكافآته,

9- جدول المواعيد الإجرائية لتقديم بيان الدعوى التحكيمية من الشركة المحتكمة والرد من المحتكم ضدها:

ـ تقوم الشركة المحتكمة بتقديم بيان شارح لدعواها التحكيمية مشتملا علي طلباتها وأسانيدها وما ترغب في تقديمه من مستندات وذلك في خلال موعد غايته في يوم السبت الموافق  2013/12/28.

ـ تمنح الشركة المحتكم ضدها أجلا للرد والتعقيب علي ما قدمته الشركة المحتكمة من بيان للدعوي التحكيمية ومستنداتها وأيضا تقديم بيان دعواها المقابلة إن رغبت في ذلك في موعد غايته في يوم الاثنين الموافق 2014/1/27.

ـ وتودع المذكرات والمستندات من سبعة نسخ بمقر هيئة التحكيم مكتب أ.د/ حسن عبد الباسط جميعي الكائن بالشقة رقم 15 بالدور الرابع بالعقار 7 شارع الفضل-طلعت حرب-قسم عابدين-القاهرة من الساعة السابعة مساء حتي الساعة العاشرة مساء طوال أيام الأسبوع فيما عدا يومي الخميس والجمعة من كل أسبوع".

ثالثا: مخاطبات الأطراف بشأن الثقة في أن هيئة التحكيم تطبق أسس العدالة والإنصاف, وتفويضها في ذلك:

167

- بتاريخ 2023/6/24 ورد إلى هيئة التحكيم من الوكيل القانوني للشركة المحتكم ضدها الأولى مخاطبة عبر البريد الإلكتروني أكدت الشركة المحتكم ضدها الأولى فيها ثقتها العالية جدا بأن هيئة التحكيم لا تتبع سياسة الكيل بمكيالين, وأنها حريصة كل الحرص على تطبيق أسس العدالة والإنصاف بالدعوى التحكيمية, كما أكدت على علم المحتكم ضدها التام أن هيئة التحكيم تتعامل مع الطرفين بما يتصف بالحيادية التامة. والتالي ما ورد من نص هذه المخاطبة في هذا الشأن:"...ونحن اذ نؤكد على سيادتكم بأننا على ثقة عالية جدا بأن هيئة التحكيم الموقرة لا تتبع سياسة الكيل بمكيالين وانها حريصة كل الحرص على تطبيق اسس العدالة والانصاف بالدعوى كما اننا نعلم جيدا ان هيئتكم الموقرة تتعامل مع الطرفين بما يتصف بالحيادية التامة..."

- وقد قام رئيس هيئة التحكيم بإرسال هذه المخاطبة الواردة من الشركة المحتكم ضدها الأولى إلى أعضاء هيئة التحكيم وإلى الشركة المحتكمة.

- وبتاريخ 2023/7/10 ورد إلى هيئة التحكيم مخاطبة بالبريد الإلكتروني من الوكيل القانوني للشركة المحتكمة تضمنت ردا على ما تضمنته مخاطبة الشركة المحتكم ضدها الأولى بتاريخ 2023/6/24 بشأن ثقتها في هيئة التحكيم وفي أنها تقضي في الدعوى على أسس العدالة والإنصاف, وأكدت المحتكمة في المخاطبة أنها أيضا تؤكد على ثقتها في هيئة التحكيم وفي حيادها التام وتقبل هي أيضا تفويض هيئة التحكيم في القضاء بناء على أسس العدالة والإنصاف, وأنه بهذا القبول يكون قد تم الاتفاق برضاء أطراف التحكيم. والتالي ما ورد من نص مخاطبة الشركة المحتكمة في هذا الشأن :"...أما عن الثقة التي يؤكدها المحتكم ضدهما في هيئة التحكيم وثقتها في حيادها التام وعدم كيلها بمكيالين وما تضمنته هذه الرسالة من تفويض لهيئة التحكيم بالقضاء علي اسس العدالة والإنصاف, فإن الشركة المحتكمة هي ايضا تؤكد ثقتها الكاملة في هيئة التحكيم والثقة في حيادها التام وتقبل هي أيضا تفويض هيئة التحكيم في القضاء بناء علي أسس العدالة والإنصاف  وبه يكون هذا التفويض لهيئة التحكيم بالقضاء بالعدل والإنصاف قد تم باتفاق وبرضاء أطراف التحكيم..."

- وقد قام رئيس هيئة التحكيم أيضا بإرسال هذه المخاطبة الواردة من المحتكمة بقبولها تفويض هيئة التحكيم بالقضاء على أسس العدالة والإنصاف إلى أعضاء هيئة التحكيم وإلى المحتكم ضدهما.

<u>القسم الثاني</u>: القانون الواجب التطبيق على النزاع:

أولا: إن هيئة التحكيم وهي تسطر لحكمها تمهيدا للفصل في النزاع القائم بين طرفيه, فإنها تشير بداية إلى أن طرفا النزاع  قد تلاقت إرادتهما واتفقا بمحضر الجلسة الأولى الإجرائية المنعقدة بتاريخ 2013/11/28 على تطبيق قانون التحكيم المصري رقم 27 لسنة 1994 على إجراءات التحكيم, وتطبيق كافة القوانين المصرية في شأن الفصل في موضوع النزاع وقواعد وإجراءات الإثبات وكل ما تعلق بهذا التحكيم, ومن ثم فإن هيئة التحكيم, وإعمالا لنص المادتين 25, 1/39 من قانون التحكيم المصري رقم 27 لسنة 1994, وإنفاذا لما اتفق عليه الطرفين وإعمالا لمبدأ سلطان الإرادة تخضع الفصل في إجراءات هذا التحكيم لما اتفق عليه الأطراف بمحضر الجلسة الأولى الإجرائية المنعقدة بتاريخ 2013/11/28 وقانون التحكيم المصري رقم 27 لسنة 1994 بشأن التحكيم في المواد المدنية والتجارية,

**168**

كما تخضع ما تعلق بموضوع النزاع وقواعد وإجراءات الإثبات إلى القوانين المصرية ذات الصلة بموضوع النزاع, ليكون القانون المصري وحده دون غيره هو المطبق على كافة الأنزعة والمسائل التي يثيرها هذا التحكيم.

<u>ثانيا: الثقة في أن هيئة التحكيم تطبق أسس العدالة والإنصاف, وتفويضها في ذلك:</u>

-بتاريخ 2023/6/24 ورد إلى هيئة التحكيم مخاطبة بالبريد الإلكتروني من الوكيل القانوني للشركة المحتكم ضدها الأولى أكدت فيها ثقتها العالية جدا بأن هيئة التحكيم لا تتبع سياسة الكيل بمكيالين, وأنها حريصة كل الحرص على تطبيق أسس العدالة والإنصاف بالدعوى التحكيمية, كما أكدت على علم المحتكم ضدها التام أن هيئة التحكيم تتعامل مع الطرفين بما يتصف بالحيادية التامة. والتالي ما ورد من نص هذه المخاطبة في هذا الشأن:"...ونحن اذ نؤكد على سيادتكم بأننا على ثقة عالية جدا بأن هيئة التحكيم الموقرة لا تتبع سياسة الكيل بمكيالين وأنها حريصة كل الحرص على تطبيق اسس العدالة والإنصاف بالدعوى كما نعلم جيدا أن هيئتكم الموقرة تتعامل مع الطرفين بما يتصف بالحيادية التامة...".

-وقد قام رئيس هيئة التحكيم بإرسال هذه المخاطبة الواردة من الشركة المحتكم ضدها الأولى إلى أعضاء هيئة التحكيم وإلى الشركة المحتكمة.

- وبتاريخ 2023/7/10 ورد إلى هيئة التحكيم مخاطبة بالبريد الإلكتروني من الوكيل القانوني للشركة المحتكمة تضمنت ردا على ما تضمنته مخاطبة الشركة المحتكم ضدها الأولى بتاريخ 2023/6/24 بشأن ثقتها في هيئة التحكيم وفي أنها تقضي في الدعوى على أسس العدالة والإنصاف, وأكدت المحتكمة في هذه المخاطبة أنها أيضا تؤكد على ثقتها في هيئة التحكيم وفي حيادها التام وتقبل هي أيضا تفويض هيئة التحكيم في القضاء بناء على أسس العدالة والإنصاف, وأنه بهذا القبول يكون قد تم الاتفاق برضاء أطراف التحكيم. والتالي ما ورد من نص مخاطبة الشركة المحتكمة في هذا الشأن :" أما عن الثقة التي يؤكدها المحتكم ضدهما في هيئة التحكيم وثقتها في حيادها التام وعدم كيلها بمكيالين وما تضمنته هذه الرسالة من تفويض لهيئة التحكيم بالقضاء على اسس العدالة والإنصاف, فإن الشركة المحتكمة هي ايضا تؤكد ثقتها الكاملة في هيئة التحكيم والثقة في حيادها التام وتقبل هي أيضا تفويض هيئة التحكيم في القضاء بناء على أسس العدالة والإنصاف وبه يكون هذا التفويض لهيئة التحكيم بالقضاء بالعدل والإنصاف قد تم باتفاق وبرضاء أطراف التحكيم.".

- وقد قام رئيس هيئة التحكيم أيضا بإرسال هذه المخاطبة الواردة من المحتكمة بقبولها تفويض هيئة التحكيم بالقضاء على أسس العدالة والإنصاف وما تضمنته من أن :"...وبه يكون هذا التفويض لهيئة التحكيم بالقضاء بالعدل و الإنصاف قد تم باتفاق و برضاء أطراف التحكيم..", إلى أعضاء هيئة التحكيم وإلى المحتكم ضدهما.

169

<u>القسم الثالث: دفوع المحتكم ضدهما:</u>

ـ حيث أن أوجه دفاع ودفوع المحتكم ضدهما الواردة بمذكراتهم وأخرها المذكرة الختامية المودعة بتاريخ 20/ 6/ 2023 قد اشتملت على العديد من الدفوع, ومن ثم فإن هيئة التحكيم ستقوم <u>في فصل أول</u> بالرد على الدفوع المتعلقة بانعدام وبطلان اتفاق التحكيم وما تبعه من الدفع بعدم اختصاص هيئة التحكيم, <u>وفي فصل ثان</u> بالرد على الدفوع المتعلقة بتشكيل هيئة التحكيم, وطلب المحتكم ضدهما وقف الدعوى التحكيمية لحين الفصل الطعون بالنقض <u>وفي فصل ثالث</u> الرد على الدفع بعدم قبول الدعوى بالنسبة للمحتكم ضده الثاني السيد/وزير النقل العراقي, استنادا إلى 1- رفعها على شخصية تتمتع بالحماية الدبلوماسية القضائية 2- لرفعها على غير ذي صفة. <u>وفي فصل رابع</u> للرد على الدفع بجحد الصور الضوئية, والدفع باستبعاد المستندات المحررة باللغة الأجنبية الغير مترجمة, والطعن بالتزوير. <u>وفي فصل خامس</u> للرد على الدفع بسقوط حق الشركة المحتكمة في اللجوء للتحكيم استنادا إلى أن البند 16 من عقد الوكالة قد حدد مدة الحل الودي بثلاثة أيام إلا أن هذا الحل قد استمر لأكثر من ست سنوات بما يعد بمثابة تنازلا ضمنيا من الشركة المحتكمة عن حقها في اللجوء إلى التحكيم لحل النزاع, <u>وفي فصل سادس</u> للرد على الدفع بانتهاء مدة التحكيم, <u>وفي فصل سابع</u> للرد على الدفع بسقوط حق الشركة المحتكمة في اللجوء للتحكيم لمرور أكثر من سنتين على انتهاء العلاقة العقدية. <u>وفي فصل ثامن</u> للرد على الدفع بإنعدام وبطلان عقد الوكالة وملحقه المؤرخ 2001/3/15 وبأن محضر اجتماع 2005/8/29 ليس عقدا , وذلك على التفصيل التالي:

<u>الفصل الأول: الدفع المبدى من المحتكم ضدهما بإنعدام وبطلان شرط التحكيم لانعدام عقد الوكالة وملحقه, ولقيامهما على إرادة معيبة بعيبي التدليس والغلط, وكذا الدفع بأن محضر 2005/9/28 ليس عقدا , والدفع بعدم اختصاص هيئة التحكيم تبعا لذلك:</u>

ـ المحتكم ضدهما  استندا في دفعهما ببطلان عقد الوكالة وملحقه لتعيب إرادة الشركة المحتكم ضدها الأولى بعيب الغلط و عيب التدليس, وذلك بمذكرتهما المقدمة من الأستاذ /أحمد الدريني المحامي بتاريخ 2014/1/27 ردا على بيان الدعوى التحكيمية. وقد أقام المحتكم ضدهما دفعهما استنادا إلى أن عقد الوكالة التجارية من العقود التي تبرم وتقوم على الاعتبار الشخصي ويتغلب فيها الاعتبار الشخصي, حيث أن الموكل لا يرتضي بالتوكيل, إلا بعد أن ادخل في اعتباره شخص الوكيل وأنه يترتب على ذلك أنه إذا وقع غلط في شخص الوكيل, فإن عقد الوكالة يكون قابلا للإبطال للغلط, ويكون الرضا في عقد الوكالة معيبا إذا شابه غلط أو تدليس أو إكراه أو استغلال, وأنه بالرجوع إلى عقد الوكالة المؤرخ 2001/1/30 موضوع الدعوى يتبين أنه كان مبرم بين كل من "شركة الخطوط الجوية العراقية المنشأة والمرخصة طبقا للقانون العراقي مقرها مطار صدام حسين ـ بغداد ـ العراق (طرف أول) وشركة هورس للسياحة والسفر ومقرها 9 شارع الشهيد محمد جمال برعي ـ أرض الجولف ـ مصر الجديدة المنشأة والمرخصة طبقا للقانون المصري (طرف ثان), وأنه بقراءة الطرف الثاني مرة أخرى يفهم منها أن الطرف الثاني هو شركة هورس للسياحة والسفر وأنها منشأة ومرخصة طبقا للقانون المصري وأن التأكيد على إعادة قراءة بيانات الطرف الثاني هو للوصول إلى فهم الغرض الأساسي وراء التعاقد مع الشركة الطرف

170

الثاني وهذا الغرض يقرأ من التعريف الموضح ببند الأطراف حيث تم التعاقد مع الشركة الطرف الثاني للأسباب الآتية:

1ـ لكون غرضها التجاري السياحة والسفر.2ـ لكونها منشأة ومرخصة.3ـ مرخصة طبقا للقانون المصري.

وأضافت أن الغرض من إبرام هذه الإتفاقية وهو إيجاد وكيل عام عن شركة مصرية مرخصة طبقا للقانون المصري في مجال السياحة والسفر, إلا أنه إذا تم الرجوع إلى الشركة المحتكمة وبحث في سجلها التجاري تتكشف الحقائق الآتية :ـ أـ أن تاريخ بدء نشاط شركة هورس للسياحة هو2001/3/14 أي بعد توقيع عقد الوكالة بأكثر من شهرين, في حين أن عقد الوكالة تم توقيعه بتاريخ 2001/1/30 وعليه يكون العقد تم إبرامه مع شركة وهمية ليس لها كيان قانوني وقت التعاقد غير مقامة أو منشأة. بـأن السيد/ عماد السيد الجلدة لم يكن وقت توقيع العقد رئيس مجلس إدارة الشركة المذكورة الغير قائمة ولكن بعد تأسيسها كانت صفته مدير مسئول, ويكون عقد الوكالة موقع ممن ليس له صفة قانونية صحيحة وقت التعاقد. تـأن الشركة الطرف الثاني المبرم معها عقد الوكالة الملغي وقت إبرام العقد لم تكن مرخص لها من وزارة السياحة المصرية, وإنما صدر لها ترخيص السياحة بتاريخ 2002/5/24 أي بعد سنة وشهرين, بالإضافة إلى أن هذا الترخيص قد منح لشركة هورس للسياحة, بينما العقد أبرم مع شركة هورس للسياحة والسفر. وأنه بناء عليه يتبين أن إبرام عقد الوكالة قد أبرم على إرادة معيبة بعيب الغش والتدليس, وعليه يكون العقد باطلا, بطلانا مطلقا, وأن ما بني على باطل فهو باطل.

ـ وفي مذكرة تالية للرد على بيان الدعوى التحكيمية, أودع المحتكم ضدهما بتاريخ 2014/6/10 مذكرة مقدمة من وكيلهما القانوني ـ آنذاك ـ الدكتور/ محمود سمير الشرقاوي, وقد ورد بالصفحة رقم 7 منها وتحت عنوان "ثانيا" أبدى المحتكم ضدهما دفعا أخر للقول ببطلان عقد الوكالة وبطلان اتفاق التحكيم, وذلك بقولهما بأن:- "اتفاق التحكيم الوارد في عقد الوكالة المنعدم المؤرخ 2001/1/30 منعدم أو باطل مطلقا", وبأنه "وحيث أن شرط التحكيم الوارد في البند 16 من عقد الوكالة المنعدم المؤرخ 2001/1/30 تم إبرامه في ذات تاريخ عقد الوكالة المنعدم لانعدام وجود المحتكمة أنذاك, فإن هذا الشرط يكون باطلا بطلانا مطلقا, أي منعدما, فلا ينتج أثرا وللمحتكم ضدها الأولى أن تتمسك ببطلانه, بل إن هيئة التحكيم يجب أن تقضي من تلقاء نفسها ببطلانه بطلانا مطلقا ولا تصح إجازته لاحقا.

وأضاف المحتكم ضدهما في تلك المذكرة أيضا أنه: "ولما كان شرط التحكيم الوارد في البند 16 من العقد المنعدم المؤرخ2001/1/30 منعدما هو أيضا, فإن الإحالة الضمنية إليه في البند 12 من محضر اجتماع 2005/8/29 تكون إحالة إلى العدم لا تنتج أثرا.".

ولقد استند المحتكم ضدهما في ذلك الدفع بانعدام العلاقة التعاقدية إلى القول بأن العقد يفترض وجود إرادتين وهذا يفترض مسبقا وجود شخصين تصدر عنهما الإرادتان, فإذا لم يوجد شخص واحد استحال إبرام العقد وأن الثابت أن السجل التجاري للشركة المحتكمة أنها قيدت في مكتب سجل تجاري الاستثمار بالقاهرة برقم 6656 بتاريخ 2001/3/14 وأن المادة 17 في فقرتها قبل الأخيرة من القانون رقم 159 لسنة 1981 بشأن الشركات المساهمة وشركات التوصية بالأسهم وشركات المسئولية المحدودة تقضي بأن الشركة لا تكتسب الشخصية الاعتبارية إلا بعد مضي خمسة عشر يوما من تاريخ قيدها في السجل التجاري وعلى ذلك فإن الشركة المحتكمة لم توجد كشخص قانوني اعتباري سوى يوم 2001/3/29 وقبل هذا التاريخ لم يكن لها وجود, ومن ثم فإن العقد المبرم بتاريخ 2001/1/30 وما تلاه من اتفاقات أو محاضر اجتماعات تكون باطلة

**171**

ويكون اتفاق التحكيم الوارد في عقد الوكالة بدوره منعدما أو باطلا بطلانا مطلقا وينسحب ذلك أيضا على الملحق المؤرخ 2001/3/15 ومحضر إجتماع 2005/8/29 باعتباره ليس عقدا.

كما أورد المحتكم ضدهما أيضا شرحا للدفع أن محضر اجتماع 2005/8/29 لا يعتبر في تكييفه الصحيح عقدا, وإنما هو محضر للاجتماع الذي تم بين الطرفين لإثبات المسائل التي تم حولها التفاوض بين الطرفين, فضلا عن أنه لم يرد به أي نص على التحكيم كوسيلة لفض المنازعات بين الطرفين وبالتالي لا يصلح سندا لإقامة الدعوى التحكيمية الماثلة.

ـ وعلى الأساس المتقدم وتبعا له دفع المحتكم ضدهما أيضا بعدم اختصاص هيئة التحكيم بنظر الدعوى التحكيمية.

ـ ومن حيث أن هيئة التحكيم وهي تستند إلى صحيح القانون للرد على الدفوع السابقة تمهد لقضائها ردا عليهما بأن المادة 1/22 من القانون رقم 27 لسنة 1994 بشأن التحكيم في المواد المدنية والتجارية اختصت هيئة التحكيم بالحق في الفصل في هذه الدفوع, وذلك بنصها على أن " تفصل هيئة التحكيم في الدفوع المتعلقة بعدم اختصاصها بما في ذلك الدفوع المبنية على عدم وجود اتفاق تحكيم أو سقوطه أو بطلانه أو عدم شموله لموضوع النزاع ".

وحيث أن مفاد النص سالف البيان أن قانون التحكيم المصري رقم 27 لسنة 1994 بشأن التحكيم في المواد التجارية والمدنية المطبق على النزاع قد اعتنق مبدأ الإختصاص بالإختصاص فجعل لهيئة التحكيم الحق في الفصل في اختصاصها بما في ذلك على سبيل المثال الإختصاص بالفصل في الدفوع المبنية على عدم وجود اتفاق تحكيم أو سقوطه أو بطلانه أو عدم شموله لموضوع النزاع هيئة التحكيم, كما أن هيئة التحكيم وتبعا لذلك تختص أيضا بالفصل في مسألة صحة العقد الأصلي المتضمن شرط التحكيم, إذ جاءت صياغة النص عامة تشمل كافة الدفوع التي تتعلق باختصاص هيئة التحكيم ومن بينها الدفع بعدم صحة العقد الأصلي المبرم بين الأطراف. (د/أحمد السيد صاوي, الوجيز في التحكيم, الطبعة الثالثة 2010 ص 124)

ـ وحيث استقام الاختصاص لهيئة التحكيم في الفصل في الدفعين المبديين من المحتكم ضدهما بانعدام اتفاق التحكيم وبعدم اختصاص هيئة التحكيم بالفصل في الدعوى التحكيمية, فإن هيئة التحكيم وردا على الدفعين تشير بداية إلى أن هذين الدفعين قد تم إبدائهما والتمسك بهما بعد انقضاء الميعاد المقرر قانونا إعمالا لنصوص المواد 8 و 2/22 و 2/30 من قانون التحكيم المصري رقم 27 لسنة 1994. حيث نصت المادة الثامنة من قانون التحكيم على أنه: " إذا استمر أحد طرفي النزاع في إجراءات التحكيم مع علمه بوقوع مخالفة لشرط في اتفاق التحكيم أو لحكم من أحكام هذا القانون مما يجوز الاتفاق على مخالفته ولم يقدم اعتراضا على هذه المخالفة في الميعاد المتفق عليه أو في وقت معقول عند عدم الاتفاق, اعتبر ذلك نزولا منه عن حقه في الاعتراض." كما نصت الفقرة الثانية من المادة 2/22 من قانون التحكيم المصري27 لسنة 1994 على أنه: "يجب التمسك بهذه الدفوع في ميعاد لا يجاوز ميعاد تقديم دفاع المدعى عليه المشار إليه في الفقرة الثانية من المادة 30 من هذا القانون.".

172

وحيث أن الثابت من الأوراق أن الميعاد المتفق عليه لقيام المحتكم ضدهما بالرد على بيان الدعوى والذي قررته هيئة التحكيم ووافق عليه الأطراف في محضر الجلسة الإجرائية الأولى التي انعقدت بتاريخ 2013/11/28 كان قد تحدد بتاريخ غايته في يوم الاثنين الموافق 2014/1/27. وحيث أن المحتكم ضدهما لم يتمسكا بهذين الدفعين في مذكرة دفاعهما المقدمة بالرد والتعقيب على بيان الدعوى التحكيمية المقدم بتاريخ 2014/1/27, ولم يبديا أي من هذين الدفعين, إلا بعد مضي عدة أشهر من هذا التاريخ وتحديدا بتاريخ 2014/6/10 الذي تم فيه تقديم مذكرات من وكلائهما القانونيون الأستاذ الدكتور/ سمير الشرقاوي والأستاذ الدكتور/ فتحي والي تضمنت هذين الدفعين.

ومن ثم فإن هذين الدفعين المتعلقين ببطلان اتفاق التحكيم وباختصاص هيئة التحكيم في الفصل في النزاع قد سقط الحق فى ابدائهما,لكونهما قد أبديا بعد الميعاد المقرر قانون, ومن ثم فهما غير مقبولين شكلا, وهو ما تقضي به هيئة التحكيم , دون حاجة إلى ذكر ذلك بالمنطوق.

<u>كذلك فإنه ومن الناحية الموضوعية ولتعلق الدفعين بالطعن على اتفاقية الوكالة العامة وملحقها بالبطلان وبأن الاتفاق المؤرخ 2005/8/29 ليس عقدا, فإن هذه الدفوع مردود عليها:</u>

من ناحية أولى بما هو مقرر بنص المادة 23 قانون التحكيم المصري من أنه:"يعتبر شرط التحكيم اتفاقا مستقلا عن شروط العقد الأخرى, ولا يترتب على بطلان العقد أو فسخه أو إنهائه أي أثر على شرط التحكيم الذي يتضمنه إذا كان هذا الشرط صحيحا في ذاته", وقد قضت محكمة النقض المصرية إعمالا لهذا النص بأنه: "من أحد القواعد الأساسية التي تعتبر من ركائز التحكيم هي استقلال شرط التحكيم الذي يكون جزءا من عقد عن شروط هذا العقد الأخرى, بحيث لا يصيبه ما قد يصيب العقد من جزاء الفسخ أو أسباب البطلان أو إنهائه, ومن ثم فإن فسخ العقد الأصلي أو بطلانه أو إنهائه لا يمنع من إنتاج شرط التحكيم لآثاره طالما هو صحيح في ذاته ومؤدى ذلك أن اتفاق التحكيم سواء كان منفصلا في هيئة مشارطة التحكيم, أو في بند من بنود العقد الأصلي, فإنه يتمتع باستقلال قانوني بحيث يصبح بمنأى عن أي عوار قد يلحق الاتفاق الأصلي يترتب عليه فسخه أو بطلانه".

(طعن رقم 824, لسنة71 ق, جلسة 2007/5/24)

ومن ناحية ثانية: فقد تثبتت هيئة التحكيم من أن المحتكم ضدهما لم يكتفيا بشرط التحكيم الذي تضمنه كل من البند16من عقد الوكالة المبرم بتاريخ 2001/1/30, والبند16من ملحق عقد الوكالة المبرم بتاريخ 2001/3/15, وإنما أبرم المحتكم ضدهما مع الشركة المحتكمة وعلى النحو الذي سمح به نص المادة العاشرة من قانون التحكيم, اتفاق مشارطة التحكيم التي تم الاتفاق عليها بين أطراف النزاع بالجلسة الإجرائية الأولى من جلسات التحكيم بتاريخ 2013/11/28 والتي حدد فيها الأطراف المسائل التي يشملها التحكيم وفصلا فيها القانون واجب التطبيق على إجراءات التحكيم وعلى موضوع التحكيم وعلى مسائل الإثبات وغير ذلك من بنود تلك المشارطة سالفة البيان.

وحيث أن هذه المشارطة هي اتفاق تالي في إبرامه لتاريخ إبرام شرط التحكيم السابق الاتفاق عليه بين الأطراف في كل من عقد الوكالة وملحقه اللذان تعلقت بهما دفوع المحتكم ضدهما بانعدام اتفاق التحكيم و بعدم اختصاص هيئة التحكيم , بل وتعلق به دفعهما بانعدام و بطلان عقد الوكالة و ملحقه.

وحيث أن المحتكم ضدهما وهما يتفقان على مشارطة التحكيم بجلسة التحكيم المنعقدة بتاريخ 2013/11/28 لم يدفعا بانعدام أو ببطلان شرط التحكيم الوارد بعقد الوكالة محل النزاع أو ملحقه المبرم بتاريخ 2001/3/15 أو بعدم اختصاص هيئة التحكيم, وإنما أكدا انعقاد إرادتيهما على الرغبة في اللجوء إلى التحكيم وفقا لما تم الاتفاق عليه بينهما وبين الشركة المحتكمة بهذه المشارطة التحكيمية, كما أن المحتكم ضدهما أثبتا أيضا في محضر الجلسة الإجرائية الأولى بتاريخ 2013/11/28 قبولهما لجميع أعضاء هيئة التحكيم, فإن ذلك يثبت منه انعدام مصلحة المحتكم ضدهما وعدم جدوى وعدم إنتاجية دفعهما بانعدام وجود اتفاق التحكيم أو دفعهما بعدم اختصاص هيئة التحكيم تبعا لذلك.

ومن ناحية ثالثة فإن الدفعين بانعدام شرط التحكيم وتبعا لذلك بعدم اختصاص هيئة التحكيم بنظر الدعوى التحكيمية, لا يقومان على سند صحيح من الواقع أو القانون. ذلك أن مقطع النزاع في هذا الدفعين سالفي الذكر يدور حول إنعدام أو بطلان عقد الوكالة موضوع النزاع وملحقه المؤرخ 2001/3/15 ومحضر اجتماع 2005/8/29, وأثر ذلك على التزامات الطرفين المترتبة على هذا العقد وعلى شرط التحكيم الذي تضمنه العقد.

وحيث أن هيئة التحكيم وهي تتبع وجه الحق في شأن الفصل في الدفعين سالفي الذكر من خلال استقراء الأسباب والأسانيد والحيثيات التي حمل عليها كل من الشركة المحتكمة ضدهما هذين الدفعين, تستظهر أن وجه النزاع الدفعين ومقصدهما ينحصر في الأثر المترتب على إبرام العقد موضوع النزاع (الوكالة العامة) قبل اكتساب الشركة المحتكمة الشخصية الإعتبارية, وما إذا كان يترتب على ذلك إنعدام العقد أو بطلانه بحسبان أن الشركة المحتكمة لم يكن لها شخصية إعتبارية قائمة وقت إبرام العقد موضوع النزاع وشرط التحكيم الوارد به, وما إذا كان هذا الإنعدام أو البطلان الذي لحق العقد الأصلي بفرض وقوعه يستطيل إلى شرط التحكيم الوارد بالعقد ليدور معه وجودا وعدما فيكون شرط التحكيم بدوره منعدما أو باطلا أيضا.

وحيث أن المادة 17 في فقرتها الأخيرة من القانون 159 لسنة1981 السالف الإشارة إليها تنص على أن الشركات المساهمة لا تكتسب الشخصية الإعتبارية إلا بعد مرور خمسة عشر يوما من تاريخ قيدها في السجل التجاري. كما أن الثابت من الأوراق أن الشركة المحتكمة قيدت بالسجل التجاري برقم 6656 بتاريخ 2001/3/14 واكتسبت الشخصية الإعتبارية بتاريخ 2001/3/29, وأنه من هذا التاريخ اكتسبت الشركة المحتكمة شخصيتها الإعتبارية وفقا للقانون بما يترتب على ذلك من آثار قانونية. ومن ثم فإن الدفعين يتعلقان بتحديد الأثر المترتب على التصرفات القانونية والتعاقدية التي أبرمتها الشركة المساهمة قبل اكتسابها الشخصية الاعتبارية, والجزاء القانوني المترتب على هذه التصرفات, وما إذا كانت هذه التصرفات تقع منعدمة أو باطلة من عدمه.

وفي هذا الشأن تشير هيئة التحكيم إلى أن قانون الشركات المصري رقم 159 لسنة 1981المطبق على النزاع وإن نص في الفقرة الأخيرة من المادة 17 على أن الشركات المساهمة لا تكتسب الشخصية الإعتبارية, إلا بعد مرور خمسة عشر يوما من تاريخ قيدها في السجل التجاري, إلا أن أحكامه جاءت خالية من ثمة أحكام تتعلق بالتصرفات القانونية والتعاقدية التي تبرمها مع الغير في الفترة ما بين

174

تأسيسها وبين اكتسابها للشخصية الإعتبارية وما إذا كانت هذه التصرفات تقع منعدمة أو باطلة من عدمه. وفي المقابل فقد استقر قضاء محكمة النقض في هذا الشأن على أن: "وجوب قيد الشركة بالسجل التجاري اعتبارا بأنها تزاول عملا تجاريا في مصر عملا بنص المادة 3/4 من القانون رقم 34 لسنة 1976 في شأن السجل التجاري, فإنه لا علاقة له بما لها من أهلية للتعاقد والالتزام كما أن عدم القيد في السجل المذكور لا يترتب عليه انعدام أهلية الشركة الأجنبية وإن أوجب توقيع الجزاء المنصوص عليه في المادة 19من القانون سالف البيان".

(الطعن12790لسنة75ق,جلسة2011/3/22مكتب-فني62ق65ص392)

ـ <u>وردا على ما تضمنه دفاع المحتكم ضدهما في الموعد المقرر قانونا بمذكرة الرد على بيان الدعوى, من الدفع ببطلان الاتفاقية الموقعة مع المحتكمة للوقوع في غلط</u> أو تعيب إرادتها بالتدليس عليها , فإن المادة 120 من القانون المدني المصري المطبق على النزاع تنص على أنه: "إذا وقع المتعاقد في غلط جوهري جاز له أن يطلب إبطال العقد, إن كان المتعاقد الآخر قد وقع مثله في هذا الغلط أو كان على علم به أو كان من السهل عليه أن يتبينه. ونصت المادة 121 من ذات القانون على أنه:" 1- يكون الغلط جوهريا إذا بلغ حدا من الجسامة بحيث يمتنع معه المتعاقد عن إبرام العقد لو لم يقع في هذا الغلط. 2- يعتبر الغلط جوهريا على الأخص: أ- إذا وقع في صفة للشيء تكون جوهرية في اعتبار المتعاقدين, أو يجب اعتبارها كذلك لما يلابس العقد من ظروف ولما ينبغي في التعامل من حسن نية. ب ـ إذا وقع في ذات المتعاقد أو في صفة من صفاته , وكانت تلك الذات أو هذه الصفة السبب في التعاقد.".

كما نصت المادة 124 من ذات القانون على أنه :"1-ليس لمن وقع في غلط أن يتمسك به على وجه يتعارض مع ما يقضي به حسن النية.2-ويبقى بالأخص ملزما بالعقد الذي قصد إبرامه , إذا أظهر الطرف الآخر استعداده لتنفيذ هذا العقد.".

كما نصت المادة 125على أنه:"1- يجوز إبطال العقد للتدليس إذا كانت الحيل التي لجأ إليها أحد المتعاقدين أو نائب عنه, من الجسامة بحيث لولاها لما أبرم الطرف الثاني العقد. 2- ويعتبر تدليسا السكوت عمدا عن واقعة أو ملابسة, إذا ثبت أن المدلس عليه ما كان ليبرم العقد لو علم بتلك الواقعة أو هذه الملابسة."

ونصت المادة 140 من ذات القانون على أنه :" 1- يسقط الحق في إبطال العقد إذا لم يتمسك به صاحبه خلال ثلاثة سنوات. 2- ويبدأ سريان هذه المدة , في حالة نقص الأهلية , من اليوم الذي يزول فيه هذا السبب, وفي حالة الغلط أو التدليس من اليوم الذي ينكشف فيه , وفي حالة الإكراه من يوم انقطاعه, وفي كل حال لا يجوز التمسك بحق الإبطال لغلط أو تدليس أو إكراه إذا إنقضت خمس عشرة سنة من وقت تمام العقد."

وحيث أن مفاد ما تقدم من نصوص القانون المدني المصري المطبق على النزاع الماثل في هذا الشأن أن المشرع المصري قد نظم حالات بطلان العقد بسبب العيوب التي تلحق الإرادة وتكون دافعة للتعاقد وهي العيوب المتعلقة بالغلط والتدليس والإكراه, وجعل توافر إحداها سببا لطلب إبطال العقد.

175

وحيث أن المشرع المصري لم يجعل أي من تلك العيوب سببا في بطلان العقد بطلانا مطلقا, وإنما جعل من شأن التحقق من وجود العيب و توافر الشرائط التي أوجب المشرع التحقق منها, رخصة لمن تعيبت إرادته طلب إبطال العقد. كما أن المشرع وحرصا منه على استقرار الأوضاع وعدم زعزعة التعاقدات حدد للتمسك بهذا الحق في طلب إبطال العقد مدة ثلاثة سنوات تبدأ من اليوم الذي يتم فيه اكتشاف الغلط أو التدليس ومن اليوم الذي ينقطع في الإكراه. فإذا لم يتمسك من تعيبت إرادته بأي من هذه العيوب خلال تلك المدة سواء بطريق الدعوى أو الدفع سقط حقه في طلب إبطال العقد.

وحيث أنه وعلى نحو ما استقر عليه قضاء محكمة النقض, فإن :".. حق إبطال العقد يزول بالإجازة صريحة كانت أم ضمنية وأن الإجازة الصادرة ممن يملكها تصح ولو لم يقترن بها ويستقر بها وجود العقد بعد أن كان مهددا بالزوال ويدل عليه كل عمل يفيد معناها ويكون كاشفا عن دلالتها إذا صدر ممن يملكها في شأن عقد قائم وكان عالما بما داخل هذا العقد من عيوب قاصدا التجاوز عنها بما مؤداه أن دعواه بإبطال العقد تكون مفتقرة لأساسها منافية لمقاصدها "(الطعن رقم 4 لسنة 15 ق, جلسة 1994/12/3), وأن :" إجازة العقد قد تكون صريحة أو ضمنية, ومن ثم فلا تثريب علي محكمة الموضوع إذا استخلصت في حدود سلطتها الموضوعية استخلاصاٍ سائغا في وقائع الدعوي ومستنداتها " (الطعن رقم 449 لسنة 26 ق, جلسة 1962/5/3, ص 595)

وحيث اقتصر دفع المحتكم ضدهما على التمسك ببطلان اتفاق التحكيم كأثر لبطلان عقد الوكالة محل النزاع لقول المحتكم ضدهما بتعييب إرادتهما بعيب الغلط في شخص الشركة المحتكمة وما نسباه إلى الشركة المحتكمة من التدليس علهما في هذا الشأن.

وحيث أن الثابت من الأوراق وظروف التعاقد -وبغير حاجة إلى التعمق في بحث مدى توافر الحالات السابق الإشارة إليها سواء ما تعلق منها بالغلط أو التدليس ـ أن المحتكم ضدهما لم يتمسكا به بهذا الدفع ولم يطلبا بطلان اتفاق التحكيم أو عقد الوكالة وأي من ملحقه أو اتفاقية إعادة تفعيل الوكالة المؤرخة 2005/8/29 في أي مرحلة من المراحل السابقة على هذه الدعوى التحكيمية. فلم يدفع المحتكم ضدهما ببطلان العقد أو يطالبا به على الرغم من تيسر استظهار ما يتعلق بشخصية الشركة المحتكمة عند التعاقد. إلا أن لامحتكم ضدهما استمرا في التمسك بالتعاقد ثم في التمسك بأن المحتكم ضدها الأولى ألغت التعاقد, ثم استمرت في السعي نحو الحلول الودية لإنهاء النزاع بشأن ما تمسكت به من الأثار المترتبة على القرار الذي اتخذته بإلغاء العقد.

كما أن الثابت من مطالعة هيئة التحكيم لأوراق الدعوى ومما تبين لها من استعراض الوقائع المحيطة بالتعاقد وما تلاه, وحتى تاريخ طلب التحكيم, أن الشركة المحتكم ضدها الأولى كانت تعلم بالضرورة بأن الشركة المحتكمة كانت تحت التأسيس وأنها تأسست خصيصا لتكون وكيل الشركة المحتكم ضدها الأولى ولتتولي تنفيذ عقد الوكالة, وأن المحتكم ضدهما قد وافقا على إبرام عقد الوكالة مع الشركة المحتكمة بينما لم تكن إجراءات قيد هذه الأخيرة بالسجل التجاري قد تمت, وهو ما أثبته وأكده أيضا ما سبق بيانه من عدم تمسك المحتكم ضدهما بهذا الادعاء في أي مرحلة من المراحل السابقة على البدء بمباشرة الدعوى التحكيمية, وبرغم مضي العديد من السنوات التي تجاوزت بزمن بعيد مهلة

176

الثلاث سنوات المقررة قانونا لسقوط الحق في طلب بطلان العقد إذا ما كانت إرادة أحد الأطراف تعيبت بعيب من عيوب الإرادة و منها الغلط و التدليس.

كما أن الثابت أيضا من الأوراق وفي ذات السياق أن المحتكم ضدها الأولى قامت بإبرام اتفاقية أخرى مع الشركة المحتكمة بتاريخ 2005/8/29, بعد مضي ما يقارب الأربع سنوات من تمتع الشركة المحتكمة بشخصيتها المعنوية, وذلك بعد أن تراجعت بموجب تلك الاتفاقية عن قرارها السابق بتاريخ 2004/12/2 بإنهاء الوكالة, فأعادت بموجب الاتفاق المبرم بتاريخ 2005/8/29 تفعيل عقد الوكالة مؤكدة لوجوده و لصحته.

وحيث أن هذا هو ما أكده المحتكم ضدهما في الصفحة الثانية عشرة من المذكرة المقدمة من اوكيلهما القانوني -أنذاك- الأستاذ الدكتور/سمير الشرقاوي بتاريخ 2014/6/10,كما أكداه أيضا باقتصار طعنهما على هذه الاتفاقية المبرمة بتاريخ 2005/8/29, بالدفع بأنها ليست عقدا وإنما محضر جلسة, كذلك فقد قام المحتكم ضدهما مرة أخرى بتاريخ 2005/11/14 بإصدار قرار أخر بإنهاء الوكالة, ثم وبعد إصدار القرار السالف بيومين وبتاريخ 2005/11/16 تراجعا عنه وأصدرا قرارا أخر بإيقاف العمل بعقد الوكالة, وعلى نحو يؤكد تمسكهما بوجود وصحة عقد الوكالة وما تلاه من ملحق الاتفاقية واتفاقية 2005/8/29, حيث لا يرد الإنهاء كما لا يرد الإيقاف إلا على عقد موجود وصحيح.

وحيث أن الثابت أيضا, أن المحتكم ضدهما استمرا منذ بدء النزاع وعلى مدار تداول الدعوى التحكيمية, في التمسك ببنود عقد الوكالة والتمسك بقيامهما بتنفيذ التزاماتهما التعاقدية والتمسك بأن المحتكمة هي من خالف هذه الالتزامات على نحو أدى بهما إلى إصدار قرار إنهاء الوكالة. هذا فضلا عن ان المحتكم ضدهما ناضلا في دفاعهما باستعراض شروط وبنود العقد و التمسك بها , و التمسك بأحقيتهما في انهاء التعاقد و فسخه , بل واستمرا في الدفع بسقوط حق الشركة المحتكمة في إقامة الدعوى التحكيمية بادعائهما بمرور اكثر من سنتين على انتهاء العلاقة التعاقدية, بما يثبت منه تأكيد المحتكم ضدهما ذاتهما على وجود و صحة عقد الوكالة , ويسقط معه ادعائهما بانعدام عقد الوكالة أو بطلانه.

لذلك فقد انتهت هيئة التحكيم إلى القضاء برفض الدفع بانعدام وببطلان عقد الوكالة الذي استند إلى انعدام الشخصية القانونية للشركة المحتكمة وقت التعاقد وإلى الادعاء بتعييب إرادة المحتكم ضدهما بعيبي الغلط والتدليس في شخص الشركة المحتكمة المتعاقد معها, وانتهت هيئة التحكيم بالتالي إلى رفض الدفع بانعدام وببطلان اتفاق التحكيم ورفض الدفع بعدم اختصاص هيئة التحكيم تبعا لذلك , دون حاجة إلى النص على ذلك في المنطوق.

<u>ـوحيث أنه عن دفع ودفاع المحتكم ضدهما بشأن محضر الاجتماع المؤرخ 2005/8/29 والتمسك بأنه لا يعتبر في تكييفه الصحيح عقدا,</u> وإنما هو محضر للاجتماع الذي تم بين الطرفين لإثبات المسائل التي تم حولها التفاوض بين الطرفين, فضلا عن أنه لم يرد به أي نص على التحكيم كوسيلة لفض المنازعات بين الطرفين وبالتالي لا يصلح سندا لإقامة الدعوى التحكيمية الماثلة.

ـ <u>فإن هيئة التحكيم وبما لها من سلطة في إسباغ التكييف القانونى الصحيح على العقود والاتفاقات والمحررات دون أن تتقيد في ذلك بتكييف الخصوم لها في الدعوى,</u> وذلك في إطار حقيقة المقصود

**177**

من هذه العقود أو الاتفاقات أو المحررات لا بالألفاظ التي صيغت فيها, مع الأخذ في الاعتبار ما يطرحه المدعي واقعا مبررا لها لما ارتأوه من تكييف لهذه العقود والاتفاقات والمحررات.

ولما كان الثابت من الاتفاقية المؤرخة 2005/8/29 والمعنونة "محضر اجتماع" أنها تضمنت وفقا لما سطر بديباجة الوثيقة أنها" لغرض إعادة تفعيل فتح خط طيران ونقل المسافرين والشحن للقطاع بغداد- القاهرة- بغداد وتسيير رحلات جوية منتظمة بطائرات الشركة العامة للخطوط الجوية العراقية وبناء على المفاوضات الجارية في تواريخ 26 و27 /2005/8 وبحضور السادة الموقعين فقد تم الاتفاق على ما يلي:-

1- إعادة تفعيل عقد الوكالة وملحقه الموقع بين الشركة العامة للخطوط الجوية العراقية والوكيل العام شركة هورس للسياحة والسفر المؤرخين في 2001/1/30 وملحقه في2001/3/15.

2- الموافقة على تعديل الفقرة (أ) من البند (20) الوارد بالملحق والخاصة بالكفالة المصرفية وتصبح (زيادة قيمة الكفالة المصرفية بمبلغ 100000$ (مائة ألف دولار أمريكي) بحيث تصل إلى 200000$ (مائتان ألف دولار أمريكي) تقدم خلال التشغيل واستلام المستندات السفرية الخاصة بالطرف الأول وممارسة النشاط التجاري).

3 ـ إلغاء الفقرة (ب) من البند (20) بذات الملحق.

4 ـ يقوم الوكيل العام بمتابعة استحصال الموافقات الأصولية لتشغيل خط بغداد-القاهرة-بغداد لقيام الجانب التجاري في الوفد بتسليم المستلزمات الفنية المتضمنة شهادة الطائرات والتأمين وتسجيلها وتسليمها مع جداول التشغيل إلى سلطات الطيران المصري لغرض دراستها واستحصال موافقات التشغيل.

5 ـ يقوم الوكيل العام بسداد المبالغ المترتبة عن أجور الخدمة الأرضية ـالوقودـ ومصاريف الإقلاع والهبوط ـالضرائب والرسوم-تموين الطائرات في مطار القاهرة بشكل مؤقت على أن يتم تسديدها من قبل الخطوط الجوية العراقية بعد قيام شركة هورس للسياحة والسفر بدفع قوائم طلب أصولية إلى الخطوط الجوية العراقية ويتم تسوية المبلغ بين الطرفين ويسدد شهريا.

6- يقوم الوكيل العام ببذل العناية اللازمة لاستخراج فيزا (تأشيرة الدخول للمسافرين العراقيين) من بغداد إلى القاهرة وسيكون المبلغ المترتب على استحصال الفيزا (30$) ثلاثون دولار أمريكي لكل جواز على أن يتم تقديم صورة الجواز في مدة لا تقل عن عشر أيام قبل المغادرة ويستثنى موظفي الخطوط الجوية العراقية وعوائلهم من رسم الفيزا.

7- يقوم الوكيل العام بعمل حملات إعلامية شاملة لتسيير رحلات الخطوط الجوية العراقية للترويج لها داخل جمهورية مصر العربية.

8- يقوم الوكيل العام بإصدار كفالة بنكية لضمان عقدي الوقود ـ والخدمات الأرضية- وتموين الطائرات نيابة عن الخطوط الجوية العراقية عند بدء التشغيل لحين قيام الخطوط الجوية العراقية بإصدارها لاحقا ورد الكفالة للوكيل العام .

9- تعديل عمولة الوكيل العام لتصبح 7% بالنسبة إلى المسافرين بالإضافة إلى 3% أما بالنسبة إلى الشحن ستكون النسبة 5% بالإضافة إلى 2%. ويتم إعادة النظر في النسبة الخاصة بالمسافرين والبالغة 7% عند تحقق أرباح من جراء التشغيل.

178

10ـ مدة العقد للوكالة العامة ثلاثة سنوات من تاريخ بدء التشغيل الفعلي تجدد تلقائيا لمدة مماثلة لمدة أخرى وتجدد هكذا تلقائيا ما لم يخطر أحد الطرفين الآخر بعدم رغبته بالتجديد قبل انتهاء المدة المجددة بستين يوما على الأقل بخطاب موصى عليه بعلم الوصول ولا يجوز لأي من الطرفين طلب الفسخ أو عدم التجديد إلا إذا وقع خطأ جسيم من الطرف الثاني .

11ـ استكمال تشطيبات مكتب الشركة العامة للخطوط الجوية العراقية في القاهرة والمتضمن ما يلي:-

1ـ التشطيب الخارجي للمكتب .2ـ تجهيز غرف الشركة بأجهزة كمبيوتر وحاسبات. 3ـ تغيير أجهزة التكييف.

4ـ وضع خريطة العالم الكبيرة خلف الكاونتر واسم العراقية أسفل الخريطة بالرخام الأخضر.

12ـ يستمر الوكيل العام شركة هورس للسياحة والسفر بالعمل بالوكالة العامة الممنوحة له والمؤرخة 2001/1/30 ويعتبر ملحق الوكالة المؤرخ في 3/15 2001 ومحضر الاجتماع الموقع بتاريخ 2005/8/27 جزء لا يتجزأ من عقد الوكالة العامة الموقعة بين الطرفين ويلغى كل ما يخالف ذلك .

ـ وحيث انتهت هيئة التحكيم إلى أن هذا المحرر أفصح بلفظ صريح على أنه "قد تم الاتفاق" وعلى نحو ثبت منه اتجاه إرادة طرفيه وإنعقاد نيتهما واتفاقهما على إعادة تفعيل عقد الوكالة وملحقه الموقع بين الشركة العامة للخطوط الجوية العراقية والوكيل العام شركة هورس للسياحة والسفر المؤرخ 2001/1/30, وملحقه في 2001/3/15, وأن هذا هو ما يتفق مع تعريف العقد بأنه توافق إرادتين أو أكثر على إحداث أثر قانوني, سواء كان هذا الأثر هو إنشاء التزام أو نقله أو تعديله أو إنهاءه, ومن ثم فإن التكييف القانوني السليم الذي تأخذ به هيئة التحكيم للمحرر سالف البيان أنه عقد واتفاق على إعادة تفعيل عقد الوكالة وملحقه المبرم بين الشركة المحتكم ضدها الأولى والشركة المحتكمة.

ولا يقدح فيما تقدم ما أورده المحتكم ضدهما في مذكرات دفاعهما من أن محضر الاجتماع بتاريخ 2005/8/29 كان نتيجة سعي الشركة المحتكمة لإعادة تفعيل عقد الوكالة الملغي آنذاك, وأن ما تم فيه هو مجرد عرض تثبيت ما تم مناقشته تمهيدا لحصول الشركة المحتكم ضدها على موافقة مجلس إدارة الشركة العامة ثم تفريغه في ملحق عقد وكالة كما تم في ملحق الوكالة المؤرخ 2001/3/15 لكون النظام الداخلي للشركة العامة للخطوط الجوية العراقية المرقم 20 لسنة 2000 (المرفق صورة منه بالحافظة رقم 4 المقدمة من المحتكم ضدهما رفق مذكرة الرد والتعقيب على بيان الدعوى) جاء به تحت عنوان مهام رئيس مجلس الإدارة  نص المادة 14 بالفصل الرابع أنه من ضمن المهام التي يمارسها مجلس الإدارة :".. س ـ إقرار العقود والاتفاقيات المتعلقة بأعمال الشركة. غ ـ اختيار الوكلاء العاملين خارج العراق وتحديد عمولتهم وإبرام عقود الوكالة معهم", وكذلك بشأن ما عرضه المحتكم ضدهما عن علم الشركة المحتكمة بذلك مسترشدين بما جاء بمحضر الإجتماع المؤرخ 2008/11/16 من عبارة تأجيل مناقشات الحل الودي لغرض عرض الأمر على مجلس إدارة كل من الطرفين لاستحصال الموافقات الأصولية المطلوبة (المرفق صورته بالحافظة رقم 4 سالفة البيان)..

فذلك الذي يتمسك به المحتكم ضدهما بأنه مجرد محضر اجتماع بتاريخ 2005/8/29, قد تبين لهيئة التحكيم أن صيغته وصريح اللفظ فيه قد جاءتا على خلاف ما يقول به و يتمسك المحتكم ضدهما, حيث وردت عباراته صريحة بالاتفاق بين الطرفين على الالتزام بإعادة تفعيل عقد الوكالة وما يترتب عليها

179

من أثار, دون أن يرد به أي نص على يتطلب موافقة مجلس إدارة الشركة العامة للخطوط الجوية العراقية. وهو ما أكده دفاع المحتكم ضدهما ذاته بما أورده في مذكرة الرد والتعقيب على بيان الدعوى التحكيمية من أنه وحينما أراد الأطراف في اجتماع 2008/11/16 تعليق نفاذ اتفاقهما على موافقة مجالس إدارتيهما فقد أوردا ذلك بنص صريح, كما أورد المحتكم ضدهما أيضا في ذات مذكرة دفاعهما ما يفيد أن ثبوت علم الشركة المحتكمة بما يتطلبه النظام الداخلي للشركة العامة للخطوط الجوية العراقية هو شرط التزام الغير به, وأنه وبذلك يكون المحتكم ضدهما ذاتهما قد أثبتا في مذكرة الدفاع هذه عدم علم الشركة المحتكمة بالنظام الداخلي للشركة العامة للخطوط الجوية العراقية في 2005/8/29, حيث أن المستند الذي قدماه لإثبات هذا العلم هو محضر اجتماع مؤرخ 2008 /11/16 أي بعد مضي ما يقرب من ثلاث سنوات تالية على اتفاق إعادة تفعيل الوكالة المؤرخ 2005/8/29.

وحيث أن ما دفعت به الشركة المحتكمة أيضا في مذكرات الدفاع المقدمة منها, بعدم جواز تمسك المحتكم ضدهما بهذا الدفع لعدم جواز استفادتهما من إهمال الشركة المحتكم ضدها الأولى في الحصول على تلك الموافقات, هو دفع سديد.

كما أن تمسك المحتكم ضدهما بالدفع بعدم الاعتداد بما ورد باتفاق إعادة تفعيل العقد الوارد بمحضر اجتماع إعادة تفعيل الوكالة الممهور بتوقيع المدير العام عبد على عبود في 2005/8/29 يتناقض بمقتضى اللزوم المنطقي والقانوني مع تمسك المحتكم ضدهما ذاتهما بالقرارات الصادرة بهذه الكيفية أو الألية الممهورة بتوقيع ذات المدير العام وتمسكهما خصوصا بقرار إنهاء عقد الوكالة محل النزاع المؤرخ 2005/11/14.

لذلك وفي ضوء ما تقدم جميعه ترفض هيئة التحكيم دفع المحتكم ضدهما بأن المحضر المحرر بتاريخ 2005/8/29 بين المحتكمة و المحتكم ضدها الأولى ليس عقدا , كما ترفض هيئة التحكيم دفع المحتكم ضدهما بأن هذا العقد لم يتضمن شرط تحكيم, حيث أن هذا الاتفاق قد أعاد تفعيل كل من اتفاقية الوكالة العامة و ملحقها الوارد بهما شرط التحكيم, وترفض هيئة التحكيم تبعا لذلك وبناء عليه الدفع بانعدام وبطلان شرط التحكيم, كما ترفض لذلك أيضا وبناء عليه الدفع بعدم اختصاص هيئة التحكيم بنظر الدعوى التحكيمية, دون حاجة إلى ذكر ذلك بالمنطوق.

<u>الفصل الثاني:دفوع المحتكم ضدهما المتعلقة بتشكيل هيئة التحكيم,وطلب المحتكم ضدهما وقف الدعوى التحكيمية لحين الفصل الطعون بالنقض:</u>

<u>أولا ـ الدفع المبدى من المحتكم ضدهما</u> (بمذكرة دفاعهما المودعة بتاريخ 2014/1/27 ردا على بيان الدعوى التحكيمية ص 4) ببطلان إجراءات التحكيم على قالة مخالفة تشكيل هيئة التحكيم لاتفاق الأطراف ومخالفته للقانون والقواعد الدولية المعمول بها في مجال التحكيم الدولي استنادا من المحتكم ضدهما إلى أن البند السادس عشر من عقد الوكالة اتفق فيه الطرفان على أنه في حالة عدم الإتفاق على رئيس لهيئة التحكيم يتم اللجوء إلي المكتب الإقليمي لمنظمة الأياتا, وعليه فإن الجهة المختصة اتفاقا لتعيين المحكم المرجح يكون المكتب الإقليمي لمنظمة الأياتا. وبناء على ما تقدم وبتطبيق نص البند السادس عشر من عقد الوكالة يتضح أن الطرفان اتفقا في شرط التحكيم بالعقد على كيفية اختيار

**180**

المحكم المرجح في اختلاف المحكمين المعينين من الطرفين وهو اللجوء إلي المكتب الإقليمي لمنظمة الأياتا لتعيين محكم مرجح .

كما استند المحتكم ضدهما إلى القول بأن المحكمين والمحكمة مقيدين بالاتفاق الذي سبق وأن اتفق عليه الطرفين في العقد, وبنص المادة 17 من قانون التحكيم المصري التي جاءت في فقرتها الثالثة مؤكدة علي احترام اتفاق الطرفين من قبل المحكمين ومن قبل المحكمة ونصت علي أنه: "3- وتراعي المحكمة في المحكم الذي تختاره الشروط التي يتطلبها هذا القانون, وتلك التي اتفق عليها الطرفان.." بما كان يتبين معه علي المحتكمة إعمال الشروط المنصوص عليها في المادة 16 من عقد الوكالة في اختيار المحكم, إلا أنها توجهت إلي المحكمة بطلبها تعيين محكم مرجح وتكون بذلك خالفت نص القانون ونص الاتفاق, وكان يجب علي المحكمة أن تقضي بعدم اختصاصها بنظر النزاع حيث أن الاختصاص الأصيل نفاذاً لحكم المادة 17 نفاذا لما جاء بإتفاق الطرفين بالبند 16 من الوكالة هو اختصاص المكتب الإقليمي لمنظمة الأياتا, وكان يجب علي المحكمة أن تطبق القانون نص المادة 3/17 التي قيدت المحكمة عند نظر أي خلاف يطرح أمامها وقد تم الاتفاق عليها من الطرفان أن تراعي الشروط التي اتفق عليها الطرفان بحكمها وتلزم الطرفين بالتوجه إلي المكتب الإقليمي لمنظمة الأياتا لتعيين محكم مرجح , وهذا ما أكده المدير الإقليمي لمنظمة الأياتا في كتابه الذي حصلت عليه الشركة المحتكم ضدها والذي تم تقديمه إلي المحكمة بطلب التماس إعادة النظر في الحكم الذي أصدرته لحصول الشركة المحتكم ضدها علي مستند هام بعد صدور حكم المحكمة فهو فاصل في الدعوي, وهذا الكتاب الذي حصلت عليه الشركة المحتكم ضدها من المدير الإقليمي لمنظمة الأياتا في اختيار محكم مرجح في حالة تقديم الطرفين طلب بذلك أو توجيه المحكمة بذلك وتم الحصول من قبل الشركة المحتكم ضدها علي هذا الكتاب بعد توجه الشركة المحتكمة إلي منظمة الأياتا ـ المكتب الإقليمي ـ , وتقديم معلومات غير صحيحة وتشويه الحقائق بطريقة لصالحها غير حقيقية.

<u>ثانيا ـ الدفع المبدى المحتكم ضدهما بمذكرة دفاعهما المودعة بتاريخ 2014/1/27 ردا على بيان الدعوى التحكيمية ص 11 ببطلان تشكيل هيئة التحكيم استنادا إلى قولهما بوجوب تعيين المحكم المرجح من جنسية أخرى غير جنسية أطراف النزاع على نحو ما تقضي به القوانين الدولية المعمول بها في مجال التحكيم الدولي</u> . واستند المحتكم ضدهما في التمسك بهذا الدفع على أنه وفقا للأعراف الدولية في مجال التحكيم الدولي وللفقرة الخامسة من المادة الحادية عشر من قانون الأونسيترال للتحكيم الدولي فإنه كان يتعين على المحكمة لدى قيامها بتعيين محكم أن تولي الاعتبار الواجب إلى المؤهلات المطلوب توافرها في المحكم وفقا لإتفاق الطرفين وإلى الاعتبارات التي من شأنها ضمان تعيين محكم مستقل ومحايد وفي حالة تعيين محكم فرد أو محكم ثالث يتعين أن تأخذ في الإعتبار كذلك استصواب تعيين محكم من غير جنسية الطرفين ....", وبناء عليه كان يتعين على محكمة استئناف القاهرة أن تعيين رئيس هيئة التحكيم من جنسية مختلفة عن جنسية أطراف النزاع. بالرغم من توافر فيه شرط الحيادية والاستقلال والنزاهة والخبرة, لكون الأمر يتعلق بإجراء شكلي يبطل التحكيم وتشكيل هيئة التحكيم وانتهى المحتكم ضدهما استنادا إلى ما تقدم إلى الدفع ببطلان إجراءات التحكيم.

وردا على الدفعين السابقين فإن هيئة التحكيم وهى تمهد لقضائها فيهما تشير إلى أنه وإنفاذا لما اتفق عليه الطرفين من خضوع الفصل في إجراءات هذا التحكيم لقانون التحكيم المصري رقم 27 لسنة 1994, فإنها تخضع الفصل في هذين الدفعين إلى قواعد وأحكام قانون التحكيم المصرى رقم 27 لسنة 1994, والذي ورد نص المادة 15 منه في هذا الشأن بأنه:(1) ـ تشكل هيئة التحكيم بإتفاق الطرفين من محكم واحد أو أكثر, فإذا لم يتفقا على عدد المحكمين كان العدد ثلاثة. (2)ـ وإذا تعدد المحكمون وجب أن يكون عددهم وترا, وإلا كان التحكيم باطلا ".

كما ورد نص المادة 16 من ذات القانون نصا على أنه: (1) لا يجوز أن يكون المحكم قاصرا أو محجورا عليه أو محروما من حقوقه المدنية بسبب الحكم عليه في جناية أو جنحة مخلة بالشرف أو بسبب شهر إفلاسه ما لم يرد إليه اعتباره. (2) لا يشترط في المحكم أن يكون من جنس أو جنسية معينة, إلا إذا اتفق طرفا التحكيم أو نص القانون على غير ذلك. (3) يكون قبول المحكم القيام بمهمته كتابة, ويجب عليه أن يفصح عند قبوله عن أية ظروف من شأنها إثارة شكوك حول استقلاله أو حيدته.

كما ورد نص المادة 17 من القانون سالف الذكر بأنه: (1) لطرفي التحكيم الإتفاق على اختيار المحكمين وعلى كيفية اختيارهم ووقت اختيارهم فإذا لم يتفقا اتبع ما يأتي: أـ إذا كانت هيئة التحكيم مشكلة من محكم واحد تولت المحكمة المشار إليها في المادة 9 من هذا القانون اختياره بناء على طلب أحد الطرفين.(ب) فإذا كانت هيئة التحكيم مشكلة من ثلاثة محكمين اختار كل طرف محكما ثم يتفق المحكمان على اختيار المحكم الثالث , فإذا لم يعين أحد الطرفين محكمه خلال الثلاثين يوما التالية لتسلمه طلبا بذلك من الطرف الآخر , أو إذا لم يتفق المحكمان المعينان على اختيار المحكم الثالث خلال الثلاثين يوما التالية لتاريخ تعيين آخرهما, تولت المحكمة المشار إليها في المادة 9 من هذا القانون اختياره بناء على طلب أحد الطرفين ويكون للمحكم الذي اختاره المحكمان المعينان أو الذي تختاره المحكمة رئاسة هيئة التحكيم, وتسري هذه الأحكام في حالة تشكيل هيئة التحكيم من أكثر من ثلاثة محكمين .(2) وإذا خالف أحد الطرفين إجراءات اختيار المحكمين التي اتفقا عليها أو لم يتفق المحكمان المعينان على أمر مما يلزم اتفاقهما عليه, أو إذا تخلف الغير عن أداء ما عهد به إليه في هذا الشأن تولت المحكمة المشار إليها في المادة 9 من هذا القانون بناء على طلب أحد الطرفين, والقيام بالإجراء, أو العمل المطلوب ما لم ينص في الإتفاق على كيفية أخرى لإتمام هذا الإجراء أو العمل.(3) وتراعي المحكمة في المحكم الذي تختاره الشروط التي يتطلبها هذا القانون وتلك التي اتفق عليها الطرفان , وتصدر قرارها باختيار المحكم على وجه السرعة, مع عدم الإخلال بأحكام المادتين18 و 19 من هذا القانون ولا يقبل هذا القرار الطعن بأي طريق من الطعن."

ـ ومن حيث أن الدفعين السابقين المبديين من المحتكم ضدهما والمنتهيين بطلب القضاء ببطلان إجراءات التحكيم يتعلقان باختيار المحكم المرجح (رئيس هيئة التحكيم), وأن المحتكم ضدهما يستندان إلى أنه كان يجب تعيينه من المدير الإقليمي لمنظمة الأياتا وأن المحكمة التي قامت بتعيين رئيس هيئة التحكيم لم تراع في اختياره أن يكون من جنسية مختلفة عن جنسية طرفا التحكيم. وأخذا فى الاعتبار بأن إعمال نص الفقرة الثالثة من المادة 17 من قانون التحكيم المصرى من عدم اشتراط أن يكون المحكم من جنس أو جنسية معينة, إلا إذا اتفق طرفا التحكيم أو نص القانون على غير ذلك, وأن شرط التحكيم الوارد بالمادة16 في كل من عقد الوكالة وملحق عقد الوكالة خلا من أي شرط بتحديد جنسية أي من



182

المحكمين, بما يجعل الدفع ببطلان تشكيل هيئة التحكيم استنادا إلى وجوب تعيين المحكم المرجح من جنسية أخرى غير جنسية أطراف النزاع دفعا لا يقوم على سند من صحيح الواقع أو القانون.

ـ كما أن الثابت بالأوراق أن طرفا التحكيم قد أعلنا في جلسة التحكيم الأولى بتاريخ الخميس الموافق 2013/11/28 في صدر مشارطة التحكيم, عن قبولهما لجميع أعضاء هيئة التحكيم, ولم يعترضا على رئيس هيئة التحكيم بل انهم لم يتمسكوا ببطلان تشكيل الهيئة لهذا السبب, بما يسقط به في جميع الأحوال أي حق لهم في التمسك بهذا الدفع اعمالا للمادة 8 من قانون التحكيم, هذا فضلا عن أن قبول الأطراف بهيئة التحكيم على النحو السالف بيانه يعد تعيينا جديدا لهم وقبولا بكافة الإجراءات التي اتبعت في تعيينهم والظروف التي صاحبت ذلك التعيين, بما يكون معه الدفعين ببطلان إجراءات التحكيم لبطلان تشكيل هيئة التحكيم بدعوى مخالفة تعيين رئيس هيئة التحكيم لشرط التحكيم لأن الجهة المختصة بتعيينه وفقا لاتفاق التحكيم هي المكتب الإقليمي لمنظمة الأياتا أو لأنه كان يجب أن يتم تعيينه من جنسية أخرى غير جنسية أطراف التحكيم, أو لغير ذلك من المبررات التي ساقها المحتكم ضدهما, لا يستندان إلى صحيح الواقع والقانون, ومخالفين لإرادة أطراف التحكيم, جديرين بالرفض.

كما وتشير هيئة التحكيم أيضا إلى الثابت من الأوراق أن الشركة المحتكمة قد أقامت الدعوى رقم 76 لسنة 129 ق أمام الدائرة 50 تجاري بمحكمة استئناف القاهرة التي دفعت المحتكم ضدها الأولى بذات الدفوع بشأن بطلان تشكيل هيئة التحكيم سواء في ذلك الدفع بأن المختص بتعيين المحكم المرجح هو المكتب الإقليمي لمنظمة الأياتا أو الدفع بأنه كان يجب تعيين المحكم المرجح من جنسية أخرى غير جنسية أطراف التحكيم, وقد انتهت محكمة استئناف القاهرة إلى القضاء بحكمها الصادربتاريخ 2013/8/26 بتعيين الأستاذ الدكتور/حسن عبد الباسط جميعي محكما ثالثا للفصل في النزاع.

وحيث أن الحكم الصادر بتعيين المحكم لا يقبل الطعن بأي طريق من طرق الطعن إنفاذا لنص الفقرة الثالثة من المادة 17 من قانون التحكيم المصري رقم 27 لسنة 1994, ومن ثم فإن الحكم الصادر من محكمة استئناف القاهرة بتاريخ 2013/8/26 قد أضحى حكما نهائيا و باتا بعدم قابليته للطعن عليه.

ولما كان هذا القضاء قد حاز قوة الشيء المحكوم به في تلك المسألة الأساسية بين الخصوم أنفسهم, ومن ثم فإنه يمنعهم من إعادة التنازع في شأنها سواء بطريق الدعوى أو الدفع أو في شأن أي حق آخر يتوقف ثبوته أو انتفاؤه على ثبوت تلك المسألة السابق الفصل فيها بين هؤلاء الخصوم أنفسهم أو على انتفائها, ويكون إعادة إثارة هذا النزاع في القضية التحكيمية الماثلة هو ما يتعارض مع حجية الأحكام, بما لا يجوز معه إثارة هذا النزاع أمام هيئة التحكيم.

وحيث تنص المادة 101 من قانون الإثبات على أنه :ـ"الأحكام التي حازت قوة الأمر المقضي تكون حجة فيما فصلت فيه من الحقوق, و لا يجوز قبول دليل ينقض هذه الحجة, ولكن لا تكون لتلك الأحكام هذه الحجية إلا في نزاع بين الخصوم أنفسهم دون أن تتغير صفاتهم بذات الحق محلا وسببا. وتقضى المحكمة لهذه الحجية من تلقاء نفسها.".

وحيث قد استقر قضاء محكمة النقض أيضا على أنه :ـ" المقرر في قضاء هذه المحكمة أن النص في المادة 101 من قانون الإثبات يدل على أن المسألة الواحدة بعينها متى كانت أساسية وكان ثبوتها أو

183

عدم ثبوتها هو الذي يترتب عليه القضاء بثبوت الحق المطلوب في الدعوى أو انتفائه فإن هذا القضاء يحوز قوة الشيء المحكوم به في تلك المسألة الأساسية بين الخصوم أنفسهم ويمنعهم من التنازع بطريق الدعوى أو الدفع في شأن أي حق آخر يتوقف ثبوته أو انتفاؤه على ثبوت تلك المسألة السابق الفصل فيها بين هؤلاء الخصوم أنفسهم أو على انتفائها." (الطعن رقم 5459 لسنة 66 ق,جلسة 01/28 2001/,مكتب فني 52, الجزء رقم 1, الصفحة رقم 205).

ـ وبناء على ما تقدم تقضي هيئة التحكيم برفض الدفعين السابقين المبديين من المحتكم ضدهما ببطلان إجراءات التحكيم للخطأ في تعيين رئيس هيئة التحكيم (المحكم المرجح) , دون النص على ذلك بالمنطوق.

ثالثا: الدفع المبدى من المحتكم ضدهما ببطلان إعادة تشكيل هيئة التحكيم, وبطلان كافة إجراءات استئناف سير الدعوى التحكيمية وكافة الإجراءات والقرارات الصادرة عن الهيئة لسبق تنحى جميع أعضاء هيئة التحكيم, ولسبق تنحي رئيس هيئة التحكيم وكذلك تنحي المحكم المسمى عن الشركة المحتكم ضدها وعدم تسميتهما محكم جديد عنها يختار بالتشاور مع المحكم المسمى عن الشركة المحتكمة رئيسا لهيئة التحكيم, ولعدم صلاحية هيئة التحكيم لمباشرة المهمة التحكيمية لافتقادهم مبدأي الحيدة والاستقلال اللازمين لمباشرة مهمتهم التحكيمية:

أورد المحتكم ضدهما الدفع السالف بيانه في مذكرة دفاعهما المقدمة أمام الخبرة بجلسة 2023/3/19 وبمحضر جلسة الخبرة الثالثة وفي جلسة الخبرة الأخيرة بتاريخ 2023/4/30,ثم في مذكرات المحتكم ضدهما الختامية المودعة بتاريخ 2023/6/20. وقد أورد المحتكم ضدهما لتأسيس هذا الدفع أن الثابت من الأوراق أن كل من رئيس وأعضاء هيئة التحكيم قد سبق لهم التنحي عن نظر الدعوى التحكيمية, ومن ثم فإن تشكيل هيئة التحكيم يعتبر باطلا.

كما أورد المحتكم ضدهما في المذكرة المقدمة بتاريخ 2023/6/20 من وكيلهما القانوني الأستاذ الدكتور/محمد حمودة والتي أوردا بها تعدادا لوقائع هذا الدفع وقدما بحوافظ المستندات صورا ضوئية اطلعت عليها هيئة التحكيم, بغية التدليل على أن الدفع المقدم منهما ببطلان تشكيل هيئة التحكيم يرجع أيضا إلى عدم صلاحية أعضاء هيئة التحكيم لنظر الدعوى التحكيمية لافتقادهم مبدأي الحيدة والاستقلال اللازمين لمباشرة مهمتهم التحكيمية,والتمسا من هيئة التحكيم في طلباتهما الختامية بهذه المذكرة أن تحكم بذلك.

ـ وحيث أن المادة 1/22 من قانون التحكيم المصري رقم 27 لسنة 1994 بشأن التحكيم في المنازعات المدنية والتجارية قد نصت على أنه: "تفصل هيئة التحكيم في الدفوع المتعلقة بعدم اختصاصها بما في ذلك الدفوع المبنية على عدم وجود اتفاق التحكيم أوسقوطه أوبطلانه أوعدم شموله لموضوع النزاع".

وحيث أن النص سالف البيان هو تكريس لمبدأ الاختصاص بالاختصاص والذي يمنح هيئة التحكيم سلطة الفصل في اختصاصها بنظر النزاع المعروض عليها بحيث تختص بتقرير ما إذا كانت مختصة أو غير مختصة فيما يتعلق بالقضية التحكيمية التي يقيمها أحد طرفي اتفاق التحكيم أمامها . ولما كان الدفع ببطلان تشكيل هيئة التحكيم في التحكيم الماثل بنظر النزاع هو وجه من أوجه الطعن في اختصاص هيئة التحكيم

184

بالنظر في النزاع, ومن ثم فإن هيئة التحكيم تختص بالفصل في هذا الدفع إعمالا لمبدأ الاختصاص بالاختصاص الذي أوردته المادة 22/1 من قانون التحكيم المصري رقم 27 لسنة 1994بشأن التحكيم في المنازعات المدنية والتجارية.

ـ لذلك وبشأن ما دفع به المحتكم ضدهما عن تنحي الأستاذ الدكتور/ شريف محمد عبد الله المحكم المسمى عن الشركة المحتكمة,, فإن الثابت أنه قد سبق لسيادته أن تنحى من مهمته التحكيمية بتاريخ 2014/7/17, إلا أن الشركة المحتكمة قد أعادت تسميته وترشيحه بتاريخ 2023/2/6, وقد قبل هو بذلك. لذلك فإن إعادة تسميته على النحو السابق من الشركة المحتكمة هو تعيين جديد صادر بتعبير كتابي صريح عن إرادة الشركة المحتكمة صاحبة الحق في تعيين من ترغب في أن يكون محكما عنها, تبعه قبول كتابي صريح من المحكم بذلك الترشيح, وبذلك فإن الدفع المبدى من المحتكم ضدهما ببطلان تشكيل هيئة التحكيم استنادا إلى سبق تنحي المحكم المسمى عن الشركة المحتكمة الأستاذ الدكتور/ شريف محمد عبد الله, هو دفع غير منتج ولا أثر قانوني له ولا تتحقق به أي مصلحة للمحتكم ضدهما, و تقضي هيئة التحكيم برفضه, دون ذكر ذلك بالمنطوق.

ـ أما بشأن تنحي كل من الأستاذ الدكتور / حسن عبد الباسط جميعي رئيس هيئة التحكيم, والأستاذ الدكتور/ عبد الحميد جلال الأحدب المحكم المسمى من المحتكم ضدهما, فإن الثابت أيضا مما قدمه كل من دفاع الشركة المحتكمة ودفاع المحتكم ضدهما بتاريخ 2023/6/20 من مذكرات وما أودع من الأطراف من مستندات ـ من بينها الصور الرسمية التي أودعتها الشركة المحتكمة لكل من الحكم الاستئنافي الصادر في الدعوى رقم 3 لسنة 132 ق عن الدائرة الثانية التجارية بمحكمة استئناف القاهرة بتاريخ 2022/3/23 والحكم الاستئنافي الصادر عن ذات الدائرة في ذات الدعوى بتاريخ 2022/9/22 والصور الرسمية من شهادات محكمة النقض بشأنهما ـ أن <u>الشركة المحتكمة</u> ـ <u>قبل التحفظ عليها</u> ـ <u>كانت قد أقامت الدعوى رقم 3 لسنة 132 ق أمام محكمة استئناف القاهرة</u> طلبت في ختامها الحكم بعزل كل من محكم المحتكم ضدهما الأستاذ الدكتور/ عبد الحميد الأحدب والأستاذ الدكتور/ حسن عبد الباسط جميعي رئيس هيئة التحكيم, وقد تدخلت الشركة المحتكم ضدها الأولى في هذه الدعوى تدخلا هجوميا, وأوردت من بين الطلبات في هذا التدخل الهجومي إثبات تنحي كل من الأستاذ الدكتور/ حسن عبد الباسط جميعي وتنحي الأستاذ الدكتور/ عبد الحميد جلال الأحدب, إلا أن الدائرة الثانية تجاري من محكمة استئناف القاهرة, وبجلسة 2022/3/23 قضت في هذه الدعوى وأصدرت حكمها الذي جرى منطوقه: حكمت المحكمة في الدعوى التحكيمية المقامة من شركة هورس للسياحة والسفر ضد الشركة العامة للخطوط الجوية العراقية وآخرين (تحكيم حر) برفض طلب الشركة المدعية (شركة هورس للسياحة والسفر) إنهاء مهمة كلا من المدعى عليهما الدكتور/حسن عبد الباسط جميعي "بصفته رئيس هيئة التحكيم "والدكتور/ عبد الحميد الأحدب "بصفته محكم عن الشركة المحتكم ضدها" (الشركة العامة للخطوط الجوية العراقية) وألزمت الشركة المدعية بالمصروفات ومبلغ مائة جنيه مقابل أتعاب المحاماة.

185

وعقب ما تقدم أقامت الشركة المحتكم ضدها الأولى (الشركة العامة للخطوط الجوية العراقية) دعوى إغفال قدمت فيها طلبي إغفال أوردت في أولهما أن المحكمة الموقرة قد أغفلت الفصل في طلباتها الواردة بصحيفة تعديل طلباتها في التدخل الهجومي المقام منها بإثبات تنحي كل من المحكم المرجح الأستاذ الدكتور/حسن عبد الباسط جميعي, وإثبات تنحي الأستاذ الدكتور/عبد الحميد الأحدب المحكم المسمى منها (الشركة العامة للخطوط الجوية العراقية مقدمة طلب الإغفال). كما أوردت في الطلب الثاني أن الحكم الصادر عن الهيئة الموقرة بتاريخ 2022/3/23 وبالإضافة إلى إغفاله طلبات التدخل الهجومي فقد أغفل أيضا الفصل في باقي طلبات الشركة المدعية في الدعوى الأصلية(هورس للسياحة السفر الشركة المحتكمة) الواردة في صحيفة افتتاح الدعوى محل طلب الإغفال.

وبجلسة 2022/9/22 قضت ذات المحكمة (الدائرة الثانية التجارية بمحكمة استئناف القاهرة) في ذات الدعوى رقم 3 لسنة 132ق بحكمها القاضي منطوقه برفض طلبي الإغفال المقامين من الشركة المحتكم ضدها الأولى بشأن الحكم الصادر بجلسة 2022/3/23 في الدعوى التحكيمية رقم 3 لسنة 132 ق استئناف القاهرة, وإلزام الشركة المدعية مصروفات ومبلغ مائة جنيه مقابل أتعاب المحاماة. وقد ورد بحيثيات ذلك الحكم على نحو مرتبط بالمنطوق أنه:"وحيث أن الثابت أن المحكمة قد فصلت دون إغفال في كافة الطلبات المبداة أمامها فيما سبق وأصدرته من أحكام, وبيان ذلك أن طلب المدعية بحكم قبول تدخلها الهجومي شكلا وفي موضوع التدخل الهجومي بإثبات تنحي المعلن إليهما الثاني والثالث عن نظر دعوى التحكيم الحر المقامة من شركة هورس للسياحة والسفر ضد الشركة الطالبة وانتهاء الدعوى رقم 3 لسنة 132 ق استئناف القاهرة بتنحيهما, قد سبق الفصل فيها بالحكم السابق صدوره في ذات الدعوى رقم 3 لسنة 132 ق استئناف القاهرة من الدائرة 50 تجاري استئناف القاهرة في 2019/1/31 والذي تضمنت أسبابه رفض التنحي وقضي في المنطوق:-" بقبول التدخل الهجومي المبدى من الشركة العامة للخطوط الجوية العراقية شكلا ورفضه موضوعا وإلزامها بمصاريف التدخل ومبلغ مائة جنيه مقابل أتعاب المحاماة, وحيث أنه بشأن طلب الشركة المدعية الفصل في باقي الطلبات الواردة بختام صحيفة الدعوى رقم 3 لسنة 132 ق, فإنه مردود بأنها ذات الطلبات التي رفضتها المحتكمة ضمنا في حكمها الصادر بتاريخ 2022/3/22 ...".

ـ ولما كان الثابت من الأحكام سالفة البيان أن محكمة استئناف القاهرة قد قضت برفض إنهاء المهمة التحكيمية وبرفض تنحي كل من رئيس هيئة التحكيم الأستاذ الدكتور/حسن عبد الباسط جميعي ومحكم المحتكم ضدهما الأستاذ الدكتور/ عبد الحميد الأحدب, وهي أحكام صادرة من محكمة استئناف القاهرة وهي بهذا الوصف أحكام نهائية وملزمة لأطرافها وهم المحتكمة والمحتكم ضدهما, ولهيئة التحكيم. بالإضافة إلى أن المحتكمة قدمت أيضا صورة رسمية من شهادة صادرة عن محكمة النقض تفيد أن محكمة النقض قد رفضت وقف تنفيذ الطعون المقامة على حكم محكمة الاستئناف الصادر بجلسة 2022/3/23.

وحيث أن الأحكام النهائية ذات حجية ملزمة لأطرافها, وكان من المقرر قانونا أنه متى حاز الحكم هذه القوة فإنه يمنع الخصوم في الدعوى التي صدر فيها من العودة إلى المناقشة في المسألة التي فصل فيها ولو بأدلة قانونية أو واقعية لم يسبق إثارتها أو أثيرت ولم يبحثها الحكم الصادر فيها, وحيث أن

186

الدفع محل البحث يقوم على تمسك المحتكم ضدهما بتنحي كل من رئيس هيئة التحكيم ومحكم المحتكم ضدهما وكانت هذه المسألة قد أثيرت وحسمت وفصل فيها بالحكمين سالفي البيان, ومن ثم يمتنع العودة إلى مناقشتها ولو بأدلة قانونية أو واقعية لم يسبق إثارتها أو أثيرت ولم يبحثها الحكم الصادر فيها, وفي هذا الشأن فإن قضاء محكمة النقض قد استقر على أنه: "وإن كانت الأحكام التي تحوز قوة الأمر المقضي حجة بما فصلت فيه من الحقوق ولا يجوز ثبوت دليل ينقض هذه الحجية على ما نصت عليه المادة 101 من قانون الإثبات, إلا أن تلك الأحكام لا تكتسب هذه القوة إلا بعد صيرورتها نهائية باستنفاد طريق الطعن العادي المقرر قانونا وهو الإستئناف. ( الطعن رقم "1104" لسنة 48ق,جلسة 5/ 1/1980م,مكتب فني رقم 31,ص89) كما قضت محكمة النقض أيضا بأنه: "المقرر في قضاء هذه المحكمة ـ أن للقضاء النهائي قوة الأمر المقضي فيما فصل فيه بين الخصوم, ومتى حاز الحكم هذه القوة فإنه يمنع الخصوم في الدعوى التي صدر فيها من العودة إلى المناقشة في المسألة التي فصل فيها ولو بأدلة قانونية أو واقعية لم يسبق إثارتها أو أثيرت و لم يبحثها الحكم الصادر فيها" (الطعن رقم 23 لسنة 49 ق, جلسة 24 / 02 / 1981م, مكتب فني رقم 32, ص 622). بما يكون معه هذين الحكمين نافذين بذاتهما, وعلى النحو الذي قامت الشركة المحتكمة وبعد صدورهما بتعيين الأستاذ الدكتور/ شريف محمد عبد الله محكما عنها وقبول سيادته بذلك, بما أدى إلى استكمال تشكيل هيئة التحكيم, وعلى النحو الذي التزم بموجبه كل من رئيس هيئة التحكيم ومحكم المحتكم ضدهما باستئناف السير في إجراءات التحكيم عقب قيام المحتكمة بتسمية محكم عنها واستكمال تشكيل هيئة التحكيم على النحو السالف بيانه.

وحيث أنه بتاريخ 2023/2/7 ورد لرئيس هيئة التحكيم خطاب صادر من لجنة إجراءات التحفظ والإدارة والتصرف في أموال الجماعات الإرهابية والإرهابيين ورد فيه ما نصه:"نفاذا للحكم الصادر من محكمة القاهرة للأمور المستعجلة في الدعوى رقم 2315 لسنة 2013 مستعجل القاهرة, وإيماء إلى القانون رقم 22 لسنة 2018 بتنظيم إجراءات التحفظ والحصر والإدارة والتصرف في أموال الجماعات الإرهابية والإرهابيين, وبالإشارة إلى التحكيم الحر المرفوع من شركة هورس للسياحة والسفر المتحفظ عليها بموجب الأمر الوقتي رقم 1 لسنة 2018 ضد الشركة العامة للخطوط الجوية العراقية.

ونظرا لسبق اختيار الأستاذ الدكتور/ شريف محمد عبد الله مأمون محكما مسمى عن شركة هورس للسياحة والسفر وقد قام بالتنحي, وأنه قد صدر بتاريخ 2023/2/5 قرار اللجنة بإعادة ترشيح الأستاذ الدكتور/ شريف محمد عبد الله مأمون محكما مسما عن شركة هورس للسياحة والسفر وقد قبل الترشح بموجب كتابه المؤرخ 2022/2/6. و نظرا لأن لجنة التحفظ قد أضافت في مخاطبتها لرئيس هيئة التحكيم الأستاذ الدكتور/ حسن عبد الباسط جميعي"أنه وفي ضوء استكمال تشكيل هيئة التحكيم برئاستكم وعضوية السيد الدكتور/عبد الحميد جلال الأحدب المحكم المسمى من الشركة العامة للخطوط الجوية العراقية, وعودة التحكيم للسير في ضوء ما تقدم. نحيطك علما بأن هيئة قضايا الدولة هي الممثل القانوني عن الشركة المحتكمة بشأن التحكيم المشار إليه المقام من الشركة المتحفظ عليها والتي تمثلها اللجنة قانونا في التقاضي أمام المحاكم وهيئات التحكيم, وبالتالي بالحضور والمرافعة وإيداع المذكرات والمستندات وكل ما يلزم قانونا بخصوص هذا التحكيم. وذلك لاتخاذ الإجراءات اللازمة قانونا والالتزام بالاستمرار في متابعة التحكيم وعقد جلساته. ومرفق طي كتابنا صورة من قرار اللجنة الصادر بترشيح

187

الدكتور/ شريف محمد عبد الله وصورة من قبوله الترشيح, وذلك لاتخاذ الإجراءات اللازمة قانونا والالتزام بالاستمرار في متابعة سير التحكيم وعقد جلساته وكذا مخاطبة هيئة قضايا الدولة على العنوان الكائن 42 شارع جامعة الدول العربية ـ المهندسين ـ الجيزة". كما وأن لجنة التحفظ قد أرفقت بخطابها سالف البيان: أـ صورة من القرار رقم (2) لسنة 2023 المؤرخ 2023/2/6 والصادر من السيد الأستاذ المستشار/ رئيس اللجنة متضمنا في مادته الأولى ترشيح السيد الأستاذ/ شريف محمد عبد الله محكما مسما عن شركة هورس للسياحة والسفر(المتحفظ عليها بموجب الأمر الوقتي الرقيم 1 لسنة 2018) في التحكيم الحر المقام من الشركة سالفة الذكر ضد الشركة العامة للخطوط الجوية العراقية. ب- صورة من خطاب السيد الدكتور/ شريف محمد عبد الله الموجه إلى السيد الأستاذ المستشار رئيس لجنة التحفظ والإدارة والتصرف في أموال الجماعات الإرهابية والإرهابيين بقبول سيادته ترشحه ويقر بالحيدة والاستقلالية والتعاون الكامل مع هيئة التحكيم المشكلة.

ـ وحيث أنه إنفاذا للخطاب سالف البيان قام الأستاذ الدكتور/شريف محمد عبد الله المحكم المسمى عن الشركة المحتكمة(هورس للسياحة والسفر المتحفظ عليها) بتاريخ 2023/2/7 بتوجيه مخاطبة إلى الأستاذ الدكتور/حسن عبد الباسط جميعي بصفته رئيس هيئة التحكيم أوضح فيها أنه قام بإجراء اتصال هاتفي مع الأستاذ الدكتور/عبد الحميد جلال الأحدب بصفته المحكم المسمى من الشركة العامة للخطوط الجوية العراقية المحتكم ضدها اتفقا من خلاله على التأكيد على اختيار الأستاذ الدكتور/حسن عبد الباسط جميعي رئيسا لهيئة التحكيم, وقبولهما بذلك.

ـ وحيث أنه وبتاريخ 2023/2/7 وعبر البريد الإلكتروني قام الأستاذ الدكتور/عبد الحميد الأحدب بصفته المحكم المسمى من الشركة العامة للخطوط الجوية العراقية المحتكم ضدها بتوجيه مخاطبة إلى السيد الأستاذ الدكتور/ حسن عبد الباسط جميعي بصفته رئيس هيئة التحكيم تضمنت ذات ما ورد بمخاطبة الأستاذ الدكتور/شريف محمد عبد الله المحكم المسمى عن الشركة المحتكمة (هورس للسياحة والسفر المتحفظ عليها) بتاريخ 2023/2/7. وأنه وبتاريخ 2023/2/7 قام الأستاذ الدكتور/ شريف محمد عبد الله المحكم المسمى عن الشركة المحتكمة (هورس للسياحة والسفر المتحفظ عليها) بالتوقيع على إقرار قبوله للمهمة وقام بتسليمه إلى رئيس هيئة التحكيم.

ـ وحيث أن المحتكم ضدهما شيدا دفعهما المار بيانه على مقولة سبق تنحي محكمهما وتنحي رئيس هيئة التحكيم, وحيث أن هذه المسألة (التنحي) قد سبق الفصل فيها بالأحكام سالفة البيان برفض التنحي وهي أحكام نهائية ذات حجية, وحيث تنص المادة 101 من قانون الإثبات على أنه :ـ" الأحكام التي حازت قوة الأمر المقضي تكون حجة فيما فصلت فيه من الحقوق , ولا يجوز قبول دليل ينقض هذه الحجة, ولكن لا تكون لتلك الأحكام هذه الحجية إلا في نزاع بين الخصوم أنفسهم دون أن تتغير صفاتهم بذات الحق محلا وسببا. وتقضى المحكمة لهذه الحجية من تلقاء نفسها."

وحيث أنه قد استقر قضاء محكمة النقض في شأن إعمال هذا النص على أنه :ـ "المقرر في قضاء هذه المحكمة أن النص في المادة 101 من قانون الإثبات يدل على أن المسألة الواحدة بعينها متى كانت أساسية وكان ثبوتها أو عدم ثبوتها هو الذي يترتب عليه القضاء بثبوت الحق المطلوب في الدعوى أو

188

انتفائه, فإن هذا القضاء يحوز قوة الشيء المحكوم به في تلك المسألة الأساسية بين الخصوم أنفسهم ويمنعهم من التنازع بطريق الدعوى أو الدفع في شأن أي حق آخر يتوقف ثبوته أو انتفاؤه على ثبوت تلك المسألة السابق الفصل فيها بين هؤلاء الخصوم أنفسهم أو على انتفائها." (الطعن رقم 5459,لسنـة 66 ق,جلسة 2001/01/28,مكتب فني 52, ج 1, ص 205).

ومن ناحية أخرى فإنه وبعد استئناف السير في القضية التحكيمية على النحو السابق بيانه, وتحديد جلسة تحكيمية بتاريخ 2023/2/16 حضر الأستاذ أحمد الدزيني المحامي وكيل الشركة المحتكم ضدها الأولى بموجب التوكيل السابق له إثباته وإيداعه بملف الدعوى التحكيمية وقام بالتوقيع بالحضور عنها بتلك الجلسة, وهو أيضا وكيل المحتكم ضده الثاني (وزير النقل العراقي ـ بصفته) بموجب التوكيل السابق له إثباته وإيداعه بملف الدعوى التحكيمية, وهو وإن لم يوقع بالحضور عن المحتكم ضده الثاني السيد/ وزير النقل العراقي (بصفته), إلا أنه قد أبدى دفعا منه وبه حضوره بجلسة التحكيم عن وزير النقل العراقي, وهو الدفع المثبت بمحضر جلسة التحكيم بتاريخ 2023/2/16 سالفة البيان بأنه لم يتم إعلان وزير النقل العراقي عن الطريق الدبلوماسي ولم يتم إعلانه بمقر وزارة النقل العراقي ببغداد بجمهورية العراق وليس بمقر شركة الخطوط الجوية العراقية بجمهورية مصر العربية.

ـ وبما تقدم أيضا وحيث لم يبد المحامي الحاضر عن المحتكم ضدهما على النحو السابق بيانه أي اعتراض على تشكيل هيئة التحكيم في تلك الجلسة التحكيمية بتاريخ 2023/2/16, وأنه وبعد اختتام الجلسة وما أصدرته هيئة التحكيم من قرارات, قرر الحاضر عن المحتكم ضدهما أنه يرغب في إبداء تحفظ مفاده "التحفظ على الطريقة التي تم بها ترشيح السيد/ محكم المحتكم ضدها حيث لم يتم إعادة ترشيحه من الشركة المحتكم ضدها وبذات الآلية التي تم إعادة ترشيح رئيس هيئة التحكيم", ثم أعقب ذلك بطلب أن تكون مهلة تقديم مذكرات ومستندات بدفاع الأطراف ودفوعهم تتضمن التعقيب على تقرير الخبير, أسبوعين بدلا من أسبوع.

وحيث أن الثابت أن الحاضر عن المحتكم ضدهما لم يبد إلا هذا التحفظ, ولم يعترض على هيئة التحكيم أو أي من أعضائها مشيرا إلى سبق تنحيه, كما لم يعترض على أي من القرارات التي اتخذتها هيئة التحكيم إلا بشأن طلب مهلة أسبوع إضافي لتقديم المذكرات والمستندات بدفاعهم ودفوعهم تتضمن التعقيب على تقرير الخبير وهو ما استجابت له المحتكمة بقبوله وقبلت به هيئة التحكيم, وأنه وبذلك يكون المحتكم ضدهما مثلهما في ذلك مثل المحتكمة, قد قبلا بهيئة التحكيم بكامل تشكيلها وجميع أعضائها, وبما يعد تعيينا جديدا لهم وقبولا بكافة الإجراءات التي اتبعت في تعيينهم والظروف التي صاحبت ذلك التعيين.

وحيث أن الثابت أن ذلك التحفظ قد اقتصر على ما أطلق عليه الحاضر عن المحتكم ضدهما بالآلية التي تم بها تعيين محكم المحتكم ضدهما وأنها ليست ذات الآلية التي تم تعيين رئيس هيئة التحكيم (المحكم المرجح) بها, وأن هذا التحفظ صريح اللفظ واضح العبارة والدلالة على أنه اقتصر على الإفادة بأن المحتكم ضدهما كانا يرغبان في أن يكون تعيين المحكم المسمى عن المحتكم ضدهما بذات آلية تعيين رئيس هيئة التحكيم, وأن هذا يثبت منه أن هذا التحفظ بهذه الصيغة قد جاء مؤكدا قبول

189

المحتكم ضدهما مرة أخرى برئيس هيئة التحكيم, وأن غاية ذلك التحفظ أن المحتكم ضدهما كانا يرغبان أن يكون تعيين المحكم المسمى منهما بذات ألية ترشيح رئيس هيئة التحكيم.

وحيث أن ذلك التحفظ من الحاضر عن المحتكم ضدهما لا يمس كذلك بالآلية التي تم ترشيح المحكم عن المحتكم ضدهما بها والتي هي سبق اختياره من المحتكم ضدها الأولى وتسميتها له,

وحيث أن هذه الألية لم يطرأ عليها تغيير, بالنظر إلى أن تنحي محكم المحتكم ضدهما قد قضي برفضه بموجب حكم الدائرة الثانية من محكمة استئناف القاهرة في الدعوى رقم 3 لسنة 132 ق وعلى النحو السالف بيانه, كما رفضت تلك المحكمة إثباته.

وحيث أنه ومن ناحية أخرى فإن ما تحفظ به الحاضر عن المحتكم ضدهما بشأن ترشيح محكمهما بذات آلية ترشيح رئيس هيئة التحكيم غير منتج أو مؤثر على تشكيل هيئة التحكيم حيث أن تعيين رئيس التحكيم تم بموجب حكم قضائي وعلى النحو السالف بيانه بالقسم الأول من أقسام هذا الحكم المتعلق بوقائع وإجراءات التحكيم, بينما آلية ترشيح محكم المحتكم ضدهما تمت بموجب تسمية الشركة المحتكم ضدها الأولى واختيارها له.

وحيث أن ما تقدم قد أكدته المحتكم ضدها الأولى ذاتها, حيث وردت إرادة المحتكم ضدهما صريحة فيما أورده الأستاذ/ أحمد الديني. محاميها ووكيلها القانوني في الجلسة الأخيرة من جلسات الخبرة بتاريخ 2023/4/30 من تأييده وتمسكه بقرار هيئة التحكيم بندب خبير حسابي للدعوى, وهو القرار الصادر من هيئة التحكيم بتشكيلها الحالي بجلسة 2023/2/16 والذي سبق للحاضر عن المحتكم ضدهما قبوله وقبول تحديد لأتعاب الخبير بشأنه بجلسة 2023/2/16. وحيث أن تأييد وتمسك الشركة المحتكم ضدها الأولى مرة أخرى في جلسة الخبراء بالقرار الصادر بندب الخبير الحسابي, يعد إعادة تأكيد على القبول بهيئة التحكيم بكامل تشكيلها وبجميع أعضائها وما اتخذته هيئة التحكيم من قرارات.

وحيث أن الشركة المحتكم ضدها الأولى خاطبت هيئة التحكيم بموجب بريد الكتروني بتاريخ 2023/6/24 مقدم من وكيل المحتكم ضدهما القانوني الأستاذ أحمد الديني المحامي أقرت فيها "بثقتها في الحياد التام لهيئة التحكيم", وبأن" هيئة التحكيم الموقرة لا تتبع سياسة الكيل بمكيالين وأنها حريصة كل الحرص على تطبيق أسس العدالة والإنصاف بالدعوى".

وحيث أن ما ورد بهذه المخاطبة من المحتكم ضدها الأولى إقرار بقبول أعضاء هيئة التحكيم وبصحة تشكيل هيئة التحكيم, وعلى نحو أفصحت عنه بالتأكيد على كامل الثقة في قيام الهيئة وعلى حيادها التام, والثقة في أنها ستطبق أسس العدالة والإنصاف, أي بدون التقيد بتطبيق قواعد القانون, فيما يعرف اصطلاحا بالتفويض في الحكم بالصلح,

وحيث أن ما تقدم يعد تركا و تنازلا من المحتكم ضدهما عن كل دفع أو طلب أبدي ببطلان تشكيل هيئة التحكيم سواء للقول بسبق تنحي أي من أعضائها أو للقول بعدم حيدة أعضاء هيئة التحكيم أوعدم استقلاليتهم.

190

لذلك وفي ضوء ما سلف بيانه يكون الدفع المبدى من المحتكم ضدهما ببطلان تشكيل هيئة التحكيم لسبق تنحي أعضاء هيئة التحكيم ولعدم صلاحيتهم لمباشرة مهمتهم التحكيمية, قد جاء على غير سند صحيح من الواقع والقانون, وتقضي هيئة التحكيم برفضه, دون ذكر ذلك بالمنطوق .

وبما تقدم أيضا, يكون الطلب المقدم من المحتكم ضدهما بوقف الدعوى التحكيمية لحين الفصل في الطعون بالنقض ولذات الأسباب قائما على غير سند من الواقع أو القانون وتقضي هيئة التحكيم برفضه دون حاجة إلى ذكر ذلك بالمنطوق.

<u>الفصل الثالث: الدفع بعدم قبول الدعوى بالنسبة للمحتكم ضده الثاني السيد/وزير النقل العراقي بصفته, والذي يستند فيه المحتكم ضدهما إلى: 1ـ رفعها على شخصية تتمتع بالحماية الدبلوماسية القضائية. 2ـ لرفعها على غير ذي صفة:</u>

<u>1ـ الدفع بعدم قبول الدعوى بالنسبة للمحتكم ضده الثاني السيد/وزير النقل العراقي, لرفعها على شخصية تتمتع بالحماية الدبلوماسية القضائية:</u> استند المحتكم ضدهما في هذا الدفع المبين بالصفحات من رقم 2 إلى رقم 5 من مذكرتهما المقدمة من الأستاذ أحمد الديريني المحامي بتاريخ 2014/6/10, والمبين أيضا بالمذكرة رقم (1) المقدمة عن المحتكم ضده الثاني من الأستاذ /أحمد الديريني المحامي, وهو الوكيل القانوني عن المحتكم ضدهما, بتاريخ 2023/6/20, إلى القول بأنه ونفاذا لاتفاقية فيينا للعلاقات الدبلوماسية وما ورد به نص المادة 14 منها بشأن البعثات الدبلوماسية من تضمنها لطبقة المبعوثين والوزراء و وزراء البابا المفوضين المعتمدين لدى رؤساء الدول, وأنه لا تفرقة بين رؤساء البعثات من حيث طبقاتهم سوى مما يتصل بأسبقيتهم و المراسم ..., وقد استطرد المحتكم ضدهما إلى القول بأن المادة 31 من اتفاقية فيينا نصت على أنه:-" يتمتع المبعوث الدبلوماسي بالحصانة ضد الاختصاص القضائي الجنائي للدولة المضيفة ويتمتع كذلك بالحصانة ضد الاختصاص القضائي والمدني والإداري ...", ودفع بأن حضور جلسات التحكيم أو أي إجراء اتخذه المحتكم ضده الثاني لا يعد تنازلا عن تلك الحصانة.

وحيث أنه وبشأن هذا الوجه من أوجه الدفع, فإن هيئة التحكيم تشير إلى أن المحتكم ضدهما ذاتهما قد أوردا في هذا الدفع الدليل على عدم صحته, حيث أنهما استندا فيه إلى عرض نصوص من اتفاقية فيينا للعلاقات الدبلوماسية, ثابت منها أن هذه الاتفاقية تخاطب المبعوثون الدبلوماسيون الذين يمثلون دولتهم في الدول الأخرى. وهو ما ورد به نص هذه الاتفاقية المبرمة في 18 إبريل1961, حيث أتى النص واضحا بأن:-" ..أن المزايا والحصانات المذكورة ليس الغرض منها تمييز أفراد وإنما تمكين البعثات الدبلوماسية بوصفها ممثلة للدول للقيام بمهامها على وجه مجد ..", كما ورد نص الفقرة ج من المادة الأولى من الاتفاقية بأن:" عبارة (الأشخاص الذين تتكون منهم البعثة) تنصرف إلى أعضاء البعثة الذين لهم الصفة الدبلوماسية.". وورد نص الفقرة هاء من نفس المادة الأولى بأن: "عبارة (مبعوث دبلوماسي) تنصرف إلى رئيس البعثة وإلى الأعضاء الدبلوماسيون في البعثة". وقد ورد نص المادة 14 من هذه الاتفاقية يرتب رؤساء البعثات الدبلوماسية في مراتب ثلاثة منها في المرتبة الثانية :" .. ب ـ مرتبة المبعوثين والوزراء ومندوبي البابا من درجة نائب قاصد رسولي المعتمدين لدى رؤساء الدول". وهو

191

ما يتضح منه أن المقصود بالوزراء هم من يتمتع بدرجة وزير من بين أعضاء البعثة الدبلوماسية التي تمثل دولتها في الدولة الأخرى والتي يتم اعتمادها من رئيس الدولة المضيفة.

وحيث يثبت مما تقدم عدم انطباق اتفاقية فيينا على المحتكم ضده الثاني الذي هو مختصم في الدعوى التحكيمية (المحتكم ضده الثاني) بصفته عن وزارة النقل العراقي الكائنة ببغداد بجمهورية العراق, وليس بصفته مبعوثا دبلوماسيا ممثلا لدولة العراق بجمهورية مصر العربية.

وحيث أورد المحتكم ضدهما أيضا أن نص المادة 31 من تلك الاتفاقية يخص حصانة المبعوث الدبلوماسي عن مقاضاته بشخصه جنائيا أو أمام القضاء المدني أو الإداري, وهو ما يثبت منه أن تلك الحصانة التي يتمتع بها المبعوث الدبلوماسي متعلقة بمقاضاته بشخصه عما يدعى عليه به جنائيا أو مدنيا, وليست متعلقة بصفته ممثلا لدولته أمام الدولة التي يدعى عليه فيها عن قيامه بشخصه بارتكاب أي من الجرائم أو بأفعال تترتب عنها المسئوليات المدنية, الأمر الذي تقضي هيئة التحكيم برفض هذا الدفع, دون حاجة لذكر ذلك بالمنطوق.

**2- وحيث أنه عن الدفع بعدم قبول الدعوى بالنسبة للمحتكم ضده الثاني السيد/ وزير النقل العراقي , لرفعها على غير ذي صفة:** استنادا من المحتكم ضدهما إلى القول بأن الشركة المحتكم ضدها هي شركة عامة عراقية لها الشخصية المعنوية من استقلال مالي وإداري وتتمتع بالأهلية الكاملة لتحقيق أغراضها ويمثلها مديرها العام أو من يخوله أمام المحاكم والجهات الأخرى ويتولى إدارة الشركة مجلس إدارة هو الجهة العليا فيها, وذلك نفاذا للنظام الداخلي لشركة الخطوط الجوية العراقية المرقم 20 لسنة 2000, وأن الثابت منه أن شركة الخطوط الجوية العراقية المؤسسة بموجب قانون شركة الخطوط الجوية العراقية رقم 108 لسنة 1988 هي شركة عامة حسبما نصت المادة الثانية, وأن المادة (16) من ذات القانون قد نصت على أن: "المدير العام هو الذي يمثل الشركة في كل ما يتعلق بإدارتها وشئونها وله أن يوكل أو ينيب عنه غيره في ذلك التمثيل", ويتضح مما سبق أن شركة الخطوط الجوية العراقية هي شخصية معنوية ولها مجلس إدارة مستقل بشئونها المالية والإدارية والتي تدار من قبله الشركة ويتولى تحقيق أهداف الشركة, وأن محكمة النقض المصرية قضت بأن الأصل أن الوزير هو الذي يمثل وزارته والمصالح والإدارات التابعة لها فيما يرفع منها أو ضدها من دعاوى أو طعون, إلا إذا منح القانون الشخصية الإعتبارية لأي جهة إدارية منها وأسند صفة النيابة عنها لغير الوزير فتكون لها عندئذ هذه الصفة في الحدود التي يعينها القانون. وأنه يتضح مما تقدم أن الشركة المحتكم ضدها هي شخصية اعتبارية معنوية لها استقلالها المالي والإداري وتتمتع بالأهلية الكاملة لتحقيق أغراضها ويمثلها مديرها العام أو من يخوله أمام المحاكم والجهات الأخرى, وعليه يكون المحتكم ضده الثاني السيد وزير النقل العراقي لا صفة له في الدعوى لتوافر الشخصية المعنوية الاعتبارية المستقلة نفاذا للقانون, والتمس المحتكم ضدهما الدفع عدم قبول الدعوى بالنسبة للمحتكم ضده الثاني وإخراجه من الدعوى بلا إلزام.

ـ فإن هيئة التحكيم تمهد لقضائها في هذا الدفع بأنه قد بات من المستقر عليه في مجال التحكيم الدولي, وعلى نحو لا لبس فيه ولا غموض فيه أن اتفاق التحكيم يمتد أثره إلى كل من تداخل أو شارك مباشرة

192

في إبرام العقد أو في تنفيذه أو في إنهائه, ما دام أن ما بدر منهم من مواقف أو أعمال يفترض معها انهم كانوا على بينة من وجود اتفاق التحكيم وحدوده ونطاقه.

كما بات من المستقر عليه أيضا في مجال التحكيم الدولي أن اتفاق التحكيم يمتد إلى غير أطرافه بالضرورة وإلى غير من وقع عليه من الغير متى كان ذلك في سياق التعاقد, كما لو رفعت دعوى تحكيم من طرفين لم يوقعا على العقد الأصلي المتضمن شرط التحكيم, وهما الشركة الأم وإحدى شركاتها التابعة لها بالرغم من أن العقد الأصلي للنزاع وقعته شركة ثانية متى كان الثابت أن تلك الشركات كان في نيتها أن يبرم العقد مع مجموعة الشركات التي تعد الشركة التابعة الطرف في العقد الأصلي إحداها.

( الطعنين رقمي 4729 و 4730 لسنة 72, جلسة 2004/6/22 )

وإعمالا لما تقدم قضت هيئة تحكيم بمركز القاهرة الإقليمي للتحكيم التجاري الدولي, صراحة في حكمها بقبول دعوى التحكيم المرفوعة من وكيل تجاري مصري ضد الشركة الأم (شركة أمريكية) والشركة التابعة لها (شركة قبرصية) وإلزامهما متضامنين بدفع تعويض إلى المحتكم برغم أن الشركة الأم لم تكن طرفا في عقد الوكالة والذي وقعه الوكيل المصري مع الشركة القبرصية التابعة وتضمن شرط التحكيم, وذلك تأسيسا على ما ثبت من مستندات الدعوى ووقائعها أن الشركة الأم قد شاركت في تكوين العقد وتنفيذه كما أنها قامت بإنهائه. (حكم التحكيم الصادر بجلسة 21 مارس 1999 مركز القاهرة الإقليم للتحكيم التجاري الدولي, مشار إليه في مجلة التحكيم, العدد الثامن أكتوبر 2010 ص 441 وما بعدها)

كذلك فإن المقرر قانونا في مجال العقود التي تكون الدولة أو إحدى هيئاتها العامة طرفا فيها, والتي اصطلح على تسميتها بعقود الدولة, أن يتسع هذا المصطلح ليشمل ليس فقط العقود التي تقوم الدولة بإبرامها بنفسها عن طريق من يمثلها (عقود الدولة بالمعني الضيق), وإنما ليشمل أيضا العقود التي تبرمها الأشخاص التابعة للدولة والمنبثقة عنها والتي تعمل لحسابها ولتحقيق أهدافها الاقتصادية. كذلك فإن "الأشكال التي تتخذها هذه الأجهزة من الناحية القانونية تتنوع بطريقة كبيرة, وأيا ما كان الشكل القانوني لها, فإنه لا يمكن إغفال السيطرة الصارمة التي تمارسها الدولة على هذه الأجهزة ولو بطريقة غير مباشرة أو حتى من خلال جهاز وسيط مستقل تماما, على نحو يصبح معه من المناسب اعتبار العقود التي تبرمها هذه الأجهزة الخاضعة لسيطرة وهيمنة الدولة عقود دولة, إذ أن هذه الأجهزة أنشئت خصيصا لتحل محل الدولة في إطار العلاقات الاقتصادية التجارية الدولية وتتصرف لصالح الدولة ولحسابها".

(د./ حفيظة السيد الحداد ,العقود المبرمة بين الدول والأشخاص الأجانب, ص70)

ولما تقدم فإن امتداد اتفاق التحكيم إلى الدولة في العقود التي تبرمها أحد هيئاتها أو وحداتها الإدارية يستند إلى فكرة التمثيل القانوني, فالهيئة أو الوحدة التابعة للدولة حين تتعاقد باسمها, فإنها تتعاقد في ذات الوقت لمصلحة الدولة التي تخضع لرقابتها وإشرافها حتى وإن كانت تتمتع باستقلال مالي وإداري, ومن ثم فإن هذا الاستقلال لا يعني أنها تتصرف بمعزل عن الدولة التابعة لها, وهو ما يخلق نوعا من التوقع المشروع Legitimate expectation لدى الطرف الآخر المتعاقد بأن الدول طرفا في العقد

193

المتضمن اتفاق التحكيم, وعلى هذا الأساس أيضا أتى قضاء هيئة التحكيم في حكم التحكيم الصادر عن غرفة التجارة الدولية في القضية المعروفة باسم قضية شركات مجموعة Bridas ضد دولة تركمنستان (مشار إليه في رسالة داليا عبد المعطي حسين على, جامعة القاهرة, 2007, هامش ص ص 348) باعتبار الدولة طرفا في العقد المتضمن اتفاق التحكيم, وذلك لما استبان من أن سلوك الحكومة اللاحق على إبرام العقد يبين منه نيتها في أن تصبح طرفا في العقد المتضمن اتفاق التحكيم, وأن العقد تضمن ثلاثة وعشرين التزاما لا يمكن تنفيذها إلا بواسطة الدولة نفسها, وهي التزامات أساسية لإتمام المشروع محل التعاقد, الأمر الذي خلق توقعا مشروعا لدى الشركة بأن ما تم الاتفاق عليه سيتم تنفيذه.

وحيث أنه في ضوء ما تقدم ولما كان الثابت لهيئة التحكيم أن وزارة النقل العراقية تدخلت ليس فقط في إبرام العقد, بل وتدخلت أيضا في مراحل تنفيذه والسعي نحو إنهائه وفي مرحلة إيقافه جميعا, ومن ذلك فإنه وفي مرحلة إبرام العقد, فإن الثابت من اتفاقية الوكالة العامة والمؤرخة 2001/1/30 أنه قد ورد في تمهيد هذا العقد النص على أن هذه الاتفاقية وبنودها تخضع لموافقة السلطات الحكومية.

كذلك فإن البند الثاني من ملحق عقد الوكالة المؤرخ 2001/3/15 قد نص على أن يعتبر العقد ساري المفعول بعد استحصال الموافقات الأصولية, وهو ما يؤكد على أن وزارة النقل العراقية قد شاركت في التفاوض وإبرام عقد الوكالة وملاحقة وأنها كانت على بينة من وجود اتفاق التحكيم ونطاقه, وبالتالي تكون قد قبلت الخضوع لهذا الشرط فيما قد يثور من منازعات تتعلق بالعلاقة التعاقدية, بما يجعلها طرفا في عقد الوكالة محل النزاع بما يتضمنه من شرط التحكيم.

وحيث قد ثبت لهيئة التحكيم أيضا ومن خلال فحص المستندات تدخل وزارة النقل العراقية في السعي لإنهاء عقد الوكالة, وذلك بما ورد في خطاب المحتكم ضدها الأولى المؤرخ 2004/12/2 برقم 417 إلى الشركة المحتكمة بشأن إنهاء اتفاقية الوكالة العامة والذى جاء بصدره ولتبرير إنهاء التعاقد أنه" نظرا لتوجهات الدولة في العراق الجديد بإعادة تأهيل الشركة العامة للخطوط الجوية العراقية ... نود إعلامكم رغبة شركتنا بإنهاء اتفاقية الوكالة العامة ". (المستند رقم 2 المقدم بحافظة المستندات رقم 1 من المحتكمة)

كذلك ورد بخطاب المحتكم ضدها الأولى في 2005/11/16 الموجه إلى الشركة المحتكمة بشأن إيقاف الوكالة تذييله بعبارة "صورة منه الى وزارة النقل ... راجين اتخاذ ما يلزم بالتنسيق مع السفارة العراقية في القاهرة لترشيح محامى يتمتع بمكانة جيدة في مجال الدعاوى بغية حضور ممثل القسم القانوني لغرض مناقشته والتعاقد معه," (المستند المقدم بالحافظة رقم 2 من حوافظ المستندات المقدمة من المحتكم ضدها الأولى).

كذلك فقد جاء خطاب وزير النقل العراقي (المحتكم ضده الثاني) المؤرخ 2010/4/11 والموجه الي الأمانة العامة لمجلس الوزراء العراقي (المستند المقدم بحافظة المستندات رقم 1 المقدمة من المحتكم ضدهما) صريحا فيما أوضحه من أن الشركة المحتكم ضدها الأولى - وهى إحدى تشكيلات وزارة النقل قد أبلغته بكتابها المرقم (2976) في 2010/3/1 بأن إلغاء عقد الوكالة العامة مع الشركة المحتكمة قد تم بناء على كتاب الأمانة العامة لمجلس الوزراء العراقي المرفق ( 1/16) في تاريخ 2005/5/8, والمتضمن تصنيف الشركة المحتكمة باعتبارها من قبيل الشركات الواجهية, وأن إعمال شرط التحكيم

194

الوارد بالعقد قد يسبب أضرارا مادية كبيرة للشركة المحتكم ضدها. ولذلك اقترح الوزير حسم الموضوع وديا تفاديا للأضرار التي تصيب الشركة.

ـ كذلك ثبت تدخل وزارة النقل في العلاقة التعاقدية محل النزاع وفي مرحلة السعي نحو إنهائها وما تلاها, وذلك بما يدل عليه الإنذار الصادر من المحتكم ضدها الأولى والموجه إلى الشركة المحتكمة والمؤرخ في 2011/8/10 بشأن مد فترة اختيار محكم عنها تؤكد فيه المحتكم ضدها أن تعيين محكم عنها يتطلب الحصول على موافقة السيد رئيس مجلس الوزراء العراقي ووزير النقل العراقي ومجلس إدارة الشركة العامة للخطوط الجوية العراقية وإيفاد وفد من القاهرة الى وزارة النقل والشركة المحتكم ضدها الأولى لاختيار محكم.(المستند رقم 4 من حافظة المستندات رقم 1 المقدمة من المحتكم ضدهما).

وقد ثبت تدخل وزارة النقل العراقية أيضا بما يدل عليه الإنذار الصادر من المحتكم ضدها الأولي في تاريخ 2011/10/13 إلي الشركة المحتكمة تؤكد فيه حضور وفد من وزارة النقل لعقد اجتماع للتسوية الودية مع الشركة المحتكمة (مقدم بحافظه المستندات رقم 1).

وحيث وعلى النحو الذي تمسكت الشركة المحتكمة بدلالته في مذكرتها المودعة بمقر التحكيم بتاريخ 2023/6/20, فقد ثبتت تبعية المحتكم ضدها الأولى لوزارة النقل العراقية بموجب الخطاب المرسل بالبريد الإلكتروني من المحتكم ضدهما بتاريخ 2023/6/17 إلى رئيس وأعضاء هيئة التحكيم بالتماس إعادة النظر في طلب المحتكم ضدهما بمنح المحتكم ضدهما مهلة إضافية إلى المهلة الأساسية التي تقررت بمحضر جلسة التحكيم بتاريخ2023/2/16- والسابق رفضه من هيئة التحكيم -,وذلك حيث ورد في صدر المخاطبة على نحو كتابي صريح العبارة التالية: <u>"جمهورية العراق-وزارة النقل -الخطوط الجوية العراقية ـ القسم: التجاري ـ الشعبة: المكاتب الخارجية /القاهرة-العدد401.</u>

ولما تقدم من ثبوت تدخل وزارة النقل العراقية في جميع مراحل العلاقة التعاقدية بين أطراف العلاقة محل النزاع في الدعوى التحكيمية, ومن أن الشركة المحتكم ضدها الأولى هي شركة تابعة لوزارة النقل العراقي, فإن هيئة التحكيم تقضي برفض الدفع المبدى من المحتكم ضدهما بعدم قبول الدعوى التحكيمية لرفعها على غير ذي صفة بالنسبة لوزير النقل العراقي وتقضي باعتباره طرفا في اتفاق التحكيم بما يترتب على ذلك من آثار, دون ذكر ذلك بالمنطوق.

<u>الفصل الرابع: بشأن دفع المحتكم ضدهما بجحد الصور الضوئية, والدفع باستبعاد المستندات المحررة باللغة الأجنبية الغير مترجمة, والطعن بتزوير المستندات:</u>

<u>أولا:ـ دفع المحتكم ضدهما في مذكرات دفاعهما المقدمة أمام هيئة التحكيم وأمام الخبرة وبمحاضر الجلسات, بجحد كافة الصور الضوئية المقدمة من الشركة المحتكمة في كافة حوافظ مستنداتها.</u>

<u>وحيث أن الثابت</u> مما ورد بمذكرات دفاع المحتكم ضدهما وما أثبتاه بمحاضر الجلسات من الدفع بجحد الصور الضوئية, قد ورد عاما ومطلقا واستطال إلى كافة المستندات المقدمة من الشركة المحتكمة بالكراتين المقدمة من الشركة المحتكمة, دون تحديد لماهية المستندات المجحودة على نحو حصري أو

195

دقيق أو محدد, وهو الأمر الذي يكون معه هذا الدفع قد أبدى غير محدد وعلى نحو مجهل, وبالتالي غير منتج في الدعوى.

ومن ناحية أخرى, فإن الثابت أن المحتكم ضدهما قد أسقطا الحق في الدفع بجحد الصور الضوئية للمستندات, وذلك بمناقشتهما لما ورد بهذه الصور الضوئية والقيام بالرد عليها وعلى ماورد بها وعلى دلالاتها. ومن ذلك ما قام به المحتكم ضدهما من الرد على فواتير تليفونات الأرضي والمحمول وبإيرادهما في مذكرات دفاعهما ادعائهما أنهما وبفحصهما الصور الضوئية المقدمة من الشركة المحتكمة اتضح لهما منها أنها صور فواتير لتليفونات أرض ومحمول باسم شركة أخرى وادعائهما بأن الفواتير الخاصة بالمحمول هي لأسماء أشخاص أي أن كل الفواتير المقدم صورها من الشركة المحتكمة لا تخص لا من قريب أو بعيد شركة الخطوط الجوية العراقية المحتكم ضدها, وكما تمسكا بأنه بالفرض الجدلي أن هذه الفواتير تخص الوكيل العام للخطوط الجوية العراقية في وقتها فإنهما وبرجوعهما إلى صور هذه الفواتير تبينا أنها خلت من اسم شركة الخطوط الجوية العراقية أو شركة هورس للسياحة والسفر.

كما أن المحتكم ضدهما بما أثبتاه في محاضر جلسات الخبرة وفي المذكرات المقدمة منهما أمام الخبير وفي مذكرات دفاعهما ومن بينها المذكرة المودعة منهما من وكيلهما القانوني الأستاذ أحمد الديريني بتاريخ 2014/6/10, والمذكرة رقم 2 المقدمة منهما أيضا من ذات الوكيل القانوني بتاريخ 2023/6/20 , قد تمسكا بتقرير الخبير المحاسبي الذي استعانا به وقدماه لنفي ادعاءات الشركة المحتكمة والتماس رفض طلباتها اعتباره جزءا من دفاعهما. وهو التقرير المقدم من المحتكم ضدهما بحافظة مستنداتهما المقدمة بتاريخ 2014/6/10 والتي تضمنت التقرير المحاسبي المقدم من مكتب  المحاسبون القانونيون العرب "مجدي حشيش وشركاه" والذي ناقش الصور الضوئية للمستندات المقدمة من الشركة المحتكمة وناقش محتواها ودلالاتها المحاسبية المقدمة من الشركة المحتكمة في حوافظ مستنداتها تأييدا لطلباتها في الدعوى التحكيمية.

وفي ضوء ما تقدم فإن هيئة التحكيم تقضي برفض دفع المحتكم ضدهما بجحد الصور الضوئية للمستندات المقدمة من الشركة المحتكمة, دون حاجة إلى ذكر ذلك بالمنطوق.

ثانيا: بشأن دفع المحتكم ضدهما بعدم الاعتداد بالمستندات المقدمة من المحتكمة باللغة الأجنبية الغير مترجمة ترجمة معتمدة إلى اللغة العربية والتي لم يتم تبادلها بين أطراف التحكيم, فإن هيئة التحكيم تقبل بهذا الدفع, وتلفت عن هذه المستندات ولا تعتد بها, بغير حاجة إلى ذكر ذلك بالمنطوق.

ثالثا: بشأن طعن المحتكم ضدهما بالتزوير على المستندات المقدمة من المحتكمة, فإن هيئة التحكيم تمهد لحكمها في شأن هذا الدفاع بأن تقدير جدية الطعن بالتزوير وما إذا كان لازما للفصل في موضوع الدعوى التحكيمية من عدمه هو من سلطة هيئة التحكيم التقديرية, فإن رأت أن الفصل في تلك المسألة ليس لازما للفصل في موضوع النزاع فلها أن تستمر في نظر الموضوع ولا توقف خصومة التحكيم, ذلك أن مجرد الطعن بالتزوير أو اتخاذ إجراءات جنائية بشأن واقعة مطروحة على هيئة التحكيم لا يكفي لوقف الدعوى التحكيمية. كما أن من المقرر قانونا أيضا أنه يدخل في تقدير هيئة

196

التحكيم أيضا تقدير ما إذا كانت المنازعة المتعلقة بالمسألة الأولية ومنها الطعن بالتزوير جدية من عدمه أم لا.

(طعن نقض 26 لسنة 32 ق جلسة 28 مارس 1966 مكتب فني 17, ج2,ق100,ص740)

وحيث أن الثابت من الأوراق أن المحتكم ضدهما لم يطعنا على المستندات المقدمة من الشركة المحتكمة إلا بعد استئناف سير التحكيم في شهر فبراير2023 وذلك بجلسات الخبرة وأمامها وفي مذكرة دفاعهما الختامية المقدمة بتاريخ 2023/6/20, على الرغم من أن هذه المستندات مقدمة منذ فجر الدعوى التحكيمية التي انعقدت أولى جلساتها بتاريخ 2013/11/28 ولم يطعنا عليها بالتزوير, كما أن المحتكم ضدهما لم يحددا المستندات محل الطعن وإنما قاما قررا أنهما يطعنان عليها جملة وعددها عدة ألاف من الصفحات دون بيان أو تحديد لأي من المستندات محل التزوير, فضلا عن أن ما أوردا من شواهد للتزوير لا تدل على تزوير هذه المستندات, وإنما هي مجرد افتراضات لا يقوم عليها طعن بالتزوير, بما تنتهي معه هيئة التحكيم إلى رفض الطعن بالتزوير المبدى من المحتكم ضدهما كونه غير منتج في الدعوى وتلفت عنه الهيئة دون حاجة إلى ذكر ذلك بالمنطوق.

الفصل الخامس: بشأن دفع المحتكم ضدهما بسقوط حق الشركة المحتكمة في اللجوء للتحكيم استنادا منهما إلى أن البند (16) من عقد الوكالة قد حدد مدة الحل الودي بثلاثة أيام إلا أن هذا الحل قد استمر لأكثر من ست سنوات بما يعد بمثابة تنازلا ضمنيا من الشركة المحتكمة عن حقها في اللجوء إلى التحكيم لحل النزاع, وهو الدفع الذي يستند فيه المحتكم ضدهما على أن البند (16) من عقد الوكالة الملغاة رتب الأسلوب الذي اتفق عليه الطرفان في حالة حدوث أي نزاع يتعلق بتفسيره أو تطبيق هذه الاتفاقية وحددت المواعيد التي يجب أن تتخذ فيها هذه الإجراءات وهي مدة ثلاثة أيام فقط ليقوم الطرفين خلالهما ببذل الجهود القصوى لحل النزاع الذي يحدث بينهم بالطرق المناسبة أي الطرق الودية, وأنه قد تم تحديد هذه المدة بثلاثة أيام فقط حيث جاءت كلمة " فقط " لتقطع الطريق على أي محاولة لهذه المماطلة, إلا أن الحل الودي قد استمر أكثر من ستة سنوات, وبالتالي يعتبر هذا إخلالا من الشركة المحتكمة لشرط التحكيم ويعتبر بمثابة تنازلا ضمنيا عن حقها في اللجوء إلى التحكيم لحل النزاع.

-وفي شأن هذا الدفع فإن هيئة التحكيم تشير بداية إلى أن قانون التحكيم المصري رقم 27 لسنة 1994 المطبق على النزاع الماثل, لم يتضمن أية نصوص تتعلق بسقوط الحق في اللجوء إلى التحكيم. وأنه بالرجوع إلى نص المادة 16 من عقد الوكالة الذي تتساند إليه الشركة المحتكم ضدها في الدفع والذي حدد مدة ثلاثة أيام فقط ليقوم الطرفين خلالهما ببذل الجهود القصوى لحل النزاع الذي يحدث بينهم بالطرق المناسبة أي الطرق الودية, فإنه لم يرتب أي أثر على مخالفة تلك المدة أو تجاوزها.

- وحيث قد انتهت هيئة التحكيم بما لها من سلطة في شأن تفسير البند 16 من الاتفاقية المبرمة بين الطرفين المشتمل على شرط التحكيم على أن الميعاد المشار إليه في هذا البند هو ميعاد تنظيمي لا يترتب على تجاوزه أي سقوط للحق في اللجوء للتحكيم, خاصة وأن الثابت من الأوراق ومراحل النزاع أن الطرفين تجاوزوا معا وباتفاقهم جميعا الميعاد المذكور المتفق عليه لحل النزاع بطريق ودي بينهما, بما يثبت كونه غير ملزم و أنه مجرد ميعاد تنظيمي فقط كما أن أطراف عقد الوكالة في السعي نحو

197

الحل الودي أيا كانت مدة هذا السعي, فإنهم يكونون جميعا قد سلكوا مسلكا معبرا عن إراداتهم لا تدع ظروف الحال شكا حول دلالته على المقصود منه, وهو اتفاق أطراف عقد الوكالة وانعقاد إراداتهم على امتداد مهلة السعي نحو الودي بالقدر الذي استطالت إليه هذه المدة, مع استمرار شرط التحكيم والحق في اللجوء إلى التحكيم قائما.

وحيث قد ثبت لهيئة التحكيم ارتضاء المحتكم ضدهما بما تقدم في معرض دفاعهما بمذكرة ردهما على بيان الدعوى التحكيمية بالصفحة رقم 81 التي أورد المحتكم ضدهما في فقرتها الأخيرة ما نصه " أن سلوك الحل الودي والسعي للتفاوض وعقد اجتماعات ودية لا يمنع من اتخاذ إجراءات التحكيم والمضي فيها جنبا إلى جنب مع الحل والمساعي الودية والتفاوض", على النحو الي يقطع بقبول المحتكم ضدهما بأن الحل الودي يمكن أن يمتد إلى أكثر من ثلاثة أيام دون إخلال بالحق في اللجوء إلى التحكيم.

ومن ناحية أخرى فإن البند 16 من ملحق عقد الوكالة المؤرخ 2001/3/15 قد جاء معدلا اتفاق التحكيم الوارد بالبند 16 من عقد الوكالة المؤرخ 2001/1/30, حيث ورد نص البند 16 من ملحق عقد الوكالة بأنه :" يتولى الطرفان المتعاقدان بحسم كافة المستجدات والخلافات التي تظهر بينها بالطرق الودية, وفي حالة عدم التوصل إلى حسم ما يستجد من أمور أو خدمات بين الطرفين يحل عن طريق لجنة التحكيم التي يتفق عليها بين الطرفين المتعاقدين". والثابت من البند سالف البيان أنه لم يتضمن بعد تعديله ميعادا للحل الودي.

لذلك وعلى ما تقدم فإن هيئة التحكيم تقضي بأن الدفع المبدى من المحتكم ضدهما بسقوط حق الشركة المحتكمة في اللجوء إلى التحكيم هو دفع لا يصادف صحيح القانون, وتقضي برفضه دون حاجة إلى النص على ذلك بالمنطوق.

<u>الفصل السادس: الرد على الدفع المبدى من المحتكم ضدهما بانتهاء مدة التحكيم:</u>

دفع المحتكم ضدهما أيضا بانتهاء مدة التحكيم على مقولة أن المتفق عليها للتحكيم وهي 12 شهرا بالإضافة للمهلة التي قررتها هيئة التحكيم وهي ستة أشهر إضافية, قد انقضت دون صدور حكم منه للخصومة التحكيمية.

وردا على الدفع المار بيانه, <u>فإن هيئة التحكيم</u> تشير إلى أن الثابت من الأوراق أن أطراف التحكيم قد اتفقا بمحضر الجلسة الأولى التحكيمية على أن تكون مدة التحكيم 12 شهر تبدأ من تاريخ إنعقاد الجلسة في 2013/11/28, والثابت أيضا, وهو ما أكده أطراف الدعوى التحكيمية في المذكرات المقدمة منهما و من بينهما ما قدمه المحتكم ضدهما بمذكرتهما المقدمة من وكيلهما القانوني الأستاذ الدكتور/محمد حمودة بتاريخ 2023/6/20, أن هيئة التحكيم كانت قد أصدرت قرارا بمد مهلة التحكيم ستة أشهر إضافية على أن تبدأ من تاريخ انتهاء المدة الأصلية المتفق عليها لتصير مدة التحكيم 18شهرا.




ـ وحيث أن الثابت, وعلى النحو الذي أوردته الشركة المحتكمة في المذكرة المقدمة منها بتاريخ 2023/6/20, أن أطراف التحكيم قد اتفقوا في جلسة التحكيم الإجرائية الأولى المنعقدة بتاريخ 2013/11/28 على أن تكون مدة التحكيم سنة (اثنتا عشر شهرا) وعلى أن يبدأ حسابها من هذا التاريخ.

ـ وبتاريخ 2014/3/2 توقف سير التحكيم بسبب تنحي السيد الدكتور/ محمد الحاج حمود المحكم السابق تسميته من المحتكم ضدهما.ثم أعيد التحكيم إلى السير بتاريخ في 2014/3/18 بالنظر إلى قيام المحتكم ضدها الأولى بتعيين السيد الأستاذ الدكتور/ عبد الحميد جلال الأحدب محكما وقبول سيادته لهذا التعيين. ثم وبتاريخ 2014/7/17 توقف سير التحكيم مرة أخرى بسبب تنحي الأستاذ الدكتور/ شريف محمد عبد الله.

ـ وبتاريخ 2014/10/20 تم استئناف سير التحكيم, حيث قامت الشركة المحتكمة هورس للسياحة والسفر, بتعيين الأستاذ الدكتور/ أحمد فتحي سرور محكما عنها. وبتاريخ 2014/11/22 بدأ سريان قرار هيئة التحكيم بإيقاف التحكيم لعدم سداد أطراف التحكيم لزيادة أتعاب التحكيم التي سبق و قررتها هيئة التحكيم.

ـ وبتاريخ 2015/1/15 أعيد التحكيم إلى السير بموجب قرار هيئة التحكيم. وبذات التاريخ السابق 2015/1/15 تم مد مدة التحكيم ستة أشهر إضافية بقرار من هيئة التحكيم, في ضوء ما خوله لها قانون التحكيم من مد التحكيم لمدة لا تزيد على ستة أشهر.

ـ وبتاريخ 2015/2/4 توقف التحكيم بسبب تنحي الأستاذ الدكتور/ أحمد فتحي سرور.

ـ وبتاريخ 2016/1/14 تم استئناف سير التحكيم بالنظر إلى تعيين لجنة التحفظ (بصفتها صاحبة الصفة في تمثيل الشركة المحتكمة قانونا و تمثيلها أمام القضاء و التحكيم) المستشار الدكتور/ محمد ياسر أبو الفتوح محكما عن المحتكمة وقبول سيادته لهذه المهمة. وبتاريخ 2016/1/31 توقف التحكيم عن السير مرة أخرى بسبب تنحي المستشار الدكتور/ محمد ياسر أبو الفتوح.

ـ وبتاريخ 2016/3/14 أعيد التحكيم إلى السير بالنظر لقيام لجنة التحفظ (بصفتها صاحبة الصفة في تمثيل الشركة المحتكمة قانونا و تمثيلها أمام القضاء و التحكيم) بتعيين الأستاذ المستشار/ عزت خميس محكما عن المحتكمة. ثم وبتاريخ 2016/3/20 توقف التحكيم عن السير بسبب عدول لجنة التحفظ بصفتها عن الشركة المحتكمة عن تعيين المستشار/ عزت خميس.

ـ وبتاريخ 2016/3/24 أعيد التحكيم إلى السير لقيام لجنة التحفظ بصفتها عن الشركة المحتكمة بتعيين الأستاذ الدكتور/ يوسف وصال محكما عن المحتكمة. ثم وبتاريخ 2016/3/30 توقف التحكيم عن السير بالنظر إلى تنحي محكم الشركة المحتكمة الأستاذ الدكتور/ يوسف وصال.

ـ وبتاريخ 2023/2/6 عاد التحكيم إلى السير بالنظر إلى قيام لجنة التحفظ بصفتها عن الشركة المحتكمة بتعيين الأستاذ الدكتور/ شريف محمد عبد الله محكما عن المحتكمة.

ـ ولما كان الثابت من الأوراق وما سلف بيانه, وما سبق سرده بصدر هذا الحكم عند سرد واقعات الدعوى التحكيمية أن الدعوى أوقفت أكثر من مرة بسبب تنحي المحكمين, وهي مدة وقف وجوبية لا

199

يتم احتسابها من مدة التحكيم, وأنه باحتساب هذه المدد مدد إيقاف للدعوى التحكيمية, يتبين أن مدة التحكيم وهي 18 شهرا لا تزال سارية ولم تنقضِ, حيث بخصم مدد إيقاف التحكيم من المدة التي بدأت بتاريخ 2013/11/28 وحتى إعادة التحكيم إلى السير بإعادة تعيين الأستاذ الدكتور/ شريف محمد عبد الله محكما عن الشركة المحتكمة بتاريخ 2023/2/6, فإن مهلة ومدة التحكيم تبقى سارية حتى نهاية يوم السبت  الموافق 21 أكتوبر 2023.

ـ وبالإضافة إلى ما تقدم, فإنه وبتاريخ 2023/6/14 أرسل وكيل المحتكم ضدهما الأستاذ/ أحمد الديريني مخاطبة إلى رئيس وأعضاء هيئة التحكيم أورد فيها أنه بالإشارة إلى محضر جلسة التحكيم المنعقدة بتاريخ 2023/2/16, وبالإشارة إلى الرسالة الإلكترونية المؤرخة في 2023/5/31 والمتضمنة منح مهلة أسبوعين لطرفي الدعوى لإيداع ما يعن لهما من مذكرات ومستندات ختامية تتضمن التعقيب على تقرير الخبير تنتهي يوم 2023/6/20, وأنه نظرا لضيق الوقت الممنوح للمحتكم ضدهما لدراسة التقرير والتعليق عليه, فإنه يلتمس الموافقة على منح المحتكم ضدهما مهلة إضافية لمدة أسبوعين آخرين إضافة إلى المهلة الأساسية ليتمكن من إعداد المذكرات تعليقا على ما جاء بالتقرير. وحيث أنه و بعد أن خاطبت هيئة التحكيم أطراف التحكيم بقرارها الصادر بتاريخ 2023/6/15 برفض طلب المحتكم ضدهما منحهما مهلة إضافية, أرسل المحتكم ضدهما مرة أخرى بتاريخ 2023/6/17 مخاطبة إلى رئيس وأعضاء هيئة التحكيم يلتمسان فيها إعادة النظر في طلبهما السابق بطلب مهلة إضافية, رفضته أيضا هيئة التحكيم.

وحيث أن هذه المخاطبات من المحتكم ضدهما بطلب مهل إضافية إلى المهل المقررة لإيداع المذكرات والمستندات والتعقيب على تقرير الخبير, تعد تنازلا من المحتكم ضدهما عن الدفع بانتهاء مهلة التحكيم.

فلما تقدم فإن هيئة التحكيم تقضي برفض هذا الدفع, دون حاجة إلى ذكره بالمنطوق.

<u>الفصل السابع: دفع المحتكم ضدهما بسقوط حق الشركة المحتكمة في اللجوء للتحكيم لمرور أكثر من سنتين على انتهاء العلاقة العقدية, واستنادا لنص المادة 190 من قانون التجارة المصري رقم 17 لسنة 1999.</u>

<u>استند المحتكم ضدهما في شأن الدفع بسقوط حق الشركة المحتكمة في إقامة الدعوى لمرور أكثر من سنتين على انتهاء العلاقة العقدية</u> على مقولة أن الشركة المحتكمة قد أقرت بأن التكييف القانوني لاتفاقية الوكالة المبرمة معها موضوع النزاع هي وكالة عقود تحكمها المواد من 177 إلى 191 من قانون التجارة المصري رقم 17 لسنة 1999, وأنه بناء على هذا التكييف المتفق عليه تمسك المحتكم ضدهما بسقوط حق الشركة المحتكمة في إقامة الدعوى التحكيمية الماثلة لمرور أكثر من سنتين على انتهاء العلاقة العقدية, وذلك حسبما نصت عليه الفقرة الثانية من المادة 190 من قانون التجارة المصري والتي نصت على أنه: "2 ـ وتسقط جميع الدعاوى الأخرى الناشئة عن عقد وكالة العقود بإنقضاء سنتين على انتهاء العلاقة العقدية ", وأنه باحتساب فترة السنتين من تاريخ العلاقة العقدية سيكون هو تاريخ 2007/11/16 وأنه بالرجوع إلى ملف الدعوى يتبين أنه في خلال هذه الفترة لم تقم الشركة المحتكمة باللجوء إلى التحكيم واتخاذ إجراءات التحكيم الفعلية, وإنما قامت الشركة المحتكمة باتخاذ إجراءات التحكيم وإقامة الدعوى التحكيمية والتي تحتسب من تاريخ طلب الشركة المحتكمة بالبدء في إجراءات التحكيم وتعيين محكم عنها وبدأت بموجبه فعلا إجراءات

200

التحكيم الماثل وهو تاريخ الإنذار المقدم من الشركة المحتكمة إلى الشركة المحتكم ضدها وبتعيينها فيه محكم عنها وكان هذا الإنذار بتاريخ 2011/8/4 والذي تم بناء عليه تشكيل هيئة التحكيم.

ــ و في المقابل أوردت الشركة المحتكمة في بيان دعواها التحكيمية أن الطرفان اتفقا على مسمى العقد بعنوان "اتفاق وكالة عامة" بعقد الوكالة الأساس المؤرخ 2001/1/30 وجاء ملحق العقد أيضا بعنوان "ملحق عقد الوكالة العامة الموقع بين الشركة العامة للخطوط الجوية العراقية وشركة هورس للسياحة و السفر ", وتحرر العقد باللغة الإنجليزية أيضا بعنوان:"General Sales Agency Agreement" , ثم عادت الشركة المحتكمة وأوردت أن العقد هو عقد وكالة عقود استنادا إلى ما ورد به قانون التجارة المصري من تنظيم بعض أنواع الوكالات التجارية ومنها وكالة العقود, ثم عادت الشركة المحتكمة وتمسكت في المذكرات المقدمة منها بأن التكييف القانوني الصحيح لعقد الوكالة محل النزاع وكما هو معنون "عقد وكالة عامة", إلا أنه ذو طبيعة خاصة تختلط فيها سمات عدة لعقود الوكالة المعروفة فضلا عن سمات عقد المقاولة وعقد العمل, واستندت في ذلك إلى نصوص تنظيم أحكام الوكالة في المواد من 699 إلى 717 من القانون المدني خاصة نص المادة 710 الذي نص على أنه: "وعلى الموكل أن يرد للوكيل ما أنفقه في تنفيذ الوكالة التنفيذ المعتاد مع الفوائد منها وقت الاتفاق, مهما كان حظ الوكيل من النجاح في تنفيذ الوكالة", وعلى ما ورد به نص المادة 711 بأن الموكل يكون مسئولا عما أصاب الوكيل من ضرر دون خطأ منه بسبب تنفيذ الوكالة تنفيذا معتادا, كما استندت الشركة المحتكمة في تكييفها لعقد الوكالة على أنه عقد مختلط إلى تنظيم القانون التجاري رقم 17 لسنة 1999 للوكالة التجارية في المواد من 148 إلى 191.

كذلك تمسكت الشركة المحتكمة بأن قرار الإلغاء الصادر من المحتكم ضدهما بتاريخ 2005/11/14 مخالف للقانون و لاتفاق المتعاقدين , و أنه تلاه القرار الذي أصدره المحتكم ضدهما بتاريخ 2005/11/16 بإيقاف العمل بالوكالة وأن هذا القرار أيضا قد أتى مخالفا للقانون ومخالفا لاتفاق المتعاقدين, و أن مقتضى ذلك هو أن عقد الوكالة لا يزال ساريا , بما يعني عدم سقوط حق الشركة المحتكمة في اللجوء إلى المطالبة بالحق عن طريق التحكيم.

وحيث أن هيئة التحكيم وهي تستظهر وجه الحق في الدفع تشير بداية إلى أنها تملك إنزال صحيح القانون على مشارطات الخصوم في الدعوى, وذلك باعتبار أن التكييف هو مسألة قانون محض لأنها تقوم على إعطاء تلك الآثار وصفها القانوني تمهيدا لإنزال حكم القانون عليها, وإذ كان القاضي ملزما بتطبيق صحيح القانون, فإنه يكون ملزما بإعطاء الوصف القانوني الصحيح لمشارطات الخصوم وآثارها بغض النظر عما يخلعانه عليها من أوصاف أو كيوف نظرا لما إذا كان الخصوم قد أثاروا التكييف الصحيح أو لم يثيروه, دون التفات كذلك إلى اتفاقهم على تكييف لمشارطاتهم وآثارها." (الأستاذ محمد كمال عبد العزيز, التقنين المدني في ضوء القضاء والفقه, طبعة 1980, الجزء الأول في الالتزامات, ص 431 وما بعدها)

كما أن هيئة التحكيم وفي خصوص ما تقدم تشير إلى أن شأنها هو ذات شأن محكمة الموضوع, بكونها ملزمة في كل حال بإعطاء الدعوى وصفها الحق وإسباغ التكييف القانوني الصحيح عليها دون أن تتقيد بتكييف الخصوم لها في الدعوى, وأن العبرة في التكييف هي بحقيقة المقصود من الطلبات لا بالألفاظ التي صيغت فيها هذه الطلبات, آخذة في الاعتبار ما يطرحه المدعي واقعا مبررا لها. كما أن تطبيق القانون على وجهه الصحيح لا يحتاج إلى طلب من الخصوم بل هو واجب على القاضي الذي عليه من

201

تلقاء نفسه أن يبحث عن الحكم المنطبق على الواقعة المطروحة عليه وأن ينزل هذا الحكم عليها أيا كان النص القانوني الذي يستند إليه الخصوم في تأييد طلباتهم أو دفاعهم أو دفوعهم. وفي هذا الشأن استقر قضاء محكمة النقض المصرية على أنه: "المناط في تكييف العقود هو بما عناه العاقدون فيها, ولا يعتد بما أطلقوه عليها من أوصاف أو ما ضمنوها من عبارات إذا تبين أن هذه الأوصاف والعبارات تخالف حقيقة التعاقد وما قصده العاقدون منه.".

( نقض رقم 4257 لسنة 62 ق جلسة 1993/12/29)

ـ وحيث أن مسألة تكييف العقد محل النزاع وبغض النظر عما إذا كان العاقدان قد اتفقا على إصباغ وصف معين عليه أو إدراجه تحت مسمى تعاقدي معين لا يلزم هيئة التحكيم القائم على تطبيق صحيح القانون وتملك وحدها التكييف القانوني السليم للعقد محل النزاع.

وحيث أنه عن العقد موضوع النزاع وتكييفه التكييف القانوني السليم, فإن الأمر يستلزم استعراض نصوص وبنوده واستظهار التزامات كل طرف وحقوقه التي خولها له الاتفاق.

وفي هذا الشأن جاء نص المادة الأولى من اتفاقية الوكالة العامة , وهي المادة المعنونة بالتعيين على النحو التالي: "الخطوط الجوية العراقية ويشـار إليها بصفته الرئيس أو المالك (طرف أول) يعين شركة هورس للسياحة والسفر ويشار إليها هنا الوكيل العام الأوحد في مصر وبصفتها وافقت على كل ما جاء في بنود كل هذه الإتفاقية", ونصت المادة الثانية من اتفاقية الوكالة العامة , بعنوان "حقوق كل طرف",على أنه:-"ما لم يتفق الطرفان على غير ذلك كتابيا, فإن الطرف الأول لن يعين أي طرف آخر لتنفيذ أي خدمات مشابهه لما جاء في بنود هذه الإتفاقية في نفس الإقليم ........". كما نصـت المادة الثالثة من الإتفاقية "بعنوان التنازل عن الالتزامات" على أنه:- "ما لم تنص هذه الإتفاقية على غير ذلك, فإن الوكيل العام قد وافق على أن لا يتنازل, أو ينقل أو يفوض من ينوب عنه أو يقوم بالتزاماتـه الواردة في الاتفاق الحـالي إلى أي طرف آخر دون موافقة كتابية من الطرف الأول". وكذلك ورد نص المادة الرابعة من الاتفاقية بعنوان " مالك المؤسسـة ووكلاءه" بأن:- " أـ الطرف الأول له الحق الكامل في اختيار من ينوب عنه وتأسيس مؤسسـتـه في بلد الوكيل العام وإسـناد أي مهام لمن ينوب عنه وفق ما يراه مناسبا له ويشـمل هذا بيع تذاكر النقل (سـواء بطريق مباشـر أو عن طريق الآخرين) والإشـراف على الحجز وتوظيف وإدارة مكاتب مبيعاته بالرغم من كونهم وكيلا عاما له. يقوم الطرف الأول بإخطار الوكيل العام بالخدمات السـابقة ونظم الخدمة لإنشاء هذه الوكالة طبقا للشـروط التي وضـعـتها الأياتا المنظمة للوكلاء العموميين. ب- إذا رفض الوكيل العام بعد التشـاورات وجود مندوب مبيعات تحت إشرافه.. يجوز للطرف الأول تعيين مندوب مبيعات والإشراف عليه وتسـليمه المستندات الخاصة به ومحاسبته بطريقة مباشرة. ج -من المتفق عليه أن هذه المؤسسة أنشأت في شكل شركة فرعية مستقلة لها وجود رسمي مملوكة للطرف الأول ناتج من اسم شركة الطرف الأول بمعنى لا يجوز تغيير اسم الطرف الأول نتيجة إنشاء هذه الشركة المشتركة. ونصـت المادة الخامسـة المعنونة "نطاق صـلاحيات الوكيل العام" على أن:" (أ) يتم تحديد صـلاحيات الوكيل العام المخولة له من الطرف الأول بدقة وذلك لاسـتخدامها داخل الإقليم المتفق عليه فقط. (ب) مع مراعاة نصـوص هذه الإتفاقية فإن الوكيل العام يمثل الطرف الأول داخل الإقليم من حيث بيع تذاكر المسافرين والشحن الجوي بالإضافة إلى الخدمات المطلوبة من الطرف الأول (خدمة طائراته) أو الطائرات الخاصة بالشركات الأخرى (شركات

202

الطيران) التي يرعاها الطرف الأول". ونصت المادة السادسة بعنوان "الخدمات المطلوبة من الوكيل العام" على أنها:" تشمل مزاولة الطرف الثاني لمهام الخدمات والتسويق على الآتي:

أ-تسـويق وعمل الدعاية اللازمة لمزاولة أعمال الطرف الأول وتعيين الموظفين المختصـين لمزاولة ذلك بكفاءة.

ب-توفير وإصـلاح وتجديد الأماكن اللازمة لمزاولة أعمال الطرف الأول في بلد الوكيل العام (الطرف الثاني).

ج- إيصال الأمانات المسلمة من الطرف الرئيسي إلى أماكنها وفق تعليمات الطرف الأول.

د-إصدار تذاكر الطيران أو فواتير الخطوط الجوية أو إخطارات الشحن أو أمر دفع المصروفات المختلفة أو كلهم معا أو مستندات النقل الأخرى أو إصدار تذاكر مدفوعة الأجر وتنفيذ الأعمال الكتابية الخاصة بها.

هاء-زيارة شركات السياحة والمكاتب الأخرى والأفراد والهيئات لتنشيط مبيعات الطرف الأول.

ف-إمداد جميع مكاتب الطرف الأول ووكلائه ووكلاء الباطن بالمطبوعات والنشرات التسويقية والتعليمات المناسبة من وقت لآخر وكذا المسـتندات الخاصـة بتسـوية الحسـاب بين الوكيل العام ومندوبين المبيعات السابق ذكرهم.

ق-توزيع جداول الطيران أو المطبوعات الورقية الأخرى الخاصـة بمواعيد الرحلات الجوية والتى يوفرها الطرف الأول عندما يطلبها الوكيل العام أو وكلاء الباطن من الفنادق أو مثيلاتها وكل هذه الأوراق سـوف تبقى مملوكة للطرف الأول.

ك-بذل قصارى جهده لكسب ثقة الطرف الأول وتمثيله أمام الجهات الحكومية والإقليمية وكذا الهيئات العامة والصحافة والمؤسسات والتفاوض مع الجهات الحكومية والقضائية التي لها سلطة على خدمات النقل الجوي في إقليم الطرف الأول.

ل-تزويد الطرف الأول بالإحصاءات أول بأول وكذا التقارير التي يتطلبها الطرف الأول.

م- تزويد الطرف الأول بالمعلومات الضرورية الخاصـة بجميع القوانين وجميع المستجدات في هذا الشـأن طبقا لهذه الإتفاقية.

ن-أداء جميع الخدمات التي يلتزم الطرف الأول بتقديمها والخاصـة بشركات الطيران الأخرى وفق تعليمات الطرف الأول.

ونصت المادة السابعة المعنونة نوعية الخدمات على أنه :-

"1- يلتزم الطرف الثاني ببذل قصارى جهده لتقديم ما يطلبه الطرف الأول فيما يتعلق بتحسين الخدمة التي يقدمها الطرف الأول بموجب هذه الإتفاقية .

2- في حالة غياب التعليمات أو أوامر الطرف الأول يقوم الطرف الثاني بتقديم الخدمات طبقا للمواصـفات الدولية الملزمة لذلك.



203

3ـ يتعهد الطرف الثاني بإتخاذ جميع الخطوات الممكنة لضمان جودة الخدمات المقدمة للطرف الأول والتي لا تقل مطلقا عن نفس المستوى السابق أو مثيله في الشركات الأخرى (كما لو كان الوكيل العام هو المالك لهذه الطائرات وخلافه).

ونص البند التاسع والمعنون مراقبة الأسعار والتعليمات على أنه:

" 1ـ يلتزم الوكيل العام بمراقبة كل التعريفات والقواعد والقوانين والتعليمات والمعلومـات التي يقيمهـا الطرف الأول, ويكون مسئولا عن تنفيذها داخل بلده ووكلاءه.

2ـ يلتزم الوكيل العام بكل القرارات الصــادرة من منظمة الأياتا وكذلك قواعد ولوائح الخدمات الواردة في هذه الإتفاقية.

3ـ غير مسموح للوكيل العام بالتغيير أو بالتعديل وأيضا لا يسمح بذلك لوكلاءه بالتغيير أو بالتعديل لأي من الشروط أو البنود الموضحة في شروط النقل أو المطبوعات التي يضعها الطرف الأول .

ونص البند العاشر من الإتفاقية والمعنون مستندات الحركة " تذاكر الطيران " على أنه:

أـ يجوز للطرف الأول أن يمد الوكيل العام بمستندات للحركة "تذاكر الطيران" بالطريقة التي يراها الطرف الأول مناسبة حتى يتمكن الوكيل العام ووكلاء الرئيس ووكلاء الباطن من العمل في مبيعات تذاكر السـفر الخاصة بخدمات الطرف الأول وخدمات شركاؤه .

بـ تظل هذه المستندات ملكا خاصا للطرف الأول وله وحده الحق الكامل في إصدارها و تداولها طبقا لهذه الإتفاقية وعلى الوكيل العام تحمل المسـئولية الكاملة في اسـتخدام هذه المسـتندات وحمايتها مادامت في حوزته.

2ـيجوز للوكيل العام اسـتخراج تذاكر مجانية أو مخفضـة على خطوط نقل الطرف الأول وذلك بموافقة كتابية مسبقة من الطرف الأول.

ونص البند الحادي عشر على أن:"1ـ يقوم الطرف الأول بسداد عمولة الوكيل العام على التذاكر الصـادرة على خطوط طيران الطرف الأول سواء الأساسية أو الإضافية أو استئجار الطائرات أو رحلات الخطوط الأخرى الخاصـة بخدمات الطرف الأول والصــادرة من بلد الوكيل العام طبقا للوائح والقواعد والقوانين الخاصـة بمنظمة الأياتا المنظمة لذلك على أن يكون الوكيل العام هو الذي قام بإصـدار مسـتندات الطرف الأول وتكون العمولة على المبيعات كالتالي :

أـ المسافر الدولي 9% من السعر الأساسي للتكلفة الحقيقية او القيمة الإسمية أو كلاهما معا.

بـ البضاعة: 5% من رسوم نقل البضاعة المشحونة.

2ـ بالإضافة الى العمولة على المبيعات الموضحة في الفقرة السابقة, سوف يدفع الطرف الأول للوكيل العام نسبة أخرى تشـجيعية على كل المبيعات التي يصـدرها الوكيل العام أو وكلاء الباطن بموجب هذه الإتفاقية سـواء على رحلاته العادية المنظمة أو الإضـافية السـارية في بلد الوكيل العام ويتم توزيع هذه العمولة على النحو التالي :

( أ ) تذاكر الركاب 3% من السعر الخاص بالقيمة الفعلية لهذا الجزء .

204

(ب) الشحن 2, 5 %من السعر المحصل على ثمن نقل البضاعة المشحونة كما هو وارد في البند 1 ب .

3- على الرغم من ما جاء بالبند المذكور أعلاه, فإن الطرف الأول يدفع العمولة ( الأساسية, أو التشجيعية ) للوكيل العام عن التذاكر المستخرجة على أن يقوم الوكيل العام بإصدار هذه التذاكر في بلده وأن يكون ثمنها مدفوع مسبقا , إن لم يكن هناك مبيعات ولا عمولات إضافية معطاه إلى أي وكيل عمومي آخر للطرف الأول.

4- لا تمنح أي عمولات على أي رسوم صادر نتيجة وزن زائد للامتعة أو ضرائب زائدة.

5- النسب السابقة الممنوحة طبقا لما جاء في هذا البند سوف تظل الوحيدة هي مكافأة لكل المبيعات لتذاكر الطيران على خطوط الطرف الأول للوكيل العام طبقا لهذه الإتفاقية بالرغم من مما سبق لا شيء هنا سوف يمنع الطرف الأول من تعويض الوكيل العام عن نفقاته إزاء متطلبات الطرف الأول أو تعليماته الإضافية كتابيا مقابل الخدمات الإضافية التي عادة يقوم بها الوكيل العام.

6- وبالرغم مما ذكر سابقا في هذا البند, فإن عمولة المبيعات و العمولة التشجيعية سوف تسدد إلى الوكيل العام عن مبيعاته الإضافية على خطوط الطيران المنتظمة والإضافية للطرف الأول وذلك عن التذاكر الصادرة ببطاقات الائتمان في حساب الطرف الأول خارج مصر هذا في حالة إن لم يكن هناك عمولة أو عمولة إضافية يكون الطرف الأول قد سددها إلى وكيل عام أخر.

7- في حالة وجود استرجاع كامل أو جزئي للتذاكر أو تحصيل أي مبالغ عن طريق الوكيل العام على تذاكر الطرف الأول لا تسدد أي عمولة للوكيل العام عن أي مبالغ تم استردادها وبالتالي فإن الوكيل العام سوف يرد إلى الطرف الأول أي عمولة تكون قد احتسبت له نتيجة هذا الاسترداد.

ــ كما اشتمل ملحق العقد المؤرخ 2001/3/15 على البنود التالية:

1- تعيين الطرف الثاني وكيلا عاما للشركة العامة للخطوط الجوية العراقية في جمهورية مصر العربية ابتداء من 2001/3/15 وتسري شروط الاتفاقيات الدولية التي تنظم عقد الوكالة على هذا العقد إضافة إلى الشروط المدرجة في هذا الملحق والتي تعتبر جزء لا يتجزأ من عقد الوكالة.

2- يمارس الطرف الثاني نشاطه التجاري والتسويقي من خلال مكاتبه ومكتب شركة الخطوط الجوية العراقية في القاهرة.

3- يمارس الطرف الأول أعمال الإدارة والمتابعة والحجوزات الخاصة لسفر الموفدين الحكوميين وإصدار تذاكر السفر لهم ويتحمل مسؤليتها إداريا و"ماليا".

4- يتحمل الطرف الثاني رواتب موظفي مكتب الخطوط الجوية العراقية (الطرف الأول) في القاهرة ومطار القاهرة, ويلتزم الطرف الثاني ويتحمل كافة استحقاقات الموظفين المذكورين وفق الأحكام والتشريعات القانونية المطبقة في هذا المجال, وأن عدد الموظفين المنسبين قابل للزيادة حسب ظروف العمل وبموافقة تحريرية صادرة من الطرف الأول.

5- يتحمل الطرف الثاني أجور وكلف النداءات الهاتفية والتلكس والفاكس الصادرة من مكتب الطرف الأول في القاهرة إلى مركز الشركة في بغداد ووكلائه ومكاتبه في الخارج مع تحمله أجور الماء والكهرباء والتكييف وأجور رسوم التأمين على المكتب والسيارة والتسجيل والكفالة على السيارة.

205

6- يلتزم الطرف الثاني بدفع بدلات الإيجار السنوية لمكتب الطرف الأول في كل من مدينة القاهرة ومكتب الشــركة في مطار القاهرة, ابتداء من تاريخ تحمله مسؤولية الوكالة. كما يتحمل أية مصـروفات أو نفقات تترتب على زيادة بدلات الإيجار وفق التشريعات القانونية النافذة.

7-يتحمل الطرف الثاني راتب محامي الطرف الأول والمنسب للعمل والبالغ (500) خمسمائة جنيه مصري شهريا وأن الراتب قابل للزيادة وبموافقة تحريرية من قبل الطرف الأول.

8-يتحمل الطرف الثاني رسـوم وأجور الاشـتراك السـنوي للسـيتا والتلكس والمحطة اللاسـلكية في المطار وجهاز الحجز ( ) ورسوم الاشتراك في لجنة شركات الطيران العامة(   ).

9-يتحمل الطرف الثاني أجور التنظيف والأدامة والصيانة لمكاتب الطرف الأول في القاهرة وكذلك صيانة وإدامة الأجهزة العامة فيها.

10-يتولى الطرف الثاني, وعلى نفقته الخاصــة تأمين كافة احتياجات مكاتب الطرف الأول في القاهرة والمحطة من القرطاسية.

11-يلتزم الطرف الثاني بتحمل نفقات الدعاية والإعلان الظرورية لمكاتب الطرف الأول.

12-يتحمل الوكيل العام نفقات ومصــاريف الضــيافة وأجور الفنادق للموفدين الطرف الأول – الرســميين والهيئات والتبرعات واية نثريات أخرى.

13-يلتزم الطرف الثاني بصــيانة وإدامة المكتب وتأثيث المكتب للطرف الأول في المدينة والمطار وبما يتناسب ومكانته استعدادا للعمل المستقبلي وبالتنسيق مع مدير المكتب.

14-يلتزم الطرف الثاني بتحمل نفقات إشــتراك موظفي المكتب بالدورات التدريبية والتطويرية التي يتطلبها سير العمل.

15-يتحمل الطرف الثاني تأمين الزى الموحد للموسمين الصيفي والشتوي للعاملين في مكتب الطرف الأول في المدينة والمطار.

16- يتولى الطرفان المتعاقدان بحسـم كافة المسـتجدات والخلافات التي تظهر بينهما بالطرق الودية, وفي حالة عدم التوصل إلى حسـم ما يستجد من أمور أو خدمات بين الطرفين يحل عن طريق لجنة التحكيم يتفق عليها الطرفين المتعاقدين.

17- يتعهد الطرف الثاني بتحديث سيارات المكتب والمطار خلال فترة الوكالة وتسجل باسم الشركة العامة للخطوط الجوية العراقية وكما يلي: أ- سيارة لاستخدام مدير المكتب في القاهرة وسيارة لمدير المحطة عند التشغيل. ب- سيارة للضيوف الرسميين تبقى لدى الطرف الثانى وتطلب عند الحاجة من الطرف الأول. ج- يتحمل الطرف الثاني صــرف أجور الوقود والزيوت إلى ســيارات المكتب في المدينة والمطار والتي يتم استخدامها من قبل الموظفين.

18-يتحمل الطرف الثاني بتصـفية وتسـديد كافة المبالغ والديون المترتبة بذمة الطرف الأول من تاريخ غلق المكتب عام 1991 التأريخية أعلاه وحسب الكشف المرفق.

206

19-يبذل الطرف الثاني المساعى لدى هيئة ميناء القاهرة الجوي وشركة مصر للطيران بخصوص المبالغ المستحقة لهما قبل الطرف الأول والسير نيابة عنه في إجراءات إلغاء أو تخفيض الديون مع الجهات المعنية لصالح الطرف الأول.

20-إشارة إلى الفقرة 24 من عقد الوكالة القياسية الموقع بين الطرفين فإن الطرف الثاني يتعهد بما يلي:

أ تقديم كفالة مصرفية بمبلغ (200000) مائتا ألف دولار حال بدء التشغيل واستلام -المستندات السفرية الخاصة بالطرف الأول وممارسة النشاط التجاري من خلالها.

ب- تقديم كفالة مصرفية بمبلغ (100000) مائة ألف دولار كضمان لحقوق الشركة حاليا وتستبدل بالفقرة أ عند بدء التشغيل.

ـ وبالنظر إلى أن نص المادة 178 من القانون التجاري المصري ورد بأنه:" أن وكيل العقود هو الذى يتحمل وحده المصروفات اللازمة لإدارة نشاطه, وإلى ما أوردته المذكرة الإيضاحية للقانون التجاري المصري من أن المادة 178 أضافت شرطا إضافيا لاعتبار العقد من قبيل وكالة العقود وهو أن يمارس الوكيل نشاطه على وجه الاستقلال.

ومن حيث أن هذا الوصف باستقلالية وكيل العقود, لا يتوافر بل وينتفي عن العقد محل النزاع, وذلك لما هو ثابت من هذا العقد وملحقه من عدم استقلالية الوكيل العام (الشركة المحتكمة), وهو البين من ناحية أولى من ثبوت تبعية الشركة المحتكمة (شركة هورس للسياحة والسفر) إلى الشركة العامة للخطوط الجوية العراقية وخضوعها لرقابتها وإشرافها مباشرة ومن خلال ممثلها المدير الإقليمي للشركة وعلى النحو الوارد بالبند الرابع من عقد الوكالة العامة الأساسي, وهو الأمر الذي يؤكده أيضا البند رقم 6 من العقد الأساسي من أن جميع الأوراق والمستندات تبقى مملوكة للطرف الأول ملكية خاصة, بالإضافة إلى ما ورد بالبند 9 من العقد من أنه غير مسموح للوكيل العام بالتغيير أو بالتعديل لأى من الشروط أو البنود الموضحة في شروط النقل أو المطبوعات التي يضعها الطرف الأول (أي المحتكم ضدها الأولى).كما أن هذا هو الأمر البين ـ من ناحية ثانية ـ بالنظر إلى التزام الشركة المحتكم ضدها الأولى بتعويض الوكيل العام عن نفقاته المالية التي أنفقها في تنفيذ كافة الالتزامات المنصوص عليها في بنود التعاقد, وما ورد بالبند 11/5 من اتفاقية الوكالة العامة السالف بيان بنودها, والذي نص على أنه: "وبالرغم ما سبق فلا شيء هنا سوف يمنع الطرف الأول من تعويض الوكيل العام عن نفقاته إزاء متطلبات الطرف الأول", بالإضافة إلى ما تضمنه البند 11/1 من اتفاقية الوكالة الأساسية من النص على أن: "يقوم الطرف الأول (الشركة المحتكم ضدها الأولى) بسداد عمولة الوكيل العام (الشركة المحتكمة) على التذاكر الصادرة على خطوط طيران الطرف الأول", وهو ما يجعل العقد محل المنازعة عقدا تجاريا من عقود الوكالة العامة, وليس عقد وكالة عقود.

ـ وحيث أورد المحتكم ضدهما ذاتهما أن العقد محل المنازعة يتضمن التزامات أخرى ليست من الالتزامات التي تتحدد بها وكالة العقود, وعلى النحو الذي ورد نصا بالمذكرة المقدمة عن المحتكم ضدهما من الأستاذ الدكتور/ محمود سمير الشرقاوي بالصفحة رقم 15 والتي أورد فيها المحتكم ضدهما أن البند 6 من عقد الوكالة المؤرخ 2001/1/30 قد نص في الفقرة ب على التزام الوكيل بتوفير وإصلاح

207

وتجديد الأماكن اللازمة لمزاولة أعمال الطرف الأول في بلد الوكيل, وأن الفقرة (ن) من ذات البند 6 تلزم الوكيل بأداء جميع الخدمات التي يلتزم الطرف الأول بتقديمها والخاصة بشركات الطيران الأخرى وفقا لتعليمات الطرف الأول. كما أن المحتكم ضدهما وفي الصفحة رقم 18 من مذكرتهما السالف بيانها أوردا أنه:" لا جدال في أن هذا الملحق يفرض على الوكيل التزامات لا تدخل عادة في التزامات وكيل العقود وهي..- تصفية وتسديد كافة المبالغ و الديون المترتبة بذمة الطرف الأول من تاريخ غلق المكتب عام 1991حسب الكشف المرفق (البند 18 من الملحق)..- بذل المساعي لدى هيئة ميناء القاهرة الجوي وشركة مصر للطيران بخصوص المبالغ المستحقة لهما قبل الطرف الأول والسير نيابة عنه في إجراءات إلغاء أو تخفيض الديون مع الجهات المعنية لصالح الطرف الأول(البند 19 من الملحق )...".

وحيث أنه وفي ضوء ما سلف بيانه, وما تضمنته الوثائق المبرمة بين الطرفين من التزامات, فإن هيئة التحكيم, قد انتهت إلى أن التكييف الصحيح للعلاقة التعاقدية بين الطرفين هو أنها وكالة تجارية عامة وليست وكالة عقود, وهو ما لا يسري عليه أو ينطبق عليه الدفع المبدى من المحتكم ضدهما,

هذا فضلا عن أن هيئة التحكيم قد انتهت إلى أن الثابت من أوراق الدعوى هو عدم اتباع المحتكم ضدهما للإجراءات التي نص عليها التعاقد أو التي وردت بها نصوص القانون في شأن فسخ أو إنهاء عقد الوكالة, وأنه بذلك فإن العلاقة التعاقدية بين أطراف الوكالة العامة محل النزاع لم يتم فسخها أو إنهائها, وأنها لا تزال سارية ومستمرة.

وحيث أنه وفي ضوء ما تقدم فإن مدة سقوط الحق في المطالبة, وباعتبار أن هيئة التحكيم انتهت إلى تكييف العلاقة التعاقدية بين الأطراف وكالة عامة, هي سبع سنوات لا يبدأ حسابها إلا منذ انتهاء التعاقد, وبشرط تمسك صاحب الحق بها. وحيث أنه وفي جميع الأحوال فلم يدفع أو يتمسك المحتكم ضدهما بذلك الدفع المستند إلى سقوط الحق بحساب هذه المدة,

وحيث أن العلاقة التعاقدية بين الشركة المحتكمة و بين المحتكم ضدهما والتي تنظمها اتفاقية الوكالة العامة المبرمة بتاريخ 2001/1/30 و ملحق عقد الوكالة المؤرخ 2001/3/15 واتفاقية إعادة تفعيل عقد الوكالة و الملحق بتاريخ 2005/8/29, لم تنقضي و لم يتم إلغائها أو فسخها وأنها لا تزال سارية كما انتهت إليه هيئة التحكيم وعلى النحو السالف بيانه,

ومن ثم فإن الدفع المبدى من المحتكم ضدهما بسقوط حق الشركة المحتكمة فى إقامة الدعوى التحكيمية بمضي سنتين, يكون قد أبدي في غير محله وعلى غير سند من الواقع أو القانون, وتقضي هيئة التحكيم برفضه دون النص على ذلك بالمنطوق.

## الرد على الطلبات

حيث أن طلبات الشركة المحتكمة الختامية هي:

1- إلزام المحتكم ضدهم وهم رئيس مجلس الوزراء العراقي (رئيس الحكومة العراقية) ووزير النقل والمالية بدولة العراق جميعا بصفتهم والشركة المحتكمة ضدها (الشركة العامة للخطوط الجوية

العراقية) علي وجه التضامن والتكافل بحكم نهائي ومعجل بالنفاذ بالمبالغ التالية تعويضا للشركة المدعية وهي:

أ- مبلغ وقدره 103672853 دولار (مائة وثلاثة ملايين دولار أمريكي وستمائة واثنان وسبعون ألف وثمانمائة وثلاثة وخمسون دولار) قيمة ما تم إنفاقه فعليا لتنفيذ الالتزامات الواردة بعقد الوكالة وتمثل قيمة خسائر ومصروفات الشركة المدعية, وهذه الخسائر أضرار مادية أوضحتها بشكل دقيق ميزانيات الشركة المحتكمة ووفقا لتقرير مراقب الحسابات وتقرير خبرة محاسبي معتمد.

ب- مبلغ وقدرة 542096579 دولار (خمسمائة واثنان وأربعون مليون دولار أمريكي وستة وتسعون ألف وخمسمائة وتسعة وسبعون دولار) قيمة ما فات من كسب وفق ما أثبته التقارير المالية والمحاسبية المقدمة.

ج - مبلغ وقدرة (100,000,000) دولار ( فقط مائة مليون دولار أمريكي ) علي سبيل التعويض عن الإنهاء والإيقاف غير المشروع والتعسفي لعقد الوكالة.

د - مبلغ وقدرة خمسمائة دولار قيمة التعويض عن الأضرار المعنوية التي لحق بالشركة المحتكمة.

1- إلزام المحتكم ضدهم بدفع فوائد قانونية عن قيمة إجمالي المطالبة بدءا من تاريخ المطالبة وحتي السداد الكامل بما لا يقل عن نسبة 11% وبما لا يقل عن فائدة البنك المركزي المصري.

2- إلزام المحتكم ضدهم بسداد كل ما تكلفة التحكيم وأمانته ومصروفاته وأتعاب المحكمين.

3- إلزام المحتكم ضدهم بدفع مبلغ 400 ألف دولار أمريكي أتعاب تقديرية ستدفع إلي محامي الشركة المحتكمة منذ بداية النزاع وحتي صدور قرار هيئة التحكيم.

4- إلزام المحتكم ضدها بسداد كافة مصاريف ورسوم الصيغة التنفيذية علي حكم التحكيم.

5- إلزام المحتكم ضدهما بأن يؤديا 5000 دولار (فقط خمسة آلاف دولار أمريكي) عن كل يوم يمتنعا فيه عن تنفيذ حكم التحكيم من تاريخ صدوره.

- وحيث أن الشركة المحتكمة قد أرسلت رسالة بالبريد الالكتروني إلى هيئة التحكيم بتاريخ 2023/6/21 طلبت فيها استدراك خطأ مادي وقع في البند " د" من طلباتها, أعقبتها بتسليم المخاطبة ورقيا إلى أمين سر التحكيم بتاريخ 2023/6/22 بذات المضمون, ليصبح طلبها بعد التصحيح: "مبلغ وقدرة خمسمائة مليون دولار قيمة التعويض عن الأضرار المعنوية التي لحق بالشركة المحتكمة, بدلا من عبارة "خمسمائة دولار أمريكي".

وحيث أن تصحيح الخطأ المادي ليس طلبا جديدا بما لا يكون هذا الاستدراك مقدما في تاريخ تال على انتهاء المهلة المحددة لإيداع المذكرات الختامية على النحو الذي تمسك به المحتكم ضدهما, ذلك أن العبرة بحقيقة الطلبات والتي يوجد لهيئة التحكيم عليها سلطة في تكييفها وبحثها, وهو ما تيقنت هيئة التحكيم معه إلى أن حقيقة الطلب في الفقرة " د" من الطلبات الختامية بالمذكرة الختامية المودعة من الشركة المحتكمة هي طلب خمسمائة مليون دولار أمريكي وليس خمسمائة دولار أمريكي, وهو الثابت

**209**

في طلبات الشركة المحتكمة منذ تقديمها بيان الدعوى التحكيمية وبمذكراتها طوال تداول الدعوى التحكيمية وبصدر المذكرة الختامية ذاتها وما تضمنته, وهي المذكرة المودعة بتاريخ 2023/6/20.

<u>لذلك فإن هيئة التحكيم ترد على هذه الطلبات على النحو الأتي :</u>

<u>أولا: ـ بشأن طلبات الشركة المحتكمة في مواجهة رئيس مجلس الوزراء العراقي و وزير المالية العراقية:</u>

ـ حيث أن الثابت هو أن الشركة المحتكمة لم تقم باتخاذ إجراءات إدخال كل من رئيس مجلس الوزراء العراقي (رئيس الحكومة العراقية) بصفته, والسيد / وزير المالية العراقي بصفته في الدعوى التحكيمية, <u>ومن ثم فإن هيئة التحكيم تقضى بعدم قبول اختصامهما في الدعوى التحكيمية, وتلتفت عن طلب المحتكمة بإلزامهما بأية مبالغ أو طلبات في الدعوى.</u>

ثانيا:ـ <u>بشأن طلب المحتكمة الحكم لها بإلزام المحتكم ضدهما (وهما المحتكم ضدها الأولى الشركة العامة للخطوط الجوية العراقية والمحتكم ضده الثاني وهو وزير النقل العراقي "بصفته"), بأن يؤديا إليها مبلغ وقدره 103672853 دولار (مائة وثلاثة ملايين دولار أمريكي وستمائة واثنان وسبعون ألف وثمانمائة وثلاثة وخمسون دولار) قيمة ما تم إنفاقه فعليا لتنفيذ الالتزامات الواردة بعقد الوكالة وتمثل قيمة خسائر ومصروفات الشركة المحتكمة.</u>

ـ ومن حيث أن هيئة التحكيم تمهد لحكمها في هذا الشأن بأن من المقرر قانونا وعلى ما استقرت عليه أحكام محكمة النقض المصرية "أن قاضي الدعوى ملزم في كل حال بإعطاء الدعوى وصفها الحق وإسباغ التكييف القانوني الصحيح عليها دون تقيد بتكييف الخصوم لها في حدود سبب الدعوى ".(الطعن رقم 29 لسنة 63 ق, جلسة 1996/11/25,مجموعة المكتب الفني, السنة 47,ص 1387), وأن لمحكمة الموضوع تكييف الدعوى بما تتبينه من وقائعها وأن تنزل عليها وصفها الصحيح في القانون غير مقيدة في ذلك إلا بالوقائع والطلبات المطروحة عليها.(نقض مدني رقم 2754, لسنة 60 ق, جلسة 1994/10/30,مجموعة المكتب الفني, السنة 45,ص 297 ـ فقرة 2), كما أن من المقرر قانونا أيضا " أن العبرة في بيان الطلبات بحقيقة المقصود منها دون اعتداد بالعبارات التي صيغت بها" (نقض مدني في الطعن رقم 4497 سنة 62 ق جلسة 1994/1/27,مكتب فني, سنة 45, ص 278 فقرة 1).

وحيث أنه في ضوء ما تقدم فإن طلب الشركة المحتكمة يقوم على أساس المسئولية العقدية الناشئة عن العقد المبرم بينها وبين الشركة المحتكم ضدها متمثلة في إخلال الشركة المحتكم ضدها عن تنفيذ العقد.

وحيث أن من المقرر قانونا أنه: "يكفى لقيام الخطأ في المسئولية العقدية, ثبوت عدم تنفيذ المتعاقد لالتزاماته المترتبة على العقد, ولا ترفع عنه المسئولية إلا إذا قام هو بإثبات أن عدم التنفيذ يرجع إلى قوة قاهرة أو بسبب أجنبي أو بخطأ المتعاقد الآخر" (الطعن رقم 199, لسنة 36 ق, جلسة 1970/11/24, مكتب فني,ج1,ص 1148) وأن إثبات الخطأ الموجب للمسئولية العقدية على أحد العاقدين هو تقدير موضوعي تستقل به محكمة الموضوع في حدود سلطتها التقديرية ما دام استخلاصها سائغا" (الطعن رقم 30,لسنة36ق,جلسة,197/4/30,مكتب فني 21, ج, ص 756), كما أن من المقرر قانونا أيضا أن: "مناط

**210**

المسئولية العقدية الإخلال بالالتزام تعاقدي يترتب عليه ضرر تحقق متى كانت هناك علاقة سببية بين الخطأ والضرر ما لم تنتف العلاقة بقيام السبب الأجنبي الذي لا يد للمدين فيه سواء كان قوة قاهرة أم حادثا فجائيا أو كان خطأ من الدائن المضرور أو فعل الغير إذ في كل هذه الأحوال لا يكون الضرر راجعا إلى الخطأ العقدي, وبالتالي فلا يكون هذا المدين ملزما بتعويض هذا الضرر, وأن الخطأ العقدي يتحقق بمجرد عدم وفاء المدين بالتزامه أيا كان سبب عدم الوفاء وسواء كان ذلك الإخلال ناشئا عن عمد أو إهمال فإنه يستوي في ذلك أن يكون التزام المدين التزاما بتحقيق غاية أو التزاما ببذل عناية, وأن عدم تنفيذ الالتزام التعاقدي يعتبر خلل في ذاته يرتب المسئولية" (حكم التحكيم رقم 1- سنة 1984م ـ تاريخ الجلسة 1985/7/7 مركز القاهرة الإقليمي للتحكيم التجاري الدولي).

وحيث أن الثابت من الأوراق من أن الشركة المحتكم ضدها الأولى أصدرت قرارا بإنهاء عقد الوكالة العامة المبرم بينها وبين الشركة المحتكمة بإرادتها المنفردة, وهو القرار الصادر بتاريخ 2004/12/2 بموجب الخطاب الموجه من الشركة المحتكم ضدها الأولى إلى الشركة المحتكمة برقم 417 والمعنون "إنهاء الوكالة العامة" والذي يفيد إنهاء اتفاقية الوكالة العامة اعتبارا من 1 شباط (فبراير) 2005 والذي يتبين من مطالعته من ناحية أولى <u>خلوه من ذكر أية أسباب للإنهاء أو بيان أي مخالفات تعاقدية ارتكبتها الشركة المحتكمة</u>, ومن ناحية ثانية تضمنه لإقرار الشركة المحتكم ضدها الأولى بأن السبب الوحيد لإنهاء الوكالة هو إرادتها المنفردة في إنهاء عقد الوكالة المبرم مع الشركة المحتكمة بوصفه من التأثيرات الجانبية التي كانت تفرض من قبل أجهزة النظام السابق والتي لا تخدم أهداف الشركة المحتكم ضدها الأولى الاقتصادية, إذ ورد نصا بهذا القرار أن الشركة المحتكم ضدها تعلم الشركة المحتكمة بإنهاء اتفاقية الوكالة العامة :"نظرا لتوجهات الدولة في العراق الجديد بإعادة تأهيل الشركة العامة للخطوط الجوية العراقية بشكل يؤهلها لإعادة التشغيل وممارسة نشاطها في مجال النقل الجوي وإعادة بناء أسواقها التقليدية بعيدا عن التأثيرات الجانبية التي كانت تفرض من قبل أجهزة النظام السابق والتي لا تخدم أهداف الشركة المحتكم ضدها الأولى الاقتصادية , نود إعلامكم رغبة شركتنا بإنهاء اتفاقية الوكالة العامة في مصر المبرمة معكم اعتبارا من 1/شباط/2005..".

وفي ضوء ما تقدم أيضا, فقد ثبت لهيئة التحكيم أيضا أن الشركة المحتكم ضدها الأولى ارتكبت عمدا خطأ تعاقديا جسيما, وهو الأمر الثابت أيضا من تراجعها عن القرار السابق لها إصداره بتاريخ 2004/12/2 بإنهاء الوكالة والعودة إلى التزامها بإعادة تفعيلها بموجب الاتفاق المبرم بينها وبين الشركة المحتكمة بتاريخ 2005/8/29 والذي جاء أيضا خلوا من التمسك أو الإشارة إلى نسبة أي مخالفات تعاقدية إلى الشركة المحتكمة.

وقد انتهت هيئة التحكيم من ذلك إلى أنه وبالرغم مما سبق من تراجع الشركة المحتكم ضدها الأولى وعلى النحو السابق عن قرار إنهاء الوكالة المخالف للقانون وللالتزامات التعاقدية المشار إليه, فإنها عادت وعلى نحو العمد إلى تكرار ذات الخطأ الجسيم وبالمخالفة للالتزامات التعاقدية وبالمخالفة للقانون, بالامتناع عمدا وبغير مبرر مشروع عن تنفيذ عقد الوكالة وملحقه وعن تنفيذ الاتفاق المبرم في 2005/8/29 بإعادة تفعيل عقد الوكالة, حيث أصدرت وبعد ما لا يجاوز الشهرين ونصف الشهر

211



فقط من ذلك الاتفاق على إعادة تفعيل الوكالة, قرارا جديدا آخر بتاريخ 2005/11/14 وبإرادتها المنفردة أيضا بإنهاء الوكالة العامة للشركة المحتكمة, متضمنا أن يكون ذلك الإنهاء اعتبارا من 2005/12/1.

كما وثبت لدى هيئة التحكيم أيضا أن القرار سالف الإشارة إليه الصاد بتاريخ 2005/11/14 بإنهاء الوكالة قد صدر متضمنا محاولة لإيجاد مبرر لإنهاء التعاقد بالقول بعدم وفاء الشركة المحتكمة بالتزاماتها التعاقدية على نحو مرسل بدون تفصيل أو إثبات, وبالمخالفة من ناحية أولى للثابت من المستندات المقدمة من الشركة المحتكمة في سياق مطالبتها بما أنفقته من أجل الوفاء وتنفيذ التزاماتها التعاقدية, ومنها ما أنفقته في الفترة السابقة على تشغيل الشركة المحتكم ضدها الأولى لطائراتها وعلى النحو الثابت أيضا من تقرير الخبير المنتدب في الدعوى التحكيمية وما تبينته هيئة التحكيم باطلاعها بنفسها ومباشرة على المستندات وأوراق الدعوى التحكيمية.

كما أن هذا القرار الذي أصدرته الشركة المحتكم ضدها الأولى بتاريخ 2005/11/14 بإنهاء الوكالة وما تلاه من قرار بإيقاف الوكالة بتاريخ 2005/11/16 قد صدرا أيضا ومن ناحية ثانية, بالمخالفة للسياق المنطقي والقانوني بالنظر إلى استحالة تصور امتناع الشركة المحتكمة عن تنفيذ التزاماتها التعاقدية المرتبطة بتشغيل المحتكم ضدها الأولى لطائراتها بينما أن الثابت من الأوراق ومن قرار الشركة المحتكم ضدها الأولى ذاته بإنهاء عقد الوكالة محل النزاع أنها امتنعت عمدا عن الوفاء بالتزاماتها التعاقدية بتحقيق نتيجة, وهي الالتزام بتسليم الشركة المحتكمة للمستندات السفرية والتذاكر والوثائق والمعلومات كما امتنعت عن تسليمها المقر الرئيسي لمباشرة أعمال الوكالة محل النزاع, وهي الأدوات اللازمة لتمكين الشركة المحتكمة من البدء في مباشرة أعمال الوكالة, وعلى نحو قد استحال فيه على المحتكمة تنفيذ التزاماتها التعاقدية القائمة على ذلك التمكين.

كما أن هيئة التحكيم قد ثبت لديها أيضا من خلال مطالعة الأوراق والوثائق المتبادلة بين الطرفين أن القرار السالف بيانه الصادر بتاريخ 2005/11/14 من المحتكم ضدهما بإنهاء الوكالة, قد صدر أيضا بالمخالفة أيضا للمنطق والسياق العقلي في الادعاء على الشركة المحتكمة بمخالفة التزامات التعاقد بينما الثابت من هذا القرار بالإنهاء الثاني لعقد الوكالة الذي أصدره المحتكم ضدهما أن التشغيل الفعلي الذي هو الشرط الأولى لبدء التزامات المحتكمة وأن هذا الشرط لم يكن قد تحقق وأن بدء تشغيل الخطوط الجوية لم يكن قد بدأ إلا قبل قرار الإنهاء بعدة أيام, وبينما الثابت أيضا أنه لم يكن قد مرعلى الاتفاق المبرم بتراجع الشركة المحتكم ضدها عن قرارها السابق بإنهاء الوكالة بتاريخ 2005/8/29 وبين القرار الثاني الصادر من المحتكم ضدهما بإنهاء عقد الوكالة و المؤرخ 2005/11/14 إلا ما لا يجاوز الشهرين ونصف الشهر فقط.

كما ثبت لهيئة التحكيم أيضا من خلال مطالعة الأوراق والوثائق المتبادلة بين الطرفين خطأ الشركة المحتكم ضدها الأولى الجسيم لتعمدها ـوبالمخالفة لالتزاماتها التعاقدية ومن بينها التزامها المنصوص عليه بملحق عقد الوكالة العامة المؤرخ 2001/3/15 بالوفاء بكافة الالتزامات التعاقدية إعمالا لمبدأ حسن النية في تنفيذ العقود ـ إنهاء الوكالة محل النزاع, حيث أقرت الشركة المحتكم ضدها الأولى بما أوردته في قرار إنهاء عقد الوكالة وهو القرار الصادر بتاريخ 2005/11/14 ذاته من أن سبب إصدار

212

هذا القرار هو أن تنفرد وتقوم هي بنفسها بعد إعادة تشغيل طائرات شركة الخطوط الجوية العراقية من وإلى مصر بالتشغيل المباشر وبمباشرة الأعمال التي كانت أوكلتها بموجب عقد الوكالة العامة إلى الشركة المحتكمة, حارمة بذلك عمدا وبغير مبرر أو سبب أو مسوغ مشروع الشركة المحتكمة من الحقوق المقررة لها بموجب التعاقد.

كما وقد تأكد هذا الخطأ العمدي الجسيم والذي ارتكبته الشركة المحتكم ضدها الأولى والمحتكم ضده الثاني بالامتناع عن تنفيذ التزاماتهما التعاقدية والإنهاء المبتسر والمتعمد وغير المبرر لعقد الوكالة محل النزاع, وذلك بما قامت به الشركة المحتكم ضدها الأولى وبتاريخ 2005/11/16 من إصدار قرار بإيقاف الوكالة, أي بعد إصدارها لقرار الإنهاء الثاني السابق صدوره بتاريخ 2005/11/14 بيومين فقط, وهو قرار متناقض ومتعارض مع قرار إنهاء الوكالة, ومتناقض أيضا مع ما تمسك به المحتكم ضدهما ذاتهما مرارا من أن دخول عقد الوكالة حيز التنفيذ وبالتالي التزامات الطرفين, معلق على بدء تشغيل الخطوط الجوية العراقية , حيث قالت الشركة المحتكم ضدها الأولى في هذا القرارـ وعلى عكس ما ثبت لهيئة التحكيم على النحو المتقدم بيانه ـ بأن إيقاف وكالة الشركة المحتكمة يرجع إلى عدم التزام الشركة المحتكمة ببنود عقد الوكالة العامة وملحقه ومحضر الاجتماع المؤرخ 2005/8/29, بينما الثابت صراحة مما تضمنه هذا القرار ذاته أن سبب قيام الشركة المحتكم ضدها الأولى بإنهاء الوكالة محل النزاع ثم إصدار قرار بإيقافها هو انصراف إرادة الشركة المحتكم ضدها الأولى إلى مباشرة نشاط التشغيل بنفسها وبدون أي وكيل من خلال مكتبها بالقاهرة ولاستبعاد الشركة المحتكمة لسبق وسمها بأنها من الشركات الواجهية, وحيث ورد نصا بنهاية هذا القرار الصادر من الشركة المحتكم ضدها الأولى عبارة :"..وستقوم شركتنا بالتشغيل المباشر من خلال مكتبنا في القاهرة", وهو الثابت أيضا بما ورد أيضا في كتاب المحتكم ضده الثاني ـوزير النقل العراقيـ الموجه بتاريخ 2010/4/11 إلى الأمانة العامة لمجلس الوزراء العراقي والذي تضمن الإقرار بأنه:" قد تم إنهاء عقد الوكالة العامة في مصر بين الشركة أعلاه (الشركة العامة للخطوط الجوية العراقية) وشركة هورس للسياحة و السفر بناء على ما جاء بكتاب أمانتكم الموقر المرقم (ق/ 2098/1/6) في 2005/5/8 والمتضمن تصنيف الشركة المذكورة من قبيل الشركات الواجهية", وهو الكتاب المقدم صورته من الشركة المحتكمة بالحافظة رقم 5 المقدمة رفق بيان الدعوى التحكيمية, والذي حاول المحتكم ضدهما في دفاعهما تفسيره على خلاف ما ورد به من اللفظ الصريح والعبارة الواضحة.

وحيث تضمن الكتاب سالف الإشارة إليه والصادر من وزير النقل العراقي, اقتراح وزير النقل العراقي (المحتكم ضده الثاني) على الأمانة العامة لمجلس الوزراء العراقي بحسم الأمر وديا تلافيا للأضرار التي تصيب الشركة المحتكم ضدها الأولى والتي قدرها آنذاك بما يجاوز التسعين مليون دولار. فإن هذا هو ما قد ثبت منه صحة ما تمسكت ودفعت به الشركة المحتكمة من أن إنهاء الوكالة وإيقافها كان مخالفا للقانون ومخالفا لاتفاق أطراف عقد الوكالة وبغير مبرر أو مسوغ مشروع, ومن ذلك بصفة خاصة لأنه كان مستندا على تنفيذ توجهات الدولة في العراق والسعي نحو انهاء التعاقدات التي تمت في ظل النظام السابق وعلى سند من تصنيف الشركة المحتكمة بأنها من الشركات الواجهية, وسعيا

213

من المحتكم ضدهما في مباشرة التشغيل المباشر لطائرات المحتكم ضدها الأولى واستبعاد الشركة المحتكمة.

كذلك وحيث قد ثبت لهيئة التحكيم خطأ المحتكم ضدهما الناجم عن امتناع الشركة المحتكم ضدها الأولى عن تنفيذ التزاماتها التعاقدية بتسليم الشركة المحتكمة المستندات السفرية والتذاكر والوثائق والمعلومات, وامتناعها عن تسليمها مقر الشركة بالقاهرة الذي تتم ممارسة النشاط الرئيسي للوكالة به, وهي الأدوات اللازمة لتمكين الشركة المحتكمة من البدء في تنفيذ أعمال الوكالة حيث جاءت البنود 1/10, 6/12 من عقد الوكالة الأساسي تنص على التزام الموكل المحتكم ضدها بتسليم الوكيل العام المحتكمة كافة أنواع المستندات والمعلومات اللازمة للقيام بأعمال الوكالة, كما ورد نص البند 1/10 بالتزام المحتكم ضدها الأولى بتسليم الشركة المحتكمة "مستندات الحركة (تذاكر الطيران) حتى يتمكن الوكيل العام من العمل في مبيعات تذاكر السفر الخاصة بخدمات الطرف الأول وخدمات شركاؤه", كما ورد نص البند 6/12 بالتزام الشركة المحتكم ضدها بإمداد الشركة المحتكمة:"بكافة أنواع التذاكر والمستندات التي تسهل عملية البيع على خطوطه وأيضا تقارير المبيعات والاستردادات التي تم خصمها وكروت الائتمان المستعملة في كافة أنواع البيع", وجاء نص البند 2 من ملحق عقد الوكالة يفيد التزام الشركة المحتكم ضدها الأولى بتسليم الشركة المحتكمة مقر الشركة بالقاهرة لكونه المقر الذي تتم ممارسة النشاط الرئيسي للوكالة به, كما جاء بالبندين رقم 2 و 4 من اتفاقية إعادة تفعيل الوكالة بتاريخ 2005/8/29 بالنص على التزام الشركة المحتكم ضدها الأولى بتسليم الشركة المحتكمة المستندات السفرية والمستلزمات الفنية المتضمنة شهادة الطائرات والتأمين وتسجيلها وتسليمها مع جداول التشغيل إلى سلطات الطيران المصري لغرض دراساتها واستحصال موافقات التشغيل, وأن هذا ما يطابق أيضا ما قرره المشرع المصري بموجب نص المادة 185 من قانون التجارة المصري من أنه: "على الموكل أن يقدم للوكيل جميع المعلومات اللازمة لتنفيذ الوكالة وأن يزوده ـ بوجه خاص ـ بمواصفات السلع والنماذج والرسوم والعلامات وغير ذلك من البيانات التي تعينه على ترويج السلع موضوع الوكالة وتسويقها",

وحيث أن الثابت من الأوراق أن المحتكم ضدها الأولى لم تقم بتقديم أي من المستندات والمعلومات التي وردت التزامات التعاقد على الوكالة بتقديمها, وامتناعها عن تسليمها مقر الشركة بالقاهرة الذي تتم ممارسة النشاط الرئيسي للوكالة به واكتفت في دفاعها بالرد على ما نسبته إليها الشركة المحتكمة من الخطأ بشأن هذا الامتناع عن تنفيذ التزامها الجوهري بالقول بأن الشركة المحتكمة لم تقم بتوجيه طلب إليها لتنفيذ الالتزام بتسليم المستندات والمعلومات, وبأن مقر الشركة الرئيسي مملوك لها وأنه بالتالي لها الحق في الانفراد به دون أن يعد ذلك استيلاء عليه.

وحيث أن ما تقدم بيانه يثبت به مخالفة الشركة المحتكم ضدها الأولى لالتزاماتها الواردة بكل من عقد الوكالة وملحقه واتفاق إعادة تفعيله, كما يخالف أيضا نص المادة 148 من القانون المدني الذي ورد بأنه:" 1ـ يجب تنفيذ العقد طبقا لما اشتمل عليه وبطريقة تتفق مع ما يوجبه حسن النية. 2ـ ولا يقتصر العقد على إلزام المتعاقد بما ورد فيه, ولكن يتناول أيضا ما هو من مستلزماته, وفقا للقانون والعرف والعدالة بحسب طبيعة الالتزام".

**214**

وحيث أن التزامات الشركة المحتكم ضدها بتسليم مكتب الخطوط الجوية بشارع قصر النيل ومكاتبها بالمطار وتسليم المستندات والتذاكر والمعلومات اللازمة لأداء الشركة المحتكمة لعملها وكذا التزامها بسدادها للمصروفات والعمولات إلى المحتكمة هي التزامات بنتيجة لم تتحقق بسبب امتناع الشركة المحتكم ضدها الأولى العمدي عن تنفيذها.

وحيث أنه يبين مما تقدم أن الشركة المحتكم ضدها الأولى قد إتجهت إرادتها إلى الامتناع عن تنفيذ التزاماتها التعاقدية, بما يترتب عليه وإعمالا للفقرة (ث) من المادة 220 من القانون المدني المصري عدم ضرورة قيام الشركة المحتكمة بإعذار الشركة المحتكم ضدها الأولى بتنفيذ التزاماتها التعاقدية.

وحيث أن الثابت من أوراق الدعوى ضرورة وفاء الشركة المحتكم ضدها الأولى بهذه الالتزامات لكون هذا الوفاء هو المتطلب الأولي والأساس لتمكين الشركة المحتكمة من البدء في تنفيذ التعاقد وما قد يترتب على تمكينها من تلك المستندات والأدوات ومقر مباشرة النشاط من إمكان مساءلتها عن تنفيذ التزاماتها التعاقدية من عدمه أو التأخير في تنفيذها أو الإخلال بها من عدمه.

وحيث أن الشركة المحتكم ضدها الأولى أصدرت أيضا (وعلى النحو السالف بيانه تفصيلا), قرارات متتالية بإنهاء عقد الوكالة, ثم إعادة تفعيلها, ثم إصدار قرار بإنهائها ومن بعد ذلك بيومين فقط إصدار قرار أخر بإيقاف العمل بالوكالة, وبدون أن يكون لادعاءات المحتكم ضدها الأولى على الشركة المحتكمة بمخالفة التزامات التعاقد أي أثر في قراراتها الصادرة بقبولها إعادة الوكالة أو إعادة تفعيلها بعد إنهائها, بل وبما يعد إسقاطا من المحتكم ضدها الأولى لأي ادعاء منها عن سبق ارتكاب الشركة المحتكمة لأي مخالفة تعاقدية.

لذلك فإن هيئة التحكيم ولثبوت مخالفة الشركة المحتكم ضدها الأول أيضا لالتزامها بالوفاء بالتزاماتها التعاقدية بحسن النية الذي تم النص عليه بملحق عقد الوكالة العامة المؤرخ 2001/3/15, ولثبوت امتناعها عمدا وعلى نحو الخطأ الجسيم عن تنفيذ التزاماتها التعاقدية ومنها التزاماتها بتحقيق نتيجة, ومن ذلك لامتناع الشركة المحتكم ضدها الأولى عن تسليم الشركة المحتكمة بوصفها الوكيل العام المستندات والمعلومات سالفة البيان والامتناع عن تسليمها مقر الشركة بالقاهرة الذي تتم ممارسة النشاط الرئيسي للوكالة به, بما أوصد الأبواب على الشركة المحتكمة وأعاقها رغما عنها عن تنفيذ عقد الوكالة.

ولما ثبت مما تقدم جميعه من تعمد المحتكم ضدهما الامتناع على نحو غير مشروع وغير مبرر عن تنفيذ الالتزامات التي التزما بها بموجب كل من عقد الوكالة العامة وملحقه واتفاق إعادة تفعيل الوكالة المؤرخ 2005/8/29, لذلك <u>فإن هيئة التحكيم تقضى أيضا بعدم صحة كافة الدفوع التي دفع بها المحتكم ضدهما سعيا لنفي أخطائهما</u> ونفي المسئولية عنهما, ومن ذلك على وجه الخصوص الادعاء بأن قرارات إنهاء التعاقد على الوكالة العامة كانت راجعة إلى إخلال الشركة المحتكمة بالتزاماتها التعاقدية.

وحيث أنه في ضوء ما تقدم, فإن هيئة التحكيم وفي شأن الطلب سالف البيان تأخذ بالإضافة إلى ما تقدم بما هو مقرر قانونا من "أن رأي الخبير لا يخرج عن كونه عنصرا من عناصر الإثبات لمحكمة

215

الموضوع تقديره دون معقب عليها في ذلك, وأنه إذا أخذت المحكمة بتقرير الخبير لاقتناعها بصحة ما جاء به, فإنها لا تكون ملزمة بالرد استقلالا على الطعون التي توجه إليه أو بإجابة طلب إعادة المأمورية إلى الخبير, لأن في أخذها بالتقرير المذكور محمولا على أسبابه يتضمن الرد المسقط لتلك الطعون, وما هو مقرر كذلك من أن أخذ محكمة الموضوع محمولا على أسبابه لا يلزمها بالرد استقلالا على الطعون الموجهة إليه أو باتخاذ إجراء آخر من إجراءات الإثبات . (نقض مدني جلسة 1958/11/13 مجموعة المكتب الفني, س 9 ص 689 ؛جلسة 1975/12/6 المجموعة المذكورة, س 26ص,1566,جلسة 1981/1/27 في الطعن رقم 665,س47 ق).

ـ وحيث أنه وبالإضافة إلى أن هيئة التحكيم تأخذ بتقرير الخبير المقدم في هذه الدعوى لكفاية الأبحاث التي قام عليها وسلامة النتائج التي انتهي إليها واستنادها إلى أصول ثابتة في أوراق الدعوى ومستنداتها, فإنها تقيم حكمها على ما تبينته من بحثها بنفسها وإطلاعها على كافة أوراق الدعوى, من أن الشركة المحتكم ضدها قد أخلت بالتزاماتها التعاقدية.

وحيث أن الخطأ العقدي يتمثل في مجرد عدم تنفيذ المدين لالتزامه الناشئ عن العقد على الوجه الوارد فيه سواء كان عدم التنفيذ كليا أو جزئيا أو كان التنفيذ معيبا أو متأخرا وبغض النظر عن الدوافع أو البواعث أو الغايات.

وحيث أن الثابت من التقرير الفني المقدم من الخبير المعين في الدعوى التحكيمية, وبالإضافة إلى ما انتهت إليه هيئة التحكيم من بحث وتمحيص أوراق الدعوى ومستنداتها والمذكرات المقدمة فيها من الطرفين ثبوت الخطأ العمدي الجسيم بالامتناع عن تنفيذ التزامات التعاقد في جانب المحتكم ضدهما, وعلى النحو الذي ترتبت عنه الأضرار محل المطالبة من الشركة المحتكمة التي تثبتت هيئة التحكيم من حدوثها, وما تثبتت منه هيئة التحكيم بتوافر علاقة السببية بين خطأ المحتكم ضدهما وبين الأضرار التي أصابت الشركة المحتكمة, لذلك فإن هيئة التحكيم قد انتهت إلى مسئولية المحتكم ضدهما التعاقدية عن تعويض الشركة المحتكمة عما أصابها من أضرار.

وبالرغم من أن المدين في المسئولية العقدية يلتزم بتعويض المضرورعن الضرر الذي أصابه بما يشمله هذا التعويض من ما لحقه من خسارة وما فاته من كسب شريطة أن يكون هذا الضرر ممكن توقعه وقت التعاقد وأن معيار توقع الضرر معيار موضوعي لا معيار ذاتي. إلا أنه وحيث ثبت لهيئة التحكيم من أوراق الدعوى ومستنداتها أن خطأ المحتكم ضدهما هو خطأ عمدي جسيم مخالف لمبدأ حسن النية في تنفيذ العقود ويرقى إلى مرتبة الغش, بما يلتزم مرتكبه بالتعويض حتى فيما يجاوز الممكن توقعه وقت التعاقد, فإن هذا هو ما لهيئة التحكيم أن تراعيه في تقديرها للتعويضات محل المطالبة من الشركة المحتكمة.

وحيث أنه وعن قيمة التعويض المطالب به من الشركة المحتكمة فإن هيئة التحكيم تمهد لقضائها في هذا الشأن بأن من المقرر قانونا أنه إذا لم يكن التعويض مقدرا في العقد أو بنص في القانون فالقاضي هو الذي يقدره, ويشمل التعويض ما لحق الدائن من خسارة.

216

كما أن من المقرر قانونا أن: "تقدير التعويض من إطلاقات محكمة الموضوع بحسب ما تراه مناسبا مستهدية في ذلك بكافة الظروف والملابسات في الدعوى فلا عليها إن هي قدرت التعويض الذى رأته مناسبا دون أن تبين أو ترد على ما أثاره الطاعن من ظروف, وأنه إن لم يكن التعويض مقدرا بالاتفاق أو بنص في القانون فإن لمحكمة الموضوع السلطة التامة في تقديره دون رقابة عليها من محكمة النقض وبحسب الحكم أن يكون قد بين عناصر الضرر الذى قدر التعويض عنه". (الطعن رقم 3714 لسنة 67 ق جلسة الثلاثاء 23 يونيو سنة 1998).

وحيث أنه وفي ضوء ما انتهت إليه هيئة التحكيم من ثبوت الخطأ العقدي العمدي الجسيم في حق المحتكم ضدهما على النحو السالف بيانه وحيث أن هذا الخطأ في اقترن بأضرار أصابت الشركة المحتكمة والمتمثلة في قيمة ما أنفقته من مبالغ لتنفيذ الالتزامات الواردة بعقد الوكالة وهو ما يمثل قيمة خسائر ومصروفات الشركة المحتكمة.

وحيث أن تقرير الخبير المعين من هيئة التحكيم قد انتهى إلى أحقية الشركة المحتكمة في تعويض قدره 94,559,028 $ دولار أمريكي (أربعة وتسعون مليون دولار وخمسمائة تسعة وخمسون ألف وثمانية وعشرون دولار أمريكي), يمثل ما لحق المحتكمة من خسارة.

وحيث أن هيئة التحكيم تأخذ بما انتهى إليه تقرير الخبرة لاطمئنانها إليه وإلى سلامة البحث الذي انتهجه الخبير في تقدير تلك المبالغ من واقع الثابت بالأوراق, ولا سيما وأن الهيئة قد اطمأنت إلى أن تقرير الخبرة قد استبعد كافه المستندات الغير مترجمة باللغة العربية فى تقدير قيمة ما لحق بالشركة المحتكمة من خسائر, ولما استظهرته هيئة التحكيم من الأسباب الأخرى, وما ثبت لهيئة التحكيم من بحث وتمحيص ومطالعة بنفسها لأوراق الدعوى والمستندات والمذكرات المقدمة من أطراف خصومة التحكيم, ومن ثم فإن هيئة التحكيم تقضي بإلزام المحتكم ضدهما بالتضامن بأن يؤديا للشركة المحتكمة مبلغ وقدره 94,559,028 $ دولار أمريكي (فقط أربعة وتسعون مليون دولار وخمسمائة تسعة وخمسون ألف وثمانية وعشرون دولار أمريكي) تعويضا عن قيمة ما قامت الشركة المحتكمة بإنفاقه فعليا لتنفيذ الالتزامات الواردة بعقد الوكالة وقيمة خسائر ومصروفات الشركة المحتكمة.

<u>ثالثا:- بشأن طلب الشركة المحتكمة إلزام المحتكم ضدهما بأن يؤديا لها مبلغ وقدرة 542096579 دولار (خمسمائة واثنان وأربعون مليون دولار أمريكى وستة وتسعون ألف وخمسمائة وتسعة وسبعون دولار) قيمة ما فات من كسب.</u>

تشير هيئة التحكيم في شأن هذا الطلب إلى ما استقر عليه قضاء النقض من أنه: "إذا كانت الفرصة أمرا محتملا أو مجرد أمل فإن تفويتها أمر محقق والقانون لا يمنع من أن يحسب في الكسب الفائت الذي هو عنصر من عناصر التعويض ما كان المضرور يأمل الحصول عليه ما دام لهذا الأمل أسباب معقولة, لما كان ذلك وكان الحكم المطعون فيه قد قرر أن الطاعن يستحق تعويضا عن إحالته إلى المعاش بغير حق ثم استبعد عند تقدير التعويض ما كان سيبلغه من مرتب وما يحصل عليه من معاش لو أنه بقى في الخدمة إلى سن الستين بمقولة أن العبرة بحالته وقت إحالته إلى المعاش, فانه يكون قد

217

خالف القانون." (الطعن رقم 158 لسنة 24 قضائية بتاريخ 1958/11/13 مكتب فني 9 رقم الجزء 3 رقم الصفحة 684), وفي القضاء السابق قضت محكمة النقض بنقض الحكم لأنه: استبعد عند تقدير التعويض ما كان سيبلغه من مرتب وما كان يحصل عليه من معاش لو أنه بقى في الخدمة إلى سن الستين, فمحكمة النقض رأت أن الطاعن كان يستحق عند تقدير التعويض ما كان سيبلغه الطاعن من مرتب وما يحصل عليه من معاش لو بقي في الخدمة إلى سن الستين,... وهذا هو ما يثبت خطأ الحكم الطعين في القانون و والخطأ في تطبيقه و يوجب نقضه.

كما قضت محكمة النقض أيضا وعلى نحو يوضح استقرار هذه المبادئ بأنه: "إذا كانت الفرصة أمرا محتملا فان تفويتها أمر محقق والقانون لا يمنع أن يحسب في الكسب الفائت الذى هو عنصر من عناصر التعويض ما كان المضرور يأمل الحصول عليه من كسب ما دام لهذا الأمل أسباب معقولة." (الطعن رقم 300 لسنة 26 قضائية بتاريخ 1962/3/29 مكتب فني 13 رقم الجزء 1 رقم الصفحة 350)

وحيث أن الثابت من تقرير الخبرة المودع في الدعوى التحكيمية, والذي تطمئن إليه هيئة التحكيم, ومما ثبت لهيئة التحكيم من بحثها بنفسها وتمحيص الأوراق والمستندات والدفاع والدفوع والطلبات, من استحقاق الشركة المحتكمة فقط لمبلغ 541,747,149 دولار أمريكي (فقط خمسمائة وواحد وأربعون مليون دولار وسبعمائة وسبعة وأربعون ألف ومائة وتسعة وأربعون دولار أمريكي) يمثل قيمة ما فاتها من كسب,

ولما كانت عناصر التعويض قد توافرت و تبين ثبوتهاعلى النحو السالف بيانه, وذلك بثبوت خطأ المحتكم ضدهما المتمثل فى إصدار قرار بإنهاء الوكالة ثم ومن بعده بيومين بإصدار قرار أخر بايقاف الوكاله, بالمخالفة للتعاقد وبالمخالفة للقانون وبدون دون مبرر مشروع, وبثبوت الضرر المحقق الذي لحق بالمحتكمة من جراء تفويت فرصه تحقيق الربح المتوقع على النحو المبين تفصيلا في تقرير الخبير وما تبينته هيئة التحكيم بنفسها من بحث الأوراق و الإطلاع عليها, ولثبوت علاقه السببيه بين خطأ المحتكم ضدهما والضرر, ولأن هيئة التحكيم تثبتت من ذلك كله و تطمئن اليه.

لذلك فإن هيئة التحكيم تقضي بإلزام المحتكم ضدهما بالتضامن بأن يؤديا للمحتكمة مبلغا وقدره 541,747,149 دولار أمريكي (خمسمائة وواحد وأربعون مليون دولار وسبعمائة وسبعة وأربعون ألف ومائة وتسعة وأربعون دولار أمريكي) تعويضا عن ما فاتها من كسب.

<u>رابعا :- بشأن طلب المحتكمة إلزام المحتكم ضدهما بأن يؤديا إليها متضامنين مبلغ وقدرة (100,000000) دولار (فقط مائة مليون دولار أمريكي) علي سبيل التعويض عن الإنهاء والإيقاف</u> غير المشروع والتعسفي لعقد الوكالة.

من حيث أن هيئة التحكيم قد انتهت فيما سبق إلى إلزام المحتكم ضدهما بتعويض المحتكمة عما لحقها من خسارة وما فاتها من كسب وأن هذا التعويض يستند إلى خطأ المحتكم ضدهما في الامتناع عمدا عن تنفيذ التزاماتهما التعاقدية و إصدارهما قرارين متتاليين مخالفين لنصوص التعاقد ولنصوص القانون أولهما بإنهاء الوكالة ثم من بعده بيومين فقط قرار أخر بايقاف العمل بالوكالة محل المنازعة,

218

وأن محل هذا الطلب هو التعويض عن ذات الأضرار محل الطلبات السابقة, ومن ثم فإن هيئة التحكيم تقضي برفض هذا الطلب.

<u>خامسا : بشأن طلب المحتكمة إلزام المحتكم ضدهما بأن يؤديا إليها متضامنين مبلغ وقدرة خمسمائة مليون دولار قيمة التعويض عن الأضرار التي لحقت بالشركة المحتكمة نتيجة للإساءة إلى سمعتها التجارية</u> والذي تستند فيه المحتكمة إلى ما أوردته ببيان دعواها التحكيمية من وجوب أن يغطي التعويض الضرر غير المالي المترتب على الإنهاء والإيقاف غير المشروع وغير المبرر المخالف للقانون ولبنود الوكالة وعن الإساءة إلى سمعة الشركة المحتكمة لدى الشركات والأفراد المتصلين بها في السوق المصري والسوق العراقي للسياحة والسفر وغيرها من الشركات التي تعمل في المجالات الأخرى لا سيما وقد ارتبطت شركة هورس ومؤسسها بعملية إغاثة الشعب العراقي في أزمته التي فرضت عليه حظرا لسنوات طويلة مما ألحق بها أضرارا مضاعفة نتيجة توقف التعامل التجاري مع الشركة و الشركات الشقيقة لشركة هورس نتيجة الإساءة لسمعتها التجارية من خلال الإنهاء والإيقاف غير المشروع والتعسفي مما فوت عليها فرص الكسب في مجالات تجارية أخرى كانت تمارسها في إطار برنامج النفط مقابل الغذاء التابع للأمم المتحدة وتقدر الشركة التعويض المطلوب هنا بمبلغ خمسمائة مليون دولار أمريكي.

ـ فإن هيئة التحكيم تمهد لقضائها في هذا الشأن بأن من المقرر قانونا بنص الفقرة الأولى من المادة 53 من القانون المدني أن الشخص الاعتباري يتمتع بجميع الحقوق إلا ما كان منها ملازما لصفة الإنسان الطبيعية, وذلك في الحدود التي قررها القانون.

وحيث كانت السمعة هي من الحقوق التي يتمتع بها الشخص المعنوي شأنه في ذلك شأن الشخص الطبيعي فالتعويض عن الإساءة للسمعة كما يكون للأشخاص الطبيعية هو أيضا حق للشخص المعنوي, وحيث قد جرى قضاء النقض على أحقية الشركات في الحصول على تعويض جراء الإضرار بسمعتها (طعن نقض رقم 11414 لسنة 85 ق, جلسة 13 /2/ 2018, مكتب فني 69, ق, 34, ص 264).

وحيث قضت محكمة النقض بأنه " لئن كان الضرر الأدبي هو الذى لا يصيب الشخص في ماله ويمكن إرجاعه إلى ما قد يصيبه من أضرار نتيجة ما يصيب الشرف والاعتبار والعرض, أو العاطفة والشعور, أو مجرد الاعتداء على حق ثابت له , وهو ما لا يتصور حدوثه إلا إذا أصابت الشخص الطبيعي , أما الشخص الاعتباري فيكون بمنأى عن ذلك التصور, إلا أنه متى أثبت الشخص الاعتباري أن ضررا قد حاق بسمعته التجارية في مجال نشاطه وأعماله وقدرته على مباشرة تلك الأعمال بين أقرانه والمتمثل في إحجام الغير عن التعامل معه بما آثر سلبا على حجم نشاطه ومعاملاته فإنه يمكن تصور التعويض عن الضرر في تلك الحالة بوصفه ضررا ماديا وليس أدبيا....".

(طعن نقض تجاري,رقم 5209,لسنة 86ق,جلسة 2018/10/22 ,, طعن نقض تجاري رقم6161 , لسنة 85 ق, جلسة 2020/11/8)

ـ وحيث أورد المحتكم ضدهما في الصفحة رقم 33 من مذكرتهما بتاريخ 2014/6/10 المقدمة من وكيلهما القانوني الأستاذ الدكتور/فتحي والي أنه "الصحيح أن الحكومة العراقية أوقفت التعامل مع الشركة المحتكمة وباقي الشركات التي كان يرأسها المدعو/عماد الجلدة", وما ورد بهذه المذكرة من

إساءات لسمعة الشركة المحتكمة بوسمها بأن رئيس مجلس إدارتها السابق سبق إدانته في تهمة جنائية وأن أنصاره تعدوا على المحكمة وأن هذا هو من أسباب عدم التعامل معها, كما أتبع المحتكم ضدهما ذلك بالقول في ذات الموضع من المذكرة السالفة  بأنه" وفضلا عن ذلك فقد كانت بعض شركات السيد/عماد سعيد الجلدة رئيس مجلس إدارة شركة هورس, قد أبرمت عقودا مع وزارة التجارة العراقية ولكنها لم تقم بسداد المبالغ المترتبة بذمتها, ولهذا كله ألغت الحكومة العراقية تعاقداتها مع السيد/عماد الجلدة وشركائه, ..." , و أن هذا يعد -وعلى نحو ما تمسكت به المحتكمة في الصفحة رقم 53 من مذكرتها المودعة بتاريخ 2023/6/20, إقرارا من المحتكم ضدهما بالأثر المترتب على الإساءة إلى السمعة التجارية للشركة المحتكمة من أضرار مادية أوضح المحتكم ضدهما ذاتهما أنها تمثلت في قيام الحكومة العراقية بمنع الشركة المحتكمة من العمل في العراق, هي وباقي الشركات التي كان يرأسها المدعو/ عماد الجلدة.

- وحيث أنه وبناء على ما تقدم تمسكت الشركة المحتكمة بهذا الإقرار وما يترتب عليه من أثار قانونية, وتمسكت بأنه إقرار مقدم بين يدي هيئة التحكيم, وأوردت أنه يثبت كل المخالفات التي قام بها المحتكم ضدهما و عدم صحة جميع ادعاءاتهما بأن الشركة المحتكمة أخلت بالتزاماتها التعاقدية ويثبت أن المحتكم ضدهما هما السبب في تعطيل العمل بعقد الوكالة, وأن هذا الإقرار يثبت تناقض دفاع المحتكم ضدهما إضرارا بها.

كما تمسكت المحتكمة بهذا الإقرار من المحتكم ضدهما بما أثبته عليهما من تسببهما فيما أصاب المحتكمة من أضرار ناجمة عن إساءة المحتكم ضدهما لسمعتها التجارية وما ترتب عليه من حرمانها من التعامل والعمل على مدار سنوات طويلة سابقة وما يلي ذلك في العراق وخارجها, كما وتمسكت بأن هذه الأضرار تجاوز أضعاف ما تحقق من ضرر وما فاتها من كسب, وتتجاوز بأضعاف قيمة عقد الوكالة محل المنازعة, وأن ما طالبت به من تعويض عن الإضرار بسمعتها التجارية بقيمة خمسمائة مليون دولار أمريكي هو مطالبة متواضعة بالقياس لما تم حرمانها منه داخل العراق وخارجها, لما ترتب على ذلك ومن الإساءة لسمعتها من حرمانها من العمل و المعاملات على مستوى السوق العالمي, وأنها قد تعرضت لأضرار جسيمة من الإساءة إلى سمعتها واستبعادها من سوق العمل بما أدى لخسارتها خسارة مالية جسيمة وأضرار محققة لم يكن من الممكن لها توقيها أو دفعها مع استمرار المحتكم ضدهما في الإساءة إليها والادعاء عليها بأنها شركة واجهية وأنها شركة مرتبطة بمعاونة النظام العراقي السابق وغير ذلك ..

وتمسكت المحتكمة بناء على ذلك بطلبها بتعويضها عن هذه الأضرار بمبلغ خمسمائة مليون دولار أمريكي.

- وحيث أن هيئة التحكيم في ضوء ما تقدم وفي ضوء ما ورد بمذكرة المحتكم ضدهما سالفة الذكر وما تمسكت به الشركة المحتكمة ترتيبا عليه, وما ثبت من إساءة المحتكم ضدهما إلى الشركة المحتكمة بالادعاء عليها بأنها شركة واجهية على النحو الثابت بالكتاب الموجه ضده الثاني من المحتكم ضده الثاني وزير النقل العراقي إلى الأمانة العامة لمجلس الوزراء الذي اقترح فيه حل المسألة وديا  تلافيا للأضرار التي قد

220

تصيب الشركة المحتكم ضدها الأولى والموقع منه بتاريخ2010/4/11, و الذي أورد فيه أن الشركة العامة للخطوط الجوية العراقية(المحتكم ضدها الأولى) وهي إحدى تشكيلات هذه الوزارة أعلمته بأنه قد تم إنهاء عقد الوكالة العامة في مصر بينها وبين شركة هورس للسياحة والسفر(المحتكمة) بناء على أنه قد تم تصنيفها على أنها من قبيل الشركات الواجهية, وكذلك ما أوردته الشركة المحتكم ضدها الأولى في قرار إنهاء الوكالة الأول بتاريخ 2004/12/2 (قبل توقيع اتفاقية إعادة تفعيل الوكالة) من أن توجهات الدولة في العراق الجديد هي إعادة تأهيل الشركة المحتكم ضدها الأولى لإعادة التشغيل وممارسة نشاطها في مجال النقل الجوي وإعادة بناء أسواقها التقليدية بعيدا عن التأثيرات الجانبية التي كانت تفرض من قبل أجهزة النظام السابق والتي لا تخدم أهداف الشركة الاقتصادية, ثم تأكيد ذلك في قرار إنهاء الوكالة الثاني بتاريخ 2005/11/14 والذي رددت فيه الشركة المحتكم ضدهما الأولى إنصراف إرادتها إلى إعادة تشغيل طائراتها بنفسها, وما أدت إليه هذه الإساءات إلى السمعة التجارية للشركة المحتكمة من استبعادها أيضا من العمل في السوق العراقي.

ـ وحيث أن لهيئة التحكيم سلطة تقديرية في تحديد قيمة التعويض عن هذه الأضرار.

لذلك, فإن هيئة التحكيم تقضي بإلزام المحتكم ضدهما بالتضامن بأداء مبلغ مائة وخمسون مليون دولار أمريكي, تعويضا للمحتكمة عما أصابها ناجمة عن الإضرار بسمعتها التجارية وما ترتب على ذلك بالتالي من أضرار مالية.

<u>سادسا: بشأن طلب المحتكمة إلزام المحتكم ضدهما بدفع فوائد قانونية عن قيمة إجمالي المطالبة بدءا من تاريخ المطالبة وحتى السداد الكامل بما لا يقل عن نسبة 11% وبما لا يقل عن فائدة البنك المركزي المصري.</u>

ـ فإن هيئة التحكيم تأخذ بما استقر عليه قضاء محكمة النقض من أن: "المقرر في قضاء هذه المحكمة أن مفاد نص المادتين 226 و 227 من القانون المدني أن هناك نوعين من الفوائد, فوائد تعويضية يتفق فيها المدين مع دائنه مقدما عليها وتكون مقابل انتفاع المدين بمبلغ من النقود يكون في ذمته لأجل محدد ولم يحل أجل استحقاقه, وفوائد تأخيرية وهي تعويض عن التأخير في الوفاء بالالتزام بدفع مبلغ محدد من النقود وتأخر المدين في سداده عند حلول أجل استحقاقه, وفى خصوص الفوائد التأخيرية المستحقة عن التأخير في الوفاء بالديون ـ وفى غير عمليات البنوك ـ فقد منع المشرع بنص المادة 227 من القانون المدني الاتفاق على فوائد تأخيرية عن حد أقصى معلوم مقداره 7% , وكان تحديد الحد الأقصى للفوائد من النظام العام, وإذ كان النص في المادة 50 من قانون التجارة رقم 17 لسنة 1999 على أن: 1ـ تعتبر تجارية القروض التي يعقدها التاجر لشئون تتعلق بأعماله التجارية . 2ـ إذا اقتضت مهنة التاجر أداء مبالغ أو مصاريف لحساب عملائه جاز له مطالبتهم بعائد عنها من يوم صرفها ما لم يتفق على غير ذلك .3ـ يحسب العائد وفقا للسعر الذى يتعامل به البنك المركزي, ما لم يتفق على مقابل أقل .4ـ يؤدى العائد في نهاية كل سنة إذا كان الدين مؤجلا لأكثر من سنة وفى يوم الاستحقاق إذا كان لأجل سنة أو أقل ما لم يتفق أو يجر العرف على غير ذلك."

**221**

وانتهت محكمة النقض إلى القول بأن "ومفاد ما تقدم أن المشرع قد افترض شرط الفائدة في القروض التي يعقدها التاجر لشئون تتعلق بأعماله التجارية إلا إذا اتفق المتعاقدون على غير ذلك على أن تحسب الفوائد بالسعر القانوني المقرر في المسائل التجارية إلا إذا اتفق على سعر آخر, وتدفع الفوائد في نهاية كل سنة دون انتظار لحلول أجل الدين إذا كان الدين مؤجلا لأكثر من سنة وتدفع هذه الفوائد في يوم الاستحقاق إذا كان الأجل سنة أو أقل ما لم يتفق أو يجرى العرف على غير ذلك وهو ما يدل على اتجاه قصد المشرع إلى تطبيق هذا النص على القروض التي ينتفع بها المدين قبل حلول أجل استحقاقها ولا يسرى في حالة تأخر المدين في سداد الدين عند حلول أجل استحقاقه مما لازمه ألا تجاوز الفوائد التأخيرية الحد الأقصى المقرر قانونا . لما كان ذلك, وكان الثابت في الأوراق أن حكم التحكيم قد تضمن قضاءه إلزام الطاعن بفوائد تأخيرية طبقا لسعر الفائدة التي يتعامل بها البنك المركزي, وكان الحد الأقصى للسعر القانوني للفوائد التأخيرية في المواد التجارية وفقا للمقــــرر في قضاء هذه المحكمة مما يتصل بالنظام العام في مصر. وكان قانون التحكيم رقم 27 لسنة 1994 قد خول بنص الفقرة الثانية من المادة 53 منه للمحكمة التي تنظر دعوى البطلان سلطة القضاء ببطلان حكم التحكيم من تلقاء ذاتها إذا تضمن الحكم ما يخالف النظام العام في مصر...فإن الحكم المطعون فيه إذ رفض القضاء ببطلان حكم التحكيم تأسيسا على أن سعر الفائدة في المسائل التجارية لم يعد متعلقا بالنظام العام وأن النعي على الحكم قضاءه بفائدة تأخير تزيد على 5% هو أمر لا يتسع له نطاق دعوى البطلان وحجب بذلك نفسه عن التحقق من مدى موافقة الفائدة المقضي بها للحد الأقصى المقرر قانونا للفائدة التأخيرية في المادة 226 مدنى فإنه يكون معيبا مما يوجب نقضه في هذا الخصوص دون حاجـــــة إلى بحث السبب الثالث مــن أسباب الطعن على أن يكون مع النقض الإحالة". (الطعن 12790 لسنة 75 ق جلسة 22 / 3 /2011 مكتب فني 62 ق 65 ص 392).

وحيث أنه في ضوء ما تقدم ولما كان <u>الإلزام بفوائد تأخيرية في المواد التجارية وفقا للمقــــرر في قضاء هذه المحكمة مما يتصل بالنظام العام في مصر. فإن هيئة التحكيم تقضي بإلزام المحتكم ضدهما بفائدة مقدرها 5% من قيمة المبالغ المحكوم بها وعلى النحو الوارد بالمنطوق.</u>

## <u>سابعا: وحيث أنه عن المصاريف وأتعاب التحكيم:</u>

فإن الهيئة وبما قرره القانون وما اتفق عليه الأطراف في شرط التحكيم الوارد بنص البند السادس عشر من اتفاقية الوكالة العامة من أن الطرف الخاسر سوف يتحمل كل التكلفة والنفقات الناجمة عن إجراء التحكيم, تقضي بإلزام المحتكم ضدهما بالتضامن بكامل مصروفات التحكيم وكامل أتعاب التحكيم.

وحيث قرر الأستاذ الدكتور شريف محمد عبد الله محكم الشركة المحتكمة بأنه سبق وعقب تنحيه بتاريخ 2014/7/17 أن تمت التسوية مع طرفي التحكيم بأن اعاد لهما مبلغ $390000 ثلاثمائة وتسعون ألف دولار أمريكي(حيث تسلم كل طرف من طرفي التحكيم من سيادته مبلغ $19500 مائة و خمسة و تسعون ألف دولار أمريكي), من كامل أتعابه التي سبق وأن تسلمها عن قيامه بمهمته التحكيمية في الفترة السابقة على تنحيه وذلك عن الفترة منذ قبوله المهمة التحكيمية محكما عن الشركة المحتكمة وحتى تاريخ تنحيه في 2014/7/17.

وفي ضوء ما تقدم, وحيث أن الأتعاب التي سبق سدادها من طرفا التحكيم عن الفترة السابقة منذ بدء التحكيم وحتى تاريخ استئناف السير فيه بتاريخ 2023/2/7 كانت $1800000 مليون وثمانمائة ألف دولار أمريكي, وأنه قد تم خصم

222

مبلغ 390000$ثلاثمائة و تسعون ألف دولار أمريكي من هذه الاتعاب السابق سدادها من طرفا التحكيم ,وهي قيمة ما سدده ما قام الأستاذ الدكتور/شريف محمد عبد الله برده الى أطراف التحكيم من هذه الأتعاب. لذلك فإن صافي ما سدده اطراف التحكيم بالفعل في ضوء ذلك منذ بدء التحكيم وحتى تاريخ استئناف سير التحكيم في2023/2/7 هو مبلغ 1420000 $ مليون و أربعمائة و عشرون ألف دولار أمريكي فقط.

وحيث أن المحتكمة والمحتكم ضدهما سددا بالفعل هذه القيمة المقدرة بمبلغ 1420000$ مليون وأربعمائة وعشرون ألف دولار مناصفة, حيث  سدد كل منهما من أتعاب التحكيم فقط مبلغ 705000$سبعمائة وخمسة ألاف دولار أمريكي.

وحيث أنه وبعد إعادة تعيين سيادة الأستاذ الدكتور/شريف محمدعبدالله محكماعن الشركة المحتكمة بتاريخ2023/2/6 وقبول سيادته  المهمة, قد أصدرت هيئة التحكيم قرارا في جلسة التحكيم التي انعقدت بتاريخ 2023/2/16 بتحديد أتعاب سيادته عن هذه المهمة الجديدة بقيمة 390000$ ثلاثمائة و تسعون ألف دولار امريكي... وحيث أن المحتكم ضدهما لم يسددا شيئا من هذه الأتعاب ومقدارها ثلاثمائة و تسعون ألف دولار أمريكي .

وحيث أنه وبما تقدم وعليه يكون ما تبقى من كامل قيمة أتعاب التحكيم التي يلتزم بها المحتكم ضدهما وفقا للحكم التحكيمي بوصفهما خاسر الدعوى, هو مجموع  ما سبق وأن سددته المحتكمة من أتعاب التحكيم في الفترة السابقة على تاريخ استئناف سير التحكيم في 2023/2/7 أي مبلغ 705000$ سبعمائة وخمسة ألاف دولار أمريكي، بالإضافة الى كامل قيمة الاتعاب التي قررتها هيئة التحكيم بتاريخ 2023/2/16 للأستاذ الدكتور شريف محمد عبد الله محكم المحتكمة عن مهمته بعد إعادة تعيينه وقبوله للمهمة ، وقيمتها 390000$ ثلاثمائة و تسعون ألف دولار أمريكي .

لذلك فإن إجمالي المتبقي من كامل الأتعاب التي يلتزم بها المحتكم ضدهما بموجب حكم التحكيم بوصفهما خاسر الدعوى هو مبلغ1095000$ مليون وخمسة وتسعون الف دولار امريكي.

ـ وحيث أن قيمة مصروفات التحكيم هي 50000$ خمسون ألف دولار أمريكي سبق وأن سدد المحتكم ضدهما نصفها وهي مبلغ 25000$ خمسة و عشون ألف دولار أمريكي, وسبق أن سددت المحتكمة نصفها الأخر وهو مبلغ 25000$ خمسة و عشرون ألف دولار أمريكي.

لذلك فإن إجمالي المتبقي من مصروفات التحكيم التي يلتزم بها المحتكم ضدهما بموجب حكم التحكيم بوصفهما خاسر الدعوى, هو مبلغ وقدره 25000$ خمسة وعشرون ألف دولار أمريكي .

وبما تقدم وعليه, فإن إجمالي المتبقي من كامل أتعاب ومصروفات التحكيم التي يلتزم المحتكم ضدهما بأدائها إلى الشركة المحتكمة بموجب الحكم التحكيمي بوصفهما خاسر الدعوى, هو مبلغ إجمالي وقدره 1120000 $ (مليون ومائة و عشرون ألف دولار امريكي), وهو ما تقضي به هيئة التحكيم في المنطوق.

## فلما تقدم من أسباب

## حكمت هيئة التحكيم بالأتي:

أولا: إلزام المحتكم ضدهما بالتضامن بأن يؤديا للشركة المحتكمة مبلغ وقدره 94 559 028 $ دولار أمريكي (فقط أربعة وتسعون مليون دولار وخمسمائة تسعة وخمسون ألف وثمانية وعشرون دولار أمريكي) تعويضا عن قيمة ما تم إنفاقه فعليا لتنفيذ الالتزامات الواردة بعقد الوكالة وقيمة خسائر ومصروفات الشركة المحتكمة,

وبفائدة قدرها 5% من جملة هذا المبلغ المحكوم به من تاريخ المطالبة الحاصل في 2013/12/28 تاريخ تقديم بيان الدعوى التحكيمية, وحتى تمام تنفيذ هذا الحكم.

ثانيا: إلزام المحتكم ضدهما بالتضامن بأن يؤديا للمحتكمة مبلغا وقدره 149, 747, 541 دولار أمريكي (خمسمائة وواحد وأربعون مليون دولار وسبعمائة وسبعة وأربعون ألف ومائة وتسعة وأربعون دولار أمريكي) تعويضا للمحتكمة عما فاتها من كسب, وبفائدة قدرها 5% من جملة هذا المبلغ المحكوم به من تاريخ هذا الحكم وحتى تمام تنفيذه.

ثالثا:إلزام المحتكم ضدهما بالتضامن بأن يؤديا للمحتكمة مبلغا وقدره 150000000$(مائة وخمسون مليون دولار أمريكي), تعويضا للمحتكمة عما أصابها ناجمة عن الأضرار الأدبية والمعنوية وما ترتب على ذلك من أضرار مالية, وبفائدة قدرها 5% من جملة هذا المبلغ المحكوم به من تاريخ هذا الحكم وحتى تمام تنفيذه.

رابعا:الزام المحتكم ضدهما بالتضامن بكامل الأتعاب وكامل مصروفات التحكيم،(والتي سبق للمحتكم ضدهما سداد مبلغ 25000$خمسة وعشرون ألف دولار أمريكي منها من مصروفات التحكيم, كما سبق لهما سداد مبلغ 705000$ سبعمائة و خمسة ألف دولار أمريكي منها من أتعاب التحكيم)، ويكون صافي المتبقي من كامل الاتعاب والمصروفات الصادر الحكم بالزام المحتكم ضدهما بأدائها إلى الشركة المحتكمة بالتضامن بينهما, هو مبلغ ومقداره 1120000$ (مليون ومائة وعشرون ألف دولار أمريكي).على أن يتحمل كل طرف أتعاب محاميه.

خامسا: رفض ما عدا ذلك من الطلبات.

صدر هذا الحكم بعد الاطلاع على الأوراق وسماع المرافعة والإيضاحات وبعد المداولة قانونا, في القاهرة في يوم الأربعاءالموافق 2023/7/26 بالإيداع بمقر التحكيم الكائن بمكتب الأستاذ الدكتور حسن عبد الباسط جميعي الكائن بالشقة رقم (15), بالدور الرابع, بالعقار رقم (7) شارع الفضل من شارع طلعت حرب ـ قسم عابدين ـ القاهرة.

هيئة التحكيم

1ـ الأستاذ الدكتور/ حسن عبد الباسط جميعي رئيس هيئة التحكيم

2ـ الأستاذ الدكتور/ شريف محمد عبد الله محمد مأمون ـ المحكم المسمى من الشركة المحتكمة (شركة هورس للسياحة والسفر ـ متحفظ عليها)

3ـ الأستاذ الدكتور/ عبد الحميد جلال الأحدب المحكم المسمى من المحتكم ضدهما (الشركة العامة للخطوط الجوية العراقية و وزير النقل العراقي بصفته)

224

# Ad-hoc International Commercial Arbitration
## Arbitral Award

**In the arbitration proceedings filed by: Horse Travel Company "S.A.E." (Under Seizure) (Claimant)**

Its address and place of correspondence at the commencement of the arbitration: 9 El Shaheed Gamal Boraie Street, Ard El Golf, Cairo

Following its placement under seizure, it became subject to the Committee for the regulation of the measures of seizure, inventory, management and disposal of the funds of terrorist groups and terrorists, pursuant to Law No. 22 of 2018, in its capacity as the legal representative of the Claimant in the present arbitration. The Committee has authorized and mandated the Egyptian State Lawsuits Authority to represent the Claimant in this arbitration, pursuant to a correspondence addressed by the Committee to the presiding arbitrator.

The address and place of correspondence for the Claimant in this arbitration has become: The headquarters of the Egyptian State Lawsuits Authority, 42 Gameat El Dwal El Arabia Street. Mohandseen, Giza, Egypt.

**Against:**

**1. Iraqi Airways**                                                      **(First Respondent)**

Its address at the time of contracting was: Saddam International Airport, Baghdad, Iraq, and has become: Baghdad International Airport, Baghdad, Iraq. Its place of correspondence, as it confirmed in the minutes of the first (procedural) hearing, was its main headquarters in Cairo, located at: 22 Qasr El Nil Street, Abdeen District, Cairo, which it subsequently changed.

Then, its address and place of correspondence, of which it notified the presiding arbitrator by virtue of the official notice served by a bailiff dated 18/4/2022, has become: 34 Al-Thawra Street, Dokki, Giza Governorate. Furthermore, based on correspondence and an official notice served by a bailiff, it shall be addressed at the address of its legal representative: Dr. Mohamed Hamouda, Attorney, 132 Al-Nil Street, Agouza, Cairo, Egypt.

**2. The Iraqi Minister of Transport - in his official capacity**        **(Second Respondent)**

His place of correspondence is at the address of either of his two legal representatives:

a) Mr. Ahmed El-Derini Abdel-Aziz, Attorney, 34 Al-Thawra Street, Dokki, Giza Governorate, Egypt.
b) Dr. Mohamed Hamouda, Attorney, 132 Al-Nil Street, Agouza, Cairo, Egypt.
c) He may also be addressed at the headquarters of the Iraqi Ministry of Transport, Baghdad, Iraq (upon the request of his legal representative at the arbitration hearing dated 16/2/2023).

<u>This Arbitral award was rendered in Cairo by deposit at the seat of arbitration</u> located at the office of the presiding arbitrator, Dr. Hassan Abdel-Basset Gemei, located at Apartment No. 15, Fourth Floor, Building No. 7, Al-Fadl Street, Talaat Harb, Abdeen District, Cairo, Arab Republic of Egypt, on Wednesday, 26/7/2023, by the Arbitral Tribunal constituted as follows:

1. Dr. Hassan Abdel-Basset Gemei - presiding arbitrator - Egyptian - Muslim - Professor of Civil Law at the Faculty of Law, Cairo University, Attorney, and International Arbitrator - residing at: 7 Al-Fadl Street off Talaat Harb, Abdeen District, Cairo.
2. Dr. Sherif Mohamed Abdallah Mohamed Mamoun - the arbitrator appointed by the Claimant (Horse Travel - under seizure) - Egyptian - Muslim - Attorney and International Arbitrator - residing at: 3 Shehab Street, Mohandiseen.
3. Dr. Abdul Hamid Jalal El-Ahdab - the arbitrator appointed by the two Respondents (Iraqi Airways General Company and the Iraqi Minister of Transport in his official capacity) - Lebanese - Muslim - Holding a Ph.D. in Law, Attorney, and International Arbitrator - residing at: Beirut, Hazmieh, Fayadieh Ascent, past the Presidential Palace intersection, near the Toyota Company, Lebanon and Gulf Bank Building, Third Floor.

## **First: Facts and Proceedings of the Arbitration:**

(1) On 3/1/2001, Horse Travel Company "S.A.E." (a company under seizure since 25/10/2015) - hereinafter referred to as the "Claimant" entered into an agreement entitled the "General Sales Agency Agreement" with Iraqi Airways (an entity affiliated to the Iraqi Ministry of Transport) - hereinafter referred to as the "First Respondent". The Iraqi Ministry of Transport, legally represented by the Iraqi Minister of Transport, is hereinafter referred to as the "Second Respondent." Pursuant to Article 16 thereof, the Parties agreed that, in the event of any dispute arising out of or relating to the interpretation or implementation of the Agreement, they shall exert their utmost efforts to resolve such dispute amicably by appropriate means within a period of three (3) days only. Failing such resolution, they shall constitute an Arbitral Tribunal in accordance with the method prescribed in that Article, which, together with Article 16 of the Annex to the principal General Sales Agency Agreement concluded on 15/3/2001, constitutes the arbitration agreement.

<u>Article 16 of the General Sales Agency Agreement states as follows:</u>

"1- In the event of any dispute arising out of or relating to the interpretation or implementation of this Agreement, the Parties shall exert their utmost efforts to resolve such dispute amicably by appropriate means within a period of three (3) days only. Failing such resolution, they shall constitute an Arbitral Tribunal in the following manner:

1. The First Party shall appoint an arbitrator
2. The General Agent shall appoint an arbitrator.
3. The arbitrators appointed by the two Parties shall, in consultation with each other, appoint the presiding arbitrator. If they fail to agree on such appointment, the Director General of the International Air Transport Association (IATA) shall appoint the presiding arbitrator.

2- The Arbitral Tribunal shall determine its own procedures and the applicable law.

3- The unsuccessful party shall bear all costs and expenses arising from the arbitration proceedings."

Article 16 of the document entitled the "Annex to the General Sales Agency Agreement," executed between Iraqi Airways and Horse Travel Company S.A.E., further provides as follows: "The contracting parties shall resolve amicably all new matters and disputes arising between them. In the event that no resolution is reached with respect to any new matters or services arising between the two Parties, such matter or dispute shall be referred to an Arbitral Tribunal to be agreed upon by the contracting parties."

(2) Pursuant to the arbitration clause, and given that the Claimant—prior to the seizure being imposed thereon—had decided to resort to arbitration to resolve the existing dispute between it and the First Respondent on the ground that the latter had unilaterally terminated the General Sales Agency Agreement concluded between them without following the legal procedures prescribed in the Agreement and its annexes, the Claimant, pursuant to Article 16 of the aforementioned Agreement, appointed Dr. Sherif Mohamed Abdallah as its arbitrator. Likewise, the First Respondent, by virtue of a formal notice served upon the Claimant through a bailiff on 30/5/2012, appointed Dr. Fadel Mohamed Jawad Kadhim as its arbitrator.

(3) The two party-nominated arbitrators, appointed respectively by the Claimant—at that time and prior to the Claimant being placed under seizure —and the First Respondent, failed to agree on the appointment of the presiding arbitrator. This prompted the Claimant, prior to being placed under seizure, to apply to IATA for the appointment of the presiding arbitrator. However, given that the IATA Rules did not provide for a roster of arbitrators and that IATA lacked the authority to make such appointment, the Claimant filed Case No. 76 of 129 seizure before the 50th Commercial Circuit of the Cairo Court of Appeal. By judgment dated 26/8/2013, the Court appointed the arbitrator next in turn to serve as the third arbitrator for the resolution of the dispute between the two companies. Accordingly, on 12/10/2013, Dr. Hassan Abdel-Basset Gemei was appointed, pursuant to that judgment, as the third arbitrator to determine the said dispute.

(4) Following the issuance of the aforementioned judgment appointing Dr. Hassan Abdel-Basset Gemei as the third arbitrator to determine the dispute, the Claimant submitted a request for arbitration to the presiding arbitrator, enclosing a copy of the judgment appointing him as the third arbitrator in the dispute and requesting that he commence the arbitration proceedings.

(5) On 31/10/2013, pursuant to the request for arbitration, the presiding arbitrator invited the arbitrator appointed by the Claimant and the arbitrator appointed by the First Respondent to attend a hearing of the Arbitral Tribunal at his office, located at Apartment No. 15, Building No. 7, Al-Fadl Street, off Talaat Harb Street, Cairo, on Thursday, 14/11/2013, for the purpose of proceeding with the arbitration proceedings. The correspondence was sent by email to both arbitrators at the email addresses previously provided to the presiding arbitrator by the Claimant in the request for arbitration. The presiding arbitrator also sent the correspondence by express mail to the arbitrator appointed by the First Respondent, Dr. Fadel Mohamed Jawad Kadhim.

(6) On 3/11/2013, the presiding arbitrator received an email from Dr. Fadel Mohamed Jawad Kadhim, the arbitrator appointed by the First Respondent, in which he declined to undertake

Page 3 of 236

the arbitral mandate due to a change in his circumstances and his inability to continue serving as arbitrator.

(7) By two letters dated 3/11/2013, addressed respectively to the Claimant and the First Respondent and delivered by hand to the headquarters of both companies — the parties to the arbitration— at the addresses specified in the request for arbitration, as well as sent by registered mail, the presiding arbitrator informed the Claimant and the First Respondent that Dr. Fadel Mohamed Jawad Kadhim, the arbitrator appointed by the First Respondent, had declined to undertake the arbitral mandate due to a change in his circumstances and his inability to continue serving as arbitrator, and invited each party to take such action as it deemed appropriate.

(8) On Wednesday, 13/11/2013, the First Respondent submitted a letter bearing its seal and a signature attributed to its Regional Manager, stating that it had appointed a new arbitrator, Dr. Mohamed Al-Haj Hamoud, whose details were as follows: Dr. Mohamed Al-Haj Hamoud, Counselor at the Iraqi Ministry of Foreign Affairs, an Iraqi national residing in Iraq; Telephone: 00964790192264 Iraq, Email: md.hamoud@mofaml.gov.iq. The letter also requested that a new date be scheduled for the commencement of the arbitration proceedings in order to allow him sufficient time to take the necessary steps to obtain an entry visa for the Arab Republic of Egypt.

(9) The presiding arbitrator contacted Dr. Mohamed Al-Haj Hamoud, the arbitrator appointed by the First Respondent, by telephone at the number specified in the aforementioned letter, and also contacted Dr. Sherif Mohamed Abdallah, the arbitrator appointed by the Claimant. It was agreed that the Arbitral Tribunal would convene on Thursday, 28/11/2013, at 2:00 p.m., to be followed by the first procedural hearing at 4:00 p.m. in the presence of the parties to the arbitration, at the office of the presiding arbitrator, located at Apartment No. 15, Building No. 7, Al-Fadl Street, Talaat Harb, Abdeen District, Cairo.

(10) On 14/11/2013, the presiding arbitrator confirmed the aforementioned date for a hearing of the arbitrators alone, to be followed by the first (procedural) hearing in the presence of the parties to the arbitration, by confirmation emails sent to the arbitrators.

(11) On the same date, 14/11/2013, the presiding arbitrator also sent an email to the parties to the arbitration at their respective email addresses, notifying them of the date and venue of the first procedural hearing, and subsequently sent the same notification by registered mail.

(12) On Thursday, 28/11/2013, at 2:00 p.m., the arbitral tribunal convened without the parties being present. At that hearing, the three arbitrators declared their acceptance of the arbitral mandate entrusted to them and their commitment to the ethical obligations applicable to arbitrators, and each signed a written declaration to that effect.

Furthermore, the members of the arbitral tribunal ratified the procedures that had been taken, and agreed to designate the office of the presiding arbitrator, Dr. Hassan Abdel-Basset Gemei, located at Apartment No. 15, Fourth Floor, Building No. 7, Al-Fadl Street, Talaat Harb, Abdeen District, Cairo, as the venue of the arbitration.

(13) On the same date, Thursday, 28/11/2013, at 4:00 PM, the arbitral tribunal held the first procedural hearing in the presence of the parties. The Claimant was represented by Dr. Salah El-Din Gamal El-Din Mohamed Abdel-Rahman, attorney (Egyptian Bar Association Card

No. 72954), and Dr. Mahmoud Salah El-Din Meselhy Attia Sherif, attorney (Egyptian Bar Association Card No. 488938), under Power of Attorney No. 1180Y of 2011, notarized at the Heliopolis Notary Public Office, a copy of which was appended to the arbitration file. Also in attendance was Mr. Youssef El-Said Youssef Saad in his capacity as the responsible manager of the company (National ID No. 27302151800511).

Additionally, the First Respondent was represented by Mr. Ahmed El-Derini Abdel-Aziz Mahmoud, attorney (Egyptian Bar Association Card No. 117398), under Power of Attorney No. 1583C of 2006, notarized at the Bar Association Notary Public Office, a copy of which was appended to the arbitration file. Also in attendance was Mr. Qaisar Ahmed Akla in his capacity as the Regional Manager of Iraqi Airways, who declared that he appoints Mr. Ahmed El-Derini Abdel-Aziz Mahmoud as attorney in the present arbitration, to submit requests, submissions, and documents, and to take all procedures. The attendees pledged to submit an official copy of the company's commercial register indicating the company's legal representative and the person with the legal capacity to represent it in the present arbitration. The two attendees also pledged to submit, as soon as practicable, a power of attorney from the individual with legal capacity authorizing them, others, or alongside them to attend the present arbitration and its proceedings.

(14) **During this first procedural hearing, the parties to arbitration agreed on an arbitration agreement, which, as recorded in the minutes of the hearing,** provides as follows: "The Presiding Arbitrator informed the representatives of both the Claimant and the First Respondent that he and the other members of the Arbitral Tribunal had accepted their appointments and would perform their arbitral mandate with impartiality and independence. He stated that they had signed separate declarations accepting the arbitral mandate and acknowledging their impartiality and independence. The Parties examined these declarations and confirmed their acceptance of all members of the Arbitral Tribunal. Furthermore, the two parties agreed to complete the arbitration agreement and its procedures as follows, which were approved by the Arbitral Tribunal:

1. Language of Arbitration: Arabic.
2. The Subject Matter of the Dispute: The Parties further clarified the subject matter of the dispute as follows:

> **1/2:** The representative of the Claimant (Horse Travel) clarified that the subject matter of the dispute and its claims are confined to the fact that the Claimant obtained a general and exclusive agency in the Arab Republic of Egypt in 2001 and fulfilled all its contractual obligations. At the time of the agency, an air embargo was imposed on the State of Iraq, no flights were operated, and it was unknown when the embargo would be lifted. Despite the prolonged duration of the embargo, the Claimant continued to perform the obligations entrusted to it. When the Respondent anticipated that the embargo was about to be lifted, it proceeded to suspend the agency, which necessitated some negotiations to reactivate the agency, as the embargo had been lifted at that time. However, for political reasons pertaining to Iraq, and merely three months or less after the reactivation of the agency, the Respondent unilaterally terminated the agency for a second time, without regard to the provisions of the law or the agreement.
>
> The representative of the Claimant added that since that date, negotiations continued between both sides through a group of Iraqi delegates and the Claimant,

all of which culminated in a failure to reach a resolution. Nevertheless, the Claimant continued to fulfill its contractual obligations, considering that the Agreement in its possession remains valid to date. This ultimately led to the implementation of Article 16 of the Agreement by requesting the constitution of the Arbitral Tribunal, a matter that took a substantial amount of time, nearly two years, until the second arbitrator was appointed. Subsequently, no consensus was reached on selecting the third arbitrator, which compelled the Claimant to resort to the courts once again amidst numerous postponements by the Iraqi party for a period exceeding a year, resulting in severe detriment to the Claimant. The representative  of the Claimant stated that its claims would be detailed during the course of the arbitral proceedings.

**2/2:** The representative of the Respondent (Iraqi Airways) clarified that the subject matter of the dispute revolves around the fact that, since the inception of the contract on 30/1/2001, the Claimant failed to execute any of the articles of the Agreement or the agreement annex dated 15/3/2003. Given the Claimant's failure to execute any of the agreement articles, the Respondent canceled the agreement in accordance with the law and the prescribed agreement articles. During this period, the Respondent suffered damages due to the non-execution of the Agreement and the failure to fulfill obligations. Furthermore, the postponements it requested during the process of selecting the arbitrator and the presiding arbitrator before the court were an exercise of its right to litigation and were due to the process of obtaining the necessary fundamental approvals from the concerned Iraqi authorities. The Iraqi side also insisted on multiple occasions, from 2006 to date, on offering all amicable means to resolve the alleged dispute with the Claimant. The Respondent reserves its right to detail its statement of defense and counterclaim after referring to the competent authorities, and to submit the same during the course of the arbitral proceedings.

3. **Applicable Law:** The Egyptian Arbitration Law No. 27 of 1994 shall apply to the arbitration proceedings. All Egyptian laws shall apply concerning the adjudication of the subject matter of the dispute, matters of evidence, and all matters related to this arbitration.
4. **Seat of Arbitration:** The office of Dr. Hassan Abdel-Basset Gemei, located at Apartment No. 15, Fourth Floor, Building 7, Al-Fadl Street, Talaat Harb, Abdeen District, Cairo. The Arbitral Tribunal shall have the right to relocate the seat of arbitration or hold hearings in any other place it deems appropriate for holding its hearings, whether inside or outside the Arab Republic of Egypt. In the event either party requests a hearing or hearings to be held elsewhere, the Arbitral Tribunal may accept such request and issue a decision to that effect, stipulating that the requesting party shall bear all expenses arising from its request, provided that the requesting Party pays the costs and expenses as determined by the Arbitral Tribunal within the time limit prescribed by it.
5. **Addresses for Correspondence, Means of Service of Notices and Correspondence**
   The parties agreed that any correspondence, notices, or notifications to and from the Arbitral Tribunal from either or both parties, or between the two parties regarding this arbitration claim, shall be via governmental or private express mail, noting that the aforementioned postal correspondence may be supplemented by email at the following addresses:
   - Address of the Claimant (Horse Travel):

9 El Shaheed Gamal Boraie Street, Ard El Golf, Cairo

Fax: 0224149170 / 020222602400 / 0201001880055

Tel.: 0224142178

Mobile: 01223686945

E-mail: salaheldin.aladacenter@gmail.com

- **Address of the Respondent (Iraqi Airways):**

The principal headquarters, which at the time of contracting was Saddam International Airport, Baghdad, Iraq, and has since become Baghdad International Airport, Baghdad, Iraq. The company insists that its correspondence be addressed to its principal headquarters in Cairo, located at 22 Qasr El Nil Street, Abdeen District, Cairo, to ensure the prompt delivery of correspondence, and such communications shall be deemed duly served upon the Respondent in Iraq and shall constitute valid legal service against it.

Fax: 0020223934200  Tel.: 020223934149  Mobile: 01114335800، Email: ahmed_derani@yahoo.com & iraqiairways.cairo@hotmail.com

- **Address of the Arbitral Tribunal:** The office of the Presiding Arbitrator, located at 7 Al-Fadl Street, off Talaat Harb, Apartment No. 15, Fourth Floor, Abdeen, Cairo, Egypt. E-mail: hgemei@hotmail.com

Tel.: 0020223951777  Mobile: 00201001649560.

6. **Arbitration Duration:** The parties agreed that the duration of the arbitration shall be twelve months in accordance with the law, commencing from the date of the current hearing on 28/11/2013, without prejudice to the Arbitral Tribunal's right to extend the arbitration duration in accordance with the law.

7. **Arbitration Secretariat and Costs:** The Arbitral Tribunal has provisionally determined the arbitration costs in the amount of USD 50,000 (Fifty Thousand United States Dollars), to be borne equally by the Parties, within a maximum period of seven days from the date of this hearing. Payment shall be made to the account of the Presiding Arbitrator, Dr. Hassan Abdel-Basset Mohammed.

In the event either party fails to pay its share of these costs and fees, the other party shall be granted a further period of seven days to make such payment on its behalf, should it wish to do so. Should this amount remain unpaid within the specified deadlines, the Arbitral Tribunal may take any decision it deems appropriate, including the suspension of the arbitration proceedings until payment is made. The Arbitral Tribunal deferred its decision on the arbitrators' fees to a subsequent hearing, to be determined in light of the submissions made on the merits of the arbitration.

8. The parties acknowledged the appointment of Mr. Fathy Mohammed Abdel Malek as the Secretary of the Arbitral Tribunal. The Arbitral Tribunal may appoint whomever it deems fit for the Tribunal Secretary and determine such person's remuneration.

9.  Procedural Timetable for the Submission of the Statement of Claim by the Claimant and the Statement of Defense by the Respondent:

– The Claimant shall submit a Statement of Claim setting forth its claims, legal and factual grounds, together with any documentary evidence upon which it intends to rely, no later than Saturday, 28/12/2013.
– The Respondent shall be granted a deadline to reply and comment on the Statement of Claim and documents submitted by the Claimant, as well as to submit its counterclaim, if it so desires, no later than Monday, 27/1/2014.
– Submissions and documents shall be lodged in seven copies at the seat of the Arbitral Tribunal at the office of Dr. Hassan Abdel-Basset Gemei, located at Apartment No. 15, Fourth Floor, Building No. 7, Al-Fadl Street, Talaat Harb, Abdeen District, Cairo. This shall be done from 7:00 PM to 10:00 PM, throughout the week, excluding Thursdays and Fridays.
– Furthermore, the Arbitral Tribunal decided to hold a hearing for oral pleadings on Saturday, 1/2/2014, at 4:00 PM.

(15) In execution of the Arbitral Tribunal's decisions regarding arbitration costs, the Presiding Arbitrator received a correspondence via email on Saturday, 7/12/2013, from Mr. Ahmed El-Derini Abdel Aziz, attorney for the Respondent. The correspondence stated that the Respondent had deposited its share of the arbitration costs into the account of the Presiding Arbitrator, as specified in the minutes of the first procedural hearing. It further noted that the deposit was made on 3/12/2013, within the seven-day deadline stipulated in the hearing minutes, by means of a bank cheque for the said amount drawn on the Arab African International Bank from the Respondent's account. A copy of the deposit slip and copy of the cheque was attached via the aforementioned email.

(16) On Sunday, 8/12/2013, the Claimant submitted a correspondence to the Tribunal Secretary at the seat of arbitration, requesting to be provided with a copy of:

a) The duly approved and authenticated letter appointing Prof. Dr. Mohammed Al-Haj Mahmoud Badan (the arbitrator appointed by the Respondent).

b) The power of attorney for arbitration issued to the representatives of the Respondent by the person holding the legal capacity to represent it, in accordance with the valid commercial register of the aforementioned company.

The aforementioned correspondence received from the Claimant also included a request to postpone the payment of the prescribed amount for the arbitration secretariat and expenses until the duly executed power of attorney is received from the authorized representative of the Respondent, and until a decision is made regarding the acceptance or rejection of selecting the Cairo Regional Centre for International Commercial Arbitration (CRCICA) as the seat of arbitration and the application of its rules.

(17) On 8/12/2013, the Presiding Arbitrator sent letters to the Parties to arbitration and the members of the Arbitral Tribunal via email, followed by registered mail, notifying all of them of the foregoing. A copy of the correspondence, the deposit slip, and copy of the cheque deposited by the Respondent were attached. The Presiding Arbitrator noted that the Claimant had not paid its share of the arbitration costs, as decided by the Arbitral Tribunal in the first procedural hearing. He further indicated that the second deadline, during which the

Respondent party has the right to pay on behalf of the Claimant party, would expire on Thursday, 12/12/2013. He emphasized that failure to pay the prescribed arbitration costs in the manner previously described would result in the matter being referred to the Arbitral Tribunal to decide as it deems appropriate, in accordance with its decision in the aforementioned first procedural hearing, including the suspension of the arbitration proceedings until the expenses are paid.

(18) On 9/12/2013, a letter was received via email by the Arbitral Tribunal from Mr. Ahmed El-Derini, the attorney for the Respondent, informing the Presiding Arbitrator of the following:

> First: Regarding the Claimant's failure to pay its share of the arbitration costs prescribed by the Arbitral Tribunal, he insists on the necessity of compelling it to pay its share within the time-frames specified for it by the Arbitral Tribunal. He maintains that it is impermissible to link the payment of its share to any other procedure relating to any procedural matter pending before the Arbitral Tribunal, in which the arbitration parties have no involvement.

> Second: Regarding the power of attorney for the Respondent, the company had previously undertaken in the minutes of the procedural hearing to submit the power of attorney as soon as possible. The non-submission of the power of attorney does not exempt the Claimant from depositing its share of the expenses prescribed by the Arbitral Tribunal. This power of attorney serves merely as a representation of attendance and the taking of actions on behalf of the Respondent; it is not a procedure for which the arbitration proceedings would be suspended. The only consequence would be that no representative of the Respondent may appear or take procedural steps until the power of attorney is submitted.

> Third: As for deciding on the matter of accepting or rejecting the selection of the Cairo Regional Centre for International Commercial Arbitration as the seat of arbitration and the application of its rules, this matter was not raised in the minutes of the procedural arbitration hearing, nor was it officially presented to the Arbitral Tribunal as an issue. The Claimant reserves the right to present this request or proposal in its statement of claim to the Respondent, allowing the latter to reply to this proposal through a submission within the period specified for it to reply to the claims of the Claimant.

> Fourth: Regarding the Claimant's request to be provided with a copy of the arbitration Power of Attorney issued to the Respondent's representatives by its legal and authorized representative—as recorded in the valid commercial register of said company—the Claimant itself has not submitted a recent official copy of its own commercial register to prove the capacity of the issuer of its proxy, nor has the Respondent obtained a copy of it. The filing of the Power of Attorney for the Respondent's representative is a matter agreed upon in the procedural hearing's minutes without a specific deadline, and it entails no consequences other than the non-attendance of the Respondent's representative at the hearings, or the inability to take any action, until a valid Power of Attorney is submitted.

(19) On 10/12/2013, Horse Travel Company (the Claimant), submitted to the Tribunal Secretary a photocopy of the deposit slip regarding the Claimant's share of the initial

arbitration costs for the above-mentioned arbitration case, amounting to USD 25,000 (Twenty-Five Thousand United States Dollars). This amount was deposited into the account of the Presiding Arbitrator in accordance with the Arbitral Tribunal's decision issued in the first procedural hearing held on 28/11/2013.

(20) On 10/12/2013, the Presiding Arbitrator sent letters to the Parties to arbitration and the members of the Arbitral Tribunal via email, followed by registered mail. This included notifying all of them of the letter received by the Arbitral Tribunal via email from Mr. Ahmed El-Derini, the attorney for the Respondent, referred to above. Furthermore, they were notified of the attendance of a representative from the Claimant, Horse Travel Company, who submitted to the Tribunal Secretary a photocopy of the deposit slip regarding the Claimant's share of the initial arbitration costs for the above-mentioned arbitration case.

(21) On 28/12/2013, the Claimant (prior to being placed Under Seizure) filed the statement of claim, together with six document portfolios, and two cartons of documents against the Respondent and the Iraqi Minister of Transport.

The Statement of Claim comprised sixty pages and concluded with the following requests for relief:

First: Accepting the Request for Arbitration.

Second: On the merits, to render an Arbitral Award in favor of the Claimant as follows:

1. Ordering the two Respondents to reimburse the amount of USD 103,666,858 (Only one hundred and three million, six hundred and sixty-six thousand, eight hundred and fifty-eight US Dollars), representing the value of the actual disbursements made to perform the obligations set forth in the Agreement. This includes general expenses, purchased fixed assets, sub-agents' entitlements, agency acquisition costs, shipping contract expenses, advertising campaign costs, feasibility study costs, insurance premiums paid to third parties, and fines.
2. Ordering Respondent to pay the amount of USD 100,000,000 (One Hundred Million US Dollars) as compensation for the unlawful and wrongful termination and suspension of the agreement.
3. Ordering the two Respondents to pay the amount of USD 497,096,579 (Only four hundred and ninety-seven million, ninety-six thousand, five hundred and seventy-nine US Dollars), representing the commissions due to the Claimant for the operations executed by the first Respondent throughout the term of the Agreement.
4. Ordering the two Respondents to pay legal interest at the rate of 11%, or at a rate not lower than the applicable Central Bank rate, calculated on the total amount claimed, commencing from the date of the claim.
5. Ordering the two Respondents to pay the amount of USD 500,000,000 (Five Hundred Million United States Dollars) as compensation for the moral damages suffered by the Claimant as a result of the termination and suspension of the agency.
6. Ordering the two Respondents to pay all arbitration costs, specifically the arbitration secretariat and expenses, the arbitrators' fees, and the attorney's fees for the Claimant.
7. Ordering the two Respondents to pay all costs and fees for obtaining the Order of Enforcement of the Arbitral Award.
8. Ordering the two Respondents to pay USD 5,000 (Only five thousand US Dollars) for each day they fail to execute the arbitral award from its date of issuance.

The Claimant further reserved it to amend and increase the claims in the future, as well as its right to take interim measures and exercise other legal rights.

The Claimant commenced its Statement of Claim by narrating the facts of the dispute, stating that the facts may be summarized as follows: On 30/01/2001, the Claimant entered into an Agreement with the Respondent, under which it obtained the general and exclusive agency to represent Iraqi Airways in selling passenger tickets, providing air freight services, and all necessary services for Iraqi aircraft at Egyptian airports in consideration for a percentage of the revenues. However, the Respondent failed to perform its obligations and obstructed the performance of the Agreement. All amicable attempts to settle the dispute, which lasted for more than six years, failed, which prompted the Claimant to resort to arbitration pursuant to Article 16 of the principal Agreement and its annex, which stipulates:

"1- In the event of any dispute arising out of or relating to the interpretation or implementation of this Agreement, the Parties shall exert their utmost efforts to resolve such dispute amicably by appropriate means within a period of three (3) days only. Failing such resolution, they shall constitute an Arbitral Tribunal in the following manner:

1. The First Party shall appoint an arbitrator
2. The General Agent shall appoint an arbitrator.
3. The arbitrators appointed by the two Parties shall, in consultation with each other, appoint the presiding arbitrator. If they fail to agree on such appointment, the Director General of the International Air Transport Association (IATA) shall appoint the presiding arbitrator.

2- The Arbitral Tribunal shall determine its procedures and the governing law.

3- The unsuccessful party shall bear all costs and expenses arising from the arbitration proceedings."

Article 16 of the Annex to the principal Agreement dated 15 March 2001 further provides as follows:

"The contracting parties shall resolve all issues and disputes arising between them through amicable means. In the event that a resolution of any matters or services giving rise to disagreement between the Parties is not reached, the matter shall be referred to an arbitral tribunal to be agreed upon by the contracting parties."

The Claimant stated that, in light of these provisions, the scope of the arbitration and the matters it covers are to be determined as follows:

Determination of Scope of Arbitration: Under this heading, the Claimant stated that, since the parties to the dispute had agreed that the arbitration would be governed in all respects by Egyptian law, the arbitration was therefore subject to Egyptian Arbitration Law No. 27 of 1994 and the provisions of Egyptian substantive law. The Claimant further stated that Article 1 of the Egyptian Arbitration Law provides that an arbitration is commercial if the dispute arose over a legal relationship of an economic nature, whether contractual or non-contractual, and enumerates several examples thereof, including commercial agencies. Accordingly, the Claimant concluded in its statement of claim that the present arbitration constituted commercial arbitration under the foregoing criterion.

The Claimant also added that Article (3) of the Arbitration Law stipulates that within the context of this Law, the arbitration is international whenever its subject matter is a dispute related to international commerce if the principal places of business of the two parties to the arbitration are situated in two different States at the time of the conclusion of the arbitration agreement. The Claimant maintained that these requirements are satisfied in the present arbitral proceedings and, accordingly, that the present arbitration constitutes an international commercial arbitration within the meaning of the Egyptian Arbitration Law and is therefore governed by its provisions.

The Claimant further stated in its statement of claim, under the heading "Matters Covered by the Arbitration Clause," that Article 16 of the Principal General Sales Agency Agreement, entitled "Arbitration," provides that any dispute relating to the interpretation or implementation of that Agreement shall be referred to arbitration, the same provision being set forth in Article 16 of the Annex to the Agreement dated 15/03/2001. Accordingly, the Claimant maintained that the scope of the arbitration agreement encompassed all disputes arising out of or relating to the Agreement. This included disputes concerning the Claimant's performance of its obligations under the Agreement and its claim for compensation for material and moral damages resulting from the Respondent's gross negligence in failing to perform its contractual obligations, as well as the repeated arbitrary and unlawful suspension of the Agreement.

Continuing its presentation of the statement of claim, the Claimant stated that the following matters required further elaboration:

First: The Framework Governing the Contractual Relationship between the Claimant and the Respondent Under this heading, the Claimant stated that the contractual framework consisted of three agreements:

a)  The General Sales Agency Agreement dated 30/01/2001 (the "Principal Agreement"), signed by both Mr. Naji Al-Mashhadani, General Manager of Iraqi Airways (the "First Party"), and Horus Travel Company (the "Second Party").
b)  The Annex to the Agreement dated 15/03/2001, concluded between the same aforementioned parties and signed by the same General Manager, Mr. Naji Al-Mashhadani.
c)  An agreement between the same parties to reactivate the General Sales Agency Agreement and its annex (as documented in meeting minutes) dated 29/08/2005, and signed by Captain Abd Ali Abboud, Chairman of the Board - General Manager of the Iraqi Airways.

Within the context and framework of the three aforementioned agreements, the Claimant set out a number of obligations incumbent upon the Parties, as follows:

1- Obligations of the General Agent (the Claimant) pursuant to the General Sales Agency Agreement dated 30/01/2001: The Claimant stated that these obligations are set forth in Article 6 and require the Second Party to perform the following service and marketing functions:

(a) Marketing and undertaking the advertising necessary for the conduct of the First Party's business, and appointing specialized personnel to perform such functions efficiently.

(b) Providing, maintaining, and refurbishing the premises necessary for the First Party to conduct its business in the country of the General Agent (the Second Party).

(c) Delivering the items entrusted by the principal to their respective destinations in accordance with the First Party's instructions.

(d) Issuing passenger tickets, air waybills, freight notices, Miscellaneous Charges Orders (MCOs), whether individually or collectively, and other transportation documents, as well as issuing prepaid tickets and carrying out the clerical work related thereto.

(e) Visiting travel agencies, other offices, individuals, and entities for the purpose of promoting the First Party's sales and business.

f) Supplying all offices of the First Party, its agents, and sub-agents, from time to time, with printed materials, marketing brochures, and appropriate instructions, as well as documents relating to the settlement of accounts between the General Agent and the aforementioned sales representatives.

(g) Distributing flight schedules and other printed materials concerning flight times provided by the First Party, where requested by the General Agent or sub-agents, to hotels or similar establishments; all such documents shall remain the property of the First Party.

(h) Exerting its utmost efforts to earn the confidence of the First Party and representing it before governmental and regional authorities, public bodies, the press, and institutions, as well as negotiating with governmental and judicial authorities having jurisdiction over air transport services within the First Party's territory.

(i) Providing the First Party with statistics on an ongoing basis and such reports as the First Party may require.

(j) Providing the First Party with the necessary information concerning all applicable laws and any developments relating thereto in connection with this Agreement.

(k) Performing, in accordance with the First Party's instructions, all services that the First Party is required to provide in relation to other airlines.

## 2- Obligations of the Claimant set forth in the Annex to the General Sales Agency Agreement dated 15/03/2001:

The Claimant stated that these obligations are set out in Articles 4 through 20 of the Annex to the Agreement, as follows:

4- The Second Party shall pay the salaries of the employees of the Iraqi Airways (the First Party) offices in Cairo and at Cairo Airport. The Second Party undertakes to bear, and shall be responsible for, all entitlements due to the aforementioned employees in accordance with the applicable laws and regulations in this regard. The number of assigned employees may be increased in accordance with operational requirements and subject to the written approval of the First Party.

5- The Second Party shall bear the charges for telephone calls, telexes, and fax communications sent from the First Party's office in Cairo to the Company's headquarters in Baghdad and to its agents and offices abroad. It shall also bear the costs of water, electricity, and air conditioning, as well as the insurance premiums for the office and vehicle, vehicle registration fees, and any required security deposit.

6- The Second Party shall pay the annual rent for the First Party's office in Cairo and the Company's office at Cairo Airport, commencing from the date on which it assumes responsibility for the agency. It shall also bear any expenses or costs arising from increases in rental rates in accordance with the applicable laws.

7- The Second Party shall bear the salary of the First Party's attorney assigned to represent the First Party, in the amount of EGP 500 (five hundred Egyptian Pounds) per month. Said salary may be increased with the written consent of the First Party.

8- The Second Party shall bear the fees and costs of the annual subscriptions for SITA, telex, the wireless station at the airport, the reservation system, and the Airlines Committee.

9- The Second Party shall bear the costs of cleaning, maintaining, and servicing the First Party's offices in Cairo, as well as the maintenance and servicing of the office equipment therein.

10- The Second Party shall, at its own expense, provide all stationery required for the First Party's offices in Cairo and at the station.

11- The Second Party shall bear the necessary advertising and publicity expenses for the First Party's offices.

12- The General Agent shall bear the expenses and costs of hospitality and hotel accommodation for the First Party's official delegates, official delegations, and visiting committees, as well as donations and any other petty cash expenses.

13- The Second Party shall undertake the maintenance and upkeep of the offices and shall furnish the First Party's offices in the city and at the airport in a manner befitting their status, in preparation for future operations and in coordination with the office manager.

14- The Second Party shall bear the expenses incurred in connection with the participation of the office employees in training and development courses required for the proper performance of their duties.

15- The Second Party shall bear the costs of providing standard uniforms for both the summer and winter seasons for the employees at the First Party's office in the city and at the airport.

16- ...............

17- The Second Party undertakes to modernize the office and airport vehicles during the agency period, and register them in the name of Iraqi Airways, as follows:

a) One vehicle for the use of the office manager in Cairo and one vehicle for the station manager upon the commencement of operations
b) One vehicle for official guests, to be kept by the Second Party and made available to the First Party upon request, as needed.
c) The Second Party shall bear the costs of fuel and lubricants for the office vehicles used by employees in the city and at the airport.

18- The Second Party shall bear, settle and pay all amounts and debts owed by the First Party from the date of the office closure in 1991, as previously stated, and in accordance with the attached statement.

19- The Second Party shall exert efforts with the Cairo Airport Authority and EgyptAir in respect of the amounts owed to them by the First Party and shall act on behalf of the First Party in pursuing procedures for the cancellation or reduction of such debts with the relevant authorities, for the benefit of the First Party.

20- With reference to Article 34 of the Standard General Sales Agency Agreement signed between the two parties, the Second Party undertakes the following:

a. To submit a bank guarantee in the amount of USD 200,000 (two hundred thousand US Dollars) upon commencement of operations, receipt of the First Party's travel documents, and commencement of commercial operations thereunder.
b. To submit a bank guarantee in the amount of USD 100,000 (one hundred thousand US Dollars) as security for the Company's existing rights, which shall be replaced by the guarantee mentioned in paragraph (a) upon the commencement of operations.

**3- Obligations of the Claimant set forth in the Agreement to Reactivate the General Sales Agency Agreement dated 29/08/2005**

 In explanation thereof, the Claimant stated that the Agreement affirmed the mutual obligations set forth in the Principal Agreement and its Annex dated 15/03/2001. The Company added that it should be noted that, following the change in the political direction of the Iraqi State after the change of its governing regime, the Respondent terminated the Claimant's Agency Agreement pursuant to its letter No. 417 dated 02/12/2004, which indicated the Respondent's intention to terminate the General Sales Agency Agreement effective February 1, 2005, requesting that the necessary procedures be taken within 60 days. However, based on several meetings held between the two parties, the Respondent decided to reactivate the Agreement and its Annex, deeming its intention to terminate the agency as null and void. It further affirmed the continuation of the Claimant (Horse Travel Company) as the general and exclusive agent of the Respondent, considering the Annex to the Agreement dated 15/03/2001 and the provisions of the meeting minutes dated 29/08/2005 as an integral part of the General Sales Agency Agreement between the two parties, and revoking any provision to the contrary.

The Claimant added, in explaining the basis of its claim, that upon reviewing the articles of this agreement, it becomes evident that the Claimant has fulfilled all of its obligations set forth in the original Agency Agreement dated 30/01/2001 and its Annex dated 15/03/2001. The two parties agreed that the Claimant would complete the remaining finishing works at

the Respondent's office in Cairo and launch new media campaigns to promote Iraqi Airways, which was indeed accomplished and completed in due time.

The Claimant then proceeded, in its Statement of Claim, to set out the obligations encumbering the Respondent under the same three aforementioned contractual frameworks. It stated that the Respondent is obligated, in light of the foregoing, by a set of fundamental obligations necessary to enable the Claimant to perform the work entrusted to it, which are:

**A- Obligations pursuant to the General Sales Agency Agreement dated 30/01/2001:**

- The obligation of the Respondent to supply the General Agent with traffic documents (flight tickets) (Article 1(10)).
- The obligation of the Respondent to pay the Claimant's commission (in accordance with the details set forth in Article 11).
- The obligation of the Respondent to supply the General Agent with all types of tickets and documents (Article 6(12)).
- The obligation not to terminate the agency except after serving a written notice of termination and the expiry of a period of at least 60 days from the issuance of the notice (Article 23).

**B- Pursuant to the Annex to the General Sales Agency Agreement dated 15/03/2001:**

- The obligation of the Respondent to fulfill all contractual obligations in application of the principle of good faith in the performance of contracts.
- The obligation to renew the Agreement by mutual agreement of the two parties and the prohibition of terminating it by unilateral will (Article 21).

**C- Obligations pursuant to the Reactivation Agreement dated 29/08/2005:**

- The obligation to execute what was agreed upon regarding the reactivation of the Agreement dated 30/01/2001 and its Annex dated 15/03/2001 (Article 1).
- The obligation to deliver the "travel" documents pertaining to the Respondent (Article 2).
- The obligation to deliver the technical requisites, including the aircraft certificates, insurance certificates, and registration documents, to be submitted along with the operating schedule to the Civil Aviation Authorities for the purpose of their review and obtaining operational approvals (Article 4).
- The obligation of automatic renewal of the Agreement and the non-termination thereof by unilateral will (Article 10).
- The obligation to enable the General Agent (the Claimant) to continue working under the General Sales Agency granted to it by the Agreement dated 30/01/2001, while considering the Annex to Agreement dated 15/03/2001, as well as the Agreement signed on 29/08/2005, as an integral part of the General Sales Agency Agreement signed by the two parties, and revoking any provision to the contrary (Article 12).

After setting out its contractual obligations and those of the Respondent, the Claimant proceeded, under Clause 3 of its Statement of Claim, to describe the performance and subsequent termination of the Agreement in light of what it referred to as the three contractual frameworks previously outlined, as follows:

**A- The Term of the Agreement and the Manner of Its Termination under the Principal Agreement:** In this regard, the Claimant stated that it was the sole general agent in Egypt pursuant to Article (1) of the Principal Sales Agency Agreement dated 30/01/2001. It further stated that it held an exclusive Agency pursuant to Article (2), without any specified term for its expiration. The Claimant added that the Main Sales Agency Agreement did not specify a fixed term and, therefore, constituted an open-ended general agency. Accordingly, neither party was entitled to terminate it, except by giving the other party written notice of its intention to terminate at least 60 days in advance. On that basis, the Claimant asserted in its Statement of Claim that the agreement could not be terminated unilaterally.

**B- The duration of the agreement's execution and its termination pursuant to Annex to the Agreement dated 15/3/2001:** The Claimant stated that the Annex to the Agreement has a duration of three years, commencing after the operation of the Respondent's aircrafts and its practice of commercial activity. This duration is renewable by mutual agreement of the Parties for indefinite periods (Article 21 of the Annex). The Claimant further submitted that this confirms the provision of the principal agreement that the agreement is of indefinite duration and that the annex contains no provision concerning its cancellation or termination.

**C- The duration of the Agreement's execution and its termination in the reactivation agreement dated 29/8/2005:** In this regard, the Claimant stated that the agreement duration is 3 years from the date of actual operation, to be automatically renewed for another similar period, unless either party notifies the other of its unwillingness to renew at least sixty days prior to the expiration of the renewed period by a registered letter with acknowledgment of receipt. Neither party may request rescission or non-renewal unless a gross error is committed by the other party.

On the basis of the foregoing, the Claimant submitted in its Statement of Claim that neither Party may terminate the agreement or decline its renewal unless the other Party has committed a material breach. The Claimant further contended that the agreement in dispute is of indefinite duration, renews automatically, and cannot be terminated unilaterally under the terms of the principal agreement and its annex dated 29/8/2005. Accordingly, the Claimant maintained that the Respondent's termination or suspension of the agreement constituted a breach of the Parties' reciprocal contractual obligations.

Under Clause Four of the Statement of Claim, titled "Repeated obstruction of the agreement's performance by the Respondent through decisions constituting material breaches of the Agreement," the Claimant stated that the Respondent unilaterally terminated the agreement on 2/12/2004. This was effected via Letter No. 417, headed "Termination of the General Sales Agency," which expressed the Respondent's intent to terminate the General Sales Agency Agreement effective February 1, 2005, without citing any justification or contractual breach. The Claimant further elaborated that the opening lines of said letter indicate that the decision to terminate was driven by the policies of the new Iraqi State, which deemed contracts executed under the former Iraqi regime—including the disputed agency agreement—detrimental to the Respondent's economic goals. On that basis, the Claimant maintained that this confirms the absence of any breach on its part of the obligations set forth in the General Sales Agency Agreement and its Annex.

**Under the heading "The Respondent's Retraction of the Agency Termination and its Commitment to Reactivate it on 29/08/2005":** The Claimant stated that, following meetings between the two parties on 26/08/2005 and 27/08/2005, the Respondent committed,

pursuant to meeting minutes dated 29/08/2005, to reactivate the Agreement and its annex. In said minutes, the Respondent affirmed the continuation of the agreement in accordance with the principal agreement and its annex, and the cancellation of anything to the contrary. The Claimant stated in this regard that it is evident from this agreement that the agency termination letter dated 02/12/2004 lacked a valid basis in law and the agreement, and constitutes an arbitrary measure and a material breach of the provisions of the contractual relationship frameworks.

**Under the heading "The Unilateral Termination of the Agreement for the Second Time on 14/11/2005":** The Claimant stated that, contrary to what was set forth in the parties' meeting minutes dated 29/08/2005, which establishes the Claimant's fulfillment of all its contractual obligations in accordance with the principal agreement and its annex, the General Manager of the Respondent Company, Pilot / Abd Ali Abboud, terminated the general agency in Egypt concluded with the Claimant, effective 01/12/2005. This was based on a claim contrary to reality, alleging that the Claimant had not fulfilled its obligations. The Claimant added that this allegation was made even though the manifest truth behind this decision is as clarified in its preamble, as the decision stated: "Due to the resumption of operations of Iraqi Airways aircraft to and from Egypt."

The Claimant continued in its statement of claim in this regard, affirming that the real motive for this decision was the Respondent's undertaking of direct operations and depriving the Claimant of its rights set forth in the contractual framework. This is corroborated by a subsequent decision issued by the same competent authority two days later, on 16/11/2005, suspending the agreement.

**Under the heading "The Respondent's Retraction of the General Sales Agency Agreement Termination and Issuance of a Decision to Suspend it on 16/11/2005":** The Claimant explained that two days after the issuance of the Agreement termination decision, another decision was issued by the same General Manager of the Respondent Company, Pilot / Abd Ali Abboud, titled "Suspension of Agency Agreement" of the Claimant. This was under the pretext of non-compliance with the provisions of the General Sales Agency Agreement, its annex, and the meeting minutes dated 29/08/2005, and the allegation that the Claimant had committed a number of violations that have no basis in reality. The Claimant added in this regard that the motive for issuing the agreement suspension decision was the Respondent's desire for direct operations through its Cairo office, as explicitly stated at the end of the suspension decision. It added that it is abundantly clear from this that the issuance of the decisions to terminate and suspend the agreement was based on the policy direction adopted by the new Iraqi State following the overthrow of the former regime. This is confirmed, as the Claimant explained, by the letter of the General Secretariat of the Iraqi Council of Ministers No. (Q 2098/1/6) dated 05/05/2005, which classified the Claimant and deemed it a "front company". The Claimant also added that this proves once again that the termination and suspension decisions have no basis in reality or law, and therefore lack legitimacy.

The Claimant concluded Clause 4 of its statement of claim by stating that it is evident from the foregoing that the Agreement is still valid, as the termination decision on 14/11/2005 does not produce any legal effect due to its violation of the agreement's conditions and the law. Furthermore, a subsequent decision was issued on 16/11/2005 to suspend the agreement, an act which confirms—as it stated—that the agreement remains subsisting between the two parties, the Claimant and the Respondent.

<u>In Clause 5 of the statement of claim, titled "Legal Characterization of the Agreement Giving Rise to the Dispute":</u> In paragraph <u>(a) concerning the legal nature of the agreement in dispute,</u> the Claimant stated that the parties to the original agreement dated 15/01/2001 had agreed upon the title of the Agreement, which was headed "General Sales Agency Agreement." Furthermore, the annex thereto was titled "Annex to the General Sales Agency Agreement Signed Between Iraqi Airways and Horse Travel Company." "A commission agency is a contract by virtue of which the agent undertakes to effect in his name a legal act for the account of the principal." Moreover, Article 148 of the Egyptian Commercial Law No. 17 of 1999, in the chapter on Commercial Agency, stipulated that: "The provisions of commercial agency shall apply, if the agent has taken profession of effecting trade operations for account of third parties."

The Claimant stated that whereas the Egyptian Commercial Law regulated certain types of commercial agencies, including contracts agency in Articles 177 through 191, and upon reviewing these articles, it becomes evident that Article 177 stipulates that: "Contracts agency is a contract under which a person undertakes on a permanent basis, and in a specific area of activity, promoting, negotiating and concluding transactions and deals in the name and for the account of the principal in return for pay."

Furthermore, Article 179 stipulated that: "The principal shall not have recourse to more than one contract agent in the same area and for the same branch of activity. Nor shall the contract agent represent for more than one establishment exercising the same activity in the same area."

The Claimant also cited the text of Article 180, which states: "The contract agency deed shall be recorded in writing. and shall particularly indicate the limits of the agency, the pay of the agent, the area of his activity, and the period of the contract if it is for a definite period." It added that upon reviewing the articles of the Agreement subject of arbitration, it becomes apparent that it constitutes a form of "Contracts Agency" specifically regulated by the Egyptian Commercial Law in the aforementioned articles.

<u>In paragraph (b) of Clause 5, entitled "International Character of the Contract," the Claimant stated that the addresses of the parties to the dispute, as set forth in the agreement</u> concluded between them in the form of a General Sales Agency Agreement, were those of Iraqi Airways, whose principal place of business is in Baghdad, and Horse Travel Company, whose principal place of business is in Cairo.

The Claimant added that the two parties agreed under Article 2 of the agreement that the agency is exclusive, as the text stated: "The First Party shall not appoint any other party to perform services similar to those provided for under the terms of this Agreement within the same territory." This bears upon the determination of the Respondent's liability for the unilateral termination of the Agreement and for acting in bad faith in the negotiations aimed at resolving the dispute.

The Claimant further stated that the parties agreed that the General Agent, i.e., the "Claimant," would represent the First Party (Iraqi Airways) within the territory in connection with the sale of passenger tickets and air cargo services (Article 5(b)). According to the Claimant, this gives rise to legal consequences, the details of which would be addressed subsequently.

The Claimant also submitted that the parties further agreed that the Claimant would undertake marketing and advertising activities for the First Party's business (Article 6(1)). According to the Claimant, this gives rise to legal consequences, the details of which would be set out later in the Statement of Claim.

The Claimant added that the obligations stipulated in Article 6 of the Agreement include the issuance of airline tickets, airline invoices, or shipping notes, as well as the representation of the First Party before governmental and regional authorities (Article 6(k)). In consideration thereof, the parties agreed that the Claimant would be paid a commission at the percentages specified in Article 11. According to the Claimant, the significance thereof would become apparent subsequently in connection with the unilateral termination of the Agreement and the financial claims, the details of which would be set out later in the Statement of Claim.

The Claimant also stated that, pursuant to Article 14, the parties agreed to observe the rules of the International Air Transport Association (IATA). The parties further agreed, under Article 16, to refer any dispute arising out of or relating to the interpretation or implementation of the Agreement to arbitration before a three-member Arbitral Tribunal, as further confirmed by Article 16 of the Annex to the Agreement. Additionally, the Claimant stated that the two parties had agreed, pursuant to Article (1) of the Agreement's Annex, that the conditions of international agreements regulating the Agreement shall apply to their agreement.

The Claimant concluded from the foregoing that the agreement thus constitutes an international agreement, as its legal elements are connected to more than one legal system. It also added, regarding the international character of the disputed agreement and its definition, that it involves a relationship that transcends the internal national economy of a specific state and relates to the interests of international trade. It asserted that the disputed agreement is an international agreement due to its connection to the legal systems of more than one state, as it was concluded between the Egyptian company Horse Travel and Iraqi Airways in Baghdad, and due to its relation to the provision of services aimed at encouraging the cross-border movement of individuals and goods, which leads to the revitalization of tourism, trade, and other activities between the two countries, thereby rendering the agreement related to the interests of international trade and having an impact on the Egyptian national economy. It concluded its statement of claim, in Clause (5) thereof, by asserting that from all the preceding, it is evident from the aforementioned elements, the circumstances surrounding the conclusion of the agreement, and the obligations of the parties, that the agreement pertains to a commercial agency agreement, with all the effects ensuing therefrom.

In Clause (6) of the statement of claim, which the Claimant titled "Determination of the Applicable Law," the Claimant stated that the principle of party autonomy is the governing principle in selecting the law that governs the subject matter of the dispute in international agreements. Furthermore, the implication of this principle is the application of the law chosen by the parties to the agreement. It added that this is recognized by the laws and international agreements relevant to the dispute, as stipulated by the Egyptian and Iraqi Civil Codes regarding the determination of the law applicable to international agreements containing a foreign element, and as stipulated in Article 3 of the Rome Convention of 19 June 1980 on the Law Applicable to Contractual Obligations, as well as Article 5 of the Hague Convention of March 14, 1978 relating to the Law Applicable to Agreements of Mediation and Contractual Representation, to which Egypt acceded on 6 June 1978, and also Article 13 of the International Chamber of Commerce (ICC) Arbitration Rules in Paris.

The Claimant further stated that a review of the provisions of both the Agreement dated 30/01/2001 and its Annex reveals the following:

A. Regarding the determination of the law applicable to the Agreement: The Claimant stated that, upon reviewing the terms of the contract, it is evident that the parties intended to apply Egyptian law, as demonstrated by the following:

1. The parties selected the Egyptian judiciary to have exclusive jurisdiction over disputes arising between them, pursuant to Article 25(2) of the Agreement.
2. The place of performance of the Agreement concluded between the parties is the Egyptian territory.
3. The parties agreed that the arbitration agreement would take place within the Egyptian territory.

B. The Claimant submitted that the applicable law is determined by the provisions of the agreement annex: This is evident from reviewing Article (1) of the Agreement Annex, which states: "The conditions of international agreements regulating the Agreement shall apply to the Agreement." The Claimant asserted that this constitutes an express agreement to subject the Agreement and its annexes to the relevant international agreements governing obligations and international contracts in general, and agency agreements in particular. Consequently, the parties' agreement is subject to the 1978 Hague Convention on the Law Applicable to Agency, as well as the 1980 Rome Convention on the Law Applicable to Contractual Obligations. In this regard, the Claimant pointed to Article (6) of the aforementioned Hague Convention, which states: "In so far as it has not been chosen in accordance with Article 5, the applicable law shall be the internal law of the State where, at the time of formation of the agency relationship, the agent has his business establishment or, if he has none, his habitual residence."

The Claimant also mentioned that the foregoing is consistent with the 1980 Rome Convention. The Claimant concluded that it is clear from all the provisions of the Agreement and its Annex that the applicable law is Egyptian law, including its substantive rules and the international agreements ratified by Egypt.

The Claimant Company concluded Clause Six of its Statement of Claim by asserting that, in light of the express provision contained in the annex to the Contract stipulating that the Contract is subject to international conventions, the Contract is likewise governed by the relevant international conventions, rules, and customs applicable to this type of transaction, pursuant to Article 39(3) of the Egyptian Arbitration Law No. 27 of 1994, which provides: "In deciding the subject matter of the dispute, the Arbitral Tribunal shall take into account the terms of the contract in dispute and the commercial customs applicable to the type of transaction."

In Clause Seven of its Statement of Claim, entitled "The Substantive Legal Rules Applicable to the Dispute Concerning the prohibition against the unilateral termination of the Agency Agreement and the Consequences Arising Therefrom," the Claimant Company asserted that the applicable substantive legal rules are found in Egyptian law, the relevant international conventions, and the customs governing international trade in relation to the termination of commercial agency agreements. The Claimant further submitted that the substantive legal rules governing the prohibition against the unilateral termination of the agency agreement in dispute demonstrate that the Egyptian legislature has regulated the termination of agency agreements under both the Civil Code and the Commercial Code No. 17 of 1999. The Claimant further submitted that the Egyptian Court of Cassation has consistently held that an agency agreement is governed, with respect to its formation, termination, and all matters relating thereto, by the general provisions governing agency under the Civil Code, except where the Commercial Code contains special provisions applicable thereto. In support of its position, the Claimant referred to a judgment of the Egyptian Court of Cassation (Civil Cassation, 08/03/1966, Collection of Court of Cassation Judgments, Vol. 17, Judgment No. 71, p. 509), adding that, pursuant to Article 188 of the Egyptian Commercial Code, a commercial agency agreement is concluded for the mutual benefit of both parties. Accordingly, where such an agreement is of indefinite duration, it may not be terminated in the absence of fault on the part of the agent; otherwise, the principal remains liable to compensate the agent for any damage resulting from such termination.

The Claimant also relied upon Article 715(2) of the Egyptian Civil Code, which provides: "Where the agency is created for the benefit of the agent or for the benefit of a third party, the principal may neither revoke nor restrict the agency without the consent of the person for whose benefit the agency was granted."

The Claimant further referred to Ministerial Decree No. 362 of 2005 of the Minister of Foreign Trade and Industry, amending certain provisions of the Executive Regulations of the Law Regulating Commercial Agency Activities and Certain Intermediary Activities, which provides that an agency agreement may not be terminated before the agent has received all amounts due and all rights arising from the agency agreement, whether the agreement is for a fixed term or an indefinite term, or has expired without renewal, together with the agent's full rights and compensation.

The Claimant further argued that Article 188 of the Commercial Code **establishes the principle of mutual interest** and therefore does not permit the unilateral termination of the Agency Agreement. It further submitted that this principle is reinforced by Article 715(2) of the Civil Code and that, as previously demonstrated, the Agency Agreement in dispute was concluded for an indefinite term. Consequently, the Respondent was not legally entitled to terminate the Agency Agreement unilaterally, **in view of the substantial harm resulting from such termination**, including the loss of the investments and expenditures incurred by the Claimant Company in performing the Agreement, while the Respondent nevertheless remained obligated to perform its obligations toward the Claimant Company.

The Claimant further submitted in its Statement of Claim that the Egyptian Court of Cassation has affirmed the foregoing interpretation in its application of Article 715 of the Egyptian Civil Code, holding that where an agency is granted for the benefit of the agent or a third party, the principal **may not unilaterally revoke the agency**. Rather, such revocation requires the consent of the person for whose benefit the agency was granted. Consequently, any unilateral revocation effected without such consent is devoid of legal effect, and the agency remains valid and enforceable notwithstanding the principal's purported termination. The Claimant therefore contended that the Respondent's **attempt to terminate**, and subsequently suspend, the Agency Agreement constituted a violation not only of the principles of good faith and mutual interest governing commercial agency agreements, but also of the applicable provisions of law and the express terms of the Agreement.

Under Clause 7(a) of its Statement of Claim, entitled "The Conflict Between the Unilateral Termination of the Agency Agreement and the Principle of Mutual Interest," the Claimant submitted that the principle of mutual interest signifies that every commercial agency agreement is founded upon cooperation between the principal and the agent, whereby the agent performs the activities entrusted to it in a manner that advances the commercial interests of both parties. The Claimant further submitted that this principle was expressly adopted by the Egyptian legislature in Article 188 of the Egyptian Commercial Code No. 17 of 1999, which provides that a commercial agency agreement is concluded for the mutual benefit of both parties. It further submitted that this principle has likewise been recognized in modern Arab and European commercial legislation and **has evolved into a general principle of law constituting an independent source of legal rules.** The Claimant further submitted that both legal scholarship and judicial precedent have consistently recognized that an exclusive commercial agency is, by its very nature, established for the benefit of the agent. Accordingly, where exclusivity has been granted, the principal is not entitled to **dismiss** the exclusive agent during the agreed contractual term except with the agent's consent or **on legally recognized grounds.**

Under Clause 7(b), entitled "Manifestations of the Mutual Interest of the Claimant in the Agency Agreement in Dispute," the Claimant explained that the mutual interest of the parties is evident from the nature and purpose of the Agreement itself. Although the Respondent's interest consisted of promoting ticket sales, providing passenger and cargo transportation services, **generating profits**, and preserving its commercial reputation within the tourism and aviation sectors despite the air embargo imposed on Iraq at the time the Agreement was concluded, the Claimant likewise had a substantial and direct interest in the continued performance of the Agreement through the receipt of commissions and the expansion of its commercial activities.

The Claimant further submitted that it was established specifically for the purpose of performing the General Agency Agreement that forms the subject matter of the present arbitration. It further stated that, prior to appointing the Claimant as its General Agent in 2001, the Respondent had conducted its business in Egypt through its own offices and employees. Following that appointment, the Claimant established the necessary organizational structure, employed qualified personnel, and undertook the activities required to perform its contractual obligations under the Agreement. The Claimant maintained that these circumstances **confirm** that the Agency Agreement was concluded for the mutual benefit of both parties.

The Agency Agreement was concluded for the mutual benefit of both parties, although it confers upon the Respondent a substantial benefit, namely the preservation of its assets, trade name, and the other rights and interests it has acquired.

The Claimant further submitted that a review of the General Agency Agreement, which forms the subject matter of the present dispute, demonstrates that it contains a provision granting the Claimant the right to represent the Respondent before governmental and non-governmental authorities and other entities, as set forth in Clause 5(b) of the Agreement, which provides: "Subject to the provisions of this Agreement, the General Agent shall represent the First Party within the Territory..." The Claimant further submitted that Clause 6, concerning the services to be performed by the General Agent, provides as follows:

a. Marketing and carrying out the advertising necessary for the First Party to conduct its business and appointing qualified personnel to perform such duties efficiently. b. Providing, repairing, and renovating the premises necessary for carrying out the First Party's business in the General Agent's country. c. Delivering consignments. d. Issuing airline tickets, arranging air transportation, and providing cargo documentation. e. …f. …k. Using its best efforts to earn the trust of the First Party and represent it before governmental and regional authorities, public bodies, the press, and other institutions, and to negotiate with the governmental and judicial authorities having jurisdiction over air transport services within the Territory of the Second Party. The Claimant further submitted that Clause 7(1) provides that the General Agent shall monitor all tariffs, rules, laws, instructions, and information issued by the First Party and shall be responsible for implementing them within its country through itself and its agents. The Claimant further referred to Clause 11(1), concerning compensation and remuneration, which provides: "The First Party shall pay the General Agent a commission on tickets issued on the First Party's routes, whether basic, supplementary, charter, or flights operated by other airlines." The Claimant further referred to Clause 11(2), which provides: "In addition to the sales commission specified in the preceding paragraph, the First Party shall pay the General Agent an additional incentive commission on all sales." The Claimant further referred to Clause 11(3), which provides: "Notwithstanding the provisions of the foregoing paragraph, the First Party shall pay the General Agent the applicable commission (whether basic or incentive) in respect of tickets issued by the General Agent, provided that such tickets are issued by the General Agent within its own country, that their price has been prepaid, and that no sales commission or additional commission has been paid to any other General Agent of the First Party." The Claimant also referred to Clause 11(4), which provides: "Notwithstanding the foregoing, nothing contained herein shall prevent the First Party from reimbursing the General Agent for expenses incurred in connection with the First Party's requirements or additional instructions."

Based on the foregoing, the Claimant submitted that all of the foregoing demonstrates that the Agency Agreement was concluded for the mutual benefit of both parties and that the Claimant's interest is the greater and more apparent, as reflected in the terms of the Agreement. The Claimant further submitted that, with respect to the exclusivity of the Agency Agreement, Clause 2 provides: "Unless the parties otherwise agree in writing, the First Party shall not appoint another party to perform any services similar to those provided for under this Agreement within the same territory." Accordingly, the Claimant concluded that the Principal is not entitled to terminate the Agency Agreement unilaterally, since it constitutes an exclusive agency established for the mutual benefit of both parties. Should the Principal act otherwise, it shall be deemed to have committed a serious fault giving rise to liability for full compensation for the damages sustained by the General Agent, namely the Claimant (Horus Tourism and Travel).

Absence of Fault on the Part of the Claimant Company Under the heading "Absence of Fault on the Part of the Claimant Company," the Claimant submitted that, if the Agency Agreement in dispute is one concluded for the mutual benefit of both parties and, accordingly, may not be terminated unilaterally by the Principal, the correspondence exchanged between the parties nevertheless contained allegations by the Respondent that the Claimant had committed a serious fault. In response, the Claimant argued that Iraqi Airways Company's execution of the Addendum to the Agency Agreement in 2005, after the circumstances preventing actual operations had ceased to exist and conditions had become suitable for the commencement of operations between Egypt and Iraq, together with the parties' agreement in Clause (1) of the Addendum to: "Reactivate the Agency Agreement concluded between Iraqi Airways Company and the General Agent, Horus Tourism and Travel Company, dated 30/01/2001, together with its Addendum dated 15/03/2001." and the confirmation contained in Clause (12) of the same Addendum, dated **29/08/2005**, that: "Horus Tourism and Travel Company shall continue to act as the General Agent under the General Agency Agreement previously granted to it, and any provision to the contrary shall be null and void." constitute an acknowledgment by the Respondent that the Agency Agreement remained valid.

The Claimant further submitted that the foregoing constitutes an acknowledgment by the Principal of all acts performed by the General Agent prior to the execution of the Addendum, an acknowledgment that the General Agent had fulfilled all of its contractual obligations, and an acknowledgment that no fault, whether minor or serious, could be attributed to it. Otherwise, the Principal would not have executed the Addendum reappointing the Claimant as its General Agent for a period of three years, automatically renewable pursuant to Clause (10).

The Claimant further submitted that any allegation of fault on its part is untenable. It argued that the Respondent reaffirmed its contractual commitments by executing the Addendum to the original Agreement and thereby negated the existence of any fault on the part of the Claimant prior to the execution of that Addendum. The Claimant further submitted that the alleged termination of the Agency Agreement occurred only a few weeks after the execution of the aforementioned Addendum, before operations had even commenced, making it impossible for any breach of the Agreement to have occurred. The Claimant further argued that the documents submitted in support of the arbitration establish that the termination of the Agency Agreement resulted from the policies of the government then in power and from an attempt to repudiate all obligations undertaken under the previous regime prior to the U.S.-led invasion of Iraq.

Accordingly, the termination was based on neither legal nor factual grounds. The Claimant further referred to the statement of defense submitted by counsel for Iraqi Airways Company at the hearing held on **15/01/2012** before the 62nd Commercial Circuit of the Cairo Court of Appeal in Case No. 51 of Judicial Year 128, as well as to the legal notice served by the Respondent upon the Claimant on **06/03/2012**, whereby the Respondent proposed either an addendum to the Agency Agreement or the conclusion of a new Agency Agreement in favor of the Claimant in exchange for the Claimant's waiver of its right to resort to arbitration. Accordingly, the Claimant concluded that it had committed no fault capable of justifying either the termination or the suspension of the Agency Agreement. The Claimant concluded this section of its Statement of Claim by submitting that the execution of the Addendum constitutes an acknowledgment of the validity and continuing effectiveness of all acts performed by the Claimant vis-à-vis the Respondent from that date onward.

Legal Consequences of the Continuation of the Agency Agreement Throughout Its Term Under the heading "The Legal Consequences of the Continuation of the Agency Agreement Throughout Its Three-Year Term, Automatically Renewable for a Similar Term and Thereafter Automatically Renewable in the Same Manner," the Claimant submitted that, since it has been established that the Agreement in dispute is an international agency agreement, was concluded for the mutual benefit of both parties, and may not be terminated unilaterally by the Principal, and since it is impossible to establish any fault whatsoever on the part of the Claimant, the Claimant is entitled to compensation for all damages sustained. The Claimant further submitted that such entitlement arises without the need to establish any fault on the part of the Principal, in accordance with the legal principles derived from the application of the corresponding substantive provisions of Egyptian law.

Under the heading **"Accordingly,"** the Claimant submitted that, based on the foregoing, neither the General Agent nor the Principal may terminate the Agency Agreement unilaterally unless there is a serious fault on the part of one of the parties. Furthermore, the grant of a commercial agency for the mutual benefit of the parties entitles the commercial agent to insist upon the continuation of the Agency Agreement if the Principal decides to terminate it unilaterally, since the commercial agent would otherwise face the risk of being deprived of its means of livelihood, as the Agency Agreement constitutes the basis of its commercial activities.

The Claimant further submitted that, as a result of the unilateral termination of the Agency Agreement by the Principal, the General Agent is entitled to take the necessary measures to claim compensation for all damages sustained, including the expenses incurred in performing the Agency Agreement, the commissions due during the initial three-year term, a further three-year term pursuant to the automatic renewal commencing from the start of operations, and a further three-year term ending in January 2014 due to the Respondent's failure to comply with the contractual notice requirements under the Agreement, in addition to compensation for lost profits, losses sustained, and moral damages.

In the Eighth Clause of its Statement of Claim, entitled "Identification of the Errors Committed by the Respondent," and under the heading "The Serious Fault in Unilaterally Terminating and Then Suspending the Agency Agreement," the Claimant stated that the first error consisted of the fact that, after signing the Addendum on 29/8/2005 and confirming that the Claimant Company

was the General Agent of Iraqi Airways, the Claimant was surprised by an act on the part of the Respondent constituting a serious fault, when the Respondent sent a letter dated 14/11/2005 stating that the Principal had unilaterally cancelled the Agency Agreement, followed two days later by a decision dated 16/11/2005 suspending the Agency Agreement. The Claimant further submitted that the termination of the Agency Agreement and its subsequent suspension without legal justification, and pursuant to unlawful directives, constituted a serious fault involving an intention to cause harm, as the Claimant Company had been classified among the companies that had dealt with the government under the regime that prevailed in Iraq prior to the invasion. The Claimant further argued that such intention constitutes conduct reflecting the seriousness of the Respondent's breach of its obligations and the extent of its violation of the principle of mutual benefit between the parties.

The Claimant further added that the Respondent's refusal to deliver the tickets, documents, and other materials necessary to enable it to perform the Agency Agreement, together with its seizure of the Company's headquarters in Cairo, where it conducted its principal business activities, constituted a failure by the Respondent to perform its principal contractual obligations, in addition to terminating the Agency Agreement despite such termination being contrary to established law and judicial precedents, thereby demonstrating the seriousness of the Respondent Company's breach of its legal obligations.

Under the heading "The Serious Fault in Failing to Provide the Information and Tools Necessary for the General Agent to Perform Its Duties," the Claimant stated that Clauses 10/1 and 12/6 of the original Agency Agreement impose upon the Principal (the Respondent) the obligation to provide the General Agent (the Claimant) with all categories of tickets, documents, and everything necessary to facilitate the execution of the Agency Agreement. It added that Article 185 of the Egyptian Commercial Code stipulates that: "The Principal shall provide the Agent with all information necessary for the performance of the Agency and, in particular, shall furnish the Agent with the specifications of the goods, samples, drawings, trademarks, and other data that will assist the Agent in promoting and marketing the goods that are the subject of the Agency. "The Claimant further noted that, since the Respondent failed to fulfill any of these contractual obligations, it committed a serious fault giving rise to its contractual liability, in addition to violating the aforementioned provision of the law.

Under the heading "The Serious Fault Consisting of the Infringement of the Scope of the Agency Granted to the Claimant," the Claimant submitted that comparative law has recognized various forms of serious fault requiring compensation to the agent for any infringement upon the generality and exclusivity of the Agency. It further submitted that the agreement providing that the Agency was exclusive to the Claimant within the Arab Republic of Egypt concerned the Company's fundamental financial interests, its strategic plans for conducting its business, entering into the contracts necessary to perform the Agency Agreement, appointing the necessary personnel, and determining the expenditures incurred in carrying out the Agency. Furthermore, the agreement limiting the Agency exclusively to the Claimant constituted an essential element of the Agreement, and had this condition not existed, the Agreement would not have been concluded under the terms set forth therein and in light of the circumstances prevailing at the time of its execution.

Under the heading "The Serious Fault Arising from the Prolongation of Amicable Settlement Negotiations and the Obstruction of the Arbitration Proceedings," the Claimant submitted that the documents clearly demonstrate bad faith and a deliberate attempt to prolong the proceedings for 6 years by requesting one adjournment after another and sending one delegation after another solely for the purpose of prolonging the negotiations in an attempt to compromise the rights of the Claimant Company, which constitutes a fault on the part of the Respondent, thereby warranting compensation.

Under the heading "Damage to the Reputation of the Claimant Company," the Claimant submitted that, following the unilateral termination of the Agency Agreement, the Respondent continued, over a period of 6 years, to damage the commercial reputation of the Claimant Company, thereby adversely affecting the commercial relationships of its sister companies within the Al-Hussan Commercial Group in their dealings with companies in Iraq and neighboring Arab countries.

In Clause Nine of the Statement of Claim, entitled "Determination of the Nature of the Respondent's Liability," the Claimant Company stated that, since the Agency Agreement in dispute is subject to international conventions, Egyptian law, and the customs of international trade governing international commercial contracts, and since the Agreement was concluded for the mutual benefit of both parties with the purpose of achieving both financial and moral benefits for them, while the relationship between the two companies was governed by the duty of honesty and good faith, the Respondent's unilateral non-performance of the Agreement and its failure to pay the Claimant's entitlements constituted a serious fault throughout the performance of the Agreement, in addition to the damages resulting from the abuse of rights, giving rise to liability under both contractual and tortious principles in accordance with the applicable legal provisions.

Under the heading "The Respondent's Contractual Liability for the Breaches Committed During the Agreed Term for the Performance of the Agreement," the Claimant submitted that, since it has been established from the foregoing that the Agency in dispute is an agency

Where the Agency Agreement is concluded for the benefit of the Agent, the Agent may not be dismissed, nor may the Agency Agreement be restricted, without the consent of the party for whose benefit the Agency Agreement was granted. Accordingly, the dismissal of the Agent is invalid, and the Agency Agreement remains in force notwithstanding such dismissal. The Claimant supported this position by referring to the Preparatory Works of the Egyptian Civil Code, pp. 234 and 325, and the judgment of the Egyptian Court of Cassation rendered on 21/03/1963, together with the rulings of the Technical Office of the Court of Cassation, Vol. 14, Rule No. 52, p. 335. The Claimant concluded that the contractual relationship between the parties remained in force for the duration of the Agreement—3 years from the commencement of actual operations—and renewed automatically. Accordingly, contractual liability attaches to the Respondent.

Based on the foregoing, the Claimant submitted that the Respondent Company's breach is established by its failure to fulfill its obligations, its cancellation and subsequent suspension of the Agency Agreement, and its failure to pay the Claimant Company's dues and compensate it for the damages it suffered as a result, in addition to compensation for the damages resulting

from its failure to perform the contracts it had entered into with third-party tourism companies for the purpose of fulfilling its obligation to market travel tickets, freight services, transportation, and accommodation for tourist groups. The Claimant further submitted that, while the general rule is that compensation for contractual liability is limited to direct and foreseeable damages, this rule does not apply where the contracting party commits fraud or a serious fault. In such cases, the aggrieved party is entitled to compensation for all damages suffered, even those that were unforeseeable at the time the Agreement was concluded. In support of this position, the Claimant cited certain legal scholarship and judgments of the Egyptian Court of Cassation, on the basis that the Respondent Company's conduct constituted a breach of a legal obligation that it was prohibited from violating, with the resulting exclusion of the limitation periods applicable to contractual liability and the assessment of damages being subject to the broader discretion of the court hearing the dispute. After presenting the foregoing, the Claimant submitted that, since the Respondent Company terminated the Agreement without legal justification and by way of deceit, thereby committing a serious fault, it is liable for damages not only because it caused unlawful harm to the Claimant Company, but also because it failed to perform its contractual obligations.

In Section 10, entitled "The Legal Basis for Determining Compensation for the Respondents' Faults," and under the heading "Compensation for Faults Committed During the Term of the Agreement," the Claimant submitted that, during the term of the Agreement, compensation is governed by various rules and provisions contained in the UNIDROIT Principles of International Commercial Contracts, the Rome Convention on Contractual Obligations, and the relevant provisions of Egyptian law. In this regard, the Claimant Company relied on Article 7.4.2 of the UNIDROIT Principles of International Commercial Contracts, which provides: "1. The creditor is entitled to full compensation for the harm sustained as a result of non-performance; such harm includes both the loss suffered and the gain of which it has been deprived. 2. The harm may be non-monetary and may result, in particular, from psychological or moral injury." The Claimant also relied upon Article 148 of the Egyptian Civil Code and Article 163(2) of Egyptian Commercial Code No. 17 of 1999 (corresponding to Article 715 of the Egyptian Civil Code), which states: "If the contract is for a fixed term, it must be based on Termination must be based on a serious and acceptable cause; otherwise, the agent is entitled to compensation. The court also cited Article 188 of the Egyptian Commercial Code in this regard, which states:" "1. A contract agency is concluded for the mutual benefit of both parties. If the contract is of indefinite duration, the Principal may not terminate it without fault on the part of the Agent; otherwise, the Principal shall be liable to compensate the Agent for the damage sustained as a result of such termination, and any agreement to the contrary shall be null and void. 2. The Agent shall likewise compensate the Principal for any damage suffered if the Agent withdraws from the Agency at an inappropriate time and without an acceptable excuse."

The Claimant concluded that the termination of the Agreement by the Principal without a serious and legitimate reason constitutes an act of arbitrariness, entitling the aggrieved party to compensation. The Claimant further referred to scholarly legal opinions, submitting that, because the Respondent terminated the Agreement and subsequently suspended it upon the commencement of actual operations without a legitimate reason and in an arbitrary manner, thereby preventing specific performance, the Claimant is entitled to seek compensation pursuant to Article 215 of the Egyptian Civil Code.

Under the heading "Proof of the Respondents' Fault," the Claimant submitted that a contractual fault consists of the debtor's failure to perform an obligation arising under the contract, and that where the contractual fault is intentional, the debtor is liable even for unforeseeable damage. The Claimant further submitted that it has been held that contractual fault is, in itself, the act of non-performance constituting the breach of the contractual obligation, provided that the obligor has not established the existence of the external cause upon which it relies. In such circumstances, the occurrence of the breach alone is all that the claimant for compensation is required to prove, and once that fact has been established, the fault giving rise to the obligor's liability is likewise established. The Claimant therefore concluded that it was sufficient to prove the existence of the Agreement, to submit the notice of termination and subsequent suspension of the Agency Agreement, and the documentary evidence demonstrating that the termination and suspension were based solely on "instructions," as acknowledged by the Respondent, while the burden rested upon the Respondent to establish that it had fulfilled its contractual obligations. The Claimant further submitted that the Respondent Company's obligation to deliver the Iraqi Airways office on Qasr Al-Nil Street, its office at the airport, the tickets necessary for the Claimant Company to carry out its activities, and the payment of expenses and commissions constituted an obligation of result. Accordingly, if the Respondent failed to perform those obligations, or delivered the premises only to seize them thereafter, and failed to provide travel and cargo tickets, it would have breached its contractual obligations because the intended contractual purpose had not been achieved.

Under the heading "Damages Resulting from the Respondents' Fault," the Claimant submitted that these damages vary according to the nature of the contractual faults, in addition to the tortious faults committed by the Respondents, as previously explained.

Under the heading "The Causal Relationship Between the Fault and the Damage," the Claimant submitted that this causal relationship is established pursuant to Article 215 of the Egyptian Civil Code, adding that this is supported by comparative law and the substantive legal rules applicable in arbitration. The Claimant further submitted that the doctrine of objective liability places the burden of proof upon the Principal, namely the Respondents. Accordingly, the unilateral termination and subsequent suspension of the Agency Agreement in the absence of the Claimant constitutes a fault on the part of the Respondents that is, in itself, sufficient to establish the Claimant's entitlement to compensation.

Under the heading "Regarding the Considerations on Which the Compensation Is Based," the Claimant company stated that the considerations underlying compensation in the present dispute vary according to the variety of faults committed by the Respondents and listed among them the material expenses incurred by the Claimant company. Under this heading, it stated: A. It incurred substantial expenses to equip and establish the Principal's headquarters on Qasr Al-Nil Street in downtown Cairo, in addition to the expenses it incurred in completing the necessary procedures, obtaining the approvals and licenses required to conduct business, and settling the Principal's debts to the Egyptian Civil Aviation Authority and various other entities, as requested by the Principal and as set forth in the Agreement and its Addendum. These conditions were imposed upon the Agent, who was compelled to accept such onerous terms considering the circumstances prevailing in Iraq from the time the Agreement was concluded until its cancellation and suspension and continuing to the present. B. Loss of Clients. The unilateral cancellation of the

Agency Agreement and its subsequent suspension caused the Agent to lose the clients it had acquired and helped expand, resulting in substantial financial and commercial losses. At the same time, the Respondents benefited from the efforts and expenses incurred by the Claimant in attracting those clients. C. The Need to Restructure and Compensate the Agent's Employees. Based on the foregoing, the Claimant submitted that the cancellation and suspension of the Agency Agreement required the Agent to undergo a lengthy process of reorganizing and restructuring its business and addressing the considerable difficulties arising from replacing its operations through a similar contract, in addition to compensating its employees for the interruption of their employment and continuing to pay their salaries until the arbitration claim was filed. D. The Claimant further submitted that, in general, all circumstances surrounding the Agreement must be considered. The Claimant asserted that the Respondent company acted in bad faith, notwithstanding the Claimant's performance of its contractual obligations in good faith, honesty, and integrity. This was evidenced by the Claimant's establishment of the company necessary to carry out the Agency at its current headquarters located at 9 Al-Shaheed Gamal Barai Street, Ard Al-Golf, in premises commensurate with the size and value of the Agency and adequate for the performance of the duties entrusted to it. The Claimant also prepared the Iraqi Airways office at 22 Qasr Al-Nil Street, settled the Respondent's debts to the Egyptian Civil Aviation Authority, concluded the necessary agreements to obtain the operating licenses required to conduct business, established the company's office at Cairo Airport, entered into agreements and contracts with travel agencies throughout the Republic for the distribution of passenger tickets and cargo services on the routes covered by the General Agency, concluded the contracts necessary to arrange accommodation and transportation for tourist groups arriving from Iraq throughout the year, and carried out the advertising necessary to preserve the Respondent company's name in the Egyptian tourism and travel market. The Claimant further stated that, notwithstanding all of the foregoing, the Respondent failed to perform the Agreement in good faith, honesty, and integrity, as the Claimant was unable to obtain the material resources and essential information necessary to facilitate and enable it to perform its duties. The necessary airline tickets were never delivered, nor were the aircraft required to carry out the Agency made available, based solely on "instructions." Nevertheless, as soon as circumstances changed and actual flight operations commenced, the Respondent hastened to cancel and then suspend the Agency Agreement unilaterally, and placed its own airline operations in the office designated for ticket sales and the marketing of tourism and travel services at 22 Qasr Al-Nil Street, thereby disregarding all the expenditures incurred by the Claimant company in equipping the premises, settling the debts owed by Iraqi Airways, and fulfilling all of its contractual obligations under the Agreement.

While awaiting the moment to reap the rewards, the Agency Agreement was cancelled and subsequently suspended by the Respondent company, which constitutes a serious fault giving rise to liability and compensation.

Under the heading "Elements of Compensation," the Claimant reiterated its reference to the Article 7.4.2 and, commenting on that provision, stated that it is clear that the elements of compensation are: 1. Compensation to the Claimant company for the losses it sustained. 2. Compensation to the Claimant company for the loss of opportunity or loss of profits. 3. Compensation to the Claimant company for psychological or moral damages.

Regarding the first element, entitled "Compensation to the Claimant Company for the Losses It Sustained," the Claimant stated that it is evident from the documents attached to the Statement of Claim that compensation consists of the Claimant company's right to recover the expenses it incurred and to obtain full compensation for the damage it sustained. Although the Agency Agreement is, by its nature, a consensual contract, it is binding upon both parties. Accordingly, the Principal is, in all circumstances, obligated to reimburse the Agent for all expenditures incurred in the performance of the Agency and to compensate the Agent for any damages sustained. In support of this argument, the Claimant referred to what it stated was the judgment of the Egyptian Court of Cassation in Appeal No. 72 of Judicial Year 19, Technical Office 2, p. 294, session of 01/02/1951. The Claimant further stated that Article 7.3.6 of the UNIDROIT Principles of International Commercial Contracts (2004 edition) provides: "Upon termination of the contract, either party may claim restitution in kind of what it has supplied, provided that it returns everything it has received. If restitution in kind is not possible or appropriate, restitution shall be made by a monetary payment whenever reasonable." The Claimant further stated that it had established, equipped, renovated, maintained, and operated the Respondent company's headquarters at 22 Qasr Al-Nil Street, Cairo, as well as its office at the airport, pursuant to Clause 6(b) of the Agency Agreement, which provides: "The Second Party's performance of service and marketing functions shall include: a. … and the appointment of employees. b. Providing, repairing, and renovating the premises necessary for the First Party to conduct its business in the country of the General Agent. "The Claimant also employed personnel to perform the Agency Agreement pursuant to Clause 6(1) of the Agreement, which provides: "The Second Party's performance of service functions shall include: a. …and appointing qualified employees to perform such duties efficiently." The Claimant further stated that it entered into contracts with tourism companies, tourist villages, and other entities, thereby serving the interests of the Respondent company. Accordingly, the Claimant is entitled to recover all expenditures incurred in that regard.

The Claimant further submitted that it is entitled to compensation for the indemnities and contractual penalties it paid to the companies with which it contracted to perform the obligations arising under the Agency Agreement. To carry out its business and fulfill its contractual obligations, the Claimant entered into agreements with numerous tourism companies, transportation companies, and tourist villages to market airline tickets and promote cargo operations on Iraqi Airways. As soon as operations commenced, however, and following the Respondent's cancellation of the Agency Agreement and the dissemination of that news throughout the tourism market, the companies that had contracted with the Claimant demanded compensation as a result of the Claimant's inability to perform its obligations, thereby causing it substantial losses. This ultimately led to the settlement of those disputes and the payment of compensation in the amount of USD $103,666,858 (one hundred three million, six hundred sixty-six thousand, eight hundred fifty-eight United States dollars), as stated by the Claimant.

Under the heading "The Second Element," the Claimant stated that the Claimant company should be compensated for its loss of profits. The Claimant noted that international arbitral tribunals of the International Chamber of Commerce (ICC) and the International Centre for Settlement of Investment Disputes (ICSID) have recognized the right to compensation for the loss of a genuine opportunity. In this regard, the Claimant referred to the award rendered by an arbitral tribunal of ICSID in Washington in Case No. 267, registered with the Centre in 2004,

which held that: *"Indonesian law, like all civil law systems, requires that compensation for loss cover the entirety of the damage, including both actual loss and anticipated loss."* The Claimant noted that this award is published in: E. Gillard: *La jurisprudence de CIRDI*, 2004, Vol. I, p. 151.

The Claimant further submitted that the forms of genuine loss of opportunity suffered by the Claimant company are varied, thereby entitling it to compensation for the cancellation and subsequent suspension of the Agreement. It further argued that the Egyptian legislature has regulated compensation for the unlawful and arbitrary termination of an agency agreement of indefinite duration, considering such termination to constitute a presumed fault on the part of the Principal pursuant to Article 188 of Commercial Code No. 17 of 1999, contained in the chapter governing commercial agency. Accordingly, Egyptian law recognizes the principle of compensation for the unlawful and arbitrary termination and subsequent suspension of an agency agreement. Consequently, the Claimant company is entitled to compensation for the unlawful and arbitrary cancellation and subsequent suspension of the Agency Agreement, particularly since it has been established that it committed neither fault nor negligence, as evidenced by the renewal of the General Agency Agreement through the 2005 Addendum, which contained no reference whatsoever to any negligence on the part of the Claimant. This is further supported by the Claimant's successful performance of its obligations in preserving the name and trademark of Iraqi Airways despite the suspension of its operations, as well as its continued promotion of Iraqi Airways' flights and tourist groups until 2005, thereby entitling the Claimant company to seek compensation in the amount of one million dollars.

Under the heading "The Claimant Company's Right to Collect the Commissions Specified in the Agreement for the Operations Carried Out by the Respondent Company During the Term of the Agreement," the Claimant stated that Clauses 11/1, 11/2, 11/3, 11/5, and 11/6 of the Agreement provide that the Claimant (the Agent) is entitled to receive commissions at the agreed rates even where the Respondent company (the Principal) itself carried out the agreed operations. The Claimant further submitted that, because the Respondent company refused to provide an accounting statement identifying those operations, the Claimant is entitled to rely upon the approved feasibility study, which demonstrates that the total amount claimed is $ 497,096,579 USD (four hundred ninety-seven millions, ninety-six thousands and five hundred and seventy-nine United States Dollars).

Under the heading "Compensation for Delay in Paying the Claimant Company's Entitlements Despite Formal Notice," the Claimant submitted that, although the legislatures of both Egypt and Iraq exempted the Claimant from the requirement of serving formal notice pursuant to Article 219 of the Egyptian Civil Code and Article 4-258 of the applicable Iraqi Civil Code, the Respondent company expressly declared in writing that it refused to perform its obligations and sent the Claimant company written notice cancelling the Agency Agreement on 14/11/2005, followed by a decision suspending the Agency Agreement on 16/11/2005. Nevertheless, the Claimant formally notified the Respondent and demanded payment of the Claimant company's outstanding entitlements pursuant to several Notices were served by a bailiff pursuant to Article 257 of the Iraqi Civil Code. Consequently, the Respondent company's delay in paying compensation became a legally recognized delay pursuant to the jurisprudence of the Egyptian Court of Cassation. In this regard, the Claimant referred to what it stated was a judgment of the Egyptian Court of Cassation, Civil Chamber, rendered on 12/11/1965, *Collection of Judgments*,

Vol. 16, p. 1028. The Claimant further submitted that, once the Respondent's delay in performing its obligation has been established, the Respondent becomes liable to compensate the Claimant company for the damages resulting from such delay after formal notice, pursuant to Article 217 of the Egyptian Civil Code and Article 259 of the Iraqi Civil Code. Such compensation extends to damages arising from the termination of the contract, including loss of profits and future damages ("Préjudice Futur"), as well as loss of opportunity ("Perte de Chances"). The Claimant further submitted that this is consistent with the settled jurisprudence of the Egyptian Court of Cassation, which has held that the loss of an opportunity constitutes an actual loss for which compensation must be awarded, and that no argument that the opportunity was merely a hope should be entertained, since such a contention is incompatible with an established fact. The Claimant emphasized that it was the sole and exclusive agent and that there was no dispute regarding the continuation of reservations, travel, air transportation, and cargo services between the two countries.

The Claimant further submitted that, because compensation is assessed according to the value of the damage as it exists at the time the final judgment is rendered, rather than at the time the damage occurred, and because the damage is capable of changing over time, the judge must assess compensation based on the value of the damage as it exists at the time of the final judgment rather than as it existed when the damage first occurred.

The Claimant concluded by requesting that the Arbitral Tribunal determine the amount of compensation and interest for late payment on the outstanding expenses and commissions in light of the increasing losses sustained by the Claimant company as a result of the delay in payment of its entitlements. The Claimant estimated such compensation at 11% of the total amount claimed, and in no event less than the prevailing interest rate of the Central Bank from the date the claim was first asserted.

Under the heading "The Third Element: Compensation for Moral Damage," the Claimant submitted that compensation for moral (non-pecuniary) damage is a well-established principle of private international law. It referred to Article 7.4.2 of the UNIDROIT Principles of International Commercial Contracts, which provides: "Harm may be non-pecuniary and may result, in particular, from psychological or moral injury. "The Claimant also referred to Article 1/22 of the Egyptian Civil Code, which it stated corresponds to Article 169(3) of the Iraqi Civil Code, providing that: "Compensation shall also include moral damage." The Claimant further noted that the Egyptian Court of Cassation ruled on this issue in Civil Cassation Appeal of 30/03/1994, *Collection of Court of Cassation Judgments*, Year 45, p. 598, holding that: "Compensation for moral damage is not intended to erase or eliminate this type of injury, for it is a form of damage that cannot be erased or eliminated by monetary compensation. Rather, its purpose is to provide the injured party with something in substitution for the moral harm suffered. The loss itself does not disappear, but is accompanied by a benefit that compensates for it." The Claimant further submitted that this principle has likewise become well established in international arbitral jurisprudence concerning compensation for moral damage. In support of this proposition, it referred to the 2008 ICSID award in *Desert Line*, in which the tribunal awarded compensation for the moral damage suffered by the investor as a result of unlawful conduct by the State or one of its entities. The Claimant further submitted that, in reaching that conclusion, the tribunal based its award of compensation for moral damage on Article 31 of the International Law

Commission's Articles on Responsibility of States for Internationally Wrongful Acts International Law Commission (ILC) Articles, which provide that: "1. A State is responsible for full reparation for the injury caused by an internationally wrongful act. 2. Such injury includes any damage, whether material or moral (resulting from the State's internationally wrongful act)." The claimant further stated that, accordingly, the respondent company's and the Iraqi Ministry of Transport's deliberate refusal to perform the contract broadened the scope of compensation to include unforeseeable damage, including compensation for the non-pecuniary harm suffered by the claimant company as a result of the respondents' bad faith in terminating the contract, which damaged the claimant company's commercial reputation.

The claimant concluded its submissions on this issue by stating that it is clear that compensation should cover the non-pecuniary harm resulting from the unlawful and arbitrary termination and suspension, in violation of the law and the terms of the agency agreement, as well as the damage to the claimant company's reputation among companies and individuals associated with it in the Egyptian market, the Iraqi tourism and travel market, and other companies operating in various sectors. It further noted that Horse Company and its founder had been involved in relief efforts for the Iraqi people during the crisis brought about by the blockade imposed for many years, which caused the company compounded losses as commercial dealings with companies affiliated with Horse ceased as a result of the damage to its commercial reputation caused by the unlawful and arbitrary termination and suspension. This also deprived the company of opportunities to earn profits in other commercial activities that it had been carrying out under the United Nations Oil-for-Food Programme. The claimant company estimated the compensation sought under this head at five hundred million United States dollars.

Under the heading "Grounds for the Minister of Transport's Responsibility," the claimant company stated that the Minister represents the Ministry in all lawsuits and appeals brought by or against the Ministry and its affiliated departments and agencies. It further noted that this principle was affirmed by the Egyptian Court of Cassation in Appeals Nos. 2739 and 2934 of Judicial Year 59, decided on 23/06/1996, Technical Office, Vol. 47, Part 2, p. 985.

Under the heading "Liability of the Principal for the Acts of Its Agent," the claimant company argued that the Minister of Transport bears liability on the basis of a principal's responsibility for the acts of its agent, and that the Ministry of Transport is likewise responsible for issuing the decision to terminate the contract and subsequently suspend it pursuant to State directives and without any legitimate factual or legal basis, while insisting on maintaining that position. The claimant submitted that this is evident from the correspondence exchanged between the Ministry and the company, and between the first respondent company and the claimant company, as reflected in the documentary exhibits. It further referred to Appeal No. 3221 of Judicial Year 61, decided on 14/12/1996, Technical Office Reports, Vol. 47, Principle No. 178, p. 1528, in which the Court held: "All persons responsible for a wrongful act are jointly liable to compensate the creditor for the full amount of the damage, without apportionment. The creditor may pursue any one of them individually or all of them jointly, pursuant to Articles 169 and 258 of the Civil Code."

The claimant concluded this section by requesting that the arbitral tribunal accept the request for arbitration and, on the merits, grant all of the relief sought in its Statement of Claim.

Thereafter, the claimant company submitted to the arbitral tribunal, together with its Statement of Claim, six document binders, which were reviewed by the arbitral tribunal. Their contents were as follows: The first binder contained four documents consisting of twenty-two pages reviewed by the Arbitral Tribunal: The first document, as indicated on the cover of the folder, is a photocopy of a General Agency Agreement dated 30/01/2001 between the claimant company and the respondent company. The second document, as indicated on the cover of the folder, is a photocopy of an addendum to the agency agreement dated 15/03/2001. The third document, as indicated on the cover of the folder, is a photocopy of the agency agreement in English. The fourth document, as indicated on the cover of the folder, is a photocopy of the minutes of a meeting regarding the reactivation of the agency agreement and its addendum. The second folder contained a single one-page document; its cover indicated that it was a photocopy of the decision terminating the General Agency dated 12/2/2004, based on directives of the State in Iraq. The third folder contained a single one-page document; its cover indicated that it was a photocopy of the decision terminating the agency for the second time, dated 14/11/2005, based on the respondent company's desire to undertake the operations itself. The fourth folder contained a single one-page document; its cover indicated that it was a photocopy of the decision suspending the agency dated 16/11/2005, alleging that the claimant company had committed a number of violations, which are not supported by the documents, and concealing the true reason behind the suspension, namely the respondent company's desire to conduct operations directly through its office in Cairo. The fifth folder contained a single one-page document; its cover indicated that it was a photocopy of a letter from the Iraqi Minister of Transport addressed to the General Secretariat of the Iraqi Council of Ministers, stating: "The termination of the agency was based on the claimant company's classification as one of the front companies." The sixth folder contained a single document consisting of seven pages, as indicated on its cover. The cover stated that it was a photocopy of a notice issued by the respondent company, accompanied by "an addendum to the General Agency Agreement amending the provisions of the contractual framework governing the agency and the settlement of the dispute, requesting that the claimant waive recourse to arbitration and refrain from asserting any claims against the respondent, which confirms that the agency agreement that is the subject of the present arbitration remains in force."

The claimant company also submitted, at the seat of arbitration, together with its Statement of Claim and the aforementioned folders, pursuant to a letter of authorization addressed by the Chairman of the Board of Directors of the claimant company to the Chairman of the Arbitral Tribunal, in the name of Mr. Taha Fawzi Abdel-Hafez, the certified public accountant authorized by the company to submit the documents, seven copies of the documents that the claimant company stated constituted the accounting and financial records supporting its claims in the arbitration proceedings, while reserving its right to submit additional documents relating to the same heads of claim. Attached to the letter was an index of those documents for two cartons (out of seven copies), which the Arbitral Tribunal reviewed. According to the index, and as stated by the claimant company, they consisted of photocopies of the following: Box No. (1), containing: 1. Feasibility study. 2. Response to the alleged violations. 3. Payments made to Iraqi Airways. 4. Fixed assets.  5. Export contracts that were not performed due to the termination of the agency

agreement. Box No. (2), containing: 1. General and administrative expenses for 2002, Group (A) and Group (B). 2. General and administrative expenses / rent.  3. Calculation of bank interest on delayed collections resulting from the termination of the agency agreement. 4. Landline and mobile telephone expenses for the years 2003, 2004, 2005, 2008, 2010, and 2012. 5. General and administrative expenses relating to the advertising and publicity campaign.

The Arbitral Tribunal noted that these documents were submitted in two boxes accompanied by the aforementioned index, without indicating the number of pages, their dates, or a detailed description of their contents. The arbitrators and the respondent company were notified of the filing of the aforementioned statement and documents by email and registered mail with acknowledgment of receipt.

On 30/12/2013, the respondent company received a copy of the statement of claim, the documents, and all of the foregoing.

On 1/1/2014, the claimant company also filed another box of documents at the seat of arbitration, which the Arbitral Tribunal reviewed. According to the claimant company and the attached index, it contained photocopies of the financial statements covering the period from 1/3/2001 to 30/9/2013, together with the payroll records and social insurance contributions for the employees of the General Agent for Iraqi Airways from 2001 to 2013. However, the claimant company did not specify in the submitted index the number of pages, the dates, or a detailed description of the documents contained in the second box. The arbitrators and the respondent company were notified of the filing of the aforementioned statement and documents by email and registered mail with acknowledgment of receipt.

(22) The Respondent's Response and Comments on the Statement of Claim and the Documents Submitted with the Response and Comments

On 27/1/2014, Mr. Ahmed Al-Dareeni Abdulaziz, counsel for the respondent company and its legal representative, filed a letter at the seat of arbitration addressed to the Arbitral Tribunal. In the letter, he stated that, in response to the Tribunal's request for a power of attorney authorizing arbitration and the conduct of its proceedings by those authorized to represent the Iraqi Airways General Company, he was submitting a copy of the power of attorney following its registration with the Real Estate Registration Office. Attached to the letter was an official filing certificate issued by the Bar Association Notarization Office under No. 291/B/2014, dated Wednesday, 22/1/2014, confirming the filing of the instrument issued in his favor by the Iraqi Airways General Company and issued by the Mission of the Arab Republic of Egypt in Baghdad under No. 29 dated 14/1/2014, authenticated by the Egyptian Ministry of Foreign Affairs under No. 7195 on 22/1/2014, with the authentication of Ahmed Orabi. The stated purpose of the filing was to preserve the document in the office's archives. Attached to the filing certificate was the power of attorney, which provides as follows: "Pursuant to the legal powers vested in us under the provisions of the Internal Regulations of the Iraqi Airways General Company No. 20 of 2000, as amended and in force, I hereby appoint, in addition to my own authority, both Mr. Ahmed Al-Dareeni Abdulaziz, our company's attorney in the Arab Republic of Egypt, and Mr. Qasr Ahmed, his deputy and the manager of our Cairo office, jointly or severally, to represent the Iraqi Airways General Company in the arbitration commenced by Horse Tourism and Travel

Company. They are authorized to attend arbitration hearings and pleadings, submit defenses, submit and receive memoranda and documents, file applications before the Arbitral Tribunal, request the appointment of experts, examine witnesses, submit all applications supporting the company's position in the arbitration, receive arbitral awards, obtain writs of execution, enforce the decisions of the Arbitral Tribunal, challenge those decisions, challenge any arbitration procedure, and take all necessary legal measures necessary for the benefit of the company as required; to that end, this power of attorney was signed by Mr. Saad Mahdi Saeed Al-Khafaji, General Manager and Chairman of the Board of Directors."

The respondent company also filed seven copies of its response to the statement of claim, consisting of ninety-nine pages. The first page of the response and comments states that it was submitted by:

1. The legal representative of the Iraqi Airways General Company (in his official capacity).
2. Mr. / The Iraqi Minister of Transportation (in his official capacity).

The respondents opened their response and comments to the statement of claim under the heading "Facts," stating that on 30/1/2001 the Iraqi Airways General Company in Baghdad (the respondent company) entered into a General Agency Agreement with Horse Tourism and Travel Company (the claimant company), a company established and licensed under Egyptian law, subject to the terms and obligations set forth in the Agreement and its addendum dated 15/3/2001. They further stated that, since Horse Tourism and Travel Company (the claimant company) failed to obtain the approval of the governmental authorities and failed to perform any of the obligations arising under the terminated agency agreement or its addendum—and for other reasons that would be addressed in their response to the claimant company's statement of claim—the respondent company suffered substantial harm as a result of the claimant company's failure to perform its obligations. Accordingly, it exercised its legal right, as provided for in the terminated agency agreement and by law, to terminate the agency agreement concluded with the claimant company on 17/5/2005. The respondents further stated that the respondent company took the termination measures in accordance with the provisions agreed upon in the terminated agency agreement and within the agreed legal time limits. They further stated that, while every amicable effort was made pursuant to Article 16 of the terminated agency agreement with a view to reinstating the terminated agency agreement and entering into a new contract with the claimant company, the claimant company wrongfully alleged that it had financial claims against the respondent company. They added that the respondent company found the claimant company to have acted without credibility and with intransigence regarding the performance of its obligations in the event a new contract was concluded after the termination of the previous agency agreement. In light of the claimant company's insistence that it had financial claims against the respondent company, all amicable efforts undertaken by the respondent company failed. The claimant company then resorted to delay and procrastination, made no effort to pursue its alleged rights—if any—and allowed years to pass in such delay until it announced, on 4/8/2011, its intention to resort to arbitration pursuant to Article 16 of the terminated agency agreement. The respondents further stated that the respondent company had in fact appointed an arbitrator on its behalf, that the Chairman of the Arbitral Tribunal was appointed by the Cairo Court of Appeal in accordance with the law, and that the first procedural hearing in the arbitration was scheduled for 28/11/2013. At that hearing, the claimant company gave a brief

presentation of the principal points of its case. On 28/12/2013, the claimant company filed its statement of claim, accompanied by document binders, and submitted 2 boxes containing photocopies of the documents on which its claims were based.

Under the heading "Defense," the respondents began their response to the statement of claim by asserting that the claimant company's allegations are not supported by either the facts or the law and are based solely on unfounded allegations, for the following reasons:

First: The respondents challenged the validity of the arbitration proceedings on the ground that the constitution of the Arbitral Tribunal was contrary to the law and the international rules applicable to international arbitration. In explaining this defense, the respondents stated that the parties to the terminated agency agreement had previously agreed, pursuant to Clause 16, that: "In the event of any dispute concerning the interpretation or application of this Agreement, both parties shall exert their utmost efforts to resolve the dispute by appropriate means within 3 days only. If no settlement is reached, they shall constitute the arbitral tribunal as follows: 1- The first party shall appoint one arbitrator. 2- The second party shall appoint one arbitrator. 3- The two arbitrators shall consult with each other to appoint the Chairman of the Arbitral Tribunal. If they fail to do so, the Regional Director of IATA shall appoint the Chairman of the Arbitral Tribunal." The respondents stated that this document was submitted as part of Document File No. 1. They further argued that Article 17, paragraphs 2 and 3, of Law No. 27 of 1994 provide that: "2- If the parties fail to comply with the procedures for appointing arbitrators agreed upon between them, or if the appointed arbitrators fail to agree on a matter requiring their joint decision, or if a third party fails to perform the function entrusted to it in this respect, the court referred to in Article (9) of this Law shall, upon the request of either party, carry out the required procedure or act, unless the agreement provides for another method of carrying out such procedure or act. 3- In appointing the arbitrator, the court shall take into account the conditions required by this Law and those agreed upon by the parties."

The respondents further stated in their response to the statement of claim that, based on Clause 16 of the terminated agency agreement, under which the parties agreed that, in the event of a failure to agree upon the Chairman of the Arbitral Tribunal, recourse should be made to the regional office of IATA, the authority designated by agreement to appoint the presiding arbitrator is therefore the IATA Regional Office.

The respondents further argued that, although Article 17(2) entrusts the court referred to in Article 9 of the Arbitration Law with resolving disagreements between the parties concerning matters not previously agreed upon, the legislature expressly restricted both the parties and the court by providing, at the end of that paragraph, that the court's authority under that provision does not apply where the parties have agreed upon another method for carrying out the relevant procedure or act. Accordingly, both the parties to the dispute and the court are bound by the parties' prior agreement in the contract, namely, that if the two arbitrators fail to agree on the appointment of a presiding arbitrator, the IATA Regional Office shall appoint the presiding arbitrator. The respondents further stated that paragraph 3 of the same Article 17 reaffirms that both the arbitrators and the court must respect the parties' agreement, providing that:

"3- In appointing the arbitrator, the court shall take into account the conditions required by this Law and those agreed upon by the parties."

The respondents argued that the Court had violated the agreement set forth in Article 16 of the agency agreement regarding the appointment of the arbitrator, as it had applied to the Court for the appointment of a presiding arbitrator. They contended that the Court should have ruled that it lacked jurisdiction to hear the dispute, since, pursuant to Article 17 and in accordance with the parties' agreement in Clause 16 of the terminated agency agreement, original jurisdiction rested with the Regional Office of IATA. The respondents maintained that this was confirmed by the Regional Director of IATA in a letter obtained by the respondent company, which was submitted to the Court in support of a petition for reconsideration of the judgment it had rendered, on the ground that the respondent company had obtained an important document after the issuance of the judgment. They further contended that the claimant company had obtained a letter from the IATA Regional Office by providing inaccurate information and misrepresenting the facts. As a result, the letter incorrectly stated that IATA lacked jurisdiction to appoint a presiding arbitrator and that such jurisdiction belonged to the Egyptian courts. The respondents further asserted that the letter had merely been drafted as a courtesy to the Court, since the terminated agency agreement contained no provision granting the Egyptian courts jurisdiction to appoint the presiding arbitrator. The respondents further argued that IATA—the Regional Office— subsequently corrected this error by providing the respondent company with a letter rectifying the mistake and confirming IATA's jurisdiction to appoint the presiding arbitrator. They noted that this letter was submitted in Document File No. "1." The respondents further argued that the claimant company's contention that Clause 16 of the addendum to the agency agreement amended Clause 16 of the terminated agency agreement was based on an erroneous interpretation. They stated that Clause 16 of the addendum to the terminated agency agreement provides: *"The contracting parties shall settle all developments and disputes arising between them through amicable means, and if they fail to resolve any matters or services arising between them, such matters shall be resolved by an arbitral tribunal agreed upon by the contracting parties."* They argued that a reading of this clause makes it clear that it does not constitute an arbitration clause or an arbitration agreement, as it is vague, imprecise, and general in nature. The respondents further submitted that Article 16 of the terminated agency agreement specifically sets out the number of members of the arbitral tribunal, the method for their appointment, the method for appointing the presiding arbitrator, the applicable law, and the party responsible for bearing the costs of arbitration. Accordingly, they argued that Article 16 constitutes the original and operative arbitration clause, while the subsequent provisions merely refer to and reaffirm it. They further contended that Clause 16 of the addendum to the agency agreement does not constitute an arbitration clause or an arbitration agreement because the addendum to the terminated agency agreement, dated **15/3/2001**, supplements and completes the original terminated agreement rather than amending it, and they referred in this regard to their Document File No. "1." The respondents further stated that Article 1 of the addendum to the terminated agency agreement, dated **15/3/2001**, approved the provisions contained therein, which are deemed an integral part of the agency agreement. Consequently, the addendum forms an inseparable part of the original agreement and merely supplements it. They further referred to Article 7(6) of the UNCITRAL Model Law on International Commercial Arbitration, which defines an arbitration agreement as follows: *"A reference in a contract to any document containing an arbitration clause constitutes an arbitration agreement in writing, provided that*

*the reference is such as to make that clause part of the contract."* They also referred to Article 10 of Law No. 27 of 1994. The respondents concluded that, accordingly, the operative provision governing the constitution of the arbitral tribunal is Clause 16 of the terminated agency agreement, and that the company respondent further stated that the court itself had acknowledged this and concluded its argument on this point by asserting that the composition of the arbitral tribunal was invalid for the reasons previously set forth, as well as for other reasons, and requested that this procedural objection be upheld.

Under the second clause of the Statement of Defense, the respondent argued that the arbitration proceedings were invalid because the composition of the arbitral tribunal was contrary to the law and the international rules governing arbitration. In support of this argument, the respondent submitted that, in accordance with established international practice in the field of international arbitration and Article 11(5) of the UNCITRAL Model Law on International Commercial Arbitration, which provides that: "In appointing an arbitrator, the court shall have due regard to any qualifications required of the arbitrator by the agreement of the parties and to such considerations as are likely to secure the appointment of an independent and impartial arbitrator; and, in the case of a sole or third arbitrator, shall also take into account the advisability of appointing an arbitrator of a nationality other than those of the parties." the court, when requested to appoint the presiding arbitrator (the third arbitrator), was required to appoint an arbitrator of a nationality other than that of either party. The respondent therefore contended that the composition of the arbitral tribunal violated the international rules and principles governing arbitration and that, accordingly, the court should have appointed the Chairman of the Arbitral Tribunal from a nationality different from that of the parties to the dispute. Although the appointed chairman satisfied the requirements of impartiality, independence, integrity, and expertise, the respondent argued that the defect was procedural in nature and therefore invalidated both the arbitration proceedings and the constitution of the arbitral tribunal.

Under the third clause of the Statement of Defense and Response to the Statement of Claim, the respondent argued that the claimant company's right to resort to arbitration had lapsed pursuant to the terminated agency agreement. In this regard, the respondent submitted that Clause 16 of the terminated agency agreement constitutes a procedural provision governing the resolution of disputes that may arise under that agreement. It sets out the procedure agreed upon by the parties in the event of any dispute concerning the interpretation or implementation of the agreement, prescribes the steps to be followed in the event of such a dispute, and specifies the time limits within which those procedures must be carried out. According to the respondent, the clause provides: "In the event of any dispute concerning the interpretation or implementation of this Agreement, the parties shall make every effort to resolve the dispute amicably through appropriate means within three days only. If no settlement is reached, they shall appoint an arbitral tribunal in the following manner..." The respondent further argued that the clause allows the parties only three days to exert every effort to resolve any dispute arising between them concerning the interpretation or implementation of the agreement through appropriate—that is, amicable—means, in order to preclude any attempt to delay the proceedings. If no amicable settlement is reached, the parties are required to proceed immediately to arbitration.

The respondent further contended that the pursuit of an amicable settlement had continued for more than six years, thereby constituting a breach by the claimant of the arbitration clause

contained in Clause 16 of the terminated agreement and an implied waiver of its right to resort to arbitration. In support of this contention, the respondent relied on Article 6 of Law No. 27 of 1994, which provides: "Where the parties to an arbitration agreement agree that the legal relationship between them shall be governed by the provisions of a model contract, an international convention, or any other document, the provisions of that document—including those relating to arbitration—shall apply." The respondent further referred to the Explanatory Memorandum to the Law, which states: "By introducing this provision, the legislature intended to respect the autonomy of the parties to the arbitration and to leave them free to determine the procedural rules governing their arbitration the legislature intended thereby to respect the autonomy of the parties and to grant them the freedom to organize the arbitration in the manner they deem appropriate, for such freedom is the cornerstone of the arbitration system; if it is lost, arbitration loses its identity."

Under the fourth clause of the Statement of Defense and Response to the Statement of Arbitration Claim, the respondent challenged all photocopies submitted by the claimant company. In this regard, the respondent argued that photocopies have no evidentiary value and that the Court of Cassation has consistently held that copies of private documents have no probative force except insofar as they lead to the original document; if the original exists, it must be referred to as the evidence, whereas if it does not exist, there is no basis for relying on photocopies because they do not bear the signature of the person who issued them. Based on the foregoing, the respondent concluded that, pursuant to the aforementioned legal principle and upon reviewing the documents submitted by the claimant company, it is evident that they are all merely photocopies. Accordingly, the respondent maintained its challenge to all of them and requested that they be disregarded.

Under the fifth clause the Statement of Defense and Response to the Statement of Arbitration Claim, the respondent requested that the arbitration claim be dismissed on the grounds that the claimant had failed to produce the original documents and had submitted documents in a foreign language without certified Arabic translations, contrary to Article 19 of the Judicial Authority Law. In support of this defense, the respondent submitted that the parties had agreed to adopt Arabic as the language of the arbitration and that, with the parties' consent, the arbitral tribunal had determined that Egyptian law would govern the subject matter of the arbitration. Accordingly, if the claimant elected to prove its case through documentary evidence, those documents were required either to be in Arabic or to be accompanied by certified Arabic translations if drafted in a foreign language. Otherwise, such documents would be inadmissible and neither the court nor the arbitral tribunal could consider them, since Arabic is the language of the arbitration. The respondent further relied on the jurisprudence of the Court of Cassation, which has held that Arabic is the official language of the State and must be used exclusively pursuant to Article 2 of the Constitution, and that judicial proceedings, the submission of evidence, and the issuance of judgments must all be conducted in Arabic in accordance with Article 19 of the Judicial Authority Law. The respondent further argued that, applying these legal principles to the present dispute, the claimant company had submitted, among the unauthenticated photocopies, documents drafted in a foreign language, in violation of the provisions of the Judicial Authority Law and the rulings of the Court of Cassation. Since the parties had agreed that Arabic would be the language of the arbitration and that Egyptian law would govern the dispute, the respondent requested that the photocopies and the foreign-

language documents be disregarded and that the claim be treated as having been filed without supporting documentary evidence. Consequently, the respondent argued that the arbitration claim should be dismissed in its present form for lack of supporting evidence.

Under the sixth clause of Defense and Response to the Statement of Arbitration Claim, the respondent argued that the claimant company's right to bring the claim had lapsed because more than two years had elapsed since the termination of the contractual relationship. In this regard, the respondent noted that, on page 17 of its Statement of Claim, under the fifth heading entitled "The Legal Characterization of the Contract," the claimant had cited a number of legal provisions in an attempt to establish that the agency agreement at issue was the second type of agency governed by Articles 177–191, and had characterized the agency agreement in dispute as a commercial agency agreement. The Respondent further submitted that the agency agreement at issue is governed by the aforementioned provisions of the Egyptian Commercial Code, which the parties to the dispute agreed would govern the present arbitration. They added that they agree with the claimant company's legal characterization of the agreement and likewise agree that the agency at issue constitutes a commercial agency agreement governed by Articles 177–191of the Egyptian Commercial Code No. 17 of 1999. Based on this agreed legal characterization, the respondents argued that the claimant company's right to commence the present arbitration proceedings has lapsed because more than two years have elapsed since the termination of the contractual relationship, pursuant to paragraph (2) of Article 190 of the Egyptian Commercial Code, which provides:"2. All other claims arising from a commercial agency agreement shall lapse upon the expiration of two years from the termination of the contractual relationship. "The respondents submitted that the effect of this provision is that claims brought by a commercial agent against the principal for commissions due, remuneration, or any other sums agreed to be borne by the principal lapse upon the expiration of two years from the termination of the commercial agency agreement. They further argued that the legislature deliberately drafted the provision in general terms and that it may not be restricted without an express statutory basis; that the two-year period applies equally to fixed-term and indefinite-term contracts; that the provision governs all disputes arising out of commercial agency agreements; and that the two-year period running from the termination of the contractual relationship is a period of forfeiture rather than a statute of limitations and, therefore, is not subject to suspension or interruption. Applying these legal principles to the present dispute, the respondents argued that the contractual relationship terminated on 17/11/2005, the date on which the respondent company rescinded and terminated the agency agreement on the ground that the claimant company had failed to perform its contractual obligations. They further submitted that this was not the appropriate stage to discuss the grounds for termination, which would be addressed later. Calculating the two-year period from the date of termination yields 16/11/2007. A review of the case file, according to the respondents, shows that during this period the claimant company neither resorted to arbitration nor took any effective steps to commence arbitration proceedings. Rather, the claimant-initiated arbitration proceedings only when it requested the commencement of arbitration and appointed an arbitrator on its behalf. According to the respondents, the present arbitration proceedings effectively commenced with the notice served by the claimant company on the respondent company appointing its arbitrator, which was dated 4/8/2011, and on the basis of which the arbitral tribunal was subsequently constituted. The respondents further submitted that the period between the termination of the contractual relationship and the commencement of the arbitration proceedings exceeded six years, as calculated by the claimant company itself and acknowledged

in the first paragraph on the second page of its Statement of Claim. Accordingly, more than two years had elapsed from the date of termination of the contractual relationship without the claimant company commencing any legal proceedings. Consequently, the claimant's right to bring the present arbitration proceedings, or any other proceedings arising out of the terminated agency agreement, had lapsed because more than two years had passed since the termination of the agency agreement on 17/11/2005. On that basis, the respondents maintained their objection that the claimant company's right to bring any claim against the respondent company had lapsed by operation of law due to the expiration of more than two years from the termination of the contractual relationship.

Under the Seventh Clause of the Statement of Defense in Response to the Statement of Arbitration Claim, the respondents argued that the rescinded agency agreement is void because it was concluded on the basis of defective consent. They stated that it is agreed that a commercial agency agreement is a contract concluded on the basis of personal consideration, meaning that the principal grants the agency only to a specifically designated person in his own identity and personal qualifications—that is, the qualities the principal deems necessary for his representation. It is likewise agreed that personal consideration predominates in agency contracts, and that, consequently, if there is a mistake concerning the identity of the agent, the agency contract is voidable for mistake, and consent in an agency contract is defective if tainted by mistake, fraud, duress, or exploitation. In this respect, agency contracts are treated like all other contracts. Referring to the agency agreement dated 30/1/2001, which is the subject matter of the present dispute, the respondents stated that it appears that it was concluded between "Iraqi Airways, established and licensed in accordance with Iraqi law, having its headquarters at Saddam Hussein Airport, Baghdad, Iraq (First Party)," and "Horse Tourism and Travel Company, having its headquarters at 9 Martyr Mohammed Gamal Street, Ard El Golf, Heliopolis, established and licensed in accordance with Egyptian law (Second Party)." They further argued that, upon rereading the description of the Second Party, it is understood that the Second Party is Horse Tourism and Travel Company, established and licensed under Egyptian law. They emphasized that rereading the particulars of the Second Party is intended to ascertain the fundamental purpose behind contracting with that company. That purpose, according to the respondents, is apparent from the description contained in the section identifying the parties, from which it is evident that the agreement with the Second Party was concluded for the following reasons: 1. Because its commercial activity is tourism and travel; 2. Because it is an established and licensed company; 3. Because it is licensed under Egyptian law. The respondents argued that the purpose of entering into this agreement was to appoint a general agent from among Egyptian companies licensed under Egyptian law in the field of tourism and travel. These conditions constituted the basis upon which the respondents contracted with Horse Company, and it was on that basis that the respondents' intention was directed toward concluding the agreement that is the subject matter of this dispute with that company, since it claimed—and acknowledged at the time—that those conditions were satisfied. Such acknowledgment is evidenced by the signature appearing beside the name of the Second Party. However, they asserted that, upon referring to the claimant company's commercial register, the following facts become apparent:

A. The date on which Horse Tourism Company commenced business was 14/3/2001, that is, more than two months after the execution of the agency agreement, whereas the agency

agreement itself was signed on 30/1/2001. Accordingly, the agreement was concluded with a fictitious company that had no legal existence at the time of contracting and had not yet been established. B. They further argued that Mr. Emad El-Sayed El-Gadawi was not, at the time of signing the agreement, Chairman of the Board of Directors of the said non-existent company; rather, after the company's incorporation, his position became Managing Director. Consequently, the agency agreement was signed by a person who lacked the proper legal capacity at the time the agreement was concluded. C. The company that was the Second Party to the rescinded agency agreement was not licensed by the Egyptian Ministry of Tourism at the time the agreement was concluded. Instead, its tourism license was issued on 24/5/2002, that is, one year and two months later. Furthermore, that license was issued to Horse Tourism Company, whereas the agreement had been concluded with Horse Tourism and Travel Company. Accordingly, they argued that the agency agreement was concluded on the basis of defective consent resulting from fraud and deceit; therefore, the agreement is absolutely null and void, and what is founded upon a void act is itself void and Invalid. It is evident from the foregoing that the argument that the Agency Agreement is invalid on the ground that it was executed based on a defect in consent is founded on valid legal grounds.

Under the heading "In Response to the Arbitrating Company's Argument That the Agency Agreement Subject to Arbitration May Not Be Terminated Unilaterally," the Respondent argued that the law may grant one of the contracting parties the right to unilaterally terminate a contract, and that the law expressly provides for such a right in agency agreements. Accordingly, the principal may terminate the agency agreement at any time. Furthermore, Article 715 of the Egyptian Civil Code provides: "The principal may, at any time, terminate or restrict the agency, even if there is an agreement to the contrary." Likewise, Article 947 of the Iraqi Civil Code provides: "The principal may dismiss the agent or restrict the scope of the agency, and the agent may resign; any agreement to the contrary shall have no effect."

It follows from these provisions that the principal may dismiss the agent at any time before completion of the work that is the subject of the agency. Accordingly, where the principal considers that his interest in the agency no longer exists, he may terminate the agency by dismissing the agent. The dismissal of an agent is affected by a unilateral declaration issued by the principal and addressed to the agent, and is governed by the general rules. Since the law does not prescribe any specific form for such dismissal, any expression of intent conveying the meaning of dismissal is sufficient. Such expression may be either express or implied. An implied dismissal may occur, for example, where the principal personally undertakes the performance of the work that is the subject of the agency. The Respondent further argued that, whether the dismissal is express or implied, it produces legal effect only once it has come to the knowledge of the agent in accordance with the general rules. The Respondent further submitted that the principal's right to dismiss a general agent constitutes a rule of public policy; therefore, no agreement may derogate from it. Consequently, an agent may not stipulate that he shall remain appointed until completion of the work entrusted to him. The principal may nevertheless dismiss the agent before completion of that work, notwithstanding such a condition. The statutory text is explicit in this regard, as stated in the opening of the first paragraph of Article 715 of the Egyptian Civil Code: "The principal may, at any time, terminate or restrict the agency, even if there is an agreement to the contrary." Likewise, the agent may not stipulate entitlement to compensation merely because the principal dismisses him, as such a condition would constitute

an impermissible restriction on the principal's freedom to dismiss the agent. The Respondent further submitted that the law intended to preserve the principal's freedom in this regard in its entirety. This principle was affirmed by the Supreme Constitutional Court in Constitutional Case No. 193 of Judicial Year 29, decided on 14 July 2012, in which the Court declared Article 189 of the Commercial Code promulgated by Law No. 17 of 1999 unconstitutional. The Constitutional Court based its ruling on the fact that the principal's and the agent's obligation to comply with the provisions of the contract, whether in its performance or termination, does not, by its nature, give rise to any legitimate expectation on the part of the agent that the contractual relationship with the principal will continue. Moreover, the principal is merely exercising his lawful right not to renew the contract upon expiration of its agreed term. The general principle established by the Civil Code is that a person who lawfully exercises a legal right shall not be liable for any damage resulting therefrom. The Respondent also submitted that Article 163 of the Egyptian Commercial Code, Law No. 17 of 1999, provides: "Either party to a commercial agency agreement may terminate the contract at any time. Compensation shall be payable only where the contract is terminated without prior notice or at an inappropriate time. If the contract is for a fixed term, its termination must be based on a serious and acceptable cause; otherwise, compensation shall be payable." The Respondent further relied on Article 715 of the Egyptian Civil Code, which provides: "The principal may, at any time, terminate or restrict the agency, even if there is an agreement to the contrary."

The Respondent further argued that the aforementioned rules, principles, and legal provisions remain applicable to the facts of the present dispute. In support of this position, the Respondent pointed to the first paragraph of Clause 23 of the terminated Agency Agreement, which provides: "This Agreement supersedes all prior agreements and shall enter into force as of 15/2/2002. It shall be valid and binding upon both Parties and may not be terminated by either Party unless the other Party has been given at least sixty (60) days' prior written notice of termination delivered to its principal office." The Respondent argued that this clause grants both Parties the right to terminate the Agency Agreement without cause or any other restriction, subject only to the requirement of providing the other Party with written notice of termination at least sixty (60) days in advance, addressed to its principal office. The Respondent complied with this requirement by serving a written notice of termination dated 17/11/2005 upon the other Party at the Claimant's principal office. The Respondent further stated that a copy of this notice was included among the documentary exhibits submitted together with its Statement of Defense and Response to the Statement of Claim. The notice was entitled "Termination of Agency Agreement" and stated: "In view of the resumption of Iraqi Airways flights to and from Egypt, and your company's failure to fulfill its obligations toward our company, it has been decided to terminate the General Agency Agreement in Egypt concluded with your company, effective 1/12/2005. You are hereby granted sixty (60) days to settle all outstanding financial and administrative matters with our company." Accordingly, the Respondent argued that it exercised the contractual right expressly conferred upon it under the terminated Agency Agreement by serving written notice of termination upon the other Party at its principal office, as evidenced by the copy of the notice included in the record. Furthermore, the Respondent granted the Claimant a period of sixty (60) days before the termination took effect in order to settle and resolve all outstanding financial and administrative matters between the Parties. The Respondent further submitted that this procedure is fully consistent with Article 715 of the Egyptian Civil Code, which grants the principal the right to terminate the agency at any time. It is likewise consistent

with Article 163 of the Egyptian Commercial Code (Law No. 17 of 1999), which grants either party to a commercial agency agreement the right to terminate the agreement and provides that compensation is payable only where such termination occurs without prior notice. As is evident from the above-mentioned notice, the Respondent notified the Claimant of the termination sixty (60) days in advance and afforded it sixty (60) days from the date of notification to settle and resolve all outstanding financial and administrative matters. Accordingly, the Respondent correctly applied the law in terminating the Agency Agreement that is the subject of the present dispute and exercised its right in accordance with the statutory provisions.

Under the heading "Confirmation of the Claimant's Knowledge of the Termination of the Agency Agreement," the Respondent further submitted that, on 18/3/2006, the Claimant served a formal notice upon the Respondent through a court process server. The opening paragraph of that notice stated: "The notifying company (the Claimant) was surprised on 17/11/2005 to receive a letter from the General Manager of Iraqi Airways informing it of the termination of the Agency Agreement concluded between the Parties." The Respondent further stated that the Claimant subsequently served another notice on 13/5/2006. That notice began by correcting a clerical error in the amount of compensation claimed in the notice dated 18/3/2006, which the Claimant had at that time sought as compensation for both material and moral damages arising from the termination of the Agency Agreement. The Respondent argued that this notice constituted the third confirmation that the Claimant had knowledge of the termination of the Agency Agreement Respondent further argued that the second confirmation of the Claimant's knowledge of the termination of the Agency Agreement was dated 19/4/2006, being the date of the first meeting between the delegations of the two companies to reach an amicable resolution of the financial issues arising from the termination of the Agency Agreement. During that meeting, the Claimant proposed that the Agency Agreement be reinstated and requested that the Respondent consider that proposal. Accordingly, the Respondent argued that this confirmed the Claimant's knowledge of the termination of the Agency Agreement pursuant to Clause 23.1 of the terminated Agency Agreement. The Respondent further argued that the Claimant did not object to the termination procedures during the intervening years, which constituted an acknowledgment on its part of the validity of those procedures and of their compliance with the law and the facts. Accordingly, based on all of the foregoing, the Respondent submitted that the procedures for terminating the Agency Agreement on 17/11/2005 were valid and enforceable against the Claimant.

Under the heading "Response to the Statements Made by the Claimant Under the Heading 'The Respondent's Withdrawal from the Termination of the Agency Agreement and Its Commitment to Reinstate It on 29/8/2005,' as Set Forth on Page 15 of the Statement of Claim," the Respondent argued that the meetings held between the Parties on 26 and 27/8/2005 did not result in any commitment to reinstate or reactivate the terminated Agency Agreement. Rather, the minutes of those meetings merely recorded the discussions initiated by the Claimant concerning its desire to reinstate the Agency Agreement following its termination. Such discussions did not constitute a withdrawal of the termination, did not form part of the Agency Agreement, could not be relied upon, and produced no legal effect whatsoever. The Respondent further argued that the Claimant based its allegations on the alleged agreement to reinstate the Agency Agreement dated 29/8/2005, as referred to on pages 10, 12, and 15 of its Statement of Claim. In reality, however, that document was merely the minutes of a meeting between delegations of the two companies following the Respondent's termination of the Agency Agreement. The meeting took place at the

Claimant's request and reflected its desire to reinstate the Agency Agreement that had previously been terminated. A delegation from the Respondent met with representatives of the Claimant, during which the Claimant presented several discussion points. Those points were discussed and recorded in the minutes of the meeting dated 29/8/2005. The minutes merely documented the matters discussed between the two delegations regarding the possible reinstatement of the terminated Agency Agreement at the Claimant's request, as a preliminary step toward obtaining the necessary corporate approvals from the Respondent's Board of Directors. The Respondent further submitted that, had the Board of Directors approved the matters discussed and recorded in those minutes, they would then have been incorporated into an addendum to the Agency Agreement and signed by both Parties, just as had occurred with the addendum to the Agency Agreement dated 15/3/2001, which bore the company's official seal. The Respondent further argued that Chapter IV of its Internal Bylaws, under the heading "Functions of the Chairman of the Board of Directors," provides in Article 14 that the Board of Directors shall exercise, among others, the following powers:(a) ...(b) ...(c) ...(d) Approving contracts and agreements relating to the company's business. (e) Selecting agents operating outside Iraq, determining their commissions, and concluding agency agreements with them. Accordingly, the Respondent argued that any contracts or agreements relating to the business of Iraqi Airways, including the execution of agency agreements and the determination of commissions payable to agents operating outside Iraq, must be approved by its Board of Directors. Consequently, any contract, agreement, or determination of commission made without the approval of the Respondent's Board of Directors shall not be recognized and shall be deemed to have no legal effect shall be deemed as if it never existed, shall not give rise to any obligations or legal consequences vis-à-vis the Iraqi Airways General Company, shall not enter into force, and shall not be considered part of any contract unless and until it has been approved by the Board of Directors. The Respondent further argued that approval of such matters does not fall within the sole authority of the General Manager, but rather requires approval by the Board of Directors, as expressly provided in the Internal Regulations of the Iraqi Airways General Company No. 20 of 2000. The Respondent further submitted that, as additional confirmation that the Claimant was aware of this procedure, the minutes of the meeting dated 16/11/2008 recorded that: "The discussions were postponed until Monday, 17/11/2008, in order to continue discussions regarding an amicable settlement and to enable Iraqi Airways and Horus Company to present the matter to their respective Boards of Directors for the purpose of obtaining the required formal approvals." The Respondent argued that this clearly demonstrates the Claimant's awareness that the approval and authorization of the Respondent's Board of Directors were required before any understandings recorded in the meeting minutes could be adopted. Only upon such approval would those understandings be incorporated into an addendum to the Agency Agreement, forming an integral part thereof. Accordingly, the Respondent submitted that the minutes of the meeting dated 29/8/2005 give rise to no legal or financial obligations or consequences, because they were never approved by the Board of Directors of the Iraqi Airways General Company as required by the company's Internal Regulations. Accordingly, the Respondent requested that the Arbitral Tribunal disregard the minutes of the meeting dated 29/8/2005, treat them as if they had never existed, and give them no legal effect whatsoever, since they were never approved by the Board of Directors of the Iraqi Airways General Company.

Under the heading "Response to the Statements Made by the Claimant in the Second Paragraph on Page 16 of the Statement of Claim," The Respondent submitted that this paragraph contains

language that clearly reveals the true basis of the decision, as evidenced by the wording of the decision itself, which states: "In view of the resumption of Iraqi Airways flights to and from Egypt." The Respondent argued that the Claimant is attempting, through this wording, to persuade the Arbitral Tribunal—contrary to the true facts—that the obvious reason for issuing the decision to terminate the Agency Agreement was the Respondent's desire to commence direct operations through its office in Cairo. In response, the Respondent reiterated that it had previously explained that the dismissal of an agent or the termination of an agency may be either express or implied, and that an implied dismissal occurs where the principal personally undertakes the performance of the work that is the subject of the Agency Agreement. Accordingly, the Respondent argued that its declaration of its intention to conduct direct operations through its Cairo office constituted an implied termination, reinforcing and confirming the prior express termination.

Under the heading "Response to the Statement of Claim on Page 16 Under the Heading 'The Respondent's Withdrawal from the Termination of the Agency Agreement and the Issuance of a Decision Suspending It on 16/11/2005,'" the Respondent submitted the following: 1. Agency Termination Decision No. 14 was issued on 17/11/2005, which is the date of issuance, not the date of signature. The document expressly bears the notation "Date of Issuance," was signed by the General Manager, and was sent to the Claimant's principal office. 2. Decision No. 254 was likewise issued on 17/11/2005, the same day on which Agency Termination Decision No. 14 was issued. It was also signed by the General Manager and sent to the Claimant's principal office under the heading "Suspension of Agency" and included some of the reasons for the termination of The Agency Agreement was the subject of Decision No. 14 dated 17/11/2005. The relevant date is not the date of signature but rather the date of issuance indicated by the reference number of the letter. The Respondent further submitted in this regard that, with respect to the expression "Suspension of the Agency", which appeared as the subject line of Letter No. 254 dated 17/11/2005, the law does not require that dismissal or termination be effected in any particular form; rather, any expression of intent conveying the meaning of dismissal is sufficient. The letter stated, "Our company will undertake direct operations through our office in Cairo," and the Respondent explained that this statement clarified that the word "suspension" was intended to mean "termination." The Respondent further submitted that the expression of termination of the Agency Agreement may be either express or implied, and that the implied expression of termination was conveyed by this final statement contained in Suspension Decision No. 254. The Respondent further argued that, when the decision is read as a whole, particularly in light of its statement that the company would undertake direct operations, it is clear that Decisions Nos. 14 and 254 were both issued on 17/11/2005, and that Decision No. 254 merely set out some of the reasons underlying the Respondent's termination of the Agency Agreement.

Under the heading "Response to the Statement of Arbitration Claim," regarding the section entitled "Identification of the Errors Allegedly Committed by the Respondents," the Respondents submitted that they had already responded to the Claimant's allegation that the Respondent Company had committed a gross error by unilaterally terminating and subsequently suspending the contract. In response to the Claimant's assertion that the meeting minutes signed by both Parties and dated 29/8/2005 constituted an addendum to the Agency Agreement, contrary to the facts and in an attempt to confer legal effect upon those minutes, the Respondents reiterated their previous response to that allegation, namely, that the aforementioned meeting minutes merely

recorded a meeting between delegations of the two companies following the Respondent's termination of the Agency Agreement, as a result of the Claimant's efforts and desire to reactivate the Agency Agreement that had previously been terminated. The Respondents further submitted that, during that meeting, the Respondent's delegation discussed the points raised by the Claimant, and those points were discussed and recorded in the minutes dated 29/8/2005, which documented the matters discussed between the two delegations for the purpose of reactivating the terminated Agency Agreement at the Claimant's request, as a preliminary step toward obtaining the necessary corporate approvals from the Board of Directors of the Iraqi Airways General Company, on the understanding that, if those matters were approved by the Board of Directors, they would then be incorporated into an addendum to the Agency Agreement dated 15/3/2001, bearing the company's official seal. The Respondents further submitted that Chapter IV of the Respondent Company's Internal Regulations, under the heading "Functions of the Chairman of the Board of Directors," provides in Article 14 that: "First: The Board of Directors shall exercise the following powers: (a) ... (b) ... (c) ... (d) Approving contracts and agreements relating to the company's business. (e) Selecting agents operating outside Iraq, determining their commissions, and concluding agency agreements with them." Accordingly, any contract, agreement, or determination of commission made without the approval of the Respondent Company's Board of Directors shall not be recognized and shall be deemed as if it had never existed, shall not give rise to any obligations or legal consequences vis-à-vis the Iraqi Airways General Company, shall not enter into force, and shall not be considered part of any contract unless and until it has been approved by the Board of Directors, since approval of such matters does not fall within the sole authority of the General Manager, as expressly provided by the Internal Regulations of the Iraqi Airways General Company No. 20 of 2000, a copy of which was indicated to be attached as Exhibit No. 4 submitted together with the Statement of Defense in response to the Statement of Claim. The Respondents further submitted that, as confirmation of the Claimant's knowledge of this procedure, the minutes of the meeting dated 16/11/2008 contained the following statement: "Postponement of the discussions until Monday, 17/11/2008, in order to continue the discussions regarding an amicable settlement so that Iraqi Airways and Horus Company may present the matter to their respective Boards of Directors to obtain the required formal approvals," and that this clearly demonstrates the Claimant's awareness of the necessity of obtaining the approval and consent of the Respondent Company's Board of Directors in order to adopt the matters agreed upon in the minutes of the meeting, and that, if such approval were granted, those matters would be incorporated into an addendum to the Agency Agreement forming an integral part thereof, and that, accordingly, it is clear that the minutes of the meeting dated 29/8/2005 do not give rise to any obligations or legal or financial consequences because they were not approved by the Board of Directors of the Iraqi Airways General Company pursuant to the Company's Internal Regulations. The Respondents therefore request that no reliance be placed upon the minutes of the meeting dated 29/8/2005, that they be treated as if they had never existed, that they be disregarded, and that no legal effect be given to them, since they were not approved by the Board of Directors of the Iraqi Airways General Company.

In the same context, the Respondents submitted that they had previously explained the validity of the procedures adopted by the Respondent Company in terminating the Agency Agreement, that those procedures were consistent with the law and based upon the true facts, the applicable law, and the agreed legal principles. By way of further confirmation, however, the Respondents

submitted that the law may grant one of the contracting parties the right to unilaterally terminate a contract, and that this is what the law provides with respect to agency agreements; accordingly, the principal may terminate the agency at any time, and Article 715 of the Egyptian Civil Code provides that: "The principal may, at any time, terminate or restrict the agency, even if there is an agreement to the contrary." Likewise, Article 947 of the Iraqi Civil Code provides that: "The principal may dismiss the agent or restrict the scope of the agency, and the agent may resign; no agreement to the contrary shall have any effect." It follows from these provisions that the principal may dismiss the agent at any time before completion of the work that is the subject of the agency. If the principal determines that his interest in the agency no longer exists, he may terminate the agency by dismissing the agent. The dismissal of the agent is affected by a unilateral declaration issued by the principal and addressed to the agent, to which the general rules apply. Since the law does not prescribe any particular form for dismissal, any expression of intent conveying the meaning of dismissal is sufficient. Such expression may be express or implied, and an implied dismissal occurs, for example, where the principal personally undertakes the performance of the work that is the subject of the agency. Whether the dismissal is express or implied, it takes effect only once it has come to the knowledge of the agent in accordance with the general rules. The Respondents reiterated the defense previously advanced in this regard, concluding that the Respondent Company correctly applied the law in terminating the Agency Agreement that is the subject of the present dispute and exercised the right conferred upon it under the aforementioned statutory provisions.

Under the heading "Confirmation of the Claimant Company's Knowledge of the Termination of the Agency Agreement," the Respondents reiterated the arguments they had previously advanced regarding the Claimant Company's knowledge of the termination of the Agency Agreement pursuant to Clause 23.1 of the terminated Agency Agreement.

Under the heading "Comment on the Contents of the Last Paragraph on Page 35 of the Statement of Claim, which states: 'In addition to seizing the company's headquarters in Cairo, from which the Respondent Company conducts its principal business in performing the Agency Agreement, following the Respondent Company's failure to fulfill its principal or fundamental obligations under the contractual relationship…,'" the Respondents submitted that the company's headquarters in Cairo, to which the Claimant referred in this paragraph as though it were the Claimant's property and alleged that the Respondent had appropriated it, is in fact owned by the Respondent Company, and that the Claimant deliberately sought to convey this false impression to the Arbitral Tribunal. The truth, however, is that the Respondent Company's headquarters has been owned by the Respondent Company and has served as its administrative headquarters since the late 1950s, and its address is 22 Qasr El Nil Street, Abdeen District, Cairo Governorate. Furthermore, this headquarters has never been under the control of anyone other than Iraqi Airways in Cairo, and one may only seize property belonging to another.

Under the heading "In Response to the Last Paragraph on Page 32 of the Statement of Claim," the Respondents submitted that the paragraph states as follows: "It is established from the defense brief of the legal representative of the Iraqi Airways General Company, submitted at the hearing on 5/1/2012 before the 62nd Commercial Chamber of the Cairo Court of Appeals in Case No. 51 of Judicial Year 128, as well as from the notice served by the Respondent upon the Claimant on 6/3/2012, that Iraqi Airways proposed an addendum to the Agency Agreement or

offered to grant the company seeking arbitration a new General Agency Agreement in exchange for waiving recourse to arbitration." The Respondents further submitted that they are unable to understand what the Claimant seeks to establish in this regard. However, upon referring to the notice addressed to the Claimant dated 6/3/2012, a copy of which was submitted as Exhibit No. 6 together with the Response to the Statement of Arbitration Claim, it becomes evident that this notice reflected the agreement reached by the Parties during those negotiations not to resort to arbitration "at present" and to waive any "alleged" claims asserted by the Claimant Company, in exchange for the Respondent Company granting the Claimant Company a new General Agency Agreement. The Parties agreed accordingly, and the Respondent Company delivered to the Claimant Company a copy of the Agency Agreement. The Claimant objected to its proposed term of three years, as required by IATA, and the Parties agreed that the Respondent Company would send an addendum to the proposed Agency Agreement to the Claimant Company for its review and response. Indeed, the aforementioned notice was accompanied by a copy of the proposed addendum to the Agency Agreement for the Claimant Company's review, as agreed and as reflected in the notice submitted with the documentary exhibits. Furthermore, the contents of the defense brief submitted to the court at the hearing on 5/1/2012, a copy of which was noted as being attached, merely confirm the same position set forth above, namely, that the Agency Agreement had been terminated and that the amicable negotiations concerned only the possibility of concluding a new Agency Agreement, and nothing more, and not what the Claimant alleged or what was stated in the notice of The reference or the memorandum submitted to the Court bears no meaning other than that which has already been stated, and the wording of this notice admits of no interpretation or inference other than what has already been explained and clarified.

Under the heading "Response to the Claimant Company's Allegation" appearing on page 38 of the Statement of Claim under the heading "The Gross Error Consisting of the Failure to Pay the Claimant Company's Entitlements," as well as in response to the Claimant Company's request set forth in Final Request No. 3 concerning the amount of commissions allegedly due to the Claimant Company in respect of the transactions carried out by the First Respondent throughout the term of the Agreement, the Respondents submitted that there is no doubt that the principal is obliged to pay the contract agent remuneration in consideration for performing the work entrusted to him, and that such remuneration is ordinarily a percentage of the value of the transaction. The Egyptian Commercial Code establishes the method for calculating remuneration where it is determined as a percentage of the value of the transactions, providing that such percentage shall be calculated on the basis of the sale price unless otherwise agreed. Article 183 of the Egyptian Commercial Code sets forth the principal's obligation to pay the contract agent's remuneration and the criteria by which such remuneration is ordinarily determined, providing that: "1. The principal shall pay the remuneration agreed upon with the agent. 2. Such remuneration may be a percentage of the value of the transaction, and such percentage shall be calculated on the basis of the sale price to customers unless otherwise agreed." Pursuant to the foregoing provision, the Parties agreed upon the commission percentages payable to the agent on tickets. Clause 11 of the terminated Agency Agreement, under the heading "Compensation and Remuneration," governs this matter and provides that: "The First Party shall pay the General Agent commission on tickets issued on the First Party's air services, whether scheduled services, supplementary services, charter flights, or flights operated by other airlines providing services for the First Party, provided that such tickets are issued from the country of the General Agent in accordance with the regulations, rules, and laws of IATA governing such matters."

Accordingly, the aforementioned provision of the terminated Agency Agreement established the principal's obligation to pay commission to the General Agent (the Claimant Company) on tickets issued from the country of the General Agent, namely, the Arab Republic of Egypt. However, that provision imposed a condition upon the principal's obligation (the Respondent Company) to pay commission to the agent (the Claimant Company) on tickets issued from the country of the General Agent (Egypt), namely, that "the General Agent must be the party that issued the First Party's documents." The second paragraph of the same clause reaffirmed this condition by providing: "2. In addition to the commission on sales referred to in the preceding paragraph, the First Party shall pay the General Agent an additional incentive commission on all sales issued by the General Agent or its sub-agents..." The Respondents further submitted that the Parties did not merely emphasize twice the requirement that the General Agent be the party issuing the tickets; rather, the third paragraph of Clause 11 reaffirmed this condition for a third time by providing: "3. Notwithstanding the foregoing, the First Party shall pay the General Agent the commission (whether basic or incentive) on tickets issued, provided that the General Agent issues such tickets in its country and that the value thereof has been paid in advance..." The Respondents further submitted that, upon reviewing the case file, there is no statement identifying any tickets sold or issued by the agent for which commission would be payable. Accordingly, the Respondents requested that the Claimant Company's request to order the First Respondent and the Second Respondent to pay the sum of seventy-nine million, ninety-six thousand five hundred and seventy-nine United States Dollars, representing the commissions allegedly due to the Claimant Company in respect of the transactions carried out by the First Respondent throughout the term of the Agreement, be dismissed because the claim is without factual or legal basis, is unsupported by the evidence on record, and the Claimant Company has failed to explain the basis upon which it calculated the amount claimed.

With respect to the submissions made by the Respondents under the heading "The Obligations Incumbent upon the Claimant Company Pursuant to the Terminated Agency Agreement and Its Addendum Dated 15/3/2001," the Respondents submitted:

First: The Respondents set out the obligations that were incumbent upon the former agent under the Agency Agreement dated 30/1/2001. Clause 6 of that Agreement, under the heading "Services Required from the General Agent," provides for the following obligations:

(a) To market and promote the First Party's business and appoint qualified personnel to perform such work efficiently.

(b) To provide, maintain, repair, and equip the premises necessary for carrying out the First Party's business in the country of the General Agent (the Second Party).

(c) To deliver consignments entrusted by the First Party to their destinations in accordance with the First Party's instructions.

(d) To issue airline tickets, airway bills, air freight invoices, shipment notices, payment orders for various expenses, or any combination thereof, as well as other transport documents, to issue prepaid tickets, and to perform the related clerical work.

(e) To visit travel agencies, other offices, individuals, and organizations in order to promote the First Party's sales.

(f) To provide all offices of the First Party, its agents, and sub-agents with information, promotional publications, and appropriate instructions from time to time, together with the documents relating to the settlement of accounts between the General Agent and the aforementioned sales representatives.

(g) To distribute flight schedules and other printed materials relating to flight schedules supplied by the First Party whenever requested by the General Agent or its sub-agents, including those supplied to hotels or similar establishments. All such materials shall remain the property of the First Party.

(h) To use its best efforts to earn the confidence of the First Party and represent it before governmental and regional authorities, public bodies, the press, institutions, and to negotiate with governmental and judicial authorities having jurisdiction over air transport services within the First Party's territory.

(i) To provide the First Party, on a current basis, with statistics and such reports as the First Party may request.

(j) To provide the First Party with all information necessary regarding applicable laws and any developments relating thereto in accordance with this Agreement.

(k) To perform all services which the First Party is required to provide in connection with other airlines in accordance with the First Party's instructions.

Type of Services: 1. The Second Party shall use its best efforts to provide whatever the First Party requests in relation to improving the services provided by the First Party under this Agreement. 2. In the absence of instructions or orders from the first party, the second party shall provide the services in accordance with the applicable international standards. 3. The Second Party undertakes to take all possible steps to ensure that the quality of the services provided to the First Party is in no way inferior to the prevailing standard or its equivalent at other companies (as if the General Agent were the owner of those aircraft, etc.).

Second: The Respondents further submitted that the obligations to which the former agent was bound pursuant to the Addendum to the Agency Agreement dated 15/3/2001 were as follows: 1. The Second Party shall bear the salaries of the employees of the Iraqi Airways office of the First Party in Cairo and at Cairo Airport. The Second Party shall be obligated to pay and bear all entitlements of the aforementioned employees in accordance with the applicable legal provisions and legislation in this field. The number of assigned employees may be increased depending on work conditions and with the written approval of the First Party. 2. The Second Party shall bear the charges and costs of telephone calls, telexes, and facsimiles sent from the First Party's office in Cairo to the Company's headquarters in Baghdad and to its agents and offices abroad, together with the costs of water, electricity, air conditioning, insurance premiums for the office and the vehicle, vehicle registration fees, and vehicle insurance. 3. The Second Party shall pay the annual

rent for the First Party's office in Cairo and the Company's office at Cairo Airport from the date it assumes responsibility for the Agency. The Second Party shall also bear any expenses or costs resulting from increases in rent in accordance with the applicable legislation. 4. The Second Party shall bear the salary of the First Party's attorney assigned to the work in the amount of five hundred (500) Egyptian Pounds per month. The salary may be increased with the written approval of the First Party. 5. The Second Party shall bear the annual subscription fees and charges for SITA, telex, the airport radio station, and reservation offices ( ), as well as the subscription fees for the Committee of Operating Airlines ( ). 6. The Second Party shall bear the costs of cleaning, maintenance, and upkeep of the First Party's offices in Cairo, as well as the maintenance and upkeep of the equipment therein. 7. The Second Party shall, at its own expense, provide all stationery requirements for the First Party's office in Cairo and at the airport. 8. The Second Party shall bear the costs of the advertising and publicity necessary for the offices of the First Party. 9. The General Agent shall bear the costs and expenses of hospitality, hotel accommodation for delegates of the First Party, officials, public bodies, and any other donations. 10. The Second Party shall maintain, upkeep, and furnish the First Party's office in the city and at the airport in a manner commensurate with its status, in preparation for future operations and in coordination with the Office Manager. 11. The Second Party shall bear the costs of enrolling the office employees in the training and development courses required for the conduct of the business. 12. The Second Party shall provide uniforms for the summer and winter seasons for the employees of the First Party's office in the city and at the airport. 13. The Second Party undertakes to update the office and airport vehicles during the term of the Agency and to register them in the name of the Iraqi Airways General Company, as follows: a. One vehicle for use by the Office Manager in Cairo and one vehicle for the Station Manager upon commencement of operations. b. One vehicle for official guests, which shall remain with the Second Party and shall be requested by the First Party whenever needed. c. The Second Party shall bear the cost of fuel and lubricants for the office vehicles in the city and at the airport used by the employees. 14. The Second Party shall settle and pay all amounts and debts owed by the First Party from the date of the closure of the office in 1991, in accordance with the attached statement. 15. The Second Party shall use its best efforts with the Cairo International Airport Authority and EgyptAir regarding the amounts owed to them by the First Party and shall proceed on behalf of the First Party with the procedures for cancelling or reducing such debts with the relevant authorities for the benefit of the First Party. 16. With reference to Clause 34 of the Standard Agency Agreement signed between the Parties, the Second Party undertakes as follows: a. To provide a bank guarantee in the amount of two hundred thousand (200,000) United States Dollars upon commencement of operations, receipt of the First Party's travel documents, and commencement of the exercise of Business operations through it. b. To provide a bank guarantee in the amount of one hundred thousand (100,000) U.S. dollars as security for the Company's rights at present, to be replaced by paragraph (a) upon commencement of operations.

Under the heading "Serious Errors and Violations Committed by the Claimant Company, Consisting of the Failure to Fulfill Its Obligations under the Terminated Agency Agreement and Its Addendum," the Respondents stated that on 30/1/2001, the Agency Agreement was signed with the Claimant Company, and obligations were thereby imposed upon it under that Agreement, as detailed in the terminated Agency Agreement that is the subject matter of this dispute, which the Respondents stated had previously been set out above. They further stated that an Addendum to the Agency Agreement was also signed on 15/3/2001, under which important

and detailed additional obligations were imposed upon the Claimant Company, as set forth in that Addendum. The Claimant Company failed, from the date of execution of the Agency Agreement until the date of its termination, to perform any of the obligations imposed upon it under the Agency Agreement or the Addendum to the Agency Agreement dated 15/3/2001. This prompted the Respondents to exercise their right under Clause 23 of the Agency Agreement, and under the applicable law, to terminate the Agency Agreement and the General Agency concluded with the Claimant Company, and to notify it of certain of those violations and serious errors resulting from its failure to perform its obligations, by means of Agency Termination Letter No. 254 dated 17/11/2005, which supplemented Agency Termination Notice No. 14 dated 17/11/2005, as well as by notifying it of the meeting held with them on 19/4/2006. By way of example, and because of the numerous violations and serious errors that constituted a principal reason for cancelling and terminating the Agency with the Claimant Company, the Claimant Company committed the following violations and errors: 1. The Claimant Company failed to provide the bank guarantee agreed upon under paragraph 24 of the Agency Agreement, as well as paragraph (b) of Clause 20 of the Addendum to the Agency Agreement dated 15/3/2001, in the amount of one hundred thousand dollars as security for the Company's rights at present. 2. The Claimant Company failed to provide the required letter of guarantee to the competent authorities referred to in the Agency Agreement and its Addendum in order to secure the provision of fuel services, ground handling services, and aircraft catering services, which resulted in delays to operational flights from 17/10/2005 to 20/10/2005, following the intervention of the Iraqi Embassy in Cairo and its coordination with the Cairo Office to commence operations, thereby causing material and moral damage to the Respondents' reputation. 3. The Claimant Company failed to pay the amounts due for ground handling services, fuel services, landing and take-off charges, and the fees due on each flight, which caused delays in the departure of the Company's aircraft from Cairo. 4. The Claimant Company failed to comply with paragraph 4 of the Addendum to the Agency Agreement, thereby causing damage to the Company's reputation and financial position as a result of local employees filing claims against the Iraqi Airways General Company seeking payment of their salaries and wages, including the labor claim brought by the local employee Zainab Zain Al-Abidin, who withdrew her claim against the Respondents after the latter paid her outstanding entitlements in the amount of US$3,710; the claim brought by the late local employee Fahmi Zidan, who likewise withdrew his claim after receiving from the Respondents his outstanding entitlements in the amount of US$1,912; and the wrongful dismissal action brought by the local employee Essam Fikri against the Claimant Company, in which judgment was rendered in his favor awarding him compensation in the amount of forty thousand Egyptian Pounds, which has not been enforced to date. 5. The Claimant Company failed to pay the insurance contributions of social insurance contributions in respect of the local employees, which amounted to EGP 11,977. This resulted in the attachment of the Respondent Company's assets, causing serious damage to the Respondent Company's commercial standing, which forced the Respondent Company to pay these amounts in installments until it ultimately settled them and benefited from a special offer announced by the General Authority for Social Insurance, after which the attachment was lifted. 6- The Claimant Company failed to pay the telephone bills for the Cairo office and the telephone line registered in the name of Iraqi Airways, resulting in the disconnection of the telephone lines due to the non-payment of the bills, which were subsequently paid by the Respondent Company, thereby causing substantial damage to the Respondent Company in carrying out business activities that relied on international communications, causing significant harm to the

Respondent Company, passenger reservations, and the reputation of the Respondent Company's business activities, in violation of Paragraph 5 of the Contract Addendum. 7- The Claimant Company failed to insure the Respondent Company's premises in Cairo, at the airport, and its vehicles, resulting in the loss of a vehicle belonging to the Respondent Company at Cairo International Airport, which has not been recovered, in violation of Paragraph 5 of the Agency Agreement Addendum. 8- No maintenance work was carried out on the air-conditioning units at either the Cairo office or the airport office, in violation of Paragraph 9 of the Agency Agreement Addendum. Rather, the Respondent Company itself carried out this work and replaced the air-conditioning unit in its main office. 9- The Claimant Company failed to supply the Respondent Company's office with stationery, in violation of Paragraph 10 of the Agency Agreement Addendum. 10- The Claimant Company failed to carry out the advertising campaigns necessary for the Company's activities in Cairo, in violation of Paragraph 11 of the Agency Agreement Addendum. 11- The Claimant Company failed to organize the training courses required for the employees of the Respondent Company's Cairo office, as required for the Respondent Company's operations, in violation of Paragraph 14 of the Agency Agreement Addendum. 12- The Claimant Company failed to provide uniforms for the employees of the Respondent Company in accordance with the prevailing practice in airline companies, in violation of Paragraph 15 of the Agency Agreement Addendum. 13- The Claimant Company failed to purchase and upgrade vehicles for the Respondent Company's offices at the airport and to register them in the name of the Respondent Company, in violation of Clause 17 of the Agency Agreement Addendum. 14- The Claimant Company's negligence resulted in the withdrawal by the Cairo International Airport Authority of the Respondent Company's office at Cairo International Airport due to the Claimant Company's default. 15- The Claimant Company failed to settle and pay all amounts and debts owed by the Respondent Company dating back to 1991, pursuant to Clause 18 of the Agency Agreement Addendum, including, for example: - The Claimant Company's failure to pay a claim issued by the South Cairo Court in the amount of EGP 209,533.00 in a case brought against the Claimant Company, which compelled the Court's Claims Office to attach the Company's funds. The Respondent Company paid those amounts, which the Claimant Company had been obligated to pay pursuant to Paragraph (18) of the Agency Agreement Addendum. - The Claimant Company's failure to pay the sum of fourteen thousand Pounds Sterling arising from a fine imposed against the Respondent Company by the Financial Affairs Prosecution in favor of the Ministry of Foreign Trade in 1991. The Respondent Company paid that amount after its assets had been attached, although the Claimant Company had been obligated to pay it pursuant to Paragraph (18) of the Agency Agreement Addendum. - The Claimant Company made no effort or attempt to pursue the Cairo International Airport Authority and EgyptAir regarding the amounts owed to them by the Respondent Company, nor did it act on behalf of the Respondent Company in the procedures for cancelling or reducing those debts with the relevant authorities for the benefit of the Respondent Company, which caused those debts to increase, resulting in the grounding of the Respondent Company's aircraft and forcing the Respondent Company to settle those debts itself 16- The respondent company was the subject of Judicial Claim No. 1148 of 2003 in the amount of EGP 23,000.00 in Case No. 4073 of 2003 before the North Cairo Court, filed by the respondent company against the claimant company to obtain a judgment confirming the validity and enforceability of the terminated agency agreement, contrary to Clause 21 of the principal general agency agreement, which required the General Agent to bear the costs of certifying the agency agreement. This compelled the respondent company to satisfy this judicial claim in order to prevent the North

Cairo Court from imposing an attachment upon it. 17- The claimant company failed to implement any provision stipulated in and agreed upon under the terminated agency agreement and listed under Clause 6 thereof. To avoid repetition, reference is made to the terminated agency agreement, none of whose provisions were implemented by the claimant company. Accordingly, the claimant company committed numerous grave breaches, too many to enumerate, exposing the respondent company to substantial damages and impairing its reputation and standing among airline companies and within the aviation industry.

The claimant further stated that the claimant company's failure to perform these obligations set forth in the agency agreement and its sole addendum caused the respondent company to sustain substantial losses, including financial claims by the Airport Authority and threats to suspend its aircraft, as well as the continuing attachments and claims issued by the Judicial Claims Department of the Ministry of Justice, the South Cairo Court, the North Cairo Court, the Ministry of Foreign Trade, and the General Authority for Social Insurance, which imposed legal attachments upon the respondent company's assets, in addition to numerous administrative attachments, claims, court summonses, and notices. All of these matters created a negative impression of the respondent company before governmental and non-governmental entities alike, and all of these matters resulted in numerous operational obstacles that stood in the way of the respondent company and rendered it unable to perform its work in the manner it sought. However, in order to remedy these matters, emerge from the situation in which the claimant company had placed it, and overcome the obstacles caused by the claimant company's failure to perform the provisions of the agency agreement and its addendum, the respondent company expended considerable time, effort, and money to address the aforementioned matters. The claimant company's failure to perform the obligations contained in the terminated agency agreement and its sole addendum, and its violation of all the provisions agreed upon in the agency agreement and its addendum from the date of execution of the agency agreement until the date of its termination, constituted the commission by the claimant company of serious breaches against the respondent company. Article 148(1) of the Civil Code provides that: "A contract must be performed in accordance with its contents." It is evident from the foregoing that the claimant company committed numerous serious breaches against the respondent company by failing to perform any of the obligations incumbent upon it under the terminated agency agreement and its addendum dated 2001/3/15. The claimant further stated that it is also evident from the foregoing that it was the claimant company that failed to perform its obligations, not the respondent company, which waited for the claimant company to perform the work required of it by implementing the agency agreement in accordance with its terms, but to no avail, thereby compelling the respondent company to terminate the agency agreement.

Under the heading "Response to the Content of the Arbitrating Company's Statement of Claim, p. 38, under the heading 'The Grave Error of Failure to Pay the Arbitrating Company's Due Amounts,' as well as the response to the first of the Arbitrating of the claimant company's request to order the respondents to pay the sum of one hundred three million, six hundred eighty-six thousand, six hundred fifty-eight United States dollars and fifty cents (USD 103,686,658.50), representing the actual expenditures allegedly incurred in performing the obligations set forth in the terminated agency agreement, including general overhead expenses, joint fixed assets, sub-agents' commissions, costs of obtaining the agency, freight contract expenses, advertising campaign costs, feasibility study expenses, and penalties payable to third parties. The

respondents stated that, upon reference to the agency agreement dated 30/01/2001 and its sole addendum dated 15/03/2001, it is evident that neither instrument imposes any obligation whatsoever upon the respondent company to bear any expenses arising out of the agency agreement, for any reason whatsoever. Article 178 of the Egyptian Commercial Code settled this issue by providing that: "The commercial agent shall carry on the agency business and manage his commercial activity independently and shall alone bear the expenses necessary for managing his business." The provision expressly states that, as a general rule, the commercial agent is not entitled to recover the expenses incurred in conducting his business, since he independently manages his business under his own supervision and bears the advertising and promotional expenses and all other expenses necessary for the management of his business. As previously stated, the claimant company did not perform any obligation arising out of the agency agreement or its addendum; consequently, it did not incur any general overhead expenses or any other expenses in performing obligations that were incumbent upon it in the first place. Furthermore, it is inconceivable that the respondent company should be required to reimburse the claimant company for expenses allegedly incurred in obtaining the agency. If this is what is intended, then the respondent company bears no liability for expenses incurred unlawfully or prior to the execution of the agency agreement, which constituted the legal basis giving rise to the contractual obligations. There is no law, custom, or legal principle requiring one party to bear expenses incurred by the other party before any contractual relationship came into existence between them, since contractual obligations arise only upon execution of the agreement, unless otherwise agreed in the executed contract.

As for freight contract expenses, the respondents stated that reference to the terminated agency agreement shows that it was concluded between the parties and was specifically limited to airline operations and to no other commercial activity. A review of the case file reveals that no freight contract was executed on the respondent company's aircraft by the claimant company, unless what is meant are expenses relating to contracts for the shipment of rice, oil, and other goods belonging to companies affiliated with the claimant company. In that case, the matter falls outside the scope of the terminated agency agreement and its sole addendum and is unrelated to the present arbitration. Accordingly, there is no connection between the respondent company and the claimant company's claim. As regards sub-agents' commissions, the respondents stated that it is well established in the aviation industry that the sub-agent is the party that issues airline tickets or air cargo waybills on the company's flights and then receives its commission from the ticket price. The sub-agent is not entitled to any other commissions in this field. Accordingly, even assuming, solely for the sake of argument, that tickets had been sold through sub-agents, they would already have deducted their commissions from the ticket price of the tickets, which otherwise would not have existed. Accordingly, this claim is unfounded and must be dismissed.

Under the heading "Response to the Second Claim of the Claimant Company," which states, "Order the Respondents to pay the sum of one hundred million dollars as compensation for the unlawful and arbitrary termination and suspension of the agency agreement," as well as the response to the claimant company's specific claim, which states, "Order the Respondents to pay the sum of five hundred million dollars as compensation for the non-pecuniary damage sustained by the claimant company as a result of the termination and suspension of the agency agreement," the Respondents stated that it had previously been explained that the respondent company's unilateral termination of the agency agreement constituted an exercise of its lawful right and that

what it had done did not constitute an arbitrary act; rather, the arbitrary act consisted of the claimant company's refusal to perform the provisions of the agreement and its insistence on causing substantial damage to the respondent company and harming its commercial reputation in the aviation sector, and that the company entitled to compensation for the damages it sustained as a result of this agency agreement was the respondent company, which had suffered considerably due to the claimant company's failure to perform the provisions of the agency agreement. The Respondents further maintained that the law may grant one of the contracting parties the right to terminate a contract unilaterally, as provided for in agency agreements, whereby the principal may terminate the agency at any time. The Respondents reiterated their previously submitted defense by referring to Article 715 of the Egyptian Civil Code and Article 947 of the Iraqi Civil Code, from which it follows that the principal may dismiss the agent at any time before completion of the work forming the subject matter of the agency, whereby the agency terminates upon the dismissal of the agent. The Respondents further maintained their previously stated position that the dismissal of the agent is effected by a unilateral declaration of intent issued by the principal and addressed to the agent, and that any expression of intent indicating dismissal is sufficient; such expression may be express or implied, for example where the principal personally performs the work forming the subject matter of the agency, and that the dismissal of the agent produces no legal effect unless it comes to the agent's knowledge. Once the agent becomes aware of the dismissal, he may not continue to carry out the acts of the agency, and if he does so, he alone shall be liable, and he may not recover from the principal any expenses incurred. Furthermore, the principal's right to dismiss the agent is a rule of public policy from which no derogation by agreement is permitted. Accordingly, the agent may not stipulate that he remain the principal's agent until completion of the work entrusted to him, and the principal may, notwithstanding such a condition, dismiss the agent before completion of the work. Likewise, the agent may not stipulate compensation in the event of dismissal by the principal, as this would constitute a restriction upon the principal's freedom. This is consistent with Article 163 of the Egyptian Commercial Code No. 17 of 1999, which provides that either party to a commercial agency agreement may terminate the agreement at any time, and that compensation shall not be due unless the termination occurs without prior notice or at an inappropriate time, and where the agreement is for a fixed term, its termination must be based on a serious and acceptable reason; otherwise, compensation shall be due. These aforementioned rules, principles, and legal provisions remain applicable to the facts of the present case, as evidenced by the fact that the terminated agency agreement provides in the first paragraph of Clause 23 thereof that: "This Agreement supersedes all prior agreements and shall enter into force as of 15/02/2002. It shall be valid and binding upon both parties and may not be terminated by either party unless the other party has first been given written notice of termination at least sixty (60) days in advance at its principal office." This clause grants both parties the right to terminate the agency agreement without cause and without being subject to any condition other than giving the other party written notice of termination at least sixty (60) days in advance at its principal office, which the respondent company complied with, as previously explained in its Statement of Defense in response to the Statement of Arbitration Claim, and that it therefore exercised its right as provided for in the terminated contract, served written notice of termination on the respondent at its principal office, and granted the respondent a period of sixty days prior to termination to settle and liquidate all outstanding financial and administrative matters between them. Accordingly, the respondent company correctly applied the law in terminating the agency agreement that is the

subject of the dispute and exercised its right as provided for in the aforementioned provisions of the law.

Regarding the respondents' statements under the heading "Confirmation of the Claimant Company's Knowledge of the Termination of the Agency Agreement," the respondents stated that, on 18/03/2006, the claimant company served a notice upon the respondents through a process server. At the beginning of that notice, it was stated that "the notifying company (the claimant) was surprised on 17/11/2005 by a letter sent by the General Manager of Iraqi Airways informing it of the termination of the agency agreement." Thereafter, the claimant company served another notice dated 13/05/2006 upon the respondents, containing the same substance as the notice dated 18/03/2006, with the sole correction of a clerical error in the amount of compensation, which it had then claimed as material and moral damages arising from the termination of the agency agreement. This notice constituted the third confirmation of the claimant company's knowledge of the termination of the agency agreement. The second confirmation was on 19/04/2006, being the date of the first meeting between the delegations of the two companies to reach an amicable settlement regarding the financial matters arising from the termination of the agency agreement, during which the claimant company proposed reinstating the agency agreement and requested that the respondents study that proposal. Thus, according to the respondents, it was established that the claimant company had knowledge of the termination of the agency agreement pursuant to Clause 1/23 of the terminated agency agreement. The claimant company did not object to the termination procedures during all those years, which constituted an acknowledgment by it of the validity of those procedures and its certainty that they were consistent with the law and the facts. Based on the foregoing, it is evident that the procedures for terminating the agency agreement on 17/11/2005 were valid and effective against the claimant company. Consequently, the respondents exercised their contractual right as previously explained, and their conduct was lawful and non-arbitrary, giving rise to no entitlement to compensation. Accordingly, the claimant company's second and fifth claims are unfounded and should be dismissed.

Under the heading "Response to the Allegations in the Statement of Claim under the Heading 'Gross Negligence Arising from Prolonging Settlement Negotiations and Obstructing Recourse to Arbitration, the respondents stated that the claimant company's allegation is contrary to the facts and is based on the mistaken assumption that recourse to arbitration requires the consent of both parties, an acknowledgment by the other party, or a request submitted by it. They further stated that the arbitration clause contained in the contract obliges both parties to exert their utmost efforts to resolve the dispute amicably by appropriate means within only three days, and, if no settlement is reached, they must proceed to appoint an arbitral tribunal. Article 16 of the agency agreement provides: "In the event of a dispute arising between the parties, they shall have only three days to settle the dispute amicably, and if no amicable settlement is reached within the said three-day period, recourse shall be made to arbitration without any condition, restriction, waiting for the consent of either party, or obtaining permission from either party." This is contrary to the course adopted by the claimant company, which, on 13/05/2006, sought an amicable settlement with the respondents. Pursuant to a notice served by a process server, negotiations took place but did not result in a settlement. Then, on 07/09/2008, the same attempt was repeated, and an initiative for an amicable settlement was presented to the respondent company pursuant to a notice served by a process server. Negotiations took place as recorded in

the minutes of the meeting dated 16/11/2008 but did not result in a settlement. On 15/11/2008, the claimant served a notice appointing its arbitrator and requested that the respondent company appoint its arbitrator; however, the arbitration proceedings were not completed on the part of the respondent company. Finally, on 04/08/2011, the claimant company appointed another arbitrator, and the arbitration proceedings commenced. The respondents concluded from this that, over a period of six years, the claimant company did not resort to arbitration and every two years, merely sent a notice proposing an amicable settlement. They further argued that there were no legal or contractual impediments preventing the claimant company from resorting to arbitration, as it eventually did in the present proceedings, since pursuing an amicable settlement, engaging in negotiations, and holding amicable meetings do not preclude initiating and pursuing arbitration proceedings simultaneously with such settlement efforts and negotiations. Accordingly, it is evident from the foregoing that the delay was attributable to the claimant company, not to the respondents, since there was nothing preventing the claimant company from resorting to arbitration. Consequently, the alleged fault in this respect has no basis in fact and does not give rise to any entitlement to compensation.

In response to the claimant company's allegations under the heading "Fault Arising from Prolonged Damage to the Reputation of the Claimant Company," the respondents stated that a review of the case file reveals that it is devoid of any document or evidence supporting this allegation, as the respondent company has not, from the date of termination of the agency agreement until the present, harmed the commercial reputation of the claimant company, whether through publication, advertising, or by any other means. On the contrary, it is the claimant company that has consistently engaged in indirectly damaging and defaming the reputation of the respondent company by failing to perform its obligations under the agency agreement, including its failure to pay telephone bills, which resulted in the disconnection of the respondent company's telephone lines. This created a negative reputation before the General Authority for Communications, as well as through its failure to pay amounts due to the Port Authority and EgyptAir, thereby damaging the respondent company's reputation before those entities and tarnishing its image before airlines. Numerous other acts constituting defamation and damage to the respondent company's commercial reputation were caused by the claimant company, and not vice versa. Accordingly, this allegation is entirely without merit and must be disregarded. The respondents further stated that the claimant company had committed numerous violations with the Iraqi Ministry of Commerce, which caused damages and resulted in fines being imposed against it. This was the reason for suspending dealings with the claimant company, and with any company within the group headed by Emad Al-Jalda, due to its failure to comply with the standards and contractual obligations governing its agreements and its failure to pay the fines lawfully and properly imposed upon it. Consequently, the issue of terminating the agency agreement has no connection whatsoever with the termination of its contracts with the aforementioned company or with any entity of the Iraqi government. In addition, the imprisonment of the chairman of Emad Al-Jalda's companies by the Egyptian judiciary on bribery charges was what adversely affected the claimant company's reputation, and these aforementioned reasons had the greatest impact on the claimant company's allegations concerning the termination of contracts entered into with it have no connection whatsoever with the respondent company or with the agency agreement that is the subject of the present dispute. The respondents referred to Document File No. 5 submitted together with the Response and Comments on the Statement of Arbitration Claim.

Under the heading "Response to the Allegations on Page 37 Under the Heading 'Gross Negligence in Failing to Provide the Information and Tools Necessary for the Agent to Perform Its Duties, "the respondents stated that a review of the case file reveals that it contains no request whatsoever from the claimant company addressed to the respondent company seeking any information, documents, or anything else that would assist the agent in performing its duties. Rather, the claimant company's own failure to fulfill its obligations and its insistence on not implementing the agency agreement from the outset were among the reasons that led it to refrain from requesting from the respondent company any information or tools that it might have used in carrying out its duties as agent. Furthermore, there is nothing in the case file indicating that the respondent company refused or declined to provide the claimant company with such information. Consequently, there was no fault whatsoever on the part of the respondent company in this respect; rather, the fault lies with the claimant company itself, and its allegation against the respondent company must therefore be disregarded.

Under the heading "Comments on the Copies of Documents Submitted by the Claimant Company," the respondents stated that, with regard to the landline and mobile telephone bills, an examination of the photocopies submitted by the claimant company shows that they are copies of landline and mobile telephone bills issued in the name of Al-Hussan Company for Import, Export, and Food Packaging, while the mobile telephone bills are issued in the names of private individuals. Accordingly, none of the bills submitted by the claimant company relate, either directly or indirectly, to Iraqi Airways, the respondent company. Even assuming, solely for the sake of argument, that these bills related to the General Agent of Iraqi Airways at the relevant time, a review of those copies shows that not a single invoice is issued in the name of Iraqi Airways or Horse Tourism and Travel Company. Rather, all of the copies submitted by the claimant company relate either to Al-Hussan Company for Import, Export, and Food Packaging or to unknown individuals or friends of the claimant company, or perhaps to their own personal telephone bills, with the apparent purpose of misleading the Arbitral Tribunal into believing that the claimant company paid those bills and that they relate to the terminated agency agreement, whereas in reality they bear no connection whatsoever, whether direct or indirect, to the terminated agency agreement. Based on the foregoing, the respondents requested that reference be made to the agency agreement and its addendum, which clearly show that there is no provision or clause requiring Iraqi Airways to pay the telephone bills of the former General Agent. On the contrary, the agreement expressly provides that it is the former General Agent who is obligated to pay all landline and mobile telephone bills relating to Iraqi Airways.

Under the heading "Plea of Inadmissibility of the Claim for Lack of Standing with Respect to the Second Respondent, the Iraqi Minister of Transport," the respondents noted that the respondent company is an Iraqi public company possessing independent legal personality and financial and administrative independence and enjoying full legal capacity to achieve its objectives. It is represented before the courts and other authorities by its General Manager or his authorized representative, and the management of the company is vested in the Board of Directors is the highest authority within the company and is responsible for formulating and establishing the administrative, financial, organizational, and technical policies and plans necessary for conducting the company's activities, achieving its objectives, supervising their implementation, and exercising all rights and powers relating thereto, pursuant to the Internal Regulations of Iraqi Airways No. 20 of 2000, previously submitted in Document File No. 1. It is established

therefrom that Iraqi Airways, established pursuant to Iraqi Airways Company Law No. 108 of 1988, is a public company, as provided in Article 2, which states: "The company shall be managed by a Board of Directors independent in its administrative and financial affairs and responsible for achieving the company's objectives pursuant to this Law." Article 16 of the same Law further provides: "The Director General shall represent the company in all matters relating to its management and affairs and may authorize or delegate another person to represent him in that capacity." In this regard, the respondents stated that, pursuant to the foregoing, it is clear that Iraqi Airways is a juridical person possessing an independent Board of Directors responsible for its financial and administrative affairs, which manages the company and is entrusted with achieving its objectives. In further confirmation of the provisions of Articles 2 and 16 of Iraqi Airways Company Law No. 108 of 1988, Article 2 of the Internal Regulations of the Iraqi Airways General Company No. 20 of 2000 provides: "The Iraqi Airways General Company shall have independent legal personality and financial and administrative independence, shall enjoy full legal capacity to achieve its objectives, and shall be represented before the courts and other authorities by its Director General or by any person authorized by him." The respondents further stated that the Egyptian Court of Cassation has held that, as a general rule, the Minister represents his Ministry and its affiliated departments and agencies in actions or appeals brought by or against them, unless the law grants a particular administrative body independent legal personality and vests the authority to represent it in someone other than the Minister, in which case that representative shall have such authority within the limits prescribed by law. Accordingly, it is evident from the foregoing that the respondent company is an independent legal entity possessing financial and administrative autonomy and full legal capacity to achieve its objectives, and that it is represented before the courts and other authorities by its Director General or his duly authorized representative, pursuant to the Iraqi Public Companies Law No. 22 of 1997, Iraqi Airways Company Law No. 108 of 1988, and the Internal Regulations of the respondent company. Consequently, the Second Respondent, the Iraqi Minister of Transport, lacks standing in these proceedings because the respondent company enjoys an independent legal personality under the law. Accordingly, the respondents requested that the claim against the Second Respondent be declared inadmissible and that he be dismissed from the proceedings without liability.

Under the heading "Response to the Claimant Company's Allegation Concerning Its Interest in Preserving the Company's Trade Name in the Tourism and Aviation Market Despite the Air Embargo," as set forth on page 28 of its Statement of Claim, the respondents stated that this allegation is refuted by the allegation itself, since the agreement was executed with the claimant company's full knowledge—and indeed its own acknowledgment in the same allegation—that an air embargo had been imposed on Iraq at the time the agreement in dispute was executed. However, Iraqi Airways continued to operate certain flights pursuant to exceptional approvals granted by the United Nations, and this situation existed at the time the agency agreement was entered into, and the claimant company expressed its consent to execute it without raising any reservation regarding this situation.

Under the heading "Response to the Claimant Company's Assertion on Page 28 of Its Statement of Claim That Horus Tourism and Travel Company Was Established for the Purpose of Obtaining and Performing the Agency Agreement That Is the Subject of the Dispute," the respondents stated that this allegation is refuted because it is incorrect, and that, if it were true, it

would constitute an admission by the claimant company that it did not exist at the time the contract was concluded, which would undermine the claimant company's position. The respondents therefore requested that the Tribunal disregard and not rely upon or accept those allegations, which it itself described as false and unfounded.

Under the heading "Response to the Claimant Company's Assertion That the Agency Agreement Is an Indefinite-Term Contract," the respondents stated that the agency agreement that is the subject of the dispute is a fixed-term contract, as established by the sole addendum to the agreement dated 15/03/2001, specifically Article 21 thereof, under which the parties agreed that the term of the general agency agreement would be three years following the commencement of operation of the First Party's aircraft and Iraqi Airways' commercial activities, renewable by agreement of the parties. This provision is clear and leaves no room for dispute that the general agency agreement at issue is for a fixed term of three years. It is also evident that the agency agreement is for a fixed term by virtue of the claimant company's own admissions in several parts of its Statement of Claim, including, by way of example, the last paragraph on page 34, the last paragraph on page 39, paragraph 3 on page 33, paragraph (b) on page 13, paragraph (c) on page 13, and the second paragraph on page 32 of the Statement of Arbitration. Accordingly, based on the provisions of the addendum to the agency agreement specifying a three-year term, together with the claimant company's acknowledgment of that term as previously stated, it is clear that the agency agreement at issue is a fixed-term agreement for a period of three years.

Under the heading "Response to the Allegation Set Out in Clause Fourth on Page 14 of the Statement of Claim," in which the claimant company alleged that, on **02/12/2004**, it received a letter from the respondent company entitled "Termination of the General Agency," expressing the respondent company's desire to terminate the general agency agreement granted to the claimant company and asserting that such termination was based on directives issued by the Iraqi Government, the respondents stated that the agency agreement was terminated pursuant to the notice of termination of the agency agreement issued on 17/11/2005, accompanied by a memorandum dated 17/11/2005 setting out the violations committed by the claimant company. They further stated that no directives had been issued by the Iraqi Government regarding this termination, but that the termination was effected because the claimant company failed to perform any of the obligations set forth in the agency agreement or its addendum dated 15/03/2001. They further stated that the introductory language contained in the letter dated 02/12/2004 was nothing more than a standard preamble used by the company in its letters terminating agency agreements to indicate that the claimant company was among the companies that failed to comply with the agency agreement and had no influence in the aviation market, and that the respondent company does not continue dealing with companies that do not serve the company's economic objectives. This constitutes evidence and confirmation of the claimant company's failure to perform the agency agreement, since, had the claimant company performed the agency agreement and its addendum, the agreement would have been renewed because it would have been classified among the active companies serving the company's economic objectives. However, the opposite was true at that time, which prompted the respondent company to address that letter to the claimant company, and it does not bear the meaning attributed to it by the claimant company.

Under the heading "Response to the Allegations Made by the Claimant Company on Page 14 of the Statement of Arbitration Claim" that "…constitutes a gross error involving an intention to cause harm by classifying the claimant company among the front companies that dealt with a government subject to the regime that prevailed in Iraq prior to the invasion," the respondents stated that this allegation has no basis whatsoever in fact, since the matters relied upon by the claimant company do not relate to the subject matter of this arbitration but rather concern other transactions with Iraqi companies to which the claimant company supplied spoiled foodstuffs, in addition to other commercial activities that have no connection with the subject matter of the dispute. They further stated that the claimant company insists on confusing and intertwining unrelated issues. The respondents requested that the Arbitral Tribunal determine what is relevant to the subject matter of the dispute and disregard matters that are remote from or unrelated to it. They further stated that documents had been submitted establishing that the said letter concerns other violations committed by the claimant company and does not relate to the subject matter of this dispute, namely Document Folder No. 5 submitted together with the response to the Statement of Arbitration Claim. The respondents further stated that, since the claimant company had committed numerous violations against the Iraqi Ministry of Trade, this caused damage and resulted in fines being imposed upon the claimant company, which led to the suspension of dealings with the claimant company and any company within the group headed by Imad Al-Jalda due to its failure to comply with the standards and terms of the contracts concluded with it and its failure to pay the fines lawfully and legally imposed upon it. Accordingly, the termination of the agency agreement has no connection whatsoever with the contracts terminated between the claimant company and any Iraqi governmental entity. Furthermore, the imprisonment sentence imposed by the Egyptian judiciary on Imad Al-Jalda, chairman of the Al-Jalda group of companies, on bribery charges was what affected the claimant company's reputation. Those aforementioned reasons had the greatest impact on what the claimant company alleges regarding the termination of contracts concluded with it, which bears no relation to the respondent company or to the agency agreement that is the subject matter of this dispute, as evidenced by Document Folder No. 5 submitted together with the response to the Statement of Arbitration Claim.

Under the heading "Comments on the Documents Submitted by the Claimant Company," the respondents stated that, upon reviewing the photocopies submitted by the claimant company, it is apparent that they all relate to a company called Al-Hussan Company for Import and Export, and that this is evident because Al-Hussan Company has no connection with the dispute at issue, is not a party thereto, and is not a party to the agency agreement that is the subject matter of the dispute. Furthermore, the terminated agency agreement that is the subject matter of this dispute was concluded between the Iraqi Airways General Company and Horse Tourism and Travel Company. This has several consequences, the most important of which are: 1- The agency agreement was fully effective, together with all legal and financial consequences arising therefrom, whether positive or negative, solely as against Horse Tourism and Travel Company and not any other company. 2- Horse Tourism and Travel Company alone is bound before the Iraqi Airways General Company to perform the agreement directly, fulfill its obligations, and claim the rights arising from the contract, if any, and that it is the sole legal entity under this contract, and not any other company or person. 3- Horse Tourism and Travel Company was contracted in this agency in its capacity as an independent legal entity, and not because it was one of a group of companies, a branch of another company, or a subsidiary thereof, nor was the

Case 1:26-cv-02614-TSC    Document 1-3    Filed 07/24/26    Page 142 of 151

contract concluded with an individual in his personal capacity who owned a group of companies, including Horse Tourism and Travel Company; rather, the contract was concluded with Horse Tourism and Travel Company and not with any other company or because it was one of a group of companies, as previously stated. 4- The contract was concluded and executed with Horse Tourism and Travel Company on the basis that it was an independent legal entity existing at the time of contracting. The agency was granted, and the contract was concluded with it because it was an existing company possessing an independent legal personality at the time of contracting. Nowhere in the agency agreement or its addendum, either expressly or impliedly, was it stated that Horse Tourism and Travel Company was not in existence, would be established, or was under incorporation. Nor was the contract concluded with an individual who, through the agency agreement or under the provisions of the original agreement or its addendum, undertook to establish Horse Tourism and Travel Company, nor was it concluded with a group of companies undertaking that one company within the group would perform the contract. Rather, the fact remains that when the Iraqi Airways General Company concluded the agency agreement with Horse Tourism and Travel Company, which was duly established and licensed under Egyptian law and given that the agency agreement is a contract concluded on the basis of personal consideration, meaning that the principal grants the agency only to a specific person in whom the qualities deemed necessary for representation are present, whether those qualities are economic or otherwise in the first instance—and Clause 3 of the agency agreement expressly provides: "Unless otherwise provided in this Agreement, the General Agent agrees that it shall not assign, transfer, or authorize another person to act on its behalf or perform its obligations under this Agreement without the prior written consent of the First Party." Accordingly, the respondents request that no consideration be given to any documents, copies of documents, financial statements, feasibility studies, contracts, invoices, statements, records, or copies of records submitted before the Arbitral Tribunal that relate to any company other than Horse Tourism and Travel Company in its capacity as the General Agent of Iraqi Airways, and that all such documents be disregarded and set aside because they have no relevance to the subject matter of the dispute.

The respondents concluded their response to the statement of arbitration claim with the following requests:

First: To declare the arbitration inadmissible procedurally and the arbitration proceedings null and void because the constitution of the Arbitral Tribunal violates the arbitration clause, the applicable laws, and international customs.

Second: To declare that the claimant company's right to resort to arbitration has lapsed due to the expiration of the agency agreement that is the subject of the dispute.

Third: To declare that the claimant company's right to bring the claim has lapsed because more than two years have elapsed since the termination of the contractual relationship.

Fourth: To declare the terminated agency agreement void because it was based on a defective intent.

Page 67 of 236

Fifth: To dismiss the claimant company's claims because they are contrary to the law and the facts.

Sixth: Dismiss all claims for compensation sought by the claimant company.

Seventh: Declare the claim inadmissible for failure to submit the original documents.

Eighth: Dismiss the claim for lack of documents supporting the claimant company's allegations.

Ninth: Declare the claim inadmissible as against the second respondent for lack of standing in the proceedings.

Tenth: Declare that the respondents are under no obligation to pay the commission claimed by the claimant company.

Eleventh: Declare that the respondents are under no obligation to reimburse any amounts claimed by the claimant as actual expenses.

Twelfth: Declare that the respondents are under no obligation to pay any bank interest.

Thirteenth: Order the claimant company to pay all arbitration costs, the arbitration deposit, arbitration expenses, the arbitrators' fees, and the respondents' attorneys' fees.

The respondent company, together with the second respondent, reserved, at the conclusion of its requests, its right to submit explanatory memoranda at a later stage in response to and clarification of any points not yet raised or that may subsequently be raised by the claimant company in support of its case against the respondent company and the second respondent. It also reserved its right to assert a counterclaim against the claimant company during the hearings.

The respondents also submitted, together with their comments and response to the statement of arbitration claim, six document binders, which were reviewed by the Arbitral Tribunal, as follows: The First Binder: As stated on its cover, it contained three photocopies of documents. The respondents stated that they consisted of: Document One: the agency agreement that is the subject matter of the dispute, dated 30/01/2001. Document Two: the addendum to the terminated agency agreement, dated 15/03/2001. Document Three: a letter from the IATA Regional Office stating that IATA has no objection to the appointment of a presiding arbitrator, subject to certain conditions. The Second Binder: As stated on its cover, it contained eight photocopies of documents. The respondents stated that they consisted of: Document One: the decision terminating the agency, dated 17/11/2005. Document Two: the decision terminating the agency, accompanied by the schedule of violations annexed thereto, together with and supplementing Letter No. 14, dated 17/11/2005. Document Three: a notice sent by the claimant company to the first respondent confirming the claimant company's knowledge of the decision cancelling and terminating the agency, dated 13/05/2006. Document Four: a notice of the same content sent by the claimant company to the respondents confirming its knowledge of the termination of the agency, dated 18/03/2006. Document Five: minutes of a meeting between the parties confirming the claimant company's knowledge of the termination of the agency and its amicable attempts to

obtain another agency, dated 19/04/2006. Document Six: notice of recourse to the present arbitration, dated 04/08/2011. Document Seven: notice expressing the intention to resort to arbitration without taking the final procedures, dated 07/09/2008. Document Eight: a notice from the claimant company to the respondents, likewise attempting to persuade the respondents to resort to arbitration without completing the procedures, dated 15/11/2008.The Third Binder: As stated on its cover, it contained various documents which, according to the respondents, evidenced violations committed by the claimant company that caused harm to the respondents. The Fourth Binder: As stated on its cover, it contained two photocopies of documents. The respondents stated that they consisted of: Document One: the Internal Regulations of the Iraqi Airways General Company for the year 2000. Document Two: minutes of the meeting between the parties to the arbitration, dated 16/11/2008. The Fifth Binder: As stated on its cover, it contained four photocopies of documents. The respondents stated that they consisted of: Document One: a news report concerning the referral of 28 supporters of Imad Al-Jalda to the Criminal Court. To be submitted to the court on 19/6/2007 in detail. The second document is the news report dated 19/6/2007. The third document consists of various letters issued by the Iraqi Ministry of Commerce indicating the numerous violations committed by the Al-Jalda Group of Companies in areas other than agency representation. The fourth document is the commercial register of the claimant company, together with a certificate of registration and a certificate from the Ministry of Tourism dated 24/2/2009. The sixth file contained, as stated on its cover, six photocopies of documents submitted by the respondent, which the respondent identified as follows: the first document is a notice from the respondent dated 6/3/2012. The second document is a defense brief in Case No. 51 of Year 128 Q, submitted by the respondent company and dated 5/1/2012. The third document is a petition requesting the appointment of a third arbitrator, filed by the claimant company, and dated 29/7/2012. The fourth document is a petition requesting the appointment of an arbitrator for the respondent company, filed by the claimant company on 3/11/2011. The fifth document is a notice from the claimant company to the respondent company regarding the change of the name of the arbitrator representing the claimant, dated 31/3/2012. The sixth document is a notice from the claimant to the respondent agreeing to extend the deadline for appointing an arbitrator for the respondent, dated 26/9/2011.

- A copy of the response and comments on the statement of arbitration claim, together with the document files, has been delivered to the claimant company and to each of the members of the Arbitral Tribunal.

- On 1/2/2014, an arbitration hearing was held in the presence of the parties at the arbitration headquarters located at the office of the Chairman of the Arbitration Tribunal, Prof. Dr. Hassan Abdel Basset Jamei, situated in Apartment No. 15 on the fourth floor of Building 7, Al-Fadl Street, Abdeen – Talaat Harb – Cairo, and in the presence of the full panel of the Arbitral Tribunal, consisting of:  1- Prof. Dr. Hassan Abdel Basset Jamei, Chairman of the Arbitration Tribunal. 2- Prof. Dr. Sherif Mohamed Abdullah Mohamed Mamoun, the arbitrator appointed by the claimant company. 3- Prof. Dr. Mohamed Al-Haj Hamoud Baddin, the arbitrator appointed by the respondent. Also present were Prof. Dr. Salah Al-Din Gamal Al-Din Mohamed Abdel Rahman and Prof. Dr. Mahmoud Salah Al-Din Moslehi Ateya Sherif, attorney-at-law under Power of Attorney No. 1180 of 2011, notarized by the Heliopolis Notary Office on behalf of the claimant company, as previously established. Also present was Mr. Youssef Al-Said Youssef Saad, the company's managing director. Appearing on behalf of Iraqi Airways (the respondent)

were Mr. Ahmed Al-Dreiti Abdul Aziz Mahmoud, attorney-at-law, and Mr. Qaisar Ahmed Akla, Director of the Cairo Office of Iraqi Airways General Company. The two attendees submitted a special power of attorney authorizing their appearance in the arbitration, issued by Mr. Saad Mahdi Saeed Al-Khafaji, General Manager and Chairman of the Board of Directors of the company, authenticated by the Mission of the Arab Republic of Egypt in Baghdad under No. 29 dated 14/1/2014, and authenticated by the Egyptian Ministry of Foreign Affairs under No. 7195 dated 22/1/2014, Ahmed Orabi Authentication Office, and deposited pursuant to Official Deposit Record No. 291, Letter (B), for the year 2014, at the Bar Association Notary Office. The original of the aforementioned power of attorney was attached to the case file. The representatives of the claimant company examined it, and at this hearing the representative of the claimant company stated that the instrument filed was an authorization and not a power of attorney, as is customary in the Arab Republic of Egypt, and that this document does not authorize appearance in the arbitration proceedings. He further added that, in his view, Mr. Qaisar Ahmed lacked the capacity to attend the hearing, and that the aforementioned authorization was undated and had been issued by the Legal Affairs Department of the respondent company. He therefore left the matter to the Arbitral Tribunal to take such action as it deemed appropriate. In response, the representative of the first respondent stated that the instrument submitted at today's hearing was a power of attorney, not an authorization, and that this is the procedure followed for chairmen of the boards of directors of public companies, as it had been authenticated by the ministry to which the company is affiliated, and both the document and its contents had been duly authenticated from the Iraqi Ministry of Foreign Affairs, as well as from the Egyptian Embassy in Iraq; consequently, the Real Estate Registration Authority accepted it for filing. Had it not been a power of attorney but merely an authorization, it would not have accepted it for filing. He further stated that, with regard to the capacity of Mr. Qaisar, who was present at the hearing, the respondent company has the right to appoint and authorize whomever it wishes from among its lawyers or employees, since the law does not require representation at hearings to be limited to lawyers only; rather, this is permissible for all categories and individuals. As for the date of the power of attorney, he stated that this does not invalidate it, because once it has been certified by the competent ministry, the Embassy of the Arab Republic of Egypt in Iraq, and the Egyptian Ministry of Foreign Affairs, and filed with the Real Estate Registration Authority, this constitutes proof of its date, since the power of attorney is to be used in the Arab Republic of Egypt and not in the Republic of Iraq. He further stated that, with respect to the issuance of the power of attorney by the Legal Affairs Department, the Legal Affairs Department is not the entity granting the power of attorney; rather, it is the entity that drafted it and is not its source, while the person possessing the legal capacity to grant the power of attorney is the one who signed it.

The representative of the claimant company responded that this authorization had not undergone the authentication of signatures as required under the Egyptian system. He further argued that Mr. Qaisar, who was present at the hearing, lacked standing to appear because he is not counsel for the respondent company. He also stated that the said authorization had not been authenticated by a notary public in accordance with the laws of Iraq and therefore lacked the status of an official power of attorney required for appearance. The representatives of the claimant company requested the attendance of Dr. Salwa Mohamed Ismail in her capacity as the Financial Director of the respondent company and acknowledged that she was not an attorney. Dr. Salwa Mohamed Ismail submitted a copy of her national identity card and signed the copy on the date of the

present hearing, 01/02/2014. The Arbitral Tribunal permitted her to attend the hearing on the condition that the respondent company submit at the following hearing evidence establishing that she is the Financial Director of the respondent company. The representative of the claimant company then requested the respondent company's commercial register establishing the capacity of Mr. Youssef Al-Said Youssef Saad, whom the respondent company had identified as Chairman of the Board of Directors. The representatives of the respondent company stated that Mr. Youssef Al-Said Saad was not the Chairman of the Board of Directors but rather the Managing Director, and that he had attended the first (procedural) hearing in that capacity and not as Chairman of the Board of Directors, as reflected in the minutes of the hearing, and undertook to submit an official copy of the company's commercial register. The representative of the respondent company then submitted a document stating that it was an official copy of the Internal Regulations of the Iraqi Airways General Company No. 20 of 2000, authenticated by the Iraqi Ministry of Transport, the Iraqi Ministry of Foreign Affairs, and the Egyptian Embassy in Iraq. The representatives of the claimant company reviewed it, and the said document was attached to the case file. The representative of the claimant company maintained his request that the respondent company be ordered to submit a commercial register valid as of the present date, since the document submitted at the hearing had been issued in 2000, in order to verify that no amendments had been made to the information contained therein after the year 2000. He further argued that the submitted document constituted an administrative decision issued by the Iraqi Minister of Transport rather than the company's commercial register. The representative of the respondent company replied that the Internal Regulations of the respondent company submitted at the hearing served as its commercial register because the respondent company is a public company. He further stated that it was for the claimant company to prove otherwise and that he would rebut any such allegation. He added that if the claimant company asserted that amendments had been made to the respondent company's Internal Regulations, it bore the burden of proving such amendments. The representative of the claimant company then reiterated his insistence that the respondent company submit its current commercial register or provide evidence establishing that its Internal Regulations, authenticated by the Iraqi Ministry of Transport, remain in force to this date. It was dated and has not been amended to date. The representative of the respondent stated that the internal regulations submitted are an official copy recently certified by the Iraqi Ministry of Transportation, as evidenced by the signatures and dates appearing thereon, and that if any amendments had been made, they would not have been certified on a date contemporaneous with the present arbitration proceedings. The representative of the claimant company responded that he maintained his request that the respondent be ordered to submit a recent official copy of the respondent company's commercial register. After both the claimant company and the respondent company had concluded their submissions, the Chairman of the Arbitral Tribunal stated that the claimant company's representative had contacted the Secretary of the Arbitral Tribunal by telephone and requested that he inform the Chairman that he had sent an email several hours before the present hearing expressing the claimant company's desire to record the hearings, provide each party with a compact disc following the hearing, transcribe the recording thereafter, have the transcript signed by the Arbitral Tribunal and the Secretary, and furnish each party with a copy of the transcript. He emphasized the claimant company's desire in this regard and requested that this request be recorded in the minutes of the hearing. The Arbitral Tribunal then sought the views of the representative of the respondent company on this request, and the representative of the respondent company objected to recording

the arbitration hearings and requested that the Tribunal rely solely on the official hearing minutes.

After considering the recording request submitted by the claimant company and the respondent company's position, the Arbitral Tribunal decided to continue recording the proceedings solely through the written minutes of the hearing, in the usual manner, to be signed by the parties and the members of the Arbitral Tribunal.

The Chairman of the Arbitral Tribunal, Prof. Dr. Hassan Abdel-Baset Jamei, then reviewed the course of the arbitration proceedings, the matters previously agreed upon at the first (procedural) hearing, and the minutes thereof, which had been held on Thursday, November 28, 2013, at the arbitration venue between the parties to the arbitration, together with the decisions previously issued by the Arbitral Tribunal following its review and deliberations. The Chairman explained that, pursuant to the procedural deadlines established by the Arbitral Tribunal in the minutes of the first (procedural) hearing and agreed upon by the parties, the claimant company filed its statement of arbitration claim on December 28, 2013, accompanied by a document binder containing six document files, each containing the documents listed on its cover, all of which were photocopies. The claimant company also submitted seven copies of two cardboard boxes containing collections of photocopies that had not been organized into document files and did not bear on their covers any indication of the date, a detailed description of their contents, or the number of documents or pages they contained.

The first cardboard box contained photocopies of groups of papers, with the first page of each group bearing the following title:1- Photocopies entitled "Feasibility Study." 2- Photocopies entitled "Response to the Violations." 3- Photocopies entitled "Payments to Iraqi Airways."4- Photocopies entitled "Second Originals."5- Photocopies entitled "Export Contracts Not Performed Due to the Termination of the Agency Agreement. "The second cardboard box contained:1- Photocopies entitled "General and Administrative Expenses for 2002 – Group (A) and Group (B)."2- Photocopies entitled "Administrative and General Expenses – Rent."3- Photocopies entitled "Bank Interest on Delayed Payment to Al-Hussan Due to the Termination of the Agency Agreement." 4- Photocopies entitled "Landline and Mobile Telephone Expenses for the Years 2003, 2004, 2005, 2008, 2010, and 2012."5- Photocopies entitled "Administrative and General Expenses – Advertising and Promotional Campaign. "The Chairman of the Arbitral Tribunal further explained that the claimant company also filed on 01/01/2014 seven copies of another box containing documents consisting of photocopies of papers that were not placed in document binders and did not bear on their face the date, the number of pages, or a detailed description of the papers. These consisted of: 1. Photocopies bearing on the first page the title "Financial Statements from 01/03/2001 through 30/09/2013." 2. Photocopies bearing on the first page the title "Salaries and Social Insurance for Employees of the General Agent Company for Iraqi Airways from 2001 through 2013." The Chairman of the Arbitral Tribunal explained that the members of the Arbitral Tribunal and the respondent company had been notified by e-mail and by registered letters with acknowledgment of receipt of the statement of claim and the accompanying documents submitted by the claimant company, as well as the additional documents submitted by the claimant company on 01/01/2014, and that the respondent had been provided with a copy of the statement of claim, the document binders, and the papers contained in the three boxes, and that each of the esteemed members of the Arbitral Tribunal had received a

copy thereof. The arbitrators appointed by the claimant company and the respondent company, together with the Chairman of the Arbitral Tribunal, acknowledged receipt of a copy of the statement of claim and all the documents and papers deposited by the claimant company at the seat of arbitration, as previously described. The representative of the respondent company likewise acknowledged receipt of a copy of the statement of claim and all such documents and papers deposited by the claimant company at the seat of arbitration, receipt of which was confirmed after they had been reviewed before the Arbitral Tribunal and the parties during the hearing. The Chairman of the Arbitral Tribunal further explained that, on **27/01/2014**, the respondent company filed at the seat of arbitration seven copies of its response to the statement of claim, together with seven copies of six document binders containing photocopies of the documents identified on their covers. He further explained that each member of the Arbitral Tribunal and the claimant company had been provided with a copy of the respondent company's response to the statement of claim together with the accompanying documents, and that the members of the Arbitral Tribunal and the claimant company had received the respondent company's response to the statement of claim and the documents attached thereto. The arbitrators appointed by the claimant company and the respondent company, together with the Chairman of the Arbitral Tribunal, acknowledged receipt of a copy of the response to the statement of claim and all the documents and papers deposited by the respondent company at the seat of arbitration. The claimant company likewise acknowledged receipt of a copy of the response to the statement of claim and all the documents deposited by the respondent company at the seat of arbitration, receipt of which was confirmed after they had been reviewed before the Arbitral Tribunal and the parties during the hearing. Thereafter, Professor Dr. Mohammed Al-Haj Hamoud Baddin, the arbitrator appointed by the respondent company, requested that the Secretariat of the Arbitration use, as the address for correspondence with him and for the delivery of all memoranda, papers, documents, and correspondence addressed to him, whether from the Arbitral Tribunal or from the parties, the premises of the Embassy of Iraq, located at 1 Abdel Moneim Riad Street, Midan El Thawra, Mohandessin, Giza Governorate. The parties to the arbitration and the Arbitral Tribunal agreed to this arrangement, provided that all documents be delivered to the Secretariat of the Arbitration for forwarding to him.

Since the Arbitral Tribunal permitted both parties to present their oral arguments, the representative of the claimant company commenced his pleadings and stated that he was submitting seven copies contained in two boxes as a supplement to the three boxes previously submitted, and that these two boxes likewise had not been placed in document binders and did not bear on their face the date or any descriptive information and a detailed list of their contents or a statement of the number of sheets or pages, as follows: The fourth box contained**: First:** Photocopies bearing on the first page the heading "General and Administrative Expenses for 2003 – Group (A) and Group (B)." Second: Photocopies bearing on the first page the heading "Continuation of General and Administrative Expenses." The representative of the claimant company present at the hearing explained that the papers include:

- Electricity, water, and gas consumption for the years 2001, 2002, 2006, 2007, 2009, and 2011;

- Electricity, water, and gas consumption for the years 2003, 2004, 2005, 2008, 2010, and 2012;

- Landline telephone expenses for the years 2001, 2002, 2006, 2007, 2009, and 2011;

- Mobile telephone expenses for the years 2001, 2002, 2006, 2007, and 2011.

The fifth box, according to the representative of the claimant company present at the hearing, contained: First: Photocopies bearing on the first page the heading "General and Administrative Expenses for 2001 – Group (A) and Group (B)." Second: Photocopies bearing on the first page the heading "Continuation of General and Administrative Expenses" for the years 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012. Third: Continuation of general and administrative expenses, landline telephone, water, and gas expenses for the year 2013. Fourth: Continuation of general and administrative expenses, details of the advertising campaign for Iraqi Airways and Horse Tourism and Travel Company.

- This being so, copies of all the documents and papers submitted by the claimant company, as previously described, were delivered to the arbitrators appointed by the claimant company and the respondent company, as well as to the Chairman of the Arbitral Tribunal. The representatives of the respondent company also acknowledged receipt of a complete copy of these documents and papers submitted by the claimant company during the hearing, and such receipt was confirmed by reviewing them before the Arbitral Tribunal and the parties to the arbitration at the present hearing. Likewise, copies were provided to the arbitrators appointed by the parties to the arbitration and to the Chairman of the Arbitral Tribunal. The representative of the claimant company also acknowledged receipt of a copy, and such receipt was confirmed by reviewing it before the Arbitral Tribunal and the parties to the arbitration at the present hearing. The Arbitral Tribunal reviewed all of these documents. The representatives of the claimant company, in their oral pleadings, responded to and commented on the defenses raised by the respondent company in its response to the Statement of Arbitration Claim, in accordance with their views regarding those defenses, and requested additional time to submit a memorandum setting out their defense and comments. The representatives of the parties to the arbitration acknowledged that the photocopy of the agency agreement submitted by both parties, together with its official translation issued by the North Cairo Court and dated 30/01/2001, constitutes an original document that neither party may dispute. The parties to the arbitration further agreed that, pursuant to what had been agreed upon at the first procedural hearing, namely that Arabic shall be the language of the arbitration, the official translation issued by the North Cairo Court, a photocopy of which had been submitted by each party in its document binders, is the version containing the terms of the underlying agreement between them in Arabic, including the arbitration clause, the term of the agreement, and all its provisions, and shall be deemed to be the agreement concluded on 30/01/2001, without recourse to the English-language version and without affecting any events, agreements, or meetings that followed that agreement or the legal consequences arising therefrom. The parties to the arbitration also agreed that the photocopies of the addendum to the agreement dated 15/03/2001 shall likewise be deemed original documents and may not be disputed by either party. The same applies to the two decisions issued and signed by the respondent company.

On 11/14/2005 and 11/16/2005 and issued on 11/17/2005. This applies to all the photocopies submitted by the parties. The representative for the Respondent submitted a document folder with seven copies of the documents listed on its cover.

The representatives for the Claimant requested a copy of the cartons of documents they presented in the hearing on this day, referenced in the transcript so that the Claimant could index them, place them in document folders, list the number of pages, and put the document data on the folder covers, provided they return the documents to the arbitration center thereafter.  This would also apply to the three document cartons deposited with the arbitration center prior to the present hearing.  The representatives for the Respondent and the tribunal both agreed to this.

After hearing arguments, studying the documents, and deliberation among the members of the arbitral tribunal, the tribunal decided on the following:

1.   Set the initial arbitration fees at USD 1,800,000, to be divided equally between the Claimant and the Respondent and paid within ten days from the date of this hearing.  If either of the parties fails to pay its share, the other party may pay the delinquent party's share within an additional ten days following the initial ten-day period.

2.   This fee must be in the form of a bank cheque (certified and acceptable for payment), in the names of the members of the arbitral tribunal, delivered to each member of the tribunal as follows:

    (1) Payment of 40% (forty percent)of this fee, equivalent to $720,000 (seven hundred and twenty thousand US dollars) in the name of the Chair of the arbitral tribunal, Dr. Hasan Abdul Basit Muhammad Gomaa,

    (2) Payment of 30% (thirty percent) of the fee, equivalent to $540,000 (five hundred and forty thousand U.S. dollars), in the name of the Arbitrator named by the Claimant, Dr. Sharif Muhammad Abdullah.

    (3) Payment of 30% of the fee, equivalent to $540,000 (five hundred and forty thousand U.S. dollars), in the name of the arbitrator named by the Respondent, Dr. Muhammad al-Haj Hamoud Beden.

3.   The arbitral tribunal decided that if the fee is not within the prescribed deadline, it may take appropriate measures, to include suspending the arbitration proceedings until the full amount of the fee is paid, as described above.

4.   The parties stipulate and the arbitral tribunal agrees to: (1) Grant the Claimant a continuance until Saturday, February 15, 2014, to provide seven copies of documentation, arguments, and defenses to the arbitration center.  Grant the Respondent a continuance until Sunday, March 16, 2014, to provide seven copies of documentation, arguments, and defenses to the arbitration center.  The hearing will be held in in the arbitration center on Saturday, March 22, 2014 at 4:00 PM, on condition that the arbitration fees explained above have been paid.

On 2/15/2014, the Claimant (Horus) filed its memorandum and document folder in seven copies. The arbitral tribunal reviewed these documents. In this memorandum, the Claimant stated that the Respondent had argued to reject the arbitration claim in its 1/27/2014 memorandum, based on:

In paragraph 1, the Claimant rejected the allegation that the arbitration proceedings must be voided since the arbitral tribunal was formed in violation of current law and rules for international arbitration, since it was an appeal to a final judicial ruling in Case No. 76 of JY 29, High Appellate Court of Cairo and was not conducted as prescribed by law. The Claimant stated that Respondents spent seven pages explaining this argument, on the pretext that the matter should have been referred to the regional director of IATA for appointment of the presiding arbitrator and that the appellate court in Cairo should have ruled for lack of jurisdiction to hear the case, etc. The Claimant added that it leaves the determination of jurisdiction to the final judgment issued in Case No. 76 of JY 126, which concerned the appointment of the presiding arbitrator (attached to the application to commence arbitration proceedings before this body). It does not provide a sufficiently detailed response. In addition, the Respondents acknowledge on page 8 of their answer to the statement of claim the existence of an official, authenticated document issued by the Regional Director of IATA stating that neither he nor the organization has jurisdiction to appoint the presiding arbitrator in this dispute. Therefore, it is impermissible to argue based on an interpretation disregarded by the Court of Appeal. The Respondent also acknowledged that the addendum to the original contract, dated 3/15/2001, is supplementary and complementary to the original contract. Furthermore, the Claimant asserted that the statement at the beginning of page 10 of the memorandum, that the addendum does not amend the contract, is incorrect, as evidenced by the fact that the aforementioned addendum amended the contract term to three years after it had been indefinite. The Claimant added that this entire defense is an appeal against the final judicial ruling to appoint Dr. Hasan Abdul Basit Gomaa as chair of the arbitral tribunal as being an improper legal procedure. Therefore, this issue may not be raised before this esteemed body.

The Claimant argued that the Respondents' initial argument "to negate the arbitration proceedings, since the formation of the arbitral tribunal violates current international law and international rules" is invalid. The Respondent argued that the arbitration was an improper appeal against a final judicial ruling. The Claimant stated that the Respondents claimed the appellate court should have appointed an arbitrator of a different nationality, based on Article 11/5 of the UNCITRAL Rules, which includes the "desirability" of appointing an arbitrator of a nationality other than that of the parties. Their claim that a foreign arbitrator must be appointed is a violation of law. There is some confusion between the legal and linguistic concepts of "desirable" and "obligatory." In addition, the UNCITRAL Rules are for guidance and are not binding. Lastly, this argument, like the last, is an appeal against the final judgement in Case No. 76 of JY129 appointing Dr. Abdul Basit Gomaa as chair of the arbitral tribunal. Therefore, these arguments should be denied.