# EXHIBIT A-3

Under the header "The Respondents answer that the Claimant waived the right to arbitration for three days to allow for an amicable resolution is illegitimate, according to the legal principle that prohibits taking advantage of contradictions.  It contradicts documents submitted by the Respondents, especially the warnings dated 3/6/2012 and 11/25/2008.  On this question, the Claimant responded that the Respondents alleged the period for amicable resolution is only three days, based on Article 16 of the basic agency contract, drafted on 1/30/2001.  The Claimant argues that precedent in Fiqh and international arbitration regarding international business relationships has established the principle of "non-contradiction" derived from the principle of estoppel.  The concept behind this principle is that no party may benefit from a contradiction it causes, either personally or from a person under the party, to the detriment of others.  This is an application of the principle of good faith during arbitration proceedings.  This is clear from the facts of the dispute, where the Respondent served legal warnings, their representatives signed meeting minutes, the Respondents corresponded with the Claimant during the negotiations to appoint the second arbitrator and the presiding arbitrator.  All of this occurred after the decision to stop the agency on 11/16/2005.  These warnings were submitted by the Respondents in their document folder provided to the esteemed arbitral tribunal on 1/27/2014 and include the meeting minutes dated 4/19/2006 in Document Folder 2, No. 5, the meeting minutes dated 11/16/2008 in Folder 4, Document No. 2, and the warning from the Respondents on 3/6/2012 to the Claimant, confirming that an amicable resolution was still available as of this date.  The Claimant added that this was in addition to a number of mutual warnings that the Respondents decided not to include, but were provided by the Claimant, such as the warning from the First Respondent to the Claimant on 11/25/2008.  This warning confirmed that Article 16/1 of the original contract, which set the amicable resolution period at three days, was amended by paragraph 16 of the agency contract addendum by putting no time limit on an amicable resolution.  According to the acknowledgement of the First Respondent, amicable efforts are still open and available to the parties until a final decision is made. The Claimant concluded by stating that based on the preceding, especially the warning dated 3/6/2012, which stated "On 10/20/2011 and 10/22/2011, there were meetings between a delegation from the warning company (Respondent) and the warned company (Claimant) within the framework of an amicable resolution regarding the amount payable arising from the "abrogation" of the agency contract that was allotted to the Claimant. The warning company attached a copy of the proposed agency contract addendum from the warned company and expressed its opinion during the week of 3/6/2012 that if there were no response during this period, it would be considered a dissolution of any amicable settlement.  On this basis, the Claimant concluded that in light of everything, it is abundantly clear from the contradictions in the documents and demands from the Respondents, and in application of the legal principle that a person may not benefit from his contradictions with the result of damage to others (the Claimant), that they are acting in bad faith with allegations that contradict the documents that they produced.  Therefore, the argument that the right to arbitration has lapsed with the end of the three-day period for amicable resolution is invalid and should be denied.

<u>The Claimant rejects the argument to refuse photocopies provided by the Claimant</u>.  The Claimant denied that it had previously pledged to provide original documents determined by the Respondents to the arbitral tribunal and technical experts in the arbitral hearings.  In addition, the meeting minutes dated 2/1/2014 show a mutual agreement for document copies submitted by all parties.

<u>The Claimant rejects the allegation that the Claimant's right to bring a suit lapsed after two years from the end of the contractual relationship, since the contract was in force as of this date.</u>  The Claimant responded that the Respondents relied on Article 190/2 of the Commercial Code.  They stated at the end of page 19 of their memorandum that this text means that for cases brought by an agent against its principal for wages, fund or any other amounts payable, it is the agent's responsibility to bring civil action within two years from the end of the agency contract.  They allege without basis from the text or legal interpretation that this article applies to all disputes arising from all contracts, of limited and unlimited term.  They also allege incorrectly that the date for the end of the contractual relationship was 11/17/2005, since this was the date the Respondents annulled the contract because of the Claimant's failure to meet its obligations. In response to this allegation, the Claimant stated that the contractual framework between the parties to the dispute consists of three documents: the general agency contract, dated 1/30/2001, which was of an unlimited term; the addendum to the agency contract dated 3/15/2001, which amended the contract term to three years from the start of operations; and the second addendum to the agency contract, concluded in the meeting minutes dated 8/29/2005, signed by pilot Abd Ali Aboud (general manager), which included re-activation of the contract in Article One, after a decision to end it had been issued on 12/2/2004.  This addendum included an amendment to the contract term in Article 10 to three years from the date of actual operations, auto-renewable for an identical term.  The contract would be renewed unless one of the parties informed the other party of its desire not to renew at least 60 days prior to the date for renewal via certified letter with confirmed receipt.  Neither party may demand termination or nonrenewal unless there is gross error by the other party.

The Claimant added that the Respondents erred in their arbitrary stoppage of the contractual relationship at their sole discretion, as shown by four documents and decisions:  <u>Decision to Terminate the Agency</u>, signed by Engineer Atta Nabeel Hussein on <u>12/2/2004</u>, which stated, "In light of the national guidance in New Iraq to reorganize the General Company for Iraqi Airways... far removed from the influence of the previous regime... we would like to inform you of our company's desire to terminate the agency agreement..."; <u>The Agreement to Activate the Agency</u>, previously granted within the contractual framework signed by General Director Pilot Abd Ali Aboud on 8/29/2005, which restored the original contract and the first addendum; then <u>The Decision to Terminate the Agency</u>, dated 11/14/2005, signed and sealed by the same general director who signed the agreement to re-activate the contract on 8/29/2005.  This document included the text, "Whereas the restart of air traffic by Iraqi Airways from and to Egypt and your company's failure to meet it's obligations to our company, it has been decided to end the agency

contract.  In addition, there is the Decision to Stop the Agency, dated 11/16/2005, two days after the previous decision, signed and sealed by the same general director, Abd Ali Aboud, which attempted to impute some of the violations to the Claimant as justification for stopping the agency contract, which concludes the first line of page three by stating, "Therefore, we have decided to halt the agency for the aforementioned reasons.  Our company will operate directly through our office in Cairo."  It states at the end of the document, "We hope you will coordinate with the Iraqi Embassy in Cairo to nominate a litigation attorney in good standing."

The Claimant stated that it is clear from this statement that concerning the general agency contract, with its two addenda dated 3/15/2001 and 8/29/2005, decisions were made at the sole discretion of the Respondents and without following legal procedure.  These four decisions were to end, then terminate or withdraw, re-activate, then terminate and withdraw by a decision to terminate, then annul or withdraw, then issue a decision to stop agency activity, then a decision to stop that was not followed by a decision to terminate as of this date.  The Claimant added that there is no certified letter with proof of receipt, according to the contract and its addendum on 5/29/2008 [*sic*], stating its desire to terminate the agency, as of the date of this arbitration. The Claimant added that the decision to stop activity was not a decision to terminate the agency, but a decision to freeze and suspend the contract so the Respondent could operate on its own.  The renewal of the contractual relationship shows that the contract was still in force.  Some, but not all, of its impacts were enacted as a result of the Respondent's refuse to meet its obligations to enable the Claimant to complete its duties.  The contract stoppage entails that the contract is still active and not dissolved but performance of its obligations are not obligatory.  The Claimant added that the decision for stoppage refers to the inclusion of the Iraqi Embassy (the state).  The decision for stoppage also refers to the recruitment of an attorney to bring a case for contract termination, which has not yet transpired as of that date or the present.

Based on the Claimant's citations, it considers the contract as stopped by the decision issued by the principal on 11/16/2005 and not as terminated.  The argument that it has no right to bring a case after two years, as stated in Article 190/2 of the Commercial Code, does not apply.  As support, it relies first on the interpretation of the phrase "agency termination" as used in Article 190/2 and subject to the rules for interpretation in Egyptian law, the first of which is to refer to other legal text in the same legal system. Article 714/3 of the Civil Code sets the course for the termination of agency, which is to complete the action entrusted by the agency, termination of the term for the agency contract, and the death of either the principal or the agent. It does not include the premature termination by one party's sole discretion. There is then a significant chasm between termination and completion.  The allegation that the passage of two years from the completion of the relationship is an attempt to apply text where it does not belong.

The Claimant has a second channel of support with the phrase "and all other cases are dropped..." contained in Article 190/2 of the Commercial Code, referring to cases other that the case for compensation that are not restricted by the limitations found in Article 190/1, which were dropped by a ruling from the Supreme Constitutional Court on 7/12/2012.  This ruling

found that limitations for bringing a case for compensation are governed by the general rules in Article 68 of the Commercial Code, which set seven years from date of completion of the obligation.  There is no cause for invoking Article 190/2, since it is an exception to the general rule on the statute of limitations for cases of commercial debt, an exception that needs no elaboration or consideration. The Respondents' own allegation confirms this. From a third aspect, the Claimant affirmed that this is confirmed by a proper legal treatment of the contract as a general agency contract, as described in the basic contract.  It is not based on a project of specified duration or a special lapse time.  As a result, it comes under the general rules found in Article 68 of the Commercial Code, which set seven years from the date the obligation is completed. The Claimant concluded that the reliance on Article 190/2 for the disputed contract is out of place.  This is supported by a fourth aspect.  The Respondents entered into official, serious negotiations on amending the contract and added an addendum to the contractual framework attached to the warning dated 3/6/2012, which cuts off the contractual relationship without terminating the contract in fact or by ruling, but through a declaration that the contract was active through the date of this warning.

The Claimant stated that in such a situation, the Respondents can't speak of dropping or lapsing while they also declare that the contract is ongoing.  By their behavior, they announce their full liability for compensating the Claimant, and therefore their need to fulfil their obligation by paying compensation to the Claimant, as made abundantly clear by their offer of a new addendum to the agency contract, dated 3/6/2012, in exchange for cessation of litigation and recourse to arbitration.  If this were not an acknowledgement of their liability, then why voluntarily make this generous offer, with no coercion or compulsion, by serving the judicial warning?

The Claimant concluded by maintaining that this defense is without merit in law, since there is no regulation for the term after dissolution per Article 190/1.  Article 190/2 refers to cases other than a case for compensation.  The term described therein regards contract termination, but there is no support in the documentation that the contract has been terminated.  In law and in fact the contract has been stopped but is still in effect between the parties as of the date of this arbitration claim.

In response to the claim that the contract is void since it was signed with a company that did not exist, the Claimant explained that the basic contract was signed on 1/30/2001, the addendum was signed on 3/15/2011 [sic], and its existence was confirmed by the minutes dated 8/29/2005.  If one wanted to cause a controversy that the company's registration was not completed as of 1/30/2001, the company was in fact under establishment and therefore had all the rights to operate according to the theory of appearance, approved by Egyptian law. The Claimant added that this lack, if any,  was rectified by the signature date for the contract addendum on 3/15/2001, after the official establishment of the company on 3/14/2001, and corrected by the signature on the second addendum on 8/29/2005.

In response to the Respondents' statement on page 32 of its defense memorandum that there was

no willingness for an agreement in the meeting minutes of 8/29/2005 so there was no effect, the Claimant stated that if there were any agreement or decision to terminate or stop that required approval of the board of directors, as claimed by the Respondents, and that there was no willingness for the agreement to re-activate the contract, as stated in the meeting minutes signed and sealed by the general director, Abd Ali Aboud, on 8/29/2005, then it would logically and legally follow that all decisions made in this manner, signed and sealed by the general director (especially the alleged decision to terminate) would have been made without this same willingness. This would require that the agency contract would still be in effect, since the Respondent can't rely on its error in not obtaining the agreement of the board of directors and the approval of the relevant minister, so this allegation may be disregarded.

In response to the Respondents allegation on page 61 of its memorandum that the Claimant did not fulfil its obligations in the agency contract and its addenda, the Claimant stated that this claim is contrary to all that has been proven in the document submitted by the Claimant on 2/1/2014, which were delivered to the Respondents.

To support its protest against the Second Respondent and the Iraqi government regarding the arbitration clause in the general agency contract, the Claimant responded to the Respondents' argument on page 86 in the answer to the arbitration claim that the case was impermissible against the Second Respondent, the Iraqi Minister of Transportation, since it lacked capacity.  It based this claim that the Respondent is an Iraqi public company with its own financial and administrative independence, represented by its general director in all of its management.  This is in application of the Law on the Iraqi Public Company, the Law on the Iraqi Airways, and its bylaws.  In response, the Claimant stated that if the principle is that the arbitration clause only binds the parties to the original contract, then it is accepted that the arbitration clause extends to whoever engages in the preparation, execution, and termination of the contract.

The Claimant maintained that international arbitration precedent has established that an arbitration agreement extends to parties who directly participate in contract execution, as long as it can be constructed by their position and actions that they were knowledgeable of the limits and scope of the arbitration agreement.  The following are indicators of this knowledge. The Claimant cited the commentary of the deceased Doctor Burhaan Amr Allah on the ruling of the Paris Appellate Court, issued on 12/7/1994 in the Magazine for International Arbitration, third edition, Beirut, 2009, page 824. He stated that whoever engages in the discussion or clearly is involved in the execution of a contract with an arbitration clause is bound by the same clause, in application of the theory of appearance.  The Claimant also referenced the paper by Ahmed al-Warfali entitled *Arbitration in Commercial Disputes*, Arbitration Magazine, Edition 14, page 181.

The Claimant stated that the Egyptian Court of Cassation established the criteria for involvement in contract execution as to whether one of the parties was subject to an arbitration clause in its ruling on commercial cassation on 7/22/2004 in Appeals 4729 and 4730 of JY 72.

The Claimant also cited the ruling of the French Court of Cassation, the Paris Appellate Court, and an arbitration award issued by a panel formed in accordance with the rules of the International Chamber of Commerce to confirm the established principle that knowledge of an arbitration clause and actual participation in the agreement containing this clause is sufficient to extend the clause to those who have not signed the agreement. The precedent rejected the claim that this extension requires the intent of this person to be bound by the arbitration clause. The Claimant also cited precedent from an arbitral tribunal formed in accordance with the rules of the Cairo Regional Centre for International Commercial Arbitration on 3/11/1999 in Claim No. 109 of 1998 to accept an arbitration claim against a parent company even though it was not a party to the contract under dispute. The Claimant stated that these rulings support the claim that if the parent company participates in the formation and execution of the contract, just as the case for the parent company in the international arbitration at the Cairo Centre, which terminated the contract under dispute by letter, the same treatment applies to the instant claim, since the Iraqi Ministry of Transportation and the Iraqi government were involved not only in the contract signing but in the execution, termination, and stoppage phases, as proven by the following: During the contract signing stage the Claimant stated that the original contract, entitled "General Agency Agreement," dated 1/30/2001, was signed by the General Director of Iraqi Airways, Naji al-Mashadani. However, the preamble states that the agreement was subject to the approval of government authorities. The Claimant added that the addendum to the agency contract dated 3/15/2001 stated in Article 2 that the contract comes into force after obtaining "formal approvals." The Respondents repeatedly used this phrase. This confirms that the nation of Iraq - the Iraqi Government - and the Iraqi Ministry of Transportation participated in the negotiations and signing of the agency contract and its addendum and that they were aware of the scope of the arbitration clause. As a result, they implicitly accepted being subject to this clause and its implications. Accordingly, they are parties in the agency contract under dispute, which includes an arbitration clause. The Claimant referenced many documents that prove Iraqi authorities were involved in the contract signing, execution, termination, and stoppage, to include:

(1) Correspondence No. 81 from the Respondents, dated 1/28/2003, regarding the status of legal cases, with the signature of the general director, Ma'moun Muhi al-Din. This correspondence contained the phrase, "Copy to the Ministry of Transportation and Communications." This correspondence was provided in Document Folder No. 1, Document No. 1.

(2) Correspondence No. 417 from the Respondents, dated 12/2/2004, to the Claimant regarding the termination of the general agency agreement, which contains the following phrase in its beginning, "In light of national guidance in New Iraq to re-organize Iraqi Airways... we would like to inform you of our company's desire to terminate the general agency agreement." This document was submitted in Document Folder No. 1, Document 2.

(3) Respondent correspondence dated 11/1/2005 to the Claimant regarding the stoppage of the agency, signed and sealed by the general director, Abd Ali Aboud, with the phrase, "Copy to the Ministry of Transportation . . . Please coordinate with the Iraqi Embassy in Cairo to

recruit a litigation attorney in good standing to represent the legal section so we can communicate and contract with this person." This document was submitted in Document Folder No. 2 provided by the First Respondent.

(4) Correspondence from the Iraqi Minister of Transportation, Amal Abdul Jabaar, dated 4/11/2010, to the Secretariat of the Iraqi Council of Ministers, explaining that the First Respondent, a subordinate entity of the Ministry of Transportation, had informed him in Correspondence No. 2976, dated 3/1/2010, that the general agency contract with the Claimant had been cancelled, based on a letter from the Secretariat of the Iraqi Council of Ministers, Attachment 16/1, dated 5/8/2005, which categorized the Claimant as a type of front company and which stated that the arbitration clause may cause the Respondent significant material damage. The minister recommended that the matter be resolved amicably to avoid damage to the company.  Document Folder No. 1, Document No. 3.

(5) Warning from the First Respondent to the Claimant, dated 8/10/2011, regarding the period to choose an arbitrator.  This document proves that the decision required approval from the prime minister, the Iraqi Minister of Transportation, and the board of directors of Iraqi Airways.  The document mentions the dispatch of a delegation from the Ministry of Transportation and the First Respondent to chose an arbitrator.  Document Folder No. 1, Document 4.

(6) Warning from the First Respondent to the Claimant dated 10/9/2011, which confirmed the contents of the previous warning.  In this document, the Respondent confirms the Minister of Transportation's interest in the matter and his final decision that the delegation would be led by the general director . . . The Claimant referred to a document that makes clear the subordination of the First Respondent to the Ministry of Transportation and subjection to its oversight and control - Document Folder No. 1, Document No. 6

(7) Warning from the First Respondent to the Claimant dated 10/13/2011 confirming the attendance of a delegation from the Ministry of Transportation at the meeting for an amicable settlement with the Claimant - Document Folder 1, Document No. 5.

(8) Correspondence from the Iraqi Embassy in Cairo dated 4/2/2012 to the head judge of Commercial Circuit 62 in the Appellate Court of Cairo requesting a delay in proceedings to allow for the appointment by the case debtor to maintain the rights, funds, and interests of the Republic of Iraq.  The original of this documents is in the document folder for Case No. 51 of JY 128, hearing on 4/5/2012.  This case was brought by the Claimant against the First Respondent.  In this claim, it is found in Folder No. 1, Document 7. (9) Warning from the First Respondent to the Claimant, dated 5/30/2010 to appoint the First Doctor Fadhel Muhammad Jawaad Kathim, who holds the position of the Advisor to the Prime Minister for Legal Affairs as its arbitrator, Document Folder No. 1, Document No. 8.

The Claimant closed this section by stating that it is abundantly clear from the preceding that both the Iraqi Council of Ministers and the Iraqi Minister of Transportation were involved in the

establishment, execution, cancellation, and stoppage of the contract and the negotiations for an amicable settlement.  Therefore, the arbitration clause in the disputed contract does extend to both, so they become parties to the arbitration clause and must be included in this present arbitration claim.  The First Respondent's defense that the claim may not be made against the Minister of Transportation is without basis and must be denied.

The Claimant closed its memorandum of commentary by firmly maintaining the following:

1.  Rejection of the arguments presented by the Respondents for the reasons stated herein, while preserving its rights to submit a detailed answer supported by documentation in the hearing scheduled for 3/22/2014 and thereafter.

2.  Addition of a new request to the requests for compensation in the arbitration claim, which is to give a final arbitration award with expedited execution.  In light of the urgent nature of the matter and its massive damage, the compensation would be of assistance.

3.  Notification to the Second Respondent of the arbitration claim or assign the First Respondent to serve notice to enable the attendance or assignment of an attorney to represent it or require the First Respondent to obtain a power of attorney therefrom.

The Claimant reserves the right to move for the inclusion of the Iraqi government, represented by the prime minister (head of government) or another from government agencies.  It also reserves the right to present technical expert reports, the originals of documents previously submitted, and additional supporting documentation.

The Claimant attached a document folder to the aforementioned memorandum, which the arbitral tribunal perused.  It consisted of eight photocopy documents with a list on the folder cover.

Document No. 1: Letter from the First Respondent to the Claimant, with notice to the Ministry of Transportation, dated 1/28/2003.

Document No. 2: Letter from the Respondents for the first cancellation of the disputed agency, dated 12/2/2004.

Document No. 3: Letter from the Iraqi Minister of Transportation to the Secretariat of the Council of Ministers, dated 4/11/2010.

Document No. 4: Warning from the First Respondent to the Claimant, dated 8/10/2011.

Document No. 5: Warning from the First Respondent to the Claimant, dated 10/13/2011.

Document No. 6: Warning from the First Respondent to the Claimant, dated 10/9/2011.

Document No. 7: Copy of the document folder presented by the First Respondent as an attachment to the Iraqi Embassy letter dated 4/5/2012.

Document No. 8: Warning from the First Respondent to the Claimant of the appointment of the advisor to the Iraqi Prime Minister as its arbitrator, dated 5/30/2012.

The Claimant explained on the folder cover that these documents indicate the involvement of the Iraqi Prime Minister, the Iraqi Minister of Transportation, and others from government agencies, to include the Iraqi Embassy in Cairo, to provide proof that they are participants in the instant arbitration claim.

In execution of the stipulation between the parties to the arbitration claim, approved by the arbitral tribunal in the hearing on 2/1/2014 to the request by the representatives for the Claimant to receive a copy of the cartons they delivered in the same hearing and referenced in the transcript for indexing and placement in document folders with the number of pages and document data on the folder covers, on condition that they be returned to the arbitration center thereafter, to include the three cartons previously deposited with the arbitration center before this hearing, the representatives for the Respondent and the arbitral tribunal agreed to this.  The Claimant received five cartons the Claimant had previously deposited, it attached the index and the arbitral tribunal reviewed all the documents and index.

On 3/2/2014, the chair of the arbitral tribunal received a correspondence stating the Dr. Muhammad al-Haj Hamoud was not able to perform his arbitration duties set for Tuesday, 3/3/2014 in light of work and health circumstances.  The Chair of the arbitral tribunal contacted Dr. Muhammad al-Haj Hamoud, the arbitrator named by the Respondent, by telephone and confirmed the situation.  An email was received from Ahmed al-Dareeni, attorney for Iraqi Airways, stating that they had received correspondence from Dr. Muhammad al-Haj Hamoud to excuse him from arbitration duties because of his inability to perform his duties.  The Respondent requested a continuance from the hearing scheduled for 3/22/2014 until a new arbitrator could be assigned and provide an answer to the memorandum from the Claimant.  On Saturday, 3/8/2014, the arbitration center received certified mail from Dr. Muhammad al-Haj Hamoud that stated his inability to continue in the arbitration role in light of work and health circumstances.  The parties were notified of this development.

On Saturday, 3/15/2014, Ahmed al-Dareeni, attorney for the Respondent, came to the arbitration center and delivered a letter to the arbitration secretariat stating that Dr. Abdul Hameed al-Ahdab, Lebanese nationality, had been appointed as its arbitrator in place of Dr. Muhammad al-Haj Hamoud Beden.  The letter also requested that a date be set for the arbitration proceedings and also a date for the submission of a defense memorandum from the Respondent, which had been set for 3/16/2014 but was suspended because of the incomplete panel.  The parties and the arbitrator named by the Claimant were notified, stating the proceedings would resume as soon as Dr. Abdul Hameed al-Ahdab accepted the arbitration duties.

On Tuesday, 3/18/2014, the office of the chair of the arbitral tribunal received a letter from Dr. Abdul Hameed al-Ahdab, the arbitrator named by the Respondent, with his acceptance of the arbitration duty and his declaration of neutrality and independence.  The parties and the arbitrator named by the Claimant were notified.

On Saturday, 3/22/2014, the parties were notified that with the formation of the panel with the

appointment by the Respondent of Dr. Abdul Hameed al-Ahdab to replace Dr. Muhammad al-Haj Hamoud Beden, the panel decided to set 1:00 PM Thursday, 4/10/2014, for the hearing in the meeting hall of the Cairo Automobile Club.

On Monday, 3/24/2014, the Claimant, the Horus Company for Tourism and Travel, was notified that as of this date, they had not yet paid the entirety of their share of the initial arbitration fees, as stated in the transcript of the hearing on 2/1/2014. They had paid a bank cheque to the members of the arbitral tribunal for USD 600,000. Each arbitrator received their own cheque, but the remainder of the fee, USD 300,000, had not yet been paid. The party was informed that since the arbitral tribunal had decided to hold the hearing on 4/10/2014, there was a need to pay the full share for the initial fees before the hearing date. The remainder of the initial fees for the arbitrator appointed by the Respondent was to be paid by bank cheque in the name of Dr. Abdul Hameed al-Ahdab or with the arbitral tribunal, with consideration that the bank cheque drafted in the name of the recused arbitrator, Dr. Muhammad al-Haj Hamoud, would be dealt with by the arbitral tribunal in its new form.

If payment was not made according to the decision from the panel, the matter would be presented to the panel in its new form for appropriate action.

On the same date, the Respondent, Iraqi Airways, was notified that it had not yet paid its share of the initial fees, as stated in the transcript from the hearing on 2/1/2014. The arbitral tribunal had decided to hold the hearing on 4/10/2014, so the party was informed it needed to pay its complete share of the initial fees before the hearing, provided that the payment be made to the arbitrator appointed by the company to replace the retired arbitrator, Dr. Muhammad al-Haj Hamoud, by issuing a bank cheque in the name of Dr. Abdul Hameed al-Ahdab. If the fee was not paid, the matter would be presented to the panel in its new form for appropriate action.

On Monday, 4/7/2014, Iraqi Airways, the First Respondent, paid the entirety of its share of the initial arbitration fees through a bank cheque in the names of the members of the arbitral tribunal, in compliance with the decision of the arbitral tribunal in the transcript from 2/1/2014. Each arbitrator received their own bank cheque.

On Tuesday, 4/8/2014, the Claimant delivered the remaining USD 300,000, the outstanding amount from its share of the initial fees, as set in the transcript of the hearing on 2/1/2014.

On Thursday, 4/10/2014, the arbitral tribunal met by itself at 10:00. In the beginning of the meeting, Dr. Abdul Hameed Jalaal al-Ahdab, the arbitrator named by Iraqi Airways, the Respondent, accepted the arbitration duties, pledged his complete neutrality and independence from the parties to the dispute and all behavior befitting an arbitrator. He then signed a written acknowledgement of the same. The parties were so informed. Dr. Abdul Hameed stated that he had apprised himself of all details of the claim following his assignment as arbitrator and had received and read all proceedings and rulings in the arbitration claim. He also received and read all memoranda, documents, arguments and defenses, and transcripts of hearings. He received a copy of everything that had been delivered to the previous arbitrator, and which had been

delivered by the Respondent to his residence in Beirut.

After the arbitral tribunal's reading of the documents, memoranda, hearing transcripts, and all decisions and proceedings, and after discussion and deliberation, the members confirmed their previous decision regarding the third hearing, to be held in the same location at 1:00 PM, as previously announced to the parties.  This hearing would be in the presence of the parties. Procedures to integrate Dr. Abdul Hameed Jalaal al-Ahdab into the panel were completed after his acceptance of the assignment.  The other arbitrators welcomed Dr. al-Ahdab in writing to continue in the proceedings. The panel decided to hear oral arguments from the parties and enable them to submit motions, all types of arguments and defenses, documents, and memoranda, with the arbitral tribunal making its decision at the end of this hearing.

On the same date, 4/10/2014, at 1:00 PM, the arbitral tribunal held its hearing with the following in attendance: Dr. Dhalah al-Din Jamaal al-Din Muhammad Abdul Rahman; Dr. Mahmoud Salaah al-Din Masaylahi Attiyah Shareef, attorney previously confirmed; Dr. Fiyaadh Melfi Aqeel al-Qudah, Jordanian attorney, by a POA from the Claimant with original attached to the arbitration file and a letter from the Egyptian Bar Association to the Chair of the arbitral tribunal stating there is no objection to his attendance with the defense; Mr. Yousif al-Sayyid Yousif Saad, manager of the Claimant; Salwa Muhammad Isma'il, financial manager for the Claimant, who had previously attended hearings;

Mr. Ahmed al-Dareeni Abdul Aziz Mahmoud, attorney previously confirmed, attended for Iraqi Airways.

In the beginning of the hearing, the Chair of the arbitral tribunal confirmed the notification of the retirement of Dr. Muhammad al-Haj Hamoud Beden, arbitrator named by the Respondent, who was replaced by Dr. Abdul Hameed Jalaal al-Ahdab, so that the formation of the panel was complete with Dr. Abdul Hameed's acceptance of the arbitration assignment.  The chair also showed the panel's previous agreement to notify the parties of the arbitrator's meeting on Thursday, 4/10/2014 at 10:00 AM, during which the acceptance by Dr. Abdul Hameed of the assignment was confirmed and his signature to a written acknowledgement of the assignment, neutrality, independence and compliance with all behaviors befitting an arbitrator.  The panel also declared that it had read all the documents, memoranda, hearing transcripts, and all proceedings and rulings.  The panel discussed these and confirmed the day's hearing with the parties and enabling them to give oral argument, submit documents, memoranda, submit motions, and give all types of arguments and defenses.

The chair informed the parties of the panel's meeting to determine the fee for the retiring arbitrator previously named by the Respondent, Dr. Muhammad al-Haj Hamoud Beden, and the Claimant's ability to recover the bank cheque in his name, then reissue bank cheques for an amount calculated for him and a cheque for Dr. Abdul Hameed al-Ahdab, as determined by the panel in the previously mentioned meeting. The parties approved these procedures.

The panel indicated that the cheque to Dr. Muhammad al-Haj, discussed in the 4/10/2014

meeting of the arbitral tribunal, had been retrieved after Dr. Muhammad returned it to the secretariat.  The Claimant, based on decisions approved by the parties in the same meeting, issued a bank cheque for USD 100,000 in the name of the retiring arbitrator as payment for services rendered before his retirement.  The former arbitrator received the bank cheque. The Claimant also issued another bank cheque in the name of Dr. Abdul Hameed al-Ahdab for USD 104,000, who received this cheque, thus settling the cash balance payable from the Claimant's share of the initial fees.  All of the arbitrators received their share of the initial fees from both the Claimant and Respondent. The Claimant provided cash payments to each arbitrator for the difference between what they received as bank cheques and the amount of the share required for the initial fees.

To complete the procedures for the hearing on 4/10/2014, the chair asked the parties if either of them had any objections or reservations regarding the appointment of Dr. Abdul Hameed al-Ahdab as arbitrator.  The representatives for the Claimant and Respondent acknowledged their acceptance and non-objection.

The chair recited the proceedings and decisions from the beginning of the claim, from the first procedural hearing held on Thursday, 11/28/2013, the second hearing with the parties in attendance on Saturday, 2/1/2014, and the proceedings and exchange of memoranda and documentation up to the present hearing on Thursday, 4/10/2014.  The parties acknowledged the accuracy of the presentation.

The chair stated that in execution of the panel's decision during the second hearing to grant the Claimant until 2/14/2014 to submit its memoranda and documentation to the arbitration center in seven copies, the Claimant, Horus Company for Tourism and Travel did submit its memorandum and documentation in seven copies.  The panel read these documents, made notes on the covers, and delivered a copy to the Respondent.  The members of the panel also received a copy.  The chair stated that the Claimant also returned the five cartons with an index stating the number of pages for each.  The panel examined this and provided a copy of the index for the five cartons to the Respondent, who confirmed receipt of their contents.

The chair then stated that the panel, in its former configuration, granted the Respondent until 3/16/2014 to provide its memoranda and documentation to the arbitration center in seven copies. However, in light of the retirement of the Respondent's arbitrator, Dr. Abdul Hameed, and the suspension of proceedings until a new arbitrator could be named, the Respondent did not submit its memoranda and documentation and requested a pause and notification to the parties to enable them to submit these requirements after the formation of the arbitral tribunal was completed.

The chair asked the parties if there was any object or reservation to the recitation of prior proceedings to form the current panel.  No party expressed any objection or reservation.  Both parties accepted the chair's recitation of proceedings to form the arbitral tribunal.

The panel allowed the parties to give oral argument.  Both parties made motions, clarifications, or submitted memoranda and documents.  The representative for the Claimant moved for a

continuance to complete its commentary to the Respondent's commentary to the arbitration claim.  The representative for the Respondent agreed to this motion.

The representative for the Respondent requested a continuance to allow for a commentary to the commentary to the Claimant's [*sic*] commentary with a deadline after the end of the period allotted for the Claimant.

The representative for the Claimant submitted a memorandum in seven copies moving for the inclusion and notification served to the following new parties to the claim:

1.  The Prime Minister of Iraq, in his official capacity, as representative for the Iraqi government.

2.  The Iraqi Minister of Transportation, in his official capacity, as representative for the Ministry of Transportation.

3.  The Iraqi Minister of Finance, in his official capacity, as representative for the Iraqi Ministry of Finance.

The Claimant maintained its reasoning and support as stated in its memorandum regarding this motion for service and inclusion.

Dr. Abdul Hameed al-Ahdab, arbitrator named by the Respondent, stated that only Egyptian law applies to the arbitration claim, so citations from French case law has no bearing on the applicable law.  The representative for the Claimant requested evidence for the statement from Dr. Abdul Hameed.  Dr. Abdul Hameed responded that he was not restricting submissions by the parties but was only expressing his opinion.  The representative for the Claimant agreed that Dr. Abdul Hameed's comment was an expression of his opinion.

After hearing oral argument and reading documentation, legal discussion and deliberation, the panel decided on the following, with the approval of the parties:

1.  Grant the Claimant until 5/10/2004 [*sic*] to submit a supplemental memorandum with documents commenting on the Respondent's answer to the claim.

2.  Grant the Respondent until 5/11/2014 to comment, with documents, to the Claimant's commentary.

3.  The secretariat will provide notice to the parties of the schedule for the next hearing.

With this, the hearing concluded; the representative signed the meeting minutes after reading and reviewing it.

On 5/10/2014, in performance of the panel's decision during the hearing on 4/10/2014, the Claimant (Horus for Tourism and Travel) filed its supplement memorandum and seven document folders with the arbitration center.  The panel read these documents.  A description of their contents will come later.

In its 43-page memorandum, the Claimant maintained its arguments from the arbitration claim,

memorandum submitted on 2/15/2014, and the memorandum for inclusion of new parties submitted on 4/10/2014.  In addition to the motions in this memorandum, it added a reply to the Respondent's arguments and defenses.

The Claimant referred to the arbitration claim to avoid repetition and added a reply to the answer to the claim submitted by the Respondent on 1/27/2014, in which it stated that the facts presented were in conflict with the facts proven by the documents.  The Claimant then presented its arguments and made a number of requests in closing.  Its response is as follows:

On the legal treatment of the general agency agreement subject of the present arbitration claim, the Claimant maintained its argument from the initial claim for the legal treatment of the basic agency agreement dated 1/15/2001.  It stated that although the contract appears to be a contract for an agency of contracts in form and appearance, upon review of the provisions of the basic agency contract and its addenda, it becomes apparent that it is actually in essence a "general agency contract" with a special and distinct character which does not belong among other contracts regulated by the Commercial Code.  The Claimant stated that the Civil Code regulates agency provisions in Articles 699 through 717, stating their structure, effect, and termination. Article 699 states that agency is a contract whereby the agent is obligated to perform legal work on behalf of the principal. Article 701/1 states, "An agency granted in general terms without specifying the type of legal act shall confer..."  Article 710 states,  "The principal must reimburse the agent for necessary expenses incurred in the normal   execution of the agency, with interest from the date of expenditure, regardless of the agent's   success in performing the agency." Article 711 states, "The principal shall be liable for damage suffered by the agent, without fault on the agent's part, resulting from the ordinary execution of the agency." Commercial Code No. 17 of 1999 regulates commercial agency in Articles 148 through 191.  Among the general provisions are many types of commercial agencies and the rules applicable for each.  The legislation is confined to regulating two types of agencies, by commission and by contract. Article 161 of the Civil Code states "In reciprocal contracts where obligations are due simultaneously, either party may withhold performance if the other fails to perform his obligation."

A review of the agency in dispute reveals that it is entitled "General Agency."  The addendum dated 2/15/2001 confirms this name with its title "Addendum to the General Agency Contract," which was signed by Iraqi Airways and Horus for Tourism and Travel.  In a third instance, this name is confirmed in the agreement to activate the agency dated 8/29/2005.

The Claimant stated that the preamble to the basic contract contains: "This agreement and it articles" are subject to approval by government authorities.  Article 2 requires that the First Party not assign any other party to perform similar services, considering that Article 4 clarifies that the Claimant is subject to the supervision of the First Respondent in the conduct of business.  Article 6 of the basic contract confirms that all documents remain the sole property of the First Party.

The Claimant also stated Article 9 does not allow the general agent (Claimant) to change or

amend any of the provisions or articles in the transport provisions or publications put in place by the First Party (First Respondent).

Article 11/5 of the general agency contract states, "Regardless of the preceding text, there is nothing that will prevent the First Party from compensating the general agent for costs resulting from the First Party's requirements."

The Claimant stated that treating the disputed agency contract as if it were an "agency of contracts" contradicts Article 178 of the Commercial Code, which states that the contracts agent alone bears the expenses necessary for managing his activities.  Therefore, the disputed contract fails to meet the criteria for an agency of contracts for lack of independence and the compensation paid to the general agent for his costs in performing the obligations in the contract and its addenda. It is obvious that the Claimant has no independence from the First Respondent, but is under its supervision and oversight, whether directly or through its regional director.  As a result, this contract lacks the essential characteristics of an agency of contracts.  The explanatory memorandum on Article 178 of the Commercial Code states that this article adds the provision that the agent must act independently for the contract to be considered an agency of contracts. Therefore, the disputed contract may not be considered an agency of contracts because the agent is not independent.

The Claimant stated that Article 11/1 of the basic agency contract supports this argument, where it states: "The First Party (First Respondent) must pay commission to the general agent for tickets on the First Party's airlines."  This means that the general agency contract has the characteristics of a commission agency.

The Claimant stated that based on the preceding, the general agency contract is a mix of various contracts, to include contracting and labor contracts.  Therefore the correct description is that it is a mixed contract with its own nature, so it can't be included as a commission contract or an agency of contracts.  It is a type of special agency contract (a contract to sell and promote airline tickets and bills of lading and provide other services to airline companies under the supervision of the principal). Both parties have joint interest in the contract and are bound by their agreement.  Therefore, it is impermissible for either party to solely cancel it to the detriment of the other party, especially since the last addendum, dated 8/29/2005, gives the Respondent the right to terminate the contract only through a court order. Note that the final articles of the contract state that any text contrary to its provisions is void.

In response to the Respondent's initial argument, and in response to the defense to void the arbitration proceedings since the formation of the arbitral tribunal is in violation of current rules for international arbitration, the Claimant mentioned that it had previously responded to this allegation in detail in its 2/15/2014 memorandum in which it refuted this allegation, noting that the Respondent had accepted all members of the arbitral tribunal and the completion of arbitration procedures, as acknowledged by the arbitral tribunal. The Claimant states that this allegation of a dispute over the arbitration fails because the Respondents acknowledged the

arbitration in the transcript of the first procedural hearing on 11/28/2013 and repeated this acknowledgement in the transcript to the third hearing on 4/10/2014.

In response to the allegation that the arbitration should be voided as in violation of rules for international arbitration because the chair has Egyptian nationality, the Claimant stated that this allegation was made in page 11 of the Respondent's defense memorandum and was responded to in its memorandum from 2/15/2014.  It added that the Respondents assigned an foreign arbitrator, Dr. Abdul Hameed al-Ahdab (Lebanese) to replace their original Iraqi arbitrator.  The chair of the arbitral tribunal was assigned by a final court order, so the formation of the arbitral tribunal was legally correct, so this argument has no basis.

In response to the allegation that the Claimant's right to arbitration fails according to Article 16 of the basic general contract, the Claimant stated that it responded to this allegation in detail in its memorandum from 2/15/2014.  It added that the Respondents acknowledged the arbitration in the hearing on 11/28/2013, page 3, where the Iraqi side insisted many times since 2006 through 11/28/2013 that it had sought to resolve the matter amicably with the Claimant.  This confirms that the Respondents' continual search for an amicable solution beyond the three days alleged by Article 16 of the basic agency contract was a matter of laudable graciousness by the Claimant and proves its good faith in keeping its contractual obligations.  In contrast, this argument is a show of the Respondents' bad faith, since they were trying to draw out the amicable resolution process over many years.  Not only is the allegation that the right to arbitration has lapsed impermissible in law according to the theory of estoppel (the ban on contradiction), this period was merely an organizational schedule that was not binding on either party; it is not an imperative norm or a matter of public interest.  It does not relate to public order.  There may be an agreement to the contrary by considering it a supplemental rule.

Under the title "Four:" regarding the argument to deny the photocopies submitted by the Claimant, the Claimant stated that it had previously responded to this allegation in its 2/15/2014 memorandum.  It added that Article 30/3 of the Egyptian Arbitration Law allows any party to attach copies of documents.  This applies to any documents or evidence it intends to submit. In addition, the Respondent did not specify which documents it protested, especially since it had submitted dozens of documents that were identical to those submitted by the Claimant, either before the arbitral tribunal or during the case to appoint the arbitrators.

In response to the Respondents' request to deny the claim since original documents were not submitted and the documents were in a foreign language that had not been translated with an official translation into Arabic, the Claimant stated that this allegation was a total disgrace, since the Claimant had not submitted any documents in a foreign language.  It had only submitted a copy of an approved translation into English of the basic agency contract.

In response to the allegation that the Claimant's right to bring suit has lapsed because of a passage of two years from the end of the contractual relationship, the Claimant stated that it had previously responded to this allegation in its 2/15/2014 memorandum.  It added as explanation

on the treatment of the contract under dispute that it is a general agency contract with a mixed and special character that is not subject to Article 190/2 of the Egyptian Commercial Code, but is subject to the general rule in Article 68 of the Commercial Code, as noted in the 2/15/2014 memorandum on page 10. In addition, the contract was stopped but still in force and effect between the parties until the start of the arbitration claim, according to the general rules in the Civil Code.

Under paragraph 7, in response the allegation that the agency contract is void because it was established based on defective will, the Claimant stated that it had responded to this allegation in its 2/15/2014 memorandum.

In response to the allegation from the Respondent and others that it is permissible to cancel the agency subject of the arbitration based on sole discretion, the Claimant had previously explained how it was not permissible to cancel the agency subject of this arbitration on sole discretion in the arbitration claim and in the memorandum from 2/15/2014. It added that the Respondents claimed they had the right to cancel the agency at their sole discretion on page 25 of their answer to the arbitration claim, according to Articles 4 and 715 of the Egyptian Civil Code and Article 163 of the Egyptian Commercial Code. The Claimant reiterated that the Respondent relies on Article 715/1 in the Civil Code, focusing on the text "The principal may terminate or restrict the agency at any time, even if otherwise agreed." It is worth noting that the Respondent chose to leave out the remainder of paragraph one of Article 715, which states, "If the agency is remunerated, the principal must compensate the agent for damage caused by dismissal at an inappropriate time or without valid reason." This was a deliberate omission to distort justice, deprive the Claimant of its rights, and intentionally cause damage. The Claimant added that the Respondent intentionally left out reference to Article 714 of the Civil Code, which states "The agency terminates upon completion of the assigned task or upon expiry of the period stipulated for the agency. It also terminates upon the death of either the principal or the agent." The Claimant maintains that this article specifies three reasons for the termination of an agency. Sole discretion is not one of these reasons.

In addition, on page 2 of its answer to the arbitration claim, the Respondent cites Article 4 of the Civil Code, that "Whoever exercises his right lawfully shall not be liable for any harm arising therefrom." which the Respondents relied upon in order to found thereon their right to terminate the Agency by unilateral will, considering it a lawful right, and consequently to deny their liability for any damages arising from the termination. The Claimant Company noted, in response, that the Respondents deliberately omitted Article 5 of the Civil Code, which provides that: "The exercise of a right is unlawful in the following cases: 1. If it is intended only to cause harm to another. 2. If the interests it seeks to achieve are of so little importance that they are wholly disproportionate to the harm caused to another as a result thereof. 3. If the interests it seeks to achieve are unlawful." The Claimant went on to state that the Respondents' termination of the Agency by unilateral will exhibited every form and manifestation of the unlawful exercise of a right set out in Article 5, and that even assuming the exercise of the right to terminate the

Agency were in itself a lawful right, the exercise of that right becomes unlawful in the three cases set out above — all of which were present in the case of the unilateral termination at issue in the present dispute, given that it was intended solely to harm the Claimant Company and to appropriate for the Respondents' own benefit the financial and non-financial returns that would otherwise have accrued to the Claimant Company had the Agency continued as agreed. Moreover, the damage sustained by the Claimant Company as a result of this premature termination vastly and dramatically exceeds the interests for which the Respondents terminated the Agency.

**As for the arguments raised by the two Respondents based on the provisions of the Commercial Code under this heading,** the Claimant noted that they had referred, at the foot of page 27 of their Reply Memorandum to the Statement of Claim, to Article 163 of Egyptian Commercial Code No. 17 of 1999, which provides that: "Either party to a commercial agency contract may terminate the contract at any time, and no compensation shall be due unless the termination is effected without prior notice or at an inopportune time. Where the contract is for a fixed term, its termination must be based on a serious and acceptable cause, failing which compensation shall be due." The Claimant observed that the Respondents persist in the practice of citing only the portion of the article that serves their position in order to justify their unlawful and abusive conduct, while deliberately omitting the remaining portion of the text — an approach inconsistent with the correct application of the law. Applied to the present case, it is evident that the Respondents deliberately disregarded the reference to the case of a fixed-term contract, whose termination must be based on a serious and acceptable cause, failing which compensation is due — which is precisely the situation at issue in the arbitration now under consideration. The Claimant further added that such abuse of right, as described above, constitutes a breach of the obligation to perform the contract in good faith, as embodied in Article 148 of the Civil Code, which provides that "the contract must be performed in accordance with its contents..." Applying the foregoing legal principles and rules to the Respondents' conduct toward the Claimant, and to the fundamental contractual and legal obligations involved, it is clear that their conduct is inconsistent with the contractual obligation and legal duty of good faith. The Claimant concluded from the foregoing that the Respondents had no right to terminate this Agency by unilateral will, given that it is an exclusive agency relating to the common interest of both contracting parties, and requested that the Respondents' defense asserting their right to terminate the Agency by unilateral will be rejected.

**Under the heading: Response to the Respondents' Defense that the Minutes of the Meeting Dated 29 August 2005 Should Not Be Considered an Integral Part of the Agency Contract**

The Claimant Company noted that the Respondents argue that the Minutes of the Meeting dated 29 August 2005 should not be regarded as an integral part of the Agency Contract, and that no effect should be given to it, on the ground that it merely records discussions raised by the Respondent Company in preparation for the Respondent Company obtaining the requisite approval of the General Company's Board of Directors on these points — approval which, once obtained, would then be formalized as an addendum to the Agency Contract to be signed by both parties, as occurred with the addendum to the Agency Contract dated 15 March 2001, all as required by Article 14 of the Internal Regulations of the General Company for Iraqi Airways. The Claimant also noted that the Respondents stated that any contract or agreement made, or any commission determined, without the approval of the Board of Directors of the General Company

(the first Respondent Company) is of no effect, gives rise to no obligation or effect whatsoever toward the General Company for Iraqi Airways, and does not become operative unless and until approved by the Board of Directors — since it is not among the powers of the General Manager alone to approve or ratify such matters. They stated that this is established by the Internal Regulations of the General Company for Iraqi Airways No. 20 of 2000, a copy of which is attached to the Claimant Company's bundle of documents, and that the Claimant Company was aware of this procedure. The Claimant further noted that this defense concluded with the statement: "It is thus evident to the honorable Tribunal that the Claimant Company was aware of the necessity of obtaining the approval and ratification of the Board of Directors of the Respondent Company, and only thereafter, upon ratification of the views reached and the minutes of the meeting by the Board of Directors, would the matter — at that point — be formalized as an addendum to the Agency Contract and considered an integral part of the Agency." The Claimant stated that this defense has no basis in fact or in law, because the Respondents' own memorandum states, at page 37, that the Egyptian Court of Cassation has held that "the terms of an instrument complete one another, and its interpretation must be based on the meaning of all its terms taken together, not on what a particular term may suggest in isolation from the meaning of the instrument as a whole." The Claimant further noted that the Court of Cassation has also held that: "In interpreting instruments, the court interprets them according to the meaning conveyed by the instrument as a whole, not according to what a particular phrase within it may suggest in isolation." The Claimant stated that applying these legal principles makes clear that regard must be had to the overall meaning conveyed by the instrument, and that the instrument at issue is entitled "Minutes of Meeting," and that its preamble records that a meeting took place between the General Company for Iraqi Airways and Horus Company for Tourism and Travel, the General Agent for the airline within the Arab Republic of Egypt, for the purpose of reactivating the opening of an air route and the carriage of passengers and cargo for the Baghdad–Cairo–Baghdad sector, and facilitating scheduled flights operated by aircraft of the General Company for Iraqi Airways; and that, based on the negotiations held on 26 and 27 August 2005 and in the presence of the signatories to these minutes, agreement was reached to reactivate the Agency Contract and its addendum executed between the General Company for Iraqi Airways and the General Agent, Horus Company for Tourism and Travel, dated 30 January 2001 and its addendum of 15 March 2001, and on the terms set out therein, and that anything inconsistent therewith is thereby repealed. The Claimant noted that it is thus clear that this meeting was not, as the Respondent Company claims, a mere record of discussions drawn up at the Claimant Company's request, but was in truth and in substance a concluded agreement as described above, comprising all the elements of a contract — parties, subject matter, cause, and reciprocal obligations — together with the repeal of anything inconsistent therewith among the prior agreements; and as such, it constitutes an integral part of the principal contract dated 30 January 2001 and of its addendum dated 15 March 2001, insofar as it does not conflict with their provisions. The Claimant further added that it is remarkable and curious that the agreement dated 29 August 2005 is the only one of the three instruments comprising the contractual relationship that does not contain the phrase "this agreement and its terms are subject to the approval of the governmental authorities," which appears in the preamble of the principal contract and likewise in the addendum to the Agency Contract dated 15 March 2001, whose Clause 22 states: "This contract shall be deemed effective upon obtaining the requisite approvals." The 2005 agreement, by contrast, imposed no such condition, meaning that it has been valid and effective since its conclusion and execution by the very same authority that executed and adhered to the first and

second instruments comprising the contractual relationship (the Chairman of the Board of Directors–General Manager of the General Company for Iraqi Airways); moreover, it is distinguished from them in that it does not require the obtaining of any (governmental or procedural) approvals. Accordingly, this meeting constitutes a valid and effective contract producing all its legal effects, the foremost of which is the repeal of anything in the prior agreements that conflicts with its terms.

**Under the heading: The Claimant Company's Response to the Statement Made in the Respondents' Statement of Defense at Pages 50 and 51**

The Claimant Company stated that the Respondents' own memorandum, in referring to the continuation of amicable settlement efforts as a result of the suspension of performance of the Agency Contract, constitutes an express and unequivocal admission by the Respondents that the two meetings dated 20 and 22 October 2011 took place within the context of continuing amicable settlement efforts concerning the Claimant Company's financial entitlements arising from the Respondents' unilateral suspension of performance of the Agency Contract, notwithstanding the commencement of arbitral proceedings on 4 August 2011 and their notification thereof. The Claimant stated that this confirms the invalidity of the Respondents' defense that the Claimant Company's right to resort to arbitration had lapsed by the expiry of the three-day period set out in Clause 16 of the principal contract. The Claimant further stated that the Respondents' admission of the continuation of amicable settlement efforts as a result of the suspension of performance of the Agency Contract constitutes an express waiver by both parties of the aforementioned three-day period. The Claimant Company further stated that, in order to put an end to any dispute over this defense, it submits to the honorable Tribunal a copy of the notice dated 25 November 2008, which states verbatim: "and in implementation of this paragraph of the addendum to the Agency Contract, the resolution of all new developments and disputes by amicable means is not bound by any time limit, and has, by virtue of this paragraph, become open-ended between the parties and unrestricted by any specific period." The Claimant Company stated that this is what appeared in the Respondents' own notice.

The Claimant also pointed to the reality that the Respondents seek to evade and refuse to acknowledge — namely, that what is stated in their Statement of Defense reflects a desire to avoid resorting to arbitration in the first place, and to procrastinate in resolving the dispute, which has continued for more than nine years, together with the continued non-performance of their contractual obligations toward the Claimant Company. The Claimant added that what the two Respondents stated in their Statement of Defense is devoid of truth and unsupported by any evidence, and that, in confirmation of this, the Claimant Company, on 6 March 2012, stated as follows in response to their notice: "In response to your notice, the Claimant Company hereby informs you of its rejection of this notice, given that you have exhausted the amicable settlement efforts, and the Claimant Company reiterates its request for the prompt appointment of your arbitrator so as to complete the arbitral proceedings previously commenced by you as of 4 August 2011 — particularly since the time limit for the appointment of your arbitrator has already expired as of 4 October 2011 — and given that the proposals submitted by you throughout the preceding years have not risen to the level of a substantive solution and have not been made in good faith, the Claimant Company hereby informs you that the Statement of Claim will reach you within a few days. Please be advised that the commencement of arbitration and the conduct thereof shall not preclude you from settling accounts with, and compensating, your counterparty in accordance with its prior claims, in demonstration of your good faith and in

rebuttal of the bad faith apparent from all of your prior correspondence." The Claimant Company stated that this demonstrates that the Respondents' conduct amounts to nothing other than a misleading of justice. The Claimant further added that the Respondents' admission of having "handed over" to the Claimant Company a copy of the Agency Contract — while objecting to the three-year term specified therein as noted on the principal contract — means only that the Claimant Company had fulfilled all of its obligations thereunder; moreover, it constitutes an express admission by the Respondents of their own fault in terminating the Agency by their unilateral will, for otherwise the Respondent Company would not have made the Claimant such a generous offer — which confirms the Claimant Company's entitlement to compensation and to all financial dues. The Claimant Company also stated that the Respondents mentioned, at paragraph 51 of their first Statement of Defense, that they had submitted, in their document bundle, a copy of the notice dated 6 March 2012 accompanied by a copy of the proposed addendum to the Agency Contract; however, upon examining their document bundle No. 6, it is apparent that this addendum was not in fact attached to the notice — deliberately and in bad faith — because what this addendum in fact establishes is the falsity of the Respondents' repeated allegation that the Agency Contract had been validly cancelled, and, conversely, it confirms the truth of what the Claimant Company has stated. This notice, issued by the Respondents and dated 6 March 2012, and its subject matter — the sending of the Respondents' proposals regarding the proposed addendum to the Agency Contract enclosed therewith — shows that this proposal was a new addendum to the Agency Contract and not a new general agency contract, as the Respondents allege, as is evident from the title of the proposed addendum itself, which reads: "Addendum to the General Agency Contract with Horus Company for Tourism and Travel." Furthermore, upon examining the contents of this addendum, it is apparent that it is indeed an addendum to the principal Agency Contract dated 30 January 2001, as confirmed by several of its clauses, including Clause 18, which provides: "In the event of any dispute between the parties, it shall be resolved amicably within ten days, and in the event no agreement is reached, the dispute shall be referred, in the manner set out in detail in Clause 16 of the Agency Contract executed between the parties, to an arbitration panel," as well as Clauses 28 and 29, which provide: "The parties agree that in the event either party fails to comply with the provisions set out in the original Agency Contract or its addendum, the Agency Contract shall be deemed automatically rescinded without the need to send a notice..." The Claimant added that all of the foregoing makes clear that what was enclosed with the notice issued by the Respondents dated 6 March 2012 comprised proposals concerning an addendum to the Agency Contract, and not a new general agency contract as the Respondents allege — which means that the principal Agency Contract dated 15 March 2001 and its reactivation of 29 August 2005 remains in force. The Claimant also stated that it rejected the Respondents' proposal, which itself confirms that the principal Agency Contract remains continuously in force and was neither notified of termination nor terminated by the Respondents, as they allege, given that they insist on relying on the provision requiring amicable settlement within the aforementioned three-day period — how, then, can the Respondent Company rely on a provision of an instrument while, at the very same time, treating that same instrument as terminated, cancelled or rescinded? The Claimant noted that this conduct is a practical illustration of the application of the principle of Estoppel, which has become one of the leading principles in arbitration, and which is aimed at defeating an opposing party's attempt to derive advantage, at its counterparty's expense, from its own contradictory statements, conduct and positions — a principle likewise expressed in Arab legal systems by the maxim that a party's attempt to repudiate its own prior act shall not be given

effect.

**Under the heading: Response to What Is Stated at Page 51 of the Respondents' Statement of Defense Concerning the Statement of Claim's Allegation of Gross Fault (Consisting in the Non-Payment of the Claimant Company's Dues for Operations It Carried Out Throughout the Term of Performance of the Contract)**

The Claimant Company noted that the Respondents relied on Clause 11 of the principal Agency Contract, entitled "Compensation and Remuneration," to argue that the Claimant Company is not entitled to the commission it claims, on the ground that such entitlement is conditional upon two requirements: first, that the tickets be issued in the Agent's (the Claimant Company's) country, and second, that the Agent (the Claimant) be the one who issued the tickets — the Respondents thereby confirming that the parties agreed that entitlement to commission is conditional on the Agent issuing the tickets, so that where it did not issue them, no commission is due. The Respondents further added that the Claimant Company had failed to submit anything supporting its claim and had not clarified the grounds on which it relied in determining the amounts claimed. In response to the Respondents' allegation that entitlement to commission is conditioned on the two requirements referred to above, the Claimant Company stated that this allegation is unfounded and without basis, being a defense that presents only one side of the truth while deliberately omitting the reciprocal obligations set out in the principal Agency Contract dated 15 March 2001 and its addendum dated 29 August 2005 — the third instrument in the contractual relationship — namely, the Respondents' own failure to perform their obligations. This is because the Claimant's obligation is linked to the Respondents' performance of their contractual obligations under the three instruments comprising the contractual relationship, as set out in the Statement of Claim at pages 11 and 12, and as the Claimant Company explained: namely, that it was incumbent on the Respondent Company to supply the Claimant Company with the travel documents (the airline tickets), under Clause 1/10, so that it could sell them and thereby obtain the value of this commission from such sales — which never occurred. This is confirmed by Clause 6/12 of the principal Agency Contract, which obliges the Respondents (in relation to the Claimant Company) to supply the General Agent with all types of tickets and documents — as likewise confirmed by the addendum to the Agency Contract dated 15 March 2001 and by the agreement to reactivate the Agency dated 29 August 2005, which obliges the Respondent Company to hand over the travel documents to the Claimant Company under Clause 2, as well as the obligation to deliver the technical requisites, including the aircraft certificates, their insurance and registration, and to submit them together with the operating schedules to the civil aviation authorities for review and for obtaining operating approvals, under Clause 2/4 — in addition to the obligation to enable the General Agent (the Claimant Company) to continue operating under the general agency pursuant to the contract dated 30 January 2001 taking into account that the addendum contract dated 15 March 2001, as well as the agreement executed on 29 August 2005, form an integral part of the general Agency Contract executed between the parties, and that anything inconsistent therewith is repealed, under Clause 12 thereof.

**Under the heading: In Response to the Respondents' Allegation that the Claimant Company Failed to Support Its Claims with Any Documents and Failed to Clarify the Grounds on Which It Relied in Determining the Amounts Due to It, and That These Claims Have No Basis in the Case File**

The Claimant noted, at pages 55 to 61, that the Respondents' mischaracterization of the Claimant Company compels it to reiterate its reference to the evidence and documents contained in the

arbitration case file and recorded in the minutes of the arbitration hearings. It noted that, at the first procedural hearing held on 28 November 2013, the Arbitral Tribunal set a procedural timetable for the submission of the Statement of Claim by the Claimant Company and of the Response by the Respondents. The Claimant stated that it is established in the minutes of the second procedural hearing, dated 1 February 2014, that the Claimant Company complied with the procedural timetable set at the first procedural hearing and filed its Statement of Claim on 28 November 2013, together with the bundles of supporting documents, and likewise filed all documents evidencing its claims in support of its Statement of Claim — whereas the Respondents' Reply Memorandum to the Statement of Claim was not filed until 27 January 2014, and the supporting documents were at that time certainly within their possession, such that they could have responded to the Claimant's claims on the basis of those documents in order to refute them. Instead, and in order to establish the contrary, they falsely responded by claiming that the Claimant Company had not submitted any documents in support of its claims; indeed, in their Reply to the Statement of Claim, at page 62, they went so far as to allege a number of examples of breaches which they claim constituted serious grounds for the cancellation and termination of the Agency with the Claimant Company — among them, the non-payment of the bank guarantee to the Claimant. The Claimant responded to this by noting that the allegation regarding payment of the bank guarantee is refuted by Clause 20 of the addendum to the Agency dated 12 March 2001, which provides: "With reference to Paragraph 24 of the principal Agency Contract, the Second Party (the Claimant Company) undertakes to provide a bank guarantee in the amount of USD 200,000 upon commencement of operations and receipt of the travel documents from the First Party (the first Respondent), and the conduct of commercial activity thereunder," as well as Clause 20(b), which provides for the furnishing of a bank guarantee in the amount of USD 100,000 as security for the Company's rights, to be replaced by paragraph (a) upon commencement of operations. The Claimant added that it is thus apparent that payment of the bank guarantee was linked to the letter of guarantee (bank guarantee), the delivery of the travel documents, and the commencement of operations, and that it is established from the foregoing that the Respondent Company refrained from delivering these documents and prevented the commencement of operations by the latter — how, then, can the Respondent Company now allege that this gross fault was established, and on that basis cancel and terminate the Agency Contract by its unilateral will, laying the fault at the Claimant Company's door? The Claimant Company stated that the Respondents' allegation at page 62, item (2), is baseless, consisting of mere unsubstantiated assertions unsupported by any evidence, and that it has been rebutted in detail by the documents and supporting evidence, because this obligation is contingent upon the actual commencement of operations, the arrival of the aircraft, and the approval of the civil aviation authorities, in accordance with Clause 8 of the agreement to reactivate the Agency dated 29 August 2005, as well as Paragraph 2 of the minutes of agreement dated 27 September 2005 — the details of this response, together with its supporting documents, having been filed with the Arbitral Tribunal's registry on 28 December 2013 and delivered to the Respondent Company at that time. The Claimant Company also stated, in this regard, that the Respondents' allegation at page 63 has been rebutted in detail by the supporting documents previously filed with the Respondents. The Claimant stated that the Respondents' allegation at page 64 is inaccurate, contrary to what is established by the record, and has likewise been rebutted in detail by the documents which the Respondent Company itself received. The Claimant added that these allegations call to mind the same self-serving inconsistency — namely, that the Respondent Company itself wished to carry out the agency functions agreed

with the Claimant Company, and, finding no other justification for the Agent, resorted to a litany of alleged breaches attributed to the Claimant Company, none of which has any basis in fact, in the record, or in the responses supported by the documents previously filed with, and delivered to, the Claimant, and received by the Respondents.

**<u>Under the heading: Response to the Respondents' Defense that They Did Not Commit a Gross Fault in Terminating, and Then Suspending, the Contract at Issue by Unilateral Will</u>**

The Claimant Company stated that the Respondents' allegation is incorrect — namely, their claim that the termination and then suspension of the Agency Contract were carried out through valid procedures, based on Article 715 of the Egyptian Civil Code, which provides that "the principal may terminate or restrict the agency, even if there is an agreement to the contrary," and likewise Article 947 of the Iraqi Civil Code, which contains a similar provision; and based on Article 163 of the Egyptian Commercial Code, which provides that: "Either party to a commercial agency contract may terminate the contract at any time, and no compensation shall be due unless the termination is effected without prior notice or at an inopportune time; and where the contract is for a fixed term, its termination must be based on a serious and acceptable cause, failing which compensation shall be due" — in addition to reliance on Clause 1/23 of the principal Agency Contract, which provides that: "This agreement supersedes all prior agreements and shall take effect as of 15 February 2002, and shall remain binding upon both parties, each of whom shall have the right to terminate the contract by unilateral will, should it so wish, without stating reasons, subject only to prior written notice of not less than 60 days to the head office of the other party; such that it shall not be cancelled by either party without first giving the other party sixty days' prior written notice of cancellation to the head office of the other party." The Claimant further noted that, in the addendum to the principal contract dated 15 March 2001, Clause 1 provides that the terms set out in that addendum are deemed an integral part of the general Agency Contract, and Clause 21 thereof provides that "the term of the general Agency Contract is three years following the commencement of operation of the First Party's aircraft and the exercise by Iraqi Airways of its commercial activity, renewable by agreement of the parties." The Claimant observed that this clause introduced an amendment to Article 23 of the principal contract, fixing a three-year term for the contract commencing upon the start of operation of the First Party's (the Respondents') aircraft, without addressing, by agreement of the parties, the cancellation or termination of the contract. The Claimant further stated that on 29 August 2005, the third and final instrument comprising the contractual relationship introduced numerous amended and repealed provisions among a number of clauses of the first two instruments, the most significant of which concern the term of the contract, its performance and its termination, Clause 10 of that agreement providing that: the term of the general Agency Contract is three years from the date of actual commencement of operations, automatically renewable for a further like term unless either party notifies the other of its wish not to renew, by registered letter with acknowledgment of receipt, at least sixty days before expiry of the renewed term, and that neither party may seek rescission of the contract save where a gross fault has been committed by the other party. The Claimant added that Clause 12 of this agreement further provides that the General Agent, Horus Company for Tourism and Travel, shall continue to act under the general agency granted to it under the contract dated 30 January 2001, and that the addendum dated 15 February 2001 and the minutes of the meeting executed on 29 August 2005 form an integral part of the general Agency Contract executed between the parties, and that anything inconsistent therewith is thereby repealed. The Claimant Company stated, in this respect, that it is clear from these two clauses that it was the common intention of the parties, from the outset and in

principle, that the contract should continue for a further like period of three years, automatically renewed as from the date of actual commencement of operations (a full three years), such interpretation excluding any possibility that the Agency Contract was intended to be of indefinite duration, continuing and extending in effect, and productive of its legal consequences, throughout these six years, and that neither party may terminate it during that period; this is the general rule, the sole exception to which — as agreed by the parties — arises only after the expiry of these first six years, as stated in the second paragraph of Clause 1 (thus generating a further consecutive three-year term — that is, six years in total), where either party may notify the other, by registered letter with acknowledgment of receipt, at least sixty days in advance, of its wish not to renew. The Claimant further stated that, given that the actual commencement of operation of the Respondents' aircraft — which it is undisputed occurred, as recorded in the "Termination and Agency" letter dated 14 November 2005 attached to the Respondent Company's documents bundle — took place, then, in accordance with the agreement to reactivate the agency, either party's right to cancel or terminate the agency, in any of its forms, could not lawfully be exercised prior to the expiry of the nine-year period following the date of actual commencement of operations — that is, prior to 2014. Accordingly, any decisions to cancel and suspend the agency issued by the Respondents' unilateral will prior to the expiry of that period were made in violation of the terms of the agreement and contrary to the rules of law and the principle of freedom of contract, rendering them absolutely null and void. The Claimant stated that this is further supported by Article 147 of the Egyptian Civil Code, which provides in clear terms that the contract is the law of the contracting parties, and may not be revoked or amended save by mutual agreement of the parties or for the reasons provided by law — as likewise established, in precisely the same terms, by Article 2 of that same Code, which provides that a legislative text may not be repealed except by a later legislative text expressly repealing it or containing provisions inconsistent with the earlier legislative text, or which regulates anew the subject matter previously governed by the earlier text's provisions, that later legislative provision superseding that earlier subject; and that the correct interpretation of the law, consistent with the legislature's intent in enacting these two provisions, is that a subsequent contractual term prevails over an earlier one only where such was agreed, or by operation of a subsequent legislative text over an earlier one. On this basis, the Claimant Company stated that, whereas the Respondents relied, in justifying the termination of the Agency, on Articles 715 and 163 of the Civil and Commercial Codes respectively, as well as on Clause 1/23 of the principal contract — said Clause 1/23 having been repealed by virtue of Clause 10 of the agreement to reactivate the Agency dated 29 August 2005 — these two Articles are non-mandatory (suppletive) provisions, and the parties were not prohibited from contracting out of their application to the extent inconsistent with their rights under the agreement to reactivate the Agency referred to in Clause 10, such provisions being capable of being supplemented or varied by agreement, as is the case here.

**<u>Under the heading: Summary of the Foregoing —</u>** the Claimant Company stated that what the Respondents relied upon in justifying the termination and suspension of the Agency with the Claimant Company, in reliance on the repealed Clause 1/23 of the principal contract, has no basis in fact or in law and, in reality, contravenes the serious contractual conditions preceding it, given that the Respondents intended, and made, this exception for themselves alone, taking for themselves the right to terminate the contract by unilateral will without restriction or condition, treating it as an absolute right, whereas what the legal texts in fact provide is precisely the opposite — the right to compensation being an exception expressly provided by the legal texts

and the contractual clauses, in addition to its being contrary to Islamic Sharia, which the Constitution, in Article 2, identifies as the principal source of legislation, as reflected in the words of the Almighty at the opening of Surat Al-Ma'idah: "O you who believe, fulfil your contracts," and the saying of the Prophet, peace be upon him: "Muslims are bound by their conditions, save a condition that renders lawful what is unlawful or unlawful what is lawful."

**Under the heading: In Response to the Allegation that the Respondent Company Had Already Terminated the Agency —** as stated at paragraph 48 of the Respondents' Statement of Defense, the Claimant Company stated that these are baseless fantasies with no foundation in reality, particularly since — as stated by the Respondents themselves — the Respondent Company came forward with a letter terminating the Agency, whereupon the Claimant Company demanded material and non-material compensation, which is decisive proof and an express admission by the Respondents of their rejection of the Claimant Company's notice asserting the invalidity of the unilateral termination of the Agency and its claim for compensation... The Claimant Company further stated that it is common knowledge that the mere sending of notices of termination by one party is not deemed to require the other party's acceptance of such termination, and that the contrary is not conceivable, nor is it accepted by sound legal reasoning. The Claimant Company also stated, thirdly, that, misleadingly and contrary to truth, the Respondent Company claims that the Claimant Company accepted the cancellation by failing to object to it in the notice, whereas it is established, according to the documents submitted and the correspondence exchanged, that it sought to reach an amicable settlement in relation to the compensation for the material and non-material damage it had sustained — which is inconsistent with the Respondent Company's false assertion that it had accepted the notion of cancellation by unilateral will as a settled matter. The Claimant further added that, given that the Respondents' termination of the Agency by unilateral will was effected in violation of the legal provisions and the agreement, thereby constituting a serious/gross fault, the Respondents are obliged to compensate the Claimant Company for the material and non-material damage it sustained — particularly given that this occurred for no justified reason, the Claimant Company having asserted the absence of any justification for the Respondents' non-performance of their obligations, whereas it is the Claimant Company that carried out its obligations fully and in detail, and this improper and untimely termination came after the Claimant Company had incurred heavy expenditure in managing and executing the Agency with the utmost honesty and integrity.

**Under the heading: In Response to What Is Stated at Page 69 of the Respondents' Statement of Defense Concerning What Is Set Out in the Statement of Claim, at Page 38, Under the Heading "Gross Fault Consisting in Non-Payment of the Claimant Company's Dues"**

The Claimant Company stated that the Respondents alleged that the Claimant Company is not entitled to any expenses it incurred in the performance of its function, in application of Article 178 of the Commercial Code, on the ground that it is independent in the conduct of its business and bears all publicity and advertising expenses and the management of its activities, in addition to the fact that the Claimant Company did not perform any obligation arising from the Agency Contract or its addendum for which it incurred any official or other expenses. The Claimant Company stated, in response, that this allegation is inaccurate and contrary to the established record and documents previously submitted, and likewise contrary to the correct application of the law and the terms of the three instruments comprising the contractual relationship, and to what has previously been explained in detail concerning the Respondents' performance of their

contractual obligations in the proper manner. The Claimant noted that the Respondents' reference to Article 178 of the Commercial Code is misapplied, since, correctly understood, that article requires that the Agent carry out its activity independently — which is, in fact, contrary to the Respondents' own interpretation, as the Claimant confirms independently. A correct interpretation is that Article 178, cited above, appears under the heading of certain types of commercial agency within the Fifth Chapter of the Commercial Code governing commercial agency contracts, and applies to a specific type of commercial agency contract that does not apply to the agency at issue in the present dispute. The Claimant had previously addressed the question of the correct legal characterization of the general Agency Contract at issue in this arbitration dispute, submitting that the Agency Contract at issue in the arbitration is a sui generis contract of mixed nature. The Claimant stated that it should not be overlooked that Article 178 of the Commercial Code lays down, as a condition for its application, an initial and fundamental premise without which it would not be capable of application, having lost the basic elements required for its application — namely, that the Agent, in carrying out the acts of the Agency, does so directly through its own activity and by its own will, in exchange for remuneration by way of commission, in addition to the benefits and advantages provided for under the Agency Contract; and that the Respondent Company ceased performance of the Agency by its own will even before the commencement of operations, notwithstanding the heavy costs the Agent had incurred in preparing for and managing the activity — costs it never recouped, gaining nothing at all, having incurred these two initial losses in the expenditure it bore, together with lost opportunities and unrealized expected gains it never obtained from the Agency; whereas the Claimant Company itself never received any Agency fee for the Agency itself, nor did it recover anything toward the necessary expenses of managing the activity. The Claimant Company stated

The basis in the non-applicability of Article 178 of the Commercial Law, is found in Article 710 of the Civil Code, which constitutes the overarching legal framework for all matters related to agency agreements. This article stipulates that: "The Principal must reimburse the Agent for what he incurred while executing the agency agreement, with standard interest from the date of agreement, regardless of the success level of the Agent in executing the agency." Furthermore, it is noteworthy that the Respondent Company acknowledged in all its memorandums and defenses that it was the party that unilaterally terminated the Power of Attorney. How, then, can they deprive the Agent of the expenses incurred during the execution of the Power of Attorney at the very moment they terminated the agency contract itself? This is further confirmed by Article 711 of the Civil Code, which states: "The Principal shall be liable for any damage suffered by the Agent that does not stem from the Agent's fault, resulting from the execution of the Power of Attorney in a customary manner." The Arbitral Tribunal stated that no error was committed by the Respondent Company, which fulfilled all its contractual obligations. On the contrary, the Respondent Company is the party that committed the error causing severe material and moral damages to the Complainant. Furthermore, the Tribunal noted that the Respondent Company's attempt to scoff at the Complainant stemmed from its weak foundation and evidence. It [the Tribunal stated] that due to the Complainant's lack of knowledge regarding any documents presented by the Respondent Company, nor the clauses of the original Power of Attorney agreement and its appendices, nor the contracts concluded pursuant to this contract.

**Under the Title: The Legal and Factual Basis for the Respondent Company's Claims for Compensation:** The Complainant stated that in an attempt by the Respondents to evade compensation due to the Complainant, they argued that they committed no errors that caused damage. They claimed that the termination and suspension of the Power of Attorney were legally executed according to the contractual framework clause. However, responding to these alleged defenses reveals their commission of serious errors that caused severe damages due to the manner of terminating and suspending the Power of Attorney in violation of law and agreed-upon terms.

**Under the Title: Proof of Gross Contractual Misconduct by the Respondent Company (First):** The Complainant reiterated that the Respondents committed a contractual error by violating the clauses governing the three relationships previously detailed in its memorandums and the arbitration statement, specifically regarding failure to enable the Complainant to execute the agreed-upon Power of Attorney due to their failure to hand over all necessary documents, operating necessities, travel tickets, and shipping bills. The Respondent Company insisted on performing these tasks itself.

**Under the Title: Proof of Legal Misconduct:** The Complainant pointed out that in addition to its contractual misconduct, the Respondents committed a legal error consisting of violating a legal obligation imposed by Egyptian Law and Iraqi Law (among others), namely the principle of good faith in contract execution, as stipulated in Article 148 of the Egyptian Civil Code. It was well known that the rule of good faith applies to all contracts, rights, obligations, and legal actions. The Complainant added that the Respondents violated this legal obligation by failing to enable the Complainant from executing the Power of Attorney, and subsequently terminating and suspending it under the pretext that the Complainant had failed to execute its contractual obligations.

**Under the Title: Violation by the Respondents of Applicable Laws Related to the Dispute Contract—Specifically Civil and Commercial Law in Both Iraq and Egypt Regarding the Termination and Suspension of the Power of Attorney as Previously**

**Explained in This Memorandum:** The Complainant reiterated, under the title "The Execution of the Complainant's Contractual Obligations According to the Original Power of Attorney Agreement and its Appendices," what it had already stated in its defense statement: an incorrect account of the dispute facts and a distortion of these facts. It alleged that on many occasions it committed no error whatsoever and fulfilled all its obligations. Therefore, the Complainant reiterated that it fulfilled all its contractual obligations, for which it paid substantial sums, to the extent of paying the debts of the Respondent Company (First) for a period spanning ten years prior to the signing of the Power of Attorney, in order to preserve the commercial reputation of both the Complainant and the Respondent Company (First), and out of care to fulfill its obligations, which is fundamentally valid grounds for claiming compensation.

**Under the Title: Compensation for Direct Damages:** The Complainant stated that it had previously proven the contractual and legal error committed by the Respondents, which caused damages to the Complainant. It pointed to Article 163 of the Civil Code, which stipulates that anyone who causes damage to another shall be liable for compensation. The intended damage here is both material and moral (non-pecuniary). Material damage is the direct damage that actually occurred in its entirety because the Respondents created it through their willful and blatant contractual and legal error, and they are responsible because they failed to fulfill their obligations—the goal of providing the Complainant with all tools and documents necessary for the Complainant to execute the Power of Attorney and benefit from it for a long period not less than twenty years from the date of contracting. Instead, they cancelled and suspended the Power of Attorney even though the three contractual frameworks were valid, and the Complainant was ready to execute the Power of Attorney after fulfilling all its obligations. The Complainant concluded that this deliberate failure by the Respondents to fulfill their obligations constitutes a contractual error giving rise to compensation for the direct damage suffered by the Complainant, because the Respondents' mistake was willful and gross, and the Complainant has the legal right to claim compensation for all types of direct damage. It also added that it is established that the obligation of the Respondents does not merely stem from a contract but also stems from an unlawful act or what is referred to as tort liability, because of this gross, deliberate error—in application of Article 163 of Egyptian Civil Law, which stipulates that anyone who causes damage to another shall be liable for compensation; as well as Article 221/1 of the Egyptian Civil Code, which stipulates... Compensation includes what the creditor suffered in terms of loss and what he missed out on (lost gain), provided this is a natural result of non-fulfillment or delay in fulfilling the obligation. Furthermore, regarding moral damage, the Respondent Company (First) claimed—without right—that there was no evidence of damage to the Complainant's reputation justifying a compensation claim. However, it is legally known that the failure to fulfill obligations contained in important commercial agency contracts, such as the Power of Attorney contract subject to this dispute, and its arbitrary and illegal cancellation, caused, in addition to material damage, moral damage consisting of the harm done to the company's commercial reputation—which is the dearest asset of the Complainant—and the undermining of its standing

Page 105 of 236

within the commercial sector. This reputation was at its peak during the period of the air embargo on Iraq, and following a publicity campaign conducted by the Complainant to promote and advertise the Respondent Company's interests. The unilateral termination of the Power of Attorney by them caused the Complainant's reputation and financial and moral standing to decline to their lowest levels, especially since the Complainant is one of Al-Hassan Group companies, which inherently possesses high commercial and moral value, and owns a number of companies spread across several countries that were also affected by the judgment of necessity and need regarding the Complainant's reputation. Furthermore, all international laws stipulate the right to compensation for moral and non-pecuniary damages. Arbitration rulings have consistently enshrined the right to compensation for damage to commercial reputation without reference to any specific rule in any country, considering this an inevitable result of the principle of complete and full compensation for damage, which is one of the most important elements of a legal entity's non-financial assets, particularly for a legal person.

**Under the Title: Compensation for Lost Profits (Loss of Expected Gain):** The Complainant stated that the Respondent Company (First) claimed that the Complainant was not entitled to compensation for lost profits because it had failed to execute the Power of Attorney. The Complainant previously refuted this claim in its memorandum, adding that the lost profit is the revenue the creditor would have earned typically if they were able to properly execute the contract. The Complainant asserted that **Lost Profits** and **Actual Damage** are two constituent pillars required by compensation arising from a tort (misconduct), breach of contract, or termination of an agreement. This definition is established across all branches of Civil, Commercial, and Administrative law, as affirmed by many international conventions, notably Article 82 of the UN Convention on Contracts for the International Sale of Goods, Article 74 of the Vienna Convention for the International Sale of Goods, and Article 2.4.2 of the Unidroit Principles relating to International Commercial Contracts, and Article 4/502 of the European Contract Law Principles adopted by the European Law Institute. These sources stipulate the creditor's right to receive full and complete compensation for the damage suffered due to non-performance; such compensation includes both the loss incurred and the profit deprived of. The Complainant also stated that all Arab laws have established this right to compensation, including Iraqi Civil Law in Article 169 and Egyptian Civil Law in Article 221.

**Under the Title: Reports Submitted by Accounting Experts:** The Complainant stated that it attached two reports issued by accredited accounting experts, which detail all elements—be they material loss, moral damage, or compensation for lost profits—based on data analyses derived from feasibility studies issued by international consulting firms.

**Under the Title: Claims of the Complainant (Concluding Memorandum):** The Tribunal noted that the Complainant reiterates its claims contained in the statement of claim and subsequent memorandums, and hereby submits a request to the Arbitration Panel for a judgment ordering the following:

1- The inadmissibility and rejection of all defenses and pleas presented by the Respondents.

2- Adherence to the contents of the memorandum regarding the joinder of new parties to the arbitration case, requesting the declaration of their service of notice, which was previously submitted

at the session dated 10/4/2014; these are His Excellency the Prime Minister of the Republic of Iraq in his capacity and His Excellency the Minister of Finance in his capacity.

3- The holding jointly and severally liable the Respondents—namely, the Prime Minister of the Republic of Iraq (Prime Minister of the Iraqi Government), the Minister of Transport, and the Ministry of Finance of the Republic of Iraq—all in their respective capacities, and the Respondent Company (Iraq Airways General Company) for a final and immediately enforceable judgment, for the following amounts as compensation to the Complainant:

a- An amount totaling $103,672,853 (One Hundred Three Million Six Hundred Seventy Two Thousand Eight Hundred Fifty-Three US Dollars), representing the actual expenses incurred in executing the obligations stipulated by the Power of Attorney contract, and representing the value of the Complainant's losses and expenses. This loss constitutes material damage that was accurately demonstrated through the Complainant's budgets and according to the report of the Certified Accountant and the report of the accredited accounting expert.

b- An amount totaling $542,096,579 (Five Hundred Forty Two Million Ninety Six Thousand Five Hundred Seventy Nine US Dollars), representing the value of lost profits, as proven by the submitted financial and accounting reports.

c- An amount totaling ($100,000,000) (Only One Hundred Million US Dollars) for compensation due to the unlawful and arbitrary termination and suspension of the Power of Attorney contract.

d- An amount totaling $500,000,000 (Five Hundred Million US Dollars) for compensation regarding moral damage suffered by the Complainant.

1- Ordering the Respondents to pay statutory interest on the total claim value commencing from the date of filing the claim until full payment, amounting to no less than 11% and no less than the Central Bank of Egypt's rate.

2- Ordering the Respondents to pay all arbitration costs, deposit, expenses, and arbitrators' fees.

3- Ordering the Respondents to pay $400,000 (Four Hundred Thousand US Dollars) as estimated attorney fees payable to the Complainant's lawyer from the commencement of the dispute until the issuance of the Arbitration Panel's decision.

4- Ordering the Respondent Company to pay all costs and fees for the enforcement decree of the arbitration award.

5- Ordering the Respondents to pay $5,000 (Only Five Thousand US Dollars) for every day they fail to execute the arbitration award from the date of its issuance. The Complainant reserves the right to modify and increase these claims in the future, as well as its right to take precautionary measures and other legal rights.

- The Complainant submitted with its memorandum seven bundles of documents, which were viewed by the Arbitration Panel. They were presented in plastic bags, and the Complainant provided a statement of contents for each bag as follows: a- **Bag One:** Contained, as stated on the cover, the original and six photocopies of a report that the Complainant identified as the Audit Report concerning financial statements for the years 2001 to 2013. The Arbitration Panel noted that it originated from the office of the CPA Mr. Taha Fawzi Abdel Hafez and contained 25 pages. b- **Bag Two:** Contained, as stated on the cover, the original and six photocopies of a report that the

Complainant identified as the Review Report concerning financial statements for the years 2001 to 2013, and the valuation regarding lost profits for the years 2005 to 2013, along with three photocopies consisting of a membership card to the Syndicate of Commercial Accountants and a certificate from the Cairo Economic Court concerning Mr. Saad El Din Ibrahim Farag (Economic Expert), comprising one original and six photocopies. The Arbitration Panel noted that this report was issued by the office of Sulaiman Zakhari Mikhail, and that the signatory on the report is Mr. Saad El Din Ibrahim Farag (Economic Expert) and the accountant Sulaiman Zakhari Mikhail. The Arbitration Panel noted that the report was drafted in 14 pages. c- **Bag Three:** Contained, as stated on the cover, what the Complainant identified as a sub-agency contract for Alaa El Din Tourism and Travel Company, serving as the sub-agent for flight ticket issuance services, limousine rental, tourism transport, and hotel booking, accompanied by photocopies of the tourist license and commercial register. The Arbitration Panel noted that this file contained 11 pages. d- **Bag Four:** Contained, as stated on the cover, what the Complainant identified as a sub-agency contract for Taba Shipping and Trading Company, serving as the sub-agent for aerial shipping bill sales. The Arbitration Panel noted that this file contained 4 sheets. e- **Bag Five:** Contained, as stated on the cover, what the Complainant identified as a registration request in Commercial Register No. 320001 issued from the Cairo Commercial Registry Office dated 31/1/1999, concerning Taba Shipping and Trading Company. The Arbitration Panel noted that this file contained 2 pages. f- **Bag Six:** Contained, as stated on the cover, what the Complainant identified as an amicable settlement agreement for the dispute between Taba Shipping and Trading Company and Horus Tourism and Travel Company. The Arbitration Panel noted that this file contained 2 pages. g- **Bag Seven:** Contained, as stated on the cover, what the Complainant identified as details of the advertising campaign. The Arbitration Panel noted that this file contained only one original cover sheet and 21 pages. The Respondent Company received a copy of the memorandum and the aforementioned document bundles on 11/5/2014. Similarly, both members of the Arbitral Panel also received a copy.

- On 10/6/2014, Mr. Ahmed Al-Derini, counsel for the Respondents, submitted a letter to the Chairman of the Arbitral Panel dated 2/6/2014. This letter stated that both the Iraqi Minister of Transport and the Iraq Airways General Company had authorized both Dr. Samir El Sharkawy and Dr. Fathi Wali, in addition to Mr. Ahmed Al-Derini, to form a defense team for the Company and for the Ministry of Transport of Iraq.

He attached copies of the powers of attorney issued to Dr. Samir El Sharkawy and Dr. Fathi Wali concerning this matter: one power of attorney from them issued by the Minister of Transport of Iraq and authenticated by the Authentication and Consular Services Office under number 975 on 29/5/2014, and another power of attorney issued by the Director General of the Respondent Company (First) and authenticated by the Authentication and Consular Services Office under number 6701 on 29/5/2014. Furthermore, he submitted with his previous letter dated 10/6/2014 at the Arbitration headquarters three memorandums in seven copies each: the first issued from Dr. Mahmoud Samir El Sharkawy's office; the second from Prof. Dr. Fathi Wali's office; and the third from Mr. Ahmed Al-Derini's law office. He also submitted five document bundles of seven copies, which were viewed by the Arbitration Panel. The Arbitration Panel was also presented with memorandums as follows:

**A memorandum submitted by Prof. Dr. Fathi Wali**, consisting of 35 pages. At the beginning, it presented the facts of the arbitration case on pages 2 to 6, followed by a defense where he referenced in Section One, titled "Exchange of Memoranda," that the Complainant filed its statement of claim on 28/12/2013, and that the Respondents submitted their memorandum of defense on 27/1/2014. These were the two deadlines contested at the first arbitration session held on 28/11/2013. Subsequently, in the second session held on 1/2/2014, the Arbitration Panel decided to grant a deadline of February 15, 2014, for the Complainant to submit its memoranda and granted the Respondents a deadline of March 16 (for submission). Pursuant to this decision, the Complainant submitted its memorandum on 15/2/2015, while the Respondents failed to submit their memorandum due to the suspension of proceedings following the apology of one arbitrator and the appointment of a replacement. He added that in the session on 10/4/2014, the Arbitration Panel decided to grant the Complainant a deadline until May 10 for submitting a supplementary memorandum and granted the Respondents a deadline commencing from May 11 until June 10 to reply to the Complainant's submissions. He further added that this meant the Complainant was given two deadlines for submitting two memoranda in response to the Respondents' defense (from 2/1 to 15/2/2014, and the second from up to 10/5/2014), whereas the Respondents were only granted one deadline for submitting a single memorandum (from May 11 until June 10, 2014). Given that Article 27 of the Arbitration Law stipulates that: "The arbitration party shall be treated equally and given a complete equal opportunity to present its case; therefore, it is not permissible to grant one party the right to submit multiple memoranda or to grant the other party two longer deadlines," he requested the Panel to grant the Respondents a new, sufficient deadline to submit a supplementary memorandum and supporting documents, consistent with the Complainant's treatment.

**Under the Title: Documents Submitted by the Court (Defense of the Respondents):** The Respondents challenged the exclusion of all materials contained in the Complainant's cartons, arguing that they consist of five massive cartons containing thousands of photocopies without a manifest clarifying the nature of these papers. The Complainant had previously committed on 27/1/2014 to submitting a file detailing these documents, and on 10/4/2014, it submitted what it termed "the document bundles presented from these containers." Upon review of these bundles, it is clear that they contain no manifest explaining the contents of the papers within the cartons; they merely contain a general listing and title for the documents without specifying the content of each paper. Therefore, these papers cannot be described as documents submitted in the case to which the Respondents can respond. Accordingly, the Respondents request the Arbitration Panel to exclude all materials contained in these cartons or compel the Complainant to submit file bundles detailing the date and contents of every document and the grounds for relying upon it.

**Under the Title: Photocopies Submitted by the Complainant:** The Respondents defended that they reject all photocopies of documents submitted by the Complainant, with the sole exception of what the two parties agreed not to challenge during the session on 1/2/2014. On that occasion, both parties agreed that the official translation from the Cairo North Court—for which both parties submitted a photocopy in their document bundles—and the photocopies submitted for the contract addenda dated 15/3/2001 are original and cannot be challenged by either party. This also applies to the two decisions issued by the Respondent Company (First) signed on 14/11/2005, 16/1/2005, and

those issued on 17/11/2005, and this applies to all similar photocopies submitted by both parties. Aside from these, the Respondents challenge all other photocopies of documents submitted by the Complainant, including photos of documents presented in cartons. In response to the Complainant's argument regarding challenging photocopies, the Respondents stated that what the Complainant put forth in its defense memorandum submitted on 10/5/2014—regarding the challenge to document photocopies and basing its claim on Article 30/3 of the Arbitration Law—is incorrect. The Complainant quoted the text of said article incompletely, when the rest of the article states: "...and this does not affect the right of the Tribunal at any stage of the case to request the original documents or writings upon which any party relies." The Respondents further argued that presenting photocopies does not prevent the Arbitration Panel from exercising its authority to request the original document, pursuant to Egyptian Law of Evidence. This is because evidence must be presented before the Arbitration Panel using legally prescribed means of proof for the fact in question, and the Egyptian Arbitration Law did not stipulate that proving via copies of documents was permissible contrary to what the law of evidence stipulates.

**Under the Title: Expert Reports Submitted by the Complainant:** The Respondents noted regarding these two reports that they relied on the papers submitted by the Complainant; therefore, neither report can be presented as proof because it constitutes the opposing party creating self-serving evidence for itself. It is legally established that a person cannot create evidence for themselves. Furthermore, both reports relied on photocopies challenged by the Respondents, which makes them unreliable as evidence. Moreover, both reports were based on adopting the Complainant's point of view, making them closer to a defense memorandum for the Complainant rather than true reports from independent experts who are presumed to be impartial and objective. Additionally, the amounts stipulated in these two reports are based on figures provided to cover specific items without evidence that they were actually disbursed by the Complainant in executing the contract subject of the dispute. In addition, both reports concluded by determining compensation amounts for the Complainant for the years 2001 to 2013, whereas it is established that none of the agreements upon which the two reports are based came into effect. It is also established that the relationship between the parties was terminated, and therefore the period for the agreement's validity had not yet begun, as it was contingent on the resumption of Iraqi Airways operation from Cairo—which only happened after the termination of the contractual relationship. Accordingly, the Respondents request the exclusion of these two reports from the evidence in the arbitration case.

**Under the Title: The Respondents' Defense (First): Lack of Jurisdiction for the Minister of Transport:** Firstly, concerning the non-admissibility of the case against the Minister of Transport, based on the argument that the arbitration agreement is only binding upon its parties. The two parties to the arbitration contract in this case are Iraq Airways General Company and Horus Tourism and Travel Company. Furthermore, the Respondent Company is a public sector company and possesses an autonomous legal personality, independent in both financial and administrative terms, which is managed by a Board of Directors with jurisdiction over all its matters, citing Document Bundle No. 4, Exhibit No. 1, submitted on 27/1/2014. The Respondents' defense further explained that if there is no dispute regarding the principle that an arbitration clause extends to those who participated in drafting, executing, or terminating the contract containing the arbitration clause, then it must be noted

that merely having a third party participate in the negotiations leading to the conclusion of the agreement containing the arbitration clause is not enough. The Respondents also argued that it is insufficient for any authority's reliance on an agreement containing an arbitration clause to extend its scope to another party; furthermore, an arbitration clause in a contract concluded by a subsidiary company does not automatically extend to the parent company. Similarly, an arbitration clause in a contract concluded by a public sector company under the supervision of a Minister shall not extend to the parent company, institution, or Minister unless one of them intervened in executing the contract or caused confusion regarding the obligation such that their will merges with the will of the contracting party. The Respondents further argued that, accordingly, it is insufficient to consider the Minister of Transport a party to the arbitration agreement in the dispute at hand, based on what the Tribunal stated on page 14 and subsequent pages of its memorandum submitted on 1/2/2014 (assuming its accuracy). Regarding the execution of the contract, it is not enough for the Minister to be considered a party to the arbitration agreement merely because the 2001 agreement stipulated that "this agreement and its clauses are subject to the approval of government authorities." The approval of an agreement by a government authority does not make it a party to the arbitration agreement. For the same reason, what is stated in Clause 2 of Appendix dated 15/3/2001—that the contract shall be considered valid upon obtaining formal approvals—is insufficient. Likewise, it is not enough that the "Ministry of Transport participated in the negotiations" or that it "was aware of the existence and clauses of the arbitration agreement," because participating in negotiations is insufficient to consider a negotiator a party to whom the arbitration clause extends. As for the execution of the contract, the Respondents argued that it is insufficient to consider the Ministry of Transport a party to the arbitration agreement merely because the Director General of the Respondent Company (First) sent an official letter No. 81 dated 28/2/2003 to the Ministry of Transport with a copy of its position on pending lawsuits; or that the Respondent Company (First) mentioned in the letter terminating the Power of Attorney that it was done "in light of the state's directives in New Iraq regarding the rehabilitation of the Iraq Airways General Company"; or that it sent a copy of the suspension letter to the Ministry of Transport for legal discussion; or that the Minister of Transport sent a letter on 11/4/2010 after terminating the Power of Attorney stating that the termination was based on the Council of Ministers Secretariat's decision classifying the Complainant as a façade company. Furthermore, it is established law that stipulating the specialized Minister's approval for an arbitration agreement according to Article One of the Egyptian Arbitration Law No. 27 of 1994 does not make the Minister a party to this agreement; nor is it sufficient to sue the Minister by invoking the concept of vicarious liability, because this basis, even if valid for suing the Minister before the courts (where he acts as the subordinate), cannot be applied in arbitration, which is limited to its parties or those to whom its scope extends.

**The Respondents also argued the absolute nullity of all agreements upon which the Complainant relies:** specifically the agreement dated 30/1/2001, its addendum dated 15/3/2001, and the meeting minutes of 29/8/2005. Based on these, they argued that when the Complainant signed the agreement on 31/1/2001, it had not yet acquired legal personality according to Article 17, last paragraph, of Law No. 159 of 1981. A joint-stock company only acquires legal personality after a period of fifteen days from its registration in the Commercial Registry. It is established that the

Complainant was registered in the Commercial Register under number 6606 on 14/3/2001; therefore, the agreement dated 30/1/2001 was concluded *before* the Complainant acquired legal personality, which leads to its absolute nullity. The same applies to the original addendum signed on 15/3/2001, as the Company only acquires legal personality after a period of fifteen days from its registration in the Commercial Registry, which occurred on 14/3/2001. Furthermore, regarding the meeting minutes of 29/8/2005, it is not correctly classified as a contract; rather, it is simply a record of a meeting held between the parties to document matters that were negotiated between them. Moreover, there is no text stating arbitration as a method for resolving disputes between the parties, and therefore, it cannot serve as a basis for the current arbitration claim.

**The Respondents also pleaded for the dismissal of the case due to prescription (statute of limitations),** based on Article 190/1 of Commercial Law No. 17 of 1999, considering that the contract dated 30/1/2001 is correctly classified as a series of agency contracts. This applies to the aforementioned article which stipulates: "All claims arising from an agency contract shall expire after two years upon termination of the contractual relationship." The memorandum submitted by the Respondents regarding clarifying and explaining the two previous defenses refers to the Respondents' memorandum submitted at the session on 27/1/2004 by Mr. Ahmed Al-Derini, and to the memo submitted by Prof. Dr. Mahmoud Samir El Sharkawy with this memo dated 10/6/2014.

**Under the Second Section Titled "Response to the Complainant's Claims (Pages 18 to 25 of the Memorandum):"** In this memorandum, the Respondents referred to their previous submissions on this matter contained in their memorandum dated Monday, 27/1/2014, submitted by Mr. Ahmed Al-Derini, and what was stated in the memorandum by Prof. Dr. Samir El Sharkawy submitted on 10/6/2014. In addition to these, the Respondents' defense memorandum added its response to the Complainant's claims regarding having fulfilled all its obligations according to the Power of Attorney agreement, as well as addressing the Complainant's claim concerning the failure of the Respondents to fulfill their obligations arising from these agreements. The Respondents' memorandum proceeds by: First, responding to the Complainant's defense that no error was made on its part; second, responding to the Complainant's defense regarding a presumed error on the part of the Respondent Company (First); third, addressing the Complainant's assertion of gross misconduct by the Respondent Company (First) for terminating and subsequently suspending the contract unilaterally. Fourth, they respond to the Complainant's claim that the Respondent Company (First) failed to provide necessary information and tools to enable the Agent to perform its duties. Fifth, in Section Five, the Respondents responded to the Complainant's defense regarding an error by the Respondent Company (First) consisting of encroachment on the scope of the agency. Sixth, they addressed the Complainant's claim of error from the Respondent Company (First) concerning failure to pay its dues. Seventh, they responded to the Complainant's defense alleging that the Respondent Company (First) prolonged negotiation efforts in amicable settlement. Finally, they responded in Eighth to the Complainant's defense regarding the Respondent Company (First)'s damaging statements about its reputation. In Section Nine, the Respondents addressed the Complainant's claim of responsibility for errors committed by the Respondent Company (First) during the agreed period for executing the contract. **Under the Third Section Titled "Absence of Contractual Liability on the Part of the Respondent Company (First) (Pages 26 to 34 of this Memorandum):"** The Respondents stated

that the existence of contractual liability requires the presence of a valid and enforceable contract which the debtor failed to execute. The pillars of contractual liability are: a valid, enforceable contract; a contractual error; damage; and a causal relationship between the error and the damage. In their defense memorandum, the Respondents discussed the elements of the aforementioned liability and concluded that there exists no valid, enforceable contract due to the lack of legal personality of the Complainant at the time the contract was executed (as previously stated). Furthermore, the second element, represented by the error, is not present on the part of the Respondent Company (First); equally, no damage has been proven against the Complainant, as they have failed to prove any error committed against them.

They added that, assuming the existence of an error, the Complainant is only entitled to compensation for the direct damage expected at the time of contracting.

The Respondents concluded their memorandum with the following requests:

Firstly: The non-admissibility and rejection of the inclusion of the Minister of Transport of Iraq in his capacity.

Secondly: The inadmissibility of the case due to prescription (statute of limitations).

Thirdly: Alternatively: The dismissal of the entire claim for all requests contained therein. With compelling the Complainant to pay the Respondent Company (First) what it paid towards the fees of the Arbitration Panel and lawyers. The Respondent Company (First) reserves its right to submit a counterclaim for compensation in its next memorandum.

**The Arbitration Panel also reviewed the memorandum submitted by Prof. Dr. Mahmoud Samir El Sharkawy,** which was 37 pages long, commencing with "The Language of Dialogue in the Hall of Justice." In it, the Respondents noted that the Complainant's supplementary memorandum dated 10/5/2014 contained inappropriate descriptions. The Respondents attached some phrases from it, calling on the Complainant to observe the rules of dialogue within the hall of justice while reserving the right for the Respondents to request appropriate judicial protection and redress. **In Section One, titled "Facts,"** the memorandum referred to the defense statement and documents submitted on 27/1/2014, in addition to other facts contained therein, while reserving the right of the Respondent Company (First) to add any future facts supporting its defense. **In Section Two, titled "Summary of Procedures and Request for a New Deadline,"** the memorandum presented the proceedings of the arbitration sessions, culminating in the Complainant being granted a deadline of three months and twelve days to submit its supplementary memorandum in response to the Respondents' defense statement. Conversely, the Respondent Company (First) was only granted a period of one month from 11/5 until 10/6/2014 to submit its reply to the Complainant's supplementary memorandum. Therefore, based on the principles of equality and equal opportunity established in Article 26 of the Arbitration Law, the Respondent Company (First) requests being granted a new deadline of two months and twelve days to submit a complementary memorandum to its preliminary submission in this memorandum. **In Section Three, titled "Defense,"** the memorandum referred to all previous memoranda and documents submitted by the Respondents, which do not contradict this memorandum. The Complainant's memorandum is dedicated to responding to and replying to several

issues raised in the Complainant's supplementary memo regarding its response to the Respondents' defense statement. It was noted that any statement, argument, or document presented by the Complainant during previous arbitration proceedings, which the Respondents did not respond to in their defense statement submitted on 27/1/2014 or in this memorandum, shall not be construed as a rejection by the Respondents of that statement, argument, or document, nor shall silence constitute acceptance or acquiescence. The Respondents reserve the right to complete their response, add new defenses and documents, modify their claims, and file a counterclaim according to their respective interests and the progress and circumstances of the arbitration proceedings.

**Under Subsection One, Titled "No Contractual Relationship Between the Complainant and Respondent Company (First):"** The Respondents presented their defense regarding the Power of Attorney dated 31/1/2001, its addendum dated 15/3/2001, and the meeting minutes dated 29/8/2005. In this regard, they argued that these agreements are void or absolutely null because the Complainant did not acquire legal personality until 29/3/2001, which is fifteen days after its registration in the Commercial Registry. They asserted that before this date, it had no existence. The memo also contained a response to the Complainant's objection concerning the voidness and nullity of the Power of Attorney dated 31/1/2001, the addendum dated 15/3/2001, and the meeting minutes dated 29/8/2005. The Respondents concluded this section by stating that there is no contractual relationship between the Complainant and the Respondent Company (First), nor is there any agreement on arbitration due to the absence of an arbitration clause, and consequently, the Arbitration Panel lacks jurisdiction to hear the case.

**Under Subsection Two, Titled "Alternatively: Subject Matter of the Claim":** The defense addressed by the Respondents focused on two main sections: First, presenting the classification of the contractual relationship; and after presenting their defense and responding to the Complainant's challenge regarding contract classification, they concluded that the correct legal classification for the agreement dated 30/1/2001 is a **Contractual Agency**. Regarding the addendum dated 15/3/2001 and the minutes of 29/8/2005, the Respondents stated that there was no dispute that the addendum imposes obligations on the Agent that do not fall within the obligations of a Contractual Agent. These include liquidating and paying all amounts and debts due to the First Party from the date the books were closed in 1991; as well as efforts made with Cairo Airport Authority and EgyptAir regarding funds owed to them before the First Party, and acting on its behalf in procedures for cancelling or reducing debts with relevant authorities for the benefit of the First Party. However, despite this, the addendum repeatedly contains a number of obligations found in the contract dated 30/1/2001, besides being an appendix to it—meaning that it amends some of its clauses or completes them while keeping the rest of its provisions as stated in the original agreement. As for the minutes of meeting 29/8/2005, the Respondents stated that all conditions stipulated therein do not count among the customary terms of a Contractual Agency, because this was not what the Board of Directors of the Respondent Company (First) adopted. **The Respondents thus concluded** that the correct legal classification for the contractual framework is **Contractual Agency**, which is specifically governed by Articles 177 to 191 and generally by Articles 148 to 165 of the Egyptian Commercial Law.

**Under Section Two, Titled "The Alleged Duration of the Contractual Relationship":** The Respondents argued that there is no dispute that Clause 23 of the Power of Attorney contract dated 30/1/2002 rendered its duration indefinite. Similarly, it is agreed that Clause 21 of the addendum dated 15/3/2001 stipulated that the general agency contract was for a period of three years after the operation of the First Party's aircraft and the practice of Iraqi Airways' commercial activities, and was subject to renewal by agreement between both parties. This condition dictates that the term of the agency is three years starting from the operation of the First Party's aircraft (the Respondent Company (First)) and its commencement of commercial activities; meaning the Power of Attorney became a fixed-term contract contingent on a suspensive condition, meaning neither party can request the other to perform any obligations before the fulfillment of that suspensive condition, as none of these obligations are due before it. The Respondents further argued that assuming the minutes of meeting 29/8/2005 were valid, Clause 10 confirms that the Power of Attorney remained a fixed-term contract stating: "The duration of the general agency is three years from the date of actual commencement of operations. **Under Section Three, Titled "The Alleged Termination of the Contractual Relationship": In the first request under this section, titled "Legal Provisions Regarding the Principal's Right to Terminate the Power of Attorney,"** the Respondents argued that there is no ground for applying Article 715, Paragraph 2, of the Civil Code, because its application is impossible on the assumed Power of Attorney from the Complainant. This is because the conditions of the agency inherently favor both parties and not just the agent or a third party. Furthermore, the law does not apply to Contractual Agency because the legislator provided it with specific provisions in Article 188/1 Commercial Law, which stipulates that: "The contractual agency shall be for the benefit of both parties." Moreover, even hypothetically assuming the contract is a commercial agency and not a contractual agency, Article 158 Commercial Law obliges the agent to inform the Principal of all transactions conducted on its behalf and to provide the Principal with an accurate account of the actions performed in its name. These two articles confirm that the Principal has an interest in a commercial agency. The Respondents also cited the ruling of the Supreme Constitutional Court in Case No. 193 of Year 29 Civil (Constitutional) issued on 14/7/2012, which concerned the request to declare Paragraph One of Article 189 Commercial Law unconstitutional. The Constitutional Court rendered its judgment declaring it unconstitutional and the Respondents presented some rationale for this ruling, concluding that: 1- The renewal of a fixed-term Power of Attorney must always be by mutual agreement between both parties; meaning each party has the right to accept or reject the renewal without causing their responsibility to arise. 2- Paragraph Two of Article 190 Commercial Law shall be read after the repeal of Paragraph One as follows: "All claims arising from a contractual agency contract shall expire after two years upon termination of the contractual relationship." From this, it is clear that all claims include the claim for compensation for the termination of the Contractual Agency by unilateral management; and the Complainant's argument that this claim, and all compensation claims, are outside the scope of Article 190, Paragraph 2, is not acceptable. Furthermore, the Complainant's assertion that the paragraph only applies to claims arising from the *end* of the contract and not those arising from its *termination* is incorrect, as there is no difference between termination and cancellation, because both fall under the causes for the termination of an agency.

**Under the Second Request, Titled "The Claimed Provisions of the Agreement under Law (Legal Provisions):"** The Respondents cited Article 21 of the addendum dated 15/3/2001 and Clause 10 of the minutes of meeting dated 29/8/2005. The defense then argued that, even assuming that the minutes of 29/8/2005 constituted an agreement, Clause 10—which stipulates that: "The duration of the contract for the agency is three years from the date of actual commencement of operations, and it shall automatically renew for a similar period; and this renewal occurs automatically unless one of the parties notifies the other of its unwillingness to renew by registered mail with proof of receipt at least sixty days before the expiry of the stipulated period, and neither party may request rescission or non-renewal except in the event of gross misconduct by the second party"—**violates public order for the following reasons:** 1- It usurps the Principal's right guaranteed by Article 174 of the Civil Code and Article 163 of the Commercial Law to unilaterally terminate the contract at any time during the original three-year period from the date of actual commencement of operations, as well as the first similar renewal term and subsequent renewals. 2- It makes the renewal of the contract for a period similar to its original duration compulsory upon the Principal, which constitutes an infringement on contractual freedom and disregards the Supreme Constitutional Court ruling previously cited. 3- It imposes a restriction on the Principal's right to terminate or non-renew the contract—that is, the requirement of gross misconduct—which contradicts Article 715/1 of the Civil Code and Article 163 of the Commercial Law. 4- Furthermore, even in the event that the requirement of "gross misconduct" by the Agent as a condition justifying the Principal's right to compensation upon termination or restriction is interpreted, this requirement still violates public order law because Article 715/1 of the Civil Code and Article 163 of the Commercial Law only obligate the Principal to compensate if the Agent proves that the Principal terminated the contract without prior notice or at an inappropriate time. The imposition of "gross misconduct" on the Agent thus shifts the burden of proof onto the Principal, which is a heavy burden since the subject matter requiring proof is gross misconduct. This constitutes a clear violation of both articles concerning public order law. **The Respondents concluded their defense** by stating that Clause 10 of the minutes of meeting dated 29/8/2005 is absolutely null and void because it violates public order. **Under the third Request, Titled "Termination of the Alleged Contract and Its Addendums":** The Respondents provided preliminary observations: The first observation is why the Respondent Company (First) insists on terminating the Power of Attorney contract that it denies existing. In response to this question, the Respondents stated that there are three documents: the original agreement dated 30/1/2001, its void addendum dated 15/3/2001, and the meeting minutes of 29/8/2005, which raise suspicion of an existing contractual relationship. The Respondent Company (First) was keen to remove this suspicion and establish certainty, especially before the start of the agency period upon the actual commencement of air service between Iraq and Egypt. **Under the Title: Facts Concerning the Alleged Termination of the Power of Attorney and the Complainant's Knowledge of It:** The Respondents argued that it is established law that an agency does not terminate merely by the occurrence of its cause of termination; rather, the Agent must be aware of the reason for termination, and thus it terminates from the time of this knowledge. The Respondents cited Article 91 of the Civil Code, which stipulates that the expression of will takes effect at the moment it reaches the knowledge of the addressee, and arrival is considered a presumption of knowledge unless evidence proves otherwise. It was established from Document Bundle No. 3 submitted with the statement of claim

that the Complainant provided a copy of the Power of Attorney termination decision and dated the document as 14/11/2005, which is the date written below the Director General's signature of the Respondent Company (First), while ignoring that this document bears the date of 17/11/2005 on the upper left side. Furthermore, the Complainant also submitted with Bundle No. 4 what it termed a copy of the suspension decision, dating it 16/11/2005, completely ignoring that this document bears the date of 17/11/2005 on the upper left side. In application of Article 91 of the Civil Code as previously cited, therefore, neither the drafting nor the issuance date of a document expressing the will is relevant; rather, what matters is the moment it reaches the knowledge of the addressee, and receipt constitutes a presumption of knowledge. Given that both documents bear irrefutable evidence that they were issued on 17/11/2005, it is neither logically nor legally conceivable for them to have reached the Complainant before their date of issuance. Consequently, the Complainant's claim that the Respondent Company (First) terminated the Power of Attorney on 14/11/2005 and suspended it on 16/11/2005 is unacceptable. The Respondents also presented a second reason for rejecting the Complainant's premise: its acknowledgment in multiple documents that it was aware and accepted the termination of the Power of Attorney, and that this knowledge occurred on 17/11/2005. They then presented several points demonstrating the second reason for rejecting the Complainant's premise that the Respondent Company (First) terminated the Power of Attorney on 14/11/2005 and suspended it on 16/11/2005. **The Respondents concluded their defense by stating** that the essence of their argument is that the Respondent Company (First) notified the Complainant of its decision to terminate the Power of Attorney via letters dated 2/4/2004, effective from February 1, 2005, thereby honoring Article 163 of Egyptian Commercial Law and Clause 23 of the original agreement, which was amended by Clause 21 of the void addendum dated 15/3/2001. The termination decision was then confirmed by its two letters issued on 17/11/2005, which included a significant number of reasons for termination. **Under the Title: Consequences of Termination:** The Respondents' defense stated that the act of termination entails important consequences, forming a substantive defense for the Respondent Company (First). These include: a- That the termination occurred under what the Complainant calls the original agreement dated 30/1/2001 and its addendum dated 15/3/2001, which stipulated that the agency period was three years after the aircraft of the Respondent Company (First) commenced operations and practiced its activities, prior to the drafting of the meeting minutes of 29/8/2005, which the Complainant incorrectly claims is an agreement to reactivate the original agreement and its addendum. b- That in application of Clause 21 of the addendum dated 15/3/2001, neither the original agreement nor its addendum ever came into force because the Complainant was notified of the termination on 2/12/2004, effective from 1/2/2005, while operations did not commence until October 20, 2005. c- That the minutes of meeting of 29/8/2005 are not an agreement to reactivate the agency and its addendum. d- That the Respondent Company confirmed the termination via the two notices sent to the Complainant on 17/11/2005. **Under Subsection Four, Titled "Prescription of the Complainant's Claim":** The Respondents submitted their defense for the first request in this section, titled: The invalidity of assuming a difference between a judgment of termination and a judgment of cancellation. This is based on the opinion of Al-Snuhuri in Volume Three, titled Termination of Agency, page 536, from his work *Explanation of Civil Law*, 2006 edition, where he stated that an agency terminates for various reasons, which can be divided into two categories: The first category comprises causes related to general rules, including those by which the

agency ends naturally through its execution and expiration of the set period. It also includes termination before execution due to impossibility of performance, bankruptcy, lack of capacity, rescission, or the occurrence of a resolutory condition. The second category consists of special reasons for the agency, derived from two characteristics of this contract: First, that the personal element is crucial in the agency, leading to its termination upon the death of the Agent and the Principal; and second, that the agency is not binding and thus terminates by the revocation of the agent or their dismissal from the agency. **Under the Second Request, Titled "The Period of Prescription for the Claim": Firstly, The Complainant's Stance:** After reviewing what the Complainant submitted regarding the statute of limitations, the Respondents argued that the Complainant's defense is incorrect and referred to their previous submissions. They added that the Complainant's interpretation of Article 190/2 of the Commercial Law—that it applies to claims other than compensation and that compensation is not subject to the period outlined in Article 190/1 of the Commercial Law, which lapsed according to the Supreme Constitutional ruling of 12/7/2012—is unacceptable. The Respondents maintained that the statute of limitation for filing a compensation claim returns to the general rules set out in Article 68 Commercial Law, which stipulates seven years. This is an inadmissible defense because it stems from both an incorrect reading of the Supreme Constitutional ruling and Paragraph 2 of Article 190 Commercial Law. Based on this ruling, which was read to stipulate that: "All claims arising from a contractual agency contract shall expire after two years upon termination of the contractual relationship." Given that the correct legal classification of the contractual relationship is **Contractual Agency**, the prescription period for every claim arising therefrom must be subject to the two-year period set by Article 190 Commercial Law—that is, two years from the date of the termination of the contractual relationship. Furthermore, the Respondents argued that the Complainant cannot rely on its involvement in negotiations, because all warnings and meetings following the notice of termination dated 2/12/2004, effective from 1/2/2005, then confirming the termination by two notices on 17/11/2005, implicitly included the reasons the Respondent Company (First) cited for terminating the agency. These facts did not result in a binding agreement for either party, and thus the claim of continued contractual relationship is inadmissible. The Respondents added that since the Complainant initiated arbitration proceedings with its notice dated 4/8/2011 to appoint an arbitrator from the Respondent Company (First), its claim has become prescribed due to the lapse of at least three and a half years since the termination of the contractual relationship. **Under the Title: Counterclaim:** The Respondent Company (First) reserved its right to submit a counterclaim and requested that space be provided for it to submit another detailed, independent memorandum regarding the counterclaim.

The Respondents concluded this memorandum with the following requests:

Firstly—1. A judgment declaring the Power of Attorney and its addendum dated 15/3/2001 as void, and stating that the minutes of meeting of 29/8/2005 do not constitute a contract. Secondly—2. The non-existence of an arbitration agreement, and consequently, the lack of jurisdiction for the Panel to hear the arbitration case. Alternatively: Dismissal of the case on its merits.

In all eventualities: Compelling the Complainant to bear all court costs, arbitrator fees, and legal fees.

**In the memorandum submitted by Mr. Ahmed Al-Derini,** which was 28 pages long, the Respondents referred to their defense memorandum dated 27/1/2914 and the memoranda of both Prof. Dr. Fathi Wali and Prof. Dr. Mahmoud Samir El Sharkawy regarding the case facts. Regarding the defense, the Respondents reiterated all that they had previously stated in the aforementioned memorandums. **Under the Title: Response to the Jurisdiction of the Minister of Transport of Iraq:** The Respondents argued for the non-admissibility of the case because it is filed against an individual enjoying **diplomatic judicial immunity**, pursuant to Articles 14 and 31 of the Vienna Convention on Diplomatic Relations, considering that the Minister of Transport of Iraq enjoys judicial immunity within the scope of his function and representation of his State; therefore, the claim is inadmissible against him. Furthermore, the Respondents asserted their defense regarding the inadmissibility of the case being raised against a party lacking proper status (standing), based on the principle that an arbitration agreement only binds its parties. Building upon the previous defenses concerning this matter, the Respondents then responded and commented on what the Complainant presented in its defense memorandum, addressing the preceding defenses and pleas regarding the legal classification of the contract subject to the dispute, and responding to the alleged errors committed by the Complainant against the Complainant's own company, concluding that the defense does not diminish the soundness of the Respondents' own defenses and pleas.

The Respondents concluded this memorandum with the following requests:

Firstly: The non-admissibility of including the Minister of Transport of Iraq in his capacity. Secondly: The nullity of the Power of Attorney contract.

Thirdly: The lapse of the Complainant's right to file a claim due to the expiration of more than two years since the termination of the contractual relationship.

Fourthly: The lack of entitlement for the Complainant in its claims, as they are inconsistent with law and reality.

Fifth: Dismissal of the entire claim for all requests contained therein.

Sixth: Compelling the Complainant to pay all arbitration costs, deposit, arbitration expenses, arbitrators' fees, and the lawyers' fees of the Respondents.

The Respondent Company (First) and the second Respondent reserved their right to submit explanatory defense memorandums or documents later. The Respondents also reserve their right to file a counterclaim against the Complainant during the course of the arbitration hearings.

**Furthermore, on 10/6/2014, the Respondents submitted five document bundles, which were reviewed by the Arbitration Panel. Their contents are as follows: Bundle One:** Contained, as stated on its cover, the original audit report concerning financial facts related to the subject of the arbitration in the dispute, issued by Mr. Magdi Hashish, CPA's office, containing 60 pages. **Bundle Two:** Contained, as stated on its cover, photocopies of a model for a new Power of Attorney agreement proposed during meetings between the two parties, dated October 20 and 22, 2011, concerning the notice sent by the Respondent Company to the Complainant on 6/3/2012. It is a model for a new agency contract called "Ayata" (Signs) for the International Civil Aviation Transport

Union, which cannot be amended. A copy of this agreement was handed over during the meeting to the Complainant, and after the meeting and with the mutual consent of both parties, a model for a proposed contractual addendum was prepared and presented to the Complainant via the notice sent to it, as well as the attached Ayata contract model derived therefrom. Moreover, two un-signed proposals were submitted by the Respondent Company for the Complainant's review, which marked the beginning of discussions to reach an amicable settlement to terminate the damage to the Complainant's reputation in this regard from the Complainant's side.

**Bundle Three:** Contained, as stated on its cover, photocopies of model letters of guarantee and their renewals for the Respondent Company (First) from a tourist company acting as an authorized agent (Wonder Company, and Kirillo Company), which is a fundamental prerequisite for providing them with travel tickets to be issued against a commission and letters of guarantee that automatically renew annually. Tickets are issued for these companies at a value less than the coverage of the letters of guarantee—this is the customary system for working with airlines and is stipulated in the Power of Attorney contract and its void addendum, which the Complainant failed to do.

**Bundle Four:** Contained, as stated on its cover, photocopies of model requests submitted by tourist companies acting as authorized agents (Wonder Company, and Kirillo Company) to obtain travel tickets for marketing against a commission after fulfilling the guarantee letter requirement. The established custom is that the tourism company must submit a request to obtain travel tickets to market them, such that the value of the tickets delivered to the tourism company is less than the coverage provided by the open guarantee letter from it to the airline—this fact is evident from the documents due to the Complainant's failure to provide any proof of submitting a request to the Respondent Company to receive tickets for marketing under the void Power of Attorney contract.

**Bundle Five:** Contained, as stated on its cover, photocopies of a model tourist license for one of the tourist companies acting as an authorized agent for the Respondent Company. This license is issued by the Ministry of Tourism and constitutes a fundamental prerequisite for the tourism company to issue air transport tickets and act as an airline agent, and it is also required for registration with IATA (Ayata). This was something the Complainant failed to obtain even after terminating the Power of Attorney, and the documents lack any evidence that the Complainant obtained the tourist license at the time the void contract was concluded, which further renders the contract void and non-existent due to the absence of the prerequisite condition for which it was contracted.

- **On 16/7/2014, the Arbitration Panel held a single session** without the presence of the parties, concluding with a majority decision to increase arbitration fees, which were to be notified to the parties at the scheduled session on 17/7/2014.

- On 17/7/2014, the Arbitration Panel held a session in the presence of the legal counsel for the Complainant and Mr. Ahmed Al-Derini, counsel previously authorized to represent the Respondent Company (First) (Iraq Airways General Company), and attended by the Minister of Transport of Iraq. Mr. Ahmed Al-Derini presented the authenticated power of attorney deposited with his office on behalf of the Minister of Transport of Iraq, as well as two other powers of attorney issued by the

Minister of Transport of Iraq—one authorizing Prof. Dr. Mahmoud Samir El Sharkawy (who attended the session), and another authorizing Prof. Dr. Fathi Wali. While awaiting the attendance of the appointed arbitrator for the Complainant, Dr. Sherif Abdullah, the Arbitration Secretary delivered to the parties the Panel's decision dated 16/7/2014 regarding the increase in arbitration fees. The representative present for the Respondent Company requested the presence of the Respondent Company itself, while the representative for the Complainant objected to the decision until it was presented to its client. During this time, Mr. Mohamed Abdel Khaleq Ali attended, bearing a Bar Association ID No. 170803, as a delegate for Dr. Sherif Mohamed Abdullah. The Chairman of the Arbitration Panel received an envelope containing multiple copies of writing from Dr. Sherif Abdullah's office and bearing his signature and office seal, stating that Dr. Sherif Mohamed Abdullah was honored to work with the Arbitration Panel and that he offered his apologies for withdrawing from this arbitration for personal reasons, offering a special apology to Dr. Abdelhamid Al-Ahdab for attending specifically from Lebanon for today's session, expressing his wishes for success, and his readiness to settle any fees he might have claimed in this arbitration at an appropriate amount if the Arbitration Panel deemed so. The Chairman of the Arbitration Panel noted this communication, indicating its consideration and attaching it to the arbitration file, and the Chairman ordered that proceedings be suspended provisionally from the date of the session pending the appointment of another arbitrator for the Complainant.

**- On 19/10/2014, the Arbitration Panel received via email at the headquarters of the legal counsel for the Complainant** (Horus Tourism and Travel) a communication stating that the Complainant **appointed Prof. Dr. Ahmed Fathi Sorour**—Egyptian nationality—as its arbitrator in place of Prof. Dr. Sherif Mohamed Abdullah, who withdrew from the arbitration mission during the session on 17/7/2014. The letter concluded by requesting necessary action to continue with the arbitration proceedings and set a date for the next session.

**- On 20/10/2014**, Mr. Hossam El-Din Saeed Abdel Gawwad Dessouky arrived at the Arbitration Headquarters and reported that he was the Financial Director of Horus Tourism and Travel Company (the Complainant). He submitted to the Arbitration Secretary a letter from the company stating its appointment of Prof. Dr. Ahmed Fathi Sorour—Egyptian nationality—as its arbitrator in the arbitration case, replacing Prof. Dr. Sherif Mohamed Abdullah who withdrew from completing his mission on 17/7/2014. Attached to this letter were photocopies of the email sent to the Arbitration Panel Chairman on 19/10/2014 and a copy of the letter sent by the aforementioned company to Prof. Dr. Ahmed Fathi Sorour, requesting his acceptance of the arbitration mission as arbitrator for the Company, along with a photocopy of the arbitrator's acknowledgment of accepting the mission from Prof. Dr. Ahmed Fathi Sorour, in which he confirms accepting the arbitration mission and undertakes to adhere to all arbitrators' conduct, guaranteeing impartiality, independence, and confirming that there is no relationship between him and the parties involved, nor are there any circumstances that raise doubt about his impartiality or independence.

**- On 24/10/2014, the Arbitration Panel convened in a single session with the presence of Prof. Dr. Ahmed Fathi Sorour**, the arbitrator appointed by your company (the Complainant—Horus Tourism and Travel), who confirmed his acceptance of the arbitration mission and signed the

corresponding acknowledgment form, thereby documenting this fact in the dedicated minutes for completing the panel's formation.

The Panel convened with its new composition on that same Friday, 24/10/2014, and decided: Firstly—to set a hearing date in the presence of the parties on Wednesday, 26 November 2014, at eleven o'clock in the morning to hear the parties' pleas.

Secondly—the Panel, by majority decision, based on the ruling of the Chairman of the Arbitration Panel, Prof. Dr. Hassan Abdel Basit Jameei, and the arbitrator appointed by the Respondent Company, Prof. Dr. Abdelhamid Galal El Ahdab, confirmed its previous decision regarding the increase in fees.

**- On 24/10/2014**, Prof. Dr. Salah El Din Gamal El Din and Prof. Dr. Mahmoud Salah El Din Musailhi sent an email to the Chairman of the Arbitration Panel referencing a letter from the Respondent Company's lawyer concerning the fees, stating that the Complainant does not agree with the increase in fees, and that it had previously registered its objection during the session on 17/7/2014. The Chairman then notified the members of the Arbitration Panel and the Respondent Company of this communication via registered mail, email, and physical letters.

**- On 6/11/2014, the Chairman sent** a letter to the parties via email and government mail stating **that the deadline for paying half of the increased fees** for both parties **expires on 8/11/2014**. And that by this day, if neither party pays its share of the increased fees previously decided by the Arbitration Panel by majority decision on 16/7/2014 and delivered to the parties on 17/7/2014, the other party will be entitled to pay the full value of the increased fees previously decided by the Arbitration Panel by majority decision on 16/7/2014, which is due by 22/11/2014. **Furthermore, it was stated that if the entire value of the increased fees decreed by the Arbitration Panel is not paid, the arbitration shall be suspended until the full amount of the increased fees is paid, as per the decision.** The Chairman also warned the parties that any correspondence sent by the parties or panel members to the Chairman or the Secretary, and any correspondence sent by the Chairman or the Secretary to any of the arbitration parties or panel members, must be done via the Chairman's dedicated email address; no electronic correspondence originating from or directed to any other email address shall be considered valid as of Thursday, 6/11/2014.

**- On 8/11/2014**, the Chairman notified the parties that the meeting hall at the Automobile Club was reserved for the scheduled session and that the arbitration hearing would take place in that hall at eleven o'clock in the morning.

**- On 22/11/2014**, the Chairman sent a communication to both the panel members and the arbitration parties via government mail reinforced by email, stating that **Saturday, 22/11/2014, was the final deadline for both parties to pay the increased fees according to the Arbitration Panel's majority decision** previously submitted to them. It further stated that upon expiry of this deadline **and in the event of failure to pay the full value of the increased fees** decreed by the Arbitration Panel by

majority decision, **the arbitration proceedings will be suspended** until the full amount of the increased fees is paid as per the Arbitration Panel's majority decision.

**- On 4/12/2014**, the Chairman received a memorandum via email from the Complainant's lawyer stating that the Complainant objects to the arbitrating case before Dr. Abdelhamid Galal El Ahdab, the arbitrator appointed by the Respondents for the arbitration case, and requests that the objection be attached and incorporated into the file of the arbitration case. Furthermore, it was stated that if this is not withdrawn within 15 days from the date thereof, the request shall automatically be referred to the competent court to hear and rule upon it, pursuant to Article 19-1 of the Egyptian Arbitration Law.

**- On 9/12/2014**, the Complainant submitted at the arbitration headquarters a request for the withdrawal of Dr. Abdelhamid Galal El Ahdab, the arbitrator appointed by the Respondents, which had previously been sent via email by the Complainant's lawyer.

- On Wednesday, 10/12/2014, a registered letter was delivered to the arbitration headquarters containing the aforementioned request for withdrawal.

- On 28/12/2014, the Chairman referred the request for withdrawal to the competent Cairo Court of Appeal, where it was filed as case No. 993 of Year 131 Civil and scheduled for hearing on 26/2/2015 before Chamber 50 of the Cairo Court of Appeal.

**- On 14/1/2015, through the personal initiative of the Chairman, all arbitrators appointed by the Complainant and the arbitrator appointed by the Respondent Company were invited to issue a decision withdrawing from the suspension** ruling issued in the arbitration case, and to propose setting a hearing date for the parties on Thursday, 29 January 2015, at eleven o'clock in the morning.

**- On the same day**, Wednesday, 14/1/2015, the Chairman received an email **from Prof. Dr. Abdelhamid Al-Ahdab**, the arbitrator appointed by the Respondents, **confirming his agreement with the Chairman's proposal to withdraw the suspension decision and continue the arbitration case.**

- The Complainant's arbitrator, Prof. Dr. Ahmed Fathi Sorour, also confirmed his agreement with the Panel's decision to lift the suspension of the arbitration and agreed to extend the duration of the arbitration for an additional six months, and agreed on the date of the arbitration hearing of 29 January 2015, but subsequently withdrew due to personal circumstances, requesting a postponement and asking for a new session date in February 2015; he then returned and refused to hold any session unless he received his fees.
- Via an email correspondence to the Chairman of the Arbitration Panel, Prof. Dr. Ahmed Fathi Sorour, the arbitrator appointed by the Complainant, requested that the settlement of his share of fees—previously paid to the withdrawing arbitrator appointed by the Complainant, Dr. Sherif Abdullah—be made so that he could set and attend the next arbitration session.

- In execution of the foregoing, and in an attempt by the Chairman to resolve this dispute regarding Prof. Dr. Ahmed Fathi Sorour's fees, the Chairman communicated with the parties, including the

Page 123 of 236

Complainant (Horus Tourism and Travel), conveying what Dr. Sherif Abdullah stated: the necessity of withdrawing the case filed against him, if any, and committing not to claim previously paid fees from him under all circumstances. Accordingly, they reached an agreement that would allow Prof. Dr. Ahmed Fathi Sorour to receive his share of the fees, thereby enabling him, in consultation with the remaining panel members, to set a date for the next session.

- On 4/2/2015, the Chairman received a correspondence from Prof. Dr. Ahmed Fathi Sorour withdrawing from the arbitration mission.

- On 5/2/2015, the Chairman communicated with the parties and the Complainant's arbitrator in a memorandum stating that: Firstly: The Arbitration Panel had concluded before the withdrawal of Prof. Dr. Ahmed Fathi Sorour, and based on what Prof. Dr. Ahmed Fathi Sorour submitted concerning the reconsideration of the Chairman's decision to increase fees, and based on the agreement of Prof. Dr. Abdelhamid Al-Ahdab, issuing a decision to reconsider the previous decision regarding the fee increase and rejecting any increase, whether related to Prof. Dr. Ahmed Fathi Sorour's fees or any other increase, unless agreed upon by the parties, while reserving the Panel's right to claim any increase not agreed upon by the parties according to law. Secondly: Reaffirming previous decisions regarding: 1- lifting the suspension of the arbitration and resuming proceedings from 15/1/2015. 2- The arbitration duration shall be six months following its expiration, in addition to the period of suspension. 3- Setting a date for the hearing with the presence of all parties (which was previously decided on 27/1/2014 and postponed as previously stated until Prof. Dr. Ahmed Fathi Sorour withdrew).

Thirdly: And given the correspondence sent by Prof. Dr./Ahmed Fathy Sorour regarding his withdrawal, the arbitration shall be considered suspended until another arbitrator is designated for the Claiming Company, in accordance with what the law stipulates in this regard.

**- On Wednesday, 18/2/2015**, Mr. Ahmed Al-Derini, counsel delivered a letter to the Chairman of the Arbitration Panel and to Prof. Dr. Abdelhamid El Ahdab, the arbitrator appointed by the Respondent Company, stating the cancellation of the powers of attorney recorded in the minutes of the session on 17/7/2014, which had been issued through powers of attorney from the Iraqi side, represented by His Excellency the Prime Minister of Iraq, His Excellency the Minister of Transport of Iraq, and the Director General of Iraq Airways. The letter stated that no correspondence, communication, or action taken by them would be recognized, nor would it result in any legal consequences for the Respondents, as they no longer represent the Iraqi side, and that notice had been given to them regarding this.

**- On Monday, 5/10/2015**, Mr. Hossam El-Din Saeed Abdel Gawwad Dessouky attended the arbitration headquarters. The Arbitration Secretary informed him that he was the Financial Director of the Complainant Company (Horus Tourism and Travel) and delivered a letter from the company dated 5/10/2015 to the Chairman of the Arbitration Panel, stating that the Complainant had selected Counselor Ashraf Mohamed El Said Issa, President at Cairo Court of Appeal and Assistant Minister of Justice, as its appointed arbitrator. The Chairman subsequently notified both the arbitrator appointed by the Respondent Company and the Complainant of this matter.

- On 20/10/2015, a postal letter was received by the Chairman of the Arbitration Panel from the Respondent Company (Iraq Airways General Company), which was also delivered at the headquarters on the same day. The company objected to the appointment of Counselor Ashraf Issa as the arbitrator for the Complainant, arguing that since he is an Assistant Minister of Justice, his appointment requires the approval of the Supreme Judicial Council, pursuant to Article 63 of the Judiciary Law. The letter also stated that they had submitted a formal objection request regarding this matter to the International Arbitration Affairs Office at the Ministry of Justice, and were awaiting the result of the investigation. On the same date, 20/10/2015 the Chairman notified the parties and the Respondent Company's arbitrator, Dr. Abdelhamid El Ahdab and Counselor Ashraf Mohamed El Said Issa, concerning the correspondence from the Respondent Company.

- On 21/10/2015, an email was received by the Chairman of the Arbitration Panel from Counselor Ashraf Mohamed El Said Issa responding to the Respondent Company's letter. In it, he stated that although the matter is personal and does not concern any other person or affect the subject of the arbitration, he noted that upon being contacted by the Complainant with his nomination, he would present the matter before His Excellency the Minister of Justice for appropriate action in light of the law, pending acceptance or rejection of the mission. On the same date, the Chairman notified the parties of the foregoing.

- On 27/10/2015, an email was received by the Chairman from the Respondent Company, stating its respect for His Excellency and Egyptian judiciary and pride in its dignity. It clarified that its objection via previous correspondence was not directed at the individual (the arbitrator), but rather related to a legal matter according to Article 63 of the Judiciary Law.

- Also on 27/10/2015, an email was received by the Chairman from Dr. Abdelhamid El Ahdab, the Respondent Company's arbitrator. In it, he stated that after reviewing the letter from Horus dated 5/10/2015 to the Chairman regarding the appointment of Counselor Ashraf Mohamed El Said Issa, and reviewing the objection letter from Iraq Airways Company, and Counselor Ashraf Mohamed El Said Issa's letter, and the letter from the Iraq Airways General Company, he concluded that the matter of resuming the arbitration proceedings is not currently raised, given that the Arbitration Panel has not yet been fully constituted, and as long as the arbitrator appointed by the Complainant has not obtained the approval of the Supreme Judicial Council.

**- On 30/12/2015, a letter was received by the Chairman from the Chairman of Misr Tourism Company dated 29/12/2015. The letter informed that the Preservation Committee for the Assets and Funds of the Muslim Brotherhood Community had mandated Masr Tourism Company to supervise and monitor some companies frozen assets belonging to the prohibited community, including Horus Tourism and Travel Company, effective from 25/10/2015. Consequently, Misr Tourism Company became the official legal representative in all legal, judicial, and material dealings pertaining to Horus Tourism and Travel Company. The letter stipulated that no dealings with Horus Tourism and Travel Company should occur after the date of delivery through Masr Tourism Company until all procedures regarding this matter are presented to the Committee for Preservation and Management of the Funds of the Muslim Brotherhood Community.**

- On 30/12/2015, the Chairman notified both the Respondent Company and its arbitrator, informing them about the letter received from Misr Tourism Company, attaching a copy of this letter with his communication to both parties.

- On 31/10/2015, an email was received by the Chairman from the Respondent Company's lawyer, Mr. Ahmed Al-Derini, also addressed to Dr. Abdelhamid El Ahdab, stating that the Preservation Committee for the Assets and Funds of the Muslim Brotherhood Community had issued a decision freezing Horus Tourism and Travel Company, all branches of the company, and transferred the management of the company to Misr Tourism Company, because this is a judicial decision, thereby resulting in the loss of legal capacity for the Complainant Company, and its management was vested in Misr Tourism Company pursuant to this decision and Article 802 of the Criminal Procedure Law.

- On 14/1/2016, the Chairman received a letter from Misr Tourism Company stating the appointment of Counselor Dr. Mohamed Yasser Abu El Fotouh as the arbitrator for the Complainant Company. On the same date, he issued an acknowledgment confirming his acceptance of the arbitration mission, his impartiality, and independence.

- On 31/1/2016, the Chairman received a letter from Misr Tourism Company stating the withdrawal of Counselor Dr. Mohamed Yasser Abu El Fotouh.

- On 14/3/2016, the Chairman received a letter from Misr Tourism Company stating the appointment of Counselor Ezzat Khamis as the arbitrator for the Complainant Company.

- On 20/3/2016, the Chairman received a letter from Misr Tourism Company stating the withdrawal of Counselor Ezzat Khamis.

- On 24/3/2016, the Chairman received a memorandum from Misr Tourism Company stating the appointment of Major General Youssef Wassal as the arbitrator for the Complainant Company. He issued an acknowledgment confirming his acceptance of the arbitration mission, his impartiality, and independence. The Arbitration Panel subsequently set the date of Thursday, 31/3/2016, for an arbitration hearing after the full constitution of the panel. On this date 31/3/2016, Mr. Hisham Hussein Sherif Mohamed Zaki Sherif attended, whose identity was confirmed by his National ID Card No. 26009282400176, acting as the authorized Executive Supervisor delegated from Misr Tourism Company, as stipulated in Commercial Register Extract No. 6656 for Horus Tourism and Travel Company dated 14/3/2016, a copy of which was submitted with a photocopy of his National ID Card. Also present were Mr. Mohamed Ibrahim El Atar, advocate at the Court of Cassation (Bar Association ID No. 142289), and Mr. Ahmed Anwar Ahmed, advocate at the Court of Appeal (Bar Association ID No. 218351) with Official Power of Attorney No. 79/D for the year 2014 from Al-Waili Documentation Office. They attended in their capacity as agents for Mr. Chairman of Misr Tourism Company—the company that assumed the management of Horus Tourism and Travel Company (the Complainant)—by the Committee for Management of the Funds of the Muslim Brotherhood Community, and were present with Mr. Hisham Hussein Sherif Mohamed Zaki Sherif, who also confirmed their powers of attorney on behalf of Misr Tourism Company in its capacity as the delegate managing the Complainant Company (Horus). Furthermore, the Respondent Company (First) (Iraq Airways General Company) was represented by Mr. Ahmed Al-Derini Abdelaziz

Mahmoud, an advocate with a previously authenticated power of attorney. The Chairman informed the attendees that Prof. Dr. Youssef Ahmed Wassal was contacted late in the evening on Wednesday, 30/3/2016, the day before this session, withdrawing from attending the hearing scheduled for Thursday, 31/3/2016. This led to a notification being sent to Dr. Abdelhamid El Ahdab, the Respondent Company's arbitrator, late on the evening of the day preceding that session, who stated that his attendance would be difficult and unnecessary. Given the delay in Prof. Dr. Youssef Ahmed Wassal's withdrawal notice for missing this session, and given that there was no opportunity to notify the parties accordingly, he stated that the session would be postponed to a later date, which would be notified to the parties subsequently.

- Following these events, while corresponding regarding another arbitration hearing date, Misr Tourism Company—in its capacity as the party with legal standing delegated for managing the frozen Complainant Company—contacted the Chairman of the Arbitration Panel to state that Dr. Youssef Wassal had withdrawn from his arbitration mission on 30/3/2016. The Chairman subsequently contacted both parties and the Respondent Company's arbitrator regarding this matter, also providing a photocopy of the withdrawal notice from Dr. Youssef Wassal delivered by the Preservation Committee. Consequently, the arbitration was suspended from its date of withdrawal.

- On 29/7/2016, Dr. Abdelhamid El Ahdab withdrew from his arbitration mission. Then, on 14/10/2016, Dr. Abdelhamid El Ahdab amended his withdrawal, stating in the letter of withdrawal that he had withdrawn at the request of the Iraqi Minister of Justice.

- On 27/3/2017, Prof. Dr. Hassan Abdel Basit Jameei submitted his withdrawal from the arbitration mission to prevent damage resulting from a dissolution lawsuit filed by Horus Tourism and Travel Company before its freezing.

- On 30/3/2017, Dr. Abdelhamid El Ahdab submitted his withdrawal, basing it on the same reasons and motives that Prof. Dr. Hassan Abdel Basit Jameei cited for his withdrawal.

**- On 22/3/2022, the Second Commercial Chamber of the Cairo Court of Appeal issued a judgment rejecting the termination of the mission of Prof. Dr. Hassan Abdel Basit Jameei, Chairman of the Arbitration Panel, and rejecting the termination of the mission of Dr. Abdelhamid El Ahdab (the arbitrator appointed by the Respondent Company). Furthermore, on 22/9/2022, this chamber issued a judgment rejecting the deficiency claim filed by the Respondent Company (First) requesting a ruling on the withdrawal of the Chairman and the arbitrator appointed by the Respondent Company, and other requests included in the original lawsuit. The judgment concerning the deficiency claim previously ruled to reject all requests, including rejecting establishing his withdrawal as having occurred prior to this final ruling on the grounds of definitive rejection of the withdrawal. (The Complainant submitted a document bundle containing these judgments with its memorandum dated 20/6/2023.**

**- On 7/2/2023, a letter was received by the Chairman from the Committee for Procedures, Preservation, Management, and Disposal of Funds of Terrorist Groups and Individuals, stating that: "Pursuant to the ruling issued by the Cairo Court for Urgent Matters in Lawsuit No. 2315 of Year 2013 (Urgent Cairo), and referring to Law No. 22 of 2018 organizing procedures**

**for freezing, listing, management, and disposal of funds of terrorist groups and individuals. Referring to the arbitration filed by Horus Tourism and Travel Company, which is frozen, under Temporary Order No. 1 of Year 2018 against Iraq Airways General Company. Given that Dr. Sherif Mohamed Abdel Abdullah was previously appointed as the arbitrator for Horus Tourism and Travel Company and subsequently withdrew. And since a decision was issued on 5/2/2023 by the Committee to re-nominate Dr. Sherif Mohamed Abdel Abdullah as the arbitrator for Horus Tourism and Travel Company, which he accepted via his letter dated 6/2/2022. Given the completion of the constitution of the Arbitration Panel under your chairmanship and the membership of Mr. Dr. Abdelhamid Galal El Ahdab, the arbitrator appointed by the Iraq Airways General Company, the arbitration is resuming in light of the foregoing. We inform you that the State Judicial Council is the legal representative for the Complainant regarding the aforementioned arbitration, which is filed by the frozen company and represented legally by the Committee before courts and arbitration panels. Therefore, the attendance, pleading, submission of memorandums, documents, and everything required by law concerning this arbitration. This must be done to take the necessary legal measures and commit to continuing to follow up on the arbitration and holding its sessions. Attached with our letter is a copy of the Committee's decision nominating Dr. Sherif Mohamed Abdel Abdullah and a copy of his acceptance of the nomination, for taking the necessary legal actions and committing to continuing the monitoring of the arbitration and holding its sessions, as well as communicating this matter to the State Judicial Council at 42 Gameat Al Dewal Al Arabeya - Mohandessin - Giza."**

In this regard, the Committee attached its memorandum stating:

a- A copy of Decision No. 2 of Year 2023 dated 6/2/2023, issued by His Excellency Counselor/ Chairman of the Committee, containing in Article One the nomination of Mr. Sherif Mohamed Abdullah as the arbitrator appointed by Horus Tourism and Travel Company (frozen pursuant to Temporary Order No. 1 of Year 2018) in the arbitration case filed by the aforementioned company against Iraq Airways General Company.

b- A copy of Mr. Sherif Mohamed Abdullah's letter addressed to His Excellency Counselor, Chairman of the Committee for Preservation, Administration, and Disposition of Assets and Funds of Terrorist Groups and Terrorists, confirming his acceptance of his nomination and acknowledging his impartiality, independence, and full cooperation with the constituted Arbitration Panel.

- On 17/2/2023, Mr. Sherif Mohamed Abdullah, the arbitrator appointed by the Complainant (Horus Tourism and Travel Company—frozen), signed an acknowledgment of acceptance of the mission and submitted it to His Excellency Mr. Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitration Panel.

- Based on the foregoing, Mr. Sherif Mohamed Abdullah, the arbitrator appointed by the Complainant (Horus Tourism and Travel Company—frozen), sent a letter dated 7/2/2023 to His Excellency Mr. Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitration Panel, clarifying that he had conducted a phone call with Prof. Dr. Abdelhamid Galal El Ahdab, who

was the arbitrator appointed by Iraq Airways General Company (the Respondent). During this call, they agreed to confirm the selection of Mr. Prof. Dr. Hassan Abdel Basit Jameei Jamii as the Chairman of the Arbitration Panel, and their mutual acceptance thereof.

- On 7/2/2023, via email, Prof. Dr. Abdelhamid El Ahdab, in his capacity as the arbitrator appointed by Iraq Airways General Company (the Respondent), addressed a letter to His Excellency Mr. Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitration Panel containing the same contents as the correspondence sent by Dr. Sherif Mohamed Abdullah, the arbitrator appointed by the Complainant (Horus Tourism and Travel Company—frozen) on 7/2/2023.

- Given the above circumstances, Mr. Prof. Dr. Hassan Abdel Basit Jameei, in his capacity as Chairman of the Arbitration Panel, and Prof. Dr. Sherif Mohamed Abdullah, the arbitrator appointed by the Complainant (Horus Tourism and Travel Company—frozen), communicated that, following the completion of the Panel's formation, a telephone call was held with Prof. Dr. Abdelhamid Galal El Ahdab, the arbitrator appointed by Iraq Airways General Company (the Respondent). The Arbitration Panel thus decided to hold an arbitration hearing in the presence of the parties, enabling them to conduct their pleas and submit memoranda and documents. This was scheduled for Thursday, 16/2/2023, at one o'clock PM. It was determined that the session would be held on this date at Business Center Main Hall (1), located at Tulip Narges Hotel, South Ninety Street—Fifth Settlement—Gate No. 4.

- On 8/2/2023, pursuant to the Arbitration Panel's decision, Mr. Prof. Dr. Hassan Abdel Basit Jameei, Chairman of the Arbitration Panel, sent a letter by mail to His Excellency Counselor/Chairman of the State Judicial Authority in his capacity as the legal representative of the Complainant Company based on the order of preservation and limitation and disposition of assets and funds of terrorist groups and terrorists, informing the Committee of the Arbitration Panel's decision to hold an arbitration hearing in the presence of the parties, enabling them to conduct their pleas and submit memoranda and documents, scheduled for Thursday, 16/2/2023, at one o'clock PM. It was determined that the session would be held on this date at Business Center Main Hall (1), located at Tulip Narges Hotel—South Ninety Street—Fifth Settlement—Gate No. 4, and invited them to attend at the specified time and place.

- On the same date, also 8/2/2023, Mr. Prof. Dr. Hassan Abdel Basit Jameei, Chairman of the Arbitration Panel, addressed Iraq Airways General Company at its address (according to the previous judicial notice sent from it to the Chairman of the Arbitration Panel dated 18/4/2022, by which it informed him of changing its mail and email addresses), notifying the company of the Arbitration Panel's decision to hold an arbitration hearing in the presence of the parties, enabling them to conduct their pleas and submit memoranda and documents, scheduled for Thursday, 16/2/2023, at one o'clock PM. It was determined that the session would be held on this date at Business Center Main Hall (1), located at Tulip Narges Hotel, South Ninety Street—Fifth Settlement—Gate No. 4, and invited it to attend at the specified time and place.

On 9/2/2023, the State Judicial Authority received the letter that was sent by mail to His Excellency Counselor/Chairman of the State Judicial Authority in his capacity as the legal representative of the Complainant Company, at its headquarters.

On 9/2/2023, the Chairman of the Arbitral Panel also notified the Committee for Measures of Preservation, Management, and Disposition of Assets of Terrorist Groups and Individuals that the State Legal Affairs Authority (State Law Authority), acting as the legal representative of the Claimant Company in the arbitration, had been addressed with an invitation to attend the arbitration session at the aforementioned time and place.

- Also on 9/2/2023, Chairman Mr. Prof. Dr. Hassan Abdel Basit Jameei addressed Mr. Ahmed Al-Derini in his capacity as the legal counsel for the Minister of Transport of Iraq, informing him of the Arbitration Panel's decision to hold an arbitration hearing in the presence of the parties, enabling them to conduct their pleas and submit memoranda and documents, scheduled for Thursday, 16/2/2023, at one o'clock PM. It was determined that the session would be held on this date at Business Center Main Hall (1), located at Tulip Narges Hotel—South Ninety Street—Fifth Settlement—Gate No. 4, and invited them to attend at the specified time and place.

- On 16/2/2023, a session was held with the full composition of the Arbitration Panel and attended by the parties. The representative for the Complainant (Subject to Freeze) was Mr. Counselor Yasser Abdel Fattah El Sayed Ahmed, a counselor from the State Cases Authority. The representative for the Respondent Company attended by Mr. Ahmed Al-Derini Abdel Aziz, with previously established authorization. He submitted a defense regarding the Minister of Transport of Iraq, arguing that the communication was not addressed to the Minister of Transport of Iraq as required by law via diplomatic channels at the Ministry of Transport in Baghdad, Republic of Iraq, but rather at the premises of the Iraq Airways Company in the Arab Republic of Egypt.

- At the beginning of the session, the Chairman of the Arbitration Panel, Prof. Dr. Hassan Abdel Basit Jameei, reviewed the proceedings of the arbitration up to and including this session on Thursday, 16/2/2023. His Excellency explained that according to the procedural schedules previously set by the Arbitration Panel, each party had submitted all its memorandums, documents, defenses, and pleas as detailed in the minutes of previous sessions and the file of the arbitration case.

The Arbitration Panel permitted any interested party among both parties—in addition to the foregoing—to participate in the proceedings and submit their memoranda and documents. The representative for the Complainant began his pleading and stated that he would adhere to all defenses and pleas previously submitted by the Complainant, and assert the evidentiary value of the documents presented by the Complainant throughout all stages of the case. He requested the referral of the arbitration to a specialized expert and declared that he entrusted the Arbitration Panel's justice in appointing this expert.

- The representative for the Respondent Company then presented its pleading, stating that it objected to the timeframe granted to the Respondent Company to attend this session, requesting consideration that the Respondent Company is a foreign company represented by a foreign government, requiring consultation and making appropriate decisions during the session, and requested an extended period

of no less than two months to consult with the Iraqi Government and Iraq Airways in Baghdad, and to consult His Excellency the Prime Minister of Iraq to make the proper decision regarding this matter.

After hearing the pleas and reviewing the documents and materials and the legal discussion among the members of the Arbitration Panel, the Panel decided the following:

Firstly—The Arbitration Panel set the arbitrator's fees for the Complainant, Prof. Dr. Sherif Mohamed Abdullah, at an amount of three hundred and ninety thousand US dollars, payable by half by the Complainant and the other half by the Respondents, within a deadline not exceeding fifteen days from the date of this session. If neither party pays its share of these fees, the other party shall be entitled to pay it on their behalf within a period not exceeding fifteen days following the expiration of the first deadline.

Secondly—Before ruling on the merits of the claims presented in the arbitration case, and before ruling on the defenses and pleas raised by the Respondents, the Arbitration Panel decided to appoint an expert for the arbitration case.

Accordingly, after hearing the pleas and reviewing the documents and materials and legal discussion among the members of the Arbitration Panel, the Arbitration Panel appointed **Prof. Nasser Abu El Abbas & Partners (Morrison Global)**, located at 2 Ismailia Square - Heliopolis - Cairo, as an expert in the arbitration case to review the file of the arbitration case and its documents, anything that the parties may present to him through defenses and other documents, and to hear testimony from each party without swearing an oath, for the purpose of determining:

1- The relationship between the parties regarding its date of origin, duration, and the obligations of each party towards the other according to the contractual relationship subject to the dispute.

2- Determining the extent to which each party executed its contractual obligations, and stating any shortcomings in fulfilling these obligations, if applicable.

3- In the event of a failure on the part of the Respondents, determining whether the Complainant has the right to compensation or not concerning error, damage, and causal link; in this case, determining the amount of compensation and its components based on the loss suffered by the Complainant and the lost gains, and providing evidence thereof; generally, determining the elements of the claim, investigating the parties' defenses, and expressing the Arbitration Panel's authorization to the appointed expert to travel to any governmental or non-governmental authority it deems necessary for reviewing documents or materials related to the case, which it finds necessary to review, hearing from both parties (and who deems it necessary to hear their statements without swearing an oath), generally taking all measures deemed necessary to uncover the truth in the dispute.

Secondly/a—The Arbitration Panel determined the expert's fees based on the claim submitted to the Panel that the expert's fees shall be paid from the arbitration costs.

Secondly/b—The Expert must deposit a written report of seven copies, signed by him, at the arbitration headquarters within a period not exceeding forty-five days from the date of receiving the case file at the arbitration headquarters, containing the final conclusion he reached.

Secondly/c—The Arbitration Secretary must immediately send the expert's written report to the parties via express government or private mail upon deposit of the report by the expert.

Secondly/d—The Arbitration Panel granted any party wishing to do so a week beginning from the day following the date of notification of the report to submit memoranda and documents with their defenses and pleas that comment on the expert's report.

Thirdly—The Arbitration Panel stipulated that, if it deems necessary at a later time, the previous deadlines are extended, and a date shall be notified to the parties for a final hearing session in the presence of all parties.

Fourthly—A signed copy from the Arbitration Panel detailing the decisions stated in items two and second/a, and secondly/b, and fourth, is to be delivered by the Arbitration Secretary to the expert, along with a copy of the case file, enabling him to proceed with his mission based on it.

This decision was issued by unanimous consensus after reviewing the case documents, hearing the pleas, and legal deliberation, and every party in the arbitration case received a signed copy thereof.

- Thus, the proceedings for the session concluded at two thirty p.m.

However, following the foregoing, Mr. Ahmed Al-Derini, counsel present, stated his desire to add an objection concerning the manner in which the arbitrator appointed by the Respondent Company was designated, noting that it did not follow the same procedure as when the Chairman of the Arbitration Panel was nominated for the Respondent Company.

He also requested that the deadline for responding to the expert report be two weeks instead of one week. Accordingly, the Complainant agreed to this and the Panel decided to adopt this period.

Thus, the proceedings concluded at two thirty p.m., and it was signed by those present after reading and reviewing the minutes of the session.

- On 18/2/2023, in execution of the Arbitration Panel's decision, the Chairman sent a memorandum to Nasser Abu El Abbas & Partners notifying them of the Panel's decision, attaching a copy of the case file containing copies of the session minutes, a copy of the arbitration statement of claim and its response, and copies of the memoranda exchanged between the parties, including five cartons, all consisting of photocopies submitted by the Complainant.

- On 20/2/2023, the expert office contacted the Chairman of the Arbitration Panel to confirm acceptance of the mission and stated that it had scheduled a date for the first expert session on Tuesday, 28/2/2023, at the expert's office, and that it had notified the parties of this.

- On 22/2/2023, the Chairman contacted the parties to reiterate the expert's notice that the first expert session was scheduled for Tuesday, 28/2/2023, at the expert's office.

- On 23/2/2023, the Chairman received an email from the expert stating the postponement of the expert session that was scheduled for Tuesday, 7/3/2023.

- On 24/2/2023, the Chairman received another email from the expert stating his withdrawal from the mission due to a sudden illness requiring surgery and long recovery, necessitating travel abroad to complete treatment.

- On 26/2/2023, the Chairman notified the parties regarding the expert's withdrawal and that after deliberation among the Arbitration Panel, it concluded to accept the expert's withdrawal and cancel the dates and procedures for the scheduled expert session. The notification also included a notice that an email was received by the Chairman, followed by a notice served by Dr. Mohamed Hamouda, attaching copies of legal powers of attorney, stipulating that he is the legal counsel for both Iraq Airways General Company and the Minister of Transport of Iraq in his capacity, and requesting mandatory service of this notice before the Arbitration Panel proceedings and sessions. Therefore, it was decided to add the notification to the Minister of Transport and Iraq Airways General Company served through their legal representative, Dr. Mohamed Hamouda.

- On 5/3/2023, a letter was received at the arbitration headquarters by Dr. Mohamed Hamouda, counsel representing both the Minister of Transport of Iraq and Iraq Airways General Company, requesting the scheduling and location for his urgent review of all procedures taken to resume the arbitration proceedings, including those from the session on 16/2/2023.

- The Chairman of the Arbitral Panel, Dr./Mohammed Hammouda, lawyer in his capacity as counsel for both Mr./The General Iraqi Aviation Corporation and the Minister of Transport of Iraq, summoned him on Sunday, 12/3/2023, at seven thirty PM, at the Arbitration Headquarters located at Premises 7, Al Fadl Street – Talaat Harb – Cairo, to be briefed on all procedures taken to resume the arbitration proceedings, including procedural actions conducted in sessions, the last of which was the session on 16/2/2032.

- On Sunday, 12/3/2023, at seven thirty PM, Mr./Mohammed Said Mahmoud Hassanin, lawyer bearing Cairo Bar Association membership number 293361 and National ID card number 28305060102032, with Power of Attorney No. 3960/A for Year 2022 from the Notary Office of the Lawyers Syndicate in Giza, representing Mr./Yasser Makawy Mohammed Makawy; and with Power of Attorney No. 4995/B for Year 2006 from the Al-Ahram Model Notary Office, presented a copy of the aforementioned powers of attorney. He also submitted an official certified copy of the power of attorney issued by the Director General of Iraqi Airways bearing number 739 on 9/3/2017 to Dr./Mohammed Mustafa Hussein Hammouda, deposited in Official Deposit Minutes No. 2965/B for Year 2017 at the Notary Office of the Lawyers Syndicate.

He also submitted an official certified copy, true and genuine, of Power of Attorney No. 150 dated 7/3/2017, issued by the Minister of Transport of Iraq to Dr./Mohammed Mustafa Hussein Hammouda, deposited in Official Deposit Minutes No. 2964/B for Year 2017 at the Notary Office of the Lawyers Syndicate. He declared that he submitted these aforementioned powers of attorney for filing with the arbitration file, confirming the status of A.D./Mohammed Mustafa Hammouda and those lawyers whom he delegates in the arbitration as his legal counsel and the point of contact to

which communications, correspondences, and notices regarding the arbitration concerning both the General Iraqi Aviation Corporation and Mr./Minister of Transport of Iraq (The Said Respondents) are directed. He was briefed and received a copy of the documents related to all procedures taken to resume the arbitration case, and what was done during its sessions, according to the request submitted by Dr./Mohammed Mustafa Hussein Hammouda regarding this matter.

- On 7/3/2023, the Arbitral Panel decided to appoint Nader and Tariq Al-Hilali Company – Accountants and Experts – as another expert in the arbitration case, replacing the withdrawing expert, to carry out the mandate stipulated in the preliminary judgment.

- On 8/3/2023, the Chairman of the Arbitral Panel addressed the new expert, Nader and Tariq Al-Hilali Company – Accountants and Experts – notifying them of the Panel's decision appointing the company as an expert in the arbitration case.

- On 8/3/2023, the new expert was provided with a copy of the arbitration documents and invited to begin fulfilling the mandate.

- On 24/3/2023, the Chairman of the Arbitral Panel addressed the arbitration parties via a decision from the Arbitral Panel stating that, considering none of the arbitration parties had paid their share of the fees for the designated arbitrator from the former Respondent Company, a decision was issued at the arbitration session held on 16/2/2023. Therefore, the Panel granted the arbitration parties an extension to pay each their share of the fees by a deadline ending on March 31, 2023. If neither party pays its share of the fees, the other party shall pay what the defaulting party failed to pay by a final deadline of April 7, 2023. In case that all the fees for the designated arbitrator from the Said Respondents are not fully paid within the aforementioned deadlines, the Arbitral Panel is authorized to take appropriate measures as it deems necessary.

- On 9/4/2023, the expert addressed the Chairman of the Arbitral Panel requesting an extension of the expertise deadline until a final deadline of 30/5/2023.

- On 17/4/2023, the Chairman of the Arbitral Panel addressed the parties with a copy of the expert's letter requesting an extension for the expertise deadline to 30/5/2023, and with a decision from the Arbitral Panel extending the expertise deadline until a final deadline of 20/5/2023.

- On 15/5/2023, the Chairman of the Arbitral Panel addressed the arbitration parties with a decision stating that, considering none of the arbitration parties had paid their share of the fees for the designated arbitrator from the Said Respondents, amounting to three hundred and ninety thousand US dollars ($390,000), despite the expiry of the deadlines set by the Arbitral Panel, the Panel decided, in order to ensure the continuity of the arbitration proceedings, to pay a portion of the fees of A.D./Sherif Mohamed Abdullah Mohammed Maamoun, the designated arbitrator from the previous Claiming Company, whose decision was issued on 16/2/2023, by deducting and seizing an amount of $150,000 (One Hundred and Fifty Thousand US Dollars) from the fees previously paid by the arbitration parties to the Chairman of the Arbitral Panel (A.D./ Prof. Dr. Hassan Abdel Basit Jameei), and paying it to A.D./Sherif Mohamed Abdullah Mohammed Maamoun, thus constituting a portion of his fees. This amount must be paid via bank transfer from the bank account of Prof. Dr.

Hassan Abdel Basit Jameei, to the bank account of Prof. Dr./Sherif Mohamed Abdullah. The Panel also decided that, based on the foregoing, it would continue adjudicating the arbitration while confirming its right to take appropriate legal decisions and procedures until the parties fully fulfill the total value of the fees previously issued by the Arbitral Panel's decision for A.D./Sherif Mohamed Abdullah Mohammed Maamoun, the designated arbitrator from the Claimant Company, amounting to three hundred and ninety thousand US dollars ($390,000). Thus, a portion must be paid from this amount—and based on this decision—to Prof. Dr. Sherif Abdullah to complete the remaining value of the fees issued by the Panel's decision dated 16/2/2023, and thus also paid from it—based on this decision—to Prof. Dr. Hassan Abdel Basit Jameei, Chairman of the Arbitral Panel, an amount equal to what was deducted and seized from his fees for paying a portion of A.D./Sherif Mohamed Abdullah Mohammed Maamoun's fees when full payment is achieved.

- On 15/5/2023, Prof. Dr. Hassan Abdel Basit Jameei issued an order to transfer the amount of ninety-five thousand US dollars ($95,000) from his bank account to the bank account of Prof. Dr./Sherif Mohamed Abdullah as a first installment of the $150,000 (One Hundred and Fifty Thousand US Dollars) stated in the aforementioned Arbitral Panel decision, by deducting and seizing this amount from the Chairman's account to pay a portion of the fees for the designated arbitrator from the Claiming Company, as detailed in this order.

- On 18/5/2023, Prof. Dr./Mohammed Mustafa Hammouda, lawyer in his capacity as counsel for the Said Respondents, sent a letter objecting to the previous decision of the Arbitral Panel regarding the deduction, seizure, and deduction of a portion of the Chairman's fees to pay a portion of the fees for the designated arbitrator from the Said Respondents. He objected to all decisions of the Arbitral Panel based on the plea of nullity of the arbitral panel formation and the pleas he included in the defense memorandum stating that it was previously submitted before the assigned expert in the case, and which was attached to this communication containing his objections. The Chairman of the Arbitral Panel subsequently addressed the Claiming Company with the previous communication.

- On 31/5/2023, the appointed expert submitted his report to the arbitration headquarters in seven copies, containing the final conclusions, which are as follows:

1- Declaring that the issue of resolving the legal defenses raised by the Respondents during the expert sessions or in the parties' defense memoranda to the Arbitration Panel is outside the scope of expertise, as it falls outside the purview of expertise.

2- Declaring that the issue of resolving the defenses related to challenging photocopies of documents submitted by the Complainant and arguing for the exclusion of documents submitted in a foreign language without translation, as well as the Complainant's defense regarding challenging the photocopies of documents submitted by the Respondents, is an internal legal matter that falls outside the scope of expertise, leaving this matter to the Arbitration Panel.

3- That the contractual relationship between the parties in the arbitration case is governed by three documents:
a- The general Power of Attorney contract dated 30/1/2001.
b- The addendum to the Power of Attorney contract dated 15/3/2001.

c- The document titled Meeting Minutes, dated 29/8/2005.

4- Based on examining and studying the implications of the memoranda and photocopies of documents submitted by both parties before the Arbitration Panel and attached to the mandate letter for the expert, and the memoranda and copies of documents during the expert sessions—and away from the issue of the evidentiary validity of these documents as a purely legal matter that falls outside the scope of expertise (as the Respondents challenged it, and the Complainant challenged photocopies of documents submitted by the Respondents), leaving this to the Arbitration Panel—it was determined that the following:

a- That the reason for the termination decision of the Power of Attorney and subsequent suspension decision by the Respondent Company (First) does not stem from any error attributable to the Complainant, but rather from the explicit will of the Respondent Company (First) to terminate the contract based on the directives of the new Iraqi state regarding the rehabilitation of Iraq Airways General Company in a manner that qualifies it for direct resumption of operations and practice of its air transport activities, and the rebuilding of its markets away from the side influences imposed by the previous regime's authorities, resulting in classifying the Complainant as a façade company.

b- That the Complainant executed its contractual obligations, and the Respondent Company is the one that failed to execute its obligations; it also obstructed the Complainant from continuing with any of its remaining contractual obligations, through the decisions issued by the Respondent Company: firstly, terminating the general Power of Attorney contract concluded with the Complainant; then agreeing on the reactivation of the agency; then issuing a decision to cancel the Power of Attorney; and finally withdrawing the cancellation decision and merely failing to execute its obligation by issuing a suspension decision for the Power of Attorney.

5- The establishment of error, damage, and the causal link between them in favor of the Respondents (First) as previously stated. Accordingly, the Complainant has the right to claim compensation for the lost gains and the losses incurred, in addition to compensation for moral damages, whose quantification is left to the Arbitration Panel, based on the elements and documents contained in this report.

6- We determined that the amount owed to the Complainant for its loss is **548,442,363 Egyptian Pounds** (Five Hundred Forty-Eight Million Four Hundred Forty-Two Thousand Three Hundred Sixty-Three Pounds), estimated at the exchange rate prevailing at that time of 5.80 EGP, equating to **$94,559,028 US Dollars** (Ninety-Four Million Five Hundred Fifty-Nine Thousand Twenty-Eight US Dollars).

7- We determined the value of the compensation due to the Complainant for its lost gains to be **$541,747,149 US Dollars** (Five Hundred Forty-One Million Seven Hundred Forty-Seven Thousand One Hundred Forty-Nine US Dollars).

8- We leave the remaining claims and defenses of both the Complainant and the Respondents, which fall outside the scope of expertise, to the Arbitration Panel.

The Arbitration Panel also reviewed the documents attached by the expert in his report, which are:

a- Three minutes of session held by the expert pursuant to the mandate, attended by the parties, as follows:

**First Session Minutes:** Held by the expert on Sunday, 19/3/2023, attended by Mr. Counselor Mohamed Ahmed Abdel Wahab, Attorney at Law with a Bar ID No. 171742, based on an authorization issued by the Preservation Committee dated 16/3/2023, which was submitted in its original form during the session for the Complainant (Subject to Freeze).

Also attended was Mr. Ahmed Al-Derini Abdel Aziz Mahmoud, Attorney at Law with a Bar ID for the Respondent Company (First) under previously established authority before the Arbitration Panel. Furthermore, Messrs. Mohamed Ali El Giryani Abdel Azim Mohamed, Attorney at Law, and Mohamed Saeed Mahmoud Hassnin, Attorney at Law, attended in their capacity as representatives for Dr. Mohamed Mostafa Hussein Hamouda, who is the agent for both the Respondents (First) General Company of Iraq Airways and the Minister of Transport of Iraq, based on powers of attorney whose originals were reviewed by the expert and a copy was attached to the expert file.

During the session, Mr. Mohamed Ali El Giryani Abdel Azim Mohamed, Attorney at Law, and Mr. Mohamed Saeed Mahmoud Hassnin, Attorney at Law, present for the Respondents, submitted a memorandum with their defense, the copy of which was provided to the representative of the Complainant, declaring in the minutes that the Arbitration Panel did not uphold the principle of equality between opposing parties, as it resumed procedures by appointing an arbitrator for the Complainant on 6/6/2023, and subsequently set a hearing date at an inappropriate time—the session on 16/2/2023—without any justification for such urgency, and failed to observe that the Respondent Company is located in another country, namely the Republic of Iraq. They also declared that Mr. Ahmed Al-Derini present for the Respondents (First) requested a preliminary deadline to notify the Minister of Transport of Iraq in his capacity and reserved clear objection regarding the method of appointing the arbitrator for the Respondent Company, as well as the Chairman of the Arbitration Panel; yet they were surprised that the Panel issued a decision during the same session to appoint an accounting expert in the arbitration case without fulfilling any of the requests from the Respondents, nor did the Panel notify the representative of Dr. Mohamed Hamouda to resume the arbitration proceedings. Therefore, they maintained their right to submit all formal and subject defenses before the expert begins his work, based on a written memorandum submitted during the session.

- On 3/4/2023, the appointed expert held the second session attended by the same parties that attended the first session. The representative for the Complainant maintained all documents, pleas, and defenses previously presented in the file of the case and the memoranda submitted by the Complainant.

The Messrs. Mohamed Ali El Giryani Abdel Azim Mohamed, Attorney at Law, and Mohamed Saeed Mahmoud Hassnin, Attorney at Law, present for the Respondents, submitted six document bundles supporting their defense contained in the memorandum they submitted during the session on 19/3/2023 to present to the Arbitration Panel, arguing that what the representative of the Complainant raised regarding legal defenses and contained in the six bundles falls outside the scope of expertise,

considering them purely legal matters. They challenged all photocopies presented in the six bundles as being mere photocopies.

The representatives for the Respondents argued that although all documents submitted during the session were photocopies, their originals are deposited in the arbitration file and can be referred to, objecting to the Arbitration Panel's decision to appoint an accounting expert, maintaining the invalidity of all arbitration procedures, including those conducted during the session on 16/2/2023. They requested submitting a defense memorandum to the Arbitration Panel to rule on the legal defenses contained therein before the expert begins his work, which they objected to.

Mr. Ahmed Al-Derini present for the Complainant maintained all previously submitted defenses and pleas before the Arbitration Panel, especially those contained in the defense memoranda submitted on 27/1/2014 and 10/6/2014 (submitted by himself and Dr. Samir El Sharkawy and Dr. Fathi Wali). He also asserted that everything in the accounting report of Mr. Magdi Hashish, treating it as supplementary to his memoranda submitted on 10/6/2014, was maintained; he also maintained challenging all photocopies presented by the Complainant and maintaining the invalidity of the Power of Attorney contract for being based on defective will, and further asserting the lapse of the Complainant's right to file a claim due to more than two years passing since the termination of the Power of Attorney, pursuant to Article 90 Paragraph Two of the Commercial Law. He also requested that the audit report submitted by the Complainant not be considered because it violated Egyptian auditing standards, as he absolved himself of responsibility for documents submitted by the Complainant, and noted that the case file lacked minutes of ordinary or extraordinary meetings, councils, or special management for the adoption of the Complainant's financial statements. He added that he challenges all photocopies presented by the Complainant.

- On 30/4/2023, the appointed expert held the third session with the presence of the same parties who attended the first and second sessions. The representative for the Complainant maintained all documents, defenses, and pleas previously submitted in the file of the case and the memoranda submitted by the Complainant.

Furthermore, Mr. Ahmed Al-Derini, present for the Complainant, affirmed and maintained all what was previously presented regarding his defense and pleas before the Arbitration Panel, especially those contained in the defense memoranda submitted on 27/1/2014 and 10/6/2014, and all documents submitted before the Arbitration Panel.

He also expressed his support for and maintenance of the decision to appoint a forensic accountant expert for the case, allowing the true nature of the claims made by the Complainant to be determined, since these are accounting claims and monetary amounts that require an expert with expertise to express an opinion and extract truth and justice. He maintained challenging all photocopies submitted by the Complainant, whether in bundles or before the Arbitration Panel; he also maintained the invalidity of the Power of Attorney contract and requested consideration of the minutes of meeting dated 29/8/2005, pursuant to Clause 17 of the void Power of Attorney. He maintained that the Power of Attorney did not take effect until the date of cancellation and that the Complainant is not entitled to any commission rates. He submitted thirteen document bundles and a defense memorandum (a

Page 138 of 236

copy of which was provided to the representative for the Complainant). Mr. Ahmed Al-Derini, present for the Complainant, also maintained all previously presented defenses and pleas before the Arbitration Panel, especially those contained in the defense memoranda submitted on 27/1/2014 and 10/6/2014, and what was stated in the accounting report of Mr. Magdi Hashish. He pleaded for the Complainant's lack of entitlement to its claims because they are inconsistent with reality and law, and rejected all compensation requests based on Article 190 of the Commercial Law, and denied consideration to all photocopies of manufactured documents because they do not belong to the Complainant, nor do they concern the subject matter of the Power of Attorney.

Mr. Mohamed Ali El Giryani Abdel Azim Mohamed, Attorney at Law, and Mr. Mohamed Saeed Mahmoud Hassnin, Attorney at Law, present for the Respondents also noted that while Mr. Ahmed Al-Derini maintaining that the decision to appoint an accounting expert is correct does not mean waiving their maintenance of all formal and substantive defenses raised in the defense memorandum submitted during the session on 19/3/2023 and the document bundles presented during the session on 3/4/2023, thereby supporting it. They also maintained the lapse of the arbitration agreement due to the expiry of the arbitration period and the prior withdrawal of the Chairman and the arbitrator appointed by the Respondents, and the Complainant's failure to consent to their return as arbitrators in the arbitration case. Furthermore, they asserted that the previous judicial notice sent by the Company on 18/4/2022 was specific and clear regarding notifying Prof. Dr. Hassan Abdel Basit Jameei in his capacity as manager of the arbitration, and that the file contained within the Complainant's possession, and it was clear that the change of the Respondent Company's legal address negated any consent from them to form or recognize the Arbitration Panel.

They also asserted that the decision to appoint an expert is void, along with all procedures, including those conducted during the arbitration case before the expert.

They requested submitting their defense memorandum to the Arbitration Panel for ruling on the legal defenses contained therein before the expert begins his work, which they objected to. In all eventualities, they referred the matter back to the Arbitration Panel to rule on these defenses. They also maintained that the documents submitted contain photocopies, challenging them and requesting that consideration be given to this challenge.

The representative for the Respondents stated that what the Complainant representative stated regarding formal defenses being presented before discussing the merits was done prior to discussing the merits, and that maintaining it was explicit and written in the defense memorandum submitted during the first expert session on 19/3/2023, thus the Respondent Company lawfully adhered to presenting procedural defenses first before addressing the merits. And that the statement made during today's session regarding the decision to appoint an expert cannot be interpreted as a waiver of previous formal defenses and does not mean tacitly waiving any previous formal defenses.

The representative for the Complainant stated that the photocopies of documents were previously discussed by the Respondent Company, leaving the consideration of this matter to the Arbitration Panel.

The Respondents stated that no documents were discussed, and they maintained their challenge since the dawn of the dispute.

The Arbitration Panel reviewed the memorandum submitted by the Respondents during the first session of expert sessions on 19/3/2023, and was informed of all defenses, pleas, and requests contained therein; it also reviewed the six document bundles submitted by the Respondents during the second expert session held on 3/4/2023. The Panel was also informed of the memorandum submitted by the Respondents during the third expert session held on 30/4/2023, and was informed of all defenses, pleas, and requests contained therein, and reviewed the thirteen document bundles submitted with it.

- On 1/6/2023, the parties were notified that the appointed expert had submitted his report. A copy of the report and minutes of the three expert sessions were attached to the communication addressed to the parties, inviting them to attend the arbitration headquarters to receive a copy of the original report on Monday, 5/6/2023, with the deadline for the parties to submit any memoranda and documents they wish, including a response and commentary on the expert report, beginning two weeks from the day following Tuesday, 6/6/2023, and ending on Tuesday, 20/6/2023.

- On 5/6/2023, Mr. Ahmed Al-Derini attended the arbitration headquarters in his capacity as counsel for the Respondent Company (First) and received an original copy of the expert report and a photocopy of the three expert session minutes.

On the same day, Mr. Mohamed Saeed Mahmoud attended in his capacity as counsel for Dr. Mohamed Hamouda, the agent for the Respondents (Second), and received an original copy of the expert report and a photocopy of the three expert session minutes.

- On 14/6/2023, the Respondent Company's lawyer, Mr. Ahmed Al-Derini, sent a communication to the Chairman and members of the Arbitration Panel stating that with reference to the minute of the arbitration session held on 16/2/2023, and referencing the email dated 31/5/2023 concerning granting a two-week period for both parties to submit memoranda and documents commenting on the forensic accounting expert report, which ends on 20/6/2023, he requested permission to grant the Respondents an additional two-week extension, in addition to the original deadline, so that they could prepare their memoranda commenting on the report.

- On 15/6/2023, the Arbitration Panel decided to reject the request submitted by the Respondent Company's lawyer, Mr. Ahmed Al-Derini, to grant the Respondents an additional two weeks beyond the original deadline set in the minute of the arbitration session held on 16/2/2023 for submitting documents and memoranda commenting on the expert report which ends on 20/6/2023, and the parties were notified of this rejection.

- On 17/6/2023, the Respondent Company's lawyer, Mr. Ahmed Al-Derini, submitted a petition to reconsider the Arbitration Panel's decision rejecting his request for an extension of time.

- On 18/6/2023, the Arbitration Panel decided to reject the petition submitted by the Respondent Company's lawyer, Mr. Ahmed Al-Derini, regarding reconsideration of its previous rejection of the request for extending the deadline. The parties were notified of this rejection.

- On 19/6/2023, the Chairman received an email from the Complainant stating its rejection of the request submitted by the Respondents for an additional two weeks' extension beyond the Panel's previously granted deadline. Based on the agreement of the parties to set the date of 16/2/2023 for submitting final memoranda and documents containing defenses and pleas commenting on the expert report, as well as its rejection of the petition submitted by the Respondents regarding reconsideration of the Panel's aforementioned refusal.

- On 19/6/2023, the Chairman sent a copy via email to the parties from the Complainant stating its rejection of the request submitted by the Respondents for an additional two weeks' extension.

- On 20/6/2023, and in execution of the Arbitration Panel's decision during the hearing held on 16/2/2023, which granted the parties a period of two weeks to submit final memoranda and documents containing their defense and pleas, including responses to the expert report, the Complainant submitted its memorandum of defense, consisting of 53 pages, which was reviewed by the Arbitration Panel. The Complainant concluded this memorandum with the following requests:

Firstly: Acceptance of the arbitration request.

Secondly: In substance, judgment against the Complainant company commanding the following:

1- The non-admissibility and rejection of all defenses and pleas presented by the Respondents.
2- Compelling the Respondents—namely, Iraq Airways General Company and His Excellency the Minister of Transport of Iraq in his capacity—jointly and severally liable to pay, with a final and immediately enforceable judgment, the following amounts as compensation to the Complainant company:
a- An amount totaling **$103,672,853 USD** (One Hundred Three Million Six Hundred Seventy Two Thousand Eight Hundred Fifty-Three US Dollars), representing the value of what the Company actually spent to execute the obligations stipulated in the Power of Attorney contract, and representing the value of the Complainant's losses and expenses. This loss constitutes material damage that was accurately demonstrated through the Complainant's budgets.
b- An amount totaling **$542,096,579 USD** (Five Hundred Forty Two Million Ninety Six Thousand Five Hundred Seventy Nine US Dollars), representing its lost profits and incurred losses.
c- An amount totaling **$100,000,000** USD (One Hundred Million US Dollars) for compensation due to the unlawful, unjustified, and arbitrary termination and suspension of the Power of Attorney contract.
d- An amount totaling [Note: The original Arabic text shows 500 instead of 500 million] dollars representing compensation for damages incurred due to its loss of market in travel, tourism, aviation, and related fields, and the material damage resulting therefrom.
1- Compelling the Respondents to pay statutory interest on the total claim value starting from the date of filing the claim until full payment, amounting to no less than 11% and no less than the Central Bank of Egypt's rate.
3- Compelling the Respondents to pay statutory interest on the total claim value starting from the date of filing the claim until full settlement, amounting to no less than 11% and no less than the Central Bank's rate.

4- Compelling the Respondents to pay all costs incurred by the arbitration, its deposit, expenses, and arbitrators' fees.

5- Compelling the Respondents to pay $400,000 (Four Hundred Thousand US Dollars) as estimated attorney fees payable to the legal representative of the Complainant from the commencement of the dispute until the issuance of the arbitration judgment.

6- Compelling the Respondent Company to pay all costs and fees for the enforcement decree of the arbitration judgment.

7- Compelling the Respondents to pay $5,000 (Five Thousand US Dollars) for every day they fail to execute the arbitration judgment from the date of its issuance. The Complainant reserves the right to modify and increase claims in the future, and other legal rights.

The Complainant began its defense memorandum by reserving that what it contained completes the statement of claim and memorandums previously submitted on 15/2/2014, 10/4/2014, and 10/5/2014; and supplementing them with a response to the defenses and pleas raised by the Respondents and what was contained in the expert report, then **under the title "The Subject"** the claimant referred to the contents of the statement of claim.

**Under the title "Pleading Waiver of All Photocopies":** The Complainant stated that in addition to what it previously maintained in its statement of claim and memorandums, it now asserts that the defense presented by the Respondents regarding challenging photocopies is inadmissible because they waived this right when discussing the documents submitted by the Complainant. Furthermore, it reiterates its reliance on the report submitted on 10/6/2014 (Bundle One), which contained the original expert report issued by Mr. Magdi Hashish, CPA's office, and considers it an integral part of its defense—namely, the report that addressed all documents submitted by the Complainant, thereby forfeiting the right of the Respondents to challenge the photocopies of the documents, rendering such a plea meritless. The Complainant also insists on what was stated in Clause Three of the minutes of the procedural session held on 28/11/2013, concerning the agreement and acknowledgment of the law governing the arbitration, which is the Egyptian Arbitration Law No. 27 of 1994, and the application of all Egyptian laws concerning the resolution of the dispute, evidence, and everything related to the arbitration. The Complainant stated that since Article 30 of the Arbitration Law stipulates that: "Each party is entitled to attach with its statement of claim or memorandum of defense, as applicable, photocopies of the documents upon which it relies and to indicate any or all of the documents and evidence it intends to submit; and this does not affect the right of the Panel at any stage of the case to request the original documents or writings on which either party relies." The Complainant argued that since it is established from reviewing page 8 of the minutes of the session dated 1/2/2014, that it stated: "The attendees from both the Complainant and the Respondent Company acknowledged that the photocopy submitted by both parties of the Power of Attorney contract and its official translation from the Cairo North Court, dated 30/1/2001, is considered original and cannot be challenged by any party." It also stated: "Attendees agreed from the Complainant and the Respondent Company that, based on what was agreed upon in the procedural session—that Arabic is the language of arbitration—the official translation from the Cairo North Court submitted by both parties as photocopies in their document bundles is the one containing the

Page 142 of 236

core contractual clauses between them in Arabic, including the arbitration clause and contract duration, and all content contained therein, considered as the agreement concluded on 30/1/2001, without recourse to the version written in English, and without affecting any subsequent events or agreements resulting therefrom." Furthermore, Article 103 of the Egyptian Law of Evidence applicable to arbitration stipulates that acknowledgment is an admission by the opponent before a court of fact claimed against him while the lawsuit concerning this fact is underway. And Article 104 of the same law stipulates that acknowledgment constitutes evidence against the acknowledging party and cannot be separated from their person unless it concerns multiple facts, and the existence of one fact does not necessarily necessitate the existence of the other facts.

The Complainant added that based on the foregoing, and according to the acknowledgment made by the Respondents at the arbitration session, it is inadmissible for them to persist in challenging the documents; this applies to similar photocopies submitted by both parties, which constitutes a clear admission from both parties of waiving their right to challenge the photocopies. Furthermore, the Respondents failed to specify the nature of the documents they intend to challenge, and therefore the Complainant is not obligated to provide the originals. **Under the Title: Dismissal of the Arbitration Case for Failure to Provide Originals and Submission of Foreign Documents Without Certified Arabic Translation Pursuant to Article 19 of the Judicial Authority Law:** The Complainant stated that in addition to what it previously maintained in its statement of claim and memorandums, regarding the first part of this plea, it had already responded in detail in the response to the challenge of documents. As for the second part, concerning foreign language documents not translated into Arabic by a certified translator, the Complainant stated that this assertion by the Respondents is false because the Complainant did not submit any foreign language documents untranslated into Arabic, except for the Power of Attorney contract, which was agreed upon by both parties. Consequently, the plea is meritless.

**Under the Title: The Nullity of the Cancelled Power of Attorney Contract:** The Complainant rebutted that the evidence presented shows that at the time the agreement was concluded, the Complainant company was a *de facto* corporation under establishment, because all rights are governed by the theory of apparent status. And the Power of Attorney contract's validity was confirmed by its addendum signed on 30/3/2023, and then confirmed and agreed upon as valid by the parties to reactivate it and adhere to its clauses on 29/8/2005.

The Complainant added that the legislator did not stipulate that the lack of registration in the Commercial Registry nullifies the corporate personality, and that the Complainant was a *de facto* company with all rights according to the theory of apparent status. Furthermore, the Respondents themselves admitted their error by acknowledging in their memorandum submitted by Dr. Samir El Sharkawy on 10/6/2014, when they justified insisting on canceling the contract that they intended to remove suspicion regarding the contractual relationship, and that they were keen to remove this suspicion and establish certainty, especially after the start of the agency period upon the actual commencement of air service between Egypt and Iraq. This acknowledgment was repeated by the Respondents before the Arbitration Panel, in addition to the fact that the documents prove the Respondents admitted the non-nullity of the contract both verbally and implicitly by asserting they

had canceled it (i.e., rescinded it), which constitutes a waiver of their right to insist on nullity. Moreover, claiming invalidity due to error is a relative nullity governed by prescription and lapses after three years of non-assertion, rendering the defense misplaced.

**Under the Title: The Minutes of Meeting Dated 29/5/2005 Do Not Constitute a Contract:** The Complainant reviewed the aforementioned minutes of meeting and stated that it is clear—contrary to the Respondents' claims—that this document constitutes a **binding contractual agreement**, encompassing all elements required for a contract: parties, object, cause (purpose), and reciprocal obligations. It also stipulates the invalidation of any clauses, agreements, or contracts contradicting its provisions. In this regard, it serves as an inseparable part of the original Power of Attorney Contract dated 30/1/2001 and its addendum dated 15/1/2001. The Complainant further added that the contract dated 29/8/2005 is the sole contractual relationship that did not include the required consent from governmental authorities, as stipulated in the preamble of the original agreement and its addendum. Furthermore, responding to the claim that this contract was signed by the Director General Abdel Ali Aboud and was not presented to the Board of Directors, the Complainant stated that it is established law and jurisprudence that actions taken by a party occupying an apparent status, which contradicts the truth, are binding on third parties in good faith, provided that the circumstances surrounding the apparent status lead to generating a general belief that this status corresponds to the truth. These actions can be used against the actual holder of the status. The Complainant concluded by stating that the minutes of meeting dated 295/2005 constitute a contract in every sense of the word, and that the Respondents' defense that it is not a contract is unfounded and merits rejection.

**Under the Title: Non-Enforcement of the Void Power of Attorney until Date of Termination:** The Complainant reiterated its adherence to the claim that the Respondent Company's arbitrary termination and suspension of the contractual relationship are governed by four documents or decisions: the termination decision dated 2/12/2004, the activation agreement dated 29/8/2005, the termination decision dated 14/11/2005, and the suspension decision dated 16/11/2005 (two days after the previous termination decision). The Complainant stated that it is clear from the previous presentation that the Respondents attempted to distort the image of the Complainant by alleging that during the period from 29/9/2005 until 17/11/2005, the Complainant failed to fulfill its obligations. This claim is false because the documents prove that the Complainant fulfilled all contractual clauses and incurred substantial expenses in executing the contract, and that the decisions issued by the Respondents caused it material damages as detailed in the statement of claim and memorandums.

**Under the Title: Non-Entitlement of the Complainant to Any Commission Fees:** The Complainant cited Articles 147, 148, and 150 of the Civil Code and certain Supreme Court rulings applying these articles. It argued that by applying these articles to the contract under dispute, it is clear that Clause 11/1, 2, 6, 5, and 3 of the contract stipulate that the Complainant has the right to collect the agreed-upon commissions, even if the Principal (the Respondent Company) executes the agreed operations. The Complainant added that since the Respondent Company refused to provide a statement of account detailing the value of these operations, the Complainant insists on relying on its submitted approved feasibility study. Thus, the Respondents' assertion that the Complainant is not entitled to commission fees is meritless and merits rejection.

**- Under the Title: Response to the Pages 26 to 29 Defense by the Respondents (The content of these pages was not specified by the Complainant):** The Complainant stated that the contents of these pages (without citing them) are baseless statements lacking any foundation in fact or law, and this response precedes other memoranda submitted by the Complainant, rendering their pleas meritless.

**Under the Title: Adherence to the Expert Report Submitted by the Respondents Dated 10/6/2014:** The Complainant stated that its adherence to this report in its final memorandum and discussions of the documents confirms that the Respondents waived their right to challenge photocopies, as previously mentioned. The Complainant also argued that what the Respondents stated by relying on this report lacks any basis in fact or law, thereby meriting rejection.

**Under the Title: Regarding the Defenses Raised by the Respondents Before the Assigned Expert:** The Complainant responded to these defenses. Regarding the plea of termination period, it maintained that the period has not ended and is continuing. It argued that the Respondents' pleas violate reality and law because they failed to account for the time during which the arbitration case was suspended due to the withdrawal of arbitrators or suspension due to failure to pay increased fees. Calculating the periods shows the following: 1- The arbitration started on 28/11/2013, a date when the parties agreed that the period would be one year (12 months), starting from the session date. 2- The period stopped on 2/3/2014 due to the withdrawal of the Respondent Company's arbitrator, Mr. Mohamed Hammoud (the duration before suspension was three months and two days). 3- The arbitration resumed on 17/3/2014 with the appointment of Dr. Abdelhamid El Ahdab as the arbitrator for the Iraqi company and his acceptance of the mission on 17/3/2014. 4- The period stopped on 17/7/2014 due to the withdrawal of Dr. Sherif Mohamed Abdullah, meaning the duration before this suspension was three months and twenty-eight days. 5- The arbitration resumed with the appointment of Dr. Ahmed Fathi Sorour as the arbitrator for the Complainant on 20/10/2014. 6- The period stopped on 22/11/2014 due to the Arbitration Panel's decision regarding the non-payment of increased arbitration fees, and the duration before this suspension was one month and two days. 7- The arbitration resumed by the Arbitration Panel's decision on 15/1/2015, where it extended the arbitration period for an additional six months. 8- The arbitration stopped on 4/2/2015 due to the withdrawal of Dr. Ahmed Fathi Sorour, and the duration before this withdrawal was sixteen days. 9- The arbitration resumed on 14/1/2016 with the appointment of Counselor Dr. Mohamed Yasser Abu El Fotouh as the arbitrator for the Complainant. 10- The arbitration stopped on 31/1/2016 due to the withdrawal of Counselor Dr. Mohamed Yasser Abu El Fotouh, and the duration before this withdrawal was seventeen days (17 days). 11- The arbitration resumed on 14/3/2016 with the appointment of Counselor Ezzat Khamis as the arbitrator for the Complainant. 12- The arbitration stopped on 20/3/2016 due to the withdrawal of Counselor Ezzat Khamis, and the duration before this suspension was six days (6 days). 13- The arbitration resumed on 24/3/2016 with the appointment of Dr. Youssef Wesal as the arbitrator for the Complainant. 14- The arbitration stopped on 30/3/2016 due to the withdrawal of Dr. Youssef Wesal, as notified by the Preservation Committee on 4/7/2016, and the duration before this withdrawal was six days (6 days). 15- The arbitration resumed on 6/2/2023 with the appointment of Dr. Sherif Mohamed Abdullah as the arbitrator for the Complainant. 16- The Complainant concluded that based on the foregoing, the total duration of the

arbitration shall be calculated after stating the previous periods of suspension, starting from 6/2/2023 until the date of the arbitration judgment, unless any new reason causes a stoppage, in which case it will be deducted from the total period. 17- Furthermore, the Complainant stated that, based on the foregoing, the expected date of conclusion of the arbitration is as previously stated, and by accurate calculation of the time elapsed in the arbitration after deducting the periods of suspension, it is October 21, 2023.

Furthermore, the Complainant stated that the Respondents' plea regarding the expiration of the arbitration period is unfounded, insisting on the continuation of the arbitration and its resolution to protect the Complainant's rights.

**Regarding the Respondents' plea concerning the invalidity of the Arbitration Panel's formation due to the prior withdrawal of the Chairman and the arbitrator appointed by the Respondent Company:** The Complainant asserted that it relies on the binding force of the judicial rulings issued rejecting the requests for withdrawal submitted by the Chairman, as well as rejecting the withdrawal of the arbitrator appointed by the Respondents and compelling them to continue their arbitration mission. This legal authority supersedes concerns regarding public order law, pursuant to Article 101 of the Egyptian Law of Evidence.

The Complainant further stated that, based on the foregoing, a judgment was previously issued by the Second Commercial Circuit of Cairo Court of Appeal in Case No. 3 of Year 132 Civil at the session held on 23/3/2022, which states: In the arbitration case filed by Horus Tourism and Travel Company against Iraq Airways General Company and others (Subject Matter), rejecting the claim of the Complainant (Horus Tourism and Travel Company) to terminate the mission of both defendants, Prof. Dr. Hassan Abdel Basit Jameei "in his capacity as Chairman of the Arbitration Panel" and Dr. Abdelhamid Galal El Ahdab "in his capacity as the arbitrator for the Respondent Company" (Iraq Airways General Company). Furthermore, a judgment was also issued by the same circuit on 22/9/2022 rejecting the omission request submitted by the Respondent Company, claiming falsely that the aforementioned judgment failed to rule upon the Respondents' request concerning the withdrawal of both Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitration Panel and Dr. Abdelhamid Galal El Ahdab in his capacity as the arbitrator for the Respondent Company, and ruling on the rejection of the omission request at the session on 22/9/2022, stating: rejecting the claim of omission concerning the judgment issued on 23/3/2022 in Arbitration Case No. 3 of Year 132 Civil, Cairo Court of Appeal. Therefore, these judgments possess *res judicata* which supersedes concerns regarding public order law, in ruling that Prof. Dr. Hassan Abdel Basit Jameei shall continue as Chairman and Dr. Abdelhamid Galal El Ahdab shall continue as the arbitrator for the Respondent Company, and consequently, the plea raised by the Respondents to this effect is baseless and merits rejection. Furthermore, the Complainant relies on the rejection of the request for suspension in Appeals Cases No. 11078, 11263, 11473, and 11206 of Year 92 Civil, where the court ruled on 27/10/2022 to reject the stay of execution request; consequently, these judgments are mandatory.

**As the Claimant added** that, furthermore, after reviewing the documents and memoranda circulated concerning the litigation regarding the two aforementioned judgments, it is clear: a- That the First

Respondent waived her right to prove withdrawal of claim, which is established by her final memorandum submitted before the Cairo Court of Appeal issuing the said judgments, as she did not include a request for proving withdrawal. b- That the Respondents provided, along with their defense memoranda and arbitration session minutes, and during the expert sessions, evidence confirming their acknowledgment of accepting the previous judgments and consenting to the completion of the arbitral mission for both the Chairman of the Arbitral Panel and the designated Arbitrator. As was done in the arbitration session held on 16/2/2023, the parties accepted the arbitral panel in its entirety, and what the arbitral panel conducted through its procedures and decisions. Neither party reserved any right regarding the procedures taken. Furthermore, it is confirmed that at the said arbitration session, the Respondents' requests were limited to a single request, which was established by the Legal Representative of the Iraqi Ministry of Transport (the Second Respondent). They objected only to the period allowed for commenting on the report after its submission, which the arbitral panel decided should be one week but made it two weeks—a matter to which the arbitral panel responded. This sole objection raised by the Respondents confirms their acceptance of the composition of the arbitral panel and constitutes a new appointment to the panel with its current composition, which is an acknowledgment that cannot be revoked, retracted, or objected to after prior consent.

**(3) Regarding the Respondents' plea concerning the lapse of the Claimant's right to resort to arbitration due to the passing of the three agreed days for amicable settlements (Hulool Al-Wadhiyah),** the Claimant stated that she adheres to the legal principle which prohibits benefiting from contradictions (**The Principle of Estoppel**). These contradictions are established by the Respondents' plea regarding the expiry of the amicable settlement period, versus what she herself submitted in documents dated later than the withdrawal of agency decision issued on 16/11/2005. Among these include two memoranda signed by the First Respondent for the purpose of reaching an amiable settlement, dated 19/4/2006, and 16/11/2008; and documents submitted before the Arbitration Panel on 27/1/2014, Document No. 5 from File No. 2, and Document No. 2 from File No. 4. Furthermore, there was a prior warning sent from her to the Claimant dated 25/11/2008, confirming that the first paragraph of Clause 16 of the Basic Power of Attorney Annex specified the settlement period as three days, which was modified by Paragraph 16 of the Contract Annex, opening the field for resolving differences through amicable methods and keeping it open to both parties. The Claimant added that the First Respondent company sent her a warning dated 6/3/2012, enclosing a copy of the Power of Attorney Annex for discussion by the recipient and stating an opinion on it within one week from the date of the warning. It noted that failure to respond would be considered a rejection of amicable settlements—a stance upon which the Claimant insists, rejecting the defense based on the lapse of the three days for amicable settlements.

**Regarding the Respondents' plea concerning the lapse of the Claimant's right to** file a lawsuit due to the passage of more than two years since the termination of the contractual relationship, the Claimant cited Articles 147, 148, and 150 of the Civil Code, stating that applying these texts to the Power of Attorney contract makes it clear that it is still active and valid. This was because the reactivation contract, according to the minutes of the meeting dated 29/8/2005, included an amendment to Clause 10 to three years starting from the effective operational date, renewable for similar periods. Furthermore, it stipulated that it remains automatically in force unless either party

notifies the other by registered letter with acknowledgment of receipt, and that neither party may unilaterally terminate or fail to renew the contract unless gross misconduct occurs on the part of the other party. Based on the foregoing, since the termination decision issued by the First Respondent on 14/11/2005 has no legal effect due to its violation of the terms of the contract and the law, the Claimant maintains that the contract is still valid but suspended by a decision from the First Respondent; consequently, she cannot allow the defense of lapse.

In this regard, the Claimant also stated that Article 190/1 of the Commercial Law does not apply to the subject contract because it is not a *Wakala Uqood* (contracts agency) but rather a general power of attorney with a specific nature.

**- Under the title Commentary on the Expert Report**, the Claimant stated her objection to this report because it did not determine for the Court an amount of one hundred million US dollars ($100,000,000) as temporary compensation for the illegal, unjustified, and arbitrary termination and suspension of the Power of Attorney contract, and she seeks judgment for this value. She also stated that she maintains what is contained in the expert report and affirms that the Respondents maintained this expertise and acknowledged its ability to clarify the truth, as evidenced by the legal representative of the Respondents during the Expert Session Minutes held on 30/4/2023, and through their adherence to the report. The Claimant maintained the expert report regarding what it concluded about the absence of fault on her part and its existence on the part of the Respondents. However, she objected to the estimate of the expenses amount to US $94,559,028, stating that she insists on claiming the actual amount she spent, which is $103,672,853. Furthermore, she maintained the report's conclusion regarding her right to obtain compensation for lost earnings, but she insisted that this lost earning should be calculated at US $542,096,579, and not the amount of US $541,741,49. The Claimant also maintained her compensation for severe damages incurred due to the commission of multiple serious errors by the Respondents, which led to damage to her reputation and exclusion from the labor market, amounting to five hundred million US dollars ($500,000,000). The Claimant concluded her defense memorandum with the aforementioned final requests.

- The Claimant submitted her defense memorandum with the following documents attached:

1- Document One: Original letter issued by the Cairo Court of Appeal, from the Office of the Chief Judge, dated 31/5/2023, in response to a correspondence addressed to the State Legal Affairs Authority (Hiyat Qadaya Ad-Dawla), requesting clarification on whether an ad hoc arbitration termination request had been submitted. The correspondence stated that there was no record of an arbitration procedure termination request from the date of 1/1/2023 until the date of the letter's drafting, 31/5/2023.

2- Document Two: Official copy of the judgment issued on 23/3/2022 by the Cairo Court of Appeal, Second Commercial Circuit, in an arbitration case registered under the court schedule No. 3 of Year 132 Q (Ad Hoc Arbitration). The case was filed by Horus Tourism and Travel Company against Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitral Panel, and Dr./Abdel Hamid Al-Ahdab in his capacity as the arbitrator for the First Respondent Company (The General Egyptian Aviation Corporation), and others. The operative part ruled: The Court ruled on the

arbitration case filed by Horus Tourism and Travel Company against the General Iraqi Aviation Corporation and others (Ad Hoc Arbitration) by **rejecting the claim of the Plaintiff** (Horus Tourism and Travel Company) to terminate the mission of both Defendants, Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitral Panel, and Dr./Abdel Hamid Al-Ahdab in his capacity as the arbitrator for the First Respondent Company (The General Iraqi Aviation Corporation), and obliged the Plaintiff with costs and an amount of one hundred Egyptian pounds for attorney fees.

3- Document Three: Official copy of the judgment issued on 22/9/2022 by the Cairo Court of Appeal, Second Commercial Circuit, in a Suit for Omission/Irregularity registered under the court schedule No. 3 of Year 132 Q. The suit was filed by the Legal Representative of the General Iraqi Aviation Corporation against Al-Ahram Company, in its capacity as authorized by the Committee for Preservation and Management of the Assets of the Banned Muslim Brotherhood to manage Horus Tourism and Travel Company, and also by Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitral Panel, and Dr./Abdel Hamid Al-Ahdab in his capacity as the arbitrator for the First Respondent Company (The General Iraqi Aviation Corporation), and Horus Tourism and Travel Company. The operative part ruled: The Court ruled: **Rejecting the closure lawsuit** filed regarding the judgment issued on 23/3/2022 in Arbitration Case No. 3 of Year 132 Q, Cairo Court of Appeal, and obliged the Plaintiff with costs and an amount of one hundred Egyptian pounds for attorney fees.

4- Document Four: Official certificate issued by the Court of Cassation / Civil Registry Department - upon request from the State Legal Affairs Authority, requesting information regarding appeal No. 11078 of Year 92 Commercial, filed by Youssef El Saeid Saad Al-Gilda in his capacity as the Legal Representative of Horus Tourism and Travel Company against Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitral Panel, and Dr./Abdel Hamid Al-Ahdab in his capacity as the designated arbitrator for the General Iraqi Aviation Corporation and the Minister of Transport. This pertains to the judgment issued by the Cairo Court of Appeal on the session dated 23/3/2022, in Case No. 3 of Year 132 Q. The certificate stated that the appeal was set for hearing on 27/10/2022 before the Commercial Circuit, and it included Appeal No. 11263 of Year 92, Appeal No. 11473 of Year 92, and Appeal No. 11206 of Year 92. The Court rejected the request for a stay of execution, obliged the appealing company with costs, and referred it to the Technical Office for necessary action.

5- Document Five: Official certificate issued by the Court of Cassation / Civil Registry Department, upon request from the State Legal Affairs Authority, requesting information regarding appeal No. 25451 of Year 92 Commercial, filed by the Legal Representative of the General Iraqi Aviation Corporation in his capacity as against the Legal Representative of Horus Tourism Company (a company under preservation), Prof. Dr. Hassan Abdel Basit Jameei in his capacity as Chairman of the Arbitral Panel, and the Legal Representative of Misr Tourism Company in his capacity as entrusted by the Committee for Preservation of the Assets of the Banned Brotherhood to manage Horus Tourism and Travel Company. This pertains to the judgment issued by the Cairo Court of Appeal on the session dated 22/9/2022, in Case No. 3 of Year 132 Q. The certificate stated that the mentioned

Page 149 of 236

appeal included a petition requesting a stay of execution of the contested judgment, and the appellant had not submitted any request for action up to the date of the certificate on 18/6/2023.

My representative received a copy of the memorandum and the attached documents listed above on the same day.

- On the same date, 20/6/2023, Mr./Ahmed El-Deriny, lawyer and legal counsel for the Respondents, deposited three defense memoranda and a bundle of documents that were reviewed by the Panel. Upon reviewing the first memorandum, it was found that it contained the defense of Mr./Minister of Transport, consisting of 13 pages, under the title "Facts," referring to what was stated in the response to the statement of the arbitration case and the memorandum submitted on 10/6/2023, to avoid repetition and prolongation. It then followed with a defense beginning by adhering to all defenses and pleas contained in the response memo to the statement of the arbitration case and the memo submitted on 10/6/2014.

**Under the title Response to the Inclusion of Mr./Minister of Transport of Iraq,** the Second Respondent's defense stated: Firstly, pleading adherence to the diplomatic immunity granted to the Second Respondent based on the Vienna Convention on Diplomatic Relations; and secondly, pleading the inadmissibility of the lawsuit for being filed against a person enjoying judicial diplomatic immunity regarding the Minister of Transport of Iraq, in accordance with the 1961 Vienna Convention on Diplomatic Relations. Under these two titles, the Second Respondent's defense cited Articles 14 and 31 of the aforementioned Convention, commenting that it is clear that the Vienna Convention adopted diplomatic immunity. The Second Respondent's defense (the Minister of Transport of Iraq) stated in his plea that international custom has settled on governments' heads and their diplomatic representatives enjoying immunity from the jurisdiction of other state courts, applying the principle of equality among members of the international community. He then provided support to his defense by quoting a ruling from the Court of Cassation in Appeal No. 2248 of Year 53 Q, session dated 9/12/1993, Technical Office 44, Vol 3, p. 354.

The court stated there that "the enjoyment by a natural or legal foreign person of judicial immunity and non-submission to national jurisdiction prevents the competence of Egyptian courts to hear disputes arising from this exemption, even if such person resides in Egypt, and that what is contained in Articles 29 - 35 of the Law of Civil Procedure issued by Law No. 13 of Year 1968 regarding the competence of the Republic's courts to hear lawsuits filed against foreigners residing in Egypt represents the general framework contained in this law, but obviously falls outside this scope what is exempted by special laws that exempt a foreigner from national jurisdiction, whether such laws are prior or subsequent to the issuance of the Law of Civil Procedure." After reviewing several similar judgments which the Second Respondent's defense stated were issued by the Court of Cassation, the Second Respondent's defense concluded with the inadmissibility of the lawsuit regarding the Minister of Transport of Iraq due to filing against a person enjoying diplomatic protection and judicial immunity.

In this context, and under Section Three, the Second Respondent's defense also adhered to the non-competence of the arbitration panel to hear the dispute concerning the Minister of Transport of Iraq,

in accordance with Article 31 of the Vienna Convention on Diplomatic Relations, which states that: "The representative enjoys immunity from the criminal jurisdiction of the host state and also enjoys immunity from civil and administrative jurisdiction except in the following cases: a- Claims relating to real estate property located within the territory of the host state, unless his possession is on behalf of the sending state for the purposes of the mission. b- Claims relating to an inheritance wherein the representative acts as executor, manager, heir, or legatee, acting as a private person in their own name and not on behalf of the sending state. c- Claims relating to any professional or commercial activity practiced by the diplomatic representative in the host state outside the scope of his official duties."

The Second Respondent concluded her defense memorandum in light of the aforementioned text and based on the judicial rulings she included in the memo, insisting on the plea regarding non-competence (non-jurisdiction). Under Section Four, entitled Non-consideration of Attendance at Arbitration Sessions or Any Procedure Undertaken by the Second Respondent Company as a Waiver of Immunity, the Second Respondent's defense stated that the waiver of diplomatic immunity must be explicit, according to Paragraph Two of Article 32 of the aforementioned Convention, which stipulated that: "2- The waiver shall be explicit in all cases." Based on this preceding text, the Second Respondent's defense argued that the waiver of immunity must be explicit and cannot be inferred from a circumstance or derived from a procedure or position taken by the diplomatic mission. Furthermore, given that the Convention constitutes a specific provision, it is not restricted by general provisions, and thus Article 32 of the Law of Civil Procedure cannot be applied.

Under the title Adherence to the Non-Applicability of General Civil Procedure Law to the Subject Matter due to Existence of Specific Provisions Governing the Dispute, the Second Respondent's defense stated that **the principle of the particular limits the general** is a principle of great importance. International conventions are considered specific texts that limit domestic general laws, and Article 93 of the Egyptian Constitution affirms the commitment of the State of Egypt to respect international conventions. Since international conventions constitute special law, and the Vienna Convention serves as such special law, the Convention must be the mandatory applicable law to the arbitration at issue; consequently, it cannot be limited by general civil procedure law. Based on this, the Second Respondent's defense insisted on a judgment declaring the arbitral panel non-competent to hear the arbitration case.

**The Second Respondent concluded her first defense memorandum with requests for the following:**

First: The inadmissibility of including the Minister of Transport of Iraq in his capacity and excluding him from the lawsuit.

Second: The non-competence of the Arbitral Panel to hear the lawsuit, as it is filed against a person enjoying judicial diplomatic immunity, pursuant to the Vienna Convention on Diplomatic Relations.

- The Panel also reviewed the second memorandum submitted by the Legal Representative of the Respondents, Mr./Ahmed El-Deriny, titled Objection to the Expert Report, which consisted of 63 pages and concluded with the following requests:

First: Rejecting what was contained in the Case Expert's report and ignoring it, rejecting its consideration, and not accepting its final result due to the reasons and objections stated in the memorandum.

Second: Ruling that the Claimant Company is not entitled to the claimed amounts.

Third: Ruling on the dismissal of the lawsuit in its current form due to the reasons contained in the substantive defense memorandum submitted with this memo.

The Respondents' defense reiterated the facts by referencing what was stated in the Statement of the Arbitration Case and the Defense Memorandum submitted on 10/6/2012, to avoid repetition, followed by a defense beginning with adhering to all their defenses and pleas presented before the Arbitral Panel, especially the memo dated 27/1/2014, the memoranda dated 10/6/2014, and the memorandum submitted before the Expert on 30/4/2023. **Furthermore, they added that given that the expert report was biased against all rights of the Respondents, which prompted the Respondent Company to object to this report with the following objections:**

**Objection One:** Under the title Failure to Address the Period of Entitlement, the Respondents' defense stated that the Expert examined all photocopies provided by the Claimant without classifying them according to the time period claimed by the Claimant. The Expert based his opinion on the statement of the claim and the memoranda submitted by the Claimant and ignored what the Respondents stated in their defense memorandum submitted on 30/4/2023, along with the Company's historical accounting record for which the Claimant claimed funds without right. Furthermore, the Expert failed to respond to the defense of the Respondents regarding the period from 2001 until 2013, during which there is no justification for claiming any amounts; and the Expert did not clarify his legal or accounting foundations in this regard nor did he respond to the defense of the Respondents. Therefore, the report is flawed and deserving of rejection.

**Under the title Objection Two: "The Claimant Company's Lack of Right to Any Commission Fees,"** the Respondents' defense stated that the Expert failed to address their specific plea regarding the lack of right for the Claimant Company to any commission fees, as stipulated in their defense memorandum submitted on 30/4/2023. The Power of Attorney contract stipulates in its Clause 11 that the commission is earned upon issuance. However, there are no travel or shipping tickets issued by the Claimant, and thus they are not entitled to any commission fees. Furthermore, Article 11 of the Convention regulated and clarified the fundamental condition for earning a commission: that the general agent must be the one who issued the documents of the First Party (the Claiming Company). This condition was confirmed by Paragraph Two of the aforementioned Clause 11 and also by Period No. 3 of the same clause. However, the Expert ignored this defense and relied on the Claimant's claims for commission fees up to 2013. Therefore, the report is flawed in this regard and deserving of rejection.

**Under the title Objection Three: "Subcontracting Agreements,"** the Respondents' defense stated that the expert's report, on page No. 34, defined the cost of revenue as the cost incurred by Horus Company's subagents and detailed and executed it using figures and tables through Clauses 3 and 4

on page No. 34, completely disregarding what was contained in the Respondents' defense memorandum submitted to him on 30/4/2023 and Clause 3 of the Power of Attorney contract. The Respondents confirmed that the aforementioned clause does not allow the Claimant to waive, transfer, or delegate any representative acting on its behalf or performing its obligations without written consent; consequently, there is no obligation binding the Respondents, nor should subcontracting agreements be considered against them.

**In Objection Four, under the title Report of the Claiming Respondent Company's Auditor**, the Respondents' defense stated that the expert report did not address their defense contained in their memorandum submitted on 10/6/2023, nor the memo submitted before the Expert itself on 30/4/2023, which included adhering to what was stated in the report of the auditor Mr./Magdy Sheish and all that it contained, treating it as an integral part of the Respondents' defense. However, the Expert disregarded this report and adopted in detail what the Claiming Company's auditor addressed—which the Court deemed contrary to Egyptian auditing standards—indicating the expert's lack of neutrality and adherence to accounting rules and Egyptian auditing standards.

**Fifth Objection to the Expert Report**: The Respondents submit that the report, at page 31, stated that the Claimant had not failed to perform those contractual obligations whose performance depended upon the Respondents' fulfillment of their obligations concerning the operation of the airline. Regarding the remaining obligations, which were not linked to the operation of the airline, the Claimant had fulfilled these obligations. Commenting on the expert's findings, the Respondents stated that the expert had failed to address the defense set out in their memorandum submitted before the expert on 30 April 2023, concerning the bank guarantee that the Claimant was required to provide on 15 March 2001, pursuant to Clause 24 of the Annex to the Agency Agreement, the first paragraph of which required the agent to furnish a letter of guarantee in the amount of USD 100,000. The Claimant failed to provide that guarantee before the Agency Agreement was canceled on 17 November 2005. Nevertheless, the expert disregarded this defense.

**Sixth Objection:** The Respondents further submit that the expert also failed to address their arguments concerning the termination date of the Agency Agreement, namely 17 November 2005. They contend that the expert should have examined the documents submitted by the Claimant—assuming the authenticity of the photocopies—only up to the date of termination of the Agency Agreement and not through the year 2013.

**Seventh Objection, "Affiliate Companies":** The Respondents stated that the Expert Report reviewed and examined only the documents submitted by the Claimant and described and presented them as though they were originals rather than photocopies. The expert used the expression "affiliate companies" sixty-four times, a characterization that, according to the Respondents, was introduced by the expert after the First Respondent argued that the photocopies did not relate to it, but rather to other companies having no connection with the canceled Agency Agreement. The Respondents further stated that they had submitted thirteen bundles of documents during the expert proceedings, including the original commercial registration record of Al-Hussan Company, which contained no reference to the existence of any affiliate company or parent company. Nevertheless, the expert disregarded this defense and those documents.

**Eighth Objection, the Relationship Between the Parties:** Counsel for the Respondents submitted, in response to the Expert's discussion of what was termed the "relationship between the parties" (at page 4 of the Report), that the Expert had established an important point concerning the documents governing such relationship. Specifically, counsel noted that the Expert emphasized that these documents had not been challenged or denied by the parties to the proceedings, notwithstanding that they consisted merely of photocopies, thereby implying that such documents would have been disregarded had either party contested their authenticity. Counsel further submitted that the Expert nevertheless proceeded to consider and rely upon documents produced by the Respondents, which, in their view, demonstrate an inconsistency in the Expert's assessment and conclusions in the present dispute. Moreover, counsel for the Respondents argued that the Expert failed to address their defense concerning the non-existence and nullity of the three documents purportedly governing the relationship between the parties, notwithstanding that this defense had previously been expressly raised in earlier submissions. Counsel further maintained that, although such defense may, at first glance, appear to constitute a purely legal argument, it nevertheless falls within the Expert's mandate, insofar as it concerns matters relating to company law, including the incorporation of companies and the acquisition of legal personality.

**Ninth Objection:** The Respondents further submit that, in response to the section of the Expert Report appearing at page 5 under the heading "Obligations Specified in the Agency Agreement Dated 30 January 2001," the expert set out the obligations incumbent upon the Claimant and stated that the Respondents had acknowledged such obligations in the memorandum submitted in response to the Statement of Claim, without addressing the comments made by the Respondents in

their memorandum dated 30 April 2023, which referred to the same obligations contained in the canceled Agency Agreement. The Respondents maintain that the expert ignored or failed to recognize any documents submitted by them demonstrating the Claimant's breach of its obligations, thereby confirming the expert's lack of impartiality and bias in favor of the Claimant.

**Tenth Objection:** Under the tenth objection, the Respondents submit that the appointed expert once again used the same unfounded and provocative language on page 8 of the report under the heading "The Claimant's Obligations Pursuant to the Annex to the Agreement Dated 15 March 2001," in relation to the admissions allegedly attributed to the Respondents, while disregarding the arguments set out in the Respondents' memorandum submitted before the expert on 30 April 2023.

**Eleventh Objection:** Under the eleventh objection to the Expert Report, the Respondents submit that the report stated, at page 13 and based on the notices submitted by the Respondents, that the Claimant had asserted therein that it had fulfilled all of its obligations under the Agency Agreement. These allegedly included the establishment of a transportation and tourism company under the name "Horus Tourism & Travel" for the implementation of the agency, the reconstruction and establishment of the premises of Iraqi Airways, the payment of all outstanding amounts owed by Iraqi Airways, the obtaining of the licenses necessary for operation, and the payment of the employees' salaries at all such Iraqi Airways offices. The Respondents further submit that a review of all these matters demonstrates that the expert reached conclusions of his own that are inconsistent with what is established in the Respondents' memorandum and supporting documents, as set out in detail in their submissions, which were reviewed and duly considered by the Arbitral Tribunal.

**Twelfth Objection:** Under the twelfth objection, the Respondents submit that, in reviewing and examining the photocopies of the documents submitted by the Claimant, particularly the lease agreements, the expert repeatedly used the expression "used or leased for the activities of the General Agency." However, the photocopies of the lease agreements submitted by the Claimant do not contain such wording. Accordingly, the Respondents contend that the expert introduced this language on the expert's own initiative, rendering the report unsuitable as evidence upon which reliance may be placed.

**Thirteenth Objection:** The Respondents submit that the expert stated, at page 30 of the report, that, upon reviewing and examining the documents, the expert concluded that the Respondents had breached their contractual obligations because they issued a decision on 2 December 2004 terminating the agency without attributing any contractual breaches to the Claimant, subsequently rescinded such termination and reactivated the agency on 29 August 2005, then again issued a decision cancelling the agency, and thereafter reversed the termination decision and issued a decision suspending the agency. The Respondents further contend that this conclusion is unfounded, as the expert failed to consider the arguments set out in the Respondents' memoranda dated 27 January 2014 and 10 June 2014, in which the matters relied upon by the expert in reaching this conclusion had already been addressed in detail. The Respondents then reiterated the arguments previously advanced in their earlier memoranda in response to the expert's findings on this issue, all of which were reviewed and duly considered by the Arbitral Tribunal.

**Fourteenth Objection:** The Respondents submit that, in his final conclusions, the expert stated that the legal defenses raised by the Respondents should be left for determination by the Arbitral Tribunal. However, the expert did not, in fact, leave either the legal defenses or the challenge to the photocopies for determination by the Tribunal; rather, the expert addressed and determined such matters. Conversely, the expert disregarded the Respondents' defenses and failed to address them in any respect whatsoever. Accordingly, the Respondents contend that the report is prejudicial to their rights.

**Fifteenth Objection:** Counsel for the Respondents stated that the Expert Report set forth the following in its final conclusion: "In light of our examination and assessment of the memoranda and copies of the documents submitted by both parties before the Arbitral Tribunal and enclosed with the letter commissioning the expert, as well as the memoranda and copies of the documents, we found as follows: The First Respondent's decision to terminate the Agency Agreement, followed by its decision to suspend the Agency Agreement, was not attributable to any fault on the part of the Claimant, but rather resulted from the First Respondent's expressed desire to terminate the Agreement based on the new policy direction of the Iraqi State …" and so forth, as stated in the Expert Report. Counsel for the Respondents argued that this conclusion had already been rebutted by the matters set out in the memorandum submitted to the Arbitral Tribunal on January 27, 2014. Counsel for the Respondents reiterated the arguments previously advanced in that memorandum, which had been reviewed by the Arbitral Tribunal.

**Sixteenth Objection, Loss of Profits:** Under the sixteenth objection, entitled "Loss of Profits," the Respondents submit that, in addressing the Claimant's alleged loss of profits, the expert relied entirely upon the accounting report submitted by the Claimant's auditor and endorsed all of its findings, while disregarding the accounting report submitted by the Respondents and prepared by Mr. Magdy Hashish's office, which was not addressed or even referred to in any manner whatsoever. The Respondents further submit that this latter accounting report had previously been incorporated into their memoranda dated 10 June 2014 and 30 April 2023. The Respondents then reiterated the arguments previously advanced in those memoranda, which had been reviewed by the Arbitral Tribunal, ultimately concluding that the Expert Report is invalid and requesting that it be disregarded, not relied upon, and excluded in its entirety.

**Seventeenth Objection, "Accrued Gain":** Under the heading "Accrued Gain," the Respondents raised their seventeenth objection to the Expert Report. The Respondents argued that, in this respect, the report relied entirely on photocopies of documents submitted by the Claimant that did not relate to the Claimant, but rather to other companies having no connection with the Agency Agreement at issue in the arbitration proceedings. The Respondents further argued that the expert merely reproduced the Claimant's description of the photocopied documents submitted by it and endorsed that description without discussion, proper accounting justification, or analysis, while failing to address the report submitted by the Respondents and prepared by the office of Mr. Magdy Hashish. Accordingly, the Respondents maintained that the conclusions reached by the expert in the report should be disregarded because the expert's findings lacked a sound technical basis and were contrary to accounting and legal principles.

The Respondents concluded this second memorandum by reiterating the relief previously sought.

The Arbitral Tribunal also reviewed the third memorandum submitted by the Respondents' legal representative, Mr. Ahmed El-Derini, entitled "Substantive Defense," consisting of twenty-eight pages and concluding with the following requests:

1. To declare the arbitration inadmissible in form and the arbitration proceedings null and void due to the composition of the Arbitral Tribunal being contrary to the arbitration agreement and to international laws and customs.
2. To declare that the Claimant has forfeited its right to resort to arbitration pursuant to the Agency Agreement that is the subject matter of the dispute.
3. To declare that the Claimant has forfeited its right to bring the claim due to the lapse of more than two years since the termination of the contractual relationship.
4. To declare the canceled Agency Agreement null and void on the grounds that it was entered into on the basis of a defective consent.

5. To declare that the Claimant is not entitled to the relief sought, as such claims are inconsistent with both law and fact.
6. To dismiss all claims for compensation advanced by the Claimant.
7. To declare the claim inadmissible due to the failure to produce the original documents.
8. To dismiss the claim for lack of supporting documents substantiating the Claimant's allegations.
9. To declare the claim inadmissible with respect to the Second Respondent on the grounds of diplomatic immunity pursuant to the Vienna Convention on Diplomatic Relations.
10. To declare that the Respondents are under no obligation to pay the commission claimed by the Claimant, as no such commission is due.
11. To declare that the Respondents are under no obligation to reimburse any amounts allegedly constituting actual expenses incurred by the Claimant.
12. To declare that the Respondents are under no obligation to pay any bank interest.
13. To order the Claimant to bear all costs of the arbitration, including the arbitration fees, deposits, expenses, arbitrators' fees, and the attorneys' fees incurred by the Respondents.

The Respondents' counsel further incorporated by reference their previous submissions contained in the memoranda filed before the Arbitral Tribunal and during the expert proceedings on 27 January 2014, 10 June 2014, and 30 April 2023, and maintained the following pleas and defenses:

1. The invalidity of the arbitral proceedings on the ground that the constitution of the Arbitral Tribunal was contrary to the arbitration agreement and to applicable international laws and practices.
2. The denial of the authenticity of all photocopies submitted by the Claimant.
3. The dismissal of the claim on the ground that the Claimant failed to produce the originals of the documents and submitted foreign-language documents that had not been accompanied by certified Arabic translations.
4. The lapse of the Claimant's right to resort to arbitration pursuant to the canceled Agency Agreement.
5. The invalidity of the canceled Agency Agreement on the ground that it was entered into on the basis of defective consent.
6. The minutes of the meeting dated 29 August 2005 do not constitute a contract.
7. The legally non-existent Agency Agreement did not remain in force until the date of its cancellation.
8. The Claimant is not entitled to any commission.

The Respondents relied in this regard on the same grounds previously set out in their earlier memoranda, which the Arbitral Tribunal had reviewed.

The Respondents also submitted, together with the three defense memoranda referred to above, a bundle of documents, which the Arbitral Tribunal reviewed and whose contents it duly considered. The bundle contained the following documents:

**Document No. 1:** A true copy of the minutes of the meeting dated 27 September 2005 between the Egyptian and Iraqi civil aviation authorities concerning the commencement of Iraqi Airways' operations and the conduct of its activities.

**Document No. 2:** True copies of a letter issued by the Embassy of the Republic of Iraq in Cairo to the Iraqi Ministry of Transport, indicating that it had communicated with the Egyptian Civil Aviation Authorities and that the latter had raised no objection to the operation of a direct air route between Baghdad and Cairo.

**Document No. 3:** True copies of a letter issued by the Iraqi Ministry of Foreign Affairs to the Iraqi Ministry of Transport, referring to the aforementioned letter and requesting the provision of the documents required to commence Iraqi Airways flights between Cairo and Baghdad.

The Respondents relied upon these documents to demonstrate that the Claimant had undertaken no measures whatsoever to obtain aircraft operating licenses necessary to commence operations, thereby disproving its assertion that it was the party that had procured such licenses.

Furthermore, on 20 June 2023, Professor Dr. Mohamed Mostafa Hamouda, attorney-at-law and legal representative of the Respondents, also submitted a memorandum on behalf of the Respondents, together with seven bundles of documents, all of which were reviewed by the Arbitral Tribunal.

Upon reviewing the memorandum, it appears that it consisted of 103 pages and commenced with a section entitled "Facts," in which the Respondents referred to all documents contained in the arbitration record and to the defense memoranda previously submitted by them, so as to avoid repetition.

**Under the heading "Defense," the Respondents raised the following defenses:**

**First:** The Respondents argued that the arbitration agreement contained in Clause Sixteen of the document alleged to be a General Agency Agreement dated 30 January 2001 had lapsed due to the expiration of both the original and extended arbitration periods agreed upon by the parties in the minutes of the first procedural session dated 28 November 2013, without the issuance of a final award disposing of the dispute. In support of this defense, the Respondents referred to Articles 8, 22, and 45 of Egyptian Arbitration Law No. 27 of 1994 concerning Arbitration in Civil and Commercial Matters, together with certain judgments which they stated had been issued by the Egyptian Court of Cassation and the Cairo Court of Appeal. The Respondents further submitted that it is established from the record that the parties agreed, in the minutes of the first procedural session held on 28 November 2013, that Egyptian arbitration law would govern the arbitration proceedings. The parties further agreed that the arbitration period would be twelve months commencing from the date of that session, without prejudice to the Arbitral Tribunal's right to extend such period for an additional six months, thereby making the total arbitration period eighteen months commencing on 28 November 2013. The Respondents further submitted that, upon calculating the arbitration period, it becomes evident that the agreed period expired without the issuance of a final award disposing of the dispute, even after taking into account the periods during which the proceedings had been suspended. Furthermore, the parties neither expressly nor implicitly agreed to extend the arbitration proceedings after the expiry of the additional period pursuant to the Tribunal's decision dated 15 January 2015 extending the arbitration period for a further six months. The Respondents further maintained that this defense had already been raised before the expert during the session held on 19 March 2023 and that a memorandum had been submitted in support thereof. Moreover, the Respondents contended that the Arbitral Tribunal, in its entirety, had withdrawn from the arbitral mandate since 2017.

**Second:** The Respondents argued that the constitution of the Arbitral Tribunal in the arbitration proceedings initiated by the Claimant was null and void due to the prior withdrawal of the President of the Arbitral Tribunal and the withdrawal of the arbitrator appointed by the Respondents, coupled with the Respondents' failure to appoint a replacement arbitrator who, together with the arbitrator appointed by the Claimant, would select the President of the Arbitral Tribunal. The Respondents further argued that the members of the Arbitral Tribunal were not qualified to hear the dispute due to their lack of the requisite impartiality and independence necessary for the performance of their arbitral duties. In support of this defense, the Respondents referred to Articles 16, 17, and 21 of the Egyptian Arbitration Law, together with certain judgments which they stated had been rendered by

the Egyptian Court of Cassation. The Respondents further submitted that it is established from the record that both the arbitrator appointed by the Respondents and the President of the Arbitral Tribunal had withdrawn from their arbitral mandates. Accordingly, the arbitrator appointed by the Respondents, Professor Dr. Abdel Hamid Galal El-Ahdab, having withdrawn from the proceedings, could no longer participate in the selection of the President of the Arbitral Tribunal. The Respondents maintained that this argument had already been raised during the session held on 16 February 2023. The Respondents further submitted that this conclusion is not affected by the assertion made in various communications and correspondence by the President of the Arbitral Tribunal that the Respondents had reappointed him by virtue of a judicial notice dated 18 April 2022, allegedly evidencing their acceptance of his appointment as President of the Tribunal following his withdrawal. According to the Respondents, such notice neither expressly nor implicitly contained any indication of such acceptance; rather, it was issued for the limited purpose of informing the Tribunal that the Respondents had changed their legal domicile in order to ensure receipt of any judicial notifications. The Respondents further contended that they had not appointed a replacement arbitrator following the withdrawal of their appointed arbitrator, Professor Dr. Abdel Hamid Galal El-Ahdab, and that the appointment of the presiding arbitrator could only take place through nomination by the arbitrators appointed by both parties. The Respondents additionally submitted that it is established from the documents and memoranda submitted by the members of the Arbitral Tribunal in the judicial proceedings arising out of the present arbitration that the members of the Tribunal had themselves become parties to those judicial proceedings. They further submitted numerous memoranda in which they expressed views regarding the arbitral dispute, addressed the allegations made against them by the Claimant, and reserved their material and moral rights to seek recourse against the Claimant following their final withdrawal. The Respondents then referred to certain incidents which they alleged had occurred during the judicial proceedings instituted by the Claimant against the President and members of the Arbitral Tribunal, all of which were reviewed and considered by the Tribunal, ultimately maintaining their defense that the reconstitution of the Tribunal was null and void and that its members lacked the requisite impartiality and independence to adjudicate the arbitration.

**Third:** The Respondents argued that all procedures relating to the resumption of the arbitration proceedings, the procedures preceding the session of 16 February 2023, and all procedures undertaken during that session, including the decision appointing an expert in the arbitration proceedings, are null and void due to the established withdrawal of the Arbitral Tribunal in its entirety and the futility of continuing the arbitration proceedings following such withdrawal. The Respondents further maintained that new procedures should have been undertaken by the parties through the appointment of a new arbitrator by each party, followed by the appointment by such arbitrators of the President of the Arbitral Tribunal, and the recommencement of the arbitration proceedings in accordance with procedures agreed upon by the parties. Upon reviewing the explanation provided by the Respondents in support of this defense, the Arbitral Tribunal found that it did not depart from the same grounds and arguments relied upon by the Respondents in support of the preceding defense, which the Tribunal had previously reviewed and considered.

**Fourth:** The Respondents further argued that the arbitration claim is inadmissible insofar as it was brought against the Iraqi Minister of Transport in his official capacity, on the grounds that the arbitration agreement does not extend to him. This defense had previously been raised by counsel for the Second Respondent in earlier memoranda and was reiterated in the present memorandum on the same grounds previously advanced and already reviewed by the Arbitral Tribunal.

**Fifth:** The Respondents further maintained their challenge for forgery with respect to the photocopies of the documents contained in the five boxes submitted by the Claimant in the arbitration record and requested the suspension of the arbitration proceedings pending the

determination of such forgery allegations, on the basis that the issue constitutes a preliminary matter that must be resolved before the merits of the dispute can be determined. In support of this request, the Respondents relied upon Articles 12, 15, and 29 of the Egyptian Code of Civil Procedure and Article 46 of the Egyptian Arbitration Law. The Respondents submitted that the Claimant had produced five boxes containing photocopies of documents, all of which had been challenged by the Respondents, while failing to produce the original documents despite repeated requests to do so. The Respondents further argued that the Claimant continues to refuse to produce the originals, particularly given that the Expert Report filed in the proceedings relied upon such challenged documents, notwithstanding the absence of the originals. The Respondents further contended that the Claimant's failure to produce the original documents constitutes evidence of forgery, arguing that, had the documents not been fabricated, the Claimant would have promptly produced them. The Respondents further asserted that the Arbitral Tribunal itself had previously acknowledged that the Claimant had committed acts of document forgery. The Respondents then referred to certain incidents which they alleged had occurred during the proceedings for the removal of the arbitrators in Appeal No. 3 of Judicial Year 132 before the Cairo Court of Appeal and identified the following alleged indicia of forgery: By notice dated 18 March 2006, the Claimant demanded that the Respondents pay EGP 15 million in alleged expenses incurred, in addition to EGP 10 million as compensation for material and moral damages allegedly suffered as a result of the termination of the agency, without attaching any documents substantiating such expenditures, or any part thereof.

On 19 April 2006, a meeting was held between representatives of the two companies, during which it was recorded that: "The parties agreed to meet on Wednesday, 19 April 2006, to discuss the disputes that had arisen concerning the termination of the agency... and agreed as follows: Horus shall prepare a detailed breakdown of the amounts claimed and supporting documents within ten days; Iraqi Airways shall, at the next meeting, present its position regarding the amounts set out in such breakdown in order to determine the extent of the claims; Horus Tourism & Travel Company proposed discussing possible compromise solutions concerning the continuation of the relationship; and Iraqi Airways shall provide Horus Tourism & Travel Company with the alleged violations." The Respondents submit that the Claimant failed to provide the supporting documentation concerning the amounts claimed, either within the aforementioned period or thereafter. By notice dated 13 May 2006, the Claimant asserted that it had undertaken efforts to obtain licenses for the resumption of operations and had expended more than USD 15 million in preparing the company's offices. The notice further demanded payment of USD 15 million in expenses and an additional USD 10 million as compensation for material and moral damages, thereby converting its previous claims from Egyptian pounds to U.S. dollars and introducing additional claims within less than two months, notwithstanding that neither notice was accompanied by any supporting documentation. On 7 September 2008, more than two years after the first notice, the Claimant issued another notice indirectly increasing the scope of its claims by alleging additional categories of expenditures not previously mentioned. By notice dated 15 November 2008, the Claimant increased its financial claims to USD 28 million and increased its compensation claim for moral damages to USD 70 million, bringing the total amount claimed to USD 98 million. More than six years after the termination of the contract, the Claimant commenced arbitration proceedings and submitted its Statement of Claim seeking, inter alia, USD 103,666,858, an additional USD 100,000,000 as compensation for wrongful termination, USD 497,096,579 in commissions, USD 500,000,000 as compensation for moral damages, together with interest at the rate of 11% and arbitration costs. The Respondents contend that the unreasonable disparity between the amounts claimed in the notices and those subsequently claimed in the Statement of Claim demonstrates that the Claimant fabricated documents to support its allegedly unfounded claims. The Respondents further submit that the Claimant subsequently increased its financial claims fivefold to reach approximately USD 5 billion, as reflected in its memorandum amending its claims. The Respondents further contend

that the alleged fabrication of documents is confirmed by the fact that such documents do not bear any official authentication and refer in this regard to the accounting report submitted by them and prepared by Mr. Magdy Hashish, which concluded that the vast majority of the documents submitted by the Claimant were unreliable. The Respondents further contend that the accounting expert deliberately ignored the accounting report submitted by the Respondents as though it had never been filed in the proceedings, notwithstanding its significance and its conclusions concerning the alleged fabrication of documents by the Claimant.

The Respondents accordingly maintained their forgery challenge and requested that the arbitration proceedings be suspended pending the determination of the forgery allegations as a preliminary issue.

**Sixth**: The Respondents further argued that the Expert Report is invalid for the following reasons:

**First Ground:** The report relied, in reaching its conclusions, upon photocopies of documents for which no originals exist or have been produced.

**Second Ground:** The expert relied upon documents submitted by the Claimant that were drafted in a foreign language and had not been accompanied by certified Arabic translations.

**Third Ground:** The expert relied upon documents submitted by the Claimant that are allegedly inaccurate or unreliable.

**Fourth Ground:** The report is entirely devoid of any independent technical or accounting analysis and instead merely reproduces and examines photocopies of documents contained in the two reports prepared at the request of the Claimant and submitted in the arbitration proceedings. The Respondents contend that this exceeds the proper scope of expert examination and renders the report invalid due to defective reasoning.

**Fifth Ground:** The expert erroneously concluded that the termination and subsequent suspension of the agency were not attributable to any fault on the part of the Claimant but rather resulted from the Respondents' desire to terminate the contract in light of the new policies adopted by the Iraqi State.

**Sixth Ground:** The expert exceeded the scope of the mandate by determining legal issues that fall exclusively within the jurisdiction of the Arbitral Tribunal, namely the reasons for the termination of the contract and whether the Claimant had fulfilled its contractual obligations.

**Seventh Ground:** The expert exceeded the scope of the mandate by converting the amounts stated in the report into U.S. dollars without any instruction from the Tribunal to do so.

**Eighth Ground:** The Expert Report is internally inconsistent and contradictory in its conclusions.

Based on the foregoing grounds of objection to the Expert Report, the Respondents ultimately requested that the report be declared invalid.

Under Items Seven and Eight, the Respondents further argued that the agreements relied upon by the Claimant were absolutely null and void and that the claim was time-barred. Upon reviewing these two defenses, the Arbitral Tribunal found that they were based on the same legal grounds as the corresponding defenses previously advanced in the Respondents' earlier memoranda.

**Ninth**: Response to the Claimant's Allegations in the Arbitration:

Under this heading, the Respondents referred to the memorandum of Dr. Fathi Wali filed in the arbitration record and further responded to the Claimant's assertions regarding the alleged absence of fault on its part, the alleged presumption of fault on the part of the Respondents, the alleged gross misconduct in terminating and subsequently suspending the contract unilaterally, the alleged failure

of the First Respondent to provide the information and tools necessary for the agent to perform its duties, the alleged encroachment upon the scope of the agency, the alleged failure to pay the Claimant's entitlements, the alleged prolongation of amicable settlement discussions, the alleged damage to the Claimant's reputation, and the alleged breaches committed during the agreed contractual period.

**Tenth:** Under the tenth section of the memorandum, entitled "Absence of Contractual Liability on the Part of the First Respondent," the Respondents referred to the memorandum of Dr. Fathi Wali on this issue and subsequently addressed certain additional points that did not depart from the Respondents' previously submitted arguments in this regard.

**The Respondents concluded their memorandum with the following requests:**

**First:** To declare that the arbitration agreement has lapsed due to the expiration of both the original and extended arbitration periods agreed upon by the parties without the issuance of a final award disposing of the dispute.

**Second:** To declare the constitution of the Arbitral Tribunal in the arbitration proceedings initiated by the Claimant null and void due to the prior withdrawal of the President of the Arbitral Tribunal and the arbitrator appointed by the Respondents, the Respondents' failure to appoint a replacement arbitrator who, in consultation with the arbitrator appointed by the Claimant, would appoint the President of the Arbitral Tribunal, and the lack of impartiality and independence required of the members of the Tribunal for the performance of their arbitral duties, together with a declaration that all procedures relating to the resumption of the arbitration proceedings and all decisions and actions taken by the Tribunal are null and void.

**Third:** To stay the arbitration proceedings pending the issuance of a final judgment in Cassation Appeal No. 11263 of Judicial Year 92 (Commercial), scheduled for hearing on 22 June 2023, as the outcome thereof bears directly upon the constitution of the Arbitral Tribunal in the present arbitration.

**Fourth:** Prior to determining the merits of the arbitration:

1. To schedule a hearing for oral pleadings on behalf of the Respondents and notify them thereof immediately upon fixing such hearing.
2. To order the Claimant to produce all original documents corresponding to the photocopies contained in the five boxes submitted in the arbitration proceedings and, in the event of failure to do so, to rule that such photocopies shall be deemed non-existent pursuant to Article 51 of the Egyptian Law of Evidence.
3. To stay the arbitration proceedings pending the initiation and determination of forgery proceedings concerning the photocopies of the documents contained in the five boxes submitted by the Claimant.
4. To order that all photocopies of the documents contained in the five boxes submitted by the Claimant in the arbitration proceedings be rejected and declared null and void on the grounds that they were fabricated and forged.

**Fifth**: With respect to the merits of the arbitration:

1. To declare the arbitration claim inadmissible insofar as it was brought against the Iraqi Minister of Transport in his official capacity due to lack of standing.
2. To declare the arbitration claim time-barred pursuant to Article 190 of the Egyptian Commercial Code.
3. To dismiss the arbitration claim on the merits.

In the alternative, to refer the arbitration file to a panel of three experts to examine its elements and determine the true merits of the arbitration dispute.

In all events, to order the Claimant to reimburse the First Respondent for all arbitration fees and expenses paid by it, without prejudice to the Respondents' other rights.

The Respondents further submitted seven bundles of documents together with the memorandum, all of which were reviewed and considered by the Arbitral Tribunal, as follows:

**First Bundle:** One document, described on the cover as a photocopy of the statement of claim in the proceedings for the removal of the arbitrators initiated by the Claimant against the members of the Arbitral Tribunal, seeking their removal, reimbursement of arbitration fees, compensation, and other relief. The Tribunal took note of the comments set out on the cover of the bundle.

**Second Bundle:** One document, described on the cover as a photocopy of a supplementary memorandum submitted by Dr. Hassan Abdel-Baset Gomaa in Proceedings for the Removal of the Arbitrators No. 3 of Judicial Year 132 before the Cairo Court of Appeal, instituted by the Claimant and others seeking his removal and reimbursement of fees and compensation. The memorandum was submitted while the case had been reserved for judgment at the hearing of 27 June 2018. The Tribunal took note of the comments set out on the cover.

**Third Bundle:** One document, described on the cover as a photocopy of a memorandum of defense and objections submitted by Professor Dr. Abdel Hamid Galal El-Ahdab in Proceedings for the Removal of the Arbitrators No. 3 of Judicial Year 132 before the Cairo Court of Appeal, instituted by the Claimant and others. This memorandum was submitted at the hearing of 28 August 2016. The Tribunal took note of the comments set out on the cover.

**Fourth Bundle:** One document, described on the cover as a photocopy of an email from Dr. Hassan Abdel-Baset Gomaa to the parties to the arbitration, indicating that he had held a private meeting with the Chairman of the Preservation Committee responsible for managing the Claimant, in order to facilitate his withdrawal from the arbitral mandate in the manner and under the conditions approved by the Committee, and that he informed the First Respondent of such meeting on the following day. The Tribunal took note of the comments set out on the cover.

**Fifth Bundle:** One document, described on the cover as a photocopy of the response of the Secretary of the arbitration proceedings to counsel for the First Respondent and the joined party, Professor Dr. Mohamed Mostafa Hamouda, during his representation thereof, in response to his request for a complete copy of all documents and records in the arbitration file. The Tribunal took note of the comments and implications set out on the cover.

**Sixth Bundle:** One document, described on the cover of the bundle as a photocopy of a memorandum setting out the opinion of the Public Prosecution before the Court of Cassation in Cassation Appeal No. 11263 of Judicial Year 92, filed by the First Respondent against the members of the Arbitral Tribunal and the Claimant. According to the description, the Public Prosecution concluded that the appeal should be admitted as to form and that the challenged judgment should be quashed on the merits. The Tribunal took cognizance of the notation and the significance attributed thereto on the cover of the bundle.

**Seventh Bundle:** This bundle contained one document, identified on its cover as a photocopy of a certificate issued by the Court of Cassation, the original of which had been submitted to the Arbitral Tribunal. The certificate stated that a hearing had been scheduled for 22 June 2023 before the Thursday Commercial Circuit, sitting in chambers, to consider Cassation Appeal No. 11263 of Judicial Year 92 (Commercial), filed by the First Respondent against the members of the Arbitral Tribunal, together with the other related cassation appeals, all of which challenged the judgment rendered by the Cairo Court of Appeal in Case No. 3 of Judicial Year 132 dismissing the action seeking the removal of the arbitrators who currently constitute the Arbitral Tribunal. The Tribunal

took note of the description of the document and the significance attributed to it on the cover of the bundle.

**On 22 June 2023**, legal counsel for the Claimant submitted a communication entitled "Rectification" to the President and members of the Arbitral Tribunal. The communication referred to the memorandum submitted on 20 June 2023 in response to the Expert Report and the Respondents' defense and explained that a clerical error had occurred in the wording of request (d) on page 52 of that memorandum. The amount of compensation claimed for the damage suffered by the Claimant as a result of the loss of its market for business in the fields of travel, tourism, aviation, and related activities, and the resulting financial damage sustained by the Company, had erroneously been stated as five hundred United States dollars (USD 500). Counsel stated that, in accordance with the Claimant's previous requests and the presentation of its claims on pages 45, 46, and 48 of the memorandum, and in order for the final prayers for relief set out in the body of the memorandum to be read consistently with request (d), which the Claimant had maintained throughout the arbitration, the correct amount was five hundred million United States dollars (USD 500,000,000).

The communication stated that this constituted a correction of the clerical error contained in the memorandum submitted on 20 June 2023.

The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Respondents.

**On 24 June 2023,** the President of the Arbitral Tribunal received an email from Mr. Ahmed El-Derini, legal counsel for the First Respondent, referring to the Claimant's request entitled "Rectification," by which the Claimant sought to correct the clerical error in the phrase "five hundred United States dollars" appearing in request (d) on page 52 of its memorandum dated 20 June 2023. The First Respondent categorically opposed the request, contending that allowing it would effectively amount to granting an additional period of time, particularly since the Claimant had previously opposed the First Respondent's request for an extension of the deadline for filing its memoranda, which had been fixed as 20 June 2023. The First Respondent, through its legal counsel, further expressed its utmost confidence that the Arbitral Tribunal would not apply double standards and that the Tribunal was fully committed to upholding the principles of justice and equity in the proceedings. Counsel further affirmed the First Respondent's full awareness that the Arbitral Tribunal treated both parties with complete impartiality.

The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Claimant.

**On the same date,** the President of the Arbitral Tribunal received a further email from Dr. Mohamed Mostafa Hamouda, who also acted as legal counsel for the Respondents, requesting the rejection of the Claimant's request entitled "Rectification," which sought to correct a clerical error.

Counsel maintained that the request contravened Egyptian law and the Arbitral Tribunal's decision because the deadline for submitting memoranda and documents had expired on 20 June 2023.

Counsel further stated that the Court of Cassation had found that the cassation appeals challenging the judgment rendered by the Cairo Court of Appeal in Case No. 3 of Judicial Year 132, concerning the removal of the arbitrators, warranted consideration and had scheduled a hearing of the appeals for Thursday, 12 October 2023.

Accordingly, the Respondents maintained their request for a stay of the arbitral proceedings pending the determination of those appeals.

The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Claimant.

**On 25 June 2023**, Dr. Mohamed Hamouda, counsel for the Respondents, sent an email to the President of the Arbitral Tribunal referring to the previous communication and attaching a copy of a certificate issued by the Court of Cassation. The certificate stated that an oral hearing of the cassation appeals had been scheduled for Thursday, 12 October 2023. The Respondents reiterated their request for a stay of the arbitral proceedings pending the determination of the appeals. The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Claimant.

**On 4 July 2023**, the President of the Arbitral Tribunal received an email from Mr. Ahmed El-Derini, counsel for the Respondents, stating that the Respondents were awaiting the Tribunal's decision concerning the Claimant's request to rectify its final prayers for relief. Counsel also requested to be informed of the procedural action that the Arbitral Tribunal intended to take in the arbitration in relation to the Respondents' requests. The President of the Arbitral Tribunal notified the Claimant of the communication. The President of the Arbitral Tribunal also circulated the communication to the members of the Tribunal and to the Claimant.

**On 5 July 2023**, the President of the Arbitral Tribunal received an email from Dr. Mohamed Hamouda, counsel for the Respondents, referring to the arbitration and supplementing the Respondents' final requests contained in their memorandum dated 20 June 2023. With respect to the Respondents' request that an expert panel be appointed to examine the matters at issue in the arbitration, the First Respondent proposed the appointment of the accounting and financial auditing firm Ernst & Young. The First Respondent stated that Ernst & Young was an internationally reputable accounting firm possessing the requisite impartiality and professional competence to prepare an accounting report in the arbitration and that the Company had no objection to bearing all costs and expenses associated with the appointment. The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Claimant.

**On 10 July 2023**, the President of the Arbitral Tribunal received an email from legal counsel for the Claimant containing the Claimant's response to the Respondents' communication opposing the request to rectify the clerical error contained in the final prayers for relief set out in the Claimant's memorandum filed on 20 June 2023.

The Claimant maintained that the rectification did not constitute a new request but was merely the correction of a clerical error, as previously explained.

The communication also responded to the Respondents' statements concerning their confidence in the Arbitral Tribunal and in adjudication on the basis of justice and equity. The Claimant similarly affirmed its confidence in the Arbitral Tribunal and in the Tribunal's complete impartiality.

The Claimant further accepted that the Arbitral Tribunal be authorized to decide the dispute on the basis of justice and equity—ex aequo et bono—and stated that this constituted an authorization by the Claimant for the Tribunal to adjudicate on that basis. The Claimant asserted that, by virtue of this acceptance, the parties to the arbitration had reached an agreement to that effect.

The communication also responded to the Respondents' communications received by the President of the Arbitral Tribunal on 4 and 5 July 2023. The Claimant maintained its request that the matter be reserved for the issuance of the Award and rejected the Respondents' request for the appointment of a three-member expert panel or a new expert, as well as any unilateral selection of such expert by the Respondents.

The President of the Arbitral Tribunal circulated the communication to the members of the Tribunal and to the Respondents.

• **On 11 July 2023**, the Arbitral Tribunal unanimously decided to close the proceedings and reserve the matter for the issuance of the Award. The Award was to be rendered and deposited at the seat of arbitration on a date of which the parties would be notified.

The President of the Arbitral Tribunal notified the parties of that decision.

• **On 12 July 2023**, following the Arbitral Tribunal's decision to close the proceedings and reserve the matter for the issuance and deposit of the Award at the seat of arbitration on a date to be notified to the parties, as stated above, the Tribunal received an email from Professor Dr. Mohamed Hamouda, legal counsel for the Respondents. The email reiterated matters previously communicated by counsel on 25 and 26 February 2023, initially by formal legal notice and subsequently by private courier, both of which had previously been circulated to the members of the Arbitral Tribunal and to the Claimant. The communication stated that Professor Dr. Mohamed Hamouda was the legal representative of the Respondents and had learned that the Arbitral Tribunal intended to resume its consideration of the arbitration. The communication reiterated counsel's previous request to be included in all notifications and correspondence concerning the First Respondent in the arbitral dispute. Counsel also reserved the Respondents' right to raise all formal, procedural, and substantive pleas and defenses and renewed the request to be notified of the date and time of any arbitral hearing should a hearing be scheduled. Counsel further referred to previous correspondence in 2017, by which the Tribunal had been notified that counsel represented the General Company for Iraqi Airways and had submitted a request to the Secretary of the Tribunal for permission to inspect and obtain copies of all documents and materials contained in the arbitration file. A copy of the power of attorney issued by the Respondents was attached once again. The Arbitral Tribunal decided to place the communication on the record of the arbitral proceedings.

• **On 18 July 2023**, following the Arbitral Tribunal's decision to close the proceedings and reserve the matter for the issuance and deposit of the Award at the seat of arbitration on a date to be notified to the parties, the Tribunal received a registered letter from Professor Dr. Mohamed Hamouda, legal counsel for the Respondents. The letter reiterated the matters previously submitted and maintained by counsel on the same grounds. In particular, counsel maintained the Respondents' objection to the Claimant's request to rectify the clerical error contained in request (d) of its final prayers for relief, on the ground that the request had been submitted after the deadline fixed for filing the final memoranda. Counsel also maintained the Respondents' request for a stay of the arbitral proceedings pending the determination of the cassation appeals by a final and unappealable judgment. Those appeals challenged the judgment dismissing the application to terminate the mandates of both the President of the Arbitral Tribunal and the arbitrator appointed by the Respondents. Counsel contended that this raised a fundamental issue concerning the invalid constitution of the Arbitral Tribunal and the Tribunal's lack of fitness to adjudicate the arbitral dispute, as set out in detail in the letter and the memoranda referred to therein. The Arbitral Tribunal decided to place the communication on the record of the arbitral proceedings.

## The Arbitral Tribunal

Having reviewed the documents, heard the explanations and oral submissions, and having deliberated in accordance with the law among the members of the Arbitral Tribunal;

Whereas the arbitration proceedings have satisfied all procedural and substantive requirements, and each party has been allowed to present such arguments, defenses, requests, memoranda, and documents as it deemed appropriate until the proceedings were reserved for the issuance of the award;

Accordingly, the arbitration is ripe and ready for determination as follows:

# Part One

**The Arbitration Agreement and Terms of Reference, and the Parties' Communications Concerning Their Confidence in the Arbitral Tribunal's Application of the Principles of Justice and Equity and Their Authorization of the Tribunal in That Regard**

**First: The Arbitration Agreement**

The arbitration agreement is contained in Clause 16 of the agreement entitled "General Agency Agreement" concluded on 30 January 2001, which, together with Clause 16 of the Annex to the General Agency Agreement executed on 15 March 2001, constitutes the arbitration clause and agreement between the parties.

Clause 16 of the General Agency Agreement executed between the General Company for Iraqi Airways and Horus Tourism & Travel Company on 30 January 2001 provides as follows:

1.   In the event of any dispute concerning the interpretation or implementation of this Agreement, both parties shall exert their utmost efforts to resolve such dispute amicably through appropriate means within a period of three days only. Should no resolution be reached, the parties shall constitute an arbitral tribunal in the following manner:
    a.   The First Party shall appoint one arbitrator.
    b.   The General Agent shall appoint one arbitrator.
    c.   The arbitrators appointed by both parties shall consult with each other in appointing the President of the Arbitral Tribunal. In the event that they fail to do so, the Director of the International Air Transport Association (IATA) shall appoint the President of the Arbitral Tribunal.
2.   The Arbitral Tribunal shall determine its own procedures and the governing law.
3.   The unsuccessful party shall bear all costs and expenses arising from the arbitration proceedings.

Clause 16 of the document entitled "Annex to the General Agency Agreement", executed between the General Company for Iraqi Airways and Horus Tourism & Travel Company on 15 March 2002, further provides as follows:

> "The contracting parties shall settle all developments and disputes arising between them amicably. In the event that any matters or disputes arising between the parties cannot be resolved, such matters shall be settled through an arbitral tribunal to be agreed upon by the contracting parties."

**Second: Terms of Reference and Arbitration Procedures**

The parties agreed upon the Terms of Reference and the procedures governing the arbitration during the first procedural session of the arbitration proceedings held on 28 November 2013. The relevant provisions, as recorded in the minutes of the aforesaid session, are as follows:

"The parties declared their acceptance of all members of the Arbitral Tribunal and agreed to supplement the arbitration agreement and its procedures in the following manner, which was approved by the Arbitral Tribunal:

## 1. Language of the Arbitration

The language of the arbitration shall be Arabic.

## 2. Subject Matter of the Dispute

(a) The representative of the Claimant (Horus Tourism & Travel) stated that the dispute and the relief sought are confined to the following:

The Claimant obtained an exclusive general agency in the Arab Republic of Egypt in 2001 and fulfilled all of its obligations under the Agreement. At the time the agency was granted, Iraq was subject to an air embargo and no flight operations were being conducted, and it was unknown when such embargo would be lifted.

Notwithstanding the prolonged duration of the embargo, the Claimant continued to perform the obligations incumbent upon it. However, once the First Respondent anticipated that the air embargo would soon be lifted, it proceeded to suspend the agency, thereby necessitating negotiations aimed at reactivating the agency, at which time the embargo had already been lifted.

Subsequently, and for political reasons relating to Iraq, and after no more than three months—or less—from the reactivation of the agency, the Respondents unilaterally terminated the agency for a second time, without regard to the provisions of either the applicable law or the Agreement.

The Claimant further stated that, from that date onwards, negotiations continued between the parties through a number of Iraqi representatives and representatives of the Claimant, all of which ultimately failed to resolve the dispute between them.

Nevertheless, the Claimant continued to perform its contractual obligations on the basis that it still considered the Agency Agreement to remain valid and in force to date. Consequently, the Claimant invoked Clause 16 of the Agency Agreement by requesting the constitution of an Arbitral Tribunal, a process which itself consumed a considerable period of time until the second arbitrator was appointed approximately two years later.

Thereafter, no agreement could be reached concerning the appointment of the third arbitrator, compelling the Claimant once again to resort to the courts amidst numerous adjournments attributable to the Iraqi side for a period exceeding one year, resulting in substantial prejudice to the Claimant.

The representative of the Claimant further stated that its claims and requests would be set out in detail during the course of the arbitration proceedings.

(b) The representative of the First Respondent (General Company for Iraqi Airways) stated that the subject matter of the dispute is that, since the execution of the Agreement on 30 January 2001, the Claimant had failed to perform any of the provisions of the Agency Agreement or the Annex thereto dated 15 March 2003.

As a consequence of the Claimant's failure to perform any of its contractual obligations, the First Respondent terminated the Agreement in accordance with the law and the contractual provisions.

The Respondents further submitted that they suffered harm as a result of the non-performance of the Agency Agreement and the Claimant's failure to fulfill its obligations.

The Respondents further maintained that the adjournments that occurred during the process of appointing the arbitrator and the President of the Arbitral Tribunal before the courts constituted a

lawful exercise of their right of recourse to judicial proceedings and were necessitated by the need to obtain the requisite approvals from the competent Iraqi authorities.

The Respondents also stated that the Iraqi side had, on numerous occasions since 2006 and up to the present date, insisted upon pursuing all amicable means to resolve the alleged dispute with the Claimant.

The Respondents reserved their right to elaborate upon their response and any counterclaims after consulting the competent authorities and to submit the same during the course of the arbitration proceedings.

### 3. <u>Applicable Law</u>

The parties agreed that Egyptian Arbitration Law No. 27 of 1994 shall govern the arbitration proceedings and that Egyptian law shall apply to the determination of the merits of the dispute, evidentiary matters, and all issues relating to the arbitration.

### 4<u>. Seat of Arbitration</u>

The seat of arbitration shall be the office of Professor Dr. Hassan Abdel-Baset Gomaa, located at Apartment No. 15, Fourth Floor, 7 Al-Fadl Street, Talaat Harb, Abdeen District, Cairo.

The Arbitral Tribunal may transfer the seat or hold hearings at any other place it deems appropriate, whether within or outside the Arab Republic of Egypt.

Should either party request that one or more hearings be held at another location, the Tribunal may approve such request and issue a decision requiring the requesting party to bear all costs and expenses resulting therefrom, provided that such party pays the amounts determined by the Tribunal within the prescribed period.

### 5. <u>Addresses for Communications and Method of Service</u>

The parties agreed that any correspondence, notices, or communications from or to the Arbitral Tribunal, between the parties and the Tribunal, or between the parties themselves concerning the present arbitration proceedings, shall be effected by governmental or private courier services, without prejudice to the possibility of supplementing such communications by electronic mail at the following addresses:

Claimant (Horus Tourism & Travel Company):

Al-Shaheed Mohamed Gamal Barai Street, Ard El Golf, Cairo.

Fax: 020222602400 / 0224149170 / 0201001880055
Landline: 0224142178
Mobile: 01223686945
Email: salaheldin.aladalacenter@gmail.com

<u>Respondent (General Company for Iraqi Airways):</u>

The principal office at the time of contracting was Saddam International Airport, Baghdad, Iraq, which subsequently became Baghdad International Airport, Baghdad, Iraq.

The Respondent further insisted that communications be directed to its principal office in Cairo, located at 22 Qasr El Nil Street, Abdeen District, Cairo, in order to ensure prompt receipt of communications, with such communications being deemed legally served upon the First Respondent in Iraq.

Fax: 0020223934200
Landline: 020223934149
Mobile: 01114335800

Emails: Ahmed_derani@yahoo.com
iraqiairways.cairo@hotmail.com

Address of the Arbitral Tribunal:

Office of the President of the Arbitral Tribunal, 7 Al-Fadl Street, Talaat Harb, Apartment No. 15, Fourth Floor, Abdeen, Cairo, Egypt.

Email: hgemei@hotmail.com
Landline: 0020223951777
Mobile: 00201001649560

## 6. Duration of the Arbitration

The parties agreed that the duration of the arbitration shall be twelve months in accordance with the law, commencing from the date of the present session, namely 28 November 2013, without prejudice to the Tribunal's authority to extend the duration of the arbitration in accordance with the law.

## 7. Deposits and Costs of Arbitration

The Arbitral Tribunal provisionally fixed the arbitration costs in the amount of USD 50,000, to be borne equally by the parties and paid within seven days from the date of the present session.

Payment shall be made into the account of Professor Dr. Hassan Abdel-Baset Mohamed.

In the event that either party fails to pay its share of such costs and fees, the other party shall be granted an additional seven days to make payment on its behalf should it so wish.

In the event of non-payment within the prescribed periods, the Tribunal may take such measures as it deems appropriate, including suspending the arbitration proceedings pending payment.

The Tribunal further decided to defer determination of the arbitrators' fees to a subsequent session, at which a decision would be rendered in light of the claims submitted in the arbitration.

## 8. Secretary to the Proceedings

The parties acknowledged the appointment of Mr. Fathi Mohamed Abdel-Malek as Secretary to the arbitration proceedings.

The Tribunal shall have the authority to appoint such persons as it deems appropriate to act as secretary to the proceedings and to determine their remuneration.

## 9. Procedural Timetable for the Submission of the Statement of Claim and the Respondents' Response

The Claimant shall submit a statement setting out its arbitration claims, including its requests, legal and factual grounds, and any documents it wishes to rely upon, no later than Saturday, 28 December 2013.

The First Respondent shall be granted a period within which to submit its response and comments on the Claimant's Statement of Claim and supporting documents, and to submit any counterclaim should it wish to do so, no later than Monday, 27 January 2014.

The memoranda and supporting documents shall be filed in seven copies at the seat of the Arbitral Tribunal, namely the office of Professor Dr. Hassan Abdel-Baset Gomaa, located at Apartment No. 15, Fourth Floor, 7 Al-Fadl Street, Talaat Harb, Abdeen District, Cairo, between 7:00 p.m. and 10:00 p.m. on all days of the week except Thursdays and Fridays.

**Third: The Parties' Communications Concerning Their Confidence in the Arbitral Tribunal's Application of Principles of Justice and Equity and Their Authorization in That Regard**

On 24 June 2023, the Arbitral Tribunal received an email communication from counsel for the First Respondent in which the First Respondent expressed its strong confidence that the Arbitral Tribunal would not apply double standards and would remain fully committed to applying principles of justice and equity in the arbitration proceedings. The First Respondent further confirmed its understanding that the Tribunal was treating both parties with complete impartiality.

The relevant portion of that communication reads as follows:

> "...We wish to confirm to Your Excellencies that we have the utmost confidence that the esteemed Arbitral Tribunal does not apply double standards and is fully committed to applying principles of justice and equity in these proceedings. We also fully appreciate that your esteemed Tribunal deals with both parties with complete impartiality..."

The President of the Arbitral Tribunal subsequently circulated this communication to the members of the Tribunal and to the Claimant.

On 10 July 2023, the Arbitral Tribunal received an email communication from counsel for the Claimant responding to the First Respondent's communication dated 24 June 2023 concerning its confidence in the Arbitral Tribunal and its belief that the Tribunal would determine the dispute on the basis of justice and equity.

In that communication, the Claimant likewise affirmed its confidence in the Arbitral Tribunal and in its complete impartiality and further stated that it also accepted empowering the Tribunal to determine the dispute on the basis of justice and equity, maintaining that, by virtue of such acceptance, the parties had thereby reached agreement on this matter.

The relevant portion of the Claimant's communication reads as follows:

> "...As regards the confidence expressed by the Respondents in the Arbitral Tribunal, their confidence in its complete impartiality and non-application of double standards, and the authorization contained in that communication empowering the Tribunal to determine the dispute on the basis of justice and equity, the Claimant likewise confirms its complete confidence in the Arbitral Tribunal and in its full impartiality and also accepts empowering the Tribunal to determine the dispute on the basis of justice and equity. Accordingly, such authorization empowering the Tribunal to decide the dispute ex aequo et bono has been agreed upon and accepted by the parties to the arbitration..."

The President of the Arbitral Tribunal subsequently circulated this communication, whereby the Claimant accepted authorizing the Tribunal to decide the dispute on the basis of justice and equity, to the members of the Tribunal and to the Respondents.

## Part Two: Applicable Law Governing the Dispute

### First: Applicable Law

In rendering its Award and as a preliminary matter prior to determining the dispute between the parties, the Arbitral Tribunal notes that, at the first procedural session held on 28 November 2013, the parties expressly agreed that Egyptian Arbitration Law No. 27 of 1994 would govern the arbitration proceedings and that all Egyptian laws would apply to the determination of the merits of the dispute, the rules and procedures of evidence, and all matters relating to the present arbitration.

Accordingly, pursuant to Articles 25 and 39(1) of Egyptian Arbitration Law No. 27 of 1994, and in implementation of the parties' agreement and the principle of party autonomy, the Arbitral

Tribunal shall apply, with respect to the arbitration proceedings, the provisions agreed upon by the parties in the minutes of the first procedural session held on 28 November 2013, together with the provisions of Egyptian Arbitration Law No. 27 of 1994 concerning Arbitration in Civil and Commercial Matters.

Furthermore, all matters relating to the merits of the dispute and the rules and procedures governing evidence shall be subject to the relevant Egyptian laws applicable to the subject matter of the dispute.

Accordingly, Egyptian law alone, to the exclusion of any other law, shall govern all disputes and issues arising in connection with the present arbitration.

## Second: The Parties' Confidence in the Tribunal's Application of Principles of Justice and Equity and Their Authorization in That Regard

On 24 June 2023, the Arbitral Tribunal received an email communication from counsel for the First Respondent in which the First Respondent expressed its strong confidence that the Arbitral Tribunal would not apply double standards and would remain fully committed to applying principles of justice and equity in the arbitration proceedings. The First Respondent further confirmed its understanding that the Tribunal was treating both parties with complete impartiality.

The relevant portion of that communication stated as follows:

> "...We wish to confirm to Your Excellencies our strong confidence that the esteemed Arbitral Tribunal does not apply double standards and is fully committed to applying principles of justice and equity in these proceedings, and we are fully aware that your esteemed Tribunal deals with both parties with complete impartiality..."

The President of the Arbitral Tribunal subsequently circulated this communication from the First Respondent to the members of the Tribunal and to the Claimant.

On 10 July 2023, the Arbitral Tribunal received an email communication from counsel for the Claimant in response to the First Respondent's communication dated 24 June 2023 concerning its confidence in the Arbitral Tribunal and its belief that the Tribunal would determine the dispute on the basis of justice and equity.

In that communication, the Claimant likewise affirmed its complete confidence in the Arbitral Tribunal and in its full impartiality and further stated that it also accepted empowering the Tribunal to decide the dispute on the basis of justice and equity, maintaining that, by virtue of such acceptance, agreement had thereby been reached between the parties to the arbitration.

The relevant portion of the Claimant's communication stated as follows:

> "...As regards the confidence expressed by the Respondents in the Arbitral Tribunal, its complete impartiality and non-application of double standards, and the authorization contained in that communication empowering the Tribunal to determine the dispute on the basis of justice and equity, the Claimant likewise confirms its complete confidence in the Arbitral Tribunal and in its full impartiality and also accepts empowering the Tribunal to determine the dispute on the basis of justice and equity. Accordingly, such authorization empowering the Tribunal to decide ex aequo et bono has been agreed upon and accepted by the parties to the arbitration."

The President of the Arbitral Tribunal subsequently circulated this communication, including the Claimant's acceptance of authorizing the Tribunal to determine the dispute on the basis of justice and equity and its statement that:

> "...such authorization empowering the Tribunal to decide ex aequo et bono has been agreed upon and accepted by the parties to the arbitration..."

to the members of the Tribunal and to the Respondents.

## Part Three: The Respondents' Defenses

Whereas the defenses and pleas raised by the Respondents in their written submissions, most recently in their final memorandum filed on 20 June 2023, include numerous jurisdictional, procedural, and substantive objections, the Arbitral Tribunal shall address those objections as follows:

In Chapter One, the Tribunal shall address the pleas concerning the non-existence and invalidity of the arbitration agreement and the consequential plea that the Arbitral Tribunal lacks jurisdiction.

In Chapter Two, the Tribunal shall address the pleas concerning the constitution of the Arbitral Tribunal and the Respondents' request for a stay of the arbitral proceedings pending the determination of the appeals before the Court of Cassation.

In Chapter Three, the Tribunal shall address the plea that the claim is inadmissible as against the Second Respondent, the Iraqi Minister of Transport in his official capacity, on the grounds that: (1) the proceedings were brought against a person enjoying diplomatic immunity from judicial proceedings; and (2) the proceedings were brought against a person lacking standing.

In Chapter Four, the Tribunal shall address the objection denying the evidentiary value of the photocopies, the request to exclude documents drawn up in foreign languages that were not accompanied by translations, and the allegation of forgery.

In Chapter Five, the Tribunal shall address the plea that the Claimant forfeited its right to resort to arbitration. This plea is based on the contention that Clause 16 of the Agency Agreement prescribed a three-day period for amicable settlement, whereas the amicable-settlement process continued for more than six years, thereby constituting an implied waiver by the Claimant of its right to resort to arbitration for the resolution of the dispute.

In Chapter Six, the Tribunal shall address the plea that the time limit for the arbitration has expired.

In Chapter Seven, the Tribunal shall address the plea that the Claimant's right to resort to arbitration was extinguished because more than two years had elapsed since the termination of the contractual relationship.

In Chapter Eight, the Tribunal shall address the pleas concerning the non-existence and invalidity of the Agency Agreement and its Annex dated 15 March 2001, and the contention that the minutes of the meeting held on 29 August 2005 do not constitute a contract, as set out in detail below:


Chapter One: The Respondents' Plea That the Arbitration Clause Is Non-Existent and Invalid on the Grounds That the Agency Agreement and Its Annex Are Non-Existent and Were Concluded on the Basis of Consent Vitiated by Fraud and Mistake; Their Plea That the Minutes of the Meeting Held on 28 September 2005 [sic] Do Not Constitute a Contract; and Their Consequential Plea That the Arbitral Tribunal Lacks Jurisdiction

The Respondents based their plea concerning the invalidity of the Agency Agreement and its Annex on the contention that the consent of the First Respondent was vitiated by mistake and fraud. They raised this plea in their memorandum filed on 27 January 2014 by their counsel, Mr Ahmed El-Derini, in response to the Statement of Claim in the arbitration.

The Respondents maintained that a commercial agency agreement is a contract concluded intuitu personae—that is, in reliance on the identity and personal qualities of the contracting party—and that such personal considerations are of paramount importance. A principal would not agree to appoint an agent without taking the identity and personal qualities of that agent into consideration.

Accordingly, where the principal is mistaken as to the identity of the agent, the agency agreement is voidable on the ground of mistake. Consent to an agency agreement is likewise vitiated where it is affected by mistake, fraud, duress or exploitation.

The Respondents further submitted that, upon examination of the Agency Agreement dated 30 January 2001, which is the subject matter of these proceedings, it is apparent that the Agreement was concluded between:

> "Iraqi Airways Company, established and licensed in accordance with Iraqi law, with its headquarters at Saddam Hussein Airport, Baghdad, Iraq (the First Party); and Horus Tourism & Travel Company, with its headquarters at Martyr Mohamed Gamal Bar'i Street, Ard El Golf, Heliopolis, established and licensed in accordance with Egyptian law (the Second Party)."

They contended that a further reading of the description of the Second Party makes clear that the Second Party was Horus Tourism & Travel Company and that it was established and licensed in accordance with Egyptian law. They emphasized that the particulars relating to the Second Party should be read again in order to ascertain the principal purpose underlying the decision to contract with that company. According to the Respondents, that purpose is apparent from the description of the parties contained in the Agreement, which indicates that the Second Party was selected for the following reasons:

1. Its commercial purpose was tourism and travel;
2. It was duly established and licensed; and
3. It was licensed in accordance with Egyptian law.

The Respondents added that the purpose of concluding the Agreement was to appoint, as general agent, an Egyptian company duly licensed under Egyptian law to operate in the field of tourism and travel. However, they maintained that a review of the Claimant's commercial register revealed the following facts:

(a) Horus Tourism Company commenced its activities on 14 March 2001, more than two months after the Agency Agreement had been executed on 30 January 2001. Accordingly, the Respondents contended that the Agreement had been concluded with a fictitious company that had no legal existence at the time of contracting and had not yet been formed or incorporated.

(b) At the time the Agreement was signed, Mr Emad El-Sayed El-Gelda was not the Chairman of the Board of the aforementioned company, which did not then exist. Following the company's incorporation, he held the position of Manager-in-Charge. Accordingly, the Respondents contended that the Agency Agreement had been signed by a person who did not have the requisite legal capacity or authority at the time of contracting.

(c) At the time the Agency Agreement, which was subsequently terminated, was concluded, the Second Party thereto was not licensed by the Egyptian Ministry of Tourism. Its tourism license was not issued until 24 May 2002, one year and two months later. Moreover, that license was granted to "Horus Tourism Company," whereas the Agreement had been concluded with "Horus Tourism & Travel Company."

Accordingly, the Respondents contended that the Agency Agreement had been concluded on the basis of consent vitiated by fraud and deceit and was therefore absolutely null and void, invoking the principle that anything founded upon an invalid act is itself invalid.

In a subsequent memorandum filed on 10 June 2014 in response to the Statement of Claim and submitted by their then counsel, Dr Mahmoud Samir El-Sharkawy, the Respondents raised, at page

7 under the heading "Second," a further plea concerning the invalidity of the Agency Agreement and the arbitration agreement. They stated:

"The arbitration agreement contained in the non-existent Agency Agreement dated 30 January 2001 is itself non-existent or absolutely null and void."

They further stated:

"Whereas the arbitration clause contained in Clause 16 of the non-existent Agency Agreement dated 30 January 2001 was concluded on the same date as the non-existent Agency Agreement, at a time when the Claimant did not then exist, that clause is absolutely null and void—that is, legally non-existent—and produces no legal effect. The First Respondent is entitled to invoke its invalidity. Indeed, the Arbitral Tribunal must declare it absolutely null and void of its own motion, and it may not be subsequently validated."

The Respondents also stated in that memorandum:

"Since the arbitration clause contained in Clause 16 of the non-existent Agreement dated 30 January 2001 is itself non-existent, the implicit reference to it in Clause 12 of the minutes of the meeting held on 29 August 2005 constitutes a reference to a legal nullity and produces no effect."

The Respondents based their plea concerning the non-existence of the contractual relationship on the proposition that a contract presupposes the existence of two expressions of will, which in turn presupposes the prior existence of two persons from whom those expressions of will emanate. If either person did not exist, the conclusion of the contract would be impossible.

They further submitted that the Claimant's commercial register established that it was registered with the Cairo Investment Commercial Registry Office under No. 6656 on 14 March 2001. They also relied on the penultimate paragraph of Article 17 of Law No. 159 of 1981 on Joint Stock Companies, Partnerships Limited by Shares and Limited Liability Companies, which provides that a company does not acquire legal personality until fifteen days have elapsed from the date of its registration in the Commercial Register.

Accordingly, the Respondents contended that the Claimant did not come into existence as a juristic person until 29 March 2001 and had no legal existence before that date. They therefore maintained that the Agreement concluded on 30 January 2001, together with all subsequent agreements and minutes of meetings, was invalid, and that the arbitration agreement contained in the Agency Agreement was likewise non-existent or absolutely null and void. They contended that the same conclusion applied to the Annex dated 15 March 2001 and to the minutes of the meeting held on 29 August 2005, the latter not constituting a contract.

The Respondents also elaborated on their plea that the minutes of the meeting held on 29 August 2005 did not, when properly characterized, constitute a contract. Rather, they constituted minutes of a meeting held between the parties recording the matters that had been the subject of negotiations between them. Furthermore, the minutes contained no provision for arbitration as a means of resolving disputes between the parties and therefore could not serve as a basis for commencing the present arbitral proceedings.

On the foregoing basis, and as a consequence thereof, the Respondents also raised a plea that the Arbitral Tribunal lacked jurisdiction to determine the arbitral proceedings.

<u>In addressing the foregoing pleas in accordance with the proper application of the law, the Arbitral Tribunal begins by noting that Article 22(1) of Law No. 27 of 1994 on Arbitration in Civil and Commercial Matters confers upon it the authority to determine those pleas.</u> Article 22(1) provides:

"The Arbitral Tribunal shall rule on pleas concerning its lack of jurisdiction, including pleas based on the non-existence, expiry or invalidity of the arbitration agreement, or on its failure to encompass the subject matter of the dispute."

The foregoing provision establishes that Egyptian Arbitration Law No. 27 of 1994 on Arbitration in Civil and Commercial Matters, which is applicable to the dispute, adopts the principle of competence-competence. It thereby empowers the Arbitral Tribunal to rule on its own jurisdiction, including, by way of example, pleas based on the non-existence, expiry or invalidity of the arbitration agreement, or on its failure to encompass the subject matter of the dispute.

Accordingly, the Arbitral Tribunal also has jurisdiction to determine the validity of the underlying contract containing the arbitration clause, since the provision is drafted in general terms encompassing all pleas relating to the jurisdiction of the Arbitral Tribunal, including a plea challenging the validity of the underlying contract concluded between the parties.

(Dr Ahmed El-Sawy, Concise Treatise on Arbitration, 3rd ed., 2010, p. 124.)

Having thus established its jurisdiction to determine the two pleas raised by the Respondents—namely, the plea concerning the non-existence of the arbitration agreement and the plea that the Arbitral Tribunal lacks jurisdiction to determine the arbitral proceedings—the Tribunal notes at the outset that those pleas were raised and maintained after the expiry of the time limit prescribed by law, pursuant to Articles 8, 22(2) and 30(2) of Egyptian Arbitration Law No. 27 of 1994.

Article 8 of the Arbitration Law provides:

"If either party to the dispute continues with the arbitral proceedings despite knowing that a requirement of the arbitration agreement, or a provision of this Law from which the parties may derogate, has not been complied with, and fails to object to such non-compliance within the agreed time limit or, in the absence of such agreement, within a reasonable time, that party shall be deemed to have waived its right to object."

Article 22(2) of Egyptian Arbitration Law No. 27 of 1994 further provides:

"Such pleas must be raised no later than the submission of the respondent's statement of defense referred to in Article 30(2) of this Law."

The record establishes that the agreed deadline for the Respondents to submit their response to the Statement of Claim, as determined by the Arbitral Tribunal and accepted by the parties in the minutes of the first procedural hearing held on 28 November 2013, was Monday, 27 January 2014.

The Respondents did not raise either of those pleas in their memorandum filed on 27 January 2014 in response to the Statement of Claim. They raised them only several months later, specifically on 10 June 2014, in memoranda submitted by their legal counsel, Professor Dr Samir El-Sharkawy and Professor Dr Fathi Wali.

Accordingly, the Respondents forfeited their right to raise the two pleas concerning the invalidity of the arbitration agreement and the Arbitral Tribunal's lack of jurisdiction to determine the dispute, because those pleas were raised after the expiry of the time limit prescribed by law. The two pleas are therefore procedurally inadmissible, and the Arbitral Tribunal so rules, without the need to include that ruling in the operative part of the Award.

Furthermore, on the merits, insofar as the two pleas challenge the General Agency Agreement and its Annex as invalid and contend that the agreement dated 29 August 2005 does not constitute a contract, the Tribunal responds to those pleas as follows:

First, Article 23 of the Egyptian Arbitration Law provides:

"The arbitration clause shall be treated as an agreement independent of the other terms of the contract. The invalidity, rescission or termination of the contract shall have no effect on the arbitration clause contained therein, provided that the clause is valid in itself."

Article 23 thus expressly recognizes the separability of the arbitration clause from the underlying contract.

In applying that provision, the Egyptian Court of Cassation held:

"One of the fundamental rules constituting a cornerstone of arbitration is the separability of an arbitration clause forming part of a contract from the other terms of that contract, such that the clause is unaffected by any rescission, invalidity or termination affecting the contract. Accordingly, the rescission, invalidity or termination of the underlying contract does not prevent the arbitration clause from producing its effects, provided that the clause is valid in itself. It follows that an arbitration agreement, whether contained in a separate submission agreement or in a clause of the underlying contract, enjoys legal independence and remains insulated from any defect affecting the underlying agreement that results in its rescission or invalidity."

(Cassation Appeal No. 824 of Judicial Year 71, judgment of 24 May 2007.)

Secondly, the Arbitral Tribunal has established that the Respondents did not confine themselves to the arbitration clauses contained in Clause 16 of the Agency Agreement concluded on 30 January 2001 and Clause 16 of the Annex to the Agency Agreement concluded on 15 March 2001. Rather, the Respondents and the Claimant entered into, as permitted under Article 10 of the Egyptian Arbitration Law, an arbitration submission agreement (Terms of Reference), which was agreed upon by the parties to the dispute at the first procedural hearing held on 28 November 2013.

In that agreement, the parties identified the matters falling within the scope of the arbitration and specified the law applicable to the arbitral proceedings, the merits of the dispute, evidentiary matters, and the other provisions contained in the aforementioned submission agreement.

Whereas the arbitration submission agreement was concluded subsequent to the arbitration clauses previously agreed upon by the parties in the Agency Agreement and its Annex, in respect of which the Respondents raised pleas concerning the non-existence of the arbitration agreement and the Arbitral Tribunal's lack of jurisdiction, as well as a plea concerning the non-existence and invalidity of the Agency Agreement and its Annex.

Whereas, when the Respondents agreed to the arbitration submission agreement at the arbitral hearing held on 28 November 2013, they did not raise any plea concerning the non-existence or invalidity of the arbitration clause contained in the Agency Agreement that is the subject of the dispute or in its Annex concluded on 15 March 2001, nor did they raise any plea that the Arbitral Tribunal lacked jurisdiction. Rather, they affirmed their intention to resort to arbitration in accordance with the arbitration submission agreement concluded between them and the Claimant.

The Respondents also recorded in the minutes of the first procedural hearing held on 28 November 2013 their acceptance of all members of the Arbitral Tribunal. This establishes that the Respondents lack a legal interest in raising their plea concerning the non-existence of the arbitration agreement and their consequential plea that the Arbitral Tribunal lacks jurisdiction, and that those pleas are, in any event, futile and without legal effect.

Thirdly, the two pleas concerning the non-existence of the arbitration clause and, consequently, the Arbitral Tribunal's lack of jurisdiction over the arbitral dispute have no sound basis in fact or law.

The crux of the dispute in relation to those two pleas concerns the alleged non-existence or invalidity of the Agency Agreement that is the subject of the dispute, its Annex dated 15 March 2001, and the minutes of the meeting dated 29 August 2005, and the effect thereof on the parties' obligations arising under the Agreement and on the arbitration clause contained therein.

In seeking to reach the correct determination of the two aforementioned pleas, and upon examining the grounds, legal bases, and reasoning on which the Respondents founded those pleas, the Arbitral Tribunal finds that the issue raised by them is confined to the legal effect of the conclusion of the agreement that is the subject of the dispute—the General Agency Agreement—before the Claimant acquired legal personality.

More specifically, the issue is whether the Agreement is rendered non-existent or invalid because the Claimant did not possess legal personality at the time when the Agreement and the arbitration clause contained therein were concluded, and whether any such non-existence or invalidity affecting the underlying agreement, assuming arguendo that it occurred, extends to the arbitration clause contained therein, such that the arbitration clause would stand or fall with the Agreement and would itself likewise be non-existent or invalid.

The final paragraph of Article 17 of the aforementioned Law No. 159 of 1981 provides that joint-stock companies do not acquire legal personality until fifteen days have elapsed from the date of their registration in the Commercial Register.

It is also established from the documents on record that the Claimant was registered in the Commercial Register under No. 6656 on 14 March 2001 and acquired legal personality on 29 March 2001. From that date, the Claimant acquired legal personality in accordance with the law, together with the legal consequences arising therefrom.

Accordingly, the two pleas concern the determination of the legal effect of the legal and contractual acts entered into by a joint-stock company before it acquires legal personality, the legal consequence applicable to such acts, and whether or not those acts are to be regarded as non-existent or invalid.

In this regard, the Arbitral Tribunal notes that, although the Egyptian Companies Law No. 159 of 1981, which is applicable to the dispute, provides in the final paragraph of Article 17 that joint-stock companies do not acquire legal personality until fifteen days have elapsed from the date of their registration in the Commercial Register, its provisions contain no rules governing the legal and contractual acts entered into with third parties during the period between the company's formation and its acquisition of legal personality, or determining whether or not such acts are non-existent or invalid.

By contrast, the Egyptian Court of Cassation has consistently held that:

> "The requirement that a company be registered in the Commercial Register, on the basis that it carries on commercial business in Egypt, pursuant to Article 3(4) of Law No. 34 of 1976 concerning the Commercial Register, has no bearing on its capacity to contract and assume obligations. Nor does the failure to register in the said Register result in the foreign company lacking legal capacity, although it does require the imposition of the sanction prescribed in Article 19 of the aforementioned Law."

> (Court of Cassation, Appeal No. 12790 of Judicial Year 75, hearing of 22 March 2011, Technical Office, Year 62, Principle No. 65, p. 392.)

<u>In response to the plea raised by the Respondents, within the legally prescribed time limit, in their memorandum in reply to the Statement of Claim</u>, that the agreement concluded with the Claimant was invalid on the ground of mistake or because their consent had been vitiated by fraud allegedly practiced by the Claimant, Article 120 of the Egyptian Civil Code, which is applicable to the present dispute, provides that:

> "If a contracting party makes a fundamental mistake, he may seek annulment of the contract if the other party made the same mistake, knew of it, or could easily have recognized it."

Article 121 of the same Code further provides that:

1.   "A mistake is fundamental if it is so grave that the party would not have entered into the contract had he not been mistaken.

2.   A mistake is especially considered fundamental if:

    a.   It relates to a quality of the subject matter considered essential by the parties, or which ought to be considered essential given the circumstances of the contract and the requirements of good faith.

    b.   It concerns the person of the contracting party or one of his attributes when that person or attribute was the main reason for contracting."

Article 124 further provides that:

1.   "A party who made a mistake may not rely on it in a manner contrary to good faith.

2.   In particular, he remains bound by the contract he intended to conclude if the other party expresses readiness to perform it."

Article 125 further provides that:

1.   "A contract may be annulled for fraud if the deceit practiced by one of the contracting parties or his representative was such that the other party would not have entered into the contract but for it.

2.   Fraud also includes deliberate concealment of a fact or circumstance if it is proven that the deceived party would not have contracted had he known of it."

Article 140 further provides that:

1.   "The right to annul the contract shall lapse if not invoked within three years.

2.   This period shall commence, in the case of incapacity, from the day on which the cause of incapacity ceases; in the case of mistake or fraud, from the day of its discovery; and in the case of duress, from the day it ends. In all cases, no right to annul for mistake, fraud, or duress may be exercised if fifteen years have passed since the contract was concluded."

The foregoing provisions of the Egyptian Civil Code, which is applicable to the present dispute, demonstrate that the Egyptian legislature has regulated the circumstances in which a contract may be annulled by reason of defects affecting consent and inducing a party to enter into the contract, namely mistake, fraud, and duress, and has made the existence of any such defect a ground for seeking annulment of the contract.

The Egyptian legislature did not, however, make any of those defects a ground for the absolute nullity of the contract. Rather, where the existence of such a defect and the satisfaction of the conditions prescribed by law are established, the party whose consent was vitiated is entitled to seek annulment of the contract.

Moreover, with a view to maintaining the stability of legal relations and avoiding disruption to contractual relationships, the legislature prescribed a period of three years within which the right to seek annulment must be invoked. That period commences on the date on which the mistake or fraud is discovered or the duress ceases. If the party whose consent was vitiated does not invoke any such defect within that period, whether by way of claim or plea, its right to seek annulment of the contract shall lapse.

As established in the case law of the Egyptian Court of Cassation:

    "...The right to seek annulment of a contract is extinguished by ratification, whether express or implied. Ratification by the person entitled to give it is valid even if it is not accompanied by acceptance, and it definitively confirms the existence of the contract after the contract had been liable to extinction. Ratification may be inferred from any act that conveys its meaning and

clearly indicates it, provided that the act is performed by the person entitled to ratify an existing contract, with knowledge of the defects affecting that contract and with the intention of overlooking them. Consequently, an action brought by that person seeking annulment of the contract would lack legal foundation and be inconsistent with its purpose." (Appeal No. 4 of Judicial Year 15, session of 3 December 1994).

The Court has also held that:

"Ratification of a contract may be express or implied. Accordingly, a trial court cannot be faulted where, within the scope of its fact-finding authority, it reasonably infers such ratification from the facts and documents of the case." (Cassation Appeal No. 449 of Judicial Year 26, session of 3 May 1962, p. 595).

The Respondents confined their plea to alleging that the arbitration agreement was invalid as a consequence of the alleged invalidity of the Agency Agreement that is the subject of the dispute, on the ground that their consent had been vitiated by mistake as to the identity of the Claimant and by the fraud that they alleged the Claimant had practiced upon them in that regard.

It is, however, established from the documents on record and the circumstances surrounding the contractual relationship—and without any need to examine in depth whether the aforementioned circumstances relating to mistake or fraud were present—that the Respondents did not invoke that plea or seek annulment of the arbitration agreement, the Agency Agreement, any of its Annexes , or the agreement dated 29 August 2005 reactivating the agency at any stage preceding the present arbitral proceedings.

The Respondents neither pleaded the invalidity of the Agreement nor sought its annulment, despite the fact that the circumstances relating to the legal personality of the Claimant were readily ascertainable at the time of contracting. Instead, the Respondents continued to rely upon the contractual relationship and subsequently maintained that the First Respondent had terminated it. The First Respondent thereafter continued to pursue amicable solutions to resolve the dispute concerning the consequences that it claimed arose from its decision to terminate the Agreement.

It is also established from the Arbitral Tribunal's review of the case file, the circumstances surrounding the conclusion of the Agreement, and the events that followed it up to the date of the Request for Arbitration that the First Respondent necessarily knew that the Claimant was still in the process of incorporation and that it had been incorporated specifically to act as the First Respondent's agent and to perform the Agency Agreement.

The Respondents agreed to conclude the Agency Agreement with the Claimant before the procedures for registering the latter in the Commercial Register had been completed.

This is further established and confirmed by the Respondents' failure to invoke that allegation at any stage preceding the commencement of the arbitral proceedings, despite the passage of many years, far exceeding the three-year period prescribed by law for exercising the right to seek annulment of a contract where the consent of one of the parties was vitiated by a defect of consent, including mistake or fraud.

It is also established from the documents on record, in the same context, that on 29 August 2005, approximately four years after the Claimant had acquired legal personality, the First Respondent entered into another agreement with the Claimant. Pursuant to that agreement, it reversed its previous decision of 2 December 2004 terminating the agency and reactivated the Agency Agreement, thereby confirming its existence and validity.

The Respondents confirmed the same on page 12 of the memorandum submitted on 10 June 2014 by their then legal representative, Professor Dr. Samir El-Sharkawy. They also confirmed it by confining their challenge to the agreement dated 29 August 2005 to the plea that it was not a contract but merely minutes of a meeting.

On 14 November 2005, the Respondents issued a further decision terminating the agency. Two days later, on 16 November 2005, they reversed that decision and issued another decision suspending the operation of the Agency Agreement.

This confirms their continued reliance upon the existence and validity of the Agency Agreement, its Annex, and the agreement dated 29 August 2005, since neither termination nor suspension can apply except to an existing and valid contract.

It is also established that, from the outset of the dispute and throughout the arbitral proceedings, the Respondents continued to rely upon the provisions of the Agency Agreement, maintained that they had performed their contractual obligations, and asserted that it was the Claimant that had breached those obligations, thereby leading them to issue their decision terminating the agency.

Furthermore, in presenting their defense, the Respondents relied upon and set out the terms and provisions of the Agreement, asserted their entitlement to terminate and rescind the contractual relationship, and continued to raise the plea that the Claimant's right to commence the arbitral proceedings had lapsed on the ground that more than two years had passed since the termination of the contractual relationship.

This establishes that the Respondents themselves confirmed the existence and validity of the Agency Agreement and, accordingly, defeats their allegation that the Agency Agreement was non-existent or invalid.

The Arbitral Tribunal therefore concludes that the plea concerning the non-existence and invalidity of the Agency Agreement, based on the Claimant's lack of legal personality at the time of contracting and on the allegation that the Respondents' consent had been vitiated by mistake and fraud concerning the identity of the Claimant with which they contracted, must be rejected.

Consequently, the Arbitral Tribunal also rejects the plea concerning the non-existence and invalidity of the arbitration agreement and the consequential plea that the Arbitral Tribunal lacks jurisdiction, without the need to state a ruling to that effect in the operative part of the Award.

As regards the Respondents' plea and defense concerning the minutes of the meeting dated 29 August 2005, and their contention that, properly characterized, that document does not constitute a contract but is merely a record of the meeting held between the parties to document the matters negotiated between them, and that it contains no provision for arbitration as a means of resolving disputes between the parties and therefore cannot serve as a basis for the present arbitral proceedings:

The Arbitral Tribunal, in exercise of its authority to determine the proper legal characterization of contracts, agreements, and instruments, is not bound by the characterization advanced by the parties in the proceedings. Rather, such characterization must be determined in light of the true intent and substance underlying those contracts, agreements, and instruments, and not merely by the terminology in which they are framed, while taking into account the factual grounds advanced by the parties in support of their proposed characterization.

It is established from the agreement dated 29 August 2005, entitled "Minutes of Meeting," that, according to the preamble to the document, it was concluded:

> "For the purpose of reactivating the Baghdad–Cairo–Baghdad air route for the carriage of passengers and cargo and operating regular flights using aircraft belonging to the General Company for Iraqi Airways, and further to the negotiations held on 26 and 27 August 2005, and in the presence of the undersigned, the following was agreed:

1. The Agency Agreement concluded between the General Company for Iraqi Airways and the General Agent, Horus Tourism & Travel Company, dated 30 January 2001, together with its Annex dated 15 March 2001, shall be reactivated.
2. Paragraph (a) of Clause 20 of the Annex, concerning the bank guarantee, shall be amended to provide as follows:

'The amount of the bank guarantee shall be increased by USD 100,000 (one hundred thousand United States dollars), bringing the total amount of the guarantee to USD 200,000 (two hundred thousand United States dollars), to be provided upon the commencement of operations, receipt of the First Party's travel documents, and commencement of commercial activities.'

3. Paragraph (b) of Clause 20 of the same Annex shall be deleted.
4. The General Agent shall follow up on obtaining the requisite official approvals for the operation of the Baghdad–Cairo–Baghdad route. For that purpose, the commercial representatives within the delegation shall provide the technical documentation, including the aircraft certificates, insurance documents, and registration documents, together with the operating schedules, to the Egyptian civil aviation authorities for review and for the purpose of obtaining the necessary operating approvals.
5. The General Agent shall temporarily pay the amounts due in respect of ground-handling services, fuel, take-off and landing charges, taxes and fees, and aircraft catering at Cairo Airport. Iraqi Airways shall reimburse such amounts after Horus Tourism & Travel Company submits duly supported statements of account to Iraqi Airways. The amounts shall be reconciled between the parties and settled monthly.
6. The General Agent shall exercise the necessary diligence to obtain entry visas for Iraqi passengers travelling from Baghdad to Cairo. The fee for obtaining each visa shall be USD 30 (thirty United States dollars) per passport, provided that a copy of the passport is submitted no fewer than ten days before departure. Employees of Iraqi Airways and their families shall be exempt from the visa fee.
7. The General Agent shall conduct comprehensive advertising campaigns within the Arab Republic of Egypt to promote the operation of Iraqi Airways flights.
8. Upon the commencement of operations, the General Agent shall issue a bank guarantee on behalf of Iraqi Airways to secure the fuel, ground-handling, and aircraft-catering contracts, pending the subsequent issuance of such guarantee by Iraqi Airways and the release and return of the General Agent's guarantee.
9. The General Agent's commission shall be amended to 7% in respect of passenger services, plus an additional 3%, and to 5% in respect of cargo services, plus an additional 2%. The 7% passenger commission shall be reviewed once profits are generated from the operations.
10. The term of the General Agency Agreement shall be three years commencing on the date on which actual operations begin. It shall automatically renew for further periods of the same duration unless either party notifies the other, by registered letter with acknowledgment of receipt, of its intention not to renew at least sixty days before the expiry of the renewed term. Neither party may seek termination or non-renewal unless the other party has committed a material breach.
11. The finishing works for the office of the General Company for Iraqi Airways in Cairo shall be completed, including the following:

(a) completion of the external finishing works for the office;

(b) equipping the Company's rooms with computers and computing equipment;

(c) replacement of the air-conditioning units; and

(d) installation of a large world map behind the counter, with the name 'Iraqi Airways' displayed beneath the map in green marble.

12. Horus Tourism & Travel Company shall continue to act as General Agent under the General Agency Agreement granted to it and dated 30 January 2001. The Annex to the Agency Agreement dated 15 March 2001 and the minutes of the meeting signed on 27 August 2005 shall form integral parts of the General Agency Agreement executed between the parties, and any provision inconsistent therewith shall be revoked."

<u>The Arbitral Tribunal concluded that the instrument expressly states that "it has been agreed,"</u> <u>thereby establishing the parties' mutual intention, assent, and agreement to reactivate the Agency</u> <u>Agreement and its Annex entered into</u> between the General Company for Iraqi Airways and the General Agent, Horus Tourism & Travel Company, dated 30 January 2001 and 15 March 2001, respectively.

This accords with the definition of a contract as an agreement between two or more parties intended to produce legal effects, whether by creating, transferring, modifying, or extinguishing an obligation.

Accordingly, the proper legal characterization adopted by the Arbitral Tribunal is that the aforementioned instrument constitutes a contract and an agreement to reactivate the Agency Agreement and its Annex entered into between the First Respondent and the Claimant.

The foregoing is not undermined by the Respondents' contention in their written submissions that the minutes of the meeting dated 29 August 2005 resulted from the Claimant's efforts to reactivate the Agency Agreement, which had been terminated at that time, and that the document merely constituted a written record of the matters discussed between the parties, pending approval by the Board of Directors of the General Company for Iraqi Airways, after which those matters would be reduced to a formal Annex to the Agency Agreement, as had occurred with the Agency Annex dated 15 March 2001.

In support of that contention, the Respondents relied upon the Internal Regulations of the General Company for Iraqi Airways, No. 20 of 2000, a copy of which was attached as Exhibit No. 4 to the Respondents' memorandum in reply and response to the Statement of Claim. Under the heading "Functions of the Chairman of the Board of Directors," Article 14 of Chapter Four provides that the functions exercised by the Board of Directors include:

"... approving contracts and agreements relating to the Company's activities, and selecting agents operating outside Iraq, determining their commissions, and entering into agency agreements with them."

The Respondents also relied upon their contention that the Claimant was aware of those requirements, referring in that regard to the minutes of the meeting dated 16 November 2008, which stated that discussions concerning an amicable settlement had been postponed for the purpose of submitting the matter to the boards of directors of both parties to obtain the requisite official approvals. A copy of those minutes was also attached as part of the aforementioned Exhibit No. 4.

The Arbitral Tribunal has found, however, that the form and express wording of the document that the Respondents characterize as merely minutes of a meeting dated 29 August 2005 contradict the characterization advanced by them. Its provisions expressly record the parties' agreement and commitment to reactivate the Agency Agreement and the consequences arising therefrom, without containing any provision requiring the approval of the Board of Directors of the General Company for Iraqi Airways.

This is confirmed by the Respondents' own defense, as set out in their memorandum in reply and response to the Statement of Claim, in which they stated that, when the parties intended at their meeting of 16 November 2008 to make the effectiveness of their agreement conditional upon the approval of their respective boards of directors, they expressly so provided.

In the same memorandum, the Respondents also stated, in substance, that proof of the Claimant's knowledge of the requirements imposed by the Internal Regulations of the General Company for Iraqi Airways was a condition for those requirements to be binding upon third parties.

The Respondents themselves thereby established in that memorandum that the Claimant was unaware of the Internal Regulations of the General Company for Iraqi Airways on 29 August 2005. The document on which they relied to establish such knowledge was the minutes of a meeting dated 16 November 2008, namely, a date almost three years after the agreement dated 29 August 2005 reactivating the agency.

The Arbitral Tribunal further finds well-founded the plea raised by the Claimant in its written submissions that the Respondents may not rely upon that defense, since they cannot benefit from the First Respondent's failure to obtain the requisite approvals.

Moreover, the Respondents' plea that no effect should be given to the agreement reactivating the Agency Agreement, as set out in the minutes of the meeting reactivating the agency and bearing the signature of the Director General, Mr. Abdul Ali Abboud, on 29 August 2005, is necessarily inconsistent, as a matter of both logic and law, with their own reliance upon decisions issued through the same procedure and bearing the signature of the same Director General. This applies particularly to their reliance upon the decision dated 14 November 2005 terminating the Agency Agreement that is the subject of the dispute.

Accordingly, in light of all the foregoing, the Arbitral Tribunal rejects the Respondents' plea that the instrument dated 29 August 2005, entered into between the Claimant and the First Respondent, does not constitute a contract.

The Arbitral Tribunal also rejects the Respondents' plea that contract did not contain an arbitration clause, since the agreement reactivated both the General Agency Agreement and its Annex, each of which contains an arbitration clause.

Consequently, the Arbitral Tribunal rejects the plea concerning the non-existence and invalidity of the arbitration clause. On the same grounds, it also rejects the consequential plea that the Arbitral Tribunal lacks jurisdiction over the arbitral dispute, without the need to state a ruling to that effect in the operative part of the Award.

**Chapter Two: The Respondents' Pleas Concerning the Constitution of the Arbitral Tribunal and Their Request for a Stay of the Arbitral Proceedings Pending Determination of the Cassation Appeals**

**First:** In their memorandum filed on 27 January 2014 in reply to the Statement of Claim, at page 4, the Respondents raised a plea concerning the invalidity of the arbitral proceedings on the ground that the constitution of the Arbitral Tribunal was contrary to the parties' agreement and in violation of the law and the internationally recognized rules applicable in the field of international arbitration.

In support of that plea, the Respondents contended that, under Clause 16 of the Agency Agreement, the parties had agreed that, in the event of a failure to agree upon the President of the Arbitral Tribunal, recourse would be had to the Regional Office of the International Air Transport Association ("IATA"). Accordingly, they maintained that the authority designated by agreement to appoint the presiding arbitrator was the Regional Office of IATA.

On that basis, and upon application of Clause 16 of the Agency Agreement, the Respondents argued that the parties had agreed in the arbitration clause upon the procedure for selecting the presiding arbitrator in the event of disagreement between the arbitrators appointed by the parties, namely, by referring the matter to the Regional Office of IATA for the appointment of the presiding arbitrator.

The Respondents further contended that both the arbitrators and the court were bound by the agreement previously concluded between the parties under the contract. They also relied upon Article 17 of the Egyptian Arbitration Law, paragraph 3 of which, they submitted, confirms that both the arbitrators and the court must respect the parties' agreement. Article 17(3) provides that:

"3. In selecting an arbitrator, the court shall have regard to the conditions required by this Law and those agreed upon by the parties."

The Respondents therefore maintained that the Claimant was required to comply with the conditions set forth in Clause 16 of the Agency Agreement concerning the selection of the arbitrator. Instead, the Claimant applied to the court for the appointment of a presiding arbitrator and thereby, according to the Respondents, acted in breach of both the law and the parties' agreement.

The Respondents further argued that the court ought to have ruled that it lacked jurisdiction to entertain the request, because, pursuant to Article 17 and the parties' agreement embodied in Clause 16 of the Agency Agreement, the primary authority to appoint the presiding arbitrator rested with the Regional Office of IATA.

They also maintained that the court was required to apply Article 17(3), which obliged it, when considering any dispute concerning the appointment of arbitrators where the parties had previously agreed upon the applicable procedure, to observe the conditions agreed upon by the parties and to direct them to approach the Regional Office of IATA for the appointment of a presiding arbitrator.

According to the Respondents, this was confirmed by the Regional Director of IATA in a letter subsequently obtained by the First Respondent and submitted to the court in support of its request for reconsideration of the judgment appointing the presiding arbitrator.

The Respondents contended that this letter constituted an important and decisive document in the dispute because it had been obtained only after the court had rendered its judgment.

They further maintained that the letter obtained from the Regional Director of IATA confirmed IATA's authority to appoint a presiding arbitrator where the parties submitted a request to that effect or where the court directed them to do so.

Finally, the Respondents contended that the First Respondent obtained that letter only after the Claimant had approached the Regional Office of IATA and had provided inaccurate information and distorted the facts in a manner designed to favor its position.

**Second:** In their memorandum filed on 27 January 2014 in reply to the Statement of Claim, at page 11, the Respondents raised a plea concerning the invalidity of the constitution of the Arbitral Tribunal, on the ground that the presiding arbitrator was required to be of a nationality different from those of the parties to the dispute, as required by the international rules applicable in the field of international arbitration.

In support of that plea, the Respondents contended that, pursuant to international practice in the field of international arbitration and Article 11(5) of the UNCITRAL Model Law on International Commercial Arbitration, the court, when appointing an arbitrator, was required to have due regard to the qualifications required of the arbitrator under the parties' agreement and to considerations likely to secure the appointment of an independent and impartial arbitrator. In the case of the appointment of a sole arbitrator or a third arbitrator, the court was also required to take into account the advisability of appointing an arbitrator of a nationality different from those of the parties.

Accordingly, the Respondents maintained that the Cairo Court of Appeal ought to have appointed a President of the Arbitral Tribunal of a nationality different from those of the parties to the dispute. They argued that, even though the appointed presiding arbitrator satisfied the requirements of impartiality, independence, integrity, and experience, the matter concerned a formal procedural requirement, non-compliance with which rendered the arbitral proceedings and the constitution of the Arbitral Tribunal invalid.

On the basis of the foregoing, the Respondents maintained their plea concerning the invalidity of the arbitral proceedings.

**Tribunal's Response to the Two Pleas**

In addressing the foregoing pleas, the Arbitral Tribunal notes, as a preliminary matter, that, in accordance with the parties' agreement that the arbitration proceedings shall be governed by Egyptian Arbitration Law No. 27 of 1994, the determination of these objections shall likewise be governed by the provisions of that Law.

Article 15 of Egyptian Arbitration Law No. 27 of 1994 provides as follows:

1. "The arbitral tribunal consists, by agreement between the parties, of one or more arbitrators. In the absence of such agreement on the number of arbitrators, the number shall be three.

2. If there is more than one arbitrator, the tribunal must consist of an odd number, on penalty of nullity of the arbitration."

Article 16 of the same Law further provides:

1. "The arbitrator cannot be a minor, under guardianship, have been deprived of his civil rights by reason of a judgment against him for a felony or misdemeanor contrary to honesty or due to a declaration of his bankruptcy; unless he has been restored to his status.

2. The arbitrator is not required to be of a given gender or nationality, unless otherwise agreed upon between the two parties or provided for by law.

3. The arbitrator's acceptance of his mission shall be in writing. When accepting, he must disclose any circumstances which are likely to cast doubts on his independence or impartiality."

Article 17 of the same Law further provides:

1. "1. The two parties to the arbitration may agree on the choice of the arbitrators, and on the method and period of time for effecting their choice. In the absence of such agreement, the following steps shall be followed:

   a. If the arbitral tribunal consists of a sole arbitrator, the court specified in Article 9 of this Law shall undertake the appointment of the arbitrator upon request of either party.

   b. If the arbitral tribunal consists of three arbitrators, each party shall appoint one arbitrator and the two arbitrators shall then appoint the third. If either party fails to appoint his arbitrator within thirty days of a request to do so from the other party, or if the two appointed arbitrators fail to agree on the third arbitrator within thirty days of the date of the latest appointment between the two, the court specified in Article 9 of this Law shall undertake the appointment upon request of either party. The arbitrator chosen by the two arbitrators or appointed by the court shall chair the arbitral tribunal. The above provisions shall apply if the arbitral tribunal consists of more than three arbitrators.

2. If either party violates the agreed procedures for the choice of arbitrators, or if the two appointed arbitrators are unable to reach an agreement expected of them under the agreed procedure, or if a third party fails to perform any function entrusted to him in this regard, then the court specified in Article 9 of this Law shall carry out the required procedure or the function needed upon the request of either party, unless the agreement provides other means for securing the appointment.

3. In the choice of the arbitrator, the court shall observe the conditions required by this Law and those agreed upon by the parties, and shall render its decision on said choice expeditiously. Subject to the provisions of Articles 18 and 19 of this Law, such decision shall be subject to no appeal."

Whereas the two foregoing pleas raised by the Respondents, culminating in a request for a ruling that the arbitral proceedings are invalid, concern the appointment of the presiding arbitrator—the President of the Arbitral Tribunal—and whereas the Respondents contend that the presiding arbitrator ought to have been appointed by the Regional Director of IATA and that the court that

appointed the President of the Arbitral Tribunal failed to ensure that the appointee was of a nationality different from those of the parties to the arbitration:

Taking into account that Article 17(3) of the Egyptian Arbitration Law does not require an arbitrator to be of any particular gender or nationality unless the parties to the arbitration agree otherwise or the law so provides, and that the arbitration clause contained in Clause 16 of both the Agency Agreement and its Annex contains no requirement concerning the nationality of any of the arbitrators, the plea concerning the invalidity of the constitution of the Arbitral Tribunal on the ground that the presiding arbitrator ought to have been of a nationality different from those of the parties to the dispute has no sound basis in fact or law.

It is also established from the documents on record that, at the first arbitral hearing held on Thursday, 28 November 2013, the parties declared, at the outset of the Terms of Reference, their acceptance of all members of the Arbitral Tribunal. They raised no objection to the President of the Arbitral Tribunal and did not invoke the invalidity of the constitution of the Tribunal on that ground. Accordingly, in all events, any right to rely upon that plea was waived pursuant to Article 8 of the Egyptian Arbitration Law.

Moreover, the parties' acceptance of the Arbitral Tribunal in the manner described above constituted a fresh appointment of its members and an acceptance of all the procedures followed in their appointment and the circumstances accompanying that appointment.

Accordingly, the two pleas concerning the invalidity of the arbitral proceedings by reason of the alleged invalidity of the constitution of the Arbitral Tribunal—whether on the ground that, pursuant to the arbitration agreement, the Regional Office of IATA was the authority competent to appoint the President of the Arbitral Tribunal; that the President ought to have been of a nationality different from those of the parties to the arbitration; or on any of the other grounds advanced by the Respondents—have no sound basis in fact or law, are contrary to the intentions of the parties to the arbitration, and must therefore be rejected.

The Arbitral Tribunal further notes that it is established from the documents on record that the Claimant instituted Case No. 76 of Judicial Year 129 before the 50th Commercial Circuit of the Cairo Court of Appeal. In those proceedings, the First Respondent raised the same pleas concerning the invalidity of the constitution of the Arbitral Tribunal, including the plea that the Regional Office of IATA was the authority competent to appoint the presiding arbitrator and the plea that the presiding arbitrator ought to have been of a nationality different from those of the parties to the arbitration.

By its judgment rendered on 26 August 2013, the Cairo Court of Appeal appointed Professor Dr. Hassan Abdel-Baset Gomaa as the third arbitrator to determine the dispute.

Whereas, pursuant to Article 17(3) of Egyptian Arbitration Law No. 27 of 1994, a judgment appointing an arbitrator is not subject to any form of challenge, the judgment rendered by the Cairo Court of Appeal on 26 August 2013 became final and unappealable.

Since that judgment acquired the force of res judicata, meaning the binding and preclusive effect of the prior judgment, in respect of that fundamental issue between the same parties, it precludes them from reopening the dispute concerning that issue, whether by way of claim or plea, or in connection with any other right whose existence or non-existence depends upon the existence or non-existence of the issue previously determined between those same parties.

Accordingly, raising that dispute again in the present arbitral proceedings would be contrary to the res judicata effect of judgments, and the dispute may therefore not be raised before the Arbitral Tribunal.

Article 101 of the Egyptian Law of Evidence provides that:

"Judgments that have acquired the authority of res judicata shall be conclusive with respect to the rights adjudicated therein, and no evidence may be admitted to contradict this authority. However, such authority shall apply only in a dispute between the same parties without any change in their capacities, and relating to the same right in subject matter and cause. The court shall give effect to this authority of its own motion."

It is also settled in the case law of the Egyptian Court of Cassation that:

"Where a particular issue is fundamental and its determination, whether affirmatively or negatively, forms the basis for adjudicating the right claimed in the action, the judgment rendered on that issue acquires the authority of res judicata between the same parties and prevents them from disputing, whether by way of claim or defense, any other right the existence or non-existence of which depends upon the determination of that issue previously adjudicated between those same parties." (Court of Cassation, Appeal No. 5459 of Judicial Year 66, Session of 28 January 2001, Technical Office, Vol. 52, Part I, p. 205).

Accordingly, on the basis of the foregoing, the Arbitral Tribunal rejects the two aforementioned pleas raised by the Respondents concerning the invalidity of the arbitral proceedings by reason of the alleged improper appointment of the President of the Arbitral Tribunal—the presiding arbitrator—without the need to state that ruling in the operative part of the Award.

**Third**: The Respondents' Plea Concerning the Invalid Reconstitution of the Arbitral Tribunal, the Nullity of the Proceedings Following Their Resumption, and the Request for a Stay Pending Determination of the Cassation Appeals

The Respondents raised this plea in their memorandum submitted during the expert proceedings at the hearing of 19 March 2023, in the minutes of the third expert hearing, at the final expert hearing held on 30 April 2023, and in their final memoranda filed on 20 June 2023.

In support of the plea, the Respondents submitted that it was established from the record that the President and all members of the Arbitral Tribunal had previously withdrawn from the arbitration and that the constitution of the Tribunal was therefore invalid.

In the memorandum filed on 20 June 2023 through their legal representative, Professor Dr. Mohamed Mostafa Hamouda, the Respondents set out the factual basis of this plea and submitted photocopies in document bundles reviewed by the Tribunal. They further contended that the members of the Tribunal were unfit to hear the arbitration because they lacked the impartiality and independence required for the performance of their arbitral mandate, and requested a ruling to that effect.

Article 22(1) of Egyptian Arbitration Law No. 27 of 1994 concerning Arbitration in Civil and Commercial Matters provides:

"The arbitral tribunal shall decide pleas relating to its lack of jurisdiction, including pleas based on the non-existence, lapse or invalidity of the arbitration agreement, or on the arbitration agreement not encompassing the subject matter of the dispute."

This provision embodies the principle of competence-competence, under which the Arbitral Tribunal has authority to determine its own jurisdiction over the dispute submitted to it. Since a plea challenging the validity of the Tribunal's constitution constitutes an aspect of a challenge to its jurisdiction, the Tribunal has authority to determine that plea pursuant to Article 22(1) of Egyptian Arbitration Law No. 27 of 1994.

As regards the Respondents' reliance on the previous withdrawal of Professor Dr. Sherif Mohamed Abdallah, the arbitrator appointed by the Claimant, it is established that the arbitrator withdrew

from the arbitral mandate on 17 July 2014. The Claimant, however, reappointed and renominated the arbitrator on 6 February 2023, and that appointment was accepted in writing.

The renewed nomination constituted a new appointment, expressed in writing by the Claimant as the party entitled to appoint its arbitrator and followed by the arbitrator's express written acceptance. The plea that the Tribunal was invalidly constituted merely because Professor Dr. Sherif Mohamed Abdallah had previously withdrawn is therefore immaterial, has no legal effect, and gives rise to no legitimate interest on the part of the Respondents. The Tribunal dismisses that plea, without the need to state such dismissal in the operative part of the Award.

As regards the alleged withdrawal of Professor Dr. Hassan Abdel-Baset Gomaa, President of the Arbitral Tribunal, and Professor Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the Respondents, the memoranda and documents filed by both parties on 20 June 2023 included official copies of the judgments rendered by the Second Commercial Circuit of the Cairo Court of Appeal in Case No. 3 of Judicial Year 132, dated 23 March 2022 and 22 September 2022, together with official copies of certificates issued by the Court of Cassation.

Those documents establish that, before the Claimant was placed under preservation measures, it instituted Case No. 3 of Judicial Year 132 before the Cairo Court of Appeal seeking the removal of Professor Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the Respondents, and Professor Dr. Hassan Abdel-Baset Gomaa, the President of the Tribunal. The First Respondent intervened in those proceedings by way of a principal intervention and sought, among other relief, a declaration recording the withdrawal of both arbitrators.

At the hearing of 23 March 2022, the Second Commercial Circuit of the Cairo Court of Appeal rendered a judgment whose operative part stated:

> "The Court rules, in the ad hoc arbitration brought by Horus Tourism & Travel Company against the General Company for Iraqi Airways and others, to dismiss the Claimant's request to terminate the mandate of each of Dr. Hassan Abdel-Baset Gomaa, in the capacity of President of the Arbitral Tribunal, and Professor Dr. Abdel Hamid Galal El-Ahdab, in the capacity of arbitrator for the respondent company, and orders the Claimant to bear the costs and EGP 100 in attorneys' fees."

The First Respondent subsequently filed two applications requesting a supplemental ruling on claims allegedly omitted from its judgment. In the first application, it submitted that the Court had failed to determine the requests set out in the amended statement of relief in its principal intervention, namely, to record the withdrawal of Professor Dr. Hassan Abdel-Baset Gomaa, the presiding arbitrator, and Professor Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the First Respondent. In the second application, it submitted that the judgment dated 23 March 2022 had also failed to determine the remaining relief sought by the Claimant in the originating application in Case No. 3 of Judicial Year 132.

At the hearing of 22 September 2022, the same court dismissed both applications requesting a supplemental ruling on claims allegedly omitted from its judgment of 23 March 2022 and ordered the applicant to bear the costs and EGP 100 in attorneys' fees. In reasons directly connected with the operative part, the Court stated:

> "It is established that the Court determined, without omission, all requests submitted to it in its previous judgments. In particular, the applicant's request that its principal intervention be admitted in form and that, on the merits of such intervention, the withdrawal of the second and third notified parties from the ad hoc arbitration brought by Horus Tourism & Travel Company against the applicant be recorded, and that Case No. 3 of Judicial Year 132, Cairo Court of Appeal, be declared terminated by reason of their withdrawal, had already been determined by the judgment previously rendered in the same Case No. 3 of Judicial Year 132 by the 50th Commercial Circuit of the Cairo Court of Appeal on 31 January 2019. The reasons for that

judgment rejected the alleged withdrawal, and its operative part ruled: 'The principal intervention brought by the General Company for Iraqi Airways is admitted in form and dismissed on the merits, and the intervener is ordered to bear the costs of the intervention and EGP 100 in attorneys' fees.' As regards the applicant's request for determination of the remaining relief sought at the conclusion of the originating application in Case No. 3 of Judicial Year 132, that request is rejected because it concerns the same relief implicitly dismissed by the Court in its judgment dated 22 March 2022 [sic]..."

The foregoing judgments establish that the Cairo Court of Appeal rejected both the request to terminate the arbitral mandate and the alleged withdrawal of Professor Dr. Hassan Abdel-Baset Gomaa, President of the Tribunal, and Professor Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the Respondents. As judgments of the Cairo Court of Appeal, they are final and binding on the Claimant, the Respondents, and the Arbitral Tribunal.

The Claimant also submitted an official certificate issued by the Court of Cassation confirming that the Court of Cassation had rejected the applications to stay enforcement of the cassation appeals brought against the appellate judgment dated 23 March 2022.

Final judgments have binding res judicata effect. Once a judgment has acquired that effect, the parties to the proceedings in which it was rendered may not reopen an issue that it determined, even on the basis of legal or factual evidence that had not previously been raised or that had been raised but not examined in the judgment. The present plea rests on the alleged withdrawal of the President of the Tribunal and the arbitrator appointed by the Respondents, an issue already raised, resolved and finally determined in the judgments described above. It may not be reopened.

In this regard, the Court of Cassation has held:

"Although judgments that have acquired the force of res judicata are conclusive as to the rights determined therein and no evidence contradicting that conclusiveness may be admitted, as provided in Article 101 of the Law of Evidence, such judgments acquire that force only after becoming final through exhaustion of the ordinary avenue of appeal prescribed by law." (Cassation Appeal No. 1104 of Judicial Year 48, hearing of 5 January 1980, Technical Office, Vol. 31, p. 89).

The Court of Cassation has also held:

"A final judgment has the force of res judicata as to what it determines between the parties. Once the judgment has acquired that force, the parties to the proceedings in which it was rendered are precluded from reopening the issue determined therein, even by relying on legal or factual evidence that had not previously been raised or that had been raised but was not examined by the judgment." (Cassation Appeal No. 23 of Judicial Year 49, hearing of 24 February 1981, Technical Office, Vol. 32, p. 622).

The two appellate judgments were therefore effective in their own right. Following their issuance, the Claimant appointed Professor Dr. Sherif Mohamed Abdallah as its arbitrator, and that appointment was accepted, thereby completing the constitution of the Arbitral Tribunal. The President of the Tribunal and the arbitrator appointed by the Respondents were consequently required to resume the arbitration once the Claimant had appointed its arbitrator and the Tribunal had been fully constituted.

On 7 February 2023, the President of the Arbitral Tribunal received a letter from the Committee for Preservation, Administration and Disposal of the Assets of Terrorist Groups and Terrorists, which stated:

"Pursuant to the judgment rendered by the Cairo Court for Urgent Matters in Case No. 2315 of 2013, Urgent Matters, with reference to Law No. 22 of 2018 regulating the procedures for the preservation, inventory, administration and disposal of the assets of terrorist groups and terrorists, and with reference to the ad hoc arbitration brought by Horus Tourism & Travel

Company, which is subject to preservation under Provisional Order No. 1 of 2018, against the General Company for Iraqi Airways..."

The letter further stated that Professor Dr. Sherif Mohamed Abdallah Mamoun had previously been appointed as arbitrator for Horus Tourism & Travel Company and had withdrawn, that a Committee decision dated 5 February 2023 had renominated him as arbitrator for Horus Tourism & Travel Company, and that he had accepted the nomination by a letter dated 6 February 2022 [sic].

The Committee added in its communication to Professor Dr. Hassan Abdel-Baset Gomaa, President of the Arbitral Tribunal:

"In light of the completion of the constitution of the Arbitral Tribunal under your presidency and with the membership of Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the General Company for Iraqi Airways, and the resumption of the arbitration in light of the foregoing, we inform you that the State Lawsuits Authority is the legal representative of the Claimant in the above-mentioned arbitration brought by the preserved company, which the Committee legally represents in litigation before courts and arbitral tribunals. The State Lawsuits Authority is therefore empowered to appear, plead, file memoranda and documents, and take all other legally required measures in connection with this arbitration. Please take the necessary legal measures, continue following the arbitration and holding its hearings, and correspond with the State Lawsuits Authority at 42 Arab League Street, Mohandessin, Giza. Enclosed are a copy of the Committee's decision nominating Dr. Sherif Mohamed Abdallah and a copy of his acceptance."

The Committee enclosed: (a) a copy of Decision No. 2 of 2023, dated 6 February 2023, issued by the Counsellor serving as President of the Committee, Article 1 of which nominated Professor Dr. Sherif Mohamed Abdallah as arbitrator for Horus Tourism & Travel Company, subject to preservation under Provisional Order No. 1 of 2018, in the ad hoc arbitration brought by that company against the General Company for Iraqi Airways; and (b) a copy of Professor Dr. Sherif Mohamed Abdallah's letter to the President of the Committee accepting the nomination and declaring impartiality, independence, and full cooperation with the constituted Arbitral Tribunal.

Pursuant to that letter, on 7 February 2023 Professor Dr. Sherif Mohamed Abdallah, the arbitrator appointed by the Claimant, wrote to Professor Dr. Hassan Abdel-Baset Gomaa in the latter's capacity as President of the Arbitral Tribunal. He stated that he had spoken by telephone with Professor Dr. Abdel Hamid Galal El-Ahdab, the arbitrator appointed by the First Respondent, and that they had agreed to confirm the appointment of Professor Dr. Hassan Abdel-Baset Gomaa as President of the Tribunal and their acceptance thereof.

On the same date, Professor Dr. Abdel Hamid Galal El-Ahdab, acting as the arbitrator appointed by the First Respondent, sent an email to the President of the Tribunal containing the same confirmation as that set out in Professor Dr. Sherif Mohamed Abdallah's communication. Also on 7 February 2023, Professor Dr. Sherif Mohamed Abdallah signed a declaration accepting the mandate and delivered it to the President of the Tribunal.

The Respondents founded their plea on the alleged prior withdrawal of their arbitrator and of the President of the Tribunal. That issue has already been determined by the final judgments described above, which rejected the alleged withdrawal and have binding res judicata effect. Article 101 of the Law of Evidence provides:

"Judgments that have acquired the force of res judicata shall be conclusive as to the rights determined therein, and no evidence contradicting that conclusiveness shall be admitted. Such judgments shall have that effect only in a dispute between the same parties, acting in the same capacities, concerning the same right, subject matter and cause. The court shall give effect to res judicata of its own motion."

The Court of Cassation has held in applying that provision:

"Where the same issue is fundamental and the existence or non-existence of the right claimed depends upon whether that issue is established, the judgment rendered on that issue acquires the force of res judicata between the same parties and precludes them from disputing, by way of claim or defense, any other right whose existence or non-existence depends upon the issue previously determined between those same parties." (Cassation Appeal No. 5459 of Judicial Year 66, hearing of 28 January 2001, Technical Office, Vol. 52, Part I, p. 205).

Following the resumption of the arbitration and the scheduling of a hearing on 16 February 2023, Mr. Ahmed El-Derini appeared as counsel for the First Respondent under the power of attorney previously placed on the arbitration record and signed the attendance sheet on its behalf. The same counsel also represented the Second Respondent, the Iraqi Minister of Transport in an official capacity, under a power of attorney previously placed on the record. Although counsel did not sign the attendance sheet on behalf of the Second Respondent, counsel raised a plea demonstrating appearance for the Minister, namely, that the Minister had not been served through diplomatic channels or at the premises of the Iraqi Ministry of Transport in Baghdad, Republic of Iraq, and should not have been served at the premises of Iraqi Airways in the Arab Republic of Egypt.

Counsel for the Respondents raised no objection to the constitution of the Arbitral Tribunal at the hearing of 16 February 2023. After the hearing had concluded and the Tribunal had issued its procedural decisions, counsel stated a reservation concerning "the manner in which the arbitrator for the Respondents was nominated, since that arbitrator was not renominated by the First Respondent through the same mechanism by which the President of the Arbitral Tribunal was renominated." Counsel then requested that the period for the parties to submit memoranda and documents, including comments on the Expert Report, be two weeks rather than one week.

That was the only reservation recorded by counsel. Counsel did not object to the Tribunal or to any of its members on the basis of any previous withdrawal and did not object to any of the Tribunal's procedural decisions, other than by requesting an additional week for the submission of memoranda and documents commenting on the Expert Report. The Claimant accepted that request, and the Tribunal granted it.

The Respondents, like the Claimant, thereby accepted the Arbitral Tribunal in its entirety, all of its members, the procedures followed in their appointment, and the circumstances accompanying those appointments. Such acceptance amounted to a renewed appointment and confirmation of the Tribunal.

The reservation was expressly and unambiguously limited to the mechanism by which the arbitrator appointed by the Respondents had been nominated and to the Respondents' wish that the same mechanism used for the President of the Tribunal be used for their party-appointed arbitrator. In that form, the reservation itself reconfirmed the Respondents' acceptance of the President of the Tribunal.

The reservation did not affect the mechanism by which the Respondents' arbitrator had been appointed: that arbitrator had previously been selected and nominated by the First Respondent, and that mechanism had not changed. The alleged withdrawal of the Respondents' arbitrator had been rejected by the Second Commercial Circuit of the Cairo Court of Appeal in Case No. 3 of Judicial Year 132, which also rejected the request to record that withdrawal.

In any event, the reservation was immaterial to the constitution of the Tribunal. The President of the Tribunal had been appointed by judicial judgment, as described in Part One of this Award concerning the facts and procedural history, whereas the arbitrator appointed by the Respondents had been nominated and selected by the First Respondent.

The First Respondent itself further confirmed the foregoing. At the final expert hearing on 30 April 2023, its counsel, Mr. Ahmed El-Derini, expressly endorsed and maintained the Tribunal's decision

appointing an accounting expert. That decision had been rendered by the Tribunal in its present composition at the hearing of 16 February 2023, at which counsel for the Respondents had accepted both the appointment and the determination of the Expert's fees. The First Respondent's renewed endorsement of the decision appointing the accounting expert constituted a further confirmation of its acceptance of the Tribunal in its entirety, all of its members, and the decisions taken by it.

By email dated 24 June 2023, filed by counsel for the Respondents, Mr. Ahmed El-Derini, the First Respondent further declared its "confidence in the complete impartiality of the Arbitral Tribunal" and stated that "the esteemed Arbitral Tribunal does not apply double standards and is fully committed to applying the principles of justice and equity in the proceedings."

That communication constituted an acknowledgment by the First Respondent of its acceptance of the members of the Arbitral Tribunal and of the validity of the Tribunal's constitution. It expressly affirmed complete confidence in the Tribunal's impartiality and in its application of the principles of justice and equity, that is, authorization to decide ex aequo et bono.

The foregoing conduct constitutes an abandonment and waiver by the Respondents of every plea or request previously made concerning the invalidity of the Tribunal's constitution, whether based on the alleged prior withdrawal of any member or on an alleged lack of impartiality or independence.

Accordingly, the Respondents' plea that the Arbitral Tribunal was invalidly constituted because its members had previously withdrawn or were unfit to perform their arbitral mandate is unfounded in fact and law. The Tribunal dismisses that plea, without the need to state such dismissal in the operative part of the Award.

For the same reasons, the Respondents' request that the arbitration be stayed pending determination of the cassation appeals is likewise unfounded in fact and law and is dismissed, without the need to state such dismissal in the operative part of the Award.

<u>Chapter Three: The Respondents' Plea that the Claims Against the Second Respondent, the Iraqi Minister of Transport in an Official Capacity, Are Inadmissible</u>

<u>The Respondents rely on two grounds: (1) that the claims were brought against a person enjoying diplomatic immunity from judicial proceedings; and (2) that the claims were brought against a person lacking standing.</u>

## First: Plea Based on Diplomatic Immunity

The Respondents set out this plea at pages 2 to 5 of their memorandum filed by their counsel, Mr. Ahmed El-Derini, on 10 June 2014, and in Memorandum No. 1 filed on behalf of the Second Respondent by the same counsel on 20 June 2023. They relied on the Vienna Convention on Diplomatic Relations and, in particular, Article 14 concerning diplomatic missions and the classes of heads of mission, including envoys, ministers and papal representatives accredited to Heads of State. They further submitted that Article 31 provides:

> "A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State.
> He shall also enjoy immunity from its civil and administrative jurisdiction..."

The Respondents argued that the Second Respondent's attendance at arbitral hearings or participation in any procedural step did not constitute a waiver of that immunity.

<u>The Tribunal notes that</u> the Respondents' own reliance on the provisions of the Vienna Convention demonstrates that this plea is unfounded. The Convention, concluded on 18 April 1961, addresses diplomatic agents representing their States in other States. Its preamble expressly states that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."

Article 1(c) provides that the expression "members of the mission" refers to the members of the mission who have diplomatic status, and Article 1(e) provides that the expression "diplomatic agent" refers to the head of the mission or a member of the diplomatic staff of the mission.

Article 14 classifies heads of diplomatic missions into three classes, the second of which is:

> "Envoys, Ministers and Internuncios accredited to Heads of State."

It is therefore clear that the "Ministers" referred to in the Convention are persons holding the rank of minister within a diplomatic mission that represents its State in another State and who are accredited to the Head of the receiving State.

The Convention does not apply to the Second Respondent, who is joined to this arbitration in an official capacity on behalf of the Iraqi Ministry of Transport, located in Baghdad, Republic of Iraq, and not in the capacity of a diplomatic agent representing the Republic of Iraq in the Arab Republic of Egypt.

The Respondents also relied on Article 31, which concerns a diplomatic agent's immunity from being prosecuted personally or sued personally in criminal, civil or administrative proceedings. That immunity relates to proceedings brought against a diplomatic agent in a personal capacity for alleged criminal conduct or acts giving rise to civil liability. It does not apply merely because the person is sued in an official capacity as representative of the State.

The Tribunal therefore dismisses this plea, without the need to state such dismissal in the operative part of the Award.

### Second: Plea that the Claims Were Brought Against a Person Lacking Standing

The Respondents submitted that the First Respondent is an Iraqi public company possessing legal personality, financial and administrative autonomy, and full capacity to achieve its purposes; that it is represented before courts and other authorities by its Director General or an authorized representative; and that its Board of Directors is its highest governing body. They relied on the Internal Regulations of the General Company for Iraqi Airways, No. 20 of 2000, and on the Iraqi Airways Company Law No. 108 of 1988, Article 16 of which provides:

> "The Director General shall represent the company in all matters relating to its management and affairs and may authorize or delegate another person to represent it."

The Respondents further relied on the principle stated by the Egyptian Court of Cassation that, as a general rule, a minister represents the ministry and the departments and agencies subordinate to it in claims and appeals brought by or against them, unless the law confers legal personality upon a particular administrative entity and assigns representation of that entity to a person other than the minister, in which case that person has standing within the limits prescribed by law.

On that basis, the Respondents submitted that the First Respondent is a separate legal person with financial and administrative autonomy, represented by its Director General or an authorized representative, and that the Iraqi Minister of Transport therefore lacks standing in this arbitration. They requested that the claims against the Second Respondent be declared inadmissible and that the Second Respondent be released from the proceedings without any order against it.

The Tribunal notes, as a preliminary matter, that it is firmly established in international arbitration that the effect of an arbitration agreement extends to any person or entity that directly intervened or participated in the conclusion, performance or termination of the contract, provided that the conduct or acts of that person or entity support the inference that it was aware of the existence, limits and scope of the arbitration agreement.

It is likewise established in international arbitration that, in the contractual context, an arbitration agreement may extend beyond its formal parties and signatories. This may occur, for example,

where an arbitration is brought by two entities that did not sign the original contract containing the arbitration clause—a parent company and one of its subsidiaries—even though the original contract was signed by another company, where the evidence establishes that the parties intended the contract to be concluded with a group of companies of which the signatory subsidiary formed part.

(Cassation Appeals Nos. 4729 and 4730 of Judicial Year 72, hearing of 22 June 2004).

Applying that principle, a tribunal constituted under the auspices of the Cairo Regional Centre for International Commercial Arbitration expressly accepted an arbitration brought by an Egyptian commercial agent against a parent company incorporated in the United States and its Cypriot subsidiary, and held them jointly liable to compensate the claimant, notwithstanding that the parent company was not a party to the agency agreement signed by the Egyptian agent and the Cypriot subsidiary. The award was based on documentary and factual evidence that the parent company had participated in the formation and performance of the contract and had terminated it.

(CRCICA Award dated 21 March 1999, cited in Arbitration Review, Issue No. 8, October 2010, p. 441 et seq.).

It is also established in relation to contracts to which a State or one of its public entities is a party—commonly described as State contracts—that the concept encompasses not only contracts concluded directly by the State through its representatives, in the narrow sense, but also contracts concluded by entities subordinate to and emanating from the State that act on its behalf and in furtherance of its economic objectives. As legal scholarship explains:

"The legal forms adopted by such bodies vary considerably. Whatever their legal form, the strict control exercised over them by the State cannot be ignored, even where such control is indirect or exercised through a wholly separate intermediary. It is therefore appropriate to regard contracts concluded by bodies subject to State control and dominance as State contracts, since those bodies were specifically created to take the place of the State in international commercial and economic relations and act for and on behalf of the State."

(Dr. Hafiza El-Sayed Haddad, Contracts Concluded Between States and Foreign Persons, p. 70).

The extension of an arbitration agreement to the State in contracts concluded by one of its agencies or administrative units is therefore founded on legal representation. When an agency or State unit contracts in its own name, it also contracts for the benefit of the State whose control and supervision it is subject to, even if it possesses financial and administrative autonomy. That autonomy does not mean that it acts in isolation from the State to which it belongs. This creates a legitimate expectation on the part of the counterparty that the State is a party to the contract containing the arbitration agreement.

The same approach was taken in the ICC arbitration known as the Bridas Group companies v. the State of Turkmenistan. The tribunal treated the State as a party to the contract containing the arbitration agreement because the government's conduct after conclusion of the contract demonstrated its intention to become a party, and because the contract contained twenty-three obligations that could be performed only by the State itself and were essential to the project. Those circumstances created a legitimate expectation on the part of the company that the agreed obligations would be performed. (Cited in Dalia Abdel-Moati Hussein Ali, doctoral thesis, Cairo University, 2007, footnote at p. 348).

In light of the foregoing, the Tribunal finds that the Iraqi Ministry of Transport intervened not only in the conclusion of the contract but also during its performance, the efforts to terminate it, and its subsequent suspension.

At the stage of conclusion, the preamble to the General Agency Agreement dated 30 January 2001 expressly provided that the Agreement and its provisions were subject to the approval of the governmental authorities.

Clause 2 of the Annex to the Agency Agreement dated 15 March 2001 likewise provided that the Agreement would become effective upon obtaining the requisite official approvals. This confirms that the Iraqi Ministry of Transport participated in the negotiation and conclusion of the Agency Agreement and its Annex, was aware of the existence and scope of the arbitration agreement, and accepted being bound by it in disputes arising from the contractual relationship.

The documents also establish the Iraqi Ministry of Transport's involvement in efforts to terminate the Agency Agreement. Letter No. 417 dated 2 December 2004 from the First Respondent to the Claimant concerning termination of the General Agency Agreement justified the termination as follows: "In view of the policies of the New Iraq aimed at rehabilitating the General Company for Iraqi Airways... we wish to inform you of our company's desire to terminate the General Agency Agreement." (Document No. 2 in Document Bundle No. 1 submitted by the Claimant).

The First Respondent's letter dated 16 November 2005 to the Claimant concerning suspension of the agency was copied to the Ministry of Transport and stated: "Please take the necessary action, in coordination with the Iraqi Embassy in Cairo, to nominate a lawyer of good standing in litigation so that a representative of the Legal Department may attend to discuss the matter and contract with that lawyer." (Document submitted in Document Bundle No. 2 filed by the First Respondent).

The Iraqi Minister of Transport's letter dated 11 April 2010 to the General Secretariat of the Iraqi Council of Ministers (submitted in Document Bundle No. 1 filed by the Respondents) expressly stated that the First Respondent, as an entity forming part of the Ministry of Transport, had informed the Minister in Letter No. 2976 dated 1 March 2010 that the General Agency Agreement with the Claimant had been canceled pursuant to the attached letter of the General Secretariat of the Council of Ministers, Ref. 1/16, dated 8 May 2005, which classified the Claimant as a front company. The letter further stated that implementation of the arbitration clause might cause substantial financial harm to the First Respondent. The Minister therefore proposed an amicable resolution to avoid harm to the company.

The Ministry of Transport's involvement in the contractual relationship, the efforts to terminate it, and the subsequent events is also demonstrated by the First Respondent's notice to the Claimant dated 10 August 2011 concerning an extension of the period for appointing its arbitrator. The notice stated that appointing an arbitrator required the approval of the Iraqi Prime Minister, the Iraqi Minister of Transport, and the Board of Directors of the General Company for Iraqi Airways, and the dispatch of a delegation to Cairo from the Ministry of Transport and the First Respondent to select an arbitrator. (Document No. 4 in Document Bundle No. 1 filed by the Respondents).

The involvement of the Iraqi Ministry of Transport is further demonstrated by the First Respondent's notice to the Claimant dated 13 October 2011, which confirmed that a delegation from the Ministry of Transport would attend a meeting with the Claimant for an amicable settlement. (Submitted in Document Bundle No. 1).

As the Claimant emphasized in its memorandum filed at the seat of arbitration on 20 June 2023, the First Respondent's subordination to the Iraqi Ministry of Transport is further demonstrated by the Respondents' email of 17 June 2023 to the President and members of the Arbitral Tribunal seeking reconsideration of their request for an extension beyond the period fixed in the minutes of the hearing of 16 February 2023, which the Tribunal had rejected. The heading of that communication expressly stated:

"Republic of Iraq - Ministry of Transport - Iraqi Airways - Department: Commercial - Division: Overseas Offices/Cairo - No. 401."

In light of the Iraqi Ministry of Transport's proven intervention throughout all stages of the contractual relationship at issue, and because the First Respondent is subordinate to the Iraqi Ministry of Transport, the Tribunal dismisses the Respondents' plea that the claims against the Iraqi Minister of Transport are inadmissible for lack of standing. The Tribunal holds that the Minister is a party to the arbitration agreement and is bound by its effects, without the need to state such determination in the operative part of the Award.

## Chapter Four: The Respondents' Objections Concerning the Photocopies of Documents, the Exclusion of Untranslated Foreign-Language Documents, and the Allegations of Forgery

### First: The Respondents' Objection to the Photocopies Submitted by the Claimant

The Respondents, in their written submissions before both the Arbitral Tribunal and the expert, as well as in the hearing minutes, disputed all photocopies submitted by the Claimant in its various documentary submissions.

The Tribunal notes that such denial was advanced in general and unqualified terms and extended to all documents contained in the boxes submitted by the Claimant, without identifying with any degree of specificity the particular documents allegedly lacking authenticity. The objection was therefore raised in vague and unspecified terms and, as such, is incapable of producing any legal effect in these proceedings.

In any event, the Tribunal finds that the Respondents have, by their conduct, waived their right to challenge such photocopies. The Respondents engaged extensively with those documents, commenting upon their contents and disputing their evidentiary value and implications.

By way of example, the Respondents addressed the landline and mobile telephone invoices submitted by the Claimant and argued that, upon examination, those invoices appeared to relate to another company and that certain mobile invoices were issued in the names of individuals. They further contended that the invoices bore no connection whatsoever to Iraqi Airways. They additionally argued, in the alternative, that even if such invoices were assumed to relate to the General Agent of Iraqi Airways at the relevant time, they did not expressly refer to either Iraqi Airways or Horus Tourism & Travel.

Moreover, the Respondents expressly relied upon the accounting report prepared on their behalf and submitted the same in support of their defense and request for dismissal of the Claimant's claims. That report, prepared by Magdy Hashish & Partners, reviewed and analyzed the photocopies submitted by the Claimant and addressed their contents and accounting implications.

The Tribunal considers that a party cannot simultaneously challenge the admissibility of documentary evidence in its entirety while at the same time relying upon and engaging substantively with that very evidence in support of its own case.

Accordingly, the Tribunal dismisses the Respondents' objection concerning the photocopies submitted by the Claimant.

### Second: Documents Submitted in a Foreign Language

With respect to the Respondents' objection to documents submitted in a foreign language without certified Arabic translations and which were not exchanged between the Parties, the Tribunal accepts this objection.

Accordingly, the Tribunal shall disregard such documents and shall accord them no evidentiary weight, without the need to state that determination in the operative part of the Award.

**Third: The Allegation of Forgery**

As regards the Respondents' allegation that the documents submitted by the Claimant are forged, the Tribunal recalls that the assessment of the seriousness of an allegation of forgery and whether determination thereof is necessary for the resolution of the dispute falls within the Tribunal's discretionary authority.

The mere assertion of forgery, or the existence of criminal proceedings concerning such allegation, does not automatically require the suspension of the arbitral proceedings. Likewise, it is for the Tribunal to determine whether the preliminary issue raised is sufficiently serious and material to warrant further consideration.

> (Court of Cassation Appeal No. 26 of Judicial Year 32, Session of 28 March 1966, Technical Office, Vol. 17, Part II, Rule No. 100, p. 740).

The Tribunal further notes that the Respondents did not raise any allegation of forgery until after the resumption of the arbitration proceedings in February 2023, notwithstanding that the impugned documents had formed part of the record since the commencement of these proceedings and since the first hearing held on 28 November 2013.

Moreover, the Respondents failed to identify the specific documents alleged to be forged and instead advanced a general allegation encompassing several thousand pages of documents without particularization.

The circumstances relied upon by the Respondents as purported indicia of forgery do not, in the Tribunal's view, establish forgery but merely amount to assumptions and inferences insufficient to substantiate such a serious allegation.

Accordingly, the Tribunal concludes that the Respondents' allegation of forgery is unsupported, lacks sufficient specificity, and is not material to the determination of the present dispute. The Tribunal therefore dismisses and disregards such allegation, without the need to state that determination in the operative part of the Award.

Chapter Five: Concerning the Respondents' Plea that the Claimant Has Forfeited Its Right to Resort to Arbitration

The Respondents contended that the Claimant had forfeited its right to resort to arbitration on the basis that Clause (16) of the Agency Agreement prescribed a three-day period for amicable settlement, whereas such amicable settlement efforts had continued for more than six years, which, according to the Respondents, constituted an implied waiver by the Claimant of its right to resort to arbitration for the resolution of the dispute.

In support of this plea, the Respondents argued that Clause (16) of the canceled Agency Agreement established the procedure agreed upon by the parties in the event of any dispute relating to the interpretation or implementation of the Agreement and specified the time limits within which such procedures were to be undertaken, namely a period of only three days during which the parties were to exert their utmost efforts to resolve any dispute arising between them through appropriate means, i.e., amicable means. The Respondents further submitted that the use of the word "only" in connection with the three-day period was intended to preclude any attempt at delay or procrastination. However, since the amicable settlement process had extended for more than six years, the Claimant had, in their view, breached the arbitration clause, thereby implicitly waiving its right to resort to arbitration.

In relation to this plea, the Arbitral Tribunal notes at the outset that the Egyptian Arbitration Law No. 27 of 1994, which is applicable to the present dispute, contains no provisions concerning the

<u>forfeiture of the right to resort to arbitration</u>. Furthermore, upon reference to Clause (16) of the Agency Agreement, upon which the Respondents rely in support of their plea, although the clause prescribed a period of only three days during which the parties were to exert their utmost efforts to resolve the dispute amicably, it did not provide for any legal consequence in the event of non-compliance with or extension beyond such period.

The Arbitral Tribunal, exercising its authority to interpret Clause (16) of the agreement concluded between the parties and containing the arbitration agreement, has concluded that the time limit referred to therein is merely directory in nature and that its expiry does not result in any forfeiture of the right to resort to arbitration. This conclusion is particularly supported by the fact, as established by the documents on record and the chronology of the dispute, that both parties jointly and by mutual agreement exceeded the said time limit stipulated for the amicable settlement of the dispute. This confirms that the period was not mandatory but merely directory in nature.

Moreover, by pursuing amicable settlement efforts, regardless of the duration thereof, the parties to the Agency Agreement adopted a course of conduct that clearly expressed their common intention and left no doubt as to its meaning, namely, that the parties had agreed to extend the period for amicable settlement to the extent that such period was prolonged, while maintaining the continued validity and effectiveness of the arbitration agreement and preserving their right to resort to arbitration.

The Arbitral Tribunal further notes that the Respondents themselves accepted the foregoing position in the course of their defense, as evidenced by page 81 of their Statement of Defence in response to the Statement of Claim, wherein the Respondents stated in the final paragraph thereof as follows:

> "Pursuing amicable settlement, engaging in negotiations, and holding friendly meetings do not preclude the commencement of arbitration proceedings and the continuation thereof simultaneously with amicable settlement efforts and negotiations."

This statement unequivocally demonstrates the Respondents' acceptance that amicable settlement efforts could extend beyond the three-day period without affecting the parties' right to resort to arbitration.

Furthermore, Clause (16) of the Annex to the Agency Agreement dated 15 March 2001 amended the arbitration agreement contained in Clause (16) of the Agency Agreement dated 30 January 2001. Clause (16) of the Annex provides as follows:

> "The contracting parties shall resolve all developments and disputes arising between them through amicable means. Should the parties fail to resolve any matters or services arising between them, such matters shall be resolved by an Arbitral Tribunal agreed upon by the contracting parties."

It is evident from the foregoing provision that, following its amendment, the clause no longer prescribed any time limit for amicable settlement.

Accordingly, and in light of the foregoing, the Arbitral Tribunal finds that the Respondents' plea that the Claimant has forfeited its right to resort to arbitration is unfounded in law and therefore dismisses such plea, without the need to expressly state so in the operative part of the Award.

**Chapter Six: Response to the Respondents' Plea that the Arbitration Period Has Expired**

The Respondents further contended that the arbitration period had expired, arguing that the agreed arbitration period of twelve (12) months, in addition to the six-month extension granted by the Arbitral Tribunal, had elapsed without a final award being rendered in the arbitral proceedings.

In response to the foregoing plea, the Arbitral Tribunal notes that it is established from the record that, during the first arbitral session, the parties agreed that the arbitration period would be twelve (12) months commencing on 28 November 2013, being the date of the first hearing. It is also established, and was confirmed by both parties in their submissions, including the memorandum submitted by the Respondents through their legal counsel, Professor Dr. Mohamed Mostafa Hamouda, dated 20 June 2023, that the Arbitral Tribunal had issued a decision extending the arbitration period by an additional six (6) months commencing upon the expiry of the original agreed period, thereby making the total arbitration period eighteen (18) months.

It is further established, as stated by the Claimant in its memorandum dated 20 June 2023, that the parties agreed during the first procedural hearing held on 28 November 2013 that the arbitration period would be one year (twelve months), calculated from that date.

On 2 March 2014, the arbitral proceedings were suspended due to the withdrawal of Dr. Mohamed El-Hag Hamoud, the arbitrator previously appointed by the Respondents. The proceedings resumed on 18 March 2014 following the appointment by the First Respondent of Professor Dr. Abdel Hamid Galal El-Ahdab as arbitrator and his acceptance of such appointment. Thereafter, on 17 July 2014, the proceedings were suspended once again due to the withdrawal of Professor Dr. Sherif Mohamed Abdallah.

On 20 October 2014, the arbitration resumed after the Claimant, Horus Tourism & Travel, appointed Professor Dr. Ahmed Fathi Sorour as arbitrator on its behalf. On 22 November 2014, the Arbitral Tribunal's decision to suspend the arbitration became effective due to the parties' failure to pay the increase in arbitration fees previously determined by the Tribunal.

On 15 January 2015, the arbitration resumed pursuant to a decision of the Arbitral Tribunal. On the same date, the Tribunal, pursuant to the powers vested in it under the Arbitration Law, extended the arbitration period by an additional six months.

On 4 February 2015, the arbitration was suspended due to the withdrawal of Professor Dr. Ahmed Fathi Sorour.

On 14 January 2016, the proceedings resumed following the appointment by the Preservation Committee, in its capacity as the entity legally authorized to represent the Claimant before courts and arbitral tribunals, of Counsellor Dr. Mohamed Yasser Aboul Fotouh as arbitrator on behalf of the Claimant and his acceptance of such appointment. On 31 January 2016, the proceedings were once again suspended due to his withdrawal.

On 14 March 2016, the arbitration resumed following the appointment by the Preservation Committee, acting in its aforesaid capacity, of Counsellor Ezzat Khamis as arbitrator on behalf of the Claimant. Subsequently, on 20 March 2016, the proceedings were suspended due to the withdrawal by the Preservation Committee of such appointment.

On 24 March 2016, the arbitration resumed after the Preservation Committee appointed Professor Dr. Youssef Wassef as arbitrator on behalf of the Claimant. On 30 March 2016, the proceedings were again suspended due to his withdrawal.

On 6 February 2023, the arbitration resumed following the appointment by the Preservation Committee of Professor Dr. Sherif Mohamed Abdallah as arbitrator on behalf of the Claimant.

It is established from the record, as previously set out and as recounted in the factual background of this Award, that the arbitral proceedings were suspended on several occasions due to the withdrawal of arbitrators. Such periods of suspension are mandatory periods of suspension and are not to be counted towards the arbitration period. Taking such periods into account, it becomes evident that the eighteen-month arbitration period had not yet expired. After deducting the periods of suspension from the period commencing on 28 November 2013 until the resumption of the arbitration following the reappointment of Professor Dr. Sherif Mohamed Abdallah on 6 February 2023, the arbitration period remained valid until the end of Saturday, 21 October 2023.

Moreover, on 14 June 2023, counsel for the Respondents, Mr. Ahmed El-Derini, addressed correspondence to the President and members of the Arbitral Tribunal referring to the procedural hearing held on 16 February 2023 and to the email dated 31 May 2023, whereby the parties had been granted a two-week period, ending on 20 June 2023, to submit any final memoranda and supporting documents containing their comments on the Expert Report. Counsel requested an additional two-week extension on the grounds that the time granted to the Respondents to review and comment on the Report was insufficient.

After the Arbitral Tribunal rejected this request by its decision dated 15 June 2023, the Respondents again addressed correspondence to the Tribunal on 17 June 2023 requesting reconsideration of their previous request for an extension. This request was likewise rejected by the Tribunal.

The Arbitral Tribunal finds that these requests by the Respondents seeking additional extensions of time for the submission of memoranda, documents, and comments on the Expert Report constitute a waiver by the Respondents of their plea that the arbitration period had expired.

Accordingly, the Arbitral Tribunal dismisses this plea, no separate ruling to that effect in the operative part of the Award being necessary.

Chapter Seven: The Respondents' Plea that the Claimant's Right to Resort to Arbitration Has Lapsed by Reason of the Expiry of More Than Two Years Since the Termination of the Contractual Relationship, Pursuant to Article 190 of Egyptian Commercial Law No. 17 of 1999

The Respondents based their plea that the Claimant had forfeited its right to bring the present claim on the assertion that the Claimant, in its Statement of Claim, had acknowledged that the legal characterization of the disputed agency agreement was that of a commercial agency agreement governed by Articles 177 to 191 of Egyptian Commercial Law No. 17 of 1999.

On the basis of this agreed characterization, the Respondents argued that the Claimant's right to commence the present arbitration had lapsed due to the passage of more than two years following the termination of the contractual relationship, pursuant to paragraph (2) of Article 190 of the Egyptian Commercial Law, which provides as follows:

"All other actions arising out of a commercial agency agreement shall lapse upon the expiry of two years from the termination of the contractual relationship."

The Respondents further submitted that, when calculating the two-year period from the date of termination of the contractual relationship, the relevant date would be 16 November 2007. Upon reviewing the case file, it appears that during this period the Claimant did not resort to arbitration or take any effective arbitral measures. Rather, the Claimant only initiated arbitration proceedings and commenced the present arbitration by requesting the commencement of arbitration proceedings and appointing an arbitrator on its behalf, whereupon the arbitral proceedings effectively commenced...

the present arbitration, being the date of the notice submitted by the Claimant Company to the Respondent Company, wherein it appointed its arbitrator; this notice was dated 4 August 2011, upon which the Arbitral Tribunal was constituted.

**Conversely, the Claimant Company stated** in its Statement of the Arbitral Claim that the two parties agreed on the designation of the contract under the title "General Agency Agreement" in the principal Agency Contract dated 30 January 2001, and the addendum to the contract likewise bore the title "Addendum to the General Agency Contract signed between the General Company for Iraqi Airways and Horus Company for Tourism and Travel"; the contract was also drawn up in English under the title "General Sales Agency Agreement." The Claimant Company then went on to state that the contract is a contract agency (agency for the conclusion of contracts), relying on the provisions of the Egyptian Commercial Code regulating certain types of commercial agency, including the contract agency. The Claimant Company then reverted, in its submitted memoranda, to maintaining that the correct legal characterization of the Agency Contract at issue — as titled "General Agency Contract" — is that it is of a special nature in which several features of the known agency contracts intermingle, in addition to features of the contract for work and the employment contract; and it relied in this regard on the provisions regulating the rules of agency in Articles 699 to 717 of the Egyptian Civil Code, in particular Article 710, which provides that: "The principal shall reimburse the agent for what it expended in the ordinary performance of the agency, together with interest thereon from the time of expenditure, regardless of the agent's measure of success in performing the agency," as well as the provision of Article 711, to the effect that the principal is liable for the damage sustained by the agent, without fault on the agent's part, as a result of the ordinary performance of the agency; the Claimant Company also relied, in characterizing the Agency Contract as a mixed contract, on the regulation of commercial agency by Commercial Code No. 17 of 1999 in Articles 148 to 191.

The Claimant Company likewise maintained that the cancellation decision issued by the Respondents on 14 November 2005 is contrary to the law and to the agreement of the contracting parties, and that it was followed by the decision issued by the Respondents on 16 November 2005 suspending the operation of the Agency, and that this decision, too, came in violation of the law and of the agreement of the contracting parties; the effect of which is that the Agency Contract remains in force, meaning that the Claimant Company's right to resort to claiming its right through arbitration has not lapsed.

**Whereas the Arbitral Tribunal, in bringing to light the correct legal position on the plea, notes at the outset that it has the power to apply the correct law to the parties' pleadings in the case,** given that characterization is a pure question of law, since it consists in giving those effects their legal description in preparation for applying the rule of law to them; and since the judge is bound to apply the correct law, it is likewise bound to give the correct legal description to the parties' pleadings and their effects, regardless of the descriptions or characterizations the parties may attach thereto, and regardless of whether the parties raised the correct characterization or did not raise it, and without regard, moreover, to their agreement on a

characterization of their pleadings and their effects." (Muhammad Kamal Abdel Aziz, The Civil Code in Light of Jurisprudence and Legal Doctrine, 1st ed. 1980, Vol. 1 on Obligations, p. 431 et seq.)

Moreover, the Arbitral Tribunal, in respect of the foregoing, notes that its position is the same as that of the trial court, in that it is bound in every case to give the case its true description and to confer upon it the correct legal characterization, without being bound by the parties' characterization of it in the case; and that what matters in characterization is the true intent of the claims, not the words in which those claims were framed, taking into account the factual basis the claimant puts forward in support thereof. Moreover, the correct application of the law does not require a request from the parties, but is rather a duty upon the judge, who is required to seek, of its own accord, the rule applicable to the matter before it, and to apply that rule thereto, whatever the legal text on which the parties rely in support of their claims, defenses, or pleas.

In this regard, the established jurisprudence of the Egyptian Court of Cassation is that: "The criterion in characterizing contracts is what the contracting parties intended thereby, and no regard is given to the descriptions they attached to them or the expressions they included therein, if it appears that such descriptions and expressions contradict the true nature of the contract and what the contracting parties intended by it."

(Cassation Appeal No. 4257 of Judicial Year 62, hearing of 29 December 1993)

Whereas the matter of characterizing the contract at issue — regardless of whether the two contracting parties agreed to attach a particular description to it or to place it under a particular contractual designation — does not bind the Arbitral Tribunal, which is charged with applying the correct law and alone possesses the sound legal characterization of the contract at issue.

Whereas, as regards the contract that is the subject of the dispute and its sound legal characterization, the matter requires a review of its provisions and clauses and the bringing to light of the obligations conferred upon each party and the rights conferred upon it by the agreement.

**In this regard, Article One of the General Agency Agreement** — the article entitled "Appointment" — provides as follows: "Iraqi Airways, referred to in its capacity as the principal or owner (First Party), appoints Horus Company for Tourism and Travel, referred to herein as the sole General Agent in Egypt, which in its capacity has agreed to all that is set out in the provisions of this agreement." **Article Two** of the General Agency Agreement, entitled "Rights of Each Party," provides that: "Unless the two parties agree otherwise in writing, the First Party shall not appoint another party to perform any services similar to those set out in the provisions of this agreement within the same territory........" **Article Three of the agreement**, entitled "Assignment of Obligations," provides that: "Unless this agreement provides otherwise, the General Agent has agreed not to assign, transfer, or delegate a substitute for itself, or to perform its obligations set out in the present agreement to any other party, without the written consent of

the First Party." Likewise, **Article Four** of the agreement, entitled "The Establishment's Owner and Its Agents," provides that: "a. The First Party has the full right to choose whoever acts on its behalf as it deems appropriate, and this includes the sale of transport tickets (whether directly or through others), supervision of reservations, and the staffing and management of its sales offices, notwithstanding that they are its General Agent. The First Party shall notify the General Agent of the aforementioned services and of the service rules governing general agents. b. If the General Agent, after consultations, refuses the presence of a sales representative under its supervision, the First Party may appoint a sales representative, supervise it, hand over to it the relevant documents, and account with it directly. c. It is agreed that this establishment was created in the form of an independent subsidiary company having an official existence derived from the name of the First Party's company, meaning that the name of the First Party may not be changed as a result of the creation of this joint company." **Article Five, entitled "Scope of the General Agent's Powers,"** provides that: "(a) The powers of the General Agent conferred upon it by the First Party shall be precisely determined for use within the agreed territory only. (b) Subject to the provisions of this agreement, the General Agent represents the First Party within the territory as regards the sale of passenger tickets and air freight, in addition to the services required from the First Party (servicing its aircraft) or the aircraft belonging to other companies (airlines) sponsored by the First Party." Article Six, entitled "Services Required from the General Agent," provides that: "The Second Party's exercise of the services and marketing functions includes the following:

a. Marketing and carrying out the advertising necessary for conducting the First Party's business, and appointing the competent staff to conduct this efficiently.

b. Providing, repairing, and renovating the premises necessary for conducting the First Party's business in the General Agent's country (the Second Party).

c. Delivering the consignments handed over by the principal party to their destinations in accordance with the First Party's instructions.

d. Issuing airline tickets, airline invoices, freight notices, or orders to pay the various expenses, or all of these together, or other transport documents, or issuing prepaid tickets, and carrying out the clerical work relating thereto.

e. Visiting tourism companies, other offices, individuals, and bodies to promote the First Party's sales.

f. Supplying all the First Party's offices, agents, and sub-agents with the appropriate printed matter, marketing bulletins, and instructions from time to time, as well as the documents relating to the settlement of accounts between the General Agent and the aforementioned sales representatives.

g. Distributing flight schedules or other printed materials relating to flight times, which the First Party provides when requested by the General Agent or the sub-agents from hotels or the like; and all these papers shall remain the property of the First Party.

h. Making its utmost effort to gain the First Party's trust and to represent it before governmental and regional authorities, as well as public bodies, the press, and institutions, and negotiating with the governmental and judicial authorities that have jurisdiction over air transport services in the First Party's territory.

i. Providing the First Party with statistics on an ongoing basis, as well as the reports required by the First Party.

j. Providing the First Party with the necessary information relating to all laws and all developments in this regard, in accordance with this agreement.

k. Performing all the services that the First Party is obliged to provide relating to other airlines, in accordance with the First Party's instructions.


**Article Seven, entitled "Quality of Services," provides that:**

"1. The Second Party undertakes to make its utmost effort to provide what the First Party requests in connection with improving the service that the First Party provides under this agreement.

2. In the absence of instructions or orders from the First Party, the Second Party shall provide the services in accordance with the binding international specifications."

3. The Second Party undertakes to take all possible steps to ensure the quality of the services provided to the First Party, which shall in no way be lower than the same prior standard or its equivalent in other companies (as if the General Agent were the owner of these aircraft and the like).

**Clause Nine, entitled "Monitoring of Prices and Instructions," provides that:**

"1. The General Agent undertakes to monitor all the tariffs, rules, laws, instructions, and information established by the First Party, and shall be responsible for their implementation within its country and by its agents.

2. The General Agent shall abide by all decisions issued by IATA, as well as the service rules and regulations set out in this agreement.

3. The General Agent is not permitted to change or amend — nor are its agents permitted to change or amend — any of the conditions or clauses set out in the conditions of carriage or the printed materials issued by the First Party."

**Clause Ten of the agreement, entitled Operational Documents ("Airline Tickets"), provides that:**

a. The First Party may supply the General Agent with operational documents ("airline tickets") in the manner the First Party deems appropriate, so that the General Agent, the principal's agents, and the sub-agents may operate in the sale of travel tickets relating to the First Party's services and the services of its partners.

b. These documents shall remain the exclusive property of the First Party, which alone has the full right to issue and circulate them in accordance with this agreement; and the General Agent shall bear full responsibility for the use and protection of these documents as long as they are in its possession.

2. The General Agent may issue free or discounted tickets on the First Party's transport routes, with the prior written consent of the First Party.

**Clause Eleven provides that:** "1. The First Party shall pay the General Agent's commission on the tickets issued on the First Party's airline routes, whether basic or additional, or on aircraft charter, or on flights of other airlines relating to the First Party's services and issued from the General Agent's country, in accordance with the regulations, rules, and laws of IATA governing this, provided that it is the General Agent that issued the First Party's documents; and the commission on sales shall be as follows:

a. International passenger: 9% of the basic price of the actual cost, or the nominal value, or both together.

b. Cargo: 5% of the transport charges for the shipped goods.

2. In addition to the commission on sales set out in the preceding paragraph, the First Party shall pay the General Agent another incentive percentage on all sales issued by the General Agent or the sub-agents under this agreement, whether on its regular scheduled flights or the additional flights in effect in the General Agent's country; and this commission shall be distributed as follows:

(a) Passenger tickets: 3% of the price relating to the actual value of this portion.

(b) Freight: 2.5% of the price collected for transporting the shipped goods, as set out in Clause 1(b).

3. Notwithstanding the provisions of the aforementioned clause, the First Party shall pay the commission (basic or incentive) to the General Agent for the tickets issued, provided that the

General Agent issues these tickets in its country and that their price is prepaid, where there are no sales and no additional commissions granted to any other general agent of the First Party.

4. No commissions shall be granted on any charges arising from excess baggage weight or excess taxes.

5. The aforementioned percentages granted in accordance with this clause shall remain the sole reward for all sales of airline tickets on the First Party's routes to the General Agent under this agreement; notwithstanding all the foregoing, nothing herein shall prevent the First Party from compensating the General Agent for its expenses in meeting the First Party's requirements or its additional written instructions, in return for the additional services the General Agent customarily performs.

6. Notwithstanding what was previously stated in this clause, the sales commission and the incentive commission shall be paid to the General Agent for its additional sales on the First Party's regular and additional airline routes, for the tickets issued by credit cards to the First Party's account outside Egypt, in the event that there is no commission or additional commission that the First Party has paid to another general agent.

7. In the event of a full or partial refund of tickets, or the collection of any amounts through the General Agent on the First Party's tickets, no commission shall be paid to the General Agent for any refunded amounts; consequently, the General Agent shall return to the First Party any commission that may have been credited to it as a result of such refund.

**The addendum to the contract dated 15 March 2001 also comprised the following clauses:**
1. The appointment of the Second Party as General Agent for the General Company for Iraqi Airways in the Arab Republic of Egypt as of 15 March 2001; and the terms of the international agreements governing the agency contract apply to this contract, in addition to the terms set out in this addendum, which are deemed an integral part of the Agency Contract.

2. The Second Party shall conduct its commercial and marketing activity through its offices and the office of Iraqi Airways in Cairo.

3. The First Party shall carry out the management, follow-up, and reservations relating to the travel of government delegates and the issuance of their travel tickets, and shall bear responsibility therefor administratively and "financially."

4. The Second Party shall bear the salaries of the staff of the Iraqi Airways office (the First Party) in Cairo and at Cairo Airport, and undertakes to cover all the entitlements of the said staff in accordance with the applicable legal provisions and legislation in this field; and the number of assigned staff may be increased according to work circumstances and with written approval issued by the First Party.

5. The Second Party shall bear the charges and costs of telephone calls, telex, and fax issued from the First Party's office in Cairo to the Company's headquarters in Baghdad and its agents, as well as bearing the water, electricity, and air-conditioning charges, and the fees for insuring the office and the vehicle, the registration, and the vehicle guarantee.

6. The Second Party undertakes to pay the annual rental allowances for the First Party's office in the city of Cairo and the Company's office at Cairo Airport, as of the date it assumed responsibility for the Agency; and it shall also bear any expenses or costs arising from an increase in the rental allowances in accordance with the legislation in force.

7. The Second Party shall bear the salary of the First Party's lawyer assigned to the work, amounting to five hundred (500) Egyptian pounds per month; and the salary may be increased with written approval from the First Party.

8. The Second Party shall bear the fees and charges of the annual subscription to SITA, the telex, the wireless station at the airport, the reservation system ( ), and the subscription fees to the committee of public airline companies ( ).

9. The Second Party shall bear the charges for cleaning, upkeep, and maintenance of the First Party's offices in Cairo, as well as the maintenance and upkeep of the general equipment therein.

10. The Second Party shall undertake, at its own expense, to secure all the stationery needs of the First Party's offices in Cairo and the station.

11. The Second Party undertakes to bear the advertising and publicity expenses necessary for the First Party's offices.

12. The General Agent shall bear the hospitality costs and expenses and the hotel charges for the First Party's delegates — the officials and bodies — as well as donations and any other incidental expenses.

13. The Second Party undertakes to maintain and keep up the office and to furnish the office for the First Party in the city and at the airport, in a manner befitting its standing, in preparation for future work, and in coordination with the office manager.

14. The Second Party undertakes to bear the costs of enrolling the office staff in the training and development courses required by the course of work.

15. The Second Party shall bear the provision of the unified uniform for the summer and winter seasons for the staff working in the First Party's office in the city and at the airport.

16. The two contracting parties shall undertake to resolve all new developments and disputes arising between them by amicable means; and in the event that no resolution is reached regarding matters or services arising between the two parties, they shall be resolved through an arbitration committee agreed upon by the two contracting parties.

17. The Second Party undertakes to renew the office and airport vehicles during the Agency period, registered in the name of the General Company for Iraqi Airways, as follows: a. A vehicle for the use of the office manager in Cairo, and a vehicle for the station manager upon commencement of operations. b. A vehicle for official guests, to remain with the Second Party and to be requested from the First Party when needed. c. The Second Party shall bear the payment of fuel and oil charges for the office vehicles in the city and at the airport that are used by the staff.

18. The Second Party shall undertake to settle and pay all the amounts and debts owed by the First Party as of the date of the closure of the office in the year 1991, the historical date mentioned above, and in accordance with the attached statement.

19. The Second Party shall make efforts with the Cairo Airport Authority and EgyptAir concerning the amounts owed to them by the First Party, and shall proceed on its behalf in the procedures for cancelling or reducing the debts with the relevant authorities in favor of the First Party.

20. With reference to Paragraph 24 of the standard Agency Contract signed between the two parties, the Second Party undertakes the following: a. To provide a bank guarantee in the amount of two hundred thousand (200,000) dollars upon commencement of operations and receipt of the First Party's travel documents and the conduct of commercial activity thereunder. b. To provide a bank guarantee in the amount of one hundred thousand (100,000) dollars as security for the Company's rights at present, to be replaced by paragraph (a) upon commencement of operations.

As regards the provision of Article 178 of the Egyptian Commercial Code, which states that: "the contract agent is the one who alone bears the expenses necessary for managing its activity," and as regards what the Explanatory Memorandum of the Egyptian Commercial Code stated — that Article 178 added a further condition for a contract to be regarded as a contract agency, namely that the agent carries out its activity independently.

Whereas this description of the contract agent's independence is not present in, but rather is negated by, the contract at issue — as is established from this contract and its addendum, namely the absence of independence of the General Agent (the Claimant Company); this is evident, firstly, from the established subordination of the Claimant Company (Horus Company for Tourism and Travel) to the General Company for Iraqi Airways, and its being subject to the latter's control and direct supervision through its representative, the Company's regional manager, as set out in Article Four of the principal Agency Contract; a matter also confirmed by Clause 6 of the principal contract, to the effect that all papers and documents remain the exclusive property of the General Agent, in addition to what is set out in Clause 9 of the contract, that the General Agent is not permitted to change or amend any of the conditions or clauses set out in the conditions of carriage or the printed materials issued by the First Party (that is, the Respondent, the first Respondent Company).

The matter is also evident — secondly — in view of the first Respondent Company's obligation to compensate the General Agent for the financial expenses it incurred in performing all the obligations stipulated in the contract clauses, and what is set out in Clause 11/5 of the General Agency Agreement whose clauses were set out above, which provides that: "notwithstanding the foregoing, nothing shall prevent the First Party from compensating the General Agent for its expenses in meeting the First Party's requirements," in addition to the provision in Clause 11/1 that: "the First Party (the first Respondent Company) shall pay the commission of the General Agent (the Claimant Company) on the tickets issued on the First Party's airline routes" — which makes the contract at issue a commercial contract of the general agency type, and not a contract-agency contract.

Whereas the Respondents themselves stated that the contract at issue includes other obligations that are not among the obligations by which a contract agency is defined, as set out verbatim in the memorandum submitted on behalf of the Respondents by Mahmoud Samir El-Sherkawy at page 15, in which the Respondents stated that Clause 6 of the Agency Contract dated 30 January 2001 provided for the agent's obligation to provide, repair, and to renew the premises necessary for conducting the First Party's business in the agent's country; and that paragraph (k) of the same Clause 6 obliges the agent to perform all the services that the First Party is obliged to provide relating to other airlines, in accordance with the First Party's instructions.

Moreover, the Respondents, at page 18 of their aforementioned memorandum, stated that: "There is no dispute that this addendum imposes on the agent obligations that do not ordinarily fall within the obligations of a contract agent, namely: — settling and paying all the amounts and debts owed by the First Party as of the date of the closure of the office in 1991, in accordance with the attached statement (Clause 18 of the addendum); — making efforts with the Cairo Airport Authority and EgyptAir concerning the amounts owed to them by the First Party, and proceeding on its behalf in the procedures for cancelling or reducing the debts with the relevant authorities in favor of the First Party (Clause 19 of the addendum)...."

Whereas, in light of the foregoing, and the obligations contained in the documents concluded between the two parties, the Arbitral Tribunal has concluded that the correct characterization of the contractual relationship between the two parties is that it is a general commercial agency and not a contract agency — which is what the plea raised by the Respondents applies to or falls under.

This is in addition to the fact that the Arbitral Tribunal has concluded that it is established from the case file that the Respondent Company did not follow the procedures stipulated by the contract, or set out in the provisions of the law, regarding the rescission or termination of the Agency Contract; and that, accordingly, the contractual relationship between the parties to the general agency at issue was not rescinded or terminated, and that it remains in force and continuing.

Whereas, in light of the foregoing, the limitation period for the lapse of the right to claim — given that the Arbitral Tribunal has concluded that the contractual relationship between the parties is a general agency — is seven years, the calculation of which begins only from the termination of the contract, and on condition that the holder of the right invokes it; and whereas, in all events, the Respondents neither raised nor invoked that plea based on the lapse of the right by the calculation of this period.

Whereas the contractual relationship between the Claimant Company and the Respondents — governed by the General Agency Agreement concluded on 30 January 2001, the addendum to the Agency Contract dated 15 March 2001, and the agreement to reactivate the Agency Contract and the addendum dated 29 August 2005 — has not expired, nor has it been cancelled or rescinded, and it remains in force, as the Arbitral Tribunal has concluded and as set out above.

Consequently, **the plea raised by the Respondents that the Claimant Company's right to bring the arbitral claim lapsed by the passage of two years** was raised without merit and without basis in fact or in law, and the Arbitral Tribunal rules to reject it without stating so in the operative part.

## **RESPONSE TO THE CLAIMS**

Whereas the Claimant Company's final claims are as follows:

1. To order the Respondents — namely, the Prime Minister of Iraq (Head of the Iraqi Government), the Minister of Transport, and the Minister of Finance of the State of Iraq, all in their capacities, and the Respondent Company (the General Company for Iraqi Airways for Iraqi Airways), jointly and severally, by a final judgment enforceable on an expedited basis, to pay the following amounts as compensation to the claimant company, namely:

a. The amount of USD 103,672,853 (one hundred and three million, six hundred and seventy-two thousand, eight hundred and fifty-three US dollars), being the value of what was actually spent to perform the obligations set out in the Agency Contract, representing the value of the losses and expenses of the Claimant Company according to the auditor's report and a certified accounting expert report.

b. The amount of USD 542,096,579 (five hundred and forty-two million, ninety-six thousand, five hundred and seventy-nine US dollars), being the value of the lost profit as established by the financial and accounting reports submitted.

c. The amount of USD 100,000,000 (one hundred million US dollars only), by way of compensation for the unlawful and arbitrary termination and suspension of the Agency Contract.

d. The amount of five hundred million dollars, being the value of compensation for the non-material damage sustained by the Claimant Company.

1. To order the Respondents to pay legal interest on the total value of the claim, from the date of the claim until full payment, at a rate not less than 11% and not less than the interest rate of the Central Bank of Egypt.

2. To order the Respondents to pay all the costs of the arbitration, its deposit, its expenses, and the arbitrators' fees.

3. To order the Respondents to pay the amount of USD 400,000 as estimated fees to be paid to the Claimant Company's lawyers, from the beginning of the dispute until the issuance of the Arbitral Tribunal's decision.

4. To order the Respondents to pay all the expenses and fees for the enforcement formula on the arbitration award.

5. To order the Respondents to pay the amount of USD 5,000 (five thousand US dollars only) for each day they refrain from enforcing the arbitration award, from the date of its issuance.

Whereas the Claimant Company sent an email to the Arbitral Tribunal on 21 June 2023 requesting the correction of a clerical error that occurred in item "d" of its claims, followed by delivering the correspondence in hard copy to the arbitration secretary on 22 June 2023 with the same content, so that its claim, after correction, became: "the amount of five hundred million dollars, being the value of compensation for the non-material damage sustained by the Claimant Company," instead of the phrase "five hundred US dollars."

Whereas the correction of a clerical error is not a new claim, such that this correction is not deemed to have been submitted on a date subsequent to the expiry of the deadline set for filing the closing memoranda, as maintained by the Respondents; this is because what matters is the true nature of the claims, over which the Arbitral Tribunal has the power of characterization and examination — which is what the Arbitral Tribunal became certain of, concluding that the true nature of the claim in item "d" of the final claims filed by the Claimant Company is a claim for five hundred million US dollars and not five hundred US dollars, as is established in the claims of the Claimant Company since it filed the Statement of the Arbitral Claim, and in its memoranda throughout the conduct of the arbitral proceedings, and in the closing memorandum itself and its contents — being the memorandum filed on 20 June 2023.

**Accordingly, the Arbitral Tribunal responds to these claims as follows:**

**First: Regarding the claims of the Claimant Company against the Prime Minister of Iraq and the Iraqi Minister of Finance:**

Whereas it is established that the Claimant Company did not take the procedures to join the Prime Minister of Iraq (Head of the Iraqi Government), in his capacity, and the Iraqi Minister of Finance, in his capacity, in the arbitral proceedings; **and therefore the Arbitral Tribunal rules**

**that their joinder in the arbitral proceedings is inadmissible, and disregards the Claimant's request to order them to pay any amounts or claims in the case.**

Second: **Regarding the Claimant's request for a judgment ordering the Respondents (namely, the first Respondent, the General Company for Iraqi Airways, and the second Respondent, the Iraqi Minister of Transport, "in his capacity") to pay it the amount of USD 103,672,853:**

The Claimant seeks a judgment ordering the Respondents to pay it the amount of USD 103,672,853 (one hundred and three million, six hundred and seventy-two thousand, eight hundred and fifty-three US dollars), being the value of what was actually spent to perform the obligations set out in the Agency Contract, representing the value of the losses and expenses of the Claimant Company. Whereas the Arbitral Tribunal prefaces its ruling in this regard by stating that it is legally established, and in accordance with the settled rulings of the Egyptian Court of Cassation, that "the judge of the case is bound in every event to give the case its description and to confer upon it the correct legal characterization, without being bound by the parties' characterization of it, within the limits of the cause of action." (Appeal No. 29 of Judicial Year 63, hearing of 25 November 1996, Technical Office Collection, Year 47, p. 1387) And that the trial court may characterize the case according to what it discerns from its facts, and apply to it its correct description in law, being bound in this only by the facts and claims presented to it. (Civil Cassation No. 2754, of Judicial Year 60, hearing of 30 October 1994, Technical Office Collection, Year 45, p. 297 — paragraph 2) It is also legally established that "what matters in setting out the claims is their true intent, without regard to the expressions in which they were framed." (Civil Cassation in Appeal No. 4497 of Judicial Year 62, hearing of 27 January 1994, Technical Office, Year 45, p. 278, paragraph 1).

Whereas, in light of the foregoing, the Claimant Company's claim is based on the contractual liability arising from the contract concluded between it and the Respondent Company, consisting of the Respondent Company's breach of the performance of the contract.

Whereas it is legally established that: "For fault in contractual liability to arise, it suffices to establish the contracting party's non-performance of its obligations under the contract, and liability is not lifted from it unless it itself proves that the non-performance is due to force majeure, or a foreign cause, or the fault of the other contracting party." (Appeal No. 199, of Judicial Year 36, hearing of 24 November 1970, Technical Office, Vol. 1, p. 1148) and that the establishment of the fault giving rise to contractual liability on one of the contracting parties is an objective assessment within the exclusive province of the trial court, within the limits of its discretionary power, so long as its inference is sound." (Appeal No. 30, of Judicial Year 36, hearing of 30 April 1971, Technical Office, Vol., p. 756); it is also legally established that: "the criterion of contractual liability is the breach of a contractual obligation resulting in damage, whenever there is a causal relationship between the fault and the damage, unless that relationship is negated by the existence of a foreign cause beyond the debtor's control — whether force

majeure, a fortuitous event, the fault of the injured creditor, or the act of a third party — since in all these cases the damage is not attributable to the contractual fault, and consequently this debtor is not obliged to compensate for this damage. And that the contractual fault materializes merely upon the debtor's failure to fulfill its obligation, whatever the cause of the failure, and whether that breach arises from intent or negligence; in this it is equal whether the debtor's obligation is an obligation to achieve a result or an obligation to exercise care; and the non-performance of the contractual obligation is in itself a defect that gives rise to liability." (Arbitration Award No. 1 of 1984, hearing date 7 July 1985, Cairo Regional Centre for International Commercial Arbitration).

Whereas it is established from the record that the first Respondent Company issued a decision to terminate the general Agency Contract concluded between it and the Claimant Company by its unilateral will — being the decision issued on 2 December 2004 by virtue of the letter addressed from the first Respondent Company to the Claimant Company under No. 417, entitled "Termination of the General Agency," which provides for the termination of the General Agency Agreement as of 1 February 2005, which, upon examination, appears, firstly, **to be devoid of any mention of reasons for the termination or any statement of contractual breaches committed by the Claimant Company;** and, secondly, to contain an acknowledgment by the first Respondent Company that the sole reason for terminating the Agency is its unilateral will to terminate the Agency Contract concluded with the Claimant Company, describing it as one of the side effects that used to be imposed by the organs of the former regime and that do not serve the economic objectives of the first Respondent Company. As this decision stated verbatim, the first Respondent Company informs the Claimant Company of the termination of the general Agency Contract: "In view of the State's orientations in the new Iraq toward rehabilitating the General Company for Iraqi Airways in a manner that qualifies it to resume operations, exercise its activity in the field of air transport, and rebuild its traditional markets away from the side effects that used to be imposed by the organs of the former regime and that do not serve the economic objectives of the first Respondent Company, we wish to inform you of our company's desire to terminate the General Agency Agreement in Egypt concluded with you as of 1 February 2005..."

In light of the foregoing, it has also been established to the Arbitral Tribunal that the first Respondent Company deliberately committed a gross contractual fault — as is also established by its retraction of the earlier decision it had issued on 2 December 2004 terminating the Agency, and its return to its obligation to reactivate it by virtue of the agreement concluded between it and the Claimant Company on 29 August 2005, which likewise was devoid of any assertion of, or reference to, the attribution of any contractual breaches to the Claimant Company.

The Arbitral Tribunal concluded from this that, notwithstanding the aforementioned retraction by the first Respondent Company, in the manner described, from the decision terminating the Agency in violation of the law and the aforementioned contractual obligations, it returned —

deliberately — to repeating the same gross fault, in breach of the contractual obligations and in breach of the law, by deliberately and without legitimate justification refraining from performing the Agency Contract and its addendum, and from performing the agreement concluded on 29 August 2005 to reactivate the Agency Contract; as, after no more than two and a half months, it issued after only that agreement to reactivate the Agency, another new decision dated 14 November 2005, likewise by its unilateral will, terminating the general Agency of the Claimant Company, providing that such termination be effective as of 1 December 2005.

The Arbitral Tribunal has also established that the aforementioned decision issued on 14 November 2005 terminating the Agency was issued containing an attempt to find a justification for terminating the contract by claiming, in a general manner without detail or proof, that the Claimant Company failed to fulfill its contractual obligations — in violation, firstly, of what is established from the documents submitted by the Claimant Company in the course of its claim for what it spent in order to fulfill and perform its contractual obligations, including what it spent in the period prior to the first Respondent Company's operation of its aircraft, as also established from the report of the expert appointed in the arbitral proceedings and from what the Arbitral Tribunal ascertained by examining, itself and directly, the documents and papers of the arbitral proceedings.

Moreover, this decision issued by the first Respondent Company on 14 November 2005 terminating the Agency, and the decision that followed it suspending the Agency on 16 November 2005, were also issued — secondly — in violation of logical and legal reasoning, given the impossibility of conceiving that the Claimant Company refrained from performing its contractual obligations connected with the first Respondent's operation of its aircraft, whereas it is established from the record and from the first Respondent Company's own decision terminating the Agency Contract at issue that it deliberately refrained from fulfilling its contractual obligations to achieve a result — namely, the obligation to deliver to the Claimant Company the travel documents, tickets, papers, and information; it also refrained from handing over to it the head office to commence the business of the Agency at issue, being the tools necessary to enable the Claimant Company to begin conducting the business of the Agency — in a manner that made it impossible for the Claimant to perform its contractual obligations founded upon that enablement.

The Arbitral Tribunal has also established, through examining the papers and documents exchanged between the two parties, that the aforementioned decision issued on 14 November 2005 by the Respondent terminating the Agency was likewise issued in violation of logic and rational reasoning in alleging against the Claimant Company a breach of the contractual obligations, whereas it is established from this second unilateral termination decision issued by the Respondents for the Agency Contract that the actual operation — which is the first condition for the commencement of the Claimant's obligations — had not been realized, and that the commencement of operation of the airline routes had begun only a few days before the termination decision; and whereas it is also established that no more than two and a half months

had passed between the agreement concluded on 29 August 2005 — by which the Respondent Company retracted its earlier decision terminating the Agency — and the second decision issued by the Respondents terminating the Agency Contract, dated 14 November 2005.

The Arbitral Tribunal has also established, through examining the papers and documents exchanged between the two parties, the gross fault of the first Respondent Company in its deliberate breach of its contractual obligations — among them its obligation stipulated in the addendum to the general Agency Contract dated 15 March 2001 to fulfill all the contractual obligations in application of the principle of good faith in the performance of contracts — namely, the termination of the general Agency at issue; as the first Respondent Company acknowledged, in what it stated in the decision terminating the Agency Contract — being the decision issued on 14 November 2005 itself — that the reason for issuing this decision is that it would act unilaterally and itself undertake, after resuming the operation of Iraqi Airways' aircraft to and from Egypt, the direct operation and the conduct of the business that it had entrusted, under the general Agency Contract, to the Claimant Company — thereby deliberately, and without justification, cause, or legitimate ground, depriving the Claimant Company of the rights established for it under the contract.

This deliberate gross fault — committed by the first Respondent Company and the second Respondent through refraining from performing their contractual obligations and through the premature, deliberate, and unjustified termination of the Agency Contract at issue — was further confirmed by what the first Respondent Company did on 16 November 2005 in issuing a decision to suspend the Agency, that is, only two days after issuing the second termination decision on 14 November 2005 — a decision that is contradictory to, and in conflict with, the decision terminating the Agency, and contradictory also with what the Respondents themselves repeatedly maintained: that the entry of the Agency Contract into force, and consequently the obligations of the two parties, is contingent upon the commencement of operation of the Iraqi Airways routes. As the first Respondent Company stated — as established to the Arbitral Tribunal in the manner set out above — that the suspension of the Agency of the General Company under the general Agency and its addendum and the minutes of the meeting dated 29 August 2005; whereas it is expressly established from what this decision contained that the reason for the first Respondent Company's terminating the Agency Contract at issue and then suspending it is that the will of the first Respondent Company turned toward conducting the operating activity itself, without any agent, through its office in Cairo, and toward excluding the Claimant Company because it had previously been labeled one of the "front companies," and whereas there appeared verbatim, at the end of this decision issued by the first Respondent Company, the phrase: "..and our company will undertake direct operation through our office in Cairo" — as is also established by what appeared in the letter of the second Respondent, the Iraqi Minister of Transport, which contained the acknowledgment that: "the general Agency Contract in Egypt has been terminated between the above company (the General Company for Iraqi Airways) and Horus Company for Tourism and Travel (the Claimant), based on what appeared

in your Secretariat's esteemed letter No. (Q/2098/1/6) of 8 May 2005, containing the classification of the said Claimant Company as one of the front companies" — being the letter submitted by the Claimant Company in bundle No. 5 filed together with the Statement of the Arbitral Claim, which the Respondents attempted, in their defense, to interpret contrary to the explicit wording and clear expression contained therein.

Whereas the aforementioned letter issued by the Iraqi Minister of Transport (the second Respondent) to the General Secretariat of the Iraqi Council of Ministers contained a proposal to settle the matter amicably in order to avoid the damage befalling the first Respondent Company, which it estimated at that time at more than ninety million dollars. This is what establishes the correctness of what the Claimant Company maintained and pleaded — that the termination and suspension of the Agency were contrary to the law and contrary to the agreement of the parties to the Agency Contract, and without justification or legitimate ground; and in particular because it was based on implementing the State's orientations in Iraq and the pursuit of terminating the contracts concluded under the former regime, and on the basis of classifying the Claimant Company as one of the front companies, and in pursuit on the part of the Respondents to undertake the direct operation of the first Respondent's aircraft and to exclude the Claimant Company.

Likewise, whereas it has been established to the Arbitral Tribunal the fault of the Respondents arising from the first Respondent Company's refraining from performing its contractual obligations to deliver to the Claimant Company the travel documents, tickets, papers, and information, and its refraining from handing over to it the Claimant Company's premises in Cairo where the principal activity of the Agency is conducted — being the tools necessary to enable the Claimant Company to begin performing the business of the Agency; as Clauses 1/10 and 6/12 of the principal Agency Contract provide for the obligation of the principal (the Respondent) to supply the General Agent (the Claimant) with all types of documents and information necessary to carry out the business of the Agency. Clause 1/10 also provided for the first Respondent Company's obligation to deliver to the Claimant Company "the operational documents (airline tickets) so that the General Agent may operate in the sale of travel tickets relating to the First Party's services and the services of its partners"; Clause 6/12 also provided for the Respondent Company's obligation to supply the Claimant Company "with all types of tickets and documents that facilitate the sale process on its routes, as well as the sales and refund reports that were deducted, and the credit cards used in all types of sales," Clause 2 of the addendum to the Agency Contract provided for the first Respondent Company's obligation to hand over to the Claimant Company the Company's premises in Cairo, being the premises where the principal activity of the Agency is conducted; Clauses 2 and 4 of the agreement to reactivate the Agency dated 29 August 2005 likewise provided for the first Respondent Company's obligation to deliver to the Claimant Company the travel documents and the technical requisites, including the aircraft certificate, insurance, and registration, and to deliver them together with the operating schedules to the Egyptian aviation authorities for the purpose of their review and

obtaining the operating approvals, and this also conforms to what the Egyptian legislature laid down by virtue of Article 185 of the Egyptian Commercial Code, that: "the principal shall provide the agent with all the information necessary to perform the agency, and shall supply it — in particular — with the specifications of the goods, the samples, drawings, marks, and other data that assist it in promoting and marketing the goods that are the subject of the agency."

Whereas it is established from the record that the first Respondent did not provide any of the documents and information that the contractual obligations required it to provide to the Agency, and refrained from handing over to it the Company's premises in Cairo where the principal activity of the Agency is conducted, and confined itself in its defense to responding to the fault attributed to it by the Claimant Company regarding this refraining from performing its fundamental obligation, by stating that the Claimant Company did not direct a request to it to perform the obligation to deliver the documents and information, and that the Company's head office is owned by it and that consequently it has the right to keep it exclusively without this being deemed a seizure of it.

Whereas what has been set out above establishes the first Respondent Company's breach of its obligations set out in each of the Agency Contract, its addendum, and the agreement to reactivate it; it also violates Article 148 of the Civil Code, which provides that: "1. The contract must be performed in accordance with its contents and in a manner consistent with the requirements of good faith. 2. The contract is not limited to binding the contracting party to what is set out therein, but also extends to its necessary implications, in accordance with the law, custom, and equity, according to the nature of the obligation."

Whereas the obligations of the Respondent Company to hand over the airline office on Qasr El-Nil Street and its offices at the airport, and to deliver the documents, tickets, and information necessary for the Claimant Company to perform its work, as well as its obligation to pay the expenses and commissions to the Claimant, are obligations to achieve a result that were not fulfilled owing to the first Respondent Company's deliberate refraining from performing them.

Whereas it is evident from the foregoing that the will of the first Respondent Company turned toward refraining from performing its contractual obligations, which entails — in application of paragraph (d) of Article 220 of the Egyptian Civil Code — that there is no need for the Claimant Company to serve the first Respondent Company with a notice to perform its contractual obligations.

Whereas it is established from the case file the necessity of the first Respondent Company's fulfillment of these obligations, since this fulfillment is the primary and fundamental prerequisite for enabling the Claimant Company to begin performing the contract, and what may result from enabling it with those documents, tools, and premises for conducting the activity — in terms of the possibility of holding it accountable for the performance of its contractual obligations or otherwise, or for delay in their performance, or breach thereof or otherwise.

Whereas the first Respondent Company also issued (in the manner set out in detail above) successive decisions terminating the Agency Contract, then reactivating it, then only two days later issuing another decision suspending the operation of the Agency — without the first Respondent Company's allegations against the Claimant Company of breach of the contractual obligations having any effect on its decisions to restore the Agency or reactivate it after terminating it; indeed, in a manner that amounts to a waiver by the first Respondent Company of any allegation on its part of any prior commission by the Claimant Company of any contractual breach.

Therefore, the Arbitral Tribunal — given the establishment of the first Respondent Company's breach also of its obligation to fulfill its contractual obligations in good faith, as stipulated in the addendum to the general Agency Contract dated 15 March 2001; and given the establishment of its deliberately refraining, in the manner of gross fault, from performing its contractual obligations, including its obligations to achieve a result — among them the first Respondent Company's refraining from delivering to the Claimant Company, in its capacity as General Agent, the aforementioned documents and information, and its refraining from handing over to it the Company's premises in Cairo where the principal activity of the Agency is conducted, thereby closing the doors upon the Claimant Company and impeding it, against its will, from performing the Agency Contract.

And since it has been established from the foregoing the deliberate refraining by the Respondents, in an unlawful and unjustified manner, from performing the obligations they undertook by virtue of each of the general Agency Contract, its addendum, and the agreement to reactivate the Agency dated 29 August 2005 — therefore, **the Arbitral Tribunal also rules that all the pleas raised by the Respondents in an attempt to negate their faults** and to disclaim liability are invalid, and in particular the allegation that the decisions terminating the general Agency contract were attributable to the Claimant Company's breach of its contractual obligations.

Whereas, in light of the foregoing, the Arbitral Tribunal, in respect of this claim, adopts — in addition to the foregoing — what is legally established, that "the expert's opinion is no more than one of the elements of evidence for the trial court, whose assessment thereof is not subject to review, and that if the court adopts the expert's report because it is satisfied of the correctness of what it contains, it is not bound to respond independently to the objections directed against it, or to grant a request to return the assignment to the expert, because in its adoption of the said report, based on its reasoning, there is included the response that defeats those objections; and it is likewise established that the trial court's adoption of the expert's report dispenses with the need to respond to the objections directed against it or to take another measure of the measures of proof. (Civil Cassation, hearing of 13 November 1958, Technical Office Collection, Vol. 9, p. 689; hearing of 6 December 1975, the said Collection, Vol. 26, p. 1566; hearing of 27 January 1981 in Appeal No. 665, Judicial Year 47).

Whereas, in addition to the Arbitral Tribunal's adoption of the expert's report submitted in this case, for the sufficiency of the research on which it was based, the soundness of the conclusions it reached, and its reliance on established sources in the case papers and documents — it founds its ruling on what it ascertained from its own examination and its perusal of all the case papers, namely that the Respondent Company breached its contractual obligations.

Whereas the contractual fault consists merely in the debtor's non-performance of its obligation arising from the contract in the manner set out therein, whether the non-performance is total or partial, or the performance is defective or delayed, and regardless of the motives, incentives, or aims.

Whereas it is established from the technical report submitted by the expert appointed in the arbitral proceedings — in addition to what the Arbitral Tribunal concluded from its examination and scrutiny of the case papers, its documents, and the memoranda submitted therein by the two parties — the establishment of the deliberate gross fault, consisting in refraining from performing the contractual obligations on the part of the Respondents, and in the manner that resulted in the damages claimed by the Claimant Company, whose occurrence the Arbitral Tribunal has established, and of which the Arbitral Tribunal has established the existence of a causal relationship between the Respondents' fault and the damages sustained by the Claimant Company; therefore, the Arbitral Tribunal has concluded the Respondents' contractual liability to compensate the Claimant Company for the damages it sustained.

And although the debtor in contractual liability is obliged to compensate the injured party for the damage it sustained, including the loss it incurred and the profit it lost, provided that such damage was foreseeable at the time of contracting and that the criterion for foreseeing the damage is an objective criterion and not a subjective one — nevertheless, whereas it has been established to the Arbitral Tribunal from the case papers and documents that the Respondents' fault is a deliberate gross fault, contrary to the principle of good faith in the performance of contracts and rising to the level of fraud, such that the one who commits it is obliged to compensate even beyond what was foreseeable at the time of contracting — this is what the Arbitral Tribunal shall take into account in its assessment of the compensation claimed by the Claimant Company.

Whereas, as regards the value of the compensation claimed, the Arbitral Tribunal prefaces its ruling in this regard by stating that it is legally established that if the compensation is not assessed in the contract or by a provision of law, then it is the judge who assesses it; and the compensation includes the loss incurred by the creditor and the profit it lost. It is also legally established that: "the assessment of compensation is within the absolute discretion of the trial court, according to what it deems appropriate, guided in this by all the circumstances and facts of the case; it is not obliged to explain or respond to the circumstances the appellant raised, without indicating the compensation it deemed appropriate; and that if the compensation is not assessed by agreement or by a provision of law, then the trial court has full authority in its assessment,

without review thereof; and it suffices for the Court of Cassation that it has set out the elements of the damage for which it assessed the compensation." (Appeal No. 3714 of Judicial Year 67, hearing of Tuesday, 23 June 1998).

Whereas, in light of what the Arbitral Tribunal concluded as to the establishment of the deliberate gross contractual fault attributable to the Respondents in the manner set out above, and whereas this fault was coupled with damages sustained by the Claimant Company, consisting of the value of the amounts it spent to perform the obligations set out in the Agency Contract, which represents the value of the losses and expenses of the Claimant Company.

Whereas the report of the expert appointed by the Arbitral Tribunal concluded that the Claimant Company is entitled to compensation of USD 94,559,028 (ninety-four million, five hundred and fifty-nine thousand, and twenty-eight US dollars), representing the loss incurred by the Claimant.

Whereas the Arbitral Tribunal adopts the conclusion of the expert's report, being satisfied with it and with the soundness of the research the expert followed in assessing those amounts from the reality established in the record — particularly since the Tribunal is satisfied that the expert report excluded all the documents not translated into Arabic in assessing the value of the losses incurred by the Claimant Company — and in view of the other grounds the Arbitral Tribunal brought to light, and what the Arbitral Tribunal established from its own examination, scrutiny, and perusal of the case papers, documents, and memoranda submitted by the parties to the arbitration dispute; therefore, the Arbitral Tribunal rules to order the Respondents, jointly, to pay the Claimant the amount of USD 94,559,028 (ninety-four million, five hundred and fifty-nine thousand, and twenty-eight US dollars only), as compensation for the value of what the Claimant Company actually spent to perform the obligations set out in the Agency Contract, and the value of the losses and expenses of the Claimant Company.

Third: **Regarding the Claimant Company's request to order the Respondents to pay it the amount of USD 542,096,579 (five hundred and forty-two million, ninety-six thousand, five hundred and seventy-nine US dollars), being the value of the lost profit.**

The Arbitral Tribunal, in respect of this claim, refers to the settled jurisprudence of the Court of Cassation that: "even if the opportunity is a probability or a mere hope, its forfeiture is a certainty, and the law does not preclude reckoning, within the lost profit — which is an element of the elements of compensation — what the injured party hoped to obtain, so long as this hope has reasonable grounds; that being so, and since the judgment under appeal held that the appellant is entitled to compensation for being referred to pension wrongfully, then excluded, in assessing the compensation, the salary he would have reached and the pension he would have obtained had he remained in service until the age of sixty, on the ground that what matters is his situation at the time of his referral to pension — it thereby violated the law." (Appeal No. 158 of Judicial Year 24, dated 13 November 1958, Technical Office, Vol. 9, No. 3, page 684). In the previous ruling, the Court of Cassation quashed the judgment because it: excluded, in assessing

the compensation, the salary the appellant would have reached and the pension he would have obtained had he remained in service until the age of sixty; the Court of Cassation held that the appellant was entitled, in the assessment of compensation, to the salary he would have reached and the pension he would have obtained had he remained in service until the age of sixty... and this is what establishes the error of the judgment under appeal in the law and the error in its application, and requires that it be quashed. The Court of Cassation also held, in a manner that illustrates the settled nature of these principles, that: "if the opportunity is a probability, then its forfeiture is a certainty, and the law does not preclude reckoning, within the lost profit — which is an element of the elements of compensation — the profit the injured party hoped to obtain, so long as this hope has reasonable grounds." (Appeal No. 300 of Judicial Year 26, dated 29 March 1962, Technical Office, Vol. 13, No. 1, page 350)

And whereas it is established from the expert report filed in the arbitral proceedings — which the Arbitral Tribunal is satisfied with — and from what the Arbitral Tribunal established from its own examination and scrutiny of the papers, documents, pleas, and claims, that the Claimant Company is entitled **only** to the amount of USD 541,747,149 (five hundred and forty-one million, seven hundred and forty-seven thousand, one hundred and forty-nine US dollars only), representing the profit it lost.

And since the elements of compensation are present and their establishment is evident in the manner set out above — namely, by the establishment of the Respondents' fault, consisting in issuing a decision to terminate the Agency and then, two days later, issuing another decision suspending the Agency, in breach of the contract and in breach of the law and without legitimate justification; and by the establishment of the certain damage sustained by the Claimant as a result of the forfeiture of its opportunity to realize the expected profit, in the manner set out in detail in the expert's report and what the Arbitral Tribunal itself ascertained from examining and perusing the papers; and by the establishment of the causal relationship between the Respondents' fault and the damage; and because the Arbitral Tribunal has established all of this and is satisfied with it.

Therefore, the Arbitral Tribunal rules to order the Respondents, jointly, to pay the Claimant the amount of USD 541,747,149 (five hundred and forty-one million, seven hundred and forty-seven thousand, one hundred and forty-nine US dollars), as compensation for the profit it lost.

**Fourth: Regarding the Claimant's request to order the Respondents to pay it, jointly, the amount of USD 100,000,000 (one hundred million US dollars only), by way of compensation for the unlawful and arbitrary termination and suspension of the Agency Contract.**

Whereas the Arbitral Tribunal has concluded to order the Respondents to compensate the Claimant for the loss it previously incurred and the profit it lost, and whereas this compensation is founded on the Respondents' fault in deliberately refraining from performing their contractual

obligations and issuing two successive decisions in breach of the provisions of the contract and the provisions of the law — the first terminating the Agency, then only two days later another decision suspending the operation of the Agency at issue, and that the subject of this claim is compensation for the very same damages that were the subject of the preceding claims; therefore, the Arbitral Tribunal rules to reject this claim.

**Fifth: Regarding the Claimant's request to order the Respondents to pay it, jointly, the amount of five hundred million dollars, being the value of compensation for the damages sustained by the Claimant Company as a result of the harm to its commercial reputation.**

wherein the Claimant relies on what it set out in the Statement of its Arbitral Claim regarding the necessity that the compensation cover the financial damage arising from the unlawful, unjustified termination and suspension in breach of the law and the terms of the Agency, and from the harm to the reputation of the Claimant Company among the companies and individuals connected with it in the Egyptian market and the Iraqi market for tourism and travel, and other companies operating in other fields — particularly since Horus Company and its founder were associated with the operation of relieving the Iraqi people during their crisis, on whom an embargo was imposed for many years, which caused it multiplied damages as a result of the cessation of commercial dealing with the Company and Horus's sister companies, owing to the harm to its commercial reputation through the unlawful and arbitrary termination and suspension, which forfeited for it profit opportunities in other commercial fields it used to conduct within the framework of the United Nations Oil-for-Food Programme; and the Company estimates the value of the compensation claimed here at five hundred million US dollars.

The Arbitral Tribunal prefaces its ruling in this regard by stating that it is legally established, by the text of the first paragraph of Article 53 of the Civil Code, that the juridical person enjoys all rights except those inherent in the natural quality of a human being, within the limits laid down by the law.

And whereas reputation is among the rights enjoyed by the juridical person, just as by the natural person, compensation for harm to reputation — as it is available to natural persons — is also a right of the juridical person; and whereas the jurisprudence of Cassation has settled on the entitlement of companies to obtain compensation for the harm to their reputation (Cassation Appeal No. 11414 of Judicial Year 85, hearing of 13 February 2018, Technical Office 69, part 34, p. 264).

And whereas the Court of Cassation has held that "although non-material damage is that which does not affect the person in its property and may be traced to the harm it may sustain as a result of what affects honor, standing, and dignity, or emotion and feeling, or the mere infringement of an established right — which is inconceivable to occur except if it befalls a natural person — nevertheless, once the juridical person establishes that harm has befallen its commercial reputation in the field of its activity and business and its ability to conduct that business among

its peers, consisting in third parties' abstention from dealing with it in a manner that negatively affected the volume of its activity and dealings, then compensation for the damage in that case may be conceived of as material damage and not non-material damage....".

(Commercial Cassation Appeal No. 5209 of Judicial Year 86, hearing of 22 October 2018; Commercial Cassation Appeal No. 6161 of Judicial Year 85, hearing of 8 November 2020)

And whereas the Respondents stated, at page 33 of their memorandum dated 10 June 2014 submitted by their legal representative Fathi Waly, that "the truth is that the Iraqi Government suspended dealing with the Claimant Company and the rest of the companies headed by the said Imad El-Gelda," and what appeared in this memorandum of harm to the reputation of the Claimant Company by labeling it with the assertion that its former chairman of the board had previously been convicted of a criminal charge and that his supporters assaulted the court, and that this is among the reasons for not dealing with it; the Respondents followed this by stating, in the same place of the aforementioned memorandum, that: "furthermore, some of the companies of Mr. Imad Said El-Gelda, chairman of the board of Horus Company, had concluded contracts with the Iraqi Ministry of Trade but did not pay the amounts owed by them, and for all this the Iraqi Government cancelled its contracts with Mr. Imad El-Gelda and his partners, ..."

And that this constitutes — as the Claimant maintained at page 53 of its memorandum filed on 20 June 2023 — an acknowledgment by the Respondents of the effect resulting from the harm to the commercial reputation of the Claimant Company, in terms of material damages, which the Respondents themselves clarified consisted in the Iraqi Government's preventing the Claimant Company from operating in Iraq, together with the rest of the companies headed by the said Imad El-Gelda.

Whereas, based on the foregoing, the Claimant Company relied on this acknowledgment and the legal effects resulting from it, and maintained that it is an acknowledgment made before the Arbitral Tribunal; and it stated that it establishes all the breaches committed by the Respondents and the invalidity of all their allegations that the Claimant Company breached its contractual obligations, and establishes that the Respondents are the cause of the disruption of the operation of the Agency Contract, and that this acknowledgment establishes the contradiction of the Respondents' defense, to its detriment.

The Claimant also relied on this acknowledgment by the Respondents, for what it established against them of their having caused the damages sustained by the Claimant arising from the Respondents' harm to its commercial reputation and the resulting deprivation from dealing and working over many prior years, and thereafter, in Iraq and abroad; it also maintained that these damages exceed manifold the damage realized and the profit it lost, and exceed manifold the value of the Agency Contract at issue, and that the compensation it claimed for the harm to its commercial reputation, in the amount of five hundred million US dollars, is a modest claim by comparison with what it was deprived of inside and outside Iraq, given the resulting harm to its

reputation, its business, and its dealings at the level of the global market, and that it sustained grave, certain financial damages and grave damages that led to its incurring a grave financial loss, and certain damages that it could not have avoided or averted, with the Respondents' continued harm to it and their allegation against it that it is a front company and a company associated with assisting the former Iraqi regime, and so forth..

Based on this, the Claimant maintained its request for compensation for these damages in the amount of five hundred million US dollars.

And whereas the Arbitral Tribunal, in light of the foregoing and in light of what appeared in the Respondents' aforementioned memorandum and what the Claimant Company maintained thereupon, and what was established of the Respondents' harm to the Claimant Company by alleging against it that it is a front company — as established by the letter addressed from the second Respondent, the Iraqi Minister of Transport, to the General Secretariat of the Council of Ministers, in which he proposed resolving the matter amicably to avoid the damages that might befall the first Respondent Company, signed by him on 11 April 2010 — in which he stated that the General Company for Iraqi Airways (the first Respondent), being one of the formations of this Ministry, informed him that the general Agency Contract in Egypt between it and Horus Company for Tourism and Travel (the Claimant) had been terminated on the basis that it had been classified as one of the front companies; as well as what the first Respondent Company stated in the first Agency termination decision dated 2 December 2004 (before signing the agreement to reactivate the Agency), namely that the orientations of the State in the new Iraq are to rehabilitate the first Respondent Company in order to resume operations, exercise its activity in the field of air transport, and rebuild its traditional markets away from the side effects that used to be imposed by the organs of the former regime and that do not serve the Company's economic objectives; then confirming this in the second Agency termination decision dated 14 November 2005, in which the first Respondent Company reiterated that its will had turned toward resuming the operation of its aircraft itself; and what these harms to the commercial reputation of the Claimant Company led to, in terms of its exclusion also from operating in the Iraqi market.

Whereas the Arbitral Tribunal has discretionary power in determining the value of compensation for these damages.

Therefore, the Arbitral Tribunal rules to order the Respondents, jointly, to pay the amount of one hundred and fifty million US dollars, as compensation to the Claimant for the damages it sustained arising from the harm to its commercial reputation and the resulting financial damages.

**Sixth: Regarding the Claimant's request to order the Respondents to pay legal interest on the total value of the claim, from the date of the claim until full payment, at a rate not less than 11% and not less than the interest rate of the Central Bank of Egypt.**

The Arbitral Tribunal adopts the settled jurisprudence of the Court of Cassation that: "It is established in the jurisprudence of this Court that the purport of Articles 226 and 227 of the Civil Code is that there are two types of interest: compensatory interest, upon which the debtor agrees in advance with its creditor, being in consideration of the debtor's use of a sum of money owed by it under an obligation to pay a specified sum whose maturity date has not yet fallen due; and delay interest, being compensation for the delay in fulfilling the obligation to pay a specified sum of money, where the debtor delays in paying it upon the maturity of its due date; and with regard to the delay interest due for the delay in the payment of debts — and outside banking transactions — the legislature, by the text of Article 227 of the Civil Code, prohibited agreement on delay interest exceeding a known maximum of 7%; and the determination of the maximum limit of interest is a matter of public order. And since the text of Article 50 of Commercial Code No. 17 of 1999 provides that: 1. The loans that a merchant concludes for matters relating to its commercial business are deemed commercial. 2. If the merchant's profession so requires. 3. Amounts or expenses on the account of its clients — it may demand a return thereon from the day of their disbursement, unless otherwise agreed. 4. The return is paid at the end of each year if the debt is deferred for more than a year, and on the maturity day if it is for a term of one year or less, unless otherwise agreed or established by custom."

The Court of Cassation concluded by stating that "the purport of the foregoing is that the legislature presumed the interest condition in loans concluded by a merchant for matters relating to its commercial business, unless the contracting parties agree otherwise, provided that the interest is calculated at the legal rate prescribed in commercial matters unless another rate is agreed; and the interest is paid at the end of each year if the debt is deferred for more than a year, and this interest is paid on the maturity day if the term is a year or less, unless otherwise agreed or established by custom — which indicates the direction of the legislature's intent in the case of the debtor's delay in paying the debt upon the maturity of its due date; and the maximum limit of interest prescribed by law does not apply to loans that the debtor uses before the maturity of their due date. That being so, and since it is established in the record that the arbitration award included in its ruling the ordering of the appellant to pay delay interest at the commercial interest rate applied by the Central Bank, and since the maximum limit of the legal rate, according to what is established in the jurisprudence of this Court, is among the matters connected with public order, and since the Arbitration Law No. 27 of 1994, by the text of the second paragraph of Article 53 thereof, granted the court hearing the annulment action the power to rule of its own accord for the annulment of the arbitration award if the award included anything contrary to public order in Egypt... then the judgment under appeal, in that the arbitration award rejected the action for annulment of the arbitration award, ruling that the interest rate in commercial matters is no longer connected with public order and that the challenge to the judgment for ruling delay interest exceeding 5% is a matter beyond the scope of the annulment action, thereby precluding itself from verifying the extent of the conformity of the interest ruled upon with the maximum limit of delay interest in Article 226 of the Civil Code — it is thereby defective in a manner that requires its quashing, without need to examine the third ground of the grounds of appeal,

provided that the quashing be with remittal." (Appeal No. 12790 of Judicial Year 75, hearing of 22 March 2011, Technical Office 62, part 65, p. 392).

**Whereas, in light of the foregoing, and since** the ordering of delay interest in commercial matters, according to what is established in the jurisprudence of this Court, is among the matters connected with public order in Egypt, **the Arbitral Tribunal rules to order the Respondents to pay interest of 5% on the value of the amounts adjudged, in the manner set out in the operative part.**

**Seventh: As regards the costs and fees of the arbitration:**

The Tribunal — pursuant to what the law provides and what the parties agreed upon in the arbitration clause set out in the text of Clause Sixteen of the General Agency Agreement, that the losing party shall bear all the costs and expenses arising from conducting the arbitration — rules to order the Respondents, jointly, to pay the full arbitration expenses and the full arbitration fees.

Whereas Sherif Abdullah Mohamed, the arbitrator of the Claimant Company, stated that, previously and following his recusal on 17 July 2014, a settlement was reached with the two parties to the arbitration whereby he returned to them the amount of USD 390,000 (three hundred and ninety thousand US dollars) — whereby each party to the arbitration received from His Excellency the amount of USD 195,000 (one hundred and ninety-five thousand US dollars) — out of the entirety of his arbitration fees that he had previously received as arbitrator for the Claimant Company in the period prior to his recusal, being for the period during which he carried out his arbitral task as arbitrator for the Claimant Company from his acceptance of the arbitral task until the date of his recusal on 17 July 2014.

In light of the foregoing, and whereas the fees previously paid by the two parties to the arbitration from the commencement of the arbitration until the resumption of its conduct on 7 February 2023 were USD 1,800,000 (one million eight hundred thousand US dollars), and that there was deducted the amount of USD 390,000 (three hundred and ninety thousand US dollars) from these previously paid fees by the two parties to the arbitration, being the value of what Sherif Abdullah Mohamed returned to the parties to the arbitration out of these fees. Therefore, the net amount actually paid by the parties to the arbitration in light of this, from the commencement of the arbitration until the date of resumption of the arbitration's conduct on 7 February 2023, is the amount of USD 1,420,000 (one million four hundred and twenty thousand US dollars only).

And whereas the Claimant and the Respondents have already paid this assessed value of USD 1,420,000 (one million four hundred and twenty thousand US dollars) equally, whereby each of them paid, of the arbitration fees only, the amount of USD 705,000 (seven hundred and five thousand US dollars).

And whereas, after the reappointment of Sherif Mohamed Abdullah as arbitrator for the Claimant Company on 6 February 2023 and his acceptance of the task, the Arbitral Tribunal issued a decision at the arbitration session held on 16 February 2023 determining his fees for this new task at the value of USD 390,000 (three hundred and ninety thousand US dollars)... And whereas the Respondents did not pay anything of these fees, amounting to three hundred and ninety thousand US dollars.

And whereas, based on the foregoing, the remainder of the full value of the arbitration fees that the Respondents are obliged to pay under the arbitration award, as the losing party, is the total of what the Claimant previously paid of the arbitration fees in the prior period, as the losing party, being the amount of USD 705,000 (seven hundred and five thousand US dollars) on 7 February 2023, in addition to the date of resumption of the arbitration's conduct on 7 February 2023, that is, the amount of USD 705,000 (seven hundred and five thousand US dollars), in addition to the full value of the fees determined by the Arbitral Tribunal on 16 February 2023 for Sherif Abdullah Mohamed, the Claimant's arbitrator, for his task after his reappointment and acceptance of the task, the value of which is USD 390,000 (three hundred and ninety thousand US dollars).

Therefore, the total remainder of the full fees that the Respondents are obliged to pay under the arbitration award, as the losing party, is the amount of USD 1,095,000 (one million ninety-five thousand US dollars).

And whereas the value of the arbitration expenses is USD 50,000 (fifty thousand US dollars), and the Respondents previously paid half thereof, being the amount of USD 25,000 (twenty-five thousand US dollars), and the Claimant previously paid the other half, being the amount of USD 25,000 (twenty-five thousand US dollars).

Therefore, the total remainder of the arbitration expenses that the Respondents are obliged to pay under the arbitration award, as the losing party, is the amount of USD 25,000 (twenty-five thousand US dollars).

And based on the foregoing, the total remainder of the full arbitration fees and expenses that the Respondents are obliged to pay to the Claimant Company under the issued award, as the losing party, is a total amount of USD 1,120,000 (one million one hundred and twenty thousand US dollars), which is what the Arbitral Tribunal rules in the operative part.

## FOR THE FOREGOING REASONS

### THE ARBITRAL TRIBUNAL HAS RULED AS FOLLOWS:

First: To order the Respondents, jointly, to pay the Claimant Company the amount of USD 94,559,028 (ninety-four million, five hundred and fifty-nine thousand, and twenty-eight US dollars only), as compensation for the value of what was actually spent to perform the

obligations set out in the Agency Contract, and the value of the losses and expenses of the Claimant Company, with interest of 5% on the total of this adjudged amount, from the date of the claim occurring on 28 December 2013 — the date of filing the Statement of the Arbitral Claim — until the complete execution of this award.

Second: To order the Respondents, jointly, to pay the Claimant the amount of USD 541,747,149 (five hundred and forty-one million, seven hundred and forty-seven thousand, one hundred and forty-nine US dollars), as compensation to the Claimant for the profit it lost, with interest of 5% on the total of this adjudged amount, from the date of this award until the complete execution thereof.

Third: To order the Respondents, jointly, to pay the Claimant the amount of USD 150,000,000 (one hundred and fifty million US dollars), as compensation to the Claimant for the moral and non-material damages it sustained and the resulting financial damages, with interest of 5% on the total of this adjudged amount, from the date of this award until the complete execution thereof.

Fourth: To order the Respondents, jointly, to pay the full fees and the full expenses of the arbitration (of which the Respondents previously paid the amount of USD 25,000 (twenty-five thousand US dollars) of the arbitration expenses, and previously paid the amount of USD 705,000 (seven hundred and five thousand US dollars) of the arbitration fees); and the net remainder of the full fees and expenses that the award orders the Respondents to pay to the Claimant Company, jointly between them, is the amount of USD 1,120,000 (one million one hundred and twenty thousand US dollars); provided that each party bears its own lawyers' fees.

Fifth: To reject the remaining claims.

**This award was issued, after** examining the papers, hearing the pleadings and clarifications, and after due legal deliberation, **in Cairo on Wednesday, 26 July 2023, by filing at the seat of arbitration** located at the office of Dr. Hassan Abdel-Basset Gomaa, situated at apartment No. (15), fourth floor, property No. (7) El-Fadl Street off Talaat Harb Street — Abdeen District — Cairo.

**The Arbitral Tribunal**

1. Dr. Hassan Abdel-Basset Gomaa — President of the Arbitral Tribunal

2. Dr. Sherif Mohamed Abdullah Mohamed Ma'moun — the arbitrator nominated by the Claimant Company (Horus Company for Tourism and Travel — under sequestration)

3. Dr. Abdel-Hamid Galal El-Ahdab — the arbitrator nominated by the Respondents (the General Company for Iraqi Airways and the Iraqi Minister of Transport, in his capacity)

*[Three arbitrators' signatures]*



# Certificate of Accuracy

This is to certify that the attached translation, from **Arabic** to **English**, is an accurate translation of the document:        **ØµÙ†Ø.Ø© 1-20**

I, **George Aziz**, declare under penalty of perjury that I understand the **Arabic** language and the **English** language and that, to the best of my knowledge and belief, the statements in the **English** language in the attached translation have the same meanings as the **Arabic** statements in the language in the original document, a copy of which I have examined.

Signature:  George Aziz

This document was acknowledged before me on the **13th** day of **July**, 20 **26**.

_____
Notary Public

**Elyxedy Fernandez**
**Notary Public, State of New York**
**Commission No. : 01FE6353937**
**Qualified in Bronx County**
**Commission Expires: 02/06/2029**

QUALITY TRANSLATIONS

QUALITY
TRANSLATIONS



# Certificate of Accuracy

This is to certify that the attached translation, from __Arabic__ to __English__, is an accurate translation of the document:
__ØµÙ†Ø.Ø© 21-70__

I, __Kawtar Aaddi__, declare under penalty of perjury that I understand the __Arabic__ language and the __English__ language and that, to the best of my knowledge and belief, the statements in the __English__ language in the attached translation have the same meanings as the __Arabic__ statements in the language in the original document, a copy of which I have examined.

Signature:

This document was acknowledged before me on the __13th__ day of __July__, 20 __26__.

Notary Public

Elyxedy Fernandez
Notary Public, State of New York
Commission No. : 01FE6353937
Qualified in Bronx County
Commission Expires: 02/06/2029





# Certificate of Accuracy

This is to certify that the attached translation, from **Arabic** to **English**, is an accurate translation of the document:

**File __ØµÙ†Ø.Ø© 71-100 / Pages 1-20**

I, **William Tierney**, declare under penalty of perjury that I understand the **Arabic** language and the **English** language and that, to the best of my knowledge and belief, the statements in the **English** language in the attached translation have the same meanings as the **Arabic** statements in the language in the original document, a copy of which I have examined.

Signature:

This document was acknowledged before me on the **13th** day of **July**, 20 **26**.

_____
Notary Public

**Elyxedy Fernandez**
**Notary Public, State of New York**
**Commission No. : 01FE6353937**
**Qualified in Bronx County**
**Commission Expires: 02/06/2029**





# Certificate of Accuracy

This is to certify that the attached translation, from **Arabic** to **English**, is an accurate translation of the document:

**File "__ØµÙ†Ø.Ø© 71-100_" Pages 21-30**

I, **Abraham Abdullah**, declare under penalty of perjury that I understand the **Arabic** language and the **English** language and that, to the best of my knowledge and belief, the statements in the **English** language in the attached translation have the same meanings as the **Arabic** statements in the language in the original document, a copy of which I have examined.

Signature: _____



This document was acknowledged before me on the **13th** day of **July**, 20 **26**.

_____
Notary Public

Elyxedy Fernandez
Notary Public, State of New York
Commission No. : 01FE6353937
Qualified in Bronx County
Commission Expires: 02/06/2029

QUALITY TRANSLATIONS





# Certificate of Accuracy

This is to certify that the attached translation, from __Arabic__ to __English__, is an accurate translation of the document:

___ØµÙ†Ø.Ø© 101-150_

I,__Ahmed Ghomri__, declare under penalty of perjury that I understand the __Arabic__ language and the__English__ language and that, to the best of my knowledge and belief, the statements in the __English__ language in the attached translation have the same meanings as the __Arabic__ statements in the language in the original document, a copy of which I have examined.

Signature: _____

This document was acknowledged before me on the__14 (Fourteen)__day of__July__, 20 26

Notary Public _____

**Elyxedy Fernandez**
**Notary Public, State of New York**
**Commission No. : 01FE6353937**
**Qualified in Bronx County**
**Commission Expires: 02/06/2029**

QUALITY TRANSLATIONS

TRANSLATIONS

# Certificate of Accuracy

This is to certify that the attached translation, from __**Arabic**__ to __**English**__, is an accurate translation of the document:

__**ØµÙ†Ø.Ø© 151-200**_

I, __**Marah Fares**__, declare under penalty of perjury that I understand the __**Arabic**__ language and the __**English**__ language and that, to the best of my knowledge and belief, the statements in the __**English**__ language in the attached translation have the same meanings as the __**Arabic**__ statements in the language in the original document, a copy of which I have examined.

Signature: _Marah Fares_

This document was acknowledged before me on the __**13th**__ day of __**July**__, 20 __**26**__.



_____
Notary Public

**Elyxedy Fernandez**
**Notary Public, State of New York**
**Commission No. : 01FE6353937**
**Qualified in Bronx County**
**Commission Expires: 02/06/2029**



QUALITY TRANSLATIONS



# Certificate of Accuracy

This is to certify that the attached translation, from___**Arabic**___to___**English**___, is an accurate translation of the document:

### File "__ØµÙ†Ø.Ø© 201-224_"

I,___**Abraham Abdullah**___, declare under penalty of perjury that I understand the ___**Arabic**___ language and the___**English**___language and that, to the best of my knowledge and belief, the statements in the ___**English**___language in the attached translation have the same meanings as the ___**Arabic**___ statements in the language in the original document, a copy of which I have examined.

Signature:

This document was acknowledged before me on the___**13th**___day of___**July**___, 20__**26**__.

Notary Public

**Elyxedy Fernandez**
**Notary Public, State of New York**
**Commission No. : 01FE6353937**
**Qualified in Bronx County**
**Commission Expires: 02/06/2029**

